Marsha A. Houston (SBN 129956)
Christopher O. Rivas (SBN 238765)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071-1514
Tel: 213.457.8000 / Fax: 213.457.8080

Attorneys for U.S. Real Estate Credit Holdings
III-A, LP

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.    2:21-bk-11188-BB |
| GLENROY COACHELLA, LLC, | Chapter 11 |
| Debtor. | **MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**<br><br>Date:   March 10, 2021<br>Time:  10:00 a.m.<br>Place:  Courtroom 1539<br>          255 E. Temple Street<br>          Los Angeles, CA  90012<br><br>Honorable Sheri Bluebond |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

## MOTION

2    U.S. Real Estate Credit Holdings III-A, LP (the "<u>Lender</u>") hereby moves the Court for an

3    order appointing a Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(a).

4    The Lender respectfully requests that the Court appoint a Chapter 11 Trustee to wind

5    down the affairs of the single asset real estate debtor, Glenroy Coachella, LLC (the "<u>Debtor</u>"),

6    including potentially pursuing or facilitating the sale of its sole property located at 84150 Avenue

7    48, Coachella, California 92201 (the "<u>Property</u>") and administering or investigating the Debtor's

8    claims.

9    This motion is based upon the accompanying Memorandum of Points and Authorities, the

10    concurrently filed Declarations of Simond Lavian, Gary Stiffelman, Edwin Leslie, Alan Tippie,

11    and Marsha A. Houston, and all of the pleadings and documents in this case, and such other

12    evidence as may be presented at the hearing on this matter.

13

14    DATED: February 17, 2021                REED SMITH LLP

15

16                                By    /s/ Christopher O. Rivas

17                                    Marsha A. Houston
                                     Christopher O. Rivas
18                                    Attorneys for Secured Creditor
                                     U.S. Real Estate Credit Holdings III-A, LP

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY .............................................3

    A.    The Loan and the Debtor's Defaults ........................................................3

        1.    The Loan ..............................................................................3

        2.    The Property and the Deed of Trust.........................................3

        3.    The Construction Project and Debtor's Complete Failure to Manage the Project ............................................................4

        4.    The Debtor's Defaults .............................................................5

        5.    Lender's Acceleration of the Note ..............................................6

    B.    The State Court Litigation.......................................................................7

    C.    The Debtor's Misconduct Before and During the State Court Litigation.............8

    D.    The Debtor Cannot Avoid the Appointment of Trustee by Hiring a Chief Restructuring Officer That Answers Only to Stuart Rubin...................12

III. LEGAL ARGUMENT ....................................................................................12

    A.    The Legal Standard for the Appointment of a Trustee .........................12

    B.    This Court Should Appoint a Trustee to Administer the Assets of the Debtor.......................................................................................14

        1.    There is Cause to Appoint a Trustee Under Section 1104(a)(1)...............14

        2.    Appointment of a Trustee Under Section 1104(a)(2) Would be in the Best Interests of the Creditors ............................................16

        3.    No Bond is Required..................................................................18

IV. CONCLUSION....................................................................................................18

MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Ampal-Am. Israel Corp.*,
    No. 12-13689 SMB, 2013 WL 1400346 (Bankr. S.D.N.Y. Apr. 5, 2013) ..............................13

*An-Tze Cheng v. K & S Diversified Invs., Inc. (In re An-Tze Cheng)*,
    308 B.R. 448 (B.A.P. 9th Cir. 2004)................................................................................15

*In re Bellevue Place Assocs.*,
    171 B.R. 615 (Bankr. N.D. Ill. 1994).............................................................................15

*In re Cardinal Indus. Inc.*,
    109 B.R. 755 (Bankr. S.D. Ohio 1990)..........................................................................16

*In re Centennial Textiles, Inc.*,
    227 B.R. 606 (Bankr. S.D.N.Y. 1998)............................................................................16

*Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*,
    828 F.2d 239 (4th Cir.1987)............................................................................................14

*Commodity Future Trading Commn'n v. Weintraub*,
    471 U.S. 343 (1985).........................................................................................................13

*In re Intercat*,
    247 B.R. 911 (Bankr. S.D. Ga. 2000) ............................................................................13

*In re Ionosphere Clubs, Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990)............................................................................16

*In re Keeley & Grabanski Land P'ship*,
    455 B.R. 153 (B.A.P. 8th Cir. 2011).........................................................................15, 18

*In re L.S. Good & Co.*,
    8 B.R. 312 (Bankr. N.D. W. Va. 1980)...........................................................................17

*In re Marvel Entm't Group*,
    140 F.3d 463 (3d Cir. 1998)............................................................................................13

*In re McCorhill Publ'g. Inc.*,
    73 B.R. 1013 (Bankr. S.D.N.Y. 1987)............................................................................13

*In re Microwave Prods. of Am., Inc.*,
    102 B.R. 659 (Bankr. W.D. Tenn. 1989)...............................................................13, 16, 17

*Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales,
    Inc.)*,
    4 B.R. 635 (Bankr. E.D.N.Y. 1980).................................................................................14

MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

*In re Nautilus of N.M., Inc.*,
    83 B.R. 784 (Bankr. D. N.M. 1988)........................................................................15

*In re Plaza de Retiro, Inc.*,
    417 B.R. 641 (Bankr. D.N.M. 2009)......................................................................16

*In re PRS Ins. Group. Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ......................................................................16

*In re Rivermeadows Assocs. Ltd.*,
    185 B.R. 615 (Bankr. D. Wyo. 1995) ....................................................................14

*In re Sharon Steel Corp.*,
    86 B.R. 455 (Bankr. W.D. Pa. 1988) .....................................................................16

*In re Suncrus Casinos, LLC*,
    298 B.R. 821 (Bankr. S.D. Fla. 2003)....................................................................13

*In re V. Savino Oil & Heating Co.*,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989)..........................................................13, 14, 16

**Statutes**

11 U.S.C. § 1104(a) ......................................................................................12, 13, 14

11 U.S.C. § 1104(a)(1)...................................................................................13, 14, 17

11 U.S.C. § 1104(a)(2)...............................................................................13, 16, 17, 18

- iii -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

This is not a garden-variety "borrower default" case, and it cries for the appointment of a Chapter 11 trustee.   The Debtor's principal, Stuart Rubin ("Rubin"), with the help of his friend and investor, Elliot Lander ("Lander"), have over the course of the prior two years, engaged in numerous acts of gross mismanagement, fraudulent misconduct, and bad faith litigation tactics to the harm of this Debtor's creditors.  On Lender's motion in the underlying state court proceedings, the court appointed Edwin Leslie as receiver (the "Receiver") over the Property, but the Debtor, at the helm of Rubin and Lander (who are completely out of the money on this Property), have stalled every effort by the Receiver to investigate the financial problems they themselves created.

A number of clear acts by this Debtor require the appointment of a Chapter 11 Trustee to manage the Debtor's affairs and to investigate the Debtor's finances, including:

(1)    The Debtor fraudulently induced Lender to make the loan on the construction project on the Property (the "Project") by providing the Lender with a false budget that was grossly understated by approximately $20 million;

(2)    The Debtor's own investors, including Gary Stiffelman ("Stiffelman"), have alleged that Rubin has defrauded them into loaning millions of dollars into the Project under false pretenses;

(3)    Rubin hired his 23-year old son, Joseph, as construction manager, although Joseph was incapable of managing a Project of this size, and Rubin diverted well over $1 million of the Debtor's cash to an adjacent cannabis dispensary that was owned, in part, by Joseph;

(4)    Rubin apparently diverted millions of dollars in funds from Mello-Roos financing to unknown parties, and although he caused more than $8.8 million in mechanics liens to be recorded against the Project, he leased a Bentley under the Debtor's name and with the Debtor's funds to further his own luxurious lifestyle; and

1    (5)    To further enrich his children, Rubin directly tied the success of the cannabis

2  dispensary to the completion of the Project through a development agreement the Debtor

3  previously reached with the City of Coachella, and an independent fiduciary is fundamentally

4  necessary to disentangle the dealings of the Debtor from this dispensary.

5    These are only a small fraction of the Debtor's malfeasance, which is otherwise

6  summarized below in a 24-point list.  The Debtor, Rubin and Lander have refused to cooperate

7  with the Receiver and have done their best to hide their mismanagement, incompetence, and

8  malfeasance.   An independent fiduciary should be appointed by this Court and should work

9  hand-in-hand with the U.S. Trustee's office to address these concerns and to ensure that the

10  property remaining in this Debtor's estate is properly administered and that the Debtor's claims

11  are appropriately investigated and administered.  If a Chapter 11 trustee is not appointed, it is

12  very clear what will happen in this case.  The Debtor will continue obfuscating and hiding its own

13  mismanagement and malfeasance.

14    Moreover, the Debtor has conclusively established that it has no means of completing the

15  Project except by borrowing more money at the risk of Lenders and the mechanics lien claimants.

16  The Debtor's inability to manage this Project was laid bare most recently when the Debtor sought

17  to force the Receiver to issue receivership certificates to their new proposed priming lender, EFO

18  Financial, for an $8 million senior secured loan, which would subordinate all liens, including

19  Lender's liens.  The state court summarily rejected the Debtor's efforts to prime the Lender and

20  other lienholders.  Now, after an unsuccessful confidential mediation before Judge Barash, and on

21  the eve of a February 16, 2021 foreclosure, the Debtor has tried one final Hail Mary:  a

22  bankruptcy case for a single non-operating co-owner of the Property while the other co-owners

23  remain non-debtors. The Debtor has no prospects to complete the construction they propose and

24  the Debtor appears to have an ill-conceived strategy to provide a long-term recovery to the equity

25  holders at the expense of the Debtor's creditors, even though equity currently has no value

26  whatsoever.  Enough is enough.  The principals of this Debtor must be removed from the

27  operation of its affairs and a competent **neutral and disinterested** party who does not answer to

28  Rubin or serve at his whim should be put in charge by the Court to protect and preserve the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

1    Property until either the Lender is granted relief from the automatic stay or until the Trustee can

2    sell the Property pursuant to a court-approved Section 363 sale and administer the estate's claims

3    and assets.

4                                            **II.**

5                    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

6    **A.      The Loan and the Debtor's Defaults**

7            **1.      The Loan**

8            Lender entered into an agreement with the Debtor (the "<u>Loan Agreement</u>") to loan up to

9    $24,400,000 for purposes of financing the construction of a luxury hotel resort in Coachella,

10   California (the "<u>Project</u>").  [Declaration of Simond Lavian ("<u>Lavian Decl.</u>"), ¶ 3.]   To evidence

11   the loan in the maximum principal amount of $24,400,000 ("<u>Loan</u>"), the Debtor made, executed,

12   and delivered to Lender a Promissory Note (the "<u>Note</u>"), pursuant to which the Debtor agreed,

13   among other things, to make regular monthly payments throughout the term of the Loan.  [Lavian

14   Decl., Exs. A, B.]

15          **2.      The Property and the Deed of Trust**

16          The Debtor owns, as a tenant-in-common with other non-debtor entities, the Property at

17   which the Project's construction commenced.  The Note is secured by a Deed of Trust, Security

18   Agreement, Financing Statement and Fixture Filing executed and delivered by the Debtor in

19   favor of Lender ("<u>Deed of Trust</u>") and recorded in the Official Records of the County of

20   Riverside on April 26, 2018, as Doc. No. 2018-0162476.  [Lavian Decl., Ex. C.]

21          The Deed of Trust encumbers the Property, together with all of the estate, right, title, and

22   interests the Debtor has or may acquire in or to the Property, including all improvements, as

23   defined therein, all accounts, deposit accounts, instruments, chattel paper and all other contracts

24   and agreements the Debtor has or may have an interest in that are arising out of or relating to the

25   acquisition, development, ownership, management or use of the Property, all additions,

26   substitutions, and proceeds of the foregoing.  [Lavian Decl., Ex. C.]

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

3.      **The Construction Project and Debtor's Complete Failure to Manage the Project**

The general contractor for the Project, who also executed certain documents in connection with the Loan, was Doug Wall Construction, Inc. ("Wall").  At the time of closing, Lender relied on a construction budget provided to it by the Debtor and Wall reflecting itemized costs to complete the Project in the amount of $30,733,120 (pre-close "Total Hard Costs") and Lender believed, based on written and oral representations of the Debtor, Rubin and Wall, that all prior costs of construction were fully paid for either by prior payment or through the closing funds of the Loan.  [Lavian Decl., ¶ 7, Ex. D.]

Shortly after closing, however, Lender learned the truth:  there were substantial hidden construction costs that were unpaid-for and that were not budgeted.  In September 2018, less than six months after the loan closed, the Debtor presented Lender with a draw request in which the Total Hard Costs budget was increased by approximately $8 million to $38,915,415, at which time the Lender required Borrowers' principals to fund the Project *pari passu* with Lender going forward to cover the $8 million shortfall.  [Lavian Decl., ¶ 8, Ex. E.]  The principals failed to make their contributions (except, perhaps, by diverting funds from other sources).

On or about April 18, 2019, after the Lender had **already** disbursed more than $12,500,862.31 towards the hard costs of construction of the Project, the Debtor presented Lender with yet another Total Hard Costs budget that had increased even more to $49,793,195.72 (net of the $19 million land cost they added to the budget), which reflected that the Debtor was now **$19 million above the original Total Hard Costs budget**.  [Lavian Decl., ¶ 9, Ex. F.]

The fact that the budget nearly **doubled** in size was not due to any external forces or unknown circumstances, but rather because the Debtor fully intended to defraud Lender by misleading it about the real costs to complete the Project (and, therefore, the Debtor's ability to pay for it), or because the Debtor, at Rubin's helm, was so incompetent that it miscalculated the cost of completing the Project by orders of magnitude.  Either way, the Debtor's defaults, the failure of this Project, and its current state are due solely to the mismanagement of the Project by the Debtor.   Rubin should not have put his unqualified son (who, like his father, had nowhere

1    near the construction expertise -- let alone hotel construction expertise -- needed to complete this

2    project), nor should the Debtor have relied on Wall, who was apparently unable to manage the

3    project as a general contractor and who left millions of dollars of unpaid subcontractors unpaid.

4        Worse, than Debtor's gross mismanagement (which itself was sufficient to derail the

5    Project), the Debtor also misappropriated funds (Mello-Roos and PACE financing) that should

6    have been used for construction to, instead, "invest" in the cannabis dispensary and to fund the

7    Debtor's lifestyle.

8        **4.    The Debtor's Defaults**

9        The Loan fully matured on May 1, 2020, and it remains unpaid, but the Debtor defaulted

10    even prior to the maturity date.  The Debtor failed to pay monthly debt service due on May 1,

11    2019, or any payments due thereafter, as required under the Note (with the exception of one

12    partial payment towards default interest that was insufficient to bring the loan current). [Lavian

13    Decl., ¶ 5.]  Additionally, the Debtor failed to keep the Loan "In-Balance" at all times, as

14    required by Section 9.13 of the Loan Agreement, which requires the Debtor to:

15
16        cause the undisbursed Loan funds to be equal to or greater than the
        amount which Lender from time to time determines necessary to:

17
18        (a) pay, through completion, all costs of construction, marketing and
        sale or leasing of the Property and Improvements in accordance
        with the Loan Documents and any Approved Budget;

19
20        (b) pay all sums which may accrue under the Loan Documents prior
        to repayment of the Loan; and

21        (c) enable borrower to perform and satisfy all of the covenants of
        Borrower contained in the Loan Document[s].

22    [Lavian Decl., ¶ 6.]

23        Critically, on or around April 18, 2019, the Debtor provided Lender an updated

24    construction budget reflecting that the Project's budget had increased by approximately $19

25    million and was very far "out of balance".  [Lavian Decl., ¶ 9.]  On May 7, 2019, as a

26    consequence of the updated budget, which was tens of millions of dollars greater than the

27    budgets previously provided by the Debtor, Lender sent the Debtor a Default Letter informing

28    the Debtor that the remaining unfunded proceeds under the Loan were $4,487.811.30, which was

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  woefully insufficient to cover the updated April 2019 construction budget, and that the

2  deficiency amount now needed to keep the Loan "In-Balance" as a result of this budget was

3  $19,252,951.98. [Lavian Decl., ¶ 10, Ex. G.]

4      In the same May 7, 2019 default letter, Lender provided notice to the Debtor that there

5  was an Interest Reserve Deficiency of $2,518,486.67.  [Lavian Decl., ¶ 10, Ex. G.]

6      The Debtor, however, failed to maintain or post the $19,252,951.98 In-Balance

7  deficiency within five business days of the May 7, 2019, Default Letter. [Lavian Decl., ¶ 11.]

8  The Debtor also failed to deposit $2,518,486.67 into the interest reserve.[1]  [Lavian Decl., ¶ 11.]

9      **5.        Lender's Acceleration of the Note**

10      The foregoing monetary defaults were defined "Events of Default" under the Loan

11  Agreement and other loan documents, including the Note and Deed of Trust (collectively with

12  Loan Agreement, the "<u>Loan Documents</u>").  Section 11.1(a) of the Loan Agreement provides that

13  an Event of Default occurs upon "Borrower's failure to pay when due any sums payable under

14  the Note or any of the other Loan Documents within five (5) days when due . . ."  [Lavian Decl.,

15  Ex. A.]  Similarly, the Note provides that it is an Event of Default thereunder "should any default

16  occur in the payment of principal or interest . . . and such payment is not made within five (5)

17  days after the date such payment is due."  [Lavian Decl., Ex. B.]  The Deed of Trust also

18  provides that an Event of Default under the Loan Agreement is an Event of Default under the

19  Deed of Trust.  [Lavian Decl., Ex. C.]

20      Section 11.2 of the Loan Agreement provides:

21          <u>ACCELERATION UPON EVENT OF DEFAULT; REMEDIES</u>.
            Upon the occurrence of any Event of Default specified in this
22          Article 11, Lender may, at its sole option, declare all sums owing to
            Lender under the Note, this Agreement and the other Loan
23          Documents immediately due and payable. . . .

24  [Lavian Decl., Ex. A.]

25      Accordingly, on or about September 9, 2019, Lender sent a Declaration of Default to the

26  Debtor identifying the various defaults, accelerating the Note's Maturity Date, and declaring all

27  _____

28  [1] There were further defaults including, for example, Borrowers' failure to deposit sufficient funds to maintain a tax
    and insurance reserve, as required under Section 2.4(a) of the Loan Agreement.  [Lavian Decl., ¶ 11.]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    sums secured by the Deed of Trust immediately due and payable under the Loan Documents.

2    [Lavian Decl., Ex. J.]

3          As of January 22, 2021, there was and still is due, owing and payable on the Note, in

4    accordance with the Loan Documents, a sum not less than $30,404,992.37, plus additional

5    interest, legal fees and costs in amounts still accruing and not yet determined.  [Lavian Decl.,

6    ¶ 19.]

7    **B.**       **The State Court Litigation**

8          By the fall of 2019, at the same time Lender was notifying the Debtor of their serious

9    defaults, suppliers and subcontractors on the Project began recording mechanic's liens and filing

10    lawsuits regarding unpaid work and materials in August 2019.  Subsequently, Wall and certain

11    subcontractors and suppliers filed their respective mechanics liens and lawsuits.  To date, more

12    than $8.8 million of mechanics liens have been recorded against the Property – an amount that is

13    staggering in light of the initial "hard cost" budget of approximately $30 million.

14          On November 19, 2019, Lender filed its verified complaint against the Debtor,

15    Guarantors, Wall, and others, asserting causes of action for judicial foreclosure, appointment of a

16    receiver, breach of contract, breach of guaranty, fraud, and other claims.   Lender immediately

17    moved *ex parte* for the appointment of the Receiver, who was first appointed on November 27,

18    2019.   On December 24, 2019, upon the stipulation of the Defendants, the Receiver's

19    appointment was confirmed and made permanent.  In exchange for the stipulation, Lender agreed

20    to refrain from foreclosing on the Property through March 2020, but as a consequence of the

21    global pandemic, the foreclosure was delayed throughout all of 2020.  [Lavian Decl., ¶ 15.]

22          Lender filed a motion for summary adjudication on its judicial foreclosure cause of action,

23    which was set to be heard on March 1, 2021.   Lender has also recorded a Notice of Sale as to the

24    Property, and a non-judicial foreclosure was set for February 9, 2021 and continued to February

25    16, 2021 at the Debtor's request.  The imminent foreclosure was unquestionably what prompted

26    the Debtor to file its petition.  Lender's efforts to pursue financial discovery relating to the Project

27    and the Debtor's management of the Project have been met with complete stonewalling from the

28    defendants.  [Lavian Decl., ¶ 15.]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    In December 2020, the Debtor filed an *ex parte* motion in a failed attempt to procure an

2    approximately $8 million loan from EFO Financial and to prime Lender's liens through receiver's

3    certificates.   The evidence filed in support of the motion was sparse, at best:   there were no loan

4    documents, the terms of the loan were incomplete, and the appraisal filed with the motion was

5    from May 2019.  Moreover, the Debtor offered zero showing as to the sudden "urgent" need

6    (after 1.5 years without any construction) for the constructions projects to be covered by EFO's

7    limited and uncertain loan, while more than $20 million of other work remained unfunded.

8    Although the Receiver requested this information prior to the Debtor filing its motion, the Debtor

9    offered no such information and **have continued to refuse to do so**.  [Lavian Decl., ¶ 17.]

10    Lender opposed the motion, as did Wall and every mechanics' lien claimant (many

11    indicated their opposition only via email, given the exigency of the motion).   The court-

12    appointed Receiver informed the Court of Rubin and Lander's efforts to keep the Receiver in the

13    dark, their refusal to provide any of their own funds to maintain or protect the property, and their

14    efforts to undermine the Receiver's efforts and to challenge the Receiver at every turn.  The Court

15    denied Defendants' motion to prime Lender's lien and institute Colliers International ("Colliers")

16    as project manager without a hearing.  [Lavian Decl., ¶ 18.]

17    Even now, months after their failed attempt to prime Lender's loan, Stuart and Rubin have

18    blocked every effort by Lender or Receiver to obtain information supporting their proposed

19    financing and construction plans, including blocking the Receiver's subpoena to Colliers (the

20    proposed new project manager engaged by the Debtor, whose involvement was a negotiated part

21    of the proposed EFO Financial priming lien), on the grounds that there is a "joint interest

22    privilege" between the Debtor and Colliers.  Notably, EFO Financial did not want Rubin to be in

23    charge of the Project, which is why Colliers was instituted as project manager.

24    **C.    The Debtor's Misconduct Before and During the State Court Litigation**

25    The Debtor has plainly shown that they do not respect court-appointed fiduciaries and that

26    they are willing to engage in self-dealing and obfuscation to protect their principals:  particularly

27    Rubin.   It would be difficult to comprehensively capture every one of the acts of incompetence or

28    bad faith by the Debtor, but below is a non-exclusive list of such acts.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Pre-Litigation Misconduct and Rubin's Manipulation and Incompetence

1.      The Debtor conspired with its loan broker and Wall to present incomplete and materially false budgets to Lender to lure it into providing the Loan.  The Debtor knew that Lender would not agree to provide the Loan had it known the true hard costs to complete the project was approximately $50 million, which was approximately $19 million more than the Debtor represented to Lender to induce it to loan the construction funds.  But Debtor hoped to get the money first, and to find a way to complete the construction as it was being built.  [Lavian Decl., ¶¶ 7-9.]

2.      Lender is advised by its fund control that the Debtor maintained dual sets of books in order to provide a misleading set to the Lender.  Meanwhile, unbeknownst to Lender, Rubin personally negotiated directly with suppliers to keep Lender from learning about outstanding and unpaid invoices from subcontractors and suppliers and misdirected construction assets to the neighboring dispensary property owned, in part, by Rubin and not part of Lender's collateral.  [Lavian Decl., ¶ 21.]

3.      Rubin's son, Joseph Rubin, was completely inexperienced and incompetent to manage the Project but was put in charge of the construction.  Joseph was also running the neighboring marijuana dispensary, which was owned by Rubin's children, and in which Glenroy Coachella, LLC, "invested" approximately $1.1 million.  [Lavian Decl., ¶ 22.]

4.      Rubin mismanaged the Project, including budgeting deficiencies, cost issues, and repeated unrealistic start dates, resulting in substantial waste and the need for a receivership to be implemented.  [Lavian Decl., ¶ 23.]

5.      Rubin's dishonesty has extended to his own partners, is the subject of litigation between Rubin and Stiffelman.  [Declaration of Gary Stiffelman ("Stiffelman Decl."), ¶ 3.]

6.      Ruben misrepresented that he was making investments of his own money in the Project, and encouraged his partner, Stiffelman, to invest over $4 million in the Project, which Stiffelman has asserted were induced by Rubin's false pretenses.  [Stiffelman Decl., ¶¶ 6, 7.]

7.      Although Ruben's investor's have sought an accounting to determine the extent of Ruben's fraud, Rubin has refused to produce financial records to even his own business partners.  [Stiffelman Decl., ¶ 8.]

8.      As part of his "shell game" to fund the Project with other people's money (and despite his promises to use his own funds), in or about April 2019, Stiffelman has testified that Rubin misappropriated approximately **$4 million of Mello-Roos proceeds** to finance the construction (something not permitted under his Mello-Roos financing), which was also a material default under the Lender's documents.  [Stiffelman Decl., ¶ 9.]  With only limited documentation, the Reciever has determined that at least $1 million of Mello-Roos proceeds have been diverted.  [Leslie Decl., ¶ 10.]

9.      Rubin's partner also learned Rubin diverted assets from the Project for his own personal use, including the lease of a Bentley using the Debtors' funds and credit.  [Stiffelman Decl.,¶ 10.]

10.      Rubin also used his son, Joseph Rubin, as a construction manager (who was at the time approximately twenty-three years old and recently out of college) on the Project, with virtually no construction experience, and certainly none in building a hotel.  Joseph was completely incompetent to handle this Project and it has become apparent that Joseph was put in charge not to complete the construction, but to, among other things, assist his father, Rubin, in diverting proceeds from the Project to support Rubin's lifestyle, and Joseph Rubin's own

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  lifestyle. For instance, while Joseph Rubin was completely inexperienced in design aspects of the
2  Project, he was given control to select items such as tiles, toilets and electronics.  Joseph Rubin
   travelled to South Korea purportedly to negotiate with Samsung for electronics for the Project,
3  which turned into a paid trip by the Project to the South Korea Winter Olympics, where he came
   back with no Samsung agreement.  [Stiffelman Decl., ¶ 11.]

4       11.     Rubin is also personally in default on numerous other obligations and loans
5  (including on his own residence in Beverly Hills and on a multi-million dollar Santa Barbara
   vacation home), and is an individual defendant in a multitude of other litigation, related and
6  unrelated to the Project, all of which materially affect his abilities to focus.  He was incapable of
   completing the Project before and he is less capable now.  What is perfectly clear is early on
7  Rubin had to know that the funding provided by the Lender was insufficient to complete the
   Project with over $20 million still necessary to complete same, with no plan to raise the necessary
8  funding above the Lender's construction financing to complete the Project.  [Stiffelman Decl.,
   ¶ 12.]

9       12.     Lender has been informed by Stiffelman, Wall, and each of the mechanics lien
10  defendants it has spoken to, that they universally agree that Rubin should have no involvement in
    any future construction of the Project.  Even EFO, which Rubin approached as a priming lender
11  on the Project, refused to leave Rubin in charge of construction and required its own choice of
    construction manager to take over.  [Lavian Decl. ¶ 24.]  Thus, the constituents in this case will
12  all support a motion to appoint a Chapter 11 Trustee.

13       13.     Rubin's own declaration reveals that he has no actual construction experience.
    Rather, it reveals that Rubin has managed parking lots and has been involved in numerous
14  property acquisitions, but no actual construction experience of any note.  [Houston Decl., Ex. D;
    Declaration of Rubin showing that he has managed parking lots, was CEO of parking lot
15  company, that he purchased an existing already-constructed hotel chain, and was involved in
    "investment companies" that acquired real estate.]  In fact, even a cursory review of Rubin's
16  declaration reveals that he was only "actively involved" in certain vague construction projects –
    with no explanation what it means to be "involved."    [Houston Decl., Ex. D.]

17                    <u>Post-Litigation Misconduct</u>

18       14.     Throughout the litigation, Rubin, with the assistance and support of his counsel,
    failed and refused to produce responsive documents, including relevant financial records, and
19  caused substantial delay before producing incomplete records, and that same disruptive approach
    would continue if Rubin remained in control moving forward.  For example, Rubin responded to
20  RFPs, RFAs and Interrogatories served in March 2020 with no documents and almost nothing
    other than objections.  [Houston Decl., Ex. A.]

21       15.     Likewise, Lander has refused to cooperate in any discovery.  Lender served
22  discovery requests on Lander and one of the Debtor in March 2020, but notwithstanding having a
    year to respond, Lander in February 2021 responded to discovery with nothing but "COVID
23  objections" and without a single document, admission, or substantive response to interrogatories.
    [Houston Decl., Ex. B.]

24       16.     Rubin and Lander have, without basis, asserted that the Receiver had and has an
25  improper bias towards Plaintiff and a prejudice against the Debtor and its principals, despite the
    fact they both stipulated to the Receiver's appointment.  [Declaration of Edwin Leslie ("<u>Leslie
26  Decl.</u>"), 3.]

27       17.     Defendants have taken an adversarial approach to nearly everything the Receiver
    has done. For example, instead of cooperating with the Receiver's discovery efforts, Rubin and
28  Lander unsuccessfully sought to quash the subpoenas that were issued by the Receiver to gather

information about the receivership estate in furtherance of his specific right to do so under the Order appointing him. [Leslie Decl., ¶ 4.]

18.    Rubin and Lander repeatedly refused to participate in any meaningful dialogue with the Receiver regarding progress on the Debtor's attempts to refinance the Project, and in at least one instance stated that the Receiver's discussions with a prospective take-out lender were improper. [Leslie Decl., ¶ 5.]

19.    When the Receiver called an all hands telephone conference in mid-2020 to discuss the status of the case, Rubin and Lander and their counsel refused to participate. [Leslie Decl., ¶ 6.]

20.    The Debtor failed to maintain insurance and currently has insurance acquired by the Receiver.

21.    Rubin and Lander failed and refused to cooperate with the Receiver regarding the preparation of tax returns for the Debtor. On a number of occasions, Receiver contacted the Debtor to request information related to tax filings, including information on the engagement of a CPA or tax preparer, the location of source documents and copies of any prior tax returns. Rubin ignored every request for information. [Leslie Decl., 7.]

22.    Without consultation with or knowledge of the Receiver, Rubin, acting on behalf of the Debtor, entered into an agreement with the City of Coachella relating to payment of lost revenues and taxes to ensure the project development agreement remained in place. The development agreement was required for Rubin to maintain his marijuana dispensary license, and it appears that much of Rubin's efforts have been diverted from the construction project to this dispensary "side project". The Debtor repeated its actions by entering into a second agreement that continued to tie together the fates of the Project with the dispensary. [Leslie Decl., ¶ 8, Exs. A, B, and C.]

23.    Glenroy Coachella holds title to a 2019 Bentley worth $140,000 financed by Porsche LSG. The vehicle is in the possession of Rubin. At least one lawsuit was filed to enforce the financing agreement. The lender offered to dismiss the suit if the vehicle were returned. Rubin purportedly cured the initial default, only to default again. Rubin has ignored demands to turn over the vehicle to the Receiver or return it to the finance company. [Leslie Decl., ¶ 9.]

24.    While the Receiver has not been provided with full access to the Debtor's books and records, based on a preliminary review of the **limited information that has actually been provided by Rubin**, the Receiver has seen indicia that there have been significant distributions of funds from the Debtor prior to the Receiver's engagement that may constitute avoidable transfers, including distributions that appear to have funded the construction of the non-borrower Lighthouse Dispensary. [Leslie Decl., ¶ 10.]

25.    The Debtor entered into a parking lot use agreement with the adjoining business owner, the Lighthouse Dispensary (a deal that benefitted Rubin and Lander), pursuant to which the Debtor leased the lot to the marijuana dispensary. But the Debtor never collected any rent under that agreement and then took the side of the dispensary when the Receiver fenced off the parking lot after the natural termination of the use agreement and the refusal of the Dispensary to pay rent demanded by the Receiver for any continued use. The Receiver gave the Dispensary extensive notice of his intent to terminate the use agreement if an agreement could not be reached. The Dispensary ignored his notices until the Receiver began taking steps to terminate their use. [Leslie Decl., ¶ 11.]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**D.    The Debtor Cannot Avoid the Appointment of Trustee by Hiring a Chief Restructuring Officer That Answers Only to Stuart Rubin**

Lender believes, based on recent conversations it has had with the Debtor, that it may oppose the appointment of a Trustee on the grounds that it has hired, or will be hiring, a Chief Restructuring Officer ("CRO").  First, the hiring of a CRO is not going to obviate any of the issues or concerns raised above, because it is clear that a CRO will be hired at the pleasure of Rubin and will answer only to Rubin.   There will be no functional difference between the Debtor being run by Rubin or by a CRO that answers only to Rubin.  Any CRO hired by the Debtor will not be an independent fiduciary.

In fact, Lender is informed that the Debtor is considering Dana Barbera, of Colliers, as a CRO.   First, Colliers, at the helm of Mr. Barbera, was proposed by the Debtor as a project manager over this Project in an ill-conceived "priming motion" filed by the Debtor in the Superior Court of California, County of Riverside.  [Houston Decl., Ex. B.]  That motion was summarily denied by the state court.   As such, Mr. Barbera does not appear to be disinterested. Second, Mr. Barbera appears to have no experience whatsoever as a CRO:  he is, as his resume indicates, a project manager and not a CRO.

Last, but not least, the Debtor itself – in an effort to block a subpoena issued by the Receiver to Colliers -- argued that "[t]he ownership [of Debtor] and Colliers share a **common interest privilege** in connection with the defense and response to the litigation and unjustified receivership . . . [and] the communications to/from the defense and Colliers are in furtherance of the common interest and the privilege and protections apply to preclude production of Colliers' records."   [Declaration of Alan G. Tippie ("Tippie Decl."), Ex. B.]

**III.**

**LEGAL ARGUMENT**

**A.    The Legal Standard for the Appointment of a Trustee**

The appointment of a trustee is governed by Section 1104(a) of the Bankruptcy Code which provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a).

Under certain circumstances a debtor may be dispossessed and other management appointed in the form of a trustee. *See In re Microwave Prods.,* 102 B.R. at 670. There are two (2) standards for the appoint of a Chapter 11 trustee: (i) under § 1104(a)(1), upon a showing of cause, "including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor," the Court "shall order" the appointment of a trustee; and/or (ii) under § 1104(a)(2), the Court may appoint a trustee in the absence of "cause" under subsection (a)(1) if such appointment "is in the interests of the creditors, any equity security holders, and other interests of the estate."

Courts will leave a debtor-in-possession in control only where current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Future Trading Commn'n v. Weintraub*, 471 U.S. 343, 355 (1985). When a debtor-in-possession is incapable of performing these duties, or when creditors' confidence evaporates, a chapter 11 trustee must be appointed. *See In re McCorhill Publ'g. Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); *In re Marvel Entm't Group*, 140 F.3d 463, 473 (3d Cir. 1998). "Where corporate governance disputes spill over into areas that affect the debtor's ability to manage its affairs or conduct its business, the Bankruptcy Code provides a clear remedy." *In re Ampal-Am. Israel Corp.*, No. 12-13689 SMB, 2013 WL 1400346, at *5 (Bankr. S.D.N.Y. Apr. 5, 2013) (holding that a bankruptcy court "should not . . . take sides in corporate governance disputes or approve the selection of one slate of directors over a competing slate", and, instead, directing the appointment of a Chapter 11 Trustee.)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1     "[I]n the appropriate case, the appointment of a trustee is a power which is critical for the

2    Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the

3    interests of creditors are served." *In re Suncrus Casinos, LLC*, 298 B.R. 821, 828 (Bankr. S.D.

4    Fla. 2003) (quoting *In re Intercat*, 247 B.R. 911, 920) (Bankr. S.D. Ga. 2000)); *see also, In re V.*

5    *Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104(a)

6    represents a potentially important protection that courts should not lightly disregard or encumber

7    with overly protective attitudes towards debtors-in-possession").

8    **B.**      **This Court Should Appoint a Trustee to Administer the Assets of the Debtor**

9     This Court should appoint a Chapter 11 Trustee acceptable to the parties and the United

10   States Trustee to take control of the affairs of the Debtor, including as an initial matter to preserve

11   the Debtor's Property pending either a foreclosure or a bankruptcy sale.

12       **1.**      **There is Cause to Appoint a Trustee Under Section 1104(a)(1).**

13     The appointment of a Chapter 11 Trustee is mandatory upon the showing of cause under

14   Section 1104(a)(1), and such cause includes "fraud, dishonesty, incompetence or gross

15   mismanagement of the debtor's affairs by current management, either before or after the

16   commencement of the case . . ." 11 U.S.C. § 1104(a)(1). Once the court makes a finding that

17   cause exists under § 1104(a)(1), "there is no discretion; an independent trustee must be

18   appointed." *In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 525 (Bankr.E.D.N.Y.1989).

19   Although the court's finding is limited to a factual determination whether "cause" exists, a court

20   is given wide latitude in determining whether the challenged conduct rises to the level of "cause."

21   *Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.,* 828 F.2d 239, 241–42 (4th Cir.1987)

22   (noting that the construction of § 1104 "requires that the courts be given discretionary authority to

23   determine whether the conduct rises to the level of 'cause' "). A court may consider both the pre-

24   and postpetition misconduct of the current management when making the determination that

25   "cause" exists for the appointment of a trustee. *In re Rivermeadows Assocs. Ltd.*, 185 B.R. 615,

26   619 (Bankr. D. Wyo. 1995) ("the Code is clear that the prepetition conduct of the debtor's

27   management may be the sole deciding factor" in the appointment of a Chapter 11 trustee);

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1 *Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),* 4 B.R.

2 635, 644–45 (Bankr. E.D.N.Y. 1980).

3     Here, the Debtor and primary principal, Rubin (as well as Lander), have repeatedly

4 demonstrated through their actions and incompetence that they are burdened with a conflict of

5 interest that has negatively affected the Debtor's ability to manage their affairs as fiduciaries.

6 The Debtor's principals have an interest in seizing control of the Project in the vain hopes of

7 maximizing their personal recovery at the sole risk of the Debtor's creditors, including Lender.

8 Rubin has a proven track record of putting himself and certain of his business partners before the

9 Debtor's legitimate creditors.

10     "The debtor in possession performing the duties of the trustee is the representative of the

11 estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate

12 available to pay creditors." *An-Tze Cheng v. K & S Diversified Invs., Inc. (In re An-Tze Cheng)*,

13 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004).  This Debtor chose to propose a hare-brained priming

14 "plan" in the state court that created zero risk for Rubin or Lander, but instead placed all the risk

15 of a failed project on the Lender and the mechanics' lien holders and other creditors.  Even in that

16 "plan", the proposed financer, EFO, did not trust Rubin to handle the construction of this Project

17 and instead required that Colliers manage the Project.  Rubin has no business being involved in

18 this Project any longer.  *See, e.g., In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 164

19 (B.A.P. 8th Cir. 2011) (including a refusal of a reasonable offer to sell as cause to appoint a

20 Chapter 11 trustee); *In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994) ("[A]

21 fiduciary—the debtor-in-possession—is proscribed from acting solely in its self-interest to the

22 exclusion of the other interest which the debtor-in-possession has the fiduciary obligation to

23 protect."); *In re Nautilus of N.M., Inc.*, 83 B.R. 784, 789–90 (Bankr. D. N.M. 1988) (appointing a

24 trustee after finding that debtor-in-possession's representative protected his own interests above

25 those the debtor's creditors).

26     Even before this filing and before the state court litigation commenced, the Debtor has

27 irrefutably demonstrated an inability to handle this Project.   While certain cost overruns or

28 budget changes can be anticipated in any large construction project, there is no bona fide

1    explanation for a budget increase (total hard costs) from approximately $30 million to

2    approximately $50 million in just a few short months.    Whether the explanation is the Debtor's

3    gross incompetence or their fraudulent intent, neither is grounds to allow this the Debtor to

4    remain in charge.

5          **2.      Appointment of a Trustee Under Section 1104(a)(2) Would be in the Best**

6                 **Interests of the Creditors**

7          Even where insufficient "cause" exists under the above standard, Section 1104(a)(2)

8    creates a flexible standard that authorizes the Court to appoint a trustee when it is in the best

9    interests of the creditors and the estate.  *Sharon Steel*, 871 F.2d at 1226; *In re Cardinal Indus.*

10   *Inc.*, 109 B.R. 755, 767 (Bankr. S.D. Ohio 1990); *In re Microwave Prods. of Am., Inc.*, 102 B.R.

11   659, 673 (Bankr. W.D. Tenn. 1989).  Bankruptcy courts consider many factors to determine

12   whether to appoint a Chapter 11 trustee under § 1104(a)(2), which provides that the Court "**shall**

13   order the appointment of a trustee . . . if such appointment is in the interests of creditors, any

14   equity security holders and other interests of the estate . . ."  11 U.S.C. § 1104(a)(2) (emphasis

15   added).   "One of the most fundamental and crucial duties of a debtor-in-possession upon the

16   filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status

17   and condition of the business undergoing reorganization."  *In re Plaza de Retiro, Inc.,* 417 B.R. at

18   641 (Bankr. D.N.M. 2009); *In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. at 526 (Bankr.

19   E.D.N.Y 1989).  Other factors evaluated by Courts include (i) the overall management of debtor,

20   both past and present, (ii) the trustworthiness of debtor's management, (iii) the confidence or lack

21   thereof of the business community and of creditors in present management, and (iv) practical

22   considerations, such as the benefits derived by the appoint of a trustee, balanced against costs. *In*

23   *re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168-169 (Bankr. S.D.N.Y. 1990); *see also In re Sharon*

24   *Steel Corp.*, 86 B.R. 455, 466 (Bankr. W.D. Pa. 1988) ("[I]n a case of this magnitude, the cost of

25   having a trustee in place is insignificant when compared with the other costs of administration

26   and when compared with the enormous benefit to be achieved by the establishment of trust and

27   confidence in . . . management.")

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    A chapter 11 debtor and its managers owe fiduciary duties to the estate.  *See In re*

2  *Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998).  An independent trustee

3  should be appointed under § 1104(a)(2) when debtors suffer from material conflicts of interest,

4  and cannot be counted on to conduct independent investigations of questionable transactions in

5  which they were involved. *See, e.g., In re PRS Ins. Group. Inc.*, 274 B.R. 381, 389 (Bankr. D.

6  Del. 2001) (appointment of trustee appropriate under § 1104(a)(2) where causes of action against

7  insiders are a significant asset of this estate); *Microwave Prods, of Am.*, 102 B.R. at 676 (chapter

8  11 trustee appointed where debtor was not in a "strong posture" to pursue possible claims due to

9  conflicts of interest and fraudulent transfers, and "a trustee would likely be able to investigate

10  claims that could result in additional sums of money coming into the estate"); *In re L.S. Good &*

11  *Co.*, 8 B.R. 312, 315 (Bankr. N.D. W. Va. 1980) (appointing trustee under § 1104(a)(2) where

12  "[t]he magnitude of the number of inter-company transactions places current management of [the

13  debtor] in a position of having grave potential conflicts of interest and the presumption arises that

14  the current management of [the debtor] will be unable to make the impartial investigations and

15  decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]").

16    The practical reality of this case is, quite simply, that a trustee is needed to administer the

17  estate, and to preserve and, perhaps, to sell the Property.  Additionally, the Lender has no faith

18  whatsoever that the Debtor is willing or even able to independently assess claims against their

19  insiders while Rubin continues to be at the helm.  Additionally, a neutral third party that answers

20  to this Court, and not to the Debtor, is needed to negotiate with the City of Coachella and to

21  disentangle Rubin's efforts to tie together the fates of the Debtor with a marijuana dispensary

22  owned by his children.  Given the Receiver's history with this Debtor, this Project, and Debtor's

23  financial affairs, the Receiver should be considered as a Chapter 11 trustee, or, at a minimum,

24  should be engaged by a Chapter 11 trustee for his expertise with this Project.   The Receiver has a

25  local office and staff and his continuing involvement as an independent fiduciary would be the

26  most productive and cost-effective solution to most of the Debtor's problems.

27    The Debtor has not demonstrated a realistic possibility that they will ever successfully

28  confirm a plan (particularly not in the very short time frame provided for in a Single Asset Real

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  Estate Case) or to sell the Property, or investigate any claims of its insiders.  The need for a

2  Chapter 11 Trustee to pursue the sale of the Property without Rubin's interference is clear.

3        Accordingly, even if the Court finds that the Debtor's representative's conflict of interest

4  or inability to act as an independent fiduciary of the estate does not amount to "cause" under §

5  1104(a)(1), the Court should appoint a trustee in the interests of creditors and the estate under §

6  1104(a)(2).  The Court has particularly wide discretion to appoint a trustee under the flexible

7  standard of § 1104(a)(2) and the facts of this case warrant the use of that discretion to appoint a

8  trustee here.  *See In re Keeley & Grabanski Land P'ship*, 455 B.R. at 165.

9        **3.**     **No Bond is Required**

10        Since Lender is requesting the appointment of a trustee under § 1104, not § 303(g),

11  Federal Rule of Bankruptcy Procedure 2007.1, not Rule 2001, is applicable to the appointment of

12  such trustee and no bond other than that which may be customarily required from a chapter 11

13  trustee is required.

14  **IV.**

15  **CONCLUSION**

16        For the foregoing reasons, this court should appoint a Chapter 11 Trustee to administer the

17  assets of the Debtor's estate, to preserve and protect the Property, to potentially sell the Property,

18  and to address issues arising between the secured creditors (i.e., the Lender and the mechanics

19  lien claimants) regarding the nature, extent and priority of their respective liens.

20

21

22  DATED:  February 17, 2021          REED SMITH LLP

23

24                 By    /s/ Christopher O. Rivas

25                     Marsha A. Houston

26                     Christopher O. Rivas
                   Attorneys for Secured Creditor
                   U.S. Real Estate Credit Holdings III-A, LP

27

28

MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
355 South Grand Avenue, Suite 2900, Los Angeles, CA  90071

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 17, 2021   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Eryk R Escobar     eryk.r.escobar@usdoj.gov
- Mark S Horoupian     mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
- Michael S Kogan    mkogan@koganlawfirm.com
- Kenneth G Lau     kenneth.g.lau@usdoj.gov
- James R Selth     jim@wsrlaw.net, jselth@yahoo.com; eduardo@wsrlaw.net; gabby@wsrlaw.net; vinnet@ecf.inforuptcy.com
- Alan G Tippie     atippie@sulmeyerlaw.com, atippie@ecf.courtdrive.com; pdillamar@sulmeyerlaw.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Daniel J Weintraub     dan@wsrlaw.net, vinnet@ecf.inforuptcy.com; gabby@wsrlaw.net; eduardo@wsrlaw.net

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) February 17, 2021 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BY PERSONAL DELIVERY:**
**Hon. Sheri Bluebond**
**USBC-Central District of California**
**255 E. Temple Street**
**Suite 1534 / Courtroom 1539**
**Los Angeles, CA 90012**

☒ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 17, 2021 | Gilda S. Anderson | *Gilda S. Anderson* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**