1  Marsha A. Houston (SBN 129956)
   Christopher O. Rivas (SBN 238765)
2  REED SMITH LLP
   355 South Grand Avenue, Suite 2900
3  Los Angeles, CA  90071-1514
   Telephone:    213.457.8000
4  Facsimile:    213.457.8080

5  Attorneys for Plaintiff
   U.S. Real Estate Credit Holdings III-A, LP

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                       **LOS ANGELES DIVISION**

11

12  In re                                  Case No.       2:21-bk-11188-BB

13  GLENROY COACHELLA, LLC,                Chapter 11

14         Debtor.                         **DECLARATION OF SIMOND LAVIAN
                                           IN SUPPORT OF MOTION FOR THE**
15                                         **APPOINTMENT OF A CHAPTER 11**
                                           **TRUSTEE**
16

17

18                                          Date:   March 10, 2021
                                            Time:   10:00 a.m.
19                                          Place:  Courtroom 1539
                                                    255 E. Temple Street
20                                                  Los Angeles, CA  90012

21                                          Honorable Sheri Bluebond

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

I, Simond Lavian, declare:

1.      I am the director of asset management at Calmwater Asset Management, LLC, the investment manager of U.S. Real Estate Credit Holdings III-A, LP ("Lender"). I am over the age of 18, and I make this declaration based on my personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently thereto.

2.      Debtor Glenroy Coachella, LLC (the "Debtor"); Force Rubin, LLC; Force Rubin 2, LLC, and Coachella Resort, LLC (collectively, with the Debtor, the "Borrowers") own, as tenants-in-common, the real property where they began developing the Project located at the southeast corner of Avenue 48 and Van Buren Street, in Coachella, California, the legal description of which is:

> Parcels 1, 2, 4, 5 and 6 of Parcel Map No. 37310, in the City of Coachella, County of Riverside, State of California, according to map on file in Book 243, Pages 82 through 84 of Parcel Maps, Records of Riverside County, California.
>
> APN: 603-220-061; 603-220-062; 603-220-064; 603-220-065; 603-220-066. (The "Property.")

3.      Lender entered into an agreement with Borrowers (the "Loan Agreement") to loan up to $24,400,000 for purposes of financing the construction of a luxury hotel resort on the Property (the "Project").  To evidence the loan in the maximum principal amount of $24,400,000 ("Loan"), Borrowers made, executed, and delivered to Lender a Promissory Note (the "Note"), pursuant to which Borrowers agreed, among other things, to make regular monthly payments throughout the term of the Loan.   A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A**, and a true and correct copy of the Note is attached hereto as **Exhibit B**.

4.      The Note is secured by a Deed of Trust, Security Agreement, Financing Statement and Fixture Filing executed and delivered by Borrowers in favor of Lender ("Deed of Trust") and recorded in the Official Records of the County of Riverside on April 26, 2018, as Doc. No. 2018-0162476.  A true and correct copy of the Deed of Trust is attached hereto as **Exhibit C**.

5.      The Loan fully matured on May 1, 2020, and it remains unpaid, but Borrowers defaulted even prior to the maturity date.  Debtors failed to pay monthly debt service due on May 1,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

2019, or any payments due thereafter (with the exception of one partial payment towards default interest that was insufficient to bring the loan current), as required under the Note.

6.    Additionally, Debtors failed to keep the Loan "In-Balance" at all times, as required by Section 9.13 of the Loan Agreement, which requires Debtors to:

> cause the undisbursed Loan funds to be equal to or greater than the amount which Lender from time to time determines necessary to:
>
> (a) pay, through completion, all costs of construction, marketing and sale or leasing of the Property and Improvements in accordance with the Loan Documents and any Approved Budget;
>
> (b) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan; and
>
> (c) enable borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Document[s].

7.    Critically, on or around April 18, 2018, the Debtor provided Lender a construction budget, attached as Exhibit C to the Loan Agreement, reflecting itemized costs to complete the Project in the approximate amount of $30,733,120 (pre-close "Total Hard Costs"), and Lender believed, based on written and oral representations of the Debtors and Wall, that all prior costs of construction were fully paid for either by prior payment or through the closing funds of the Loan.  A true and correct copy of that construction budget is attached as **Exhibit D**.

8.    Just months later, around September 2018, the Debtor presented Lender with a draw request in which the Total Hard Costs budget was increased by approximately $8 million to $38,915,415, at which time the Lender required Borrowers to fund the Project *pari passu* with Lender going forward.

9.    On or about April 18, 2019, after the Lender had **already** disbursed more than $12,500,862.31 towards the hard costs of construction of the Project, the Debtor presented Lender with a Total Hard Costs budget that had increased even more to $49,793,195.72 (net of the $19 million land cost they added to the budget), which reflected that the Debtor was now $19 million above the original Total Hard Costs budget.  A true and correct copy of the updated budget is attached as **Exhibit E**.

10.     On May 7, 2019, as a consequence of the updated budget, which was tens of millions of dollars greater than the budgets previously provided by Debtors, Lender sent Debtors a Default Letter informing Debtors that the remaining unfunded proceeds under the Loan was $4,487.811.30, which was woefully insufficient to cover the updated April 2019 construction budget, and that the deficiency amount now needed to keep the Loan "In-Balance" as a result of this budget was $19,252,951.98. In the same May 7, 2019 default letter, Lender provided notice to Debtors that there was an Interest Reserve Deficiency of $2,518,486.67.   A true and correct copy of the Default Letter is attached as **Exhibit F**.

11.     Debtors, however, failed to maintain or post the $19,252,951.98 In-Balance deficiency within five business days of the May 7, 2019, Default Letter.  Debtors also failed to deposit $2,518,486.67 into the interest reserve.  There were further defaults including, for example, Borrowers' failure to deposit sufficient funds to maintain a tax and insurance reserve, as required under Section 2.4(a) of the Loan Agreement.

12.     By letter dated May 28, 2019, Lender notified Debtors of an additional default under the Loan Documents due to Borrower's failure to deposit $61,246.05 in the Tax and Insurance Reserve as required under the Loan Agreement.  A true and correct copy of the letter dated May 28, 2019, is attached as **Exhibit G**.

13.     On April 26, 2018, defendants A. Stuart Rubin and Elliot Lander ("Guarantors") executed an "Indemnity and Guaranty Agreement" ("Guaranty").  Through the Guaranty, the Guarantors assumed liability for and guaranteed payment of, all of the Debtors' obligations and liabilities arising under the Loan Documents.  A true and correct copy of the Guaranty is attached as **Exhibit H**.

14.     On or about September 9, 2019, Lender sent a Declaration of Default to Debtors and Guarantors identifying the various defaults, accelerating the Note's Maturity Date, and declaring all sums secured by the Deed of Trust immediately due and payable under the Loan Documents. A true and correct copy of the Declaration of Default letter is attached as **Exhibit I**.

15.     On November 19, 2019, Lender filed its verified complaint against Debtors, Guarantors, Wall, and others, asserting causes of action for judicial foreclosure, appointment of a

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF SIMOND LAVIAN

receiver, breach of contract, breach of guaranty, fraud, and other claims. Lender immediately moved ex parte for the appointment of the Receiver, who was first appointed on November 27, 2019. On December 24, 2019, upon the stipulation of the Defendants, the Receiver's appointment was confirmed and made permanent. In exchange for the stipulation, Lender agreed to refrain from foreclosing on the Property through March 2020, but as a consequence of the global pandemic, the foreclosure was delayed throughout all of 2020.

16. Lender filed a motion for summary adjudication on its judicial foreclosure cause of action, which was set to be heard on March 1, 2021. Lender has also recorded a Notice of Sale as to the Property, and a non-judicial foreclosure was set for February 16, 2021. The imminent foreclosure was unquestionably what prompted Debtors to file their petitions. Lender's efforts to pursue financial discovery relating to the Project and Debtors' management of the Project have been met with complete stonewalling from the defendants. A true and correct copy of the Notice of Sale is attached as **Exhibit J**.

17. In December 2020, Debtors filed an ex parte motion in a failed attempt to procure an approximately $8 million loan from EFO Financial and to prime Lender's liens through receiver's certificates. The evidence filed in support of the motion was sparse: there were no loan documents, the terms of the loan were incomplete, and the appraisal filed with the motion was from May 2019. Moreover, the Debtors offered zero showing as to the sudden "urgent" need (after 1.5 years without any construction) for the constructions projects to be covered by EFO's limited and uncertain loan, while more than $20 million of other work remained unfunded. Although the Receiver requested this information prior to Debtors filing their motion, the Debtors offered no such information and have continued to refuse to do so.

18. Lender opposed the motion, as did Wall and every mechanics' lien claimant (many indicated their opposition only via email, given the exigency of the motion). The court-appointed Receiver informed the Court of Rubin and Lander's efforts to keep the Receiver in the dark, their refusal to provide any of their own funds to maintain or protect the property, and their efforts to undermine the Receiver's efforts and to challenge the Receiver at every term. The Court denied Defendants' motion to prime Lender's lien and institute Colliers International as project manager

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF SIMOND LAVIAN

1    without a hearing.

2    19.    As of January 22, 2021, there was and still is due, owing and payable on the Note, in

3    accordance with the Loan Documents, the following amounts totaling not less than $30,404,992.37

4    (not inclusive of continuing accruing interest and legal fees and costs, which continue to accrue):

| Principal Balance | $ | 19,619,969.79 |
|---|---|---|
| Protective Advances | $ | 4,152,912.04 |
| Past Due Interest | $ | 3,896,985.62 |
| Past Due Default Interest | $ | 1,351,347.45 |
| Current contract interest | $ | 145,378.42 |
| Current default interest | $ | 59,950.00 |
| Accrued Late Charges | $ | 110,953.35 |
| Misc. Fees | $ | 82,073.52 |
| Outstanding Lender Expenses | $ | 988,555.33 |
| Reserves | $ | (3,133.15) |
| **Total Indebtedness** | **$** | **30,404,992.37** |

20.    Lender believes that Debtors conspired with their loan broker and Wall to present incomplete and materially false budgets to Lender to lure it into providing the Loan.   Lender would not have agreed to provide the Loan had it known the true cost to completion was $60 million rather than $37 million, but it has become apparent that Debtors hoped to get the money first, and to find a way to complete the construction as it was being built.

21.    Lender has been advised by its control fund that Debtors maintained dual sets of books in order to provide a misleading set to the Lender.  Meanwhile, unbeknownst to Lender at the time, Lender has since been informed that Rubin personally negotiated directly with suppliers to keep Lender from learning about outstanding and unpaid invoices from subcontractors and suppliers and misdirected construction assets to the neighboring dispensary property owned, in part, by Rubin and not part of Lender's collateral.

22.    Lender understands that Rubin's son, Joseph Rubin, was completely inexperienced and incompetent to manage the Project but was put in charge of the construction.   Joseph was also running the neighboring marijuana dispensary, which was owned by Rubin's children, and in which Glenroy Coachella, LLC, "invested" more than $1.1 million.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF SIMOND LAVIAN

23.     Over the course of the Project, Lender saw that Rubin mismanaged the Project, including budgeting deficiencies, cost issues, and repeated unrealistic start dates, resulting in substantial waste and the need for a receivership to be implemented.

24.     Through the course of the state court litigation, Lender has been informed by Stiffelman, Wall, and each of the mechanics lien defendants it has spoken to, that they universally agree that Rubin should have no involvement in any future construction of the Project.   Even EFO, which Rubin approached as a priming lender on the Project, refused to leave Rubin in charge of construction and required its own choice of construction manager to take over.  Thus, the constituents in this case will all support a motion to appoint a Chapter 11 Trustee

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Los Angeles, California on February 17, 2021.

Simond Lavian

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF SIMOND LAVIAN

# Exhibit A

# LOAN AGREEMENT

among

**GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN, LLC,** a Delaware limited liability company, **FORCE RUBIN 2, LLC,** a Delaware limited liability company, and **COACHELLA RESORT, LLC**, a California limited liability company, collectively, AS BORROWER

and

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership, AS LENDER

Executed as of April 26, 2018

**Property**: Southeast Corner of Avenue 48 and Van Buren Street, Coachella, California

Table of Contents

Page

**ARTICLE 1.    DEFINITIONS** ........................................................................ **2**

    1.1    INCORPORATION OF EXHIBITS AND SCHEDULE ..................................... 2
    1.2    DEFINED TERMS ................................................................................... 2

**ARTICLE 2.    LOAN** ...................................................................................... **19**

    2.1    LOAN ................................................................................................... 19
    2.2    MATURITY DATE ................................................................................. 19
    2.3    FUNDING OF LOAN .............................................................................. 19
    2.4    ADDITIONAL RESERVES ...................................................................... 23
    2.5    CASH MANAGEMENT AND DISTRIBUTION OF CASH FLOW ............... 28
    2.6    ADDITIONAL COLLATERAL OPTION .................................................... 30

**ARTICLE 3.    DISBURSEMENT** .................................................................... **32**

    3.1    CONDITIONS PRECEDENT TO INITIAL LOAN DISBURSEMENT ........... 32

**ARTICLE 4.    BORROWER'S EQUITY** ......................................................... **41**

    4.1    COMMITMENT ..................................................................................... 41

**ARTICLE 5.    INSURANCE** .......................................................................... **41**

    5.1    PROPERTY INSURANCE ....................................................................... 41
    5.2    BOILER AND MACHINERY INSURANCE ............................................... 42
    5.3    FLOOD INSURANCE ............................................................................. 42
    5.4    EARTHQUAKE INSURANCE ................................................................. 42
    5.5    TERRORISM INSURANCE ..................................................................... 42
    5.6    LIABILITY INSURANCE ........................................................................ 42
    5.7    CONSTRUCTION INSURANCE .............................................................. 42
    5.8    OTHER INSURANCE ............................................................................. 43
    5.9    GENERAL ............................................................................................. 43

**ARTICLE 6.    REPRESENTATIONS AND WARRANTIES** ........................... **44**

    6.1    AUTHORITY/ENFORCEABILITY .......................................................... 44
    6.2    BINDING OBLIGATIONS ...................................................................... 44
    6.3    FORMATION AND ORGANIZATIONAL DOCUMENTS ........................... 44
    6.4    NO VIOLATION .................................................................................... 44
    6.5    COMPLIANCE WITH LAWS .................................................................. 44
    6.6    LITIGATION ......................................................................................... 44
    6.7    FINANCIAL CONDITION ...................................................................... 45
    6.8    NO MATERIAL ADVERSE CHANGE ..................................................... 45
    6.9    ACCURACY ......................................................................................... 45
    6.10   TAX LIABILITY ................................................................................... 45
    6.11   STRUCTURE CHART ............................................................................ 45

Exhibit Page 10

Table of Contents
(continued)

Page

6.12    COMPLIANCE................................................................. 45
6.13    ERISA ............................................................................ 45
6.14    BUSINESS LOAN ......................................................... 46
6.15    HOTEL MANAGEMENT AGREEMENT ..................... 46
6.16    FRANCHISE AGREEMENT .......................................... 46
6.17    MATERIAL AGREEMENTS .......................................... 46
6.18    LEASES .......................................................................... 46
6.19    PATRIOT ACT AND RELATED MATTERS ................. 46
6.20    NO BANKRUPTCY ........................................................ 47
6.21    NOT FOREIGN PERSON................................................ 47
6.22    INTENTIONALLY DELETED ........................................ 47
6.23    PACE LOAN ................................................................... 47
6.24    COMPLETION DATE ..................................................... 47
6.25    CONSTRUCTION DOCUMENTS .................................. 48
6.26    TENANT IN COMMON AGREEMENT .......................... 48

**ARTICLE 7.      HAZARDOUS MATERIALS.................................................. 49**

7.1    SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS ........ 49
7.2    LEGAL EFFECT OF SECTION ..................................... 53

**ARTICLE 8.      RECONVEYANCE AND PARTIAL RELEASE ...................................... 53**

8.1    FULL REPAYMENT AND RECONVEYANCE.............. 53
8.2    PARTIAL RELEASE OF PROPERTY........................... 53

**ARTICLE 9.      COVENANTS OF BORROWER.......................................... 55**

9.1    EXPENSES..................................................................... 55
9.2    ERISA COMPLIANCE ................................................... 56
9.3    LEASING ........................................................................ 56
9.4    APPLICATION OF GROSS OPERATING INCOME..................... 57
9.5    SUBDIVISION MAPS .................................................... 57
9.6    FURTHER ASSURANCES ............................................. 57
9.7    ASSIGNMENT................................................................. 57
9.8    CONSTRUCTION MANAGEMENT............................... 57
9.9    TRANSFERS ................................................................... 58
9.10    SINGLE PURPOSE ENTITY ......................................... 60
9.11    MATERIAL AGREEMENTS .......................................... 62
9.12    CONSTRUCTION AND COMPLETION OF IMPROVEMENTS .................. 63
9.13    IN-BALANCE ................................................................. 65
9.14    BORROWER EQUITY ................................................... 66
9.15    HOTEL MANAGEMENT AGREEMENT....................... 66
9.16    MAINTENANCE ............................................................ 67
9.17    UTILITIES...................................................................... 67

Table of Contents
(continued)

Page

9.18    NO CHANGE IN USE ................................................................. 67
9.19    PATRIOT ACT AND RELATED MATTERS ................................ 67
9.20    PACE LOANS ............................................................................. 67
9.21    INTEREST RATE CAP AGREEMENT .......................................... 67
9.22    TENANT IN COMMON AGREEMENT ......................................... 68
9.23    FRANCHISE AGREEMENT ......................................................... 69
9.24    MELLO-ROOS CFD FINANCING ............................................... 70

ARTICLE 10.    REPORTING COVENANTS ........................................ 70

10.1    FINANCIAL INFORMATION ..................................................... 70
10.2    BOOKS AND RECORDS ............................................................. 72
10.3    MONTHLY PROGRESS REPORTS ON CONSTRUCTION TIMELINE ....... 72
10.4    INTENTIONALLY DELETED ...................................................... 72
10.5    INTENTIONALLY DELETED ...................................................... 72
10.6    OPERATING STATEMENTS FOR PROPERTY AND
         IMPROVEMENTS .................................................................... 72
10.7    BUDGET .................................................................................... 73

ARTICLE 11.    EVENTS OF DEFAULT AND REMEDIES ................... 73

11.1    EVENT OF DEFAULT ................................................................. 73
11.2    ACCELERATION UPON EVENT OF DEFAULT; REMEDIES .......... 77
11.3    DISBURSEMENTS TO THIRD PARTIES ...................................... 77
11.4    LENDER'S COMPLETION OF CONSTRUCTION ......................... 77
11.5    REPAYMENT OF FUNDS ADVANCED ........................................ 78
11.6    RIGHTS CUMULATIVE, NO WAIVER ......................................... 78

ARTICLE 12.    MISCELLANEOUS PROVISIONS .............................. 78

12.1    INDEMNITY ............................................................................... 78
12.2    FORM OF DOCUMENTS ............................................................ 79
12.3    NO THIRD PARTIES BENEFITED ............................................... 79
12.4    NOTICES .................................................................................... 79
12.5    ATTORNEY-IN-FACT ................................................................. 80
12.6    ACTIONS ................................................................................... 80
12.7    RIGHT OF CONTEST ................................................................. 80
12.8    RELATIONSHIP OF PARTIES ..................................................... 80
12.9    DELAY OUTSIDE LENDER'S CONTROL ..................................... 80
12.10   ATTORNEYS' FEES AND EXPENSES; ENFORCEMENT ............... 81
12.11   IMMEDIATELY AVAILABLE FUNDS ........................................... 81
12.12   LENDER'S CONSENT ................................................................. 81
12.13   LOAN SALES AND PARTICIPATIONS; DISCLOSURE OF
         INFORMATION ....................................................................... 81

Table of Contents
(continued)

Page

12.14  SECONDARY MARKET TRANSACTION; DISCLOSURE OF
       INFORMATION ................................................................................. 82
12.15  LENDER'S AGENTS ........................................................................ 83
12.16  TAX SERVICE ................................................................................. 83
12.17  WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE
       IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY ........... 83
12.18  SEVERABILITY ............................................................................... 84
12.19  HEIRS, SUCCESSORS AND ASSIGNS ............................................. 84
12.20  TIME .............................................................................................. 84
12.21  HEADINGS ..................................................................................... 84
12.22  GOVERNING LAW ........................................................................... 84
12.23  INTEGRATION; INTERPRETATION ................................................ 85
12.24  JOINT AND SEVERAL LIABILITY .................................................... 85
12.25  COUNTERPARTS ............................................................................ 85
12.26  CONFIDENTIALITY AND PUBLICITY .............................................. 85
12.27  BROKERS ....................................................................................... 86
12.28  OFFSETS AND COUNTERCLAIMS ................................................... 86
12.29  REMEDIES OF BORROWER ............................................................ 86
12.30  PRINCIPLES OF CONSTRUCTION .................................................. 87
12.31  1031 EXCHANGE ........................................................................... 87
12.32  BORROWERS' DESIGNEE ............................................................... 87

**SCHEDULES**

Schedule I        Borrower's Organizational Chart

**EXHIBITS**

Exhibit A        Description of the Property
Exhibit B        Loan Documents
Exhibit C        Approved Budget
Exhibit D        Intentionally Deleted
Exhibit E        Form of Disbursement Request
Exhibit F        Intentionally Deleted
Exhibit G        Engineering Contracts
Exhibit H        Intentionally Deleted
Exhibit I        FF&E Budget
Exhibit J        Work to be Completed under the PACE Loan Documents
Exhibit K        Intentionally Deleted
Exhibit L        Cash Management Notice
Exhibit M        Legal Description of Restaurant Pad
Exhibit N        State of Borrower Formation
Exhibit O        SB Apartment Property Description
Exhibit P        Mello-Roos CFD Financing Documents

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "**Agreement**") is dated as of April 26, 2018, by and among **GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN, LLC**, a Delaware limited liability company**, FORCE RUBIN 2, LLC**, a Delaware limited liability company, and **COACHELLA RESORT, LLC**, a **California** limited liability company (collectively, jointly and severally the "**Borrower**"), and **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership (together with its successors and assigns, "**Lender**").

R E C I T A L S

A.    Borrower is the owner in fee of 100% of the ownership interests in the land located at the Southeast Corner of Ave 48 and Van Buren Street, in Coachella, California, and to be known as the Glenroy Resort and legally described on **Exhibit A** attached hereto and incorporated herein by reference (the "**Real Property**"). The Real Property consists (or will consist upon Completion (as hereinafter defined)) of approximately one prefabricated casita and fifty (50) newly built casitas containing no less than 250 guest rooms, currently under construction and such other amenities thereof (together with all "Improvements" referenced in the Security Instrument (defined below), collectively, the "**Improvements**").  As used herein, the term "**Property**" shall collectively mean the fee interest of Borrower in the Real Property and the Improvements, all related personal property and all "**Property**" described in the Security Instrument.

B.    Borrower has applied to Lender for a loan in the amount of up to Twenty-Four Million Four Hundred Thousand and No/100 Dollars ($24,400,000.00) (the "**Loan**") for certain improvement and development costs related thereto, and Lender is willing to make the Loan on the terms and conditions hereinafter set forth.  The Loan is evidenced by, among other things, that certain Promissory Note, dated as of the date hereof made by Borrower in the original principal amount of up to $24,400,000.00 to Lender, $10,900,500.00 of which shall be funded on the date hereof and payable to Lender (such Promissory Note, together with all amendments, modifications and/or supplements thereto are hereinafter collectively referred to as the "**Note**"). The terms and provisions of the Note are hereby incorporated by reference in this Agreement.

C.    Borrower's obligations under the Loan will be secured by, among other items, a first priority Deed of Trust, Security Agreement and Financing Statement dated as of the date hereof, from Borrower to the trustee named therein for the benefit of Lender encumbering the Property, and granting Lender a first priority lien in the Property (such Deed of Trust, Security Agreement and Financing Statement, together with amendments, modifications and/or supplements  thereto is hereinafter referred to as the "**Security Instrument**").

NOW, THEREFORE, Borrower and Lender agree as follows:

1

# ARTICLE 1.
## DEFINITIONS

**1.1** **INCORPORATION OF EXHIBITS AND SCHEDULE**. **Schedule I** and **Exhibits A through P** to this Agreement, attached hereto are incorporated in this Agreement and expressly made a part hereof by this reference.

**1.2** **DEFINED TERMS**. The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below. Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

"**Acceptable Counterparty**" means any counterparty to an required interest rate cap agreement that has and shall be maintained by Borrower pursuant to the terms of Section 1(i) of the Note, having a credit rating of at least (a) either (i) a long-term unsecured debt rating of "A" or higher by S&P or (ii) if the long-term unsecured debt rating is "A" or lower by S&P, a short-term rating of not less than "A-1" from S&P; and (b) a long-term unsecured debt rating of not less than "A2" by Moody's.

"**Accounts**" shall have the meaning ascribed to such term in Section 2.5(b) hereof.

"**ADA**" means the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq. as now or hereafter amended or modified.

"**Additional Collateral**" shall have the meaning ascribed to such term in Section 2.6(a) hereof.

"**Administrative Fee Holdback**" shall have the meaning ascribed to such term in Section 2.3(b)(D) hereof.

"**Affiliate**" of any Person means (a) any other Person which directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person, (b) any other Person with five percent (5%) or more of the equity interest of which is held beneficially or of record by such Person (in each case, directly or indirectly), (c) with respect to Borrower or any Guarantor, any partner or member in Borrower or any Guarantor (other than partners or members that obtain an interest in Borrower or Guarantor in violation of the terms of the Loan Documents), and (d) any Guarantor or Borrower.

"**Affiliate Fees**" shall have the meaning ascribed to such term in Section 3.1.1(z) hereof.

"**Agreement**" shall have the meaning ascribed to such term in the preamble hereto.

"**Apartment Company**" means SRCT Holdings LLC, a California limited liability company, an Affiliate of Glenroy Coachella, LLC, and owner of the Apartment Property, and any successor owner of the same, permitted hereunder with Lender's prior written consent.

"**Apartment Property**" means all of the Improvements on the land more particularly described on **Exhibit O**, and owned by the Apartment Company.

2

"**Applicable Laws**" shall have the meaning ascribed to such term in <u>Section 6.18</u> hereof.

"**Approved Bank**" means an institution whose commercial paper, short-term debt obligations or other short-term deposits are rated at least "AA" by S&P, "P–1" by Moody's and "F–1" by Fitch, and whose long-term senior unsecured debt obligations are rated at least "AA-" by S&P, "A" by Fitch, and "A2" by Moody's and whose deposits are insured by the FDIC.

"**Approved Budget**" shall have the meaning ascribed to such term in <u>Section 10.6</u> hereof.

"**Approved Leases**" means (i) executed Leases of retail space in the Improvements, each of which must be with non-Affiliated third parties and comply with the terms and conditions of <u>Section 9.3</u>, and (ii) Leases otherwise approved, in writing, by Lender (to the extent required under this Agreement), and, in any case, as of the date of determination, the tenant under each Lease must be in occupancy of the leased retail premises, must have commenced rent payments to Borrower, and must not have materially defaulted or made a claim that Borrower has defaulted under the Lease.

"**Approved Plans and Specifications**" shall have the meaning ascribed to such term in <u>Section 3.1.2(l)(b)</u> hereof."

"**Architect**" means Carrier Johnson + Culture, KHA Architects or such other architect as may be selected by Borrower and approved by Lender.

"**Architect's Contract**" means collectively, (i) that certain executed Architect's Agreement dated June 5, 2017, between Glenroy Coachella, LLC and Carrier Johnson + Culture, and (ii) that certain executed Architect's Proposal dated October 18, 2017 between Glenroy Coachella, LLC and KHA Architects, each relating to the design and construction of the Improvements.

"**Assignment of Hotel Management Agreement**" means that certain Subordination, Non-Disturbance and Attornment Agreement dated as of the date hereof among Lender, Borrower and Hotel Manager.

"**Bankruptcy**" means with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged a bankrupt or insolvent, or has entered against itself an order for relief, in any bankruptcy or insolvency proceeding, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment, without such Person's consent or acquiescence, of a trustee, receiver or liquidator of such Person or of all or any substantial part of

3

its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978 (11 USC § 101-1330) as now or hereafter amended or recodified.

"**Borrower**" shall have the meaning ascribed to such term in the preamble hereto.

"**Borrower Equity**" means, as of the date of the first advance of funds under the Construction Completion Holdback pursuant to Section 2.3(b)(B), Fifteen Million Two Hundred Thousand and No/100 Dollars ($15,200,000.00) of unborrowed funds which Borrower shall cause to be contributed to or applied in payment of the costs and expenses incurred by Borrower in connection with Borrower's ownership and development of the Property by the Closing Date, as evidenced to Lender.

"**Borrower's Operating Account**" means that certain deposit account number: 11010923 maintained by Borrower at Banc of California, having an address at 3 MacArthur Place, Santa Ana, CA 92707, ABA# 322274527 and a beneficiary name of Glenroy Coachella, LLC.

"**Business Day**" means a day of the week (but not a Saturday, Sunday or public holiday on which the banking institutions in Los Angeles, California are authorized or required by law to be closed) on which the offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"**Cap Provider**" shall have the meaning ascribed in Section 9.21 hereof.

"**Cash Collateral**" shall have the meaning ascribed to such term in Section 2.6(a) hereof.

"**Cash Management Account**" shall have the meaning ascribed to such term in Section 3.1.1(g) hereof.

"**Cash Management Agreement**" means that certain Cash Management Agreement entered into on the date hereof among Lender, Borrower and Cash Management Bank.

"**Cash Management Bank**" means Wells Fargo Bank, N.A., or such other subsequent cash management bank selected by Lender in its sole discretion.

"**Cash Management Period**" means the period commencing on the Effective Date and continuing for the term of the Loan, and shall require that all Operating Income of the Property be deposited in the Lockbox Account, for application pursuant to the terms of Section 2.5 hereof

"**Cash Trap Period**" shall be deemed to (i) commence upon (a) the occurrence of any Event of Default, (b) the occurrence of any Bankruptcy Case involving Borrower, Principal, Guarantor or Hotel Manager, (c) the occurrence of a DSCR Failure; and shall (ii) have terminated, if ever, provided that no other event that would cause a Cash Trap Period to commence has occurred and is continuing, (1) in the case of the foregoing clause (i)(a),

4

Borrower cures the Event of Default giving rise to such Cash Trap Period, in Lender's determination, and no other Event of Default has occurred which is continuing, (2) in the case of a Bankruptcy Case of the Hotel Manager or the Hotel Franchisor only, if Borrower replaces the Hotel Manager with a Qualified Replacement Hotel Manager under a Qualified Replacement Hotel Management Agreement, or Borrower replaces the Hotel Franchisor with a Qualified Replacement Franchisor under a Qualified Replacement Franchise Agreement respectively, as applicable, and (3) in the case of a DSCR Failure, unless and until (A) the applicable DSCR Cure Event has occurred, or (B) Borrower has posted Additional Collateral within ten (10) calendar days after the date of Lender's written notice of such DSCR Failure, which remains in place for the term of the Loan in accordance with, and subject to the terms of <u>Section 2.6</u>). Notwithstanding the foregoing, Borrower shall have the right to prepay the Loan by the amount that is required (and no more) to avoid a DSCR Failure, and such prepayment may be made without the payment of a Make Whole Payment.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall have the meaning ascribed to such term in the Security Instrument with respect to the Property, and shall include the Pledge Agreement.

"**Completion**" means the completion of all Improvements and the satisfaction of all of the following conditions as reasonably determined by Lender in its sole discretion:

(i) a written certification from Borrower shall have been delivered to the Lender certifying that the Improvements have been completed, lien-free, and in the commercially reasonable opinion of Borrower in accordance with the Construction Documents and Approved Budget and in compliance with all Applicable Laws, and, if required by Lender at its sole and absolute discretion, the matters in such certification shall have been verified by the Construction Consultant;

(ii) Lender receives a copy of the permanent certificates of occupancy for the use and operation of the Property in accordance with the Loan Documents, the Management Agreements, together with evidence that all other approvals from Governmental Authorities have been issued and all Applicable Laws have been satisfied so as to allow the Property to be used and operated in accordance with the Loan Documents, the Franchise Agreement, and the Hotel Management Agreement provided that if all work to complete the Required Construction & Improvements has been paid for, Borrower may continue to pursue the issuance by the Governmental Authorities of the permanent final certificates of occupancy of the Property and the temporary certificates of occupancy issued to the Property shall satisfy this condition;

(iii) Lender receives (x) evidence of the payment of all costs and expenses of completing the Improvements and (y) full and complete lien releases from the Architect, the Engineer, the General Contractor and subcontractors performing work in connection with the design, development and construction of the Improvements; and

(iv) all of Borrower's and Guarantor's representations and warranties in each of the Loan Documents are true and correct and no Default or Event of Default has occurred and is continuing.

16100193.16

"**Completion Date**" means April 30, 2018 with regard to Phase I Construction and October 1, 2018 with regard to any Phase II Construction, in each case subject to Force Majeure delays.

"**Completion Guaranty**" means that certain Completion Guaranty of even date herewith, by Guarantor in favor of Lender, as modified, amended and/or supplemented from time to time.

"**Construction Budget**" means the construction budget portion of the Approved Budget attached hereto as **Exhibit C**.

"**Construction Completion Holdback**" shall have the meaning ascribed to such term in Section 2.3(b)(B)(1).

"**Construction Consultant**" means Integrity Joint Control, Inc. d/b/a Integrity Fund Control.

"**Construction Contract**" means that certain Cost Plus Construction Contract between Doug Wall Construction Inc. and Borrower, dated June 1, 2017, which contract is for a guaranteed maximum price, and all amendments, supplements, appendices and addenda to each thereto (which shall be subject to Lender's consent)  which relate to the construction of the Improvements, which shall provide for, among other things, (a) a complete line item, hard and soft cost budget to complete the Improvements at a cost not to materially exceed the budgeted cost set forth in the Approved Budget, (b) a construction schedule in accordance with the Construction Schedule, and (c) a turnkey lien-free outside completion date for the Improvements on or before the Completion Date (subject to Force Majeure).

"**Construction Costs**" means the construction costs (hard and soft) payable by Borrower for the Completion of the Project pursuant to the Construction Documents, the Franchise Agreement, the Approved Budget, and applicable laws.

"**Construction Costs Reserve**" is defined in Section 2.4(e).

"**Construction Documents**" means, collectively, the Plans and Specifications, the Architect's Contract, the Engineer's Contract, the Construction Contract, the Construction Management Agreement, the Approved Budget, other Major Contracts, and all drawings, plans, renderings, budgets, contracts, agreements, documents, instruments, consents, licenses, permits, authorizations and approvals relating to the design, development, construction, completion, management, use and occupancy of the Improvements, together with all service contracts, supply contract and other material agreements entered into as of the date hereof by Borrower in connection with the Improvements.

"**Construction Management Agreement**" means that certain Construction Management Agreement entered into between Borrower and Construction Manager on or about the date hereof.

"**Construction Schedule**" means that certain schedule for completion of the work to be performed under the construction budget portion of the Approved Budget, a draft of which

6

schedule is attached hereto as **Exhibit F**, as the same shall be finalized pursuant to <u>Section 3.1.1(x)</u>, and shall be extended by Lender day for day on account of any Force Majeure delay.

"**Construction Shortfall Amounts**" shall mean actual Construction Costs incurred by Borrower to Complete the Improvements in excess of the amounts shown on the Approved Budget.

"**Control**" means the possession, directly or indirectly, of the power to cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, family relationship or otherwise. Controlled and Controlling shall have correlative meanings.

"**Debt Service Coverage Ratio**" shall mean the ratio calculated by Lender as of any date of (i) the sum of pre-tax Gross Operating Income for the preceding twelve (12) months, ending with the most recently completed calendar month, from normal Property operations as set forth in the quarterly statements required to be provided by Borrower under this Agreement (and compared against the annual statements for the operation of the Property required hereunder), less Permitted Operating Expenses for the twelve month period ending with the most recently completed calendar month, to (ii) Debt Service.  All calculations of Debt Service Coverage Ratio shall be subject to verification by Lender.

"**DSCR Cure Event**" shall be deemed to have occurred as of the Payment Date occurring immediately after: (i) with respect to the Initial Cash Trap Period, the date the Property shall have achieved a Debt Service Coverage Ratio of at least 1.30:1.00 for one calendar quarter, tested quarterly on a trailing twelve (12) month basis (provided this occurs during the initial term of the Loan and not in an extended term), and (ii) with respect to any Cash Trap Period occurring during the initial term of the Loan or during an extended term of the Loan (if extended pursuant to <u>Section 1(h)</u> of the Note), but after a DSCR Cure Event with respect to the Initial Cash Trap Period has occurred, the date the Property shall have achieved, for two (2) consecutive calendar quarters, tested quarterly on a trailing twelve month basis, a Debt Service Coverage Ratio of at least 1.40:1.00, provided that in each instance Borrower shall have the option of posting Additional Collateral pursuant to the terms of <u>Section 2.6</u> hereof, or may prepay the outstanding principal balance of the Note by the amount that is required (and no more) to avoid such a DSCR Failure (which prepayment may be made without the payment of a Make Whole Payment), which Additional Collateral or prepayment, when and if it occurs, shall be a DSCR Cure Event.

"**DSCR Failure**" shall be deemed to have occurred (a) during the Initial Cash Trap Period unless and until a DSCR Cure Event with respect to such Initial Cash Trap Period has occurred; or (ii) if at any time during the term of the Loan, but after the Initial Cash Trap Period has been cured, the Debt Service Coverage Ratio is below 1.30:1.00, tested quarterly on a trailing twelve (12) month basis, or (iii) during any extended term of the Loan, extended pursuant to <u>Section 1(h)</u> of the Note, the Debt Service Coverage Ratio of the Property is below 1.40:1.00, tested quarterly, on a trailing twelve-month (12) month basis; and (b) shall end upon Lender giving notice to Borrower and the Deposit Bank that either (i) a DSCR Cure Event has occurred, which notice Lender shall be required to give if no Event of Default is continuing, or (ii) the Loan and all other obligations under the Loan Documents have been repaid in full.

7

"**Default**" means an event, omission or condition, that, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"**Deposit Account**" shall have the meaning ascribed to such term in <u>Section 2.5(a)</u> hereof.

"**Deposit Bank**" shall have the meaning ascribed to such term in <u>Section 3.1.1(g)</u> hereof.

"**Development Agreement**" means the Glenroy Resort Development Agreement dated February 15, 2018 by and between the City of Coachella, a municipal corporation organized and existing under the laws of the State of California and Glenroy Coachella, LLC, a California limited liability company.

"**Development Management Fee**" means a development fee not to exceed two and one-half percent (2.50%), provided the fee is included in the Approved Budget.

"**Development Manager**" means Glenroy Coachella, LLC, a California limited liability company.

"**EB-5 Laws**" means any and all statutes, laws, rules, regulations, judgments, orders, writs, injunctions or decrees of any Governmental Authority issued in connection with or governing the EB-5 Program currently in effect, as the same may be amended, supplemented or modified from time to time, and any successor statutes and laws, and all rules and regulations from time to time promulgated thereunder or in furtherance thereof.

"**EB-5 Loan**" means that certain loan of the Total EB-5 Offering Amount Raised to be made by an EB-5 Lender to member(s) in Borrower pursuant to and in accordance with the EB-5 Program, subject to the Lender's prior written consent as to the structure of, security for and process and documentation regarding such EB-5 Loan.

"**EB-5 Program**" means that certain program designed specifically to serve non-U.S. citizens seeking to immigrate to the United States by making a qualifying investment through a "regional center," as such term is defined at 8 CFR 204.6(e), approved under the Immigrant Investor Program, as provided at 8 CFR 204.6(m).

"**Effective Date**" means the first date Lender disburses any funds into escrow (and, in all events, interest or amounts funded and deemed funded shall begin to accrue interest on the date Lender disburses any funds into escrow).

"**Engineer**" means Jacobsson Engineering Construction, Inc. and all other engineers listed on **Exhibit G** hereto, or such other engineer as may be selected by Borrower and approved by Lender.

"**Engineer's Contract**" means the Time and Material Contract between Jacobsson Engineering Construction, Inc. and Borrower, dated June 1, 2018, and any other contracts listed on **Exhibit G**.

"**Environmental Indemnity Agreement**" means that certain Hazardous Substances Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantor, collectively, in favor of Lender , as modified, amended and/or supplemented from time to time.

"**Environmental Laws**" shall have the meaning ascribed to such term in Section 7.1(a) hereof.

"**Environmental Report**" means that certain Phase I environmental site assessment dated October 6, 2017, and prepared by AEI Consultants, Project No. 378033, with respect to the Property, for the benefit of Lender.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and any regulations issued pursuant thereto, as now or from time to time hereafter in effect.

"**Event of Default**" shall have the meaning ascribed to such term in Section 11.1 hereof.

"**Excess Cash**" shall have the meaning ascribed to such term in Section 2.5 hereof.

"**Excess Cash Reserve**" shall have the meaning ascribed to such term in Section 2.4(g) hereof.

"**Exchange Accommodation Agreement**" means that certain Qualified Exchange Accommodation Agreement, dated as of the date hereof, by and between Exchange Accommodator and Exchange Transferee.

"**Exchange Accommodator**" means Force Financial LLC, a California limited liability company.

"**Exchange Interest Transfer**" is defined in Section 9.9(e).

"**Exchange Transferee**" means, with respect to the ownership interests to be transferred by Force Financial LLC pursuant to Section 9.9(e), collectively (i) Stuart Rubin Parking Investments LLC, a Delaware limited liability company with respect to Force Rubin, LLC, a Delaware limited liability company, and (ii) Stuart Rubin Children's Trust, with respect to Force Rubin 2, LLC, a Delaware limited liability company.

"**Exit Fee**" shall have the meaning ascribed to such term in the Note.

"**Family Members**" means the spouses, parents, children and grandchildren of the partners, members, or other equity interest holders in Borrower and any trust established for estate planning purposes for the benefit of such partners, members or other equity interest holders in Borrower or any of the foregoing specified family members.

"**FF&E**" means all machinery, furniture, furnishings, equipment, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory and articles of personal property and accessions, renewals and replacements thereof and substitutions therefor (including, without limitation, beds, bureaus, chiffonniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies,

9

venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, food carts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and drink dispensers, ice makers, radios, clock radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washer and dryers), other customary hotel equipment and other tangible property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation and occupancy at the Property and all building equipment, material and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation, enjoyment and occupancy of the Property.

"**FF&E Budget**" shall mean the FF&E budget portion of the Approved Budget.

"**FF&E Reserve**" shall have the meaning given to such term in Section 2.4(c).

"**FF&E Reserve Amount**" means, with respect to each calendar month, an amount equal to the greatest of (a) the following applicable percentage of Gross Operating Income for such calendar month: (i) for each calendar month occurring in the initial twelve (12) month period commencing on the first Payment Date after the Completion Date, two percent (2%), (ii) for the following twelve (12) month period commencing on the first anniversary of the Completion Date, three percent (3%), and (iii) for each calendar month thereafter until maturity, four percent (4%); or (b) the amount of any capital, FF&E or replacement reserve required under any of the Hotel Management Agreement for such calendar month.

"**Franchise Agreement**" means that certain Franchise Agreement dated as of April 25, 2018 by and between Borrower and Hotel Franchisor, as the same may be modified, amended and/or supplemented from time to time as expressly permitted pursuant to the terms hereof and the other Loan Documents, or a Qualified Replacement Franchisor permitted pursuant and in accordance with the terms hereof, as applicable.

"**FIRREA**" means Financial Institutions Reform Recovery and Enforcement Act of 1989, and any regulations issued pursuant thereto, as now or from time to time hereafter in effect.

"**Force Majeure**" means (a) an act of God, war, strikes or similar labor troubles affecting the Property, fire, severe weather (including hurricanes), including, without limitation, flood, earthquakes or other casualty, injunction, theft, court order, requisition or order of a Governmental Authority enjoining the performance of the obligations under this Agreement, or

10

(b) United States Secretary of Treasury certified domestic "act of terrorism" affecting construction activities in the county in which the Property is located; provided, (i) "Force Majeure Event" shall not include delays, stoppage or any other interference with the construction of any Improvements caused by insolvency, bankruptcy or any lack of funds of Borrower, Guarantor, or any Affiliate of the foregoing and (ii) that Borrower shall deliver to Lender, within ten (10) Business Days after the occurrence of any Force Majeure Event, written notice of such Force Majeure Event, the cause of such Force Majeure Event and the date on which such Force Majeure Event commenced.

"**Fund Control Agent**" shall mean as of the date hereof Integrity Joint Control, Inc. d/b/a Integrity Fund Control, or any subsequent company selected and retained by Lender to provide accounting and disbursement functions in connection with disbursements of advances of holdback amounts pursuant to and in accordance with the terms of this Loan Agreement, including, without limitation, Sections 2.3 and 3.1 hereof.

"**Future Advance Funding Amount**" shall have the meaning ascribed to such term in Section 2.3(b).

"**GAAP**" means generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**General Contractor**" means Doug Wall Construction Inc. and any other general contractor selected by Borrower and approved by Lender, which general contractor (and all subcontractors) shall be duly licensed and bonded, and shall have consented to collateral assignment of the Construction Contract to Lender as additional security for the Loan.

"**Governmental Authority**" means any federal, state, commonwealth, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, or any court or administrative tribunal.

"**Gross Operating Income**" shall have the meaning ascribed to such term in Section 10.6(a).

"**Gross Sales Proceeds**" means the aggregate amount of sales proceeds received by Borrower from the sale of a Release Parcel, prior to any adjustments or deductions, for the payment of amounts set forth in Section 8.2 hereof.

"**Guarantor**" or "**Guarantors**" means collectively, Gary Stiffelman, Elliot Lander and A. Stuart Rubin, as to any guaranty or indemnification now or hereafter executed in connection with the Loan, any other Person who, or which, in any manner, is or becomes obligated to Lender thereunder.

"**Guaranty**" means the Indemnity and Guaranty Agreement dated as of the date hereof, made by Guarantors in favor of Lender, as modified, amended and/or supplemented from time to time.

"**Hazardous Substances**" shall have the meaning ascribed to such term in <u>Section 7.1(a)</u> hereof.

"**Holdbacks**" means, collectively, the Interest Holdback, the Construction Completion Holdback, the Administrative Fee Holdback and the Property Tax and Insurance Holdback.

"**Hotel Franchisor**" means Intercontinental Hotel Group with respect to their Hotel Indigo brand, and any successor hotel franchisor for the Property expressly permitted pursuant to this Agreement.

"**Hotel Manager**" means Highgate Hotels, L.P., a Delaware limited partnership, and any successor hotel manager for the Property as expressly permitted pursuant to this Agreement.

"**Hotel Management Agreement**" means that certain Hotel Management Agreement dated as of April 26, 2018 by and between Borrower and Hotel Manager, as the same may be modified, amended and/or supplemented from time to time as permitted pursuant to the terms hereof and the other Loan Documents, or a Qualified Replacement Hotel Management Agreement permitted pursuant and in accordance with the terms hereof, as applicable.

"**Identification Information**" means the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number.

"**Improvements**" shall have the meaning given such term in the Recitals above.

"**In-Balance**" shall have the meaning ascribed to such term in <u>Section 9.13</u>.

"**Interest Rate Cap**" shall have the meaning ascribed to such term in <u>Section 9.21</u>.

"**Initial Cash Trap Period**" means the period commencing on the date hereof and ending on the date, if any, that the Property complies with a DSCR of at least 1.30:1.00 for one calendar quarter, tested quarterly, on a trailing 12-month basis.

"**Initial Funding Amount**" shall have the meaning ascribed to such term in <u>Section 2.3(a)</u>.

"**Interest Holdback**" shall have the meaning ascribed to such term in <u>Section 2.3(b)(A)(1)</u>.

"**Interest Reserve**" shall have the meaning ascribed in <u>Section 2.4(b)</u> hereof.

"**Interest Reserve Deficiency**" means that Lender concludes in its sole and absolute discretion that the existing available amounts in the Interest Reserve and the Interest Holdback may be insufficient to pay interest under the Loan through the Maturity Date, pursuant to the terms of the Note during the remaining Loan term period.

"**Investing Member**" means, without differentiation, each Person that makes an investment in EB-5 Lender pursuant to the EB-5 Program.

"**Key Money**" means that certain amount paid by Hotel Franchisor to Borrower in an amount equal to $2,300,000.00, to be deposited with Lender when and as paid under the Franchise Agreement, and applied in accordance with the terms of Sections 2.4(d) and 2.4(f) hereof, unless expressly agreed to otherwise herein by Lender.

"**Leases**" means any lease, occupancy agreement, sublease or other agreement creating possessory rights in all or any portion of the Property.

"**Lender**" shall have the meaning ascribed to such term in the preamble hereto.

"**Lender Expenses**" shall have the meaning ascribed to such term in Section 2.3(a) hereof.

"**Letter of Credit**" shall have the meaning ascribed to such term in Section 2.6(a) hereof.

"**Loan**" shall have the meaning ascribed to such term in Recital B hereof.

"**Loan Commitment Fee**" shall have the meaning ascribed to such term in the Note.

"**Loan Documents**" means those documents, as hereafter modified, amended and/or supplemented from time to time, properly executed and in recordable form, if necessary, listed in **Exhibit B** hereof as Loan Documents.

"**Loan-to-Value Ratio**" means, as of the date of calculation, the ratio of (a) the sum of (i) the outstanding principal amount of the Loan the Mello-Roos CFD Financing and the PACE Financing as of the date in question, and (ii) the committed and undisbursed portion of the Loan as of the date in question, to (b) the fair market value of the Property, as determined by Lender based on an MAI appraisal obtained by Lender at Borrower's costs from an MAI appraiser selected by Lender, or determined in Lender's sole but good faith discretion by any other commercially reasonable method, as of the date in question. If Lender desires to have an MAI appraisal of the Property commissioned upon the occurrence of an Event of Default, Lender may obtain the same at Borrower's sole cost and expense.

"**MAI**" means Member of the Appraisal Institute.

"**Major Contract**" shall mean any contract with respect to the design, development, construction and completion of the Improvements under which there is an obligation to pay more than $50,000, which shall be subject to collateral assignment to Lender as additional security for the Loan.

"**Material Agreements**" means (i) each of the Construction Documents, (ii) the Development Agreement, (iii) all comfort letters and subordination, non-disturbance, and attornment agreement among Lender, Hotel Manager, Hotel Franchisor and/or Borrower, (iv) the PACE Loan documents, (v) the Mello-Roos Financing Documents, (vi) any Lease, (vii) each management, brokerage or leasing agreement, and (viii) any cleaning, maintenance, service or

13

other contract or agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition means any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral.

"**Maturity Date**" shall mean May 1, 2020, as may be extended, subject to the terms and conditions of the Note.

"**Mello-Roos CFD Financing**" means that certain indebtedness to be incurred by Borrower after the date hereof, and secured by a lien on the Property, in a principal amount not to exceed $6,315,000.00, and advanced and repaid in accordance with the terms of the Mello-Roos CFD Financing Documents; which proceeds are to be deposited with Lender and maintained in the Construction Costs Reserve when and as disbursed, and may be applied in accordance with the terms of Section 2.4(f) hereof, unless expressly agreed to otherwise in writing by Lender,

"**Mello-Roos CFD Financing Documents**" means collectively the financing documents executed in connection thereto, drafts of which are more particularly set forth on **Exhibit P** hereof.

"**Net Sales Proceeds**" shall mean, with respect to each Release Parcel sold, the Gross Sales Proceeds received for such Release Parcel less (i) required deposits for the Tax and Insurance Reserve as required under Section 2.4(a), and (ii) the actual and reasonable expenses of the sale of the applicable Release Parcel, as approved by Lender; including, marketing and sales commissions payable to third parties unaffiliated to Borrower, in an amount not to exceed 4.0% of the gross sales price for such Release Parcel, California real estate transfer taxes and other customary charges payable to the State of California in connection with such sale of a Release Parcel.

"**Note**" shall have the meaning ascribed to such term in Recital B hereof.

"**OFAC**" shall have the meaning ascribed to such term in Section 6.18 hereof.

"**OFAC Laws and Regulations**" shall have the meaning ascribed to such term in Section 6.18 hereof.

"**Operating Agreements**" means, collectively, any covenants, restrictions or agreements of record relating to the construction, operation or use of the Property.

"**Operating Budget**" shall have the meaning ascribed to such term in Section 10.6 hereof.

"**Operating Expenses**" means all actual operating expenses and disbursements of every kind, nature or description actually paid or due and payable (and accrued even if not payable in the case of real property taxes and insurance premiums) during (or projected by Lender to be incurred for) the period being measured, including, without limitation, those for franchise fees,

management, operation, maintenance, repairs, annual taxes, bond assessments, insurance, utilities and other annual expenses actually expended, on a cash basis.  Operating Expenses shall not include any interest or principal payments on the Loan or any allowance for depreciation nor shall it include asset management fees or any other fees payable under the Borrower's Operating Agreement.

"**Other Related Documents**" means those documents, as hereafter modified, amended, and/or supplemented from time to time, properly executed and in recordable form, if necessary, listed in **Exhibit B** attached hereto as Other Related Documents.

"**Outstanding Principal Balance**" means the then outstanding principal balance of the Loan.

"**PACE Lien**" means any lien, tax or special assessment or any other encumbrance relating to a PACE Loan on or affecting all or any portion of the Property or any interest therein, or any direct or indirect interest in Borrower.

"**PACE Loan**" means a loan made on the date hereof to Borrower to finance energy efficient improvements and renewable energy projects, or other similar initiatives, and commonly known as a "Property-Assessed Clean Energy (PACE) Loan", as the same may now or hereafter be more particularly defined and described in any applicable legal requirements or promulgated by any Governmental Authority and shown on the Approved Budget.

"**PACE Loan Documents**" means collectively, that certain Agreement to Pay Assessment and Finance Improvements dated as of April 24, 2018 by and between the California Statewide Communities Development Authority, a joint exercise of powers authority and Borrowers, with respect to financing certain Improvements under the CaliforniaFIRST program for property assessed clean energy improvements, together with all documents, agreements and instruments executed by Borrower (or any of them) in connection therewith.

"**Participant**" shall have the meaning ascribed to such term in <u>Section 12.13</u> hereof.

"**Patriot Act**" shall have the meaning ascribed to such term in <u>Section 6.18</u> hereof.

"**Payment Date**" shall have the meaning ascribed to such term in the Note.

"**Permitted Change**" shall mean, a modification to the Approved Plans and Specification, a Construction Contract or both which (i) is not structural in nature; (ii) does not decrease the rentable area of the Improvements or otherwise diminish the revenue generation capabilities of the Improvements; (iii) does not increase the aggregate construction cost of the Improvements (or causes a reallocation of costs within the Approved Budget) by more than One Hundred Thousand and No/100 Dollars ($100,000.00) in the singular or One Million and No/100 Dollars ($1,000,000.00) in the aggregate with all prior Permitted Changes; provided, however, to the extent any such change increases the aggregate construction cost for the Improvements, the Borrower equity requirement described in <u>Section 3.1.1</u> hereof shall be increased by a like amount and a deposit in such amount shall be provided by Borrower into the Construction Completion Holdback, as a condition to such item being deemed a Permitted Change; (iv) does

not cause the Improvements to be in violation of any Legal Requirements; (v) is described by written notice to Lender (including a copy of any change order) no later than five (5) Business Days following its implementation; and (vi) has been approved by, to the extent required, by the Hotel Manager, or such other party under the PACE Loan Documents, the Mello-Roos CFD Financing Documents from whom consent is otherwise required, all sureties under payment or performance bonds, if any, covering such Construction Contract and all required Governmental Authority.

"**Permitted Operating Expenses**" shall have the meaning ascribed to such term in Section 10.6(b) hereof.

"**Person**" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

"**Phase I Construction**" means the construction of the 51 casitas, and all infrastructure work under and pursuant to the PACE Loan Documents, and as otherwise shown on the Approved Budget.

"**Phase II Construction**" means construction of the additional amenity improvements listed on the Approved Budget or construction as may be required pursuant to the Mello-Roos CFD Financing Documents.

"**Plans and Specifications**" shall include all plans, maps, sketches diagrams, surveys, drawings, specifications or lists of materials or any changes or modifications thereof in connection with the Improvements, all of which shall have been delivered to and approved by Lender, as the same may be amended from time to time with the written consent of Lender in accordance with the terms of this Agreement.

"**Pledge Agreement**" means that certain Pledge and Security Agreement given by The Stuart Rubin Children's Trust, an Affiliate of Glenroy Coachella, LLC ("**Pledgor**"), and the owner of that certain multifamily apartment building located at 410 Micheltorena, Santa Barbara, California, to Lender, as collateral for the repayment by Borrower of the Loan.

"**Prescribed Laws**" shall have the meaning ascribed to such term in Section 6.18 hereof.

"**Property**" shall have the meaning ascribed to such term in Recital A hereof.

"**Property Tax and Insurance Holdback**" shall have the meaning ascribed to such term in Section 2.3(b)(C)(1).

"**Quality Assurance Reports**" shall mean any quality assurance reports of inspection or compliance from a Franchisor under a Franchise Agreement with respect to the Property.

"**Qualified Replacement Hotel Manager**" shall mean a reputable, credit worthy and experienced professional hotel management organization acceptable to Lender in its reasonable discretion.

16100193.16

"**Qualified Replacement Franchisor**" shall mean a reputable, credit worthy and experienced professional hotel franchisor acceptable to Lender in its reasonable discretion.

"**Qualified Replacement Franchise Agreement**" shall mean collectively, (a) a franchise agreement with a Qualified Replacement Franchisor either substantially in the same form and substance as the Hotel Franchise Agreement, or otherwise acceptable to Lender, in its sole but reasonable discretion; and (b) a comfort letter issued by the Hotel Franchisor for the benefit of Lender, and its successors and/or assigns.

"**Qualified Replacement Hotel Management Agreement**" shall mean, collectively, (a) a hotel management agreement with a Qualified Hotel Manager either (i) substantially in the same form and substance as the Hotel Management Agreement, or (ii) otherwise acceptable to Lender, in its sole but reasonable discretion; and (b) a subordination of hotel management agreement, executed by Borrower and such Qualified Replacement Hotel Manager for the benefit of Lender, at Borrower's expense, on form acceptable to Lender.

"**Real Property**" shall have the meaning ascribed to such term in Recital A hereof.

"**Release Parcel**" means the Restaurant Parcel released with Lender's consent in accordance with, and pursuant to the terms of Section 8.2.

"**Release Price**" shall have the meaning ascribed to such term in Section 8.2(g).

"**Required Construction & Improvements**" shall have the meaning ascribed to such term in Section 2.3(f).

"**Required Seasonality Reserve Balance**" is defined in Section 2.4(d).

"**Reserves**" means, collectively, any reserves established under the Loan Documents, including without limitation, the Tax and Insurance Reserve, the FF&E Reserve, the Seasonality Reserve, the Construction Costs Reserve, the Key Money Reserve, the Excess Cash Reserve and the Interest Reserve.

"**Restaurant Pad**" shall mean that certain portion of the Property more particularly described on **Exhibit M** hereto, which constitutes a Release Parcel.

"**RevPAR**" shall mean the "revenue per available room," as defined in Smith Travel's STR Report, or if the STR Report no longer uses such term, the aggregate gross room revenues of the hotel located on the Property for a given period of time, divided by the total available room nights for such period.

"**Seasonality Reserve**" is defined in Section 2.4(d).

"**Seasonality Reserve Funds**" is defined in Section 2.4(d).

"**Secondary Market Transaction**" shall have the meaning ascribed to such term in Section 12.14 hereof.

16100193.16

"**Security Instrument**" shall have the meaning ascribed to such term in Recital C hereof.

"**Servicing Fee**" shall have the meaning ascribed to such term in Section 9.1 hereof.

"**Single Purpose Entity**" shall have the meaning given to such term in Section **Error! Reference source not found.** hereof.

"**Strike Rate**" shall mean 3.00%.

"**Subdivision Map**" shall have the meaning ascribed to such term in Section 9.5 hereof.

"**Survey**" shall have the meaning ascribed to such term in Section 3.1.1(k) hereof.

"**Tax and Insurance Reserve**" shall have the meaning ascribed to such term in Section 2.4(a) hereof.

"**Tenant in Common Agreement**" means that certain agreement entered into by Borrowers dated as on or about April 24, 2018.

"**TIC 1 Borrower**" shall have the meaning ascribed to such term in Section 9.9(e) hereof.

"**TIC 2 Borrower**" shall have the meaning ascribed to such term in Section 9.9(e) hereof.

"**Title Company**" means Stewart Title of California, Inc.

"**Title Policy**" means an ALTA extended coverage lender's title policy issued by Title Company insuring the lien of the Security Instrument in the full maximum principal amount of the Loan subject only to such exceptions approved by Lender and including such endorsements as are required by Lender.

"**Total EB-5 Offering Amount Raised**" shall mean the aggregate amount of capital caused to be raised by Borrower (and in respect of which subscription agreements will be executed and delivered and I-526 Petitions filed with USCIS), in an amount acceptable to Lender with Lender's prior consent.

"**Transfer**" means the sale, transfer, hypothecation, encumbrance, mortgage, conveyance, lease, alienation, assignment, pledge, disposition, divestment, or leasing with option to purchase, or assignment of the Property, or any portion thereof or interest therein (whether direct or indirect, legal or equitable, including the issuance, sale, assignment, pledge, alienation, conveyance, divestment, transfer, disposition, hypothecation, mortgage or encumbrance of any direct or indirect ownership interest in Borrower or in any entity having an ownership interest in Borrower, whether direct or indirect) (or entering into any agreement or contract to do any of the foregoing that is not conditioned on compliance with the terms of the Loan Documents), or undertaking, suffering or causing any of the foregoing to occur voluntarily, involuntarily or by operation of law.

"**UCC Searches**" shall have the meaning ascribed to such term in Section 3.1.1(t).

## ARTICLE 2.
## LOAN

2.1 **LOAN**. By and subject to the terms of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the principal sum of up to Twenty-Four Million Four Hundred Thousand and No/100 Dollars ($24,400,000.00), said sum to be evidenced by the Note. The Note shall be secured, in part by, among other things, the Security Instrument encumbering the Property. Amounts disbursed to or on behalf of Borrower pursuant to the Note shall be used to complete the Required Construction & Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents.

2.2 **MATURITY DATE**. On the Maturity Date, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full. All payments due to Lender under this Agreement, whether at the Maturity Date or otherwise, shall be paid in immediately available funds.

2.3 **FUNDING OF LOAN**.

(a) Initial Funding Aggregate Amount. Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, including, without limitation, satisfaction of the conditions precedent set forth in Section 3.1.1 hereof, on the Effective Date, Borrower agrees to borrow from Lender, and Lender shall disburse to Borrower from the proceeds of the Loan the sum of Ten Million Nine Hundred Thousand Five Hundred and No/100 Dollars ($10,900,500.00) (the "**Initial Funding Amount**"). The Initial Funding Amount, together with the Borrower Equity, shall be used for paying (A) out-of-pocket fees, costs and expenses incurred by Lender in connection with the Loan transaction, including, without limitation, all appraisal, title, escrow, engineering, environmental and attorneys' fees and expenses (collectively, the "**Lender Expenses**"), (B) the Loan Commitment Fee, (C) establishment of operating accounts for Borrower's ownership, operation, management, development and construction of the Property, (D) Construction Costs; (E) establishment of the Tax and Insurance Reserve and the Interest Reserve. Borrower hereby authorizes Lender to disburse on the Effective Date such Loan proceeds directly to Lender as are necessary to pay the Lender Expenses and the Loan Commitment Fee.

(b) Future Advances. Thirteen Million Four Hundred Ninety Nine Thousand Five Hundred and No/100 Dollars ($13,499,500.00) of the Loan shall not be released to Borrower on the Effective Date (the "**Future Advance Funding Amount**"). Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, subsequent to the Effective Date, Lender shall disburse to Borrower the Future Advance Funding Amount as provided in this Section 2.3(b) and Section 3.1.2, and such disbursements shall be added to the outstanding principal balance of the Note. The Future Advance Funding Amount shall be used for the following purposes:

(A) Interest Holdback.

(1) One Million Eight Hundred Thousand and No/100 Dollars ($1,800,000.00) of the Future Advance Funding Amount shall not be released to

Borrower or deemed to be advanced on the Effective Date and shall not constitute a portion of the outstanding principal balance under the Note, but shall be made available as a holdback for interest payments under the Loan (the "**Interest Holdback**") and shall be disbursed pursuant to the terms and conditions of this Section 2.3 and Section 3.1.2.

(2)     The Interest Holdback may be periodically disbursed directly by Lender to Lender for the payment of interest which accrues and becomes due under the Note.  The funds in such Interest Holdback shall, for purposes of interest calculation, be deemed disbursed to Borrower as of the date applied by Lender to interest outstanding under the Note.

(3)     If at any time during the initial term of the Loan (prior to any extension of the term of the Loan), determined by Lender quarterly, there is an Interest Reserve Deficiency, Borrower shall, within thirty (30) days after the date of any such quarterly notice by Lender, pay to Lender an amount to be funded as part of the Interest Reserve, the amount of the Interest Reserve Deficiency.  Such deposit by Borrower shall be derived from additional Borrower Equity and shall not come from Loan proceeds or otherwise be borrowed.

(4)     Lender is hereby authorized to charge the Loan directly for such interest payments when due by reducing the amount in the Interest Holdback.  If Lender disburses funds to Lender directly from the Interest Holdback, Lender shall provide Borrower with a monthly interest statement. Depletion of the Interest Holdback shall not release Borrower from any of Borrower's obligations under the Loan Documents including, without limitation, payment of all accrued and due interest.  Lender shall have no obligation to release any portion of the Interest Holdback during any period that a Default or an Event of Default exists.

(B)     Construction Completion Holdback.

(1)     Eleven Million Four Hundred Sixty Nine Thousand Five Hundred and No/100 Dollars ($11,469,500.00) of the Future Advance Funding Amount shall not be released to Borrower or deemed to be advanced on the Effective Date but shall be made available for the payment of ninety percent (90%) of the costs and expenses of completing the Required Construction & Improvements in accordance with this Agreement and the other Loan Documents and as specified in Approved Budget (the "**Construction Completion Holdback**"). Amounts in the Construction Completion Holdback shall be made available on the terms and conditions contained herein (including the conditions contained in Section 3.1.2 hereof).

(2)     Notwithstanding anything in this Agreement to the contrary, if Lender determines in its reasonable discretion that the aggregate costs and expenses of completing the Required Construction & Improvements will exceed the budgeted expenditures set forth in the Approved Budget, then from and after the date of such determination; Lender shall have no further obligation to make any then-unfunded portion of the Construction Completion Holdback available to Borrower, and Borrower shall have no further right to request or obtain any such portion of the Construction

20

Completion Holdback, unless and until Borrower escrows the deficiency determined by Lender with Lender for deposit in the Construction Completion Holdback.

(C)    Property Tax and Insurance Holdback.    One Hundred Thirty Thousand and No/100 Dollars ($130,000.00) of the Future Advance Funding Amount shall not be released to Borrower or deemed to be advanced on the Effective Date but shall be made available for the payment of real property taxes and assessments (including amounts due under the PACE Loan (to the extent not otherwise paid under the terms of the PACE Loan, and the Mello-Roos CFD Financing) for the Property, and to pay insurance premiums for the insurance coverage required for the Property, each in accordance with, and pursuant to the terms of this Agreement and the other Loan Documents.    Amounts in the Property Tax and Insurance Holdback shall be made available on the terms and conditions contained herein (including the conditions contained in Sections 2.4(a) and 3.1.2 hereof).

(D)    Administrative Fee Holdback.    One Hundred Thousand and No/100 Dollars ($100,000.00) of the Future Advance Funding Amount shall not be released to Borrower or deemed to be advanced on the Effective Date but shall be made available for the payment of the Servicing Fee and Construction Consultant fees that are payable by Borrower in accordance with, and pursuant to the terms of this Agreement and the other Loan Documents (the "Administrative Fee Holdback").    Amounts in the Administrative Fee shall be advanced automatically each month by Lender on the applicable terms and conditions contained herein to pay such Servicing Fees and Construction Consultant's fees hereunder.

(c)    Disbursement Requests Subsequent to Effective Date from Holdbacks and Reserve Accounts.  Without limitations on other restrictions on funding contained in this Section 2.3 or Section 3.1.2, (i) there shall not be more than one (1) disbursement every thirty (30) days from any one Holdback and Reserve under this Section 2.3, and (ii) provided monthly disbursements from the Construction Completion Holdback shall not be less than Two Hundred Fifty Thousand Dollars ($250,000.00).  In addition, in connection with any such disbursement, Borrower shall give to Lender, at 11755 Wilshire Blvd., Suite 1425, Los Angeles, California 90025, Attention: Simond Lavian or at such other address as Lender shall designate, an original or facsimile written request for disbursement in the form of **Exhibit E** attached hereto or such other form as is required by Lender in its sole discretion (together with all supporting documents and information required by Lender for draws), no later than 2:00 p.m. Eastern Standard Time or Eastern Daylight Time, as applicable, and not less than ten (10) Business Days prior to the proposed funding date of such disbursement.  Each such request for disbursement shall specify (i) Borrower's desired funding date (which shall be a Business Day) in respect of the disbursement of proceeds from a Holdback or a Reserve, (ii) the amount of the proposed disbursement, (iii) the proposed use of such disbursement of Holdback and Reserve proceeds, (iv) a certification that each of the conditions to Lender's obligation to fund the Holdback and Reserve proceeds as set forth herein have been satisfied, and (v) shall be accompanied by such additional documents and information relating to the proposed disbursement as Lender shall reasonably require.  Subject to Lender's approval of the request for disbursement, which shall be in Lender's good-faith discretion, and in accordance with the terms and conditions contained in this Agreement, Lender shall use good faith efforts to make available to Borrower the proceeds

21

of each disbursement requested by Borrower on the funding date specified in the Borrower's request for disbursement (or such other date as Lender shall deem appropriate) and shall disburse such funds into such account of Borrower as Borrower shall specify and Lender shall approve. Each such request for a disbursement from the Construction Completion Holdback shall be accompanied by an administrative fee in the amount of Five Hundred and No/100 Dollars ($500.00) per draw.

(d)     General Provisions Relating to Holdbacks and Reserves.  Funds in the Holdbacks and Reserves shall be used only for the purposes and pursuant to line item limitations set forth in the Approved Budget (subject to adjustment as provided in Section 10.6 hereof), or as otherwise set forth in this Agreement.  Funds in each of the Reserves may be commingled by Lender with other funds of Lender (or its servicer, if applicable).  Borrower grants to Lender a first priority security interest in all funds on deposit in the Reserves to secure its obligations under the Loan Documents.  If an Event of Default shall occur and be continuing hereunder or under any other of the Loan Documents, Lender may, without notice or demand on Borrower or any Affiliates of Borrower, at its option: (i) withdraw any or all of the funds (including, without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, reasonable attorneys' fees, costs and expenses) to the Loan or any other obligations of Borrower under the other Loan Documents in such manner as Lender shall deem appropriate in its sole discretion, (ii) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, including, without limitation, those with respect to the Reserves and/or (iii) exercise any other remedies available at law or in equity.  Borrower shall execute any and all documents or agreements, and take such actions, as Lender in its good faith deems necessary or advisable to ensure that Lender shall at all times retain a first-priority perfected security interest in each of the Reserves. Lender shall have no obligation to advance funds from any of the Holdbacks or from any of the Reserves if a Default or an Event of Default exists.  Without limitation, Lender shall have no obligation to advance any funds from (A) the Construction Completion Holdback after the first anniversary (1st) of the date hereof; or (B) any Reserves after the date that is ninety (90) days prior to the Maturity Date. The funds in the Holdbacks shall, for purposes of interest calculation, be deemed disbursed to Borrower as of the date disbursed by Lender (whether disbursed to Borrower or to third parties).

(e)     Non-Usage Fee.  In consideration of Lender's commitment to make disbursements of the Future Advance Funding Amount as provided in this Agreement, Borrower agrees to pay to the Lender a non-refundable unused line fee of one percent (1.0%) per annum on the daily amount of the unused portion of the Future Advance Funding Amount (determined for each such day by deducting from the Future Advance Funding Amount the aggregate amount of all disbursements of the Future Advance Funding Amount made as of the end of such day), from the date hereof to and including the Maturity Date. Such unused line fee shall be payable monthly in arrears on each Payment Date and on the Maturity Date.  All unused line fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(f)     Required Construction and Improvements.  The construction work remaining to be performed under the Construction Documents to complete the Improvements pursuant to the Approved Plans and Specification (collectively, the "**Required Construction &**

22

**Improvements**"), including, without limitation, Completion of the Required Construction & Improvements in compliance with <u>Section 9.12</u> hereof and all work to be paid from any Holdback or Reserve hereunder, shall be completed in a lien-free and good and workmanlike manner as soon as practicable in substantial accordance with the Approved Plans and Specifications and in strict compliance with the Construction Schedule and the Approved Budget, subject to Force Majeure delays. Without limitation, all Required Construction & Improvements shall comply with the Construction Documents, and with all applicable laws, ordinances, rules and regulations of all Governmental Authorities having jurisdiction over the Property, the Hotel Management Agreement and applicable insurance requirements, including applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters. If Lender disapproves any portion of the construction or equipping of the Property, Borrower, within fifteen (15) days after such disapproval, shall commence to correct the condition so disapproved, and thereafter will diligently complete such correction. Borrower agrees that all materials contracted or purchased for construction of the Property and all labor hired or contracted for with respect to any construction and paid for with proceeds of the Loan will be used and employed solely on the Property and for no other purpose.

(g)    On or after the Closing Date, Lender may sell, assign or transfer (including through a participation) a portion of its interest in the Loan, including the entire obligation to fund the Future Advances pursuant to this <u>Section 2.3</u> (the "**Funding Obligations**"), to one or more parties (the "**Funding Parties**") (in which case Lender shall have no further obligation for the Funding Obligations provided the Funding Parties assume such Funding Obligations in a manner directly enforceable by Borrower and such assumption is delivered to Borrower. The Funding Parties may assign, transfer or sell all or any portion of its Funding Obligations and shall thereafter be relieved of such Funding Obligation provided that such assignee assumes such Funding Obligation in writing in a manner directly enforceable by Borrower and such assumption is delivered to Borrower, and no failure to fund such Funding Obligation by the Funding Parties or by such assignee, transferee or purchaser shall result in any offset, defense or counterclaim to the payment of the Loan or to the enforcement of any rights of Lender under the Loan Documents, and Borrower's sole remedy shall be a suit for actual damages (as opposed to consequential, punitive or exemplary damages) against such non-funding assignee, transferee or purchaser. After any such sale, assignment or transfer, Lender shall have no Funding Obligations hereunder.

**2.4**    <u>**ADDITIONAL RESERVES**</u>.

(a)    <u>Tax and Insurance Impounds</u>. Upon Completion of the Improvements, Borrower shall maintain a Tax and insurance reserves with Lender, and shall deposit monthly commencing on the First Payment Date (as defined in the Note) occurring after Completion of the Improvements, an amount equal to one-twelfth (1/12th) of the annual real property taxes and assessments (including any assessments with respect to the PACE Loan and the Mello-Roos CFD Financing) for the Property and one-twelfth (1/12th) of the annual insurance premiums payable for the Property, each as reasonably estimated by Lender (the "**Tax and Insurance Reserve**"). Notwithstanding the foregoing, on the Effective Date, the Tax and Insurance Reserve shall be funded in an amount which, when the required monthly payments are added thereto, will be sufficient to pay such charge when due, in Lender's discretion, calculated by Lender based on the then current tax bills provided by Borrower and the total Construction Costs paid to

23

Complete the Improvements. Borrower shall provide to Lender a copy of the applicable invoices at least thirty (30) days prior to when due.  If Lender at any time determines in its reasonable discretion that any amounts paid into the Tax and Insurance Reserve are insufficient for the payment in full of such taxes, assessments, levies and/or insurance premiums, Lender shall notify Borrower of the increased amounts required to pay all amounts due, whereupon Borrower shall pay (or cause to be paid) to Lender within thirty (30) days thereafter the additional amount as stated in Lender's notice.

So long as no Event of Default has occurred and is continuing, any and all sums in the Tax and Insurance Reserve shall be held by Lender in the Tax and Insurance Reserve to pay annual real property taxes and assessments for the Property when necessary so that the maximum tax discount available may be obtained with regard to the Property and to pay insurance premiums for the Property in one installment before the same become delinquent. Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all real property taxes and assessments and insurance premiums to be paid from the Tax and Insurance Reserve, and, so long as no Event of Default hereunder or under any other Loan Document has occurred and is continuing, Lender shall pay the governmental authority or other party entitled thereto directly, to the extent funds are available for such purpose in the Tax and Insurance Reserve.  In making any payment from the Tax and Insurance Reserve, Lender shall be entitled to rely on any bill, statement or estimate procured from any public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof. The Tax and Insurance Reserve shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Lender's option and in Lender's discretion, may either be held in a separate account or be commingled by Lender with the general funds of Lender or Lender's loan servicer. Interest (if any) on the funds contained in the Tax and Insurance Reserve shall accrue for the benefit of and belong to Lender and shall be paid immediately to Lender.  No interest on funds contained in the Tax and Insurance Reserve shall be paid by Lender to Borrower.  The Tax and Insurance Reserve is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment of taxes, assessments and insurance premiums following receipt of bills, invoices or statements therefor in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received.  Upon assignment of the Loan by Lender, any funds in the Tax and Insurance Reserve shall be turned over to the assignee and any responsibility of Lender, as assignor, with respect thereto shall terminate.  If the total funds in the Tax and Insurance Reserve shall exceed the amount of payments actually applied by Lender for the purposes of the Tax and Insurance Reserve, such excess shall, at the option of Lender, either be credited by Lender on subsequent payments to be made hereunder or refunded to Borrower. If, however, the Tax and Insurance Reserve shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Lender the full amount of any such deficiency.  If Borrower shall fail to deposit with Lender the full amount of such deficiency as provided above, such failure shall constitute an Event of Default and, without limiting Lender's other rights and remedies by reason thereof, Lender shall have the option, but not the obligation, to make such deposit and all amounts so deposited by Lender, together with interest thereon at the Default Interest Rate from the date deposited by Lender until actually paid by Borrower, shall be

24

immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  If there is an Event of Default, Lender may, but shall not be obligated to, to the extent permitted by law, apply at any time the balance then remaining in the Tax and Insurance Reserve against the indebtedness secured by the Security Instrument in whatever order Lender shall subjectively determine.  No such application of the Tax and Insurance Reserve shall be deemed to cure any Event of Default hereunder.  Upon full payment of the indebtedness secured hereby in accordance with its terms or at such earlier time as Lender may elect, the balance of the Tax and Insurance Reserve then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

(b)    Interest Reserve.  If at any time the Interest Holdback hereunder has a balance equal to, or less than $1,800,000.00 (the "**Required Interest Balance**"), then upon Lender' written request, Borrower shall commence on the first Payment Date after the date of such notice to deposit with Lender and thereafter on a calendar quarter basis on the Payment Date occurring immediately the end of a calendar quarter, an amount that when taken together with the available balance of the Interest Holdback shall equal the Required Interest Balance and shall continue to deposit amounts such that the Required Interest Balance is so maintained between the Interest Holdback balance and the Interest Reserve balance until such time as Lender determines, in its sole discretion, that debt service payable for the remaining term of the Note (through the Maturity Date) is less than the Required Interest Balance, or can be sustained by the projected Gross Operating Revenue of the Property. Amounts deposited by Borrower hereunder shall be held and applied by Lender as an additional source for the payment of interest that accrues and becomes due under the Note during the term of the Loan (the "**Interest Reserve**").  After the Interest Holdback has been exhausted, funds in the Interest Reserve may be periodically disbursed by Lender directly for the payment of debt service which accrues and becomes due under the Note, subject to the terms and conditions of this Agreement.  Amounts on deposit in the Interest Reserve shall be additional collateral and security for the payment and performance by Borrower of all of its obligations under the Loan Documents. If there is an Event of Default, Lender may, but shall not be obligated to, to the extent permitted by law, apply at any time the balance then remaining in the Interest Reserve against the indebtedness secured by the Security Instrument in whatever order Lender shall determine in its sole and absolute discretion. No such application of the Interest Reserve shall be deemed to cure any Default or Event of Default hereunder.  Upon full payment of the indebtedness secured hereby in accordance with its terms or at such earlier time as Lender may elect, the balance of the Interest Reserve then in Lender's possession shall be paid over to Borrower.

(c)    FF&E Reserve.  After Completion, Borrower shall perform, on an ongoing basis, such capital repairs, improvements and replacements of FF&E (the "**Replacements**") that are reasonably necessary or appropriate in accordance with sound hotel management practices and in accordance with the terms of the Hotel Management Agreement in order to keep the Property in operating condition and repair consistent with other full service hotel properties in the same market segment and in the metropolitan area in which the Property is located, and to keep the Property or any portion thereof from deteriorating.  After Completion, Borrower shall maintain an FF&E reserve (the "**FF&E Reserve**") in accordance with the Hotel Management Agreement.  If the Hotel Management Agreement does not provide for an FF&E Reserve, then Borrower shall deposit monthly with Lender, on each Payment Date commencing on the first

25

Payment Date after Completion, as the FF&E Reserve, an amount equal to one-twelfth (1/12th) of the FF&E Reserve Amount calculated by the Lender and determined on the date hereof to be necessary to pay for such capital repairs, improvements and replacements of FF&E at the Property. Borrower shall provide to Lender reasonable evidence of the Replacements undertaken with funds from the FF&E Reserve. If Lender at any time reasonably determines that any amounts paid into the FF&E Reserve are insufficient for the payment in full of Replacements in accordance with sound hotel management practices and in accordance with the terms of the Hotel Management Agreement and the requirements of the Hotel Management Agreement, then Lender shall notify Borrower of the increased FF&E Reserve Amount required to pay all amounts due, whereupon Borrower shall pay (or cause to be paid) into the FF&E Reserve the additional amount stated in Lender's written notice. Funds in the FF&E Reserve shall be applied to pay amounts on the FF&E Budget (prepared in accordance with the Hotel Management Agreement) approved by Lender; the initial FF&E Budget with sources and uses shown thereon is attached hereto as **Exhibit I** (the "**FF&E Budget**").

(d)    Seasonality Reserve. Key Money shall be, together with all amounts of Excess Cash available in accordance with the terms of Section 2.5(v), deposited with Lender until amounts therein equal at least, but not in excess of Two Million and No/100 Dollars ($2,000,000.00 (the "**Required Seasonality Reserve Balance**"), and escrowed by Lender in a reserve (the "**Seasonality Reserve**") and disbursed in accordance with the provisions of Section 2.4(d)(i) below. If on any subsequent Payment Date the funds on deposit in the Seasonality Reserve are less than the Required Seasonality Reserve Balance, deposits shall continue to be made to the Seasonality Reserve until such time as the amount of the funds on deposit in the Seasonality Reserve are equal to the Required Seasonality Reserve Balance (all amounts deposited in the Seasonality Reserve being referred to herein as the "**Seasonality Reserve Funds**"). Funds in the Seasonality Reserve in excess of the Required Seasonality Reserve Balance shall be disbursed by Lender to Borrower, pursuant to the terms and conditions of Section 2.4(f) below, upon Borrower's satisfaction of the conditions set forth in Section 2.4(f). The Required Seasonality Reserve Balance comprises the amount reasonably estimated by Lender in its sole discretion to be necessary for the purpose of funding a working capital reserve to provide an additional source for payment of debt service, monthly deposits into the Reserves and Operating Expenses in months during which Gross Operating Income from the Property is insufficient to pay such amounts (the "**Shortfall Amount**"). Lender may reassess its estimate of the amount of necessary Seasonality Reserve Funds from time to time, and may increase the Required Seasonality Reserve Balance upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to properly maintain and operate the Property. Upon Completion of the Improvements, and the Property's operation for at least twelve (12) consecutive months, Borrower may request that Lender consider reassessing, in its discretion, its estimate of the amount of necessary Seasonality Reserve Funds based on such 12-month operating history of the Property.

(i)    Disbursements of Seasonality Reserve Funds. Lender shall make disbursements of Seasonality Reserve Funds from the Seasonality Reserve for Shortfall Amounts upon satisfaction by Borrower of each of the following conditions with respect to each such disbursement: (a) Borrower shall submit Lender's standard form of draw request for payment to Lender in accordance with the terms of Section 2.3(c) prior to the applicable Payment Date, which request shall specify the total Shortfall Amount (based

26

on debt service, Reserve deposits and Operating Expenses due); (b) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; and (c) Lender shall have received (i) a certification from Borrower stating that (A) all previous disbursements of Seasonality Reserve Funds for Operating Expenses have been used to pay the previously identified Operating Expenses, and (B) all Operating Expenses to be paid with the requested Shortfall Amount are in accordance with the annual Approved Budget.  Nothing in this Section 2.4(d)(i) shall reduce Borrower's future obligations to make deposits to the Seasonality Reserve in accordance with the terms and conditions of this Agreement.

(e)    Construction Costs Reserve; Mello-Roos CFD Financing.    Borrower shall deposit the proceeds from the Mello-Roos CFD Financing with Lender on the date loaned to Borrower, which funds will be maintained by Lender in a reserve (the "**Construction Costs Reserve**"), and disbursed to be used by Borrower for (i) the repayment of the Loan as permitted under Section 9.9(f) in connection with a release of the Pledge Agreement, (ii) the repayment of the Loan as permitted under Section 2 of the Note, and (iii) for the payment of Construction Costs associated with any additional future construction at the Property, provided the location, scope, cost, and timing of the same shall be consented to by Lender, which consent shall be granted or withheld in Lender's sole discretion. In addition to the applicability of the conditions set forth in Section 3.1 hereof with regards to any disbursements of the funds of the Mello-Roos CFD Financing hereunder to pay Construction Costs pursuant to clause (iii) above, Lender requires compliance with additional terms and conditions to the disbursement of such funds for such purpose. Borrower may request that funds in this Construction Cost Reserve be used to pay Construction Shortfall Amounts, subject to Lender's prior written consent, exercised in Lender's sole and absolute discretion. Borrower shall exhaust the amounts available in the Construction Completion Holdback before seeking disbursements from the Construction Costs Reserve.

(f)    Key Money Reserve.    Borrower shall deposit the Key Money promptly when and as paid by Hotel Manager to Borrower, with Lender for deposit into the Seasonality Reserve, to be used pursuant to the terms of Section 2.4(d) hereof. Upon Borrower's request therefore, and provided (A) no Event of Default or Cash Trap Period is continuing, (B) the Property has complied with a DSCR of no less than 1.30:1.00 for two (2) consecutive calendar quarters, tested quarterly on a trailing 12-month basis, and (C) the amounts in the Seasonality Reserve are not less than the Required Seasonality Reserve Balance, Lender shall release any Key Money remaining on such date in the Seasonality Reserve in excess of the Required Seasonality Reserve Balance to Borrower. Such funds shall be disbursed upon Borrower's written request in accordance with this Section 2.4(f).

(g)    Excess Cash Reserve.    Upon the occurrence and during the continuance of a Cash Trap Period, all Excess Cash deposited with Lender pursuant to the terms of Section 2.5(c)(xi) shall be held by Lender as additional security for the Loan (amounts so held shall be referred to as the "**Excess Cash Reserve Funds**") in a reserve account maintained by Lender at the Cash Management Bank, or otherwise at Lender's discretion (the "**Excess Cash Reserve**"), for application in accordance with the terms of Section 2.5(c) and this Section 2.4(g). In addition, any Additional Collateral posted by Borrower pursuant to the terms of Section 2.6, in the form of immediately effective funds, shall be deposited by Lender, when received, in the Excess Cash Reserve for application pursuant to the terms of this Agreement.  At such time as

27

any Cash Trap Period shall end, any funds, other than the Additional Collateral posted, then held in the Excess Cash Reserve Account shall be returned to Borrower, provided no Event of Default or other Cash Trap Period has occurred and is continuing.  The Additional Collateral shall only be released in accordance with, and subject to the terms of <u>Section 2.6</u>.

### 2.5  <u>CASH MANAGEMENT AND DISTRIBUTION OF CASH FLOW</u>.

(a)    As of the date hereof, Borrower has entered into a Deposit Account Control Agreement with Deposit Bank, and established a deposit account into which all Gross Operating Income shall be deposited daily by Borrower and Hotel Manager for the term of the Loan. Upon the earlier of Completion or the execution of any Lease at the Property, and thereafter with respect to any Lease entered into after the Completion Date, Borrower or Hotel Manager shall deliver a notice in the form of **Exhibit L** (a "**Cash Management Notice**"), to such each tenant at the Property directing each tenant to remit its rent checks directly, as more fully described in the Deposit Account Control Agreement to the Deposit Account. Borrower shall cause all Gross Operating Income from the Property to be transmitted directly by Borrower or the Hotel Manager into the deposit account maintained under the Deposit Account Control Agreement in accordance with the terms thereof (the "**Deposit Account**") commencing on the date hereof. Without in any way limiting the foregoing, all Gross Operating Income actually received by Borrower or Hotel Manager shall be deposited into the Deposit Account within two (2) Business Days after its receipt thereof.  Funds deposited into the Deposit Account shall be swept by the Deposit Bank on a daily basis into the Cash Management Account maintained under the Cash Management Agreement and applied and disbursed in accordance with the terms of <u>Section 2.5(c)</u> of this Agreement.  Funds in the Cash Management Account shall be invested at Lender's discretion. Lender will also establish subaccounts of the Cash Management Account, which may be ledger or book entry accounts and not actual accounts (such subaccounts are referred to herein as "**Subaccounts**"). The Deposit Account, the Cash Management Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom. Borrower shall pay for all expenses of opening and maintaining all of the above accounts.

(b)    As security for repayment of the Loan and the performance by Borrower of all the terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Gross Operating Income and in and to all payments to or monies held in the Deposit Account, the Cash Management Account and all Subaccounts created pursuant thereto and this Agreement (collectively, the "**Accounts**"). Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Gross Operating Income in its possession prior to the (i) payment of such Gross Operating Income to Lender or (ii) deposit of such Gross Operating Income into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Accounts, or permit any lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a

28

receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument or exercise its other rights under the Loan Documents. The Accounts shall not constitute trust funds and may be commingled with other monies held by Lender. Upon repayment in full of the Loan, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower

(c) Provided that no Event of Default has occurred and is continuing, any Gross Operating Income deposited into the Cash Management Account up to and including the Business Day prior to a Payment Date shall be applied on such Payment Date as follows in the following order of priority:

(i) First, to make payments into the Tax and Insurance Reserve in accordance with Section 2.4(a);

(ii) Next, the balance, if any, to the Cash Management Bank to pay the monthly fees charged by the Cash Management Bank in accordance with the Cash Management Agreement;

(iii) Next, the balance, if any, to Lender to make the monthly interest payments due and payable under the Note that are not otherwise paid from the Advances under Interest Holdback pursuant to Section 2.3(b)(A) or funds in the Interest Reserve pursuant to Section 2.4(b);

(iv) Next, the balance, if any, to fund any other Reserves, except Seasonality Reserve which is funded pursuant to the terms below, required to be funded by Borrower hereunder;

(v) Next, the balance, if any, to Lender for the payment of any other amounts then due and payable under the Loan Documents;

(vi) Next, the balance, if any, to Borrower's Operating Account for the payment of the Permitted Operating Expenses pursuant to the Approved Budget;

(vii) Next, provided no Cash Trap Period is continuing, the balance, if any after payment of amounts in clauses (i) through and including (vi) ("**Excess Cash**"), to Lender for deposit in the Seasonality Reserve in accordance with the terms and conditions of Section 2.4(d) until the balance therein is equal to the Required Seasonality Reserve Balance;

(viii) Next, provided no Cash Trap Period is continuing and the Seasonality Reserve has a balance equal to the Required Seasonality Reserve Balance, any Excess Cash to Borrower's Operating Account, in accordance with the Loan Documents; and

(ix) Next, if a Cash Trap Period is continuing, Excess Cash, if any, first to the Seasonality Reserve until the balance therein is equal to the Required Seasonality Reserve Balance, and thereafter any remaining Excess Cash for deposit in the Excess Cash Reserve pursuant to, unless and until such Cash Trap Period has concluded in accordance with the terms hereof.

SUBJECT TO THE PROVISIONS OF SECTION 3 OF THE NOTE, IN THE EVENT THAT GROSS OPERATING INCOME SHALL NOT BE SUFFICIENT TO ENABLE BORROWER TO MAKE ANY OF THE PAYMENTS DESCRIBED IN SUBPARAGRAPHS (i) THROUGH (vii) ABOVE, BORROWER SHALL NOT BE RELIEVED OF ITS OBLIGATIONS TO MAKE SUCH PAYMENTS.

(d)     Notwithstanding the foregoing, upon the occurrence of an Event of Default, the cash management system put in place pursuant to the terms of this Section, shall be effective, and Borrower shall not apply Gross Operating Income to any other purpose without Lender's prior written consent.  After the occurrence of an Event of Default, Lender shall have all of the remedies available to it pursuant to this Agreement, the other Loan Documents and Applicable Laws.

## 2.6     ADDITIONAL COLLATERAL OPTION.

(a)     If there is a DSCR Failure continuing, Borrower shall have the option in lieu of the deposits of Excess Cash pursuant to Sections 2.5(c)(ix), to (i) deposit with Lender an amount, in immediately effective funds, equal to the amount of the outstanding principal balance of the Note that would need to be repaid so that the resulting Debt Service Coverage Ratio calculated as of such date is equal to no less than 1.30:1.00 (the "**Additional Collateral Amount**"), for deposit in the Excess Cash Reserve for application pursuant to the terms hereof ("**Cash Collateral**"), or (ii) deliver to Lender an irrevocable, unconditional, transferable, clean sight draft letter of credit in the nominal amount equal to the Additional Collateral Amount, which letter of credit shall: (i) be negotiable and transferable by Lender and without charge to the beneficiary of such letter of credit in connection with a foreclosure by Lender or any other mortgagee or any other sale or transfer of the Loan by Lender pursuant to this Agreement, (ii) be issued for the benefit of Lender by an Approved Bank, (iii) provide for payment of all or any portion of the face amount of the letter of credit to Lender upon the receipt by the issuing bank of a statement signed by a representative of Lender that Lender is entitled to such amount pursuant to the terms of this Agreement, (iv)  have an expiration date not earlier than one (1) year following its issuance date (and which shall be automatically renewed pursuant to Section 2.6(d) below), and (v) be otherwise in form and substance satisfactory to Lender (as such letter of credit, may be renewed, extended, or replaced, the "**Letter of Credit**"; which together with the Cash Collateral shall be referred to collectively, from time to time, as the "**Additional Collateral**").

(b)     If a DSCR Failure exists and is then continuing, and Borrower exercises its option to deliver Additional Collateral to Lender pursuant to, and in compliance with the terms of Section 2.6(a) above, Borrower shall deliver such Additional Collateral, as it elects, to Lender within ten (10) calendar days after the date Lender notifies Borrower in writing of such DSCR Failure, If Borrower elects to post Cash Collateral as its Additional Collateral hereunder, Borrower shall deposit such Cash Collateral into the Excess Cash Reserve maintained in accordance with Sections 2.4(g), and if Borrower elects to post a Letter of Credit with Lender as its Additional Collateral hereunder, Borrower shall deliver such Letter of Credit directly to Lender, and as of the date of delivery of such applicable Additional Collateral, the deposit of Excess Cash pursuant to Section 2.5(c)(xi) shall cease, and a DSCR Cure Event shall be deemed to have occurred provided no Event of Default has occurred and is continuing.  Lender shall hold

30

the Additional Collateral subject to the terms of <u>Section 2.4(g)</u> and this <u>Section 2.6</u>. Upon Lender's receipt and acceptance of such Additional Collateral under this <u>Section 2.6(b)</u>, subject to the terms of this Section 2.6, Borrower shall be thereafter entitled to receive a disbursement of the Excess Cash to the Borrower's Operating Account to the extent expressly provided in <u>Sections 2.5(c) and 2.6</u>, provided no Event of Default has occurred and is continuing.

(c)    If a Letter of Credit has been posted by Borrower hereunder, Borrower agrees that no less than thirty (30) days prior to the expiration date of the Letter of Credit, and upon each renewal or extension thereof, until such date as the Letter of Credit has been released by Lender as provided below, Borrower shall deliver to Lender a renewal or extension of the Letter of Credit for a term of not less than one (1) year, in form and content satisfactory to Lender and issued by an Approved Bank, and having a nominal amount equal to the maximum principal amount of the Note. Lender shall be entitled to draw upon the Letter of Credit or apply the Cash Collateral (i) to repay the outstanding principal amount of the Note if the Debt Service Coverage Ratio of the Property continues to decline and falls below 1.20:1.00 for two consecutive calendar quarters, tested quarterly on a trailing 12-month basis, and (ii) when any Event of Default exists (including, without limitation, Borrower's failure to deliver a renewal or failure to deliver an extension of any posted Letter of Credit as required above). Without limiting the foregoing, if at any time the bank issuing any such Letter of Credit shall cease to be an Approved Bank, Lender shall have the right, after ten (10) Business Days' notice thereof, to draw down the full amount of any posted Letter of Credit and hold the proceeds of such draw in the Excess Cash Reserve in accordance with <u>Section 2.4(g)</u> hereof unless Borrower shall have replaced the Letter of Credit with a Letter of Credit issued by an Approved Bank prior to such draw down.

(d)    Any Additional Collateral delivered by Borrower to Lender pursuant to this <u>Section 2.6</u> shall be additional security for the payment of the Loan. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to apply any Cash Collateral or draw on any Letter of Credit and to apply all or any part thereof (after reimbursement of any costs and expenses, including attorneys' fees and reimbursements, incurred by Lender in connection with such application or draw, as the case may be) to the repayment of the outstanding principal balance of the Note in such order, proportion and priority as Lender may determine in Lender's sole discretion. Any such application to the outstanding principal balance of the Note shall be subject to any then applicable Make Whole Payment. No application of the Cash Collateral or draw by Lender on any Letter of Credit shall cure or be deemed to cure any Event of Default or limit in any respect any of Lender's remedies under the Loan Documents on account thereof, it being understood that Lender's rights and remedies hereunder shall be cumulative and Lender shall have no obligation to apply the proceeds of any Additional Collateral to missed installments or other amounts then due and unpaid under the Loan. No delay or omission of Lender in exercising any right to apply the Cash Collateral or to draw on the Letter of Credit shall impair any such right, or shall be construed as a waiver of, or acquiescence in, any Event of Default.

(e)    Provided no Event of Default exists and is continuing, Lender shall, upon Borrower's request, release its rights in the Additional Collateral and either disburse the Cash Collateral or surrender the Letter of Credit to the issuing bank after the occurrence of an applicable DSCR Cure Event for two (2) consecutive calendar quarters.

31

(f)    In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this <u>Section 2.6</u>, Lender shall have the additional rights to draw in full any Letter of Credit: (i) if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (ii) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); or (iii) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Approved Bank and Borrower shall not have replaced such bank with an Approved Bank within ten (10) Business Days after notice thereof.  Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in (i), (ii) or (iii) above.

**ARTICLE 3.**
**DISBURSEMENT**

**3.1    <u>CONDITIONS PRECEDENT TO INITIAL LOAN DISBURSEMENT</u>**.

3.1.1    <u>Initial Advance under the Loan</u>.  Lender's obligation to advance the Initial Funding Amount under the Loan Documents shall be subject to satisfaction of following conditions precedent by not later than the date hereof:

(a)    <u>No Default or Event of Default</u>.  There exists no Default or Event of Default.

(b)    <u>Loan Documents</u>. Lender shall have received all Loan Documents, other documents, instruments, policies, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents.

(c)    <u>Security Instrument</u>.  The Security Instrument is a valid lien upon the Property and is prior and superior to all other liens and encumbrances thereon except those approved by Lender in writing.

(d)    <u>Representations and Warranties True at Closing</u>.  The representations and warranties contained in <u>Article 6</u> of this Agreement or otherwise made by or on behalf of Borrower in any of the Loan Documents or in any certificate, written statement or other writing given in connection with the Loan (including, but not limited to, all financial and operating statements) shall be true and correct on and as of the Effective Date with the same effect as if made at such time.

(e)    <u>Performance</u>.  Borrower shall have performed and complied with all agreements and conditions contained herein required to be performed and complied with by Borrower prior to or on the Effective Date.

(f)    <u>Reports, Studies and Permits</u>.  Lender shall have received and approved in form and substance reasonably satisfactory to Lender:  (i) a report of the physical condition of the Property; (ii) copies of all agreements which were material to completion of the

32

Improvements; (iii) copies of all building permits and similar permits, licenses, approvals, zoning and land use approval, development agreements and other authorizations of governmental agencies, if any, required in connection with the development of the Property; and (iv) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by or with any governmental agency in connection with the Property.

(g)    Environmental Matters.  Lender shall have received the Environmental Report in form and substance reasonably satisfactory to Lender from an independent, licensed environmental engineer approved by Lender, certifying to Lender that the Property is free from any Hazardous Substances, except for such uses which are in compliance with Environmental Laws.  Such report shall be addressed directly to Lender or, if such report is not addressed to Lender, Borrower shall obtain reliance letters satisfactory to Lender.

(h)    Cash Management.  Borrower shall have entered into a deposit account control agreement and a cash management agreement with Wells Fargo Bank, N.A. (the "**Deposit Bank**"), and Lender in a form mutually acceptable to the parties thereto. Lender shall maintain with the Deposit Bank a deposit account (the "**Cash Management Account**") whereby all Gross Operating Income generated by the Property shall be deposited, and on and after Completion applied pursuant to the terms of Section 2.5 hereof.

(i)    Tenant in Common Agreement. Lender shall have received and approved in form and substance the Tenant in Common Agreement among the Borrowers.

(j)    Title Insurance.  The Title Company shall be irrevocably committed to issue to Lender the Title Policy which shall include extended coverage policies of title insurance, together with such endorsements as required by Lender, in the amount of the Loan (or other amount approved by Lender) and issued by Title Company, with such reinsurance or co-insurance as may be required by Lender, in form and substance satisfactory to Lender insuring that Borrower is the owner of the fee interest in the Property, and that the Security Instrument creating the insurable interest of Lender under the Title Policy is a valid first lien on the Property encumbered thereby, in favor of Lender, its successors and assigns, as the insured, free and clear of all liens, encumbrances and exceptions to title whatsoever, other than encumbrances approved in writing by Lender prior to the Effective Date.

(k)    Survey.  Borrower shall have furnished to Lender two (2) copies of an acceptable survey by an independent, registered surveyor reasonably satisfactory to Lender, certified to Lender, its successors and assigns, and the Title Company as correct and as having been made in accordance with the most recent standards for "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM (the "**Survey**").

(l)    Insurance.  Borrower shall have delivered to Lender the policies of insurance (or certificates) as required by Article 5 of this Agreement, and shall have delivered evidence reasonably satisfactory to Lender of the payment of all premiums payable for the existing period of such policies.

33

(m)    <u>Consents, Licenses, Permits and Approvals</u>.    Borrower shall have furnished to Lender copies of, or other evidence satisfactory to Lender establishing that Borrower has obtained or is in the process of obtaining, all consents, licenses, permits and approvals from any and all governmental authorities having jurisdiction over Borrower and/or the Property, which are required in connection with the development of the Property and construction of the Improvements in accordance with the Construction Documents and/or the execution, delivery and performance by Borrower under, and the validity and enforceability of, the Loan Documents, and all such consents, licenses, permits and approvals obtained as of the Effective Date shall be in full force and effect, and written proof that any and all corporate, partnership and limited liability company action necessary to enable Borrower to enter into the financing transactions contemplated by this Agreement shall have been obtained and/or taken by Borrower (including, without limitation, any required consents of any partners, members and/or shareholders).

(n)    <u>REAs, CCRs</u>.    Lender shall have received copies of any reciprocal easement agreements, development agreements, covenants, conditions and restrictions or similar agreements affecting the Property and each and all of the same shall be reasonably satisfactory in form and substance to Lender.

(o)    <u>Financial Statements</u>.    Lender shall have received originally signed and dated financial statements, balance sheets, and tax returns from Borrower, and each Guarantor, and any other financial information relating to the Property requested by Lender, including, without limitation, income and expense statements.

(p)    <u>Payment of Fees and Expenses</u>.    Borrower shall have paid to Lender, on or before the Effective Date, the Loan Commitment Fee and the Lender Expenses.

(q)    <u>Lien Search Reports</u>.    Lender shall have received satisfactory reports of UCC, federal tax lien, state tax lien, bankruptcy, judgment and pending litigation searches conducted by a search firm reasonably acceptable to Lender (collectively, the "**UCC Searches**"). Such UCC Searches shall have been received in relation to Borrower, Guarantor and each owner of the Property (or any portion thereof) immediately prior to the acquisition of the Property by Borrower (to the extent that Borrower is acquiring the Property from such prior owner in connection with the Loan).

(r)    <u>No Injunction</u>.    No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of Lender would enjoin, prohibit or restrain, or impose or result in an adverse effect upon the making or repayment of the Loan or the consummation of the transactions contemplated by the Loan Documents.

(s)    <u>Material Agreements</u>.    Borrower shall have delivered to Lender a copy of all Material Agreements and Operating Agreements relating to the Property, including without limitation, the Development Agreement, the Hotel Management Agreement and the Comfort Letter with the Hotel Manager. In addition, if required by Lender, Borrower shall obtain estoppels and other customary agreements with any third parties under such Material Agreements and Operating Agreements.

(t)    Site Inspection.  Lender shall have performed, or caused to be performed on its behalf, an on-site due diligence review of the Property to be acquired with the Loan satisfactory to Lender in Lender's sole discretion.

(u)    Subdivision.  Lender shall have received evidence satisfactory to Lender (including title endorsements) that the Real Property comprising the Property constitutes a separate lot for real estate tax and assessment purposes.

(v)    No Material Adverse Change.  Since the date financial reports were delivered to Lender, there shall have been no material adverse change in the financial condition or business of Borrower or Guarantor nor any material decline in the condition or market value of the Property, each as determined by Lender in its sole discretion.

(w)    Underwriting and Due Diligence.  Lender shall have satisfactorily completed its underwriting and due diligence with respect to the Loan, Borrower, the partners, joint venturers or members of Borrower, each Guarantor, and the Property, including, without limitation, any title, survey, insurance, tenant estoppel letters, lease abstracts, environmental reports, structural reports, and financial statements relating to the Property, and Lender shall have completed such other real estate and legal due diligence investigations as Lender deems necessary, and such review and investigations shall provide Lender with resulting information which, in Lender's sole discretion, is satisfactory to permit Lender to enter into this Agreement and to make the Loan.

(x)    Budgets.  Lender shall have reviewed and approved on or before the date hereof (i) the Construction Budget, the FF&E Budget and the Operating Budget of the Property (which shall include separate operating budgets for each of the Hotel and the Playground) that comprise the Approved Budget attached hereto as **Exhibit C**, provided that Borrower shall have ninety (90) days after the date hereof to prepare and submit for Lender's approval a separate operating budget for the Playground parcel comprising the Property, to be part of the Approved Budget, (ii) Borrower's proposed sources and uses of funds for the Loan proceeds, and (iii) the detailed Construction Schedule for completion of the construction of the Required Construction & Improvements, which Borrower shall provide to Lender, for Lender's reasonable approval, within thirty (30) days after the date hereof, and once approved shall be considered the "Construction Schedule" and shall not be further amended without the prior approval of Lender. If Borrower fails to so provide, or Lender fails to reasonably approve the Construction Schedule submitted by Borrower, the existing Construction Schedule attached hereto shall govern until a revised version of the same is approved by Borrower and Lender.

(y)    Affiliate Fees.  Borrower shall have disclosed to Lender, and Lender shall have approved, all fees, commissions and other amounts (collectively, "**Affiliate Fees**") which have been or will be reimbursed or paid to or paid on behalf of Borrower, any Guarantor or any Affiliate thereof in connection with the acquisition or financing of the Property, including, without limitation, amounts paid by the Seller or any affiliate of the Seller.  All Affiliate Fees shall be deducted from the calculation of the capitalization costs of the financing transaction contemplated by this Agreement for determining the maximum principal amount of the Loan and Borrower's required equity contribution.  Without limitation on the foregoing, all Affiliate Fees

shall be subordinate to the Loan and shall be terminable by Lender in the event of the occurrence of an Event of Default;

(z)    <u>Borrower Equity</u>.  Borrower shall have caused (and Borrower hereby agrees to cause) the portion of the Borrower Equity equal to (i) $15,200,000.00 to be applied as of the Closing Date to the costs of construction of the Required Construction & Improvements incurred by Borrower to date, and evidenced to Lender's satisfaction, and the costs of Closing the Loan;

(aa)    <u>Charter Documents</u>.    Lender shall have received from Borrower and Guarantor, certified copies of all organizational documents relating to such Person (other than a natural Person) as Lender may request, including, but not limited to, all partnership or operating agreements evidencing the organization, existence and authority of Borrower and such other corporate, partnership and limited liability company documents with respect to Borrower and its constituent entities as Lender shall require, including evidence of authorization and incumbency of all Persons executing the Loan Documents on behalf of Borrower, good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the execution, delivery and performance of the Loan Documents, and incumbency certificates;

(bb)    <u>Additional Matters</u>.    Lender shall have received such other permits, certificates (including certificates of occupancy reflecting the use of the Property as of the Effective Date), opinions, documents and instruments (including without limitation, written proof from the appropriate Governmental Authority regarding the zoning of the Property and the Construction Documents) in form and substance reasonably acceptable to Lender relating to the Loan as may have been requested by Lender and all other documents and all legal matters in connection with the Loan shall be reasonably satisfactory in form and substance to Lender.

(cc)    <u>Pledge Agreement</u>.    Borrower shall have caused Pledgor to execute and deliver to Lender, that certain Pledge Agreement whereby all of Pledgors right, title and ownership interests in the Apartment Company owning the Apartment Property (and all rents, revenue and products thereof) shall be pledged to Lender as collateral for the Loan, unless and until released in accordance with Section 9.9 hereof.

3.1.2    <u>Construction Holdback Draws; Reserve Disbursements.</u> The obligation of Lender to make any disbursement under the Loan of all or a portion of the Future Advance Funding Amount consisting of advances from the Construction Completion Holdback or from any Reserves hereunder (including the Reserves under <u>Section 2.4</u>) from time to time is subject to the satisfaction of the following additional conditions precedent as of the date of any such disbursement:

(a)    <u>Advance or Disbursement Request</u>.  Lender shall have received a written request for advance or disbursement submitted in accordance with <u>Section 2.3</u> of this Agreement (any advance of Future Advance Funding Amount shall be in an amount of not less than $250,000.00), which shall provide a detailed description of the uses of the proceeds of such applicable advance or disbursement;

36

(b)     Use of Proceeds; Disbursement Schedule.    The proceeds of the disbursement are solely for uses permitted under this Agreement, including the disbursement schedule contained in the Approved Budget; and Borrower shall have satisfied any other specific conditions herein for use of the Loan proceeds to be disbursed to Borrower;

(c)     In-Balance.  The Loan is In-Balance pursuant to the terms of Section 9.13 hereinbelow;

(d)     Lien Waivers. Delivery of lien waivers from the General Contractor and any applicable sub-contractor, in form satisfactory to the Title Company, which lien waiver may be conditioned, only, upon payment from such advance or disbursement;

(e)     Representations and Warranties.  All of the representations and warranties of Borrower contained in this Agreement or in any other Loan Document shall be true and correct in all material respects as though made on and as of such date;

(f)     No Event of Default.  No Default or Event of Default shall have occurred and be continuing or would result from the making of such disbursement;

(g)     Application of Gross Operating Income.  Borrower shall have applied all Gross Operating Income in accordance with the Section 2.5(v) hereof and shall provide evidence reasonably satisfactory to Lender evidencing such application, upon Lender's request;

(h)     No Material Adverse Change.  No change shall have occurred in Borrower, the Property or any other Collateral which has a material adverse effect upon the value of the Collateral or the right or ability of Lender to receive payment in full of all amounts payable by Borrower to Lender under this Agreement or the other Loan Documents;

(i)     Title Policy.  Title search confirming that the lien of the Security Instrument continues to be insured by the Title Policy as a first priority lien against the Property free and clear of any liens other than the Permitted Encumbrances and any other matter approved by Lender, and Lender shall receive a downdate of the Title Policy and any endorsements to the Title Policy required by Lender in connection therewith (including any endorsement required to increase the amount of coverage to reflect such disbursement);

(j)     Affirmation.  If required by Lender, each Guarantor shall have reaffirmed in writing to Lender all of its obligations under the Guaranty;

(k)     Fees and Costs.  All out-of-pocket fees and expenses payable to Lender (or other fees and expenses due and payable hereunder), to the extent then due and payable, shall have been (or contemporaneously are being) paid in full and all title premiums and other title and survey charges shall have been (or contemporaneously are being) paid in full;

(l)     Additional Requirements for Payments from Certain Holdbacks.  In connection with reimbursements to be made from the Construction Completion Holdback, the following additional terms and conditions shall apply:

37

(i)     Without limitation on other requirements, Lender shall require that Borrower shall furnish to Lender, separately with respect to each such request, AIA forms G702 and G703 (or acceptable equivalents) and such other forms and schedules of values as may from time to time be approved or required by Lender, duly signed and sworn to by Borrower and each applicable contractor, with all blanks appropriately completed, setting forth such details concerning construction of the improvements as Lender shall require.  If required by Lender, Borrower shall have furnished to Lender evidence that all required inspections by Governmental Authorities have been satisfactorily completed.

(ii)    Borrower shall have submitted and Lender shall have approved in writing (A) the Improvements to be constructed and the estimated cost thereof as set forth in the Approved Budget, (B) the  Plans and Specifications for such Required Construction & Improvements (in which event such Plans and Specifications shall be included as "**Approved Plans and Specifications**"), which Approved Plans and Specifications may not be changed in any material respect without Lender's prior written consent, and (C) the Construction Contract and other Construction Documents, including each Major Contract, as requested by Lender. Upon Lender's request, Borrower shall assign any such Major Contract to Lender.

(iii)   All work performed by Borrower prior to the date a payment or reimbursement is requested shall be completed or progressing to the satisfaction of Lender (and/or its agents, including without limitation the Construction Consultant) and substantially in accordance with the Approved Plans and Specifications, the Approved Budget, the Franchise Agreement and all legal requirements.

(iv)    Borrower shall not use any portion of any disbursement for payment of any other cost except as specifically set forth in a request for payment or reimbursement approved by Lender in writing or as properly reallocated by Borrower pursuant to this Agreement.

(v)     No funds will be used to pay or reimburse Borrower for payment for materials not stored at the Property unless Borrower furnishes Lender evidence, satisfactory to Lender, that such materials are properly stored and secured offsite.

(vi)    Borrower shall have provided to Lender evidence satisfactory to Lender (including access to the Property to Lender and any agent of Lender for the purpose of an inspection of work done), at Borrower's expense, if requested by Lender that the construction covered by the request for payment or reimbursement has been performed and the applicable materials have been furnished.

(vii)   Borrower shall have furnished to Lender a list of the names and addresses of all mechanics and materialmen who have performed labor or supplied materials the cost of which is to be paid from the disbursement of proceeds that is the subject of the improvements payment or reimbursement request.

38

(viii)    Disbursement for hard costs shall be limited to the lesser of:  (A) the actual cost to Borrower of work and labor performed on the improvements and materials incorporated into the improvements or suitably stored on the Property; or (B) the amounts allocated to the work, labor and materials in question on budgets and schedules of values approved by Lender multiplied by the percentage of completion (as reasonably determined by Lender) of such work, labor and materials (subject in all events to the ten percent (10%) retention).

(ix)    Disbursements on account of soft costs shall be limited to the actual amounts of such costs as indicated by invoices, statements, vouchers, receipts or other written evidence satisfactory to Lender.

(x)    Throughout the course of construction of the Required Construction & Improvements, Lender shall have the right, in its good-faith discretion, to employ, at Borrower's sole cost and expense, an inspector or inspectors and a consultant or consultants (including the Construction Consultant) who shall review as agent for Lender all construction activities undertaken in regard to any Property. At Lender's election, exercised in its sole discretion, such amounts may be payable out of the Construction Completion Holdback.  If required by Lender, delivery of a certificate or indication from such inspector(s) and/or consultant(s) that construction complies with the Approved Plans and Specifications and the Approved Budget (including percent completion requirements and in-balance requirements herein) may be a further condition precedent to Lender's approval of each draw request.

(xi)    Lender shall have received unconditional lien waivers (or conditional lien waivers conditioned only on payment) executed by each contractor, subcontractor and materialman supplying labor or materials and any architect's certificates as to work completed which is the subject of such advance, satisfactory to the Lender and the Title Company.

(xii)    Without limitation on the other terms and conditions contained herein, all disbursements (A) from the Construction Completion Holdback shall be pursuant to and for the purposes provided in the Approved Budget.  Any contingency under the Approved Budget may be used only with the prior written consent of Lender and for purposes approved in writing by Lender (in its sole but reasonable discretion). Major changes to the Approved Budget, including as a result of material changes in the Approved Plans and Specifications, and material reallocation of budget line items that are other than a Permitted Change shall be subject to the prior written consent of Lender.

(xiii)    No event, circumstance or condition exists or has occurred which, in Lender's sole but reasonable judgment, could delay or prevent the completion of the Required Construction & Improvements specified under the Approved Budget by the Completion Date, subject to Force Majeure delays; and

(m)    _Final Advance_.  In addition to the foregoing conditions, the final advance from the Construction Completion Holdback shall be subject to Borrower's compliance with the following to Lender's reasonable satisfaction:

(A)    A final certificate(s) of occupancy for all Improvements at the Property under applicable law, issued by the appropriate Governmental Authorities, certifying that all of the Property, as constructed, may be legally occupied, provided that (i) all of the Required Construction & Improvements have been completed and paid for in full (unless being fully paid with the proceeds of this last Advance), and (ii) Borrower is diligently pursuing the final certificate of occupancy for the Improvements, to the extent not available on the date of the final Advance, a temporary certificate of occupancy for the Improvements with conditions attached thereto shall suffice so long as the Property may be legally occupied and open for business;

(B)    A certificate of substantial completion from the Architect certifying that construction of the Improvements has been satisfactorily completed substantially in accordance with final Approved Plans and Specifications;

(C)    A General Contractor's final affidavit and final lien waiver in form and substance satisfactory to Lender and the Title Company;

(D)    A final affidavit and final lien waiver from the Architect, the Engineer, and all subcontractors, architects, engineers, materialmen or other parties who have supplied labor, materials or services for the construction of the Improvements as Lender and the Title Company may require, in form and substance reasonably satisfactory to Lender and the Title Company;

(E)    If requested by Lender, a final endorsement to the Title Policy, in form and substance acceptable to Lender, insuring the full amount of all Loan proceeds actually disbursed, without exception other than Permitted Encumbrances and, without limitation, insuring matters of survey to and including the date of the final "as-built" survey, together with an ALTA 3.1 zoning endorsement (including parking) or if unavailable, alternative evidence, including legal opinions, regarding zoning acceptable to Lender;

(F)    Confirmation that all insurance requirements under the Loan Documents have been satisfied; and

(ii)    To the extent any easements benefiting or burdening the Property are required in connection with the improvements to the Property, such easements shall have been granted or reserved prior to date of the final advance in form reasonably acceptable to Lender.

(n)    Lender shall have received such other documents or items as Lender or its counsel may require in their reasonable, good-faith discretion.

(o)    Lender, at its option and without further direction from Borrower, may make an advance hereunder to make a construction payment to the Person to whom payment is due or through an escrow satisfactory to Lender or directly to Borrower for payment to such Persons, provided that if Lender elects to pay any such Person directly, and Borrower notified Lender in writing that it is contesting in good faith pursuant to Section 12.7 hereof amounts payable to such Person, Lender shall not so make such advance and payment pursuant to this

<u>Section 3.1.2(n)</u> but may, at its option, advance such amount into an escrow satisfactory to Lender pending the conclusion of such contest by Borrower, provided the conditions of <u>Section 12.7</u> hereof are satisfied. Borrower hereby irrevocably directs and authorizes Lender to so advance the proceeds of the Loan. All sums so advanced shall constitute advances of the Loan and shall be secured by the Loan Documents.

3.1.3    <u>Retainage</u>.    An amount equal to ten percent (10%) of the hard costs of construction of the Improvements shall be retained by Lender with each Advance and shall be paid over by Lender to Borrower, provided that no lien claims are then filed against the Property, when all of the requirements for the final Advance specified in <u>Section 3.1.2</u> have been satisfied; provided, however, (i) Lender shall not unreasonably withhold its consent to a release of that portion of the retainage applicable to a particular Construction Contract when the work to be provided by such applicable contractor has been completed and verified by the Fund Control Agent, a full lien waiver has been obtained from that applicable contractor and normal and customary confirmation and safeguards followed in accordance with California law and (ii) once fifty percent (50%) of the work necessary to build the Required Construction & Improvements has been Completed, as determined by Lender, the amount of retainage for the remaining fifty percent (50%) of the work shall be reduced to five percent (5%), except that the foregoing proviso shall in no event result in the aggregate retainage then held by Lender being less than the amount required pursuant to the Construction Contract.

## ARTICLE 4.
## BORROWER'S EQUITY

**4.1**    **COMMITMENT**.  Upon the closing of the Loan, Borrower shall satisfy all terms and conditions of <u>Section 3.1.1(y)</u> hereof.

## ARTICLE 5.
## INSURANCE

Borrower shall at all times keep the improvements now existing or hereafter erected on the Property insured against all losses, hazards, casualties, liabilities and contingencies as Lender shall require and in such amounts and for such periods as Lender shall require.  Borrower shall purchase and maintain the following policies of insurance with respect to the Property in form and substance satisfactory to Lender as follows:

**5.1**    **PROPERTY INSURANCE**.  Property insurance covering loss or damage by fire, lightning, water, wind and such other perils as are included in a standard "special causes of loss form" property insurance policy in an amount no less than one hundred percent (100%) of the replacement cost (including cost of demolition, increased costs to repair or rebuild the Property to comply with current building, zoning or land use ordinance or law, and debris removal) of all real and personal property, including tenant improvements, twelve (12) months of gross operating or business income with not less than an additional ninety (90) day period of extended indemnity coverage, and including such other endorsements as Lender may reasonably require, insuring against damage to the Property in an amount acceptable to Lender.  The loss valuation clause of the policy shall be replacement cost value.  The deductible under such policy shall not exceed $25,000.  This policy shall contain ordinance or law coverage, including loss to

41

undamaged parts of the building to the full building damage limit of the policy and with demolition and increased cost of construction insured to limits in an amount acceptable to Lender.  The policy shall contain a standard mortgagee insurance clause and a Lender's Loss Payable Endorsement or clause (ISO form CP 12 18 or equivalent) with Lender named on the policy as both mortgagee and loss payee.

5.2    **BOILER AND MACHINERY INSURANCE**.  Boiler and machinery (or equipment breakdown) insurance, in an amount which is no less than twenty percent (20%) of the sum of the one hundred percent (100%) replacement cost value of the Property, or such other amount agreed by Lender, plus an amount equivalent to the annual Gross Operating Income for the Property, covering the mechanical breakdown of boilers, air conditioning equipment and other machinery and equipment in an amount deemed necessary by Lender.  The loss valuation clause of the policy shall be replacement value.

5.3    **FLOOD INSURANCE**.  Flood insurance if the Property lies within Flood Zones A or V, or if otherwise deemed necessary by Lender, in a form and with insured limits and deductibles acceptable to Lender.

5.4    **EARTHQUAKE INSURANCE**.  If the Property is in an area prone to geological phenomena, including, but not limited to, sinkholes, or mine subsidence, earth movement or earthquake, insurance covering such perils with insured limits and deductibles acceptable to Lender.  This policy shall include ordinance or law coverage as shown above in Section 5.1.  The loss valuation clause of the policy shall be replacement cost.

5.5    **TERRORISM INSURANCE**.  As required by Lender, Borrower shall provide evidence of insurance covering loss from acts of terrorism.

5.6    **LIABILITY INSURANCE**.  Commercial General Liability insurance with limits no less than $5,000,000 each occurrence and $5,000,000 in the aggregate for any policy year with Lender included as an additional insured with the coverage primary and non-contributory to any other valid and collectible insurance.  The use of a combination of primary and excess liability insurance policies shall be permitted in order to maintain the required limits of liability insurance.  All liability insurance policies must provide for claims to be insured on an occurrence basis.  All liability policies shall include coverage of a broad form standard, including, but not limited to, explosion, collapse and underground property damage (x, c, and u), completed operations, broad form contractual liability, broad form property damage and personal injury coverage.

5.7    **CONSTRUCTION INSURANCE**.  During any period of construction, reconstruction, renovation or alteration of the Property at a cost in excess of ten percent (10%) of the stated amount of the Note, Borrower shall maintain at Borrower's sole expense, with licensed insurers approved by Lender, the following policies of insurance in form and substance satisfactory to Lender:

(a)    Builder's Risk Insurance coverage in any amount equal to 100% of the completed value replacement cost of all improvements to be constructed, written on a Causes of Loss – Special Form or its equivalent, in a non-reporting completed value form. The loss

42

valuation clause of the policy shall be replacement cost value. Coverage shall be extended to insure project soft costs to include 100% of the cost during the construction term of construction loan interest, taxes and insurance and shall insure loss of income or rents in an amount equivalent to the gross income or loss of rents for an indemnity period of no less than twelve months.  Any exclusion for loss or damage to existing structures shall be removed from the policy.  The policy shall contain a basic perils deductible no greater than $25,000.  Coverage shall permit for partial occupancy by Borrower and shall insure all construction materials and supplies on the construction site, stored off-site and while in transit.  The policy shall include coverage of ordinance or law perils as shown above in <u>Section 5.1</u> and of equipment breakdown perils as shown above in <u>Section 5.2</u>;

(b)    Borrower shall require of its contractor, and contractor shall purchase and maintain, (1) general liability insurance with limits of $3,000,000 each occurrence / $3,000,000 annual aggregate with Lender and Borrower included as additional insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $1,000,000 per occurrence. Borrower shall require of the sub-contractors, and sub-contractors shall purchase and maintain, (1) general liability insurance with limits of $1,000,000 each occurrence / $1,000,000 annual aggregate with Lender and Borrower included as additional insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $1,000,000 per occurrence.

**5.8    <u>OTHER INSURANCE.</u>**    Borrower shall provide such other insurance and in such amounts as are required pursuant to the Franchise Agreement or as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

**5.9    <u>GENERAL</u>**.  All insurance policies contemplated by <u>Section 5.1</u> hereof shall name Borrower as the insured.  All premiums on insurance policies shall be paid in full. Borrower shall provide the Lender certified copies of all required insurance policies, or other evidence which is reasonably acceptable to Lender.  Property insurance certificates shall be issued using the ACORD 28 form.  All insurance policies shall provide that the insurance shall not be cancelable or materially changed without thirty (30) days prior written notice to Lender. All policies, other than liability insurance policies, shall not contain any co-insurance clause or such clause shall be removed by an "agreed amount" endorsement.  Lender shall be named under a Lender's Loss Payable Endorsement (ISO form CP 12 18 or equivalent)  and as mortgagee with a standard form mortgagee clause applying on all non-liability insurance policies which Borrower maintains with respect to the Property and Improvements.  Borrower shall provide to Lender evidence, in a form as is reasonably required by Lender, of any other hazard insurance Lender may reasonably deem necessary at any time during the Loan.  Without limitation on the foregoing, all policies shall be insured by a licensed insurance company or companies with a rating of A- VIII or better by A.M. Best Co. and shall contain deductibles not in excess of five percent (5%) of the policy limits.

# ARTICLE 6.
## REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender as of the Effective Date (and as of the date of any additional advances hereunder) and continuing thereafter that:

**6.1** **AUTHORITY/ENFORCEABILITY**.  Borrower is in compliance with all laws and regulations applicable to its organization, existence and transaction of business and has all necessary rights and powers to own, develop and operate the Property and Improvements as contemplated by the Loan Documents.

**6.2** **BINDING OBLIGATIONS**.  Borrower is authorized to execute, deliver and perform its obligations under the Loan Documents, and such obligations shall be valid and binding obligations of Borrower.

**6.3** **FORMATION AND ORGANIZATIONAL DOCUMENTS**.  Borrower has delivered to Lender all formation and organizational documents of Borrower and of the managing member, partners, joint venturers or members of Borrower, if any, and of all Guarantors other than Guarantors which are natural persons, if any, and all such formation and organizational documents remain in full force and effect and have not been amended or modified since they were delivered to Lender.  As of the date hereof, the organizational chart set forth as Schedule I hereto accurately sets forth the ownership structure of Borrower and its Affiliates both before and after the Exchange Interest Transfer, as noted thereon. A true, correct and complete copy of the certificate of formation of each Borrower listed on **Exhibit N** with the applicable Secretary of State shown thereof, pursuant to which each Borrower was formed, along with an Operating Agreement for each such Borrower dated as of date shown on **Exhibit N**, have been delivered to Lender, have not been amended, are in full force and effect, and all required filings with applicable authorities have been made with respect to each Borrower. Each Borrower shall promptly provide Lender with copies of any amendments or modifications of the formation or organizational documents of such Borrower and any Guarantor.

**6.4** **NO VIOLATION**.  Borrower's execution, delivery, and performance under the Loan Documents do not: (a) require any consent or approval not heretofore obtained under any partnership agreement, operating agreement, articles of incorporation, bylaws or other document; (b) violate any Applicable Laws; or (c) conflict with, or constitute a breach or default or permit the acceleration of obligations under any agreement, contract, lease, or other document by which the Borrower is or the Property and Improvements are bound or regulated

**6.5** **COMPLIANCE WITH LAWS**.  Borrower has obtained, or shall timely obtain all permits, licenses, exemptions, and approvals necessary to construct, occupy, operate and market the Property and Improvements in accordance with the Approved Budget, and shall maintain compliance with all Applicable Laws. The Property is a legal parcel lawfully created in full compliance with all subdivision laws and ordinances.

**6.6** **LITIGATION**.  Except as disclosed in writing to Lender prior to the date hereof, there are no claims, actions, suits, or proceedings pending, or to Borrower's knowledge

threatened, against Borrower or any Guarantor affecting the Property or Improvements with a claimed exposure in excess of $100,000.

**6.7** **FINANCIAL CONDITION**.    All financial statements and information heretofore and hereafter delivered to Lender by Borrower, including, without limitation, information relating to the financial condition of Borrower, the Property, the Improvements, the partners, joint venturers or members of Borrower, each Guarantor, fairly and accurately represent the financial condition of the subject thereof in all material respects and have been prepared (except as noted therein) in accordance with GAAP, as modified by the Uniform System of Accounts, consistently applied. Borrower acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

**6.8** **NO MATERIAL ADVERSE CHANGE**.    There has been no material adverse change in the financial condition of Borrower and/or Guarantor since the dates of the latest financial statements furnished to Lender and, except as otherwise disclosed to Lender in writing, Borrower has not entered into any material transaction which is not disclosed in such financial statements.

**6.9** **ACCURACY**.    All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any misrepresentation or omission.

**6.10** **TAX LIABILITY**.    Borrower has filed all required federal, state, county and municipal tax returns and has paid all taxes and assessments owed and payable, and Borrower has no knowledge of any basis for any additional payment with respect to any such taxes and assessments.

**6.11** **STRUCTURE CHART**.    The organizational chart set forth as Schedule I hereto accurately sets forth the ownership structure of Borrower and its Affiliates shown thereon.

**6.12** **COMPLIANCE**.    Borrower is familiar with and in compliance with all governmental requirements for the development, ownership and operation of the Property and construction of the Improvements and will conform to and comply with all governmental requirements and any Approved Plans and Specifications relating to any construction.

**6.13** **ERISA**.

(a)    Borrower is not an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code), and neither the execution of this Agreement nor the making of the Loan gives rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(b)    Borrower is not (i) an employee benefit plan (as defined in Section 3(3) of ERISA), (ii) a plan as defined in Section 4975(e)(1) of the Code, which is subject to Section

45

4975 of the Code, or (iii) an entity whose underlying assets constitute "plan assets" of any such employee benefit plan or plan for purposes of Title I of ERISA or Section 4975 of the Code.

6.14    **BUSINESS LOAN**.  The Loan is a business loan transaction in the stated amount solely for the purpose of carrying on the business of Borrower and none of the proceeds of the Loan will be used for the personal, family or agricultural purposes of the Borrower.

6.15    **HOTEL MANAGEMENT AGREEMENT**. The Hotel Management Agreement is in full force and effect and there is no material default, breach or violation existing thereunder by Borrower or to Borrower's knowledge, Hotel Manager and, to the best actual knowledge of Borrower and after diligent inquiry, no event has occurred that, with the passage of time or the giving of notice, or both, would constitute a material default, breach or violation thereunder. The Hotel Management Agreement is subject to that certain Subordination, Non-Disturbance and Attornment Agreement dated as of the date hereof, executed by Borrower and Hotel Manager in favor of Lender.

6.16    **FRANCHISE AGREEMENT**.  The Franchise Agreement is in full force and effect and there is no material default, breach or violation existing thereunder by Borrower or to Borrower's knowledge, Hotel Franchisor, and, to the best actual knowledge of Borrower and after diligent inquiry, no event has occurred that, with the passage of time or the giving of notice, or both, would constitute a material default, breach or violation thereunder. The Franchise Agreement is subject to that certain Comfort Letter dated as of the date hereof, executed by Hotel Franchisor in favor of Lender.

6.17    **MATERIAL AGREEMENTS**.

(a)    Borrower has not entered into, and is not bound by, any Material Agreement which continues in existence, except those previously disclosed in writing to Lender.

(b)    Each of the Material Agreements is in full force and effect, there are no monetary or other defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other defaults thereunder by any other party thereto.  None of Borrower, or any other Person acting on Borrower's behalf has given or received any notice of default under any Material Agreement that remains outstanding or in dispute.

(c)    Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

(d)    No Material Agreement or Operating Agreement has as a party which is an Affiliate of Borrower.

6.18    **LEASES**.  The Property is not subject to any Leases or occupancy agreements other than as previously disclosed to Lender in writing prior to the date hereof.

6.19    **PATRIOT ACT AND RELATED MATTERS**.  Borrower and Guarantor shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting Borrower, the Property, or the use thereof, including, without limitation, Prescribed Laws (collectively, "**Applicable Laws**").  The

46

term "**Prescribed Laws**" means, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "**Patriot Act**"), (b) OFAC Laws and Regulations (as defined below), (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other legal requirements relating to money laundering or terrorism. Lender shall have the right to audit Borrower's compliance with the Prescribed Laws. Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that each of Borrower and the Property complies with all Prescribed Laws or is exempt from compliance with Prescribed Laws. "**OFAC Laws and Regulations**" means any lists, laws, rules, sanctions and regulations maintained by the United States Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") pursuant to any authorizing statute, Executive Order No. 13224 (September 23, 2001) and any related enabling or implementing executive orders or regulation, including the Trading with the Enemy Act, 50 U.S.C. App. 1-44, as amended from time to time, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, as amended from time to time, the unrepealed provisions of the Iraqi Sanctions Act, Pub. L. No. 101-513; United Nations Participation Act, 22 U.S.C. § 287c, as amended from time to time, the International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa 9, as amended from time to time, The Cuban Democracy Act, 22 U.S.C. §§ 6001-10, as amended from time to time, The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 2339b, as amended from time to time, and The Foreign Narcotics Kingpin Designation Act, Pub. L. No. 106-120, as amended from time to time.

     **6.20**   **NO BANKRUPTCY**.  No bankruptcy or insolvency proceedings are pending or contemplated by Borrower or, to the best knowledge of Borrower, against Borrower or by or against any endorser or cosigner of the Note, or any guarantor or indemnitor under any guaranty or indemnity agreement executed in connection with the Note or the loan evidenced thereby and secured hereby.

     **6.21**   **NOT FOREIGN PERSON**.  Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations.

     **6.22**   **INTENTIONALLY DELETED**.

     **6.23**   **PACE LOAN**.  Other than the PACE Loan, there are no other PACE loans or PACE liens affecting or relating to either the Property or Borrower. The existing PACE Loan is in full force and effect, and there are no existing defaults or events of default, or events that, with the giving of notice, the passage of time, or both, would constitute defaults or events of default under the existing PACE Loan. The current principal balance outstanding under the existing PACE Loan is $7,888,548.25. **Exhibit J** attached hereto contains a true, correct and complete list of all work to be completed on the Property under the existing PACE Loan, together with the unfunded amounts due for such work.

     **6.24**   **COMPLETION DATE**.  No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or threatened litigation or proceeding or basis therefor) exists which could adversely affect the ability of Borrower to complete the Improvements required to be completed under the Approved Budget prior to the Completion

Date, subject to Force Majeure delays.  Borrower shall complete the Required Construction & Improvements and obtain a final certificate of occupancy for the Improvements by April 30, 2018 for the Phase I Construction and by the date set forth in the Mello-Roos CFD Financing Documents for any Phase II Construction to be built pursuant thereto, provided however, if by such dates Borrower has not obtained a final certificate of occupancy for the Improvements, the same may be legally occupied and open for business and all the work to complete the Required Construction & Improvements has been completed and paid in full, Borrower may operate the Property under a temporary certificate of occupancy for the Improvements, provided that Borrower continues to use diligent efforts to promptly obtain a final certificate of occupancy for the Improvements and deliver a copy of the same to Lender promptly after receipt.

      **6.25**  **CONSTRUCTION DOCUMENTS.**  Borrower has delivered to Lender a true, correct and complete copy of all Construction Documents (which have not been amended except as disclosed in writing to Lender on or before the date hereof). There are no defaults beyond the expiration of any applicable notice and cure periods by Borrower under any Construction Documents, except as disclosed in writing to Lender on or before the date hereof.

      **6.26**  **TENANT IN COMMON AGREEMENT**.

        (i)    The Tenant in Common Agreement is in full force and effect and has not been modified or amended.

        (ii)    There are no defaults under the Tenant in Common Agreement on the part of any Borrower, and no event has occurred, which with the passage of time, the giving of notice, or both, would constitute a default under the Tenant in Common Agreement on the part of any Borrower.

        (iii)    The Tenant in Common Agreement provides that so long as the Loan or any portion thereof is outstanding, each tenant-in-common agrees that it will not seek or be entitled to seek and obtain a partition of all or any part of the Property without first obtaining the prior written consent of Lender, and each tenant-in-common expressly waives any right it may have to partition the Property or any part thereof, unless Lender has consented in writing to such party's exercise of such rights.

        (iv)    The Tenant in Common Agreement provides that each tenant-in-common agrees that the Tenant in Common Agreement, and all rights and privileges and remedies of each tenant-in-common thereunder, including without limitation, any rights of first refusal, purchase options or other similar rights under the Tenant in Common Agreement, are subject and subordinate to the Mortgage and the other Loan Documents and the Liens created thereby, and to all rights of the Lender thereunder.

        (v)    The Tenant in Common Agreement provides that no party thereunder may exercise any remedy provided for therein (including any rights of indemnification) against any other party for as long as the Loan (or any portion thereof) is outstanding.

        (vi)    The Tenant in Common Agreement provides that each tenant-in-common waives, for so long as the Loan (or any portion thereof) is outstanding, any lien

48

rights, whether statutory or otherwise, that it may have against the co-tenancy interest of any other tenant-in-common.

(vii)    The Tenant in Common Agreement provides that for so long as the Loan (or any portion thereof) is outstanding, Lender shall be a third party beneficiary of the Tenant in Common Agreement.

**ARTICLE 7.**
**HAZARDOUS MATERIALS**

**7.1    SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS.**

(a)    Borrower hereby represents and warrants to Lender that, as of the date hereof, to the best of Borrower's knowledge and except as disclosed to Lender in writing prior to the Effective Date:  (i)  the Property is not in material violation of any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination or clean-up (collectively, "**Environmental Laws**"), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq. and 40 CFR §302.1 et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986; the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq. and 40 CFR § 116.1 et seq.); those relating to Lead Based Paint (as defined below); the Hazardous Materials Transportation Act (49 U.S.C. §1801 et seq.); the Clean Air Act, 42 U.S.C.  §7401 et seq; the Toxic Substances Control Act; 15 U.S.C. §2601 et seq; the Safe Drinking Water Act) (42 U.S.C. §300f et seq; and the regulations promulgated pursuant to said laws, all as same may have been or may be amended relating to or affecting the Property, any portion thereof, whether or not caused by or within the control of Borrower; (ii) to the best of Borrower's knowledge, no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls, petroleum products, flammable explosives, radioactive materials, infectious substances or raw materials which include hazardous constituents), paint containing more than 0.5% lead by dry weight ("**Lead Based Paint**") or any other substances or materials which are included under or regulated by Environmental Laws, or any mold (collectively, "**Hazardous Substances**"), are located on or have been handled, generated, stored, processed or disposed of on or released or discharged from the Property (including underground contamination) except for those substances used by Borrower in the ordinary course of Borrower's business and in compliance with all Environmental Laws; (iii) the Property is not subject to any private or governmental lien or judicial or administrative notice or action relating to Hazardous Substances; (iv) to the best of Borrower's knowledge, there are no existing or closed underground storage tanks or other underground storage receptacles for Hazardous Substances on the Property; (v) Borrower has received no written notice of and, to the best of Borrower's knowledge, there exists no investigation, action, proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property nor does Borrower know of any basis for such a claim; and (vi) Borrower has received no notice of and, to the best of Borrower's knowledge, there has been no claim by any party that any use, operation or condition of the Property has caused any nuisance

49

or any other liability or adverse condition on any other property nor does Borrower know of any basis for such a claim.

(b)    Borrower shall keep or cause the Property to be kept free from Hazardous Substances (except those substances used by Borrower in the ordinary course of its business or in the construction of the Improvements and in compliance with all Environmental Laws), shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Substances (except those substances used by Borrower in the ordinary course of its business or in the construction of the Improvements and in compliance with all Environmental Laws), and, without limiting the generality of the foregoing, so long as this Agreement continues in effect, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos.

(c)    Borrower shall immediately notify Lender if Borrower shall become aware of the possible existence of (i) any Hazardous Substances on the Property (except those substances used by Borrower in the ordinary course of its business or in the construction of the Improvements and in compliance with all Environmental Laws), or other potential environmental problem or liability, with respect to the Property, (ii) any lien, action or notice affecting the Property or Borrower resulting from any violation or alleged violation of the Environmental Laws, (iii) the institution of any investigation, inquiry or proceeding concerning Borrower or the Property pursuant to any Environmental Law or otherwise relating to Hazardous Substances, or (iv) the discovery of any occurrence, condition or state of facts which would render any representation or warranty contained in this Agreement incorrect in any respect if made at the time of such discovery or (v) that the Property is in violation of any Environmental Laws. Further, immediately upon receipt of the same, Borrower shall deliver to Lender copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential presence or existence of any Hazardous Substances at, on, about, under, within in connection with the Property.  Borrower shall, promptly following written request thereof by Lender, at Borrower's sole cost and expense, and regardless of the source of contamination, take all actions as shall be reasonably necessary or advisable for the clean-up of any and all portions of the Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment and remedial actions in accordance with all applicable Environmental Laws (and in all events in a manner reasonably satisfactory to Lender), and shall further pay or cause to be paid, at no expense to Lender, all clean-up, administrative and enforcement costs of applicable governmental agencies which may be asserted against the Property.  In the event Borrower fails to do so, Lender may, but shall not be obligated to, cause the Property or other affected property to be freed from any Hazardous Substances or otherwise brought into conformance with Environmental Laws and any and all costs and expenses incurred by Lender in connection therewith shall be paid by Borrower within five (5) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice.  In the event Borrower fails to pay such costs and expenses within five (5) days after such written notice from Lender, such costs and expenses, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable by Borrower on demand and shall be secured by this Agreement and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  In furtherance of the foregoing, Borrower hereby grants to

50

Lender and Lender's agents and employees access to the Property during normal business hours and an irrevocable license to remove any items reasonably deemed by Lender to be Hazardous Substances and to do all things Lender shall deem necessary to bring the Property in conformance with Environmental Laws.  Borrower covenants and agrees, at Borrower's sole cost and expense, to indemnify, defend, protect (at trial and appellate levels, and with attorneys, consultants and experts reasonably acceptable to Lender), and hold Lender harmless from and against any and all present and future liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys', reasonable consultants' and reasonable experts' fees and disbursements actually incurred in investigating, defending, settling or prosecuting any claim, litigation or proceeding) (collectively, "Costs") which may at any time be imposed upon, incurred by or asserted or awarded against Lender or the Property, and arising directly or indirectly from or out of:  (i) the violation of any Environmental Laws relating to or affecting the Property, whether or not caused by or within the control of Borrower arising prior to the date Lender or its designee succeeds to the interest of Borrower to the Property;  (ii) the actual or alleged presence, release or threat of release of any Hazardous Substances now or hereafter, on, in, under or affecting all or any portion of the Property, regardless of whether or not caused by or within the control of Borrower arising prior to the date Lender or its designee succeeds to the interest of Borrower to the Property; (iii) the failure by Borrower to comply fully with the terms and conditions of this <u>Section 7.1</u>; (iv) the breach of any representation or warranty contained in this <u>Section 7.1</u>; or (v) the enforcement of this <u>Section 7.1(c)</u>, including, without limitation, the cost of assessment, containment and/or removal of any and all Hazardous Substances from all or any portion of the Property, the cost of any actions required to be taken under this <u>Section 7.1</u> in response to the presence, release or threat of release of any Hazardous Substances on, in, under, within or otherwise affecting any portion of the Property to prevent or minimize such release or threat of release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, welfare or the environment, and costs incurred to comply with the Environmental Laws in connection with all or any portion of the Property arising prior to the date Lender or its designee succeeds to the interest of Borrower to the Property.  The indemnity set forth in this <u>Section 7.1(c)</u> shall also include, without limitation, any diminution in the value of the security afforded by the Property or any future reduction in the sales price of the Property by reason of any matter set forth in this <u>Section 7.1(c)</u>. Notwithstanding anything contained herein to the contrary, in no event shall Borrower be liable for or be obligated to indemnify Lender for Costs resulting solely from Lender's gross negligence or willful misconduct or arising after the date Lender or its designee succeeds to the interest of Borrower to the Property. Lender's rights under this <u>Section 7.1(c)</u> shall survive payment in full of the indebtedness secured hereby and shall be in addition to all other rights of Lender under this Agreement, the Note and the other Loan Documents.

(d)    Upon Lender's request, at any time and from time to time after the occurrence of an Event of Default hereunder or at such other time as Lender has reasonable grounds to believe that Hazardous Substances are or have been released, stored or disposed of on or around the Property or that the Property may be in violation of the Environmental Laws, Borrower shall provide, at Borrower's sole cost and expense, an inspection or audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant reasonably approved by Lender indicating the presence or absence of Hazardous Substances on

51

the Property or an inspection or audit of the Improvements prepared by an engineering or consulting firm approved by Lender indicating the presence or absence of friable asbestos or substances containing asbestos on the Property, as applicable.  If Borrower fails to provide such inspection or audit within thirty (30) days after such request, without waiving any other rights or remedies of Lender by reason of Borrower's failure to do so, Lender may order the same, and Borrower hereby grants to Lender and Lender's employees and agents access to the Property during normal business hours and an irrevocable license to undertake such inspection or audit. The cost of such inspection or audit shall be paid by Borrower within five (5) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice.  In the event Borrower fails to pay such cost within five (5) days after such written notice from Lender, such cost, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(e)    Reference is made to the Environmental Indemnity Agreement. The provisions of this Agreement and the Environmental Indemnity Agreement shall be read together to maximize the coverage with respect to the subject matter thereof, as determined by Lender; provided, however, the obligations of the Indemnitors (as defined in the Environmental Indemnity Agreement) are not secured by the liens and security interests under this Agreement, as more fully set forth in the Environmental Indemnity Agreement.

(f)    Borrower agrees that if it has been, or if at any time hereafter it is, determined that the Property contains Lead Based Paint, on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) receipt of a an assessment report describing the location and condition of the Lead-Based Paint (a "**Lead Based Paint Report**") making such determination, if such determination is hereafter made, as applicable, Borrower shall, at Borrower's sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations, abatement and maintenance plan for the Lead Based Paint on the Property, which plan shall be prepared by an expert reasonably approved by Lender, and be in form, scope and substance reasonably acceptable to Lender (together with any Lead-Based Paint Report, the "**O&M Plan**") (If an O&M Plan has been prepared prior to the date hereof, Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof.)  Compliance with the O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

(g)    Borrower agrees that if it has been, or if at any time hereafter it is, determined that the Property contains asbestos-containing materials ("**ACM's**"), on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) receipt of a report prepared by an environmental consultant making such determination, if such determination is hereafter made, as applicable, Indemnitors shall, at their sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations and maintenance program (the "**Maintenance Program**") designed by an environmental consultant, reasonably approved by Lender, with respect to the ACM's,

52

consistent with "Guidelines for Controlling Asbestos-Containing Materials in Buildings" (ISOPIA, 1985) and other relevant guidelines, and such Maintenance Program will hereafter continuously remain in effect until the Loan is repaid in full.  In furtherance of the foregoing, Borrower shall inspect and maintain all ACM's on a regular basis and ensure that all ACM's shall be maintained in a condition that prevents exposure of occupants to ACM's at all times. Without limiting the generality of the preceding sentence, provided a Maintenance Program is in place, Lender may reasonably require (i) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (ii) an amendment to such Maintenance Program to address changing circumstances, laws or other matters, (iii) at Borrower's sole cost and expense, supplemental examination of the Property by consultants specified by Lender (but not more frequently than once in any calendar year unless an Event of Default has occurred and is continuing), and (iv) variation of the Maintenance Program in response to the reports provided by any such consultants.

       7.2    **LEGAL EFFECT OF SECTION**.  Borrower and Lender agree that: this Article 7 is intended as Lender's written request for information (and Borrower's response) concerning the environmental condition of the real property security, and as such it is expressly understood that Borrower's duty to indemnify Lender hereunder shall survive:  (i)  any judicial or non-judicial foreclosure under the Security Instrument, or transfer of the Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Security Instrument; and (iii) the satisfaction of all of Borrower's obligations under the Loan Documents.

## ARTICLE 8.
## RECONVEYANCE AND PARTIAL RELEASE

       8.1    **FULL REPAYMENT AND RECONVEYANCE**.  Upon indefeasible payment in full of all sums owing and outstanding under the Loan Documents and full satisfaction of all other obligations under this Agreement and the other Loan Documents, Lender shall issue a full release and reconveyance of the Property and Improvements from the lien of the Security Instrument; provided, however, that all of the following conditions shall be satisfied at the time of, and with respect to, such reconveyance and remittance:  (a) Lender shall have received all escrow, closing and recording costs, the costs of preparing and delivering such reconveyance and any sums then due and payable under the Loan Documents; (b) Lender shall  have received the Exit Fee (as defined in the Note) in accordance with the Note and any Make Whole Payment provided for in the Note; and (c) Lender shall have received a written release satisfactory to Lender of any set aside letter, letter of credit or other form of undertaking which Lender has issued to any surety, governmental agency or any other party in connection with the Loan and/or the Property and Improvements.  Lender's obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of issuance of such full release or reconveyance, and any commitment of Lender to lend any undisbursed portion of the Loan shall be canceled.

       8.2    **PARTIAL RELEASE OF PROPERTY**.  After the Effective Date, Borrower shall have the right to obtain from Lender a partial release of the Release Parcel from the lien of the Security Instrument securing Borrower's obligations under the Loan Documents in connection with the transfer  of the Release Parcel, provided Borrower has complied with all of the following terms and conditions precedent to Lender's satisfaction:

(a)     Borrower shall deliver to Lender a written request for such partial release not later than sixty (60) days prior to the day on which Borrower desires such partial release to become effective (which notice may be revoked by Borrower at any time prior to Lender's recordation of such partial release);

(b)     All lot split, zoning, use, access, reciprocal access and title insurance matters shall be addressed to the satisfaction of Lender, including without limitation, the (i) issuance of a date down endorsement, (ii) at Lender's request, the issuance of a new or updated ALTA survey depicting the remaining portion of the property, (iii) the approval and execution by all necessary parties of a Lender approved (in the exercise of Lender's good faith discretion) reciprocal access agreement between the Property and the Released Property; and (iv) Lender's review and approval in the exercise of its good faith discretion of the proposed use(s) of the Released Party.  In addition, with respect to the parking count, access and configuration of the remaining Property, and without limitation on the foregoing, at no time prior to or following any such partial release shall there be less than the number of legal parking spaces required by all applicable codes, laws and regulations, remain on the remaining property after such partial release;

(c)     Such Release Parcel shall not, at any time while the Loan (or any portion thereof) remains outstanding, be used for hotel purposes (and any deed conveying the same to a buyer shall expressly contain such restrictions against hotel use during the term of the Loan);

(d)     No Default or Event of Default shall have occurred and be continuing either as of the date on which Borrower shall request such partial release and/or as of the effective date of such partial release;

(e)     Borrower shall have paid to Lender a portion of the Exit Fee equal to the proportionate of the amount of Loan principal prepaid in connection with the applicable partial release;

(f)     The Loan shall be partially prepaid in an amount equal to a "**Release Price**" equal to the greater of (i) $150,000.00 or (ii) one hundred percent (100%) of the Net Sales Proceeds of the sale thereof, which shall be applied to repay principal outstanding under the Note;

(g)     Borrower shall have provided Lender with evidence acceptable to Lender that the Property and the remaining portion of the Property each has been formally designated as a distinct, separate, tax lot and Lender shall have received evidence satisfactory to Lender that any tax, bond or assessment affecting the Property, including any assessment or special tax imposed in connection with any improvement district, assessment district or special taxing district, shall have been properly allocated between the subject Released Property and the remaining Property;

(h)     Borrower, at its sole cost and expense, shall have delivered to Lender one or more endorsements to the Title Policy insuring that, after giving effect to such release, (x) the lien created hereby and insured under such title policy is a first priority lien on the remaining

54

Property subject only to original permitted exceptions applicable to the remaining Property, and (y) the Title Policy is in full force and effect and unaffected by such release;

(i)     At Lender's request, Borrower shall provide to Lender an ALTA survey of the remaining portion of the Property;

(j)     Lender shall have reasonably determined that such Partial Release shall not result in, nor shall there have otherwise occurred subsequent to the Effective Date, any material adverse change in the operation of the remaining Property;

(k)     At the time of each such Partial Release Lender shall have determined in the exercise of its sole and absolute discretion that as of the sale closing date for the respective Released Property (i) the Loan to Value Ratio for the remaining Property shall be no more than sixty-five percent (65%), and (ii) the Debt Service Coverage Ratio for the remaining Property shall be at least equal to the Debt Service Coverage Ratio for the Property immediately prior to the close of escrow for the applicable Released Property;

(l)     Neither the acceptance of any payment or the issuance of any partial release by Lender shall affect the Borrower's obligation to pay all amounts owing under this Agreement or the other Loan Documents or the lien of the Security Instrument on the remaining Property; and

(m)     Lender shall have been paid, in immediately available funds, all escrow, closing and recording costs; the costs of preparing and delivering such partial release and any other related documents, including without limitation reasonable attorneys' fees; the out-of-pocket costs incurred by Lender in verifying that all conditions precedent to the release of the applicable parcels have been satisfied; the cost of any title insurance endorsements required by Lender and a reconveyance fee equal to Five Hundred Dollars ($500.00).

## ARTICLE 9.
## COVENANTS OF BORROWER

**9.1     EXPENSES**.  Borrower shall pay, whether or not the closing of the Loan occurs, all of the Lender expenses and all other costs and expenses incurred by Lender or any of its Affiliates, from time to time, including documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches, if required by Lender), all servicing fees and expenses and reasonable attorneys' fees incurred (a) in any effort to enforce, protect or collect payment of any obligations  hereunder or otherwise secured by the Security Instrument or to enforce any Loan Document or any related agreement, document or instrument, or effect collection hereunder or thereunder, (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement and the other Loan Documents and all related agreements, documents and instruments, (c) arising in any way out of administration of the Loan including any wire transfer fees or audit expenses and a servicing fee equal to $1,200.00 per month payable to the servicer selected by Lender, in arrears on each Payment Date commencing on the First Payment Date (the "**Servicing Fee**"), (d) in connection

55

Exhibit Page 68

with instituting, maintaining, preserving, enforcing and foreclosing on Lender's security interests, whether through judicial proceedings or otherwise, (e) in connection with reviewing Borrower's compliance with insurance requirements (both prior to the Effective Date and thereafter during the term of the Loan), (f) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower or any Guarantor, (g) in seeking, obtaining or receiving any advice with respect to its rights and obligations under this Agreement, any of the other Loan Documents and all related agreements, documents and instruments, or (h) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement or any other Loan Document or any related agreement, document or instrument, including, without limitation, in connection with the transfers contemplated by Section 9.9, and all of the same may be charged to Borrower's account and shall be part of the obligations secured by the Security Instrument.  Borrower recognizes and agrees that formal written appraisals of the Property and Improvements by a licensed independent appraiser may be required by Lender's internal procedures and/or federal regulatory reporting requirements on an annual and/or specialized basis and that Lender may, at its option, require inspection of the Property and Improvements by an independent supervising architect and/or cost engineering specialist:  (i) at least once each month during the course of any capital improvement project/construction at the Property; (ii) upon Completion of any new or remodeled Improvements; and (iii) at least semi-annually thereafter.  If any of the services described above are provided by an employee of Lender, Lender's costs and expenses for such services shall be calculated in accordance with Lender's standard charge for such services.

**9.2    ERISA COMPLIANCE**.  Borrower shall at all times comply with the provisions of ERISA with respect to any retirement or other employee benefit plan to which it is a party as employer, and as soon as possible after Borrower knows, or has reason to know, that any Reportable Event (as defined in ERISA) with respect to any such plan of Borrower has occurred, it shall furnish to Lender a written statement setting forth details as to such Reportable Event and the action, if any, which Borrower proposes to take with respect thereto, together with a copy of the notice of such Reportable Event furnished to the Pension Benefit Guaranty Corporation.

**9.3    LEASING**.  Borrower may not enter into any Lease at the Property without the prior written consent of Lender.  Notwithstanding the foregoing, Borrower shall operate the Property as a full service hotel and will provide short term occupancy to guests thereof and short term licenses to use the grounds of the Property for events, and none of such occupancy arrangements shall be considered a "Lease" for the purposes of this Section 9.3. Borrower shall use commercially reasonable efforts to cause all Leases at the Property to be based on not less than prevailing market terms from time to time, taking into account market standard rental concessions, rent abatement and free rent. All Leases shall be in Borrower's standard form lease previously approved by Lender. Borrower shall timely perform all obligations that are required to be performed by the landlord under the Leases. All Leases requiring approval hereunder (and expansions, renewals or modifications of Leases, and any cancellation or termination of any such Leases) of all or any part of the Property and Improvements shall be with Tenants approved by Lender in writing and upon terms approved in writing by Lender in its sole but reasonable discretion prior to Borrower's execution of any such Lease (or expansion, renewal or modification of a Lease). Without limitation on the foregoing, all Leases shall include customary estoppel, subordination, attornment and mortgagee protection provisions satisfactory to Lender. Borrower shall deliver to Lender true, complete and correct copies of any proposed Lease (or

16100193.16

proposed expansion, renewal or modification of a Lease) requiring Lender's approval in accordance with Section 9.4 and Lender shall approve or disapprove such proposed Lease (or proposed expansion, renewal or modification of a Lease) within ten (10) Business Days after its receipt of the same. In the event Lender does not approve or disapprove the proposed Lease (or proposed expansion, renewal or modification of a Lease) within such ten (10) Business Day period, and after an additional written notice to Lender requesting approval of such Lease and Lender's failure to approve or disapprove such proposed Lease within an additional five (5) Business Days after Lender's receipt of such second written notice, then the proposed Lease shall be deemed approved by Lender upon the expiration of such five (5) Business Day period.

       **9.4**    **APPLICATION OF GROSS OPERATING INCOME**.  Borrower shall apply all Gross Operating Income from the Property and Improvements pursuant to the Approved Budget and otherwise in accordance with the terms of the Loan Documents.

       **9.5**    **SUBDIVISION MAPS**.  Borrower shall have no right to record any final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, "**Subdivision Map**"), without Lender's prior written consent, which approval may be granted or withheld in Lender's sole and absolute discretion. Without limitation on the foregoing, Lender shall also have the right to approve, in its sole and absolute discretion, any changes to or amendments of the current zoning for the Property.

       **9.6**    **FURTHER ASSURANCES**.  Upon Lender's request and at Borrower's sole cost and expense, Borrower shall execute, acknowledge and deliver any other instruments and perform any other reasonable acts necessary, desirable or proper, as determined by Lender, to carry out the purposes of this Agreement and the other Loan Documents or to perfect and preserve any liens created by the Loan Documents.

       **9.7**    **ASSIGNMENT**.  Without the prior written consent of Lender in its sole discretion, Borrower shall not assign Borrower's interest under any of the Loan Documents, or in any monies due or to become due thereunder, and any assignment without such consent shall be void.  In this regard, Borrower acknowledges that Lender would not make this Loan except in reliance on Borrower's expertise, reputation, prior experience in developing, owning, constructing, operating commercial real property, Lender's knowledge of Borrower, and Lender's understanding that this Agreement is more in the nature of an agreement involving personal services than a standard loan where Lender would rely on security which already exists.

       **9.8**    **CONSTRUCTION MANAGEMENT**.  The construction of the Required Construction & Improvements shall be managed by the Construction Manager pursuant to the Construction Management Agreement.  The Construction Management Agreement shall at all times be terminable upon not less than thirty (30) days' prior written notice, without the prior written consent of Lender, Borrower shall not enter into any new agreement, or modify, amend, supplement, assign, replace or terminate any existing agreement, in each case, which provides for construction supervisions services for  the Property or Improvements.  All such agreements must expressly provide that they are subordinate to Lender's rights and interests under the Loan and the Loan Documents in all respects.  All construction managers for the Property shall be subject to Lender's prior approval, not to be unreasonably withheld and, at Lender's request,

Borrower shall cause each such asset manager or leasing agent to execute and deliver to Lender a consent and agreement to the foregoing provisions in form and substance acceptable to Lender.

9.9    **TRANSFERS**.

(a)    By delivery of this Agreement, Borrower acknowledges that the financial standing and managerial and operational ability of Borrower are substantial and material considerations to Lender in its agreement to make the Loan and that any encumbrance or transfer of an interest in the Property or in Borrower whether direct or indirect, will materially impair Lender's security under the Security Instrument.  To induce Lender to make the Loan, Borrower agrees Borrower shall not effect a Transfer, either directly or indirectly, or by operation of law, without in each instance first obtaining Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and conditions as Lender deems necessary or appropriate, all within Lender's sole and absolute discretion, to the extent permitted by Applicable Law.  Upon any Transfer made in violation of this Section 9.9, without limitation on Lender's other rights, Lender shall have the absolute right in its sole discretion, without demand or notice, to declare all sums, indebtedness and obligations secured by this Agreement and the other Loan Documents to be immediately due and payable (including the Make Whole Payment and the Exit Fee (as each such term is defined in the Note)), except to the extent that and in such particular circumstances where exercise of such right by Lender is prohibited by law.  Any Transfer effected pursuant to a consent by Lender shall be subject to this Agreement and the other Loan Documents, and any direct transferee shall, as a condition of the effectiveness of any such consent and as a covenant of Borrower and such transferee, and in form and substance prescribed by Lender, assume all obligations hereunder and agree to be bound by all provisions contained herein.  Such assumption shall not, however, release Borrower or any maker or guarantor (including any Guarantor) from any liability thereunder.

(b)    Borrower shall have the right to cause or permit (i) transfers of direct or indirect partnership interests, membership interests and/or other equity interests in Borrower to Family Members (as hereinafter defined) for estate planning purposes so long as the transferor of any such interest shall at all times retain all decision-making authority with respect to such transferred interest, including all voting and consent rights with respect thereto, and any transfers taking effect upon the death of the transferor; provided, however, that in no event will any such transfers (or series of transfers) be permitted hereunder if any such transfers (or series of transfers) would cause an Event of Default (including a default under Section 9.10 hereof); (ii) provided no Event of Default has occurred and is continuing, the transfer, in one or a series of transactions of not more than forty-nine percent (49%) of the direct or indirect non-managing membership interests in Borrower, and further provided that (A) no such transfer shall result in the change of Control in such direct or indirect interest holder in Borrower or in Borrower, (B) no such transfer shall result in Stuart Rubin owning directly or indirectly less than fifty-one percent (51%) of all classes of direct or indirect ownership interest Borrower, (C) as a condition to each such transfer, Lender shall receive from Borrower not less than seven (7) calendar days prior to such transfer, the Identification Information, and (D) such transferee shall comply with the General Transferee Conditions in Section 9.9(c) below; it is agreed that any transfer under this clause (ii) of Section 9.9(b) equal to or in excess of twenty percent (20%) of the direct or indirect non-managing membership interests in Borrower shall require the Borrower to satisfy each of the conditions set forth in subclauses (A), (B), (C) and (D) of this clause (ii).

(c)    In addition to the foregoing, any transferees of any interest transferred pursuant to Sections 9.9(b)(i) or (ii) above, shall satisfy the following conditions precedent to such Transfer: (I) such transferee shall not have been convicted of any crime (other than a misdemeanor not involving moral turpitude), or be the subject of any ongoing criminal proceeding; (II) such Transfer to such transferees will not violate The USA Patriot Act of 2001 (Public Law 107-56) and federal regulations issued with respect thereto or cause Lender to be in violation of the Patriot Act; (III) such transferees shall not have filed for bankruptcy (or other similar insolvency proceedings) within the seven (7) year period prior to such Transfer (in the case of this Clause (III), if such transferee will, by virtue of any such transfer, have or obtain direct or indirect Control of either Borrower or such interest holder in Borrower); (IV) such Transfer shall not cause any violation of Section 9.10 of this Agreement; (V) such Transfer shall not cause any of Borrower's representations or warranties contained in this Agreement or the other Loan Documents to become untrue; and (VI) to the extent a transferee shall own up to twenty percent (20%) of the direct or indirect ownership interests in Borrower immediately following such Transfer (provided such transferee owned less than ten percent (10%) of the direct or indirect ownership interests in Borrower as of the Effective Date), Borrower shall deliver (and Borrower shall be responsible for any reasonable out of pocket costs and expenses in connection therewith), the Identification Information and customary searches reasonably requested by Lender in writing (including credit, judgment, lien, litigation, bankruptcy, criminal and watch list) reasonably acceptable to Lender with respect to such transferee (the foregoing conditions set forth in clauses (I) through (VI) being the "**General Transferee Conditions**"). Borrower shall pay any and all reasonable costs and expenses of Lender incurred in connection with such transfer (including, without limitation, reasonable attorneys' fees and expenses).

(d)    EB-5 Loan. The structure of, any pledge of membership interest in Borrower or modifications to the Borrower's Operating Agreement to accommodate a preferred equity interest in Borrower given as collateral in connection with an EB-5 Loan, shall require the prior written consent of Lender, as to its structure, form and substance, not to be unreasonably withheld or delayed.

(e)    Exchange Matters. Notwithstanding the prohibition on Transfers set forth in Section 9.9, Lender's consent shall not be required in connection with the Exchange Interest Transfer, in accordance with this Section 9.9(e), provided Borrower provides Lender with no less than thirty (30) days prior written notice of the date of such Exchange Interest Transfer (defined below), together with copies of all documents consummating the same, a certified copy of the final Organizational Chart of Borrower in "Post Closing" form attached hereto as **Schedule 1**, unless otherwise consented to by Lender in its sole discretion, together with any other certifications, documents, or modification to the Loan Documents as may be reasonably required by Lender in connection with the consummation of the Exchange Interest Transfer, if any. Borrower shall cause the Exchange Accommodator to transfer one hundred percent (100%) of its direct and/or indirect interests in Force Rubin, LLC, a Delaware limited liability company (the "**TIC 1 Borrower**") and Force Rubin 2, LLC, a Delaware limited liability company (the "**TIC 2 Borrower**") to the applicable Exchange Transferee on or before the date that is sixty (60) days after the Closing Date, such that Exchange Accommodator is no longer an owner of any direct and/or indirect interests in TIC 1 Borrower or TIC 2 Borrower (the "**Exchange Interest Transfer**"). Borrower hereby covenants and agrees that no Borrower Party shall permit the assignment, modification or termination of any agreements between Exchange Accommodator

59

and Exchange Transferee or any Affiliate of Exchange Transferee without the prior written consent of Lender (other than the termination of the Exchange Accommodation Agreement following the Exchange Interest Transfer).  In addition, Borrower shall pay prior to delinquency any and all fees, reimbursements and other amounts due and payable to Exchange Accommodator.  No other changes to the ownership structure of the Property or any Borrower shall be permitted without Lender's prior written consent, if and to the extent required under the terms of this Section 9.9(e).

(f)     Release of the Pledge Agreement.  If at any time after the date hereof (i) no Event of Default or Cash Trap Period is continuing, and the Loan to Value Ratio of the Property on the date of determination does not exceed seventy-four percent (74%), Borrower may apply funds resulting from the Mello-Roos CFD Financing to repay the then outstanding principal balance of the Note by $2,200,000.00, subject to, and in accordance with the terms of the Mello-Roos CFD Financing Documents and Section 2 of the Note, including, without limitation, the payment of the applicable Make Whole Payment and the Exit Fee, or (ii) regardless of whether an Event of Default or Cash Trap Period is continuing or the Loan to Value Ratio of the Property, Borrower may apply funds obtained by other than the Mello-Roos CFD Financing to repay the then outstanding principal balance of the Note by $2,200,000.00, subject to, and in accordance with the terms of Section 2 of the Note, including, without limitation,  the payment of the applicable Make Whole Payment and the Exit Fee, and upon the occurrence of the matters in clauses (i) or (ii) hereof, upon Borrower's written request, Lender shall release the Pledge Agreement as Collateral for the Loan.

**9.10**   **SINGLE PURPOSE ENTITY**.  Each Borrower hereby represents and warrants to, and covenants with, Lender that Borrower has been, is and shall remain a single purpose bankruptcy remote entity and shall at all times comply with the following covenants ("**Single Purpose Entity**"):

(a)     The purpose for which Borrower is organized shall be limited to (i) acquiring, owning, developing, holding, selling, leasing, transferring, exchanging, operating and managing Borrower's interest in the Property, (ii) entering into the Loan, (iii) refinancing the Loan in connection with a permitted repayment of the Loan, and (iv) transacting any and all lawful business that is incident, necessary and appropriate to accomplish the foregoing.

(b)     Borrower has not owned, does not own and will not own any asset or property other than (i) its interest in the Property and (ii) incidental personal property necessary for and used in connection with the ownership or operation of the same.

(c)     Borrower shall not engage in a business other than the ownership, operation and management of the Property and acquire any other property without Lender's prior written consent.

(d)     Borrower shall not enter into any contract or agreement with any Affiliate, any Guarantor other than the Development Agreement, without Lender's prior written consent.

(e)     Borrower shall not incur, create, assume or guarantee any indebtedness or liabilities, secured or unsecured, direct or contingent, other than (i) the Loan and incidental costs

and expenses associated therewith, (ii) unsecured indebtedness incurred in the ordinary course of business of owning, operating, and maintaining the Property, that (A) are in such amounts that are normal and reasonable under the circumstances (but in no event more than one percent (1.00%) of the stated principal balance of the Loan (in the aggregate together with all trade payables or accrued expenses incurred by Borrower)), (B) are not evidenced by a note, and (C) are required to be paid within sixty (60) days from the date they are first incurred by Borrower, and (iii) non-delinquent property taxes and assessments.  No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Property, and no indebtedness may be secured, directly or indirectly, by any partnership, membership or other equity interest in Borrower (comprising the same) without Lender's consent in Lender's sole and absolute discretion.

(f)    Borrower has not made and will not make any loans or advances to any Person or entity and shall not acquire obligations or securities of an Affiliate.

(g)    Borrower is as of the Effective Date solvent, and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, so long as the Property is generating sufficient cash flow for Borrower to satisfy such covenant, and provided that under no circumstance shall any member of Borrower be required to make any capital contributions.

(h)    Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not amend, modify or otherwise change, its organizational documents in any way which would result in a violation of the covenants of this Section 9.10, without the written consent of Lender.

(i)    Borrower shall maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates.  Borrower's assets will not be listed as assets on the financial statement of any other Person.  Borrower shall have its own separate financial statement, provided, however, that Borrower's assets may be included in a consolidated financial statement of its parent companies if inclusion on such a consolidated statement is required to comply with the requirements of GAAP, and provided, further, that such consolidated financial statement shall contain a footnote to the effect that Borrower's assets are owned by Borrower, as the case may be and that they are being included on the financial statement of its parent solely to comply with the requirements of GAAP, and provided, further, that such assets shall be listed on Borrower's own separate balance sheet.  Borrower will file its own tax returns (unless a disregarded entity for tax purposes) and will not file a consolidated federal income tax return with any other corporation.  Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)    Except to the extent that Borrower is (i) required to file consolidated tax returns by law; or (ii) treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, (1) Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person; (2) Borrower's assets will not be listed as assets on the financial statement of any other Person; it being understood that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates

61

and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on Borrower's own separate balance sheet; and (3) Borrower will file its own tax returns (to the extent Borrower is required to file any tax returns) and will not file a consolidated federal income tax return with any other Person.  Borrower has maintained and shall maintain its books, records, resolutions and agreements in accordance with this Agreement.

(k)    Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person, shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name and shall not identify itself or any of its Affiliates as a division or part of the other.

(l)    Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(m)    Neither Borrower, nor any constituent party of Borrower has or at any time sought nor will seek the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, or the sale of material assets of Borrower except as permitted hereunder and/or in connection with a payoff of the Loan.

(n)    Borrower will not commingle the funds and other assets of Borrower with those of any other Person, and will not participate in a cash management system with any such Person.

(o)    Borrower will not commingle its assets with those of any other Person and will hold all of its assets in its own name.

(p)    Borrower will not guarantee or become obligated for the debts of any other Person and has not, does not and will not in the future hold itself out as being responsible for the debts or obligations of any other Person.

(q)    Borrower shall not pledge its assets for the benefit of any other Person, other than with respect to the Loan.

(r)    Borrower shall not file a petition for relief under the Bankruptcy Code, or under any other present or future state of federal law regarding bankruptcy, reorganization or other debtor relief law.

(s)    Borrower shall not partition and shall not permit any partition of the Property.

**9.11    MATERIAL AGREEMENTS.**

(a)    Borrower shall (i) promptly perform and/or observe the covenants, agreements and conditions required to be performed and observed by it under each Material Agreement and Operating Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of

the giving of any notice of any default by any party under any Material Agreement and Operating Agreement of which it is aware and (c) promptly enforce the performance and observance of all of the covenants, agreements and conditions required to be performed and/or observed by any other party under each Material Agreement and Operating Agreement to which Borrower is a party in a commercially reasonable manner

(b)     Borrower shall not, without Lender's prior consent: (a) enter into, surrender or terminate any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject (unless, with respect to Material Agreements (other than Leases), the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject, except as provided therein or, with respect to Material Agreements (other than Leases), on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or the Property is subject in any material respect, except, with respect to Material Agreements (other than Leases), on an arm's-length basis and commercially reasonable terms.

## 9.12    CONSTRUCTION AND COMPLETION OF IMPROVEMENTS

(a)     Construction of the Improvements.  Construction of the Improvements has commenced and Borrower agrees that it shall diligently pursue such Required Construction & Improvements to Completion on or prior to the Completion Date, subject to Force Majeure delays, in accordance with the Approved Budget and the Construction Documents and in compliance with all restrictions, covenants and easements affecting the Property, all Applicable Laws, and all required approvals of Governmental Authorities, and with all terms and conditions of the Loan Documents, free from any liens (other than Permitted Encumbrances), claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith unless bonded and removed as a Lien on the Property. Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the Completion Date. The Construction Documents may not be amended, altered or modified without the prior written consent of Lender, which consent shall not be unreasonably withheld, so long as no Default or Event of Default is continuing.

(b)     Change Orders.

(i)     Changes in Plans and Specifications. Borrower agrees that no material changes will be made in the Approved Plans and Specifications except upon the prior written approval of the same by Lender.

(ii)     Extras and Contract Changes. Borrower agrees (a) that no change orders in excess of five percent (5%) per line item in the Approved Budget, individually, or 10% of the total hard costs of construction as set forth in the Approved Budget ("**Permitted Budget Variance**"), in the aggregate for any Phase, shall be allowed to any contractor, subcontractor, architect, or engineer and that no material change be made in

Main Document    Page 77 of 243

any such Construction Contract with Borrower; in either case, without Lender's prior written approval and consent which shall not be unreasonably withheld; (b) that Borrower will furnish Lender promptly, after execution thereof, with executed copies of all contracts between Borrower and any contractor for the Required Construction & Improvements; and Borrower shall provide Lender with a copy of all subcontracts between the General Contractor and all of their subcontractors and suppliers, and (c) that only a Construction Contract between Borrower and a contractor, including the General Contractor having a cost in excess of $25,000.00 (each a "**Material Contract**"), shall be subject to Lender's reasonable approval as to form, amount, and the contractor employed. Any changes to the Approved Plans and Specs shall also be subject to the approval in advance in writing (if required) by all applicable Governmental Authorities and by each surety under payment or performance bonds (if any) covering the applicable Construction Contract or any other contract for construction of all or a part of the Improvements.

(iii)    <u>Defects and Variances</u>.  Borrower will, upon demand of Lender and at Borrower's sole expense, correct any structural defect in the Required Construction & Improvements, or any variance from the Plans which is not either (i) a Permitted Change, or (ii) approved in writing by Lender.

(c)    <u>Construction Consultant</u>.  Borrower acknowledges that (i) Lender may retain a Construction Consultant, at Borrower's sole cost while construction is proceeding, to act as a consultant and only as a consultant to Lender in connection with the construction and completion of any portion of the Improvements and will have no duty to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other person or party, and (v) Lender reserves the right to replace the Construction Consultant with another inspecting engineer or other appropriate Person at any time and without prior notice to or approval by Borrower.  Lender hereby advises Borrower that it will advise any Construction Consultant retained by it of the restrictions contained in this <u>Section 9.12</u>. Any Construction Consultant may perform the following services on behalf of Lender:

(i)    To review and advise Lender whether, in the opinion of the Construction Consultant, the Construction Documents are satisfactory;

(ii)    To review requests for advances of the Construction Completion Holdback, and any requests for approval of changes to the Documents in a timely, commercially reasonable manner such that approval of disbursement requests are not unreasonably delayed;

64

(iii)    To make periodic inspections (approximately at the date of each monthly request for disbursements from the Construction Completion Holdback) for the purpose of assuring that completion of the Improvements to date is in accordance with the Construction Documents and the Approved Budget and to approve Borrower's then current disbursement request as being consistent with Borrower's obligations under this Agreement; and

(iv)    The fees of the Construction Consultant incurred in connection with any (i) inspections of the construction and/or completion of individual portions of the Improvements, (ii) review of whether the Construction Documents are satisfactory or requests for approval of changes to the Construction Documents, and (iii) approval of a request for disbursement of the Construction Completion Holdback, shall be paid by Borrower within ten (10) days after Borrower's receipt of the billing therefor and expenses incurred by Lender shall be reimbursed to Lender within ten (10) days after such receipt or deemed receipt, but neither Lender nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services, except for its gross negligence and/or willful misconduct or (iii) any approval by the Construction Consultant of completion of the Improvements.  Neither Lender nor the Construction Consultant assumes any obligation to Borrower or any other person concerning the quality of construction of the Improvements or the absence therefrom of defects. The fee charged by the Construction Consultant shall be 0.25% of the amount of each such disbursement from the Construction Completion Holdback, provided if the construction is not Completed by May 1, 2019, an additional fee of $2,000.00 per month shall be charged by the Construction Consultant until construction is Completed.

(d)    Fund Control Agent.  Borrower acknowledges that Lender may retain, at Borrower's sole cost and expense, the assistance of a Fund Control Agent to assist Lender, in making disbursement of advances of the Construction Completion Holdback requested by Borrower pursuant to, and in accordance with the terms of Section 2.3 hereof, and approved by Lender (or the Construction Consultant).  Borrower shall cooperate with the Fund Control Agent as reasonably requested by Lender. The Construction Consultant shall fulfill the duties of a Fund Control Agent for this Loan and as such the fee in Section 9.12(c)(iv) pays both the Construction Consultant and Fund Control Agent.

**9.13    IN-BALANCE**.  Borrower shall at all times cause the undisbursed Loan funds to be equal to or greater than the amount which Lender from time to time determines necessary to: (a) pay, through completion, all costs of development, construction, marketing and sale or leasing of the Property and Improvements in accordance with the Loan Documents and any Approved Budget; (b) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan; and (c) enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Document.  Furthermore, without limitation of the immediately preceding sentence Borrower shall at all times cause (a) the undisbursed portion of the Construction Completion Holdback to be equal to or greater than the amount which Lender from time to time determines necessary to pay, through completion, all costs to complete all work required to be completed under the Approved Budget, and (b) there to be no Interest Reserve

65

Deficiency (collectively "**In-Balance**").  If Lender determines at any time that the undisbursed Loan funds (and available Holdbacks and Reserves) are insufficient for said purposes, then Borrower shall provide Borrower with its calculation of such insufficiency, and Borrower shall deposit the amount of such deficiency into the applicable Reserve designated by Lender within five (5) Business Days after the date of Lender's written demand therefore and, notwithstanding anything to the contrary in this Agreement, Lender shall not be required to disburse any proceeds of the Loan whether from a Holdback or a Reserve, until Borrower deposits the applicable amount of such deficiency in an account as required by this paragraph.  Any funds deposited in accordance with this paragraph shall be available for payment of costs and expenses enumerated in this paragraph prior to any additional Reserve funds being made available for payment of such costs by Lender.

      **9.14    BORROWER EQUITY**.    Borrower shall cause the Borrower Equity, to be contributed to or applied in payment of the costs and expenses incurred by Borrower in connection with Borrower's ownership and development of the Property (none of which shall be removed as Borrower's equity from the Property or utilized to pay any fees, costs, refunds or other charges for the Property or the Loan transaction), prior to the disbursement by Lender of any initial proceeds of the Loan or disbursements of the Loan subsequent to the Effective Date.

      **9.15    HOTEL MANAGEMENT AGREEMENT**.    Borrower shall (i) cause the Property to be operated pursuant to the Hotel Management Agreement; (ii) promptly perform and/or observe in all material respects all of the covenants, agreements and obligations required to be performed and observed by Borrower under the Hotel Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (iii) promptly notify Lender of any default under or any material adverse change with respect to the Hotel Management Agreement; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, and/or notices of default received by Borrower under the Hotel Management Agreement; and (v) use best efforts to promptly enforce in all material respects the performance and observance of all of the covenants and agreements required to be performed and/or observed by Borrower under the Hotel Management Agreement.  Without Lender's prior written consent, Borrower shall not (A) surrender, terminate or cancel the Hotel Management Agreement; (B) reduce or consent to the reduction of the term of the Hotel Management Agreement; (C) fail to exercise any option or right to renew or extend the term of the Hotel Management Agreement; (D) surrender, terminate, forfeit, or suffer or permit the surrender, termination or forfeiture of the Hotel Management Agreement; (E) materially increase or consent to the increase of the amount of any charges under the Hotel Management Agreement; (F) modify, change, supplement, alter or amend the Hotel Management Agreement or waive any of its rights and remedies under the Hotel Management Agreement; or (G) grant its consent or approval as may be requested or required in connection with the terms and provisions of the Hotel Management Agreement.

      The Hotel Management Agreement shall at all times be terminable by Lender upon an Event of Default under the Loan without payment of a premium or termination fee and otherwise upon not less than thirty (30) days' prior written notice; provided, however, that without the prior written consent of Lender, Borrower shall not enter into any new agreement, or modify, amend, supplement, assign, replace or terminate any existing agreement, in each case, which provides for the management, leasing and/or operation of the Property or Improvements. All such

agreements must expressly provide that they are subordinate to Lender's rights and interests under the Loan and the Loan Documents in all respects. All replacement Hotel Managers shall be subject to Lender's prior written approval and, at Lender's request, Borrower shall cause such replacement Hotel Manager to execute and deliver to Lender a replacement subordination, non-disturbance and attornment agreement with regards to any Qualified Replacement Hotel Management Agreement, in form and substance acceptable to Lender.

9.16    **MAINTENANCE**.  Borrower shall keep the Property in good condition and repair and shall provide security for the Property in at least the same manner as maintained on the date hereof.

9.17    **UTILITIES**.  Borrower shall pay when due all charges that are incurred by Borrower for the benefit of the Property for gas, telephone, electricity, water, sewer, or other services furnished to the Property.

9.18    **NO CHANGE IN USE**.  The Property shall be used solely as a hotel with associated resort amenities and Borrower shall not permit any change in use or additional uses on the Property without the prior written consent of Lender.

9.19    **PATRIOT ACT AND RELATED MATTERS**.  Borrower and Guarantor shall comply with any and all existing and future Applicable Laws, including, without limitation, all Prescribed Laws.

9.20    **PACE LOANS**.  Other than with respect to the existing PACE Loan, Borrower shall not incur or accept a PACE Loan, and shall not permit or suffer the existence of any PACE Lien on all or any portion of the Property, in either case without Lender's prior written consent thereto. With respect to the existing PACE Loan, Borrower shall (i) promptly perform and/or observe in all material respects all of the covenants, agreements and obligations required to be performed and observed by Borrower under the existing PACE Loan and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) comply with all terms of the existing PACE Loan Documents, and not suffer to exist any default or event of default beyond applicable notice and cure periods under the existing PACE Loan Documents.

9.21    **INTEREST RATE CAP AGREEMENT**.  Borrower shall purchase, and collaterally assign to Lender pursuant to the Assignment of Cap, one or more interest rate cap agreements satisfying the criteria set forth herein (each, a "**Cap**"), and Borrower shall maintain such Cap or Caps in full force and effect, until all sums, indebtedness and obligations secured by this Agreement, the Note and the other Loan Documents are fully and finally repaid. Each Cap (i) shall be collaterally assigned to Lender pursuant to the Assignment of Cap; (ii) shall have a notional amount equal to the Required Notional Amount (as defined below), or shall have a notional amount which, when added to the notional amount of other Caps that are concurrently provided hereunder, result in aggregated notional amounts equal to the Required Notional Amount (subject to clause (iv) below), (iii) shall have a strike rate equal to the "**Strike Rate**" and shall provide that to the extent that the LIBOR exceeds the Strike Rate, then the Cap Provider shall pay to Lender not less than the amount of interest that would accrue on the notional amount of such Cap at a per annum rate equal to the difference between the LIBOR and the Strike Rate for deposit with Lender, (iv) shall have a term expiring not sooner than the Maturity Date, and

67

(v) shall be issued by an Acceptable Counterparty acceptable to Lender in Lender's reasonable discretion at the time that the Cap is issued (the "**Cap Provider**"). Thereafter, if the financial rating of the Cap Provider falls below a rating criteria of a long term unsecured debt rating of "A-" by S&P or "A3" by Moody's, then within ten (10) Business Days following written request from Lender, Borrower shall either (x) deliver to Lender a replacement Cap satisfying all of the criteria of an Acceptable Counterparty, or (y) either (1) cause the obligations of the Cap Provider to be guaranteed by a guarantor whose long term, unsecured and unsubordinated debt rating by S&P is at all times equal to the Acceptable Counterparty criteria, or (2) pledge collateral satisfactory in the sole discretion of Lender and each Rating Agency that has rated securities backed by the Loan, provided that in the case of each of the preceding clauses (x) and (y), all documents, collateral, opinions and other requirements shall be executed, delivered and/or satisfied, as appropriate, to the satisfaction of Lender and each Rating Agency that has rated securities backed by the Loan in their sole discretion. Upon the occurrence of any prepayment or mandatory reduction in principal hereunder, absent an Event of Default, Borrower shall have the option to replace any Cap with another Cap satisfying the criteria specified herein, reflecting the decreased Required Notional Amount.  Failure to deliver any Cap within ten (10) Business Days of the date on which the same is required hereunder shall constitute an Event of Default.

### 9.22    TENANT IN COMMON AGREEMENT.

(a)     Each Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions set forth in the Tenant in Common Agreement on the part of each such Borrower to be performed thereunder, and (ii) promptly deliver to Lender any notice given or received by any Borrower under the Tenant in Common Agreement.

(b)     No Borrower shall without the prior consent of Lender, terminate or cancel the Tenant in Common Agreement or modify, change, supplement, alter or amend the Tenant in Common Agreement in any manner whatsoever, and any such termination, cancellation, modification, change, supplement, alteration or amendment of the Tenant in Common Agreement without the prior consent of Lender shall be void and of no force and effect.

(c)     Each Borrower hereby assigns to Lender, as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of the Loan Documents all of the rights, privileges and prerogatives of the applicable Borrower under the Tenant in Common Agreement and the Hotel Management Agreement, including any rights of first refusal (including any such rights arising under Section 363(i) of Chapter 11 of the United States Bankruptcy Code), purchase options or other similar rights under the Tenant in Common Agreement.  Each Borrower hereby agrees that any rights of first refusal, purchase options or other similar rights under the Tenant in Common Agreement afforded to any Borrower are hereby made expressly subordinate to the Security Instrument and the other Loan Documents.

(d)     Each Borrower hereby agrees that all rights and remedies of each such Borrower, including rights of indemnification, under the Tenant in Common Agreement are hereby expressly made subject and subordinate to the terms and conditions of the Loan Documents and, so long as the Loan is outstanding, no Borrower shall exercise any such rights

68

and remedies, including any rights of indemnification, against any other tenant-in-common under the Tenant in Common Agreement.

(e)     Each Borrower hereby waives any rights it may have (whether by operation of law or pursuant to the terms of the Tenant in Common Agreement), so long as any portion of the Debt is outstanding, to create or suffer to exist any Lien on all or any portion of any other tenant-in-common interest held by any other Borrower pursuant to the terms of the Tenant in Common Agreement and, so long as the Loan is outstanding, no Borrower shall place a Lien on all or any portion of any other tenant-in-common interest held by any other Borrower pursuant to the terms of the Tenant in Common Agreement.

(f)     Each Borrower hereby waives any right that it may have (whether by operation of law or pursuant to the terms of the Tenant in Common Agreement), so long as any portion of the Debt is outstanding, to make any application to or petition any court for a partition of the Property, and, so long any portion of the Debt is outstanding, no Borrower shall make any application to or petition any court for a partition of the Property.

**9.23    FRANCHISE AGREEMENT**.

(a)     The Improvements on the Property shall be operated under the terms and conditions of the Franchise Agreement.  Borrower shall (i) pay all sums required to be paid by Borrower under the Franchise Agreement, (ii) diligently perform, observe and enforce all of the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Franchise Agreement, (iii) promptly notify Lender of the giving of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Franchise Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice, and (iv) promptly deliver to Lender a copy of each financial statement, budget, projection, business plan, property improvement plan, capital expenditure plan, notice, report (including but not limited to Pace reports) and estimate received by it under the Franchise Agreement. Borrower shall not, without the prior consent of Lender, surrender the Franchise Agreement or terminate or cancel the Franchise Agreement or modify, change, supplement, alter or amend the Franchise Agreement, in any respect, either orally or in writing, and Borrower hereby assigns to Lender as further security for the payment of the Loan and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender the Franchise Agreement or to terminate, cancel, modify, change, supplement, alter or amend the Franchise Agreement in any respect, and any such surrender of the Franchise Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of the Franchise Agreement without the prior consent of Lender, shall be void and of no force and effect.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Franchise Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed or

69

observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Franchise Agreement shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If Franchisor shall deliver to Lender a copy of any notice sent to Borrower of default under the Franchise Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall, from time to time, use its best efforts to obtain from Franchisor such certificates of estoppel with respect to compliance by Borrower with the terms of the Franchise Agreement as may be requested by Lender. Borrower shall exercise each individual option, if any, to extend or renew the term of the Franchise Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender as its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Any sums expended by Lender pursuant to this paragraph shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the Lien of the Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

(b)    Borrower shall cause Hotel Franchisor to execute and deliver to Lender a comfort letter with regards to the Franchise Agreement, in form and substance acceptable to Lender on the date hereof.

**9.24    MELLO-ROOS CFD FINANCING**.    Borrower shall diligently pursue to closing the Mello-Roos CFD Financing to closing as soon as reasonably practicable, but in no event later than one hundred fifty (150) days after the Closing Date, which final Mello-Roos CFD Financing Documents (including, without limitation, evidence that all original bonds issued in connection therewith have been issued and the proceeds thereof are available to be used to pay Project Costs of constructing the improvements consistent with such Mello-Roos CFD Financing Documents and the Approved Budget (which funds are to be held in a separate account controlled by the applicable Local Development Authority) shall be submitted, prior to the closing of such financing, to Lender, and shall be subject to Lender's reasonable consent thereto; it being agreed that Lender has reviewed draft documents listed on **Exhibit P** and are acceptable to Lender.

## ARTICLE 10.
## REPORTING COVENANTS

**10.1    FINANCIAL INFORMATION**.

(a)    Borrower shall deliver to Lender, as soon as available, but in no event later than ninety (90) days after each calendar year end, and not later than thirty (30) days after each calendar quarter end, a current financial statement for Borrower (including, without limitation, an income and expense statement, rent roll and balance sheet) certified by an authorized representative of Borrower. In addition, Borrower shall deliver to Lender, as soon as available, but in no event later than twenty (20) days after the end of each calendar month, a

70

construction progress report, including at a minimum a job cost report, an updated Approved Budget and Construction Schedule and a report setting forth any variances from the Approved Budget and Construction Schedule, a current income and expenses statement and, if applicable. Borrower shall cause each Guarantor to deliver to Lender annual financial statements (including contingent liabilities) of Guarantor as applicable, within ninety (90) days after the end of each calendar year and upon Lender's request unaudited quarterly financial statements not later than thirty (30) days after each calendar quarter end, and such other financial statements of each Guarantor for such other periods and to be delivered within such time periods as Lender may reasonably request, provided that Lender shall not request such reports for any periods more frequently than quarterly and within delivery time periods less than thirty (30) days of the end of the applicable quarter and provided further, that all such information shall be substantially in the same form as the financial information provided to Lender prior to closing of the Loan unless otherwise approved by Lender. Each Guarantor's financial statements shall be certified by an authorized representative of each Guarantor, as applicable, to be true and correct in all material aspects and not contain any material omissions. Notwithstanding anything to the contrary contained herein, if an Event of Default occurs and is continuing or is imminently reasonably expected by Lender to occur, Lender may require that all financial statements required hereunder be audited by an accounting firm approved by Lender in writing in its reasonable discretion.

(b)     Borrower shall deliver to Lender such quarterly and other financial information regarding any persons or entities in any way obligated on the Loan as Lender may specify and within such reasonable times as Lender may request. If in addition to the annual financial statements audited financial information is prepared, Borrower shall deliver to Lender copies of that information within twenty (20) days of its final preparation. All such financial information shall include a statement which specifies the accounting methodology used to prepare the information. Without limitation, all financial statements will include a calculation of Gross Operating Income, and occupancy statistics, STR Report, and to the extent that any Leases exist, delinquency reports, leasing pipeline activity, prospective and actual tenant and expenses payable and receivable reports, and rent rolls and shall be certified by Borrower.

(c)     If any statements, information or reports required hereunder (including under this Section 10.1, Sections 10.3, 10.4 and 10.5) are not timely delivered, there shall be an initial fee of $500.00 for the first day late and a subsequent fee of $250.00 per each day thereafter that such statements, information or reports are not delivered.

(d)     Borrower shall deliver copies of each of the following reports, Quality Assurance Reports, the STR Report (including the RevPar of the Hotel), the Group Rooms PACE Report and the Meetings and Banquets PACE Report, each month, with thirty (30) days after the end of each calendar month.

(e)     Deliver to Lender copies of any notices given or received by Borrower with respect to the existing PACE Loan concurrently with the giving of any such notice delivered by Borrower, and promptly following receipt of any such notice received by Borrower. Without Lender's prior written consent, Borrower shall not (A) surrender, terminate or cancel the existing PACE Loan; (B) modify, change, supplement, alter or amend the existing PACE Loan or waive any of its rights and remedies under the existing PACE Loan; or (C) grant its consent or

71

approval as may be requested or required in connection with the terms and provisions of the existing PACE Loan.

**10.2** **BOOKS AND RECORDS**.  Borrower shall maintain complete books of account and other records for the Property and Improvements and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by Lender upon reasonable prior notice.

**10.3** **MONTHLY PROGRESS REPORTS ON CONSTRUCTION TIMELINE**. In addition to any other reporting requirements contained herein, until such time as the Note is paid in full, within twenty (20) days after the end of each month, Borrower shall provide Lender with progress reports on the status of the construction timeline (including Borrower's adherence to such timeline and any modifications to such timeline) as set forth in the Construction Schedule.

**10.4** **INTENTIONALLY DELETED**.

**10.5** **INTENTIONALLY DELETED**.

**10.6** **OPERATING STATEMENTS FOR PROPERTY AND IMPROVEMENTS**. Until such time as the Note is paid in full, Borrower shall deliver to Lender monthly operating reports within twenty (20) days after the end of each month, and within twenty (20) days after the end of each quarter, which show in detail the amounts and sources of Gross Operating Income received by or on behalf of Borrower and the amounts and purposes of Permitted Operating Expenses paid by or on behalf of Borrower with respect to the Property and Improvements for the previous month.

(a) "**Gross Operating Income**" for this purpose means the sum of any and all amounts, payments, fees, rentals, additional rentals, expense reimbursements (including, without limitation, all reimbursements by tenants, lessees, licensees and other users of the Property and Improvements), discounts or credits to Borrower, income, interest and other monies directly or indirectly received by or on behalf of or credited to Borrower from any person with respect to Borrower's ownership, use, development, operation, leasing, franchising, marketing or licensing of the Property and Improvements, including, all income and proceeds received from food and beverage operations and from catering services conducted from the Property. Gross Operating Income shall be computed on a cash basis and shall include for each quarterly statement all amounts actually received in such quarter whether or not such amounts are attributable to a charge arising in such quarter.

(b) "**Permitted Operating Expenses**" means the following expenses, but only to the extent provided in the Operating Budget: (i) taxes and assessments (including payments due under the PACE Loan, if any) imposed upon the Property and Improvements to the extent that such taxes and assessments are required to be paid by Borrower and are actually paid or reserved for by Borrower; (ii) bond assessments (including any amounts due under the Mello-Roos CFD Financing, if any, or the PACE Loan); (iii) insurance premiums for casualty insurance (including, without limitation, earthquake insurance) and liability insurance carried in connection with the Property and Improvements; (iv) operating expenses incurred by Borrower

72

for the management, operation, cleaning, leasing, maintenance and repair of the Property and Improvements (including all management fees and franchise fees), but in all events only to the extent provided in the Approved Budget.  Permitted Operating Expenses shall not include any interest or principal payments on the Loan or any allowance for depreciation.

      **10.7**   **BUDGET**.  On or before December 1 of each year throughout the term of the Loan, as the same may be extended, Borrower shall submit to Lender for Lender's review and approval, if and to the extent Borrower has the right under the Hotel Management Agreement to approve the same, (a) the Construction Budget for the Property, if construction is ongoing, which shall not include any payment to Borrower or any Affiliate unless expressly approved by Lender, in writing, in its sole discretion, the Construction Budget approved as of the date hereof is attached hereto as **Exhibit C,** (b) an annual operating budget (the "**Operating Budget**") for the Property, which may include separate operating budgets for the Hotel and the Playground, and (c) an annual FF&E budget governing the purchase and replacement of furniture, fixtures and equipment at the Property, once approved by Lender in its discretion, the Construction Budget, the Operating Budget(s) and the FF&E Budget, shall be collectively referred to herein as the "**Approved Budget**").   The Approved Budget as of the date hereof is attached hereto as **Exhibit C.**  Borrower shall cause the Property to be constructed, owned and operated in accordance with the Approved Budget attached hereto, and Borrower shall make no changes to any the Approved Budget or portion thereof without the prior written consent of Lender, except as otherwise expressly permitted hereunder. The Approved Budget for the remainder of 2018 is attached as **Exhibit C** attached hereto.

**ARTICLE 11.**
**EVENTS OF DEFAULT AND REMEDIES**

      **11.1**   **EVENT OF DEFAULT**.  The occurrence of any one or more of the following shall constitute an event of default (an "Event of Default") under this Agreement and the other Loan Documents:

      (a)   Monetary.  Borrower's failure to pay when due any sums payable under the Note or any of the other Loan Documents within five (5) days when due (provided, however, that there shall be no grace period for amounts due at the Maturity Date or upon earlier acceleration nor any grace period if a grace period is already provided hereunder for such payments); or

      (b)   Liens, Attachment; Condemnation.  (i) The recording of any claim of lien against the Property or Improvements or the service on Lender of any bonded stop notice relating to the Loan and the continuance of such claim of lien or bonded stop notice for twenty (20) days without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender; or (ii) the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Property or Improvements; or (iii) the sequestration or attachment of, or any levy or execution upon any of the Property or Improvements, any other collateral provided by Borrower under any of the Loan Documents, any monies in the Reserves, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby; or

73

(c)      Representations and Warranties.  Any of Borrower's representations or warranties contained in the this Agreement or any other Loan Document was untrue  in any material respect when made; or

(d)      Voluntary Bankruptcy; Insolvency; Dissolution. (i) The filing of a petition by Borrower for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law; (ii) the filing of any pleading or an answer by Borrower in any involuntary proceeding under the Bankruptcy Code or other debtor relief law which admits the jurisdiction of the court or the petition's material allegations regarding Borrower's insolvency; (iii) a general assignment by Borrower for the benefit of creditors; or (iv) Borrower applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Borrower or any of its property; or

(e)      Involuntary Bankruptcy.  The failure of Borrower to effect a full dismissal of any involuntary petition under the Bankruptcy Code or under any other debtor relief law that is filed against Borrower or in any way restrains or limits Borrower or Lender regarding the Loan, the Property or the Improvements, prior to the earlier of the entry of any court order granting relief sought in such involuntary petition, or sixty (60) days after the date of filing of such involuntary petition; or

(f)      Partners; Corporate Guarantor; Limited Guarantor.  The occurrence of any of the events specified in Section 11.1 (d) or 11.1 (e) as to any Guarantor; or

(g)      Transfer.  Any Transfer occurs without the prior written consent of Lender in its sole and absolute discretion (except as may be expressly permitted by Section 9.9 hereof); or

(h)      Loss of Priority.  The failure at any time of the Security Instrument to be a valid first lien upon the Property and Improvements or any portion thereof, other than as a result of any release or reconveyance of the Security Instrument with respect to all or any portion of the Property and Improvements pursuant to the terms and conditions of this Agreement; or

(i)      Single Purpose Entity.  Borrower shall fail to strictly comply with the provisions of Section 9.10 (Single Purpose Entity) (other than failure of an immaterial nature that does not increase the risk of consolidation of the Borrower into the bankruptcy of another Person);or

(j)      Adverse Financial Condition.   Any material adverse change in the financial condition of Borrower or any Guarantor, from the condition shown on the financial statement(s) submitted to Lender and relied upon by Lender in making the Loan, the materiality and adverse effect of such change in financial condition to be reasonably determined by Lender in accordance with its credit standards and underwriting practices in effect at the time of making such determination; or

(k)      Key Person or Entity.  The retirement, death, or incapacity of A. Stuart Rubin or the withdrawal of A. Stuart Rubin from the operation of Borrower, and Borrower's failure to provide a substitute or replacement of such Person approved in writing by Lender in its sole discretion within ninety (90) days after the occurrence of any such retirement, death,

incapacity or withdrawal (provided, however, that Lender shall not unreasonably withhold its consent to a substitution or replacement who (i) executes guaranties in favor of Lender in form and substance as previously executed by Guarantor and (ii) provides that management and Control of Borrower will be by an individual or individuals approved in writing by Lender, which individuals must be experienced in owning, operating, leasing and developing comparable properties and (iii) Guarantors shall have, in the aggregate, a tangible net worth, as determined by Lender pursuant to the terms of Section 4(f) of the Completion Guaranty and Section 3(f) of the Indemnity and Guaranty Agreement, in excess of Thirty Million Dollars ($30,000,000.00), including liquidity (i.e., cash and readily marketable securities) of at least Three Million Dollars ($3,000,000.00), provided that for so long as the Reserves are maintained with Lender pursuant to the terms hereof, Five Hundred Thousand and No/100 Dollars ($500,000.00) shall be credited to such Minimum Liquidity Requirement; or

(l)     <u>Environmental Indemnity Agreement</u>.  The occurrence of a default (after all notice and grace periods provided therein, if any, shall have expired) under the Environmental Indemnity Agreement; or

(m)     <u>Guaranties</u>.  The occurrence of a default (after all notice and grace periods provided therein, if any, shall have expired) under the Carveout Guaranty or the Completion Guaranty; or

(n)     <u>Construction Schedule.</u>     (i) A discontinuance or abandonment of construction of the work required to be performed under the Construction Budget for a period of twenty (20) days, provided that if such discontinuance or abandonment is caused by Force Majeure, such period shall be extended for an additional period equal to the lesser of (x) the number of days of delay actually caused by such Force Majeure, or (y) sixty (60) days; (ii) a material failure to adhere to the Construction Schedule, provided that if such failure is caused by Force Majeure, the applicable deadline or deadlines in the Construction Schedule shall be extended for an additional period equal to the lesser of (x) the number of days of delay actually caused by such Force Majeure, or (y) sixty (60) days, or (iii) a delay in construction of any of the work to be performed under the Construction Budget  or any portion thereof, regardless of cause, so that the same is not, or in Lender's judgment will not be, completed on or before the Completion Date, provided that if such failure is caused by Force Majeure, the Completion Date shall be extended for an additional period equal to the lesser of (x) the number of days of delay actually caused by such Force Majeure, or (y) sixty (60) days; or (iv) a delay in construction of any of the work to be performed under any Lease, regardless of cause, so that the same is not, or in Lender's judgment will not be, completed on or before the date required in the Lease.

(o)     <u>Deposit Account Control Agreement</u>.  Any default by Borrower under the terms of the Deposit Account Control Agreement which is not cured within thirty (30) days after written notice of such default given by Lender to Borrower;

(p)     <u>Other Payments</u>.  Borrower's failure to timely fund any Reserves as required hereunder if such failure continues for five (5) Business Days following Borrower's receipt of written notice thereof from Lender; or

16100193.16

Exhibit Page 88

(q)    Permits; Utilities; Insurance.    (i) The neglect, failure or refusal of Borrower to keep in full force and effect any material permit, license, consent or approval required for the operation of the Property that is not fully reinstated within thirty (30) days after Lender gives Borrower notice of the lapse of effectiveness of such material permit, license, consent or approval; (ii) the curtailment in availability to the Property of utilities or other public services necessary for the full occupancy and utilization of the Improvements that is not restored to full availability within thirty (30) days after Lender gives Borrower notice of such curtailment of availability; or (iii) the failure by Borrower to maintain any insurance required under this Agreement or any Loan Document; or

(r)    Material Obligation.    Subject to Borrower's right to contest set forth in Section 12.7 hereof, failure of Borrower to pay when due any indebtedness or other liability of Borrower or the Property aggregating in excess of $100,000.00 ("**Material Indebtedness**"); the default by Borrower in the performance (beyond the applicable grace period with respect thereto, if any) of any term, provision or condition contained in any agreement under which any Material Indebtedness was created or is governed; the occurrence of any other event or condition, the effect of which event or condition is to cause, or to permit the holder or holders of any Material Indebtedness to cause, such Material Indebtedness to become due prior to its stated maturity; or any Material Indebtedness of Borrower shall be declared to be due and payable or required to be prepaid or repurchased (other than by a regularly scheduled payment) prior to the stated maturity thereof; or

(s)    PACE Loans.    Except with respect to the existing PACE Loan, if Borrower shall incur or accept another PACE loan or shall permit or suffer the existence of a PACE Lien whether in connection with the PACE Loan or any other PACE loan on all or any portion of the Property, in either case without Lender's prior written consent thereto, or if there shall exist any default or event of default under the existing PACE Loan Documents beyond any applicable notice and/or cure period(s); or

(t)    Mello-Roos CFD Financing.    Except with respect to the existing Mello-Roos CFD Financing, if Borrower shall incur or accept any other Mello-Roos CFD indebtedness or shall permit or suffer the existence of any other lien on the Property in connection therewith, in either case without Lender's prior written consent thereto, or if there shall exist any default or event of default under the Mello-Roos CFD Financing anticipated to close within ninety (90) days after the date hereof, beyond any applicable notice and/or cure period(s); or

(u)    Exchange Matters.    If (i) the Exchange Accommodator and Exchange Transferee fail to complete the Exchange Interest Transfer on or before the date that is seventy-five (75) days after the Closing Date, (ii) TIC 1 Borrower or TIC 2 Borrower seeks or obtains a partition of all or any part of the Property without first obtaining the prior written consent of Lender, or (iii) the manager under the Tenant in Common Agreement breaches or defaults under the Tenant in Common Agreement in any material respect.

(v)    Franchise Agreement.    If a default has occurred and continues beyond any applicable cure period under the Franchise Agreement, and such default permits a party to terminate or cancel the Franchise Agreement.

16100193.16

(i)    If Borrower terminates or cancels the Franchise Agreement or operates the Property under the name of any hotel chain or system other than Hotel Indigo, without Lender's prior written consent.

(w)    Hotel Management Agreement.  If a default has occurred and continues beyond any applicable cure period under the Hotel Management Agreement, and such default permits a party to terminate or cancel the Hotel Management Agreement.

(i)    If Borrower terminates or cancels the Hotel Management Agreement or hires a replacement Hotel Manager, without Lender's prior written consent.

(x)    Other Default.  The occurrence of an event of default under any other Loan Document or Borrower's default in the performance of any other term, covenant or condition contained in this Agreement or any other Loan Document which is not cured within thirty (30) days after written notice of such default given by Lender to Borrower.

**11.2    ACCELERATION UPON EVENT OF DEFAULT; REMEDIES**.  Upon the occurrence of any Event of Default specified in this Article 11, Lender may, at its sole option, declare all sums owing to Lender under the Note, this Agreement and the other Loan Documents immediately due and payable.  Upon such acceleration, Lender may, in addition to all other remedies permitted under this Agreement and the other Loan Documents and at law or in equity, apply any sums in the Reserves to the sums owing under the Loan Documents and any and all obligations of Lender to fund further disbursements under the Loan shall terminate.

**11.3    DISBURSEMENTS TO THIRD PARTIES**.  Upon the occurrence of an Event of Default occasioned by Borrower's failure to pay money to a third party as required by this Agreement, Lender may but shall not be obligated to make such payment from the Loan proceeds or other funds of Lender.  If such payment is made from proceeds of the Loan, Borrower shall immediately deposit with Lender, upon written demand, an amount equal to such payment.  If such payment is made from funds of Lender, Borrower shall immediately repay such funds upon written demand of Lender.  In either case, the Event of Default with respect to which any such payment has been made by Lender shall not be deemed cured until such deposit or repayment (as the case may be) has been made by Borrower to Lender.

**11.4    LENDER'S COMPLETION OF CONSTRUCTION**.  Upon the occurrence of an Event of Default, Lender may, upon five (5) days prior written notice to Borrower, and with or without legal process, take possession of the Property and Improvements, remove Borrower and all agents, employees and contractors of Borrower from the Property and Improvements, complete the work of any construction and market and sell or lease the Property and/or Improvements.  For this purpose, Borrower irrevocably appoints Lender as its attorney-in-fact, which agency is coupled with an interest.  As attorney-in-fact, Lender may, in Borrower's name, take or omit to take any action Lender may deem appropriate, including, without limitation, exercising Borrower's rights under the Loan Documents and all contracts concerning the Property and/or Improvements.

16100193.16

**11.5    REPAYMENT OF FUNDS ADVANCED**.  Any funds expended by Lender in the exercise of its rights or remedies under this Agreement and the other Loan Documents shall be payable to Lender upon written demand, together with interest at the rate applicable to the principal balance of the Note from the date the funds were expended.

**11.6    RIGHTS CUMULATIVE, NO WAIVER**.  All Lender's rights and remedies provided in this Agreement and the other Loan Documents, together with those granted by law or at equity, are cumulative and may be exercised by Lender at any time.  Lender's exercise of any right or remedy shall not constitute a cure of any Event of Default unless all sums then due and payable to Lender under the Loan Documents are repaid and Borrower has cured all other Events of Default.  No waiver shall be implied from any failure of Lender to take, or any delay by Lender in taking, action concerning any Event of Default or failure of condition under the Loan Documents, or from any previous waiver of any similar or unrelated Event of Default or failure of condition.  Any waiver or approval under any of the Loan Documents must be in writing and shall be limited to its specific terms.

## ARTICLE 12.
## MISCELLANEOUS PROVISIONS

**12.1    INDEMNITY**.  EXCEPT TO THE EXTENT OF/DUE SOLELY TO LENDER'S WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FOR, FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES), REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR STRICT LIABILITY OF LENDER OR ITS DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, SUCCESSORS OR ASSIGNS, WHICH ANY SUCH PARTY MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY OF THE PROPERTY OR IMPROVEMENTS.  BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS SUCH PARTIES SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE SECURITY INSTRUMENT.

      **12.2**    **FORM OF DOCUMENTS**.    The form and substance of all documents, instruments, and forms of evidence to be delivered to Lender under the terms of this Agreement and any of the other Loan Documents shall be subject to Lender's approval and shall not be modified, superseded or terminated in any respect without Lender's prior written approval.

      **12.3**    **NO THIRD PARTIES BENEFITED**.    No person other than Lender and Borrower and their permitted successors and assigns shall have any right of action under any of the Loan Documents.

      **12.4**    **NOTICES**.    All notices or other communications required or permitted to be given pursuant to the provisions of this Agreement shall be in writing and shall be considered as properly given if delivered to the appropriate party at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement).    Except when otherwise required by law, any notice which a party is required or may desire to give the other shall be in writing and may be sent by e-mail (provided that a copy is simultaneously sent by one of the other permitted means of giving notice hereinafter set forth), by personal delivery or by mail (either (i) by United States registered or certified mail, return receipt requested, postage prepaid, or (ii) by Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery).    Any notice so given by e-mail shall be deemed to have been given as of the date on which the sender of such communication shall confirm receipt thereof by the appropriate parties.    Any notice so given by mail shall be deemed to have been given as of the date of delivery established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be.    Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the notice is to be given; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.    For purposes of notice, the addresses of the parties shall be:

| | |
|---|---|
| Borrower: | 1801 S. La Cienega Blvd, Suite 301 |
| | Los Angeles, CA 90035 |
| | Attention:  A. Stuart Rubin |
| | Email:  srubin@rprp.com |
| | |
| With a copy to: | Jeffer Mangels Butler & Mitchell LLP |
| | 1900 Avenue of the Stars |
| | Los Angeles, CA 90067 |
| | Attention:  David A. Sudeck |
| | Email:  dsudeck@jmbm.com |
| | |
| Lender: | U.S. Real Estate Credit Holdings III-A, LP |
| | c/o Calmwater Capital |
| | 11755 Wilshire Blvd., Suite 1425 |
| | Los Angeles, California 90025 |
| | Attention:  Larry Grantham, Managing Director |
| | Email:  larry@calmwatercapital.com |

16100193.16

With a copy to:    Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202
Attention:  Ana L. Tenzer, Esq.
Email:  altenzer@bhfs.com

Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of fifteen (15) days' notice to the other party in the manner set forth hereinabove.  Borrower shall forward to Lender, without delay, any notices, letters or other communications delivered to the Property or to Borrower naming Lender, "Lender" or any similar designation as addressee, or which is reasonably likely to affect the ability of Borrower to perform its obligations to Lender under the Loan Documents.

**12.5    ATTORNEY-IN-FACT**.  Borrower hereby irrevocably appoints and authorizes Lender, as Borrower's attorney-in-fact, which agency is coupled with an interest, to execute and/or record in Lender's or Borrower's name any notices, instruments or documents that Lender deems appropriate to protect Lender's interest under any of the Loan Documents; provided, however, that Lender shall not exercise such power unless an Event of Default exists.

**12.6    ACTIONS**.  Borrower agrees that Lender, in exercising the rights, duties or liabilities of Lender or Borrower under the Loan Documents, may commence, appear in or defend any action or proceeding purporting to affect the Property, the Improvements, or the Loan Documents and Borrower shall immediately reimburse Lender upon written demand for all such expenses so incurred or paid by Lender, including, without limitation, attorneys' fees and expenses and court costs.

**12.7    RIGHT OF CONTEST**.  Borrower may contest in good faith any claim, demand, lien, levy or assessment by any person other than Lender which would constitute an Event of Default if: (a) Borrower pursues the contest diligently, in a manner which Lender determines is not prejudicial to Lender, and does not impair the rights of Lender under any of the Loan Documents; and (b) Borrower deposits with Lender any funds or other forms of assurance which Lender in good faith determines from time to time appropriate to protect Lender from the consequences of the contest being unsuccessful.  Borrower's compliance with this Section 12.7 shall operate to prevent such claim, demand, levy or assessment from becoming an Event of Default.

**12.8    RELATIONSHIP OF PARTIES**.  The relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any third party with respect to the Property or Improvements, except as expressly provided in this Agreement and the other Loan Documents.

**12.9    DELAY OUTSIDE LENDER'S CONTROL**.  Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend or terminate all or any portion of Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any

16100193.16

governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

**12.10  ATTORNEYS' FEES AND EXPENSES; ENFORCEMENT**.  If any attorney is engaged by Lender to enforce or defend any provision of this Agreement, any of the other Loan Documents or Other Related Documents, or as a consequence of any Event of Default under the Loan Documents, with or without the filing of any legal action or proceeding, and including, without limitation, any fees and expenses incurred in any bankruptcy proceeding of the Borrower, then Borrower shall immediately pay to Lender, upon demand, the amount of all attorneys' fees and expenses and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.

**12.11  IMMEDIATELY AVAILABLE FUNDS**.  Unless otherwise expressly provided for in this Agreement, all amounts payable by Borrower to Lender shall be payable only in United States currency, immediately available funds.

**12.12  LENDER'S CONSENT**.  Wherever in this Agreement there is a requirement for Lender's consent, determination and/or a document to be provided or an action taken "to the satisfaction of Lender", except as otherwise expressly set forth herein, it is understood by such phrase that Lender shall exercise its consent, right or judgment in its sole and absolute discretion.

**12.13  LOAN SALES AND PARTICIPATIONS; DISCLOSURE OF INFORMATION**.  Borrower agrees that Lender may elect, at any time, to sell, assign or grant participations in all or any portion of its rights and obligations under the Loan Documents to a reputable nationally or regionally recognized commercial lender with established funding sources, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at Lender's sole discretion ("**Participant**"). Borrower further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to:  (a) the Property and Improvements and its operation; (b) Borrower, Managing Member or Guarantor (provided that Lender shall not disclose financial information of Guarantor unless such potential participant is notified it must maintain such financial information confidential; and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan. In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves. In connection with any such sale, assignment or participation, Borrower further agrees that the Loan may be split into two or more loans with the economic terms materially the same as provided herein and in the other Loan Documents, the Loan Documents shall be sufficient evidence of the obligations of Borrower to each purchaser, assignee, or participant, and upon written request by Lender, Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation, at no cost to Borrower, except for Borrower's own legal fees and

expenses.  The indemnity obligations of Borrower under the Loan Documents shall also apply with respect to any Participant.

**12.14  SECONDARY   MARKET   TRANSACTION;   DISCLOSURE   OF INFORMATION**.  Borrower acknowledges that Lender may effectuate one or more Secondary Market Transactions.  At no out-of-pocket expense to Borrower, Borrower shall cooperate in all respects with Lender (and agrees to cause its Affiliates and their respective officers and representatives to cooperate) in effecting any such Secondary Market Transaction and shall cooperate in all respects (and agrees to cause its Affiliates and their respective officers and representatives to cooperate) to implement all requirements imposed by any Investment Party or Rating Agency involved therein, including, without limitation, by executing amendments to Borrower's organizational documents (including, without limitation, Borrower's organizational chart) and/or the obligations evidenced by the Note and this Agreement and secured by the Security Instrument, and modifications to any Loan Documents, and by delivering an estoppel certificate acceptable to Lender within ten (10) days of Lender's request and such other documents as may be reasonably requested by Lender, which may include, among other things, opinions of counsel (including, if requested by Lender, a so-called "substantive non-consolidation" opinion with respect to Borrower and its Affiliates acceptable to Lender in its sole discretion at Borrower's sole cost and expense).  Borrower shall provide such information and documents relating to Borrower, any Guarantor, the Property and any tenants as Lender may reasonably request in connection with such Secondary Market Transaction.  Borrower shall make available to Lender all information concerning its business and operations that Lender may reasonably request.  Lender shall be permitted to share all information provided in connection with the Loan with the Investment Parties, Rating Agencies, investment banking firms, accounting firms, law firms and other third-party advisory firms involved with the Loan Documents or the applicable Secondary Market Transaction, including without limitation, all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to:  (a) the Property and Improvements and its operation; (b) any party connected with the Loan (including, without limitation, Borrower, any Person having any interest, whether direct or indirect, in Borrower, any constituent partner or member of Borrower and any Guarantor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  It is understood that the information provided to Lender in connection with the Loan may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus potential Investment Parties may also see some or all of the information with respect to the Loan, any Guarantor, the Property, Borrower and the holders of direct or indirect interests in Borrower.  Borrower irrevocably waives any and all rights it may have under any Applicable Laws (including, without limitation, any right of privacy) to prohibit such disclosure.  Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower.  Borrower hereby agrees to indemnify, defend and hold the Lender Indemnified Parties harmless as to any losses, damages, costs, expenses, liabilities (including, without limitation, strict liability), claims, obligations, settlement payments, penalties, fines, assessments, citations, litigation, demands, defenses, judgments, suits, proceedings or other expenses of any kind whatsoever (including reasonable attorneys' fees and expenses and court costs), that arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the information provided by or on behalf of Borrower, or arise out of or are based upon the omission or alleged omission by Borrower to

16100193.16

state therein a material fact required to be stated in such information, or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading.  Lender may publicize the existence of the Loan or Borrower's obligations under the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.  As used herein, the following terms shall have the following meanings:  (x) "Secondary Market Transaction" shall be (1) any sale of the Security Instrument, this Agreement, the Note and other Loan Documents to one or more investors as a whole loan, (2) a participation of the Loan or Borrower's obligations under the Loan to one or more investors, (3) a securitization of the Loan, (4) a pledge of the Loan, the Security Instrument, this Agreement, the Note and/or the other Loan Documents, and/or (5) any other sale, pledge, hypothecation, participation, encumbrance or transfer of the Loan or Borrower's obligations under the Loan or any interest therein to one or more investors; and "Investment Party" shall mean any actual or potential purchaser, transferee, assignee, lender, secured party, servicer, participant or investor in a Secondary Market Transaction.

**12.15  LENDER'S AGENTS**.  Lender may designate an agent or independent contractor to exercise any of Lender's rights under this Agreement and any of the other Loan Documents.  Any reference to Lender in any of the Loan Documents shall include Lender's agents, employees or independent contractors.

**12.16  TAX SERVICE**.  Lender is authorized to secure, at Borrower's expense, a tax service contract with a third party vendor which shall provide tax information on the Property and Improvements satisfactory to Lender.

**12.17  WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY**.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.  NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE.  PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION

16100193.16

OF A REFEREE.  IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE A REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN.    THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.  ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

**12.18  SEVERABILITY**.  If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents; provided, however, that if the rate of interest or any other amount payable under the Note or this Agreement or any other Loan Document, or the right of collectability therefor, are declared to be or become invalid, illegal or unenforceable, Lender's obligations to make advances under the Loan Documents shall not be enforceable by Borrower.

**12.19  HEIRS, SUCCESSORS AND ASSIGNS**.    Except as otherwise expressly provided under the terms and conditions of this Agreement, the terms of the Loan Documents shall bind and inure to the benefit of the heirs, successors and assigns of the parties.

**12.20  TIME**.  Time is of the essence of each and every term of this Agreement.

**12.21  HEADINGS**.  All article, section or other headings appearing in this Agreement and any of the other Loan Documents are for convenience of reference only and shall be disregarded in construing this Agreement and any of the other Loan Documents.

**12.22  GOVERNING LAW**.    THIS AGREEMENT, AND THE LOAN, AS A WHOLE, WAS NEGOTIATED IN THE STATE OF CALIFORNIA, AND LENDER HAS SUBSTANTIAL BUSINESS OPERATIONS IN THE STATE OF CALIFORNIA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND, EXCEPT AS OTHERWISE PROVIDED IN SECTIONS 9-301 OR 9-307 OF THE UCC, IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE

FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA; PROVIDED, HOWEVER, THAT AT ALL TIMES THE PROVISIONS HEREIN FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT TO THE SECURITY INSTRUMENT SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND, EXCEPT AS SET FORTH ABOVE, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

**12.23** **INTEGRATION; INTERPRETATION**.   The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

**12.24** **JOINT AND SEVERAL LIABILITY**.   The liability of all persons and entities obligated in any manner under this Agreement and any of the Loan Documents shall be joint and several.   Without limitation on the foregoing, notwithstanding that Borrower is comprised of tenants-in-common, the liability hereunder and under the other Loan Documents of each and all of the TICs shall be joint and several.

**12.25** **COUNTERPARTS**.   To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document.   It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.   Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.   Facsimile and other electronically transmitted signatures shall serve as the functional equivalent of manually executed signatures for all purposes.

**12.26** **CONFIDENTIALITY AND PUBLICITY**.

(a)      Borrower hereby agrees that Lender or any Affiliate of Lender may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes, (ii) use Borrower's or any Guarantor's names, logos or

85

other indicia germane to such parties in connection with such advertising, marketing or other similar purposes and (iii) disclose any and all information concerning the Loan Documents, as well as any information regarding the Borrower or any Guarantor and their operations, received by Lender in connection with the Loan Documents required by its lenders or funding or financing sources (subject to any conditions expressly set forth herein).

(b)  Borrower agrees, and agrees to cause each of its Affiliates, (i) not to transmit or disclose provision of any Loan Document to any Person (other than to Borrower's advisors and officers on a need-to-know basis) without Lender's prior written consent, (ii) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions.  Borrower agrees to submit to Lender and Lender reserves the right to review and approve all materials that Borrower or any of its Affiliates prepares that contain Lender's name or describe or refer to any Loan Document, any of the terms thereof or any of the transactions contemplated thereby.  Borrower shall not, and shall not permit any of its Affiliates to, use Lender's name (or the name of any of Lender's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without Lender's prior written consent.  Nothing contained in any Loan Document is intended to permit or authorize Borrower or any of its Affiliates to contract on behalf of Lender.

**12.27  <u>BROKERS</u>**.  Except for George Smith Partners, Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender harmless for, from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein, regardless of whether caused in whole or in part by the negligence or strict liability of Lender.  The provisions of this <u>Section 12.27</u> shall survive the expiration and termination of this Agreement and the payment of the Loan.

**12.28  <u>OFFSETS AND COUNTERCLAIMS</u>**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including any servicer of Borrower, or otherwise offset any obligations to make payments required under the Loan Documents.

**12.29  <u>REMEDIES OF BORROWER</u>**.  If a claim or adjudication is made that Lender or any of its agents, including any servicer of Borrower, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including any servicer of Borrower, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including any servicer of Borrower, with respect to actions taken by Lender or its agents on Borrower's behalf, other than any such claim arising from the gross negligence or willful misconduct of Lender or such agent.

16100193.16

**12.30    PRINCIPLES OF CONSTRUCTION**.  Unless otherwise specifically provided, (a) all references to sections and schedules are to those in this Agreement or the other applicable Loan Document, as the context requires, (b) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement or the other applicable Loan Document, as the context requires, as a whole and not to any particular provision, (c) all definitions are equally applicable to the singular and plural forms of the terms defined, (d) the word "including" means "including but not limited to," (e) accounting terms not specifically defined herein shall be construed in accordance with GAAP, as modified by the Uniform System of Accounts, (f) the word "Property" shall be deemed followed by the words "or any part thereof," (g) the term "knowledge" of a Person means the actual knowledge of such Person, after having made due inquiry and investigation and (h) whenever pursuant to this Agreement or any agreement, instrument or document contemplated herein, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory or acceptable to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (unless otherwise expressly provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.

**12.31    1031 EXCHANGE**.  Borrowers acknowledge that they have established a tenancy in common ownership structure for the Property in order to, among other things, obtain certain tax benefits afforded under the provisions of Section 1031 of the Code. Each Borrower expressly acknowledges that, together with its own professional advisors and legal counsel, it has performed its own due diligence and legal analysis relating to a tenancy in common ownership structure and to the financial, tax, legal and other issues as it had deemed necessary or appropriate to make an informed investment decision to purchase a tenancy in common interest in the Property. Each Borrower expressly acknowledges that Lender has not acted in any way whatsoever as an advisor to any Borrower with respect to the foregoing and agrees that Lender shall have no responsibility or express or implied liability whatsoever with respect to any of the foregoing.

**12.32    BORROWERS' DESIGNEE**.  Each of the Borrowers hereby makes, constitutes and appoints Borrowers' Designee the true and lawful attorney-in-fact of such Borrower, with the power from time to time, in the name, place and stead of such Borrower, to give Lender directions of any kind, to execute amendments or modifications of any Loan Document, to take the actions or make such deliveries specified herein to be taken or delivered by Borrowers' Designee and to give and receive notices of any kind on behalf of such Borrower under this Agreement or any of the other Loan Documents. Any notice given by Lender to Borrowers' Designee shall be deemed to have been given to each and every Borrower.


**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGE(S)]**

16100193.16

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date appearing on the first page of this Agreement.

**LENDER:**

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP,**
an Irish limited partnership, acting by its
General Partner, U.S. Real Estate Credit
Holdings III-A GP Limited

By: **Calmwater Asset Management, LLC,**
a Delaware limited liability company,
its Investment Manager

By: _____
Name: _Larry W. Grantham Jr._
Title: _Authorized Signatory_

[SIGNATURES CONTINUED ON THE NEXT PAGE]

Loan Agreement
Glenroy Coachella, California

**BORROWER**:

**GLENROY COACHELLA, LLC**,
a Delaware limited liability company

By: GLENROY COACHELLA HOLDINGS, LLC,
a Delaware limited liability company
Its: Sole Member

By: _____
    A. Stuart Rubin, Manager

Loan Agreement
Glenroy Coachella, California

**FORCE RUBIN, LLC,**
a Delaware limited liability company

By:_____
Name:  Robert Minsky
Title:   Manager


**FORCE RUBIN 2, LLC,**
a Delaware limited liability company

By:_____
Name:  Robert Minsky
Title:   Manager

Loan Agreement
Glenroy Coachella, California

**COACHELLA RESORT, LLC,**
a California limited liability company

By:_____

    Elliot Barton Lander, M.D., Trustee of The Elliot
    Lander Separate Property Trust dated December 2,
    2009, Its Member

## SCHEDULE I

## BORROWER'S ORGANIZATIONAL CHART

### Closing



### Post-Closing



SCHEDULE I

# EXHIBIT A

# DESCRIPTION OF THE PROPERTY

Parcels 1, 2, 4, 5 and 6 of Parcel Map No. 37310, in the City of Coachella, County of Riverside, State of California, according to map on file in Book 243, Pages 82 through 84 of Parcel Maps, Records of Riverside County, California.

A-1

16100193.16

## EXHIBIT B

## DOCUMENTS

I.      Loan Documents.  The documents listed in this Section I, and amendments, modifications and supplements thereto which have received the prior written consent of Lender, together with any documents executed in the future that are approved by Lender and that recite that they are "Loan Documents" for purposes of this Agreement are collectively referred to herein as the Loan Documents.

1.  This Agreement.

2.  The Promissory Note dated as of the date hereof, in the maximum principal amount of $24,400,000.00, made by Borrower payable to the order of Lender.

3.  The Deed of Trust, Security Agreement and Financing Statement dated as of the date hereof, executed by Borrower, as Trustor, to the trustee named therein, for the benefit of Lender, as Beneficiary.

4.  Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be filed with the Secretary of State of the State of California.

5.  Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be filed with the Secretary of State of the State of Delaware.

6.  Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be recorded in the Official Records of Riverside County, California.

7.  Assignment of Leases and Rents dated as of the date hereof, executed by Borrower and Lender.

8.  Assignment of Permits Licenses and Contracts dated as of the date hereof, executed by Borrower and Lender.

9.  Contractors Certificate for each General Contractor, Architect, Engineer involved with the Property dated as of the date hereof, executed by Borrower and Lender.

10. Indemnity and Guaranty Agreement dated as of the date hereof, executed by Guarantor in favor of Lender.

11. Hazardous Substances Indemnity Agreement dated as of the date hereof, executed by the Borrower and Guarantor  in favor of Lender

12. Completion Guaranty dated as of the date hereof, executed by Guarantor in favor of Lender.

B-1

16100193.16

13. Pledge and Security Agreement dated as of the date hereof, executed by The Stuart Rubin Children's Trust, as Pledgor, and Lender.

14. Uniform Commercial Code – National Financing Statement – Form UCC-1, for the Pledge and Security Agreement, to be recorded in the Official Records of Riverside County, California.

II.    Other Related Documents (Which Are Not Loan Documents):  None.

# EXHIBIT C

## Approved Budget

| | Budget | Paid to-date | Remaining Budget pre-close | Draw #1 | Remaining Budget post-close |
|---|---|---|---|---|---|
| **Hard Costs** | | | | | |
| Casita Construction and FF&E | $16,462,916 | $2,049,155 | $14,413,761 | $5,162,381 | $9,251,380 |
| Quonset Hut Construction | $4,172,104 | $1,515,846 | $2,656,258 | $0 | $2,656,258 |
| Infrastructure & Site Work | $6,869,000 | $2,976,482 | $3,892,518 | $2,574,794 | $1,317,724 |
| Building A - Conference Center | $1,054,100 | $0 | $1,054,100 | $0 | $1,054,100 |
| Kitchen Equipment | $175,000 | $0 | $175,000 | $0 | $175,000 |
| Hard Cost Contingency | $1,500,000 | $0 | $1,500,000 | $0 | $1,500,000 |
| DWC 5% Mark Up | $500,000 | $0 | $500,000 | $0 | $500,000 |
| Total Hard Costs | $30,733,120 | $6,541,483 | $24,191,637 | $7,737,175 | $16,454,462 |
| | | | | | |
| **Soft Costs** | | | | | |
| Architecture, Legal, Engineering, and Permits | $2,696,807 | $2,313,835 | $382,972 | $0 | $382,972 |
| Hotel Flag, F&B Consulting, Licenses | $200,000 | $82,500 | $117,500 | $0 | $117,500 |
| Legal & AccountingFees | $40,000 | $0 | $40,000 | $0 | $40,000 |
| Fund Control & Loan Servicing Fees | $113,843 | $0 | $113,843 | $13,842.94 | $100,000 |
| Property Taxes & Insurance | $130,000 | $0 | $130,000 | $0 | $130,000 |
| Operating Supplies & Pre-opening Expenses | $1,500,000 | $0 | $1,500,000 | $0 | $1,500,000 |
| Total Soft Costs | $4,680,650 | $2,396,335 | $2,284,315 | $13,843 | $2,270,472 |
| | | | | | |
| **Financing Fees & Costs** | | | | | |
| Calmwater Origination Fee | $366,000 | $0 | $366,000 | $366,000 | $0 |
| PACE Project Development Expenses | $36,400 | $0 | $36,400 | $36,400 | $0 |
| PACE Finance and Closing Expenses | $141,000 | $0 | $141,000 | $141,000 | $0 |
| PACE Capitalized Interest | $332,913 | $0 | $332,913 | $332,913 | $0 |
| PACE Development Fee | $176,250 | $0 | $176,250 | $176,250 | $0 |
| PACE Program Administration Fee | $227,852 | $0 | $227,852 | $227,852 | $0 |
| GSP Investment Banking Fees | $483,863 | $0 | $483,863 | $483,863 | $0 |
| Other Closing Costs | $499,620 | $0 | $499,620 | $499,620 | $0 |
| Calmwater Interest Holdback | $1,800,000 | $0 | $1,800,000 | $0 | $1,800,000 |
| Total Financing Fees & Costs | $4,063,898 | $0 | $4,063,898 | $2,263,898 | $1,800,000 |
| | | | | | |
| **Total Costs** | $39,477,668 | $8,937,818 | $30,539,849 | $10,014,915 | $20,524,934 |
| Bank Hapoalim Payoff | | | $4,000,000 | $4,000,000 | $0 |
| Total Uses | | | $34,539,849 | $14,014,915 | $20,524,934 |

C-1

## **EXHIBIT D**

## **Intentionally Deleted**

D-1

## EXHIBIT E

## FORM OF DISBURSEMENT REQUEST

U.S. Real Estate Credit Holdings III-A, LP
c/o Calmwater Capital
11755 Wilshire Boulevard, Suite 1425
Los Angeles, CA  90025
Tel:  (310) 806-9770
Fax:  (310) 943-3550
Attention:  Larry Grantham

Re:      _____ ("Borrower")

Dear_____:

Pursuant to the terms of that certain Loan Agreement dated as of _____, 20__ (as modified, amended and/or supplemented from time to time, the "Loan Agreement"), and the representations and warranties set forth therein and herein, Borrower hereby submits a disbursement request for the amount of $_____ (the "Loan").  Capitalized terms have the same meanings as in the Loan Agreement.

This disbursement request ("Request") shall be deemed to be a representation by Borrower and of the person/entity signing this Request (in the case of the person/entity signing this Request, to person's/entity's knowledge) that (A) no Event of Default has occurred or will exist (and no event that with the passage of time or giving of notice has occurred or will exist that would constitute an Event of Default) upon the making of this requested disbursement; (B) the representations and warranties contained herein and in the other Loan Documents as of the date hereof are true and correct in all material respects; (C) all information set forth in this Request; and on any exhibit attached hereto is true, correct and complete in all material respects; and (D) all conditions precedent to the disbursement to be made in connection with this Request have been satisfied.

      (a)      the Borrower has received no notice and has no knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code), liens or claims of lien, either filed or threatened against the Borrower, any Guarantor or the Property, except the liens of the Lender and those which have heretofore been specifically identified in writing to the Lender;

      (b)      no event, circumstance or condition exists or has occurred which could delay or prevent the completion of the Property by the Completion Date other than Force Majeure events described here by Borrower;

      (c)      all construction related disbursements advanced by the Lender to the Borrower for labor, materials and/or services furnished prior to this draw request have

E-1

been paid to the parties entitled to such payment, and all Loan proceeds so disbursed have been used for the purposes set forth in the Loan Agreement;

(d)    all work and materials furnished to date for the Property conform with the Approved Plans and Specifications, and the Borrower has approved all work and materials for which a payment is now due and for which this construction disbursement is being requested;

(e)    the total amount of the requested construction disbursement represents the actual amount payable to the general contractor and/or subcontractors who have performed work on the Project, and all of the construction disbursement requested hereby will be used as payment for the work on the Property described on the attached documentation and for no other reason;

(f)    all change orders or changes to the Approved Plans and Specifications or the schedule of values have been submitted to and approved by Lender; and

(g)    the Loan is In Balance (including, without limitation, any change orders approved by the Lender).

The following is an itemized statement of the costs incurred or due for which disbursement is requested with respect to the Approved Budget, and the total amount incurred, expended and/or due for such item less prior disbursements.

| ITEM | TOTAL AMOUNT INCURRED LESS PRIOR DISBURSEMENTS |
|---|---|
| 1) | |
| 2) | |
| TOTAL DISBURSEMENT REQUEST | |

This Request is submitted as of _____, 20__.

[BORROWER]

By: _____
Name: _____
Title: _____

E-2

## **EXHIBIT F**

### **Intentionally Deleted**

F-1

# **EXHIBIT G**

## **Engineering Contracts**

1.      Saxon Engineering.

16100193.16

# **EXHIBIT H**

# **Intentionally Deleted.**

H-1

# **EXHIBIT I**
## **FF&E Budget**

[See Approved Budget]

I-1

# Exhibit J

## Work to be Completed under the PACE Loan

**Glenroy Coachella REVISED PACE Scope of Work - Casitas ONLY**

|  | REVISED Scope |
|---|---|
| 1200 Concrete | $950,000 |
| 1207 Framing | $2,887,000 |
| **TOTAL Seismic Structural Scope** | **$3,837,000** |
| **Building Envelope** | |
| 1208 Doors & Windows | $749,957 |
| 1218 Insulation | $264,000 |
| 1223 Roof (estimated) | $568,200 |
| **Plumbing** | |
| 1202 Plumbing Fixtures | $526,872 |
| **HVAC** | |
| 1206 HVAC | $1,051,000 |
| **Electric** | |
| 1204 Electric Fixtures | $52,971 |
| **TOTAL Energy & Water Scope** | **$3,213,000** |
| **GRAND TOTAL PACE Scope of Work** | **$7,050,000** |

Confidential - PACE Equity LLC

1

**Exhibit K**

**Intentionally Deleted**

K-1

## Exhibit L

## Cash Management Notice

[Letterhead of Landlord]

**[Name and Address of Tenant]**

Re:    [*Name of Property*]

Dear Tenant:

You are hereby directed to make all future payments of rent and other sums due to the landlord under your Lease of the referenced property payable as follows:

Payable to:    _____

Address:    _____

_____

_____

Please take particular care in making the check, cashier's check or money order payable only to the above-mentioned name because only instruments made payable to the referenced name will be credited against sums due by you to landlord.  Until otherwise advised in writing by landlord and the above mentioned payee (or its successor or assign), you should continue to make your payments for rent and other sums as directed by the terms of this letter.

Thank you in advance for your cooperation with this change in payment procedures.

_____

By:    _____

## Exhibit M

## Legal Description of Restaurant Pad

Parcel 1 of Parcel Map No. 37310, in the City of Coachella, County of Riverside, State of California, according to map on file in Book 243, Pages 82 through 84 of Parcel Maps, Records of Riverside County, California.

M-1

## Exhibit N

## State of Borrower Formation

Delaware
California

N-1

16100193.16

## Exhibit O

### Apartment Property Description

Real property in the City of Santa Barbara, County of Santa Barbara, State of California, described as follows:

PARCEL ONE:

THAT PART OF THE PORTION OF BLOCK 65 IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, AS SAID BLOCK IS DELINEATED ON THE OFFICIAL CITY MAP THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEASTERLY TERMINUS OF COURSE NUMBERED (3) DESCRIBED IN THE DEED TO THE STATE OF CALIFORNIA, RECORDED NOVEMBER 13, 1958 IN VOLUME 1569 OF OFFICIAL RECORDS, AT PAGE 476, RECORDS OF SAID COUNTY; THENCE (A) ALONG SAID COURSE (3) SOUTH 51° 07' 31" WEST, 205.14 FEET TO THE SOUTHEASTERLY TERMINUS OF COURSE NUMBERED (4) DESCRIBED IN SAID DEED; THENCE (B) ALONG SAID COURSE (4) NORTH 15° 11' 22" WEST, 95.15 FEET TO AN INTERSECTION WITH THE NORTHEASTERLY LINE OF THE PARCEL DESCRIBED IN DEED TO STATE OF CALIFORNIA RECORDED JUNE 20, 1957, IN VOLUME 1454 OF OFFICIAL RECORDS AT PAGE 251, RECORDS OF SAID COUNTY; THENCE (C) ALONG LAST SAID NORTHEASTERLY LINE SOUTH 48° 30' 00" EAST, 3.82 FEET TO A POINT DISTANT NORTH 48° 30' 00" WEST, 125.00 FEET FROM THE NORTHWESTERLY LINE OF MICHELTORENA STREET DESCRIBED IN LAST SAID DEED; THENCE (D) PARALLEL TO SAID NORTHWESTERLY LINE OF MICHELTORENA STREET NORTH 41° 30' 00" EAST, 150.00 FEET TO AN INTERSECTION WITH THE NORTHWESTERLY PROLONGATION OF COURSE NUMBERED (2) DESCRIBED IN FIRST SAID DEED; THENCE (E) ALONG SAID PROLONGATION SOUTH 48° 30' 00" EAST, 110.00 FEET TO THE POINT OF BEGINNING.

PARCEL TWO:

AN EASEMENT FOR INGRESS, EGRESS AND DRIVEWAY PURPOSES OVER, UPON AND THROUGH THAT PORTION OF CITY BLOCK 65 IN THE CITY OF SANTA BARBARA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHWESTERLY LINE OF MICHELTORENA STREET, DISTANT THEREON 134 FEET SOUTHWESTERLY FROM THE MOST EASTERLY CORNER OF SAID BLOCK 65; THENCE SOUTH 41° 30' 00" WEST, ALONG THE NORTHWESTERLY LINE OF SAID MICHELTORENA STREET 24.00 FEET; THENCE NORTH 48° 30' 00" WEST, AT RIGHT ANGLES TO SAID NORTHWESTERLY LINE OF MICHELTORENA STREET, 5.00 FEET; THENCE SOUTH 51° 07' 31" WEST, TO A POINT ON A LINE WHICH BEARS SOUTH 20° 14' 12" EAST, FROM THE MOST SOUTHERLY CORNER OF THAT TRACT OF LAND DESCRIBED IN THE DEED TO B. E. FOSTER, A MARRIED MAN, RECORDED JANUARY 7, 1965 AS INSTRUMENT NO. 625 IN BOOK 2086, PAGE 1025 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE NORTH 20° 14' 12" WEST, TO THE MOST SOUTHERLY CORNER OF SAID FOSTER TRACT OF LAND; THENCE ALONG THE SOUTHEASTERLY LINE OF SAID FOSTER TRACT OF LAND, NORTH 51° 07' 31" EAST, TO A POINT THEREON FROM WHICH THE POINT OF BEGINNING BEARS SOUTH 48° 30' 00" EAST; THENCE SOUTH 48° 30' 00" EAST; THENCE SOUTH 48° 30' 00" EAST, TO THE POINT OF BEGINNING.

APN: 027-211-011

16100193.16

**Exhibit P**

**Mello-Roos CFD Financing Documents as of the date hereof**

1.  Draft CFD Application by Glenroy-Coachella LLC (undated; not signed by City)

2.  Formation Schedule dated as of 6/13/2017

3.  Construction Budget dated 6/3/2017 (prepared by Jacobsson Engineering)

4.  Draft Proposed District Boundary Map (Incomplete draft; undated)

5.  Calculation of Acreage and Maximum Special Taxing Rate (proforma dated 12/1/2017)

6.  Rate and Method of Apportionment of Special Tax (Draft version 4 undated)

7.  Confirmation Letter from the City to Pace Equity, LLC, addressed to Marx-Okubo and Calmwater Capital dated December 7, 2017

16100193.16

# Exhibit B

## PROMISSORY NOTE
### (Glenroy Coachella, California)

$24,400,000.00                                                     April 26, 2018

**FOR VALUE RECEIVED**, the undersigned, **GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN, LLC**, a Delaware limited liability company**, FORCE RUBIN 2, LLC**, a Delaware limited liability company**, and COACHELLA RESORT, LLC**, a California limited liability company (collectively, jointly and severally, "Borrower") the principal place of business of which is set forth opposite its signature on the signature page below, promises to pay to the order of **U.S. REAL ESTATE CREDIT HOLDINGS III-A LP**, an Irish limited partnership ("Lender"), having its principal office at c/o Calmwater Capital, 11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025, or at such other place as Lender may designate to Borrower in writing from time to time, the principal amount of up to Twenty-Four Million Four Hundred Thousand and No/100 Dollars ($24,400,000.00) in lawful money of the United States of America (the "Loan"), with interest thereon to be computed on the unpaid principal balance at the "Note Rate" (as defined herein), adjusted with respect to each Interest Period (as defined herein), together with all other amounts due hereunder and under the other Loan Documents (as defined in the Loan Agreement (as defined herein)), and to be paid in installments as set forth in this Note.  Capitalized terms used herein but not defined herein shall have the meaning set forth in that certain Loan Agreement (the "Loan Agreement") between Borrower and Lender, dated as the date hereof.

### 1.    TERMS OF PAYMENT

(a)    (i)    Borrower shall deliver to Lender (A) on the date the proceeds of the Loan are advanced to or for the benefit of Borrower (the "Initial Funding Date"), a payment of interest only for the period from and including the Initial Funding Date through and including April 30, 2018 and (B) thereafter, commencing on June 1, 2018 (the "First Payment Date") and on each Payment Date (as hereinafter defined) thereafter throughout the term of the Loan, monthly payments of interest in arrears.  As used herein, "Payment Date" means the First Payment Date and the first day of each calendar month thereafter throughout the term of the Loan and "Monthly Payment" shall mean each payment of interest and principal (if any) due on each Payment Date throughout the term of the Loan.

(ii)    On the Initial Funding Date, Borrower shall pay to Lender a loan commitment fee (the "Loan Commitment Fee") in the amount equal to one and one-half percent (1.5%) of the maximum amount of the Loan.  Borrower hereby authorizes Lender to disburse on the Initial Funding Date a portion of the Loan in such amount directly to Lender in payment of the Loan Commitment Fee.  The Loan Commitment Fee shall be deemed earned upon payment and shall not be subject to reduction or be refundable under any circumstances.

(b)    Unless extended pursuant to Section 1(h) hereof or accelerated pursuant to the terms of the Loan Documents, the unpaid principal amount, together with all accrued and unpaid interest thereon, the **"Exit Fee"** (as defined herein) and any and all accrued and unpaid sums under the Loan Documents shall be due and payable on May 1, 2020 (the "Maturity Date"),

16101479.10

subject to extension pursuant to Section 1(h) below. Interest on the principal amount of this Note shall be calculated on the basis of a 360-day year and based on the actual number of days elapsed for any period in which interest is being calculated. Solely for the purpose of making any payment hereunder, but not for the purpose of calculating the amount thereof or the application/allocation thereof to principal and interest, if the first (1st) day of a given month is not a Business Day (as defined herein), then the Payment Date for such month shall be the next succeeding Business Day. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever. Business Day, as used herein, shall mean a day other than (i) a Saturday or Sunday, or (ii) any other day on which commercial banks in Los Angeles, California are not permitted or required to be open for general banking business.

(c)     Payments in federal funds immediately available at the place designated for payment received by Lender prior to 5:00 p.m. local time of such place on a Business Day at said place of payment shall be credited prior to close of business while other payments may, at the option of Lender, not be credited until immediately available to Lender in federal funds at the place designated for payment prior to 5:00 p.m. local time at said place of payment on a Business Day.  Each such monthly installment shall be applied first, to the payment of accrued interest, second, to any amounts hereafter advanced by Lender hereunder or under any other Loan Document, third, to any late fees, fourth, to other amounts payable to Lender, and, last, to reduction of principal.

(d)     For each Interest Period, Lender shall calculate the interest payable for such Interest Period at the Note Rate on the unpaid principal balance as of the LIBOR Determination Date (defined below) for such Interest Period, and no adjustments to such payment amount shall be made on account of principal payments made during the Interest Period after the first Business Day thereof.  Lender's calculations of interest payable for an Interest Period, shall be conclusive and binding absent manifest error.

(e)     The terms as used in the Loan Documents and this Note mean:

(i)     "Note Rate" means an interest rate equal to LIBOR (defined below) plus eight and seventy-five one-hundredths percent (8.75%) per annum.

(ii)     "Interest Period" means the period from and including the first day of a calendar month during the term of the Loan to but excluding the first day of the immediately succeeding calendar month; provided, however, the first Interest Period shall commence on the date hereof and shall end on, and include, the last day of the current calendar month and the last Interest Period shall end on the Maturity Date.

(iii)     "LIBOR" means the greater of (i) one and twenty-five one-hundredths percent (1.25%) per annum and (ii) the quoted offered rate for one-month United States dollar deposits in an amount equal to $1,000,000 with leading banks in the London interbank market that appears as of 8:00 a.m. (London time) on the related LIBOR Determination Date on the display page designated as "BBAM" on Bloomberg (or such other display as may replace "BBAM" on Bloomberg), or any successor thereto, as the London Interbank Offering Rate, and if such rate does not appear on said "BBAM"

2

display on any such LIBOR Determination Date, then the arithmetic mean (rounded upward if necessary to the nearest whole multiple of 1/1,000%) of certain offered quotations of rates to prime banks in the London interbank market as of approximately 11:00 a.m., London time, in an amount that is representative for a single transaction in the relevant market on such LIBOR Determination Date. If on any LIBOR Determination Date, Lender is required but is unable to determine the LIBOR in the manner provided in clauses (i) and (ii) above, LIBOR for the next Interest Period shall be the rate of interest per annum as reasonably determined by Lender at which U.S. dollar deposits in an amount approximately equal to the Loan, and with one month maturities, are offered in immediately available funds by leading banks in the London interbank market at 8:00 a.m., London time.  The establishment of LIBOR on each LIBOR Determination Date by the Lender shall be final and binding, absent manifest error.

(iv)    "LIBOR Determination Date" shall mean, with respect to any Interest Period, the date that is two (2) LIBOR Business Days immediately preceding the day on which such applicable Interest Period commences.

(v)    "LIBOR Business Day" shall mean a day upon which (i) United States dollar deposits may be dealt in on the London interbank markets and (ii) commercial banks and foreign exchange markets are open in London, England and in New York, New York, USA.

(f)    Borrower shall purchase, collaterally assign to Lender pursuant to an assignment of interest rate cap agreement acceptable to Lender, and maintain in effect, for the term of this Note, an interest rate cap agreement with an Acceptable Counterparty (a "Cap"), which shall have a term coterminous with the term of the Loan, shall have a notional amount equal to the maximum amount of the Loan and a strike rate equal to or lower than three percent (3.00%), and obligate the counterparty to make monthly payments equal to the excess of LIBOR over the strike rate, calculated on the notional amount.  If at any time the counterparty to any Cap required hereunder ceases to be an Acceptable Counterparty, then within ten (10) Business Days following written request from Lender, Borrower shall either (x) deliver to Lender a replacement Cap satisfying all of the criteria set forth above, or (y) either (1) cause the obligations of the counterparty to such Cap to be guaranteed by a guarantor acceptable to Lender in its sole discretion, or (2) pledge collateral satisfactory in the sole discretion of Lender and each Rating Agency that has rated securities backed by the Loan, provided that in the case of each of the preceding clauses (x) and (y), all documents, collateral, opinions and other requirements shall be executed, delivered and/or satisfied, as appropriate, to the satisfaction of Lender and each Rating Agency that has rated securities backed by the Loan in their sole discretion  As used herein, "Acceptable Counterparty" means any counterparty to a Cap required hereunder, having a credit rating of at least (a) either (i) a long-term unsecured debt rating of "A+" or higher by S&P or (ii) if the long-term unsecured debt rating is "A" or lower by S&P, a short-term rating of not less than "A-1" from S&P; and (b) a long-term unsecured debt rating of not less than "A1" by Moody's.

(g)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender in good faith to make or maintain the Loan using LIBOR to calculate the Note Rate, or if Lender determines that for any period of

3

time LIBOR is not determinable in accordance with the criteria set forth herein, then for such period of time Lender shall select another generally recognized index in substitution for LIBOR for purposes of determining the Note Rate, to achieve a Note Rate which Lender in good faith estimates reasonably approximates the Note Rate that would have been applicable had LIBOR been available, and the Note Rate determined in accordance with this sentence conclusively shall be the Note Rate hereunder applicable to such period.  In the event that any change in any requirement of any Applicable Law or in the interpretation or application thereof, or compliance in good faith by Lender with any request or directive (whether or not having the force of law) hereafter issued from any Governmental Authority which is generally applicable to all Lenders subject to such Governmental Authority's jurisdiction:

> (i)     shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of LIBOR hereunder;

> (ii)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

> (iii)   shall hereafter impose on Lender any other condition, the result of which is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender reasonably deems to be material and related to the Loan, and provided that Lender imposes any such additional amounts consistently on all of its borrowers under similar loans to the Loan.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 1(j), Lender shall provide Borrower with written notice specifying in reasonable detail the event or circumstance by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive absent manifest error.  This provision shall survive payment of this Note and the satisfaction of all other obligations of Borrower under this Note, the Loan Agreement and the other Loan Documents.

> (h)     Borrower shall have one (1) option to extend the Maturity Date for a period of twelve (12) months after the then-scheduled Maturity Date (the "Extension Term"), provided that Borrower's right to exercise each such option shall be subject to and conditioned on Borrower's satisfaction of all of the following terms and conditions:

> (i)     Borrower shall deliver to Lender a notice (the "Extension Notice"), not earlier than ninety (90) days prior to the then-scheduled Maturity Date, nor later than

4

thirty (30) days prior to the then-scheduled Maturity Date, of Borrower's election to extend the then-scheduled Maturity Date as permitted in this Section 1(f), which election shall be irrevocable.

(ii)    No Default nor Event of Default shall have occurred and shall remain uncured (as of the date of the Extension Notice and as of the date on which the Extension Term would commence).

(iii)    All of the representations and warranties of Borrower or any indemnitor or guarantor contained in the Loan Documents shall be true, accurate and complete in all material respects as of the date the Extension Notice is given and as of the date on which the Extension Term would commence (as if all such representations and warranties were remade as of the date the Extension Notice is given and as of the date on which the Extension Term would commence and Borrower's delivery of the Extension Notice shall be deemed to be a remaking and reaffirmation of all of such representations and warranties as of such dates).

(iv)    Borrower shall deliver to Lender an endorsement or written continuation of the title insurance policy issued to Lender as of the date hereof insuring the priority of the lien of the Security Instrument, showing that on the commencement date of the Extension Term, title to the Property covered by such title insurance policy is vested in Borrower and that no exceptions to title to the Property exist, other than those exceptions set forth in the original title insurance policy issued to Lender by the title company as of the date hereof.

(v)    Borrower shall deliver to Lender (and, at Lender's request, cause to be recorded or filed, as applicable) any and all such other items as Lender may reasonably require to confirm or assure the liens and security interests of Lender in the Property (as defined in the Security Instrument) continue to be valid and enforceable first priority liens and security interests securing the indebtedness evidenced hereby, including without limitation, UCC searches, supplemental environmental or engineering reports, consultant's reports, modifications or extension agreements and other documentation, all at no cost to Lender.

(vi)    As of the effective date of the Extension Term, there shall be no existing law, rule, regulation or guideline applicable to Lender, this Loan transaction or the Property prohibiting or precluding Lender's modification or extension of the Loan or otherwise materially and adversely affecting the validity and enforceability of the Loan Documents and the Loan shall be in good standing as determined by Lender, in its sole and absolute discretion.

(vii)    Borrower shall pay any and all fees and charges incurred in connection with the extension of the scheduled Maturity Date, including without limitation, reasonable attorneys' fees and disbursements incurred by Lender and fees and expenses relating to the examination of title, title insurance premiums, surveys, and recording costs, documentary, transfer or other similar taxes and revenue stamps.

16101479.10

(viii)    Borrower shall pay to Lender concurrently with the delivery of the Extension Notice an extension fee in an amount equal to one-half of one percent (0.50%) of the full stated principal balance of this Note.

(ix)    The Property shall have (i) maintained a Loan to Value Ratio of not more than seventy percent (70%); and (ii) a Debt Service Coverage Ratio of no less than 1.40:1:00, all calculated on a trailing 12 month basis (as applicable) as of the applicable date of determination, as more particularly set forth in the Loan Agreement.

(x)    Lender's receipt of an appraisal prepared by a third-party for the Property, at Borrower's expense, in form and substance reasonably satisfactory to Lender.

(xi)    Borrower shall have achieved and satisfied "Completion" of the Improvements, as defined in and pursuant to the terms of the Loan Agreement.

(xiii)    Borrower and Lender shall have entered into an amendment to the Loan Documents memorializing such extension of the Term of the Loan, and such amendment, shall modify the DSCR Failure threshold applicable during such extended term in the definition of "DSCR Failure" in the Loan Agreement to 1.40:1.00, which shall apply until the Maturity Date of the Loan.

## 2.    PREPAYMENT

During the first partial calendar month of the term of this Loan (if any), and through and including May 1, 2019 (collectively, the "Early Prepayment Period"), Borrower may prepay the Loan in full or in part so long as (i) Borrower gives to Lender not less than thirty (30) days and not more than ninety (90) days prior irrevocable written notice to Lender specifying the date on which prepayment is to be made (the "Early Prepayment Date"), (ii) Borrower pays on the Early Prepayment Date:  (a) all accrued interest to and including the Early Prepayment Date; (b) the Make Whole Payment; (c) the Exit Fee (or a prorated portion of the Exit Fee based on the partial amount of the Loan being prepaid); and (d) all other sums due under this Note and the other Loan Documents and (iii) if Borrower prepays only a portion of the Loan, the principal prepaid shall not be less than Five Hundred Thousand Dollars ($500,000).  At any time after the Early Prepayment Date, Borrower may prepay the Loan in full or in part upon not less than thirty (30) days and not more than ninety (90) days prior irrevocable written notice to Lender specifying the date on which prepayment is to be made (the "Prepayment Date") and upon prepayment of: (a) all accrued interest to and including the Prepayment Date; (b) the Exit Fee (or a prorated portion of the Exit Fee based on the partial amount of the Loan being prepaid); and (c) all other sums due under this Note and the other Loan Documents and (iii) if Borrower prepays only a portion of the Loan, the principal prepaid shall not be less than Five Hundred Thousand Dollars ($500,000).  No amount repaid in respect of the Loan may be reborrowed.  Lender agrees that Borrower may use proceeds of the Mello-Roos CFD Financing to prepay the Loan in part, in accordance with, and subject to the terms of this Section 2 of this Note and Section 9.9(f) of the Loan Agreement

6

For purposes of this Section 2, the term "Make Whole Payment" shall mean an amount equal to the product of: (a) the principal balance of the Loan being repaid or prepaid, (b) the number of days from the date of repayment or prepayment through the Early Prepayment Period, and (c) a daily rate based upon the Interest Rate per annum.

## 3. EXCULPATION

(a)    Notwithstanding anything in the Loan Documents to the contrary, but subject to the qualifications hereinbelow set forth, Lender agrees that:

(i)    Borrower shall be liable for the indebtedness evidenced hereby and for the other obligations arising under the Loan Documents to the full extent (but only to the extent) of the security given therefor, the same being the Property.

(ii)    Judicial or other proceedings brought by Lender against Borrower upon an Event of Default shall be limited to the preservation, enforcement and foreclosure, or any thereof, of the liens, security titles, estates, assignments, rights and security interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, and, except with respect to the liability described below in this Section 3, no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of Borrower other than the Property.

In the event of a foreclosure of such liens, security titles, estates, assignments, rights or security interests securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, no judgment for any deficiency upon the indebtedness evidenced hereby shall be sought or obtained by Lender against Borrower, except with respect to the liability described below in this Section 3; PROVIDED, HOWEVER, THAT, NOTWITHSTANDING THE FOREGOING PROVISIONS OF THIS SECTION 3, BORROWER SHALL BE FULLY AND PERSONALLY LIABLE (AND SUBJECT TO LEGAL ACTION) FOR PAYMENT AND PERFORMANCE OF EACH OF THE FOLLOWING:

(A)    any and all Losses (as defined herein) to the extent caused by any fraud or material misrepresentation or failure to disclose a material fact by Borrower or any of Borrower's principals, officers, general partners, managing members or managers, any guarantor, any indemnitor or any agent, employee or other person authorized or apparently authorized to make statements, representations or disclosures on behalf of Borrower, any principal, officer, general partner or member of Borrower, any guarantor or any indemnitor;

(B)    any and all Losses (as defined herein) to the extent caused by any misapplication or misappropriation of any proceeds paid under any insurance policies (or paid as a result of any other claim or cause of action against any person or entity) by reason of damage, loss or destruction to all or any portion of the Property which, under the terms of the Loan Documents, should have been delivered to Lender;

7

(C)    any and all Losses (as defined herein) to the extent caused by any misapplication or misappropriation of any proceeds or awards resulting from the condemnation or other taking in lieu of condemnation of all or any portion of the Property, or any of them which, under the terms of the Loan Documents, should have been delivered to Lender;

(D)    any and all Losses (as defined herein) to the extent caused by any misapplication or misappropriation of any tenant security deposits or other refundable deposits paid to or held by Borrower or any other person or entity in connection with Leases of all or any portion of the Property which are not applied in accordance with the terms of the applicable Lease or other agreement;

(E)    any and all Losses (as defined herein) to the extent caused by any misapplication or misappropriation (including failure to turn over to Lender on demand following an Event of Default) of:  (i) any tenant security deposits and Rents and Profits collected in advance, (ii) any funds disbursed to Borrower from any Reserve, (iii) any funds held by Borrower for the benefit of another party, or (iv) any other funds payable to Lender under the Loan Documents.

(F)    for all obligations and indemnities of Borrower under the Loan Documents (including, without limitation, the Hazardous Substances Indemnity Agreement dated of even date herewith) relating to hazardous or toxic substances or compliance with environmental laws and regulations to the full extent of any losses or damages (including, but not limited to, those resulting from diminution in value of the Property) incurred by Lender as a result of the existence of such hazardous or toxic substances or failure to comply with environmental laws or regulations;

(G)    all Rents and Profits, issues, products and income of the Property received or collected by or on behalf of Borrower after an Event of Default (or any event which, with notice and the passage of time, or both, would constitute an Event of Default) and not applied to payment of principal, interest and other amounts due under this Note and the other Loan Documents, and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented from directing the disbursement of such sums);

(H)    for any and all Losses (as defined herein) incurred or suffered by Lender and arising out of or in connection with waste committed with respect to the Property by, or damage to the Property as a result of the intentional misconduct or gross negligence of Borrower or any of Borrower's principals, officers, partners, managing members, or managers, any guarantor, any indemnitor, or any agent or employee of any such persons, or any removal of any of the Property in violation of the terms of the Loan Documents;

(I)    any and all Losses (as defined herein) to the extent caused by failure to pay any valid taxes, assessments, mechanic's liens, materialmen's liens or

8

other liens which could create liens on any portion of the Property which would be superior to the lien or security title of the Security Instrument or the other Loan Documents, to the full extent of the amount claimed by any such lien claimant except, with respect to any such taxes or assessments, to the extent that (i) the Rents and Profits, issues, products and income of the Property are insufficient to pay such amounts, and (ii) funds have been deposited with Lender pursuant to the terms of the Loan Agreement specifically for the applicable taxes or assessments and not applied by Lender to pay such taxes and assessments, and as to any other lienable event, to the extent adequate security therefor has been posted by Borrower;

(J)    any and all Losses (as defined herein) to the extent caused by any violation of Section 9.10 of the Loan Agreement [Single Purpose Entity];

(K)    for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under the Note, in the event of any transfer of or further encumbrance placed on the Property in violation of Section 9.9 of the Loan Agreement [Transfer];

(L)    for all obligations of the Borrower set forth in the Loan Documents, including, without limitation, the payment of all principal, interest, and other amounts under this Note if (i) the Exchange Accommodator and Exchange Transferee fail to complete the Exchange Interest Transfer on or before the date that is sixty (60) days after the Closing Date, (ii) any of the Borrowers seeks or obtains a partition of all or any part of the Property without first obtaining the prior written consent of Lender, or (iii) the [Manager] under the Tenant in Common Agreement breaches or defaults under the Tenant in Common Agreement in any material respect;

(M)    for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under this Note, if Borrower shall voluntarily file a petition under Title 11 of the U.S. Code (the "Act"), as such Act may from time to time be amended, or under any similar or successor Federal statute relating to bankruptcy, insolvency, arrangements or reorganizations, or under any state bankruptcy or insolvency act, or file an answer in any involuntary proceeding admitting insolvency or inability to pay debts, or if Borrower shall fail to seek dismissal within ninety (90) days of the filing of any such involuntary proceeding, or fail to obtain a vacation of any such involuntary proceeding within one hundred twenty (120) days of the filing of such involuntary proceeding, or if any affiliate of Borrower initiates or joins in any such involuntary proceeding against Borrower, or if Borrower shall be adjudged a bankrupt, or if a trustee or receiver shall be appointed for Borrower or Borrower's property, or if the Property shall become subject to the jurisdiction of a Federal bankruptcy court or similar state court, or if Borrower shall make an assignment for the benefit of Borrower's creditors, or if there is an attachment, execution or other judicial seizure of any portion of Borrower's assets and such seizure is not discharged within ten (10) days;

(N)    for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts

9

under this Note, upon any action by Borrower or any guarantor or indemnitor under any indemnity or guaranty executed in connection with the Loan which prevents Lender from lawfully taking possession of the Property after an Event of Default;

(O) any and all Losses (as defined herein) if Borrower (i) moves, changes or relocates the terms of the Account (as defined in that certain Deposit Account Control Agreement of even date herewith (the "Deposit Account Agreement") executed by Borrower in favor of Lender) to a financial institution other than the Depository (as defined in the Deposit Account Agreement) without Lender's prior written approval, or (ii) fails to deposit all funds received from the operation of the Property or otherwise derived from the Borrower's ownership of the Property into the Account;

(P) any and all Losses (as defined herein) in the event Borrower fails to complete, or fails to cause to be completed, the Required Work in accordance with the terms of the Loan Agreement; provided, however, that Borrower shall have no liability under this subparagraph (O) if (i) funds were made available in the Reserves to pay for such Required Work, (ii) Borrower has complied with each of the terms and conditions set forth in the Loan Agreement for the disbursement of funds from such applicable Reserve(s) for the payment of the Required Work and (ii) Lender nevertheless refuses to disburse funds from the applicable Reserve(s) in accordance with the terms of the Loan Agreement; and

(Q) for all obligations set forth in the Loan Documents, including without limitation the payment of all principal, interest, and other amounts under this Note, if any violation of Section 9.10 of the Loan Agreement [Single Purpose Entity] causes Borrower to be substantively consolidated with any other debtor in a bankruptcy or other insolvency proceeding.

(R) for all obligations set forth in the Loan Documents, if the Franchise Agreement (or the right to operate the Property thereunder) or the Hotel Management Agreement shall be cancelled, surrendered or terminated by or as a result of the acts or omissions of Borrower or any Affiliate of Borrower without the prior written consent of Lender.

As used in this Section 3, "Losses" shall mean and include any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgment, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damage, of whatever kind or nature (including but not limited to reasonable attorneys' fees (which attorneys' fees shall include but not be limited to appellate fees and reasonable fees for all paralegals, legal assistants and other paraprofessionals)) and other costs of defense). Notwithstanding the foregoing, Borrower shall not be liable for any Losses that are attributable to the gross negligence or willful misconduct of Lender.

References herein to particular sections of the Loan Documents shall be deemed references to such sections as affected by other provisions of the Loan Documents relating thereto. Nothing

16101479.10

contained in this Section 3 shall (x) be deemed to be a release or impairment of the indebtedness evidenced by this Note or the other obligations of Borrower under the Loan Documents or the lien of the Loan Documents upon the Property, or (y) preclude Lender from foreclosing the Loan Documents in case of any default or from enforcing any of the other rights of Lender except as stated in this Section 3, or (z) release, relieve, reduce, waive, limit or impair in any way whatsoever any obligation of any party to the Indemnity and Guaranty Agreement and Hazardous Substances Indemnity Agreement each of even date herewith executed and delivered in connection with the indebtedness evidenced by this Note.

(b)     Notwithstanding anything to the contrary in this Note, the Security Instrument or any of the other Loan Documents, Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness evidenced hereby or secured by the Security Instrument or any of the other Loan Documents or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Note, the Security Instrument and the other Loan Documents.

## 4.     DEFAULT

(a)     It is hereby expressly agreed that should any default occur in the payment of principal or interest as stipulated above and such payment is not made within five (5) days after the date such payment is due (except that no grace, cure or notice period is provided for the payment of principal and interest due on the Maturity Date), or should any other "Event of Default" or any default not cured within any applicable grace or notice period occur under any other Loan Document, then an event of default (an "Event of Default") shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon and the Exit Fee, shall, at the option of Lender and with notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.

(b)     In the event that any payment is not received by Lender on the date when due (subject to the applicable grace period), then in addition to any default interest payments due hereunder and any other amounts due under the Loan Documents, Borrower shall also pay to Lender a late charge in an amount equal to five percent (5.0%) of the amount of such overdue payment. Notwithstanding the foregoing, such late charge shall not apply to any balloon payment of principal due on the Maturity Date (as the same may be extended) or following an acceleration of the Loan.  So long as any Event of Default exists, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the outstanding principal balance of this Note from (i) the date of the occurrence of any such Event of Default or, in the case of any monetary Event of Default, the due date of the payment giving rise to such Event of Default, through and including (ii) the date such Event of Default is cured or, in the case of any monetary Event of Default, the full amount of the payment due is credited or the outstanding principal amount evidenced hereby, together with all interest accrued and unpaid thereon and all other amounts payable under and with respect to the Loan Documents is paid and credited, at a rate per annum equal to the lesser of (a) five percent (5.0%) in excess of

11

the Note Rate, or (b) the maximum rate of interest, if any, which may be charged or collected from Borrower under applicable law (the "Default Interest Rate"), and such default interest shall be immediately due and payable.  Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty.

(c)    The remedies of Lender in this Note or in the Loan Documents, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively or together in Lender's discretion.  In the event this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs of collection including, without limitation reasonable attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements.  In addition, in connection with any other action arising from or in connection with this Note, the Lender shall be entitled to an award of its costs and expenses, including without limitation reasonable attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements, incurred or paid before and at trial or any other proceeding which may be instituted, at any tribunal level, and whether or not suit or any other proceeding is instituted.

(d)    The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument.  All of the terms and provisions of the Loan Documents are incorporated herein by reference.  Some of the Loan Documents are to be filed for record on or about the date hereof in the appropriate public records.

(e)    Time is of the essence with respect to this Note and the provisions herein contained.

### 5.    LIMIT OF VALIDITY

Lender and Borrower intend to comply at all times with applicable usury laws.  The provisions of this Note and of all agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid to Lender for the use, forbearance or detention of the money loaned under this Note ("Interest") exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under this Note in the inverse order of its maturity (whether or not then due) or, at the option of Lender, be paid over to Borrower, and not to the payment of Interest.  All Interest (including without

12

limitation any amounts or payments deemed to be Interest) paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full period until payment in full of the principal balance of this Note so that the Interest thereof for such full period will not exceed the maximum amount permitted by applicable law.  Borrower agrees to an effective rate of interest that is the rate stated herein plus any additional rate of interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Borrower, or any benefit received or to be received by Lender, in connection with this Note.  This <u>Section 5</u> will control all agreements between Borrower and Lender.

## 6.    NO WAIVER: AMENDMENT

No failure to accelerate the indebtedness evidenced hereby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (a) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (b) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.  No extension of the time for the payment of this Note or any installment due hereunder made by agreement with any person or any guarantor now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender agrees otherwise in writing.  This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

## 7.    WAIVERS

Presentment for payment, demand, protest and notice of demand, intent to accelerate, acceleration, protest and nonpayment and all other notices are hereby waived by Borrower.  Borrower hereby, for itself and any other person or entity claiming by, through, under or on behalf of Borrower, further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

## 8.    USE OF FUNDS

Borrower hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal, family or household purposes, but only for commercial and business uses and purposes as represented, disclosed and certified to Lender by Borrower prior to the date hereof.

16101479.10

## 9.    ENFORCEABILITY

This Note shall be interpreted, construed and enforced according to the laws of the State of California (without reference to the conflicts of law rules of the State of California. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, which shall include, without limitation, a transferee pursuant to Section 12.13 of the Loan Agreement, whether by voluntary action of the parties or by operation of law (without implying Lender's consent to any transfer or further encumbering of the Property in violation of Section 9.9 of the Loan Agreement).  As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.  If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Titles of articles, sections, clauses and paragraphs are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.  This Note shall not be construed more strictly against one party than against the other merely by virtue of the fact that this Note may have been physically prepared by one of the parties, or such party's counsel, it being agreed that all parties and their respective counsel have mutually participated in the negotiation and preparation of this Note.  This Note and the other Loan Documents contain the entire agreements between the parties hereto relating to the subject matter hereof and thereof, and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.  Lender may sell, transfer and deliver the Loan Documents to one or more investors in the secondary mortgage market.  In connection with such sale, Lender may retain or assign responsibility for servicing the Loan or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the investors.  All references to Lender herein shall refer to and include, without limitation, any such servicer, to the extent applicable.

## 10.    UNCONDITIONAL PAYMENT

Borrower is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.  In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

## 11.    TAXES

14

Borrower shall pay the cost of all revenue, tax or other stamps now or hereafter required by law at any time to be affixed to this Note, to the Security Instrument and/or to any other Loan Document; and if any tax is now or hereafter imposed with respect to notes of the nature of this Note or debts of the nature of the debt evidenced by this Note, Borrower agrees to pay to Lender upon demand the amount of such tax, and hereby waives any contrary provision of any law or rule of court now or hereafter in effect.

## 12.    SEVERABILITY

In the event any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Furthermore, in the event that the application of any provision of this Note to any person or circumstance shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, then, and in any event, such invalidity, illegality or unenforceability shall not be deemed to affect the application of such provision to any person or entity or circumstance against whom or which such application is legal, valid and enforceable.

## 13.    EXIT FEE

Upon the Maturity Date (including any acceleration thereof), or upon Borrower's prepayment of this Note (or portion thereof) pursuant to Section 2 hereof, a fee (the "Exit Fee") in the amount equal to one-half of one percent (0.50%) of the maximum stated principal amount of this Note shall be due and payable by Borrower to Lender in cash or immediately available funds, provided however, if Borrower prepays less that the full principal amount of the Loan, then on such date the Exit Fee payable shall be a prorated portion of the Exit Fee based on the partial amount of the principal under the Loan being so prepaid at such time pursuant to Section 2 hereof, with the balance of such Exit Fee being paid when the balance of the outstanding principal of the Loan evidenced by the Notes is so repaid by Borrower. All prepayments of this Note shall be applied by Lender to reduce the outstanding interest and principal balance of this Note.

TO THE EXTENT THE MAKE WHOLE PAYMENT OR THE EXIT FEE IS DEEMED IN WHOLE OR IN PART TO CONSTITUTE A CHARGE, FEE OR PENALTY FOR PREPAYMENT OF THE LOAN (ALTHOUGH NOT INTENDED AS SUCH), BORROWER HEREBY EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER APPLICABLE LAW (INCLUDING UNDER CALIFORNIA CIVIL CODE SECTION 2954.10) TO PREPAY THIS NOTE, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY DATE OF THIS NOTE, AND (B) AGREES THAT, IF, FOR ANY REASON, A PREPAYMENT OF ANY OR ALL OF THIS NOTE IS MADE, UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE OF THIS NOTE BY LENDER ON ACCOUNT OF ANY DEFAULT BY BORROWER UNDER THIS NOTE, THE SECURITY INSTRUMENT, OR ANY OTHER DOCUMENT SECURING THIS NOTE, INCLUDING, BUT NOT LIMITED TO, ANY TRANSFER, DISPOSITION OR FURTHER ENCUMBRANCE AS PROHIBITED OR RESTRICTED HEREIN AND BY THE SECURITY INSTRUMENT, THEN BORROWER SHALL BE OBLIGATED TO PAY, CONCURRENTLY

15

THEREWITH, THE MAKE WHOLE PAYMENT AND THE EXIT FEE THAT WOULD THEN BE DUE.  BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS NOTE AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

| _____ | _____ | _____ | _____ |
| Initials | Initials | Initials | Initials |

### 14.    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE LAND (AS DEFINED IN THE SECURITY INSTRUMENT) IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS NOTE OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN SOUTHERN CALIFORNIA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT BORROWER WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS NOTE (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM).  BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 12.4 OF THE LOAN AGREEMENT, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(b)    EACH OF BORROWER AND LENDER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY

16

THEREWITH, THE MAKE WHOLE PAYMENT AND THE EXIT FEE THAT WOULD THEN BE DUE.  BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS NOTE AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

| _____ | _____ | _____ | _____ |
| Initials | Initials | Initials | Initials |

14.    **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.**

(a)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE LAND (AS DEFINED IN THE SECURITY INSTRUMENT) IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS NOTE OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN SOUTHERN CALIFORNIA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT BORROWER WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS NOTE (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM).  BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 12.4 OF THE LOAN AGREEMENT, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(b)    EACH OF BORROWER AND LENDER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY

THEREWITH, THE MAKE WHOLE PAYMENT AND THE EXIT FEE THAT WOULD THEN BE DUE.  BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS NOTE AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

| _____ | _____ | _____ | _____ |
| Initials | Initials | Initials | Initials |

### 14.      SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a)      BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE LAND (AS DEFINED IN THE SECURITY INSTRUMENT) IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS NOTE OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN SOUTHERN CALIFORNIA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT BORROWER WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS NOTE (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM).  BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 12.4 OF THE LOAN AGREEMENT, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(b)      EACH OF BORROWER AND LENDER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY

16

COURT TRIAL WITHOUT A JURY.  NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE.  IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE A REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.  ANY PARTY TO THIS NOTE MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

**[END OF TEXT; SIGNATURE FOLLOWS ON NEXT PAGE]**

17

**IN WITNESS WHEREOF,** each Borrower has executed this Promissory Note as of the date first above written.

**"BORROWER"**

**GLENROY COACHELLA, LLC,**
a Delaware limited liability company

By: GLENROY COACHELLA HOLDINGS, LLC,
a Delaware limited liability company
Its: Sole Member

By:_____
A. Stuart Rubin, Manager

**FORCE RUBIN, LLC**,
a Delaware limited liability company

By: _____

Name:  Robert Minsky

Title:   Manager


**FORCE RUBIN 2, LLC**,
a Delaware limited liability company

By: _____

Name:  Robert Minsky

Title:   Manager

**COACHELLA RESORT, LLC,**
a California limited liability company

By:

Elliot Barton Lander, M.D., Trustee of The Elliot
Lander Separate Property Trust dated December 2,
2009, Its Member

# Exhibit C

Recording Requested By:
Stewart Title of California

Page 1 of 46
03/26/2018 04:03 PM Fees: $412.00
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: REGINA #080

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202
Attention: Ana L. Tenzer, Esq.

01180-291970

(Space Above For Recorder's Use)

## DEED OF TRUST,
## SECURITY AGREEMENT, FINANCING STATEMENT
## AND FIXTURE FILING

by

**GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN, LLC**, a Delaware limited liability company, **FORCE RUBIN 2, LLC**, a Delaware limited liability company, and **COACHELLA RESORT, LLC**, a California limited liability company

having an office at

1801 S. La Cienega Blvd., Suite 301, Los Angeles, CA 90035

(collectively, jointly and severally the **"Borrower"**)

to

**STEWART TITLE OF CALIFORNIA, INC.**, a California corporation

having an office at

7676 Hazard Center Drive, 14th Floor, San Diego, CA 92108

**("Trustee")**

for the benefit of

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership

having an office at

11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025

**("Lender")**

———————

APN Nos. 603-220-061; 603-220-062; 603-220-064; 603-220-065; 603-220-066

Recording Requested By:
Stewart Title of California

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202
Attention: Ana L. Tenzer, Esq.

01180-291970

(Space Above For Recorder's Use)

**DEED OF TRUST,
SECURITY AGREEMENT, FINANCING STATEMENT
AND FIXTURE FILING**

**by**

**GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN,
LLC**, a Delaware limited liability company, **FORCE RUBIN 2, LLC**, a Delaware limited
liability company, and **COACHELLA RESORT, LLC**, a California limited liability company

having an office at

1801 S. La Cienega Blvd., Suite 301, Los Angeles, CA 90035

(collectively, jointly and severally the **"Borrower"**)

to

**STEWART TITLE OF CALIFORNIA, INC.**, a California corporation

having an office at

7676 Hazard Center Drive, 14th Floor, San Diego, CA 92108

**("Trustee")**

for the benefit of

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership

having an office at

11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025

**("Lender")**

———————————————

APN Nos. 603-220-061; 603-220-062; 603-220-064; 603-220-065; 603-220-066

16101593.7

## DEED OF TRUST, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING

### (Glenroy Coachella, California)

**THIS DEED OF TRUST, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING** (this "Security Instrument") is made as of April 26, 2018 ("Effective Date"), by **GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN, LLC**, a Delaware limited liability company, **FORCE RUBIN 2, LLC**, a Delaware limited liability company, and **COACHELLA RESORT, LLC**, a California limited liability company (collectively, jointly and severally the "Borrower"), the address of which is 1801 S. La Cienega Blvd., Suite 301, Los Angeles, CA 90035, to Stewart Title of California, Inc., a California corporation ("Trustee"), the address of which is 7676 Hazard Center Drive, 14th Floor, San Diego, CA 92108, for the benefit of **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership ("Lender"), the address of which is 11755 Wilshire Blvd., Suite 1425, Los Angeles, CA 90025.

W I T N E S S E T H   T H A T:

BORROWER HEREBY IRREVOCABLY GRANTS, BARGAINS, SELLS, TRANSFERS, MORTGAGES, CONVEYS AND ASSIGNS TO TRUSTEE, IN TRUST FOR THE BENEFIT OF LENDER, WITH POWER OF SALE AND RIGHT OF ENTRY, all of Borrower's right, title and interest now owned or hereafter acquired in and to the following property, all of which is hereinafter collectively defined as the "Property":

A.    All that certain land situated at the Southeast Corner of Ave 48 and Van Buren Street, Coachella, California, more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "Land"), together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining and all of the estate, right, title, interest, claim and demand whatsoever of Borrower therein or thereto, either at law or in equity, in possession or in expectancy, now or hereafter acquired;

B.    All structures, buildings and improvements of every kind and description now or at any time hereafter located or placed on the Land (the "Improvements");

C.    All furniture, furnishings, fixtures, goods, equipment, inventory or personal property owned by Borrower and now or hereafter located on, attached to or used in and about the Improvements, including, but not limited to, inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any (including, but not limited to, beds, bureaus, chiffoniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted

plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers), other customary hotel equipment, all machines, engines, boilers, dynamos, elevators, stokers, tanks, cabinets, awnings, screens, shades, blinds, carpets, draperies, lawn mowers, and all appliances, plumbing, heating, air conditioning, lighting, ventilating, refrigerating, disposal and incinerating equipment, and all fixtures and appurtenances thereto, and such other goods and chattels and personal property owned by Borrower as are now or hereafter used or furnished in operating the Improvements, or the activities conducted therein, and all building materials and equipment hereafter situated on or about the Land or the Improvements, and all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (exclusive of any of the foregoing owned or leased by tenants of space in the Improvements);

D.    All easements, rights of way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, air rights and other development rights now or hereafter located on or appurtenant to the Land and/or the Improvements or under or above the same or any part or parcel thereof, and all estates, rights, titles, interests, tenements, hereditaments and appurtenances, reversions and remainders whatsoever, in any way belonging, relating or appertaining to the Land and/or the Improvements or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Borrower;

E.    All water, ditches, wells, reservoirs and drains and all water, ditch, well, reservoir and drainage rights which are appurtenant to, located on, under or above or used in connection with the Land and/or the Improvements, or any part thereof, whether now existing or hereafter created or acquired;

F.    All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Land;

G.    All cash funds, deposit accounts, including, without limitation, all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance and other rights and evidence of rights to investments or cash, now or hereafter created or held by Lender pursuant to this Security Instrument or any other of the Loan Documents (as

2

hereinafter defined), including, without limitation, all funds now or hereafter on deposit in any reserves or accounts held by or on behalf of Lender pursuant to this Security Instrument or any other of the Loan Documents (including, without limitation, the reserves established pursuant to Article I of this Security Instrument) (collectively, the "Reserves");

H.    All leases (including, without limitation, oil, gas and mineral leases), licenses, rental agreements, concessions and occupancy agreements of all or any part the Land and/or the Improvements now or hereafter entered into (each, a "Lease" and collectively, "Leases"), and all rents, royalties, issues, profits, revenue, income and other benefits (collectively, the "Rents and Profits") of the Land and/or the Improvements, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future Lease or other agreement pertaining thereto or arising from any of the Contracts (as hereinafter defined) or any of the General Intangibles (as hereinafter defined) and all cash or securities deposited to secure performance by the tenants, lessees, licensees or occupants (each, a "Tenant" and collectively, "Tenants"), as applicable, of their obligations under any such Leases, whether said cash or securities are to be held until the expiration of the terms of said Leases or applied to one or more of the installments of rent coming due prior to the expiration of said terms, subject to, however, the provisions contained in Section 1.8 hereinbelow;

I.    All contracts and agreements, including the Hotel Management Agreement, now or hereafter entered into covering any part of the Land and/or the Improvements (except Leases) (collectively, the "Contracts") and all revenue, income and other benefits thereof, including, without limitation, management agreements, service contracts, maintenance contracts, equipment leases, personal property leases and any contracts or documents relating to construction on any part of the Land and/or the Improvements (including plans, drawings, surveys, tests, reports, bonds and governmental approvals) or to the management or operation of any part of the Land and/or the Improvements;

J.    All present and future deposits given to any public or private utility with respect to utility services furnished to any part of the Land and/or the Improvements;

K.    All present and future funds, accounts, instruments, accounts receivable, documents, causes of action, claims, general intangibles (including without limitation, patents, copyrights, trademarks, trade names, service marks and symbols now or hereafter used in connection with any part of the Land and/or the Improvements, all names by which the Land or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Borrower has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Land and/or the Improvements) and all notes or chattel paper now or hereafter arising from or by virtue of any transactions related to the Land and/or the Improvements (collectively, the "General Intangibles");

L.    All water taps, sewer taps, certificates of occupancy, permits, licenses, franchises, certificates, consents, approvals and other rights and privileges now or hereafter obtained in connection with the Land and/or the Improvements and all present and future warranties and guaranties relating to the Improvements or to any equipment, fixtures, furniture, furnishings,

personal property or components of any of the foregoing now or hereafter located or installed on the Land and/or the Improvements;

M.    All building materials, supplies and equipment now or hereafter placed on the Land and/or in the Improvements and all architectural renderings, models, drawings, plans, specifications, studies and data now or hereafter relating to the Land and/or the Improvements;

N.    All right, title and interest of Borrower in any insurance policies or binders now or hereafter referred to in clauses (A)-(M) and (O)-(Q) including any unearned premiums thereon;

O.    All proceeds, products, substitutions and accessions (including without limitation, claims and demands therefor) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards;

P.    All present and future tax refunds relating to the Property.  The term "Tax" includes, without limitation, all real estate and personal property taxes, assessments and impositions, whether special or general, and any similar governmental charges or assessments that are levied upon the Property; and

Q.    All other or greater rights and interests of every nature in the Land and/or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Borrower.

FOR THE PURPOSES OF SECURING:

(1)    The debt evidenced by that certain Promissory Note (such Promissory Note, together with any and all renewals, modifications, consolidations and extensions thereof, substitutions therefor, replacements thereof and any other evidence of indebtedness given in exchange therefor, is hereinafter referred to as the "Note") signed as of the Effective Date, made by Borrower to the order of Lender in the original principal amount of up to Twenty-Four Million Four Hundred Thousand and No/100 Dollars ($24,400,000.00), with a maturity date of May 1, 2020, as may be extended in accordance with the Note, together with interest as therein provided;

(2)    The full and prompt payment and performance of all of the provisions, agreements, covenants and obligations contained herein and contained in any other agreements, documents or instruments now or hereafter evidencing, securing, guaranteeing or otherwise relating to the indebtedness evidenced by the Note (the Note, this Security Instrument, the Loan Agreement between the parties of even date herewith (the "Loan Agreement"), the Cash Management Agreement between the parties of even date herewith (the "Cash Management Agreement"), any interest rate cap agreement required under the Loan Documents, and such other agreements, documents and instruments executed and/or delivered in connection with the Loan, together with any and all renewals, amendments, extensions and modifications thereof, supplements thereof and other changes of any kind thereto are hereinafter collectively referred to as the "Loan Documents") and the payment of all other amounts therein covenanted to be paid and performance of all other obligations therein covenanted to be performed;

4

(3)     Any and all additional advances made by Lender to protect or preserve the Property or the lien or security interest created hereby on or in the Property, or for Taxes, assessments or insurance premiums as hereinafter provided or for performance of any of Borrower's obligations hereunder or under the other Loan Documents or for any other purpose provided herein or in the other Loan Documents (whether or not the original Borrower remains the owner of the Property at the time of such advances); and

(4)     Any and all other indebtedness now owing or which may hereafter be owing by Borrower to Lender, including, without limitation, the Make Whole Payment and the Exit Fee (as such terms are defined in the Note) and any other prepayment fees, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, consolidations, replacements and extensions thereof.

(All of the sums referred to in Paragraphs (1) through (4) above are herein sometimes referred to as the "secured indebtedness" or the "indebtedness secured hereby").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

TO HAVE AND TO HOLD the above granted and described Property, together with all and singular the rights, hereditaments and appurtenances in any way appertaining or belonging thereto, unto Trustee and Trustee's successors or substitutes in this trust, and for their successors and assigns, in trust and for the uses and purposes hereafter set forth, forever, subject, however, to all Permitted Exceptions (defined in Section 1.1 below).

Borrower, for Borrower and Borrower's successors and assigns, hereby agrees to warrant and forever defend, all and singular, title to the Property unto Lender, and Lender's successors or substitutes in this trust, forever, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof;

PROVIDED, HOWEVER, that if Borrower shall pay in full or cause to be paid in full to Lender the secured indebtedness and all other covenants contained in the Loan Documents shall have been performed on or before the Maturity Date, then this Security Instrument shall be satisfied and the estate, right, title and interest of Lender in the Property shall cease, and, upon payment to Lender of all costs and expenses incurred for the preparation of the release hereinafter referenced and all recording costs, if allowed by law, Lender shall release this Security Instrument and the lien hereof by proper instrument.

Anything to the contrary herein or elsewhere notwithstanding, the obligations of the guarantor under (i) the Hazardous Substances Indemnity Agreement, dated as of the date hereof, from Borrower and A. Stuart Rubin, individually ("Guarantor"), to Lender (the "Hazardous Substances Indemnity"), and (ii) the Indemnity and Guaranty Agreement, dated as of the date hereof, from Guarantor, to Lender (the "Indemnity and Guaranty Agreement"), or any other guarantor under any other separate guaranty accepted by Lender, shall not be secured by this Security Instrument, any separate assignment of leases or assignment of rents, or any other lien encumbering the Property.

16101593.7

# ARTICLE 1
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER

For the purpose of further securing the indebtedness secured hereby and for the protection of the security of this Security Instrument, for so long as the indebtedness secured hereby or any part thereof remains unpaid, Borrower covenants and agrees as follows:

1.1 <u>Certain Representations, Warranties and Covenants of Borrower</u>. Borrower, for itself and its successors and assigns, does hereby represent, warrant and covenant to and with Lender, its successors and assigns, that, except as disclosed to Lender in writing prior to the Effective Date:

(a) Borrower has good and marketable title to the Land and to the Improvements located thereon, subject only to those matters set forth as exceptions to or subordinate matters that Lender has agreed to accept in the title insurance policy issued to Lender insuring the lien of this Security Instrument, excepting therefrom all preprinted and/or standard exceptions (the "<u>Permitted Exceptions</u>"), and has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and mortgage the Land and the Improvements located thereon in the manner and form hereby done or intended. Borrower will preserve Borrower's interest in and title to the Land and to the Improvements located thereon and will forever warrant and defend the same to Lender against any and all claims whatsoever and will forever warrant and defend the validity and priority of the lien and security interest created herein against the claims of all persons and parties whomsoever, subject to the Permitted Exceptions. The foregoing warranty of title shall survive the foreclosure of this Security Instrument and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Land and to the Improvements located thereon pursuant to any foreclosure.

(b) The Land and the Improvements, and the intended use thereof by Borrower comply in all material respects with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, applicable health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Property. The Land and the Improvements constitute one or more separate tax parcels for purposes of ad valorem taxation. The Land and the Improvements do not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements or such rights over or restrictions against have been obtained. Without limitation of the foregoing, the Improvements have been designed and shall be constructed and completed, and thereafter maintained, in strict accordance and full compliance with all of the requirements of the Americans with Disabilities Act, of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, et. seq., as amended from time to time. Borrower shall be responsible for all ADA compliance costs. All certifications, permits, licenses and approvals, including, without limitation, building permits for the Required Construction Work, and upon Completion, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property as a hotel and resort facility, whether temporary or permanent, have been obtained and are in full force and effect, or upon Completion will be obtained and thereafter maintained in full force and effect. Borrower shall keep and maintain, or cause Property Manager to keep and maintain, all certifications, permits, licenses and approvals

16101593.7                                                                              Exhibit Page 155

necessary for the operation of the Property as a hotel and resort facility. The use being made of the Property shall be in conformity with the certificate of occupancy when issued for the Property, or any portion thereof.

(c)    All utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Land and the Improvements for their intended purposes are available to the Property, including water, storm sewer, sanitary sewer, gas, electric, cable and telephone facilities, through public rights of way or perpetual private easements approved by Lender.

(d)    All streets, roads, highways, bridges and waterways necessary for access to and full use, occupancy, operation and disposition of the Land and the Improvements have been completed, have been dedicated to and accepted by the appropriate municipal authority and are open and available to the Land and the Improvements without further condition or cost to Borrower.

(e)    All curb cuts, driveways and traffic signals shown on the survey delivered to Lender prior to the execution and delivery of this Security Instrument are existing and have been fully approved by the appropriate governmental authority.

(f)    The Property is free from delinquent water charges, sewer rents, taxes and assessments.

(g)    As of the date of this Security Instrument, the Property is free from unrepaired material damage caused by fire, flood, accident or other casualty.

(h)    As of the date of this Security Instrument, no part of the Land or the Improvements has been taken in condemnation, eminent domain or like proceeding nor is any such proceeding pending or, to Borrower's knowledge and belief, threatened or contemplated.

(i)    The Improvements are structurally sound, in good repair and free of material defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within the Improvements, including, without limitation, the heating, ventilating and air conditioning systems and the electrical and plumbing systems, are in working order and condition.

(j)    Borrower has delivered to Lender true, correct and complete copies of any Contracts and all amendments thereto or modifications thereof.

(k)    Each Contract constitutes the legal, valid and binding obligation of Borrower and, to the best of Borrower's knowledge and belief, is enforceable against any other party thereto. No default exists, or with the passing of time or the giving of notice or both would exist, under any Contract which would, in the aggregate, have a material adverse effect on Borrower or the Property.

(l)    No Contract provides any party with the right to obtain a lien or encumbrance upon the Property superior to the lien of this Security Instrument.

16101593.7

(m)    Borrower and the Property are free from any past due obligations for sales and payroll taxes, including, but not limited to, transient accommodation taxes.

1.2    Defense of Title.  If, while this Security Instrument is in force, the title to the Property or the interest of Lender therein shall be the subject, directly or indirectly, of any action at law or in equity, or be attached, directly or indirectly, or endangered, clouded or adversely affected, directly or indirectly, in any manner, Borrower, at Borrower's expense, shall take all necessary and proper steps for the defense of said title or interest, including without limitation the employment of counsel approved by Lender, the prosecution or defense of litigation, and the compromise or discharge of claims made against said title or interest.  Notwithstanding the foregoing, in the event that Lender determines that Borrower is not adequately performing Borrower's obligations under this Section 1.2, or in good faith determines that a conflict of interest or potential conflict of interest exists therein, Lender may, without limiting or waiving any other rights or remedies of Lender hereunder, take such steps, with respect thereto as Lender shall deem necessary or proper and any and all costs and expenses paid by Lender in connection therewith, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.3    Performance of Obligations.  Borrower shall pay when due the principal of and the interest on the indebtedness evidenced by the Note.  Borrower shall also pay all charges, fees and other sums required to be paid by Borrower as provided in the Loan Documents, and shall observe, perform and discharge all obligations, covenants and agreements to be observed, performed or discharged by Borrower set forth in the Loan Documents in accordance with their terms.  Further, Borrower shall promptly and strictly perform and comply with all covenants, conditions, obligations and prohibitions required of Borrower in connection with any other document or instrument affecting title to the Property, or any part thereof, regardless of whether such document or instrument is superior or subordinate to this Security Instrument.

1.4    Insurance.  Borrower shall, at Borrower's expense, maintain in force and effect on the Property at all times while this Security Instrument continues in effect all required insurance pursuant to the Loan Agreement.

1.5    Payment of Taxes.  Borrower shall pay or cause to be paid all Taxes which are or may become a lien on the Property or which are assessed against or imposed upon the Property. Borrower shall furnish Lender with receipts (or if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such Taxes at least fifteen (15) days prior to the applicable delinquency date therefor.  Notwithstanding the foregoing, Borrower may in good faith, by appropriate proceedings and upon notice to Lender, contest the validity, applicability or amount of any asserted Tax so long as (a) such contest is diligently pursued, (b) Lender determines, in Lender's subjective opinion, that, if such Tax is not paid, such contest suspends the obligation to pay the Tax and that nonpayment of such Tax will not result in the sale, loss, forfeiture or diminution of the Property or any part thereof or any interest of Lender therein, and, (c) prior to the earlier of the commencement of such contest or the delinquency date of the asserted Tax, Borrower deposits in the Tax and Insurance Reserve  an amount determined by

16101593.7

Lender to be adequate to cover the payment of such Tax (if unpaid) and a reasonable additional sum to cover possible interest, costs and penalties; provided, however, that Borrower shall promptly cause to be paid any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and provided, further, that as and when each such contest shall be concluded, the Taxes, interest, costs and penalties shall be paid prior to the date any writ or order is issued under which the Property may be sold, lost or forfeited.

     1.6    Casualty and Condemnation.  Borrower shall give Lender prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof.  All insurance proceeds on the Property, and all causes of action, claims, compensation, awards and recoveries for any damage, condemnation or taking of all or any part of the Property or for any damage or injury to the Property for any loss or diminution in value of the Property, are hereby assigned to and shall be paid to Lender.  Lender may participate in any suits or proceedings relating to any such proceeds, causes of action, claims, compensation, awards or recoveries and Lender is hereby authorized, in Lender's own name or in Borrower's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Borrower shall from time to time deliver to Lender any instruments required to permit such participation, provided, however, that, so long as no Event of Default shall have occurred and be continuing, Lender shall not have the right to participate in the adjustment of any loss which is not in excess of ten percent (10%) of the face amount of the Note.  Lender shall apply any sums received by Lender under this Section 1.6, first, to the payment of all of Lender's costs and expenses (including, but not limited to, legal fees and disbursements) incurred in obtaining those sums, and, then, as follows:

     (a)    In the event that less than twenty percent (20%) of the Improvements have been taken or destroyed, then if:

     (1)    no Event of Default is then continuing hereunder or under any of the other Loan Documents, and

     (2)    the Property can, in Lender's reasonable judgment, with diligent restoration or repair, be returned to a condition at least equal to the condition thereof that existed prior to the casualty or partial taking causing the loss or damage within the earlier to occur of (i) six (6) months after the receipt of insurance proceeds or condemnation awards by either Borrower or Lender and (ii) six (6) months prior to the then applicable maturity date of the Note or such earlier date required for such completion pursuant to the Franchise Agreement, and

     (3)    all necessary governmental approvals can be obtained to allow the timely restoration and repair of the Property as described in Section 1.6(a)(2) above, and the reoccupancy thereof, and

     (4)    there are sufficient sums available (through insurance proceeds or condemnation awards and contributions by Borrower, the full amount of which shall, at Lender's option, have been deposited with Lender) for such restoration or repair (including, without limitation, for any costs and expenses of Lender to be incurred in administering said restoration

or repair) and for payment of principal and interest to become due and payable under the Note during such restoration or repair, and

(5)     the economic feasibility of the Improvements after such restoration or repair will be such that income from their operation is reasonably anticipated to be sufficient to pay operating expenses of the Property and debt service on the indebtedness secured hereby in full in accordance with Lender's then current underwriting standards, and

(6)     the Hotel Agreement in effect as of the date of the occurrence of such casualty or condemnation, whichever the case may be, shall (1) remain in full force and effect during the restoration and shall not otherwise terminate as a result of the casualty or condemnation or the restoration, or (2) if terminated, shall have been replaced with a Qualified Replacement Hotel Management Agreement with a Qualified Hotel Manager, prior to the opening or reopening of the Property or any portion thereof for business with the public; and

(7)     the Franchise Agreement is not terminated as a result of such Casualty or Condemnation; and

(8)     in the event that the insurance proceeds or condemnation awards received as a result of such casualty or partial taking exceed twenty percent (20%) of the face amount of the Note, if required by Lender, Borrower shall have delivered to Lender, at Borrower's sole cost and expense, an appraisal report in form and substance reasonably satisfactory to Lender appraising the value of the Property as proposed to be restored or repaired to be not less than the appraised value of the Property considered by Lender in Lender's determination to make the loan secured hereby, and

(9)     Borrower so elects by written notice delivered to Lender within five (5) days after settlement of the aforesaid insurance or condemnation claim, then, Lender shall, solely for the purposes of such restoration or repair, advance so much of the remainder of such sums as may be required for such restoration or repair, and any funds deposited by Borrower therefor, to Borrower in the manner and upon such terms and conditions as would be required by a prudent construction lender, including, but not limited to, the prior reasonable approval by Lender of plans and specifications, contractors and form of construction contracts and the furnishing to Lender of permits, bonds, lien waivers, invoices, receipts and affidavits from contractors and subcontractors, in form and substance satisfactory to Lender in Lender's discretion, with any remainder being applied by Lender for payment of the indebtedness secured hereby in whatever order Lender directs in its absolute discretion.

(b)     In all other cases, namely, in the event that ten percent (10%) or more of the Improvements have been taken or destroyed or Borrower does not elect to restore or repair the Property pursuant to clause (a), above, or otherwise fails to meet any of the requirements of subsection (a) above of this Section 1.6, then, in any of such events, Lender may elect, in Lender's absolute discretion and without regard to the adequacy of Lender's security, to the extent permitted by applicable law, to do either of the following:  (1) accelerate the maturity date of the Note and declare any and all indebtedness secured hereby to be immediately due and payable and apply the remainder of such sums received pursuant to this Section 1.6(b) to the payment of the indebtedness secured hereby in whatever order Lender directs, in Lender's

absolute discretion, with any remainder being paid to Borrower, or, (2) notwithstanding that Borrower may have elected not to restore or repair the Property pursuant to the provisions of Section 1.6(a)(7) above, require Borrower to restore or repair the Property in the manner and upon such terms and conditions as would be required by a prudent construction lender, including, but not limited to:  the deposit by Borrower with Lender, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including without limitation Lender's costs and expenses to be incurred in connection therewith; the prior approval by Lender of plans and specifications, contractors and form of construction contracts; and the furnishing to Lender of permits, bonds, lien waivers, invoices, receipt and affidavits from contractors and subcontractors, in form and substance satisfactory to Lender in Lender's discretion, and apply the remainder of such sums toward such restoration and repair, with any balance thereafter remaining being applied by Lender for payment of the indebtedness secured hereby in whatever order Lender directs in Lender's absolute discretion.

Any reduction in the indebtedness secured hereby resulting from Lender's application of any sums received by Lender hereunder shall take effect only when Lender actually receives such sums and elects to apply such sums to the indebtedness secured hereby and, in any event, the unpaid portion of the indebtedness secured hereby shall remain in full force and effect and Borrower shall not be excused in the payment thereof.  Partial payments received by Lender, as described in the preceding sentence, shall be applied, first, to the final payment due under the Note and, thereafter, to installments due under the Note in the inverse order of their due date.  If Borrower elects or Lender directs Borrower to restore or repair the Property after the occurrence of a casualty or partial taking of the Property as provided above, Borrower shall promptly and diligently, at Borrower's sole cost and expense and regardless of whether the insurance proceeds or condemnation award, as appropriate, shall be sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to the Property's value, condition and character immediately prior to such casualty or partial taking in accordance with the foregoing provisions and Borrower shall pay to Lender all costs and expenses of Lender incurred in administering said rebuilding, restoration or repair, provided the Lender makes such proceeds or award available for such purpose.  Borrower agrees to execute and deliver from time to time such further instruments as may be requested by Lender to confirm the foregoing assignment to Lender of any award, damage, insurance proceeds, payment or other compensation. Lender is hereby irrevocably constituted and appointed the attorney in fact of Borrower (which power of attorney shall be irrevocable so long as any indebtedness secured hereby is outstanding, shall be deemed coupled with an interest, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof), with full power of substitution, subject to the terms of this Section 1.6, to settle for, collect and receive any such awards, damages, insurance proceeds, payments or other compensation from the parties or authorities making the same, to appear in and prosecute any proceedings therefor and to give receipts and acquittances therefor.

Notwithstanding the foregoing, Borrower shall commence and diligently pursue the restoration and repair of the Improvements after a casualty or condemnation to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable requirements, Environmental Laws and in accordance with the terms and conditions of the Franchise Agreement and the Hotel Management Agreement.

11

1.7    Mechanics' Liens.  Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Land or Improvements; provided, however, that Borrower shall have the right to contest in good faith any such claim or demand, so long as Borrower does so diligently, by appropriate proceedings and without prejudice to Lender and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest.  In the event Borrower shall contest any such claim or demand, Borrower shall promptly notify Lender of such contest and thereafter shall, upon Lender's request, promptly provide a bond, cash deposit or other security satisfactory to Lender to protect Lender's interest and security should the contest be unsuccessful.  If Borrower shall fail to promptly discharge or provide security against any such claim or demand as aforesaid, Lender may do so and any and all expenses incurred by Lender, together with interest thereon at the Default Interest Rate from the date paid by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.8    Rents and Profits.  As an additional source for the payment of the indebtedness secured hereby, and cumulative of any and all rights and remedies provided for herein, Borrower hereby absolutely and presently assigns to Lender all existing and future Rents and Profits. Borrower hereby grants to Lender the sole, exclusive and immediate right, without taking possession of the Property, to demand, collect (by suit or otherwise), receive and give valid and sufficient receipts for any and all of said Rents and Profits, for which purpose Borrower does hereby irrevocably make, constitute and appoint Lender as Borrower's attorney-in-fact with full power to appoint substitutes or a trustee to accomplish such purpose (which power of attorney shall be irrevocable so long as any indebtedness secured hereby is outstanding, shall be deemed to be coupled with an interest, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof).  Lender shall be without liability for and is hereby released from any loss which may arise from a failure or inability to collect Rents and Profits, proceeds or other payments. However, unless an Event of Default is continuing under this Security Instrument, Borrower shall have a license to collect and receive the Rents and Profits when due and prepayments thereof for not more than one (1) month prior to due date thereof.  Upon the occurrence and during the continuance of an Event of Default hereunder, Borrower's license shall automatically terminate without notice to Borrower or, if required by law, immediately upon written demand for the Rents and Profits made by Lender to Borrower and Lender may thereafter, without taking possession of the Property, collect the Rents and Profits itself or by an agent or receiver.  From and after the termination of such license, Borrower shall be the agent of Lender in collection of the Rents and Profits and all of the Rents and Profits so collected by Borrower shall be held in trust by Borrower for the sole and exclusive benefit of Lender and Borrower shall, within one (1) business day after receipt of any Rents and Profits, pay the same to Lender to be applied by Lender as hereinafter set forth.  Neither the demand for nor collection of Rents and Profits by Lender shall constitute any assumption by Lender of any obligations under any Lease or other agreement relating thereto.  Lender is obligated to account only for such Rents and Profits as are actually collected or received by Lender.  Borrower irrevocably agrees and consents that the respective payors of the Rents and Profits shall, upon demand and notice from Lender of an Event of Default hereunder, pay said Rents and Profits to Lender without liability to determine the actual existence of any Default claimed by Lender.  Borrower hereby waives any right, claim

or demand which Borrower may now or hereafter have against any such payor by reason of such payment of Rents and Profits to Lender, and any such payment shall discharge such payor's obligation to make such payment to Borrower. All Rents and Profits collected or received by Lender shall be applied against all expenses of collection, including, without limitation, reasonable attorneys' fees, against costs of operation and management of the Property and against the indebtedness secured hereby, in whatever order or priority as to any of the items so mentioned as Lender directs in Lender's sole subjective discretion and without regard to the adequacy of its security. Neither the exercise by Lender of any rights under this Section 1.8 nor the application of any Rents and Profits to the secured indebtedness shall cure or be deemed a waiver of any Default hereunder. The assignment of Rents and Profits hereinabove granted shall continue in full force and effect during any period of foreclosure or redemption with respect to the Property. Borrower has executed an Assignment of Leases and Rents dated as of the Effective Date (the "Lease Assignment") in favor of Lender covering all of the right, title and interest of Borrower, as landlord, lessor or licensor, in and to any leases, licenses and occupancy agreements relating to all or portions of the Property. All rights and remedies granted to Lender under the Lease Assignment shall be in addition to and cumulative of all rights and remedies granted to Lender hereunder.

1.9    Leases and Licenses. Upon the occurrence and during the continuance of an Event of Default under this Security Instrument, whether before or after the whole principal sum secured hereby is declared to be immediately due or whether before or after the institution of legal proceedings to foreclose this Security Instrument, forthwith, upon demand of Lender, Borrower shall surrender to Lender and Lender shall be entitled to take actual possession of the Property or any part thereof personally, or by Lender's agent or attorneys. In such event, Lender shall have, and Borrower hereby gives and grants to Lender, the right, power and authority to make and enter into Leases with respect to the Property or portions thereof for such rents and for such periods of occupancy and upon conditions and provisions as Lender may deem desirable in Lender's absolute discretion, and Borrower expressly acknowledges and agrees that the term of any such Lease may extend beyond the date of any foreclosure sale at the Property; it being the intention of Borrower that in such event Lender shall be deemed to be and shall be the attorney-in-fact of Borrower for the purpose of making and entering into Leases of parts or portions of the Property for the rents and upon the terms, conditions and provisions deemed desirable to Lender in Lender's sole discretion and with like effect as if such Leases had been made by Borrower as the owner in fee simple of the Property free and clear of any conditions or limitations established by this Security Instrument. The power and authority hereby given and granted by Borrower to Lender shall be deemed to be coupled with an interest, shall not be revocable by Borrower so long as any indebtedness secured hereby is outstanding, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof. In connection with any action taken by Lender pursuant to this Section 1.9, Lender shall not be liable for any loss sustained by Borrower resulting from any failure to let the Property, or any part thereof, or from any other act or omission of Lender in managing the Property, nor shall Lender be obligated to perform or discharge any obligation, duty or liability under any Lease covering the Property or any part thereof or under or by reason of this instrument or the exercise of rights or remedies hereunder. Borrower shall, and does hereby, indemnify Lender for, and hold Lender harmless from, any and all claims, actions, demands, liabilities, loss or damage which may or might be incurred by Lender under any such Lease or under this Security Instrument or by the exercise of rights or

16101593.7

remedies hereunder and from any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any such Lease, other than those finally determined to have resulted solely from the gross negligence or intentional misconduct of Lender. Should Lender incur any such liability, the amount thereof, including, without limitation, costs, expenses and reasonable attorneys' fees, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Nothing in this Section 1.9 shall impose on Lender any duty, obligation or responsibility for the control, care, management or repair of the Property, or for the carrying out of any of the terms and conditions of any such Lease nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the Tenants or by any other parties or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property. Borrower hereby assents to, ratifies and confirms any and all actions of Lender with respect to the Property taken under this Section 1.9.

1.10    Payment of Utilities, Assessments, Charges, Etc. Borrower shall pay when due all utility charges which are incurred by Borrower or which may become a charge or lien against any portion of the Property for gas, electricity, water and sewer services furnished to the Land and/or the Improvements and all other assessments or charges of a similar nature, or assessments payable pursuant to any restrictive covenants, whether public or private, affecting the Land and/or the Improvements or any portion thereof, whether or not such assessments or charges are or may become liens thereon.

1.11    Access Privileges and Inspections. Lender and the agents, representatives and employees of Lender shall, subject to the rights of Tenants, have full and free access to the Land and the Improvements and any other location where books and records concerning the Property are kept at all reasonable times for the purposes of inspecting the Property and of examining, copying and making extracts from the books and records of Borrower relating to the Property. Borrower shall lend assistance to all such agents, representatives and employees of Lender. Lender shall have the right to take one (1) asset management trip a year at Borrower's cost and expense, not to exceed One Thousand Dollars ($1,000) per trip.

1.12    Waste; Alteration of Improvements. Borrower shall not commit, suffer or permit any intentional waste on the Property nor take any actions that might invalidate any insurance carried on the Property. Borrower shall maintain the Property in good condition and repair. No part of the Improvements may be removed, demolished or materially altered, without the prior written consent of Lender. Without the prior written consent of Lender, Borrower shall not commence construction of any improvements on the Land other than improvements required for the maintenance or repair of the Property.

1.13    Zoning. Without the prior written consent of Lender, Borrower shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Land or the Improvements. Borrower shall comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Land or the Improvements. Borrower shall comply with all existing and future requirements of all

governmental authorities having jurisdiction over the Property. Borrower shall keep all licenses, permits, franchises and other approvals necessary for the operation of the Property in full force and effect. Borrower shall operate the Property in such a manner as to allow the operation thereof as a hotel and resort facility and shall maintain any non-conforming use for so long as the indebtedness secured hereby is outstanding. Borrower shall not cause or permit any nonconforming use of the Land and the Improvements to be discontinued or abandoned without the prior written consent of Lender.

1.14    Security Interest. This Security Instrument is also intended to encumber and create a security interest in, and Borrower hereby grants to Lender a security interest in, all sums on deposit with Lender in any of the Reserves set forth herein and all fixtures, chattels, accounts, equipment, inventory, contract rights, General Intangibles and other personal property included within the Property, all renewals, replacements of any of the aforementioned items, or articles in substitution therefor or in addition thereto or the proceeds thereof (all of said property is hereinafter referred to collectively as the "Collateral"), whether or not the same shall be attached to the Land or the Improvements in any manner. It is hereby agreed that to the extent permitted by law, all of the foregoing Collateral is to be deemed and held to be a part of and affixed to the Land and the Improvements. The foregoing security interest shall also cover Borrower's leasehold interest in any of the foregoing property which is leased by Borrower. Notwithstanding the foregoing, all of the foregoing property shall be owned by Borrower and no leasing or installment sales or other financing or title retention agreement in connection therewith shall be permitted without the prior written approval of Lender. Borrower shall, from time to time upon the request of Lender, supply Lender with a current inventory of all of the Collateral in which Lender is granted a security interest hereunder, in such detail as Lender may reasonably require. Borrower shall promptly replace all of the Collateral subject to the lien or security interest of this Security Instrument when worn or obsolete with Collateral comparable to the worn out or obsolete Collateral when new and will not, without the prior written consent of Lender, remove from the Land or the Improvements any of the Collateral subject to the lien or security interest of this Security Instrument except such as is replaced by an article of equal suitability and value as above provided, owned by Borrower free and clear of any lien or security interest except that created by this Security Instrument and the other Loan Documents and except as otherwise expressly permitted by the terms of this Security Instrument. All of the Collateral shall be kept at the location of the Land except as otherwise required by the terms of the Loan Documents. Borrower shall not use any of the Collateral in violation of any applicable statute, ordinance or insurance policy.

1.15    Security Agreement. This Security Instrument constitutes a security agreement between Borrower and Lender with respect to the Collateral in which Lender is granted a security interest hereunder, and, cumulative of all other rights and remedies of Lender hereunder, Lender shall have all of the rights and remedies of a secured party under any applicable Uniform Commercial Code. Borrower hereby agrees to execute and deliver on demand and hereby irrevocably constitutes and appoints Lender the attorney in fact of Borrower to execute and deliver and, if appropriate, to file with the appropriate filing officer or office such security agreements, financing statements, continuation statements or other instruments as Lender may request or require in order to impose, perfect or continue the perfection of the lien or security interest created hereby. Except with respect to Rents and Profits to the extent specifically provided herein to the contrary, Lender shall have the right of possession of all cash, securities,

instruments, negotiable instruments, documents, certificates and any other evidences of cash or other property or evidences of rights to cash rather than property, which are now or hereafter a part of the Property and Borrower shall promptly deliver the same to Lender, endorsed to Lender, without further notice from Lender.  Borrower agrees to furnish Lender with notice of any change in the name, identity, organizational structure, residence, or principal place of business or mailing address of Borrower within ten (10) days of the effective date of any such change (without implying Lender's consent to any such change in violation of the provisions of this Security Instrument).  Upon the occurrence and during the continuance of any Event of Default, Lender shall have the rights and remedies as prescribed in the Security Instrument, or as prescribed by general law, or as prescribed by any applicable Uniform Commercial Code, all at Lender's election.  Any disposition of the Collateral may be conducted by an employee or agent of Lender.  Any person, including without limitation both Borrower and Lender, shall be eligible to purchase any part or all of the Collateral at any such disposition.  Expenses of retaking, holding, preparing for sale, selling or the like (including, without limitation, Lender's attorneys' fees and legal expenses), together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  Lender shall have the right to enter upon the Land and the Improvements or any real property where any of the Collateral which is the subject of the security interest granted herein is located to take possession of, assemble and collect the same or to render it unusable, or Borrower, upon demand of Lender, shall assemble such Collateral and make it available to Lender at the Land, a place which is hereby deemed to be reasonably convenient to Lender and Borrower. If notice is required by law, Lender shall give Borrower at least ten (10) days' prior written notice of the time and place of any public sale of such Collateral or of the time of or after which any private sale or any other intended disposition thereof is to be made, and if such notice is sent to Borrower, as the same is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Borrower.  No such notice is necessary for any such Collateral which is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market.  Any sale made pursuant to the provisions of this <u>Section 1.15</u> shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the foreclosure sale as provided in <u>Section 3.1</u> hereof upon giving the same notice with respect to the sale of the Property hereunder as is required under said <u>Section 3.1</u>.  Furthermore, to the extent permitted by law, in conjunction with, in addition to or in substitution for the rights and remedies available to Lender pursuant to any applicable Uniform Commercial Code:

(a)     In the event of a foreclosure sale, the Property may, at the option of Lender, be sold as a whole; and

(b)     It shall not be necessary that Lender take possession of the aforementioned Collateral, or any part thereof, prior to the time that any sale pursuant to the provisions of this Section 1.15(b) is conducted and it shall not be necessary that said Collateral, or any part thereof, be present at the location of such sale; and

(c)     Lender may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Lender, including the sending of notices and the conduct of the sale, but in the name and on behalf of Lender.

The name and address of Borrower (as Debtor under any applicable Uniform Commercial Code) is:

> Glenroy Coachella, LLC
> Stuart Rubin Entity
> Elliot Lander Entity
> 1801 S. La Cienega Blvd., Suite 301
> Los Angeles, CA 90035
> Attention: Stuart Rubin

The name and address of Lender (as Secured Party under any applicable Uniform Commercial Code) are:

> U.S. Real Estate Credit Holdings III-A, LP
> c/o Calmwater Capital
> 11755 Wilshire Blvd., Suite 1425
> Los Angeles, CA 90025
> Attention: Larry Grantham

1.16    Easements and Rights of Way. Borrower shall not grant any easement or right of way with respect to all or any portion of the Land or the Improvements without the prior written consent of Lender. The purchaser at any foreclosure sale hereunder may, at the purchaser's discretion, disaffirm any easement or right of way granted in violation of any of the provisions of this Security Instrument and may take immediate possession of the Property free from, and despite the terms of, such grant of easement or right of way. If Lender consents to the grant of an easement or right of way, Lender shall be paid a standard review fee of Five Hundred Dollars ($500), together with all other expenses, including, without limitation, reasonable attorneys' fees, incurred by Lender in the review of Borrower's request and in the preparation of documents effecting the subordination.

1.17    Compliance with Laws. Borrower shall at all times comply with all statutes, ordinances, orders, regulations and other governmental or quasi-governmental requirements and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property, including, but not limited to, those concerning employment and compensation of persons engaged in operation and maintenance of the Property and any environmental or ecological requirements, even if such compliance shall require structural changes to the Property; provided, however, that, Borrower may, upon providing Lender with security satisfactory to Lender, proceed diligently and in good faith to contest the validity or applicability of any such statute, ordinance, regulation or requirement so long as during such contest the Property shall not be subject to any lien, charge, fine or other liability and shall not be in danger of being forfeited, lost or closed. Borrower shall not use or occupy, or allow the use or occupancy of, the Property in any manner which violates any Lease to the Property or any applicable law, rule, regulation or order or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.

1.18    Additional Taxes. In the event of the enactment after this date of any law of the state where the Property is located or of any other governmental entity deducting from the value

of the Property for the purpose of taxation any lien or security interest thereon, or imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges of liens herein required to be paid by Borrower, or changing in any way the laws relating to the taxation of mortgages or security agreements or debts secured by mortgages or security agreements or the interest of the Lender or secured party in the property covered thereby, or the manner of collection of such taxes, so as to adversely affect this Security Instrument or the indebtedness secured hereby or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges or liens, or reimburse Lender therefor; provided, however, that if in the opinion of counsel for Lender (a) it might be unlawful to require Borrower to make such payment, or (b) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in either such event, Lender may elect, by notice in writing given to Borrower, to declare all of the indebtedness secured hereby to be and become due and payable in full ninety (90) days from the giving of such notice, provided that the Make Whole Payment and any other prepayment premium or penalty shall not be payable in connection with an accelerated payment of the debt required under this Section 1.18.

1.19    Secured Indebtedness.  It is understood and agreed that this Security Instrument shall secure payment of not only the indebtedness evidenced by the Note but also any and all substitutions, replacements, renewals and extensions of the Note, any and all indebtedness and obligations arising pursuant to the terms hereof and any and all indebtedness and obligations arising pursuant to the terms of any of the other Loan Documents other than (i) the Indemnity and Guaranty Agreement and (ii) the Hazardous Substances Indemnity in favor of Lender, all of which indebtedness is equally secured with and has the same priority as any amounts advanced as of the date hereof. It is agreed that any future advances made by Lender to or for the benefit of Borrower from time to time (including, without limitation), whether made under this Security Instrument or the other Loan Documents or otherwise and whether or not such advances are obligatory or are made at the option of Lender, or otherwise, made for any purpose, and all interest accruing thereon, shall be equally secured by this Security Instrument and shall have the same priority as all amounts, if any, advanced as of the date hereof, although there may be no indebtedness outstanding at the time any such advance is made, and unless otherwise expressly provided in a written instrument executed by Borrower and Lender shall be subject to all of the terms and provisions of this Security Instrument.  It shall be an Event of Default hereunder if Borrower shall file or record a notice limiting the maximum principal amount which may be secured by this Security Instrument.

1.20    Borrower's Waivers.  To the full extent permitted by law, Borrower agrees that Borrower shall not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, moratorium or extension, or any law now or hereafter in force providing for the reinstatement of the indebtedness secured hereby prior to any sale of the Property to be made pursuant to any provisions contained herein or prior to the entering of any decree, judgment or order of any court of competent jurisdiction, or any right under any statute to redeem all or any part of the Property so sold.  Borrower, for Borrower and Borrower's successors and assigns, and for any and all persons ever claiming any interest in the Property, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily with and upon the advice of competent counsel: (a) waives, releases, relinquishes and forever forgoes all rights of valuation, appraisement, stay of execution, reinstatement and notice of election or intention to mature or declare due the

secured indebtedness (except such notices as are specifically provided for herein); (b) waives, releases, relinquishes and forever forgoes all right to a marshalling of the assets of Borrower, including without limitation the Property, to a sale in the inverse order of alienation, or to direct the order in which any of the Property shall be sold in the event of foreclosure of the liens and security interests created hereby and agrees that any court having jurisdiction to foreclose such liens and security interests may order the Property sold as an entirety; and (c) waives, releases, relinquishes and forever forgoes all rights and periods of redemption provided under applicable law. To the full extent permitted by law, Borrower shall not have or assert any right under any statute or rule of law pertaining to the exemption of homestead or other exemption under any federal, state or local law now or hereafter in effect, the administration of estates of decedents or other matters whatever to defeat, reduce or affect the right of Lender under the terms of this Security Instrument to a sale of the Property, for the collection of the secured indebtedness without any prior or different resort for collection, or the right of Lender under the terms of this Security Instrument to the payment of the indebtedness secured hereby out of the proceeds of sale of the Property in preference to every other claimant whatever. Further, Borrower hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, releases, relinquishes and forever forgoes all present and future statutes of limitations as a defense to any action to enforce the provisions of this Security Instrument or to collect any of the indebtedness secured hereby to the fullest extent permitted by law. Borrower covenants and agrees that upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, Borrower shall not seek a supplemental stay or otherwise shall not seek pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law, or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against any guarantor or indemnitor of the secured obligations or any other party liable with respect thereto by virtue of any indemnity, guaranty or otherwise.

      1.21   Contractual Statute of Limitations. Borrower hereby agrees that any claim or cause of action by Borrower against Lender, or any of Lender's directors, officers, employees, agents, accountants or attorneys, based upon, arising from or relating to the indebtedness secured hereby, or any other matter, cause or thing whatsoever, whether or not relating thereto, occurred, done, omitted or suffered to be done by Lender or by Lender's directors, officers, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one (1) year after Borrower first acquires or reasonably should have acquired knowledge of the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Lender or any other person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter. Borrower agrees that such one (1) year period of time is reasonable and sufficient time for a borrower to investigate and act upon any such claim or cause of action. The one (1) year period provided herein shall not be waived, tolled or extended except by the specific written agreement of Lender. This provision shall survive any termination of this Security Instrument or any of the other Loan Documents.

16101593.7

## ARTICLE 2
## EVENTS OF DEFAULT

2.1     Events of Default.  "Event of Default" shall have the meaning ascribed to it in the Loan Agreement.

## ARTICLE 3
## REMEDIES

3.1     Remedies Available.  During an Event of Default under this Security Instrument, then the power of sale granted to Trustee under this Security Instrument shall be rendered operative, this Security Instrument is subject to judicial foreclosure or foreclosure by power of sale as provided by law and Lender may, at Lender's option and by or through Lender's nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights, remedies and recourses, either successively or concurrently:

(a)     Acceleration.  Accelerate the maturity date of the Note and declare any or all of the indebtedness secured hereby to be immediately due and payable without any presentment, demand, protest, notice, or action of any kind whatever (each of which is hereby expressly waived by Borrower), whereupon the same shall become immediately due and payable.  Upon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable Make Whole Payment and the Exit Fee provided for in the Note shall then be immediately due and payable.

(b)     Entry on the Property.  Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of Lender's security, enter upon and take possession of the Property, or any part thereof, without force or with such force as is permitted by law and without notice or process or with such notice or process as is required by law unless such notice and process is waivable, in which case Borrower hereby waives such notice and process, and does any and all acts and performs any and all work which may be desirable or necessary in Lender's judgment to complete any unfinished construction on the Land, to preserve the value, marketability or rentability of the Property, to increase the income therefrom, to manage and operate the Property or to protect the security hereof and all sums expended by Lender therefor, together with interest thereon at the Default Interest Rate, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(c)     Collect Rents and Profits.  With or without taking possession of the Property, sue or otherwise collect the Rents and Profits, including those past due and unpaid.

(d)     Appointment of Receiver.  Upon, or at any time prior or after, initiating the exercise of any power of sale, instituting any judicial foreclosure or instituting any other foreclosure of the liens and security interests provided for herein or any other legal proceedings hereunder, make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Borrower and without regard to the adequacy of the Property for the repayment of the indebtedness secured

16101593.7                                                                              Exhibit Page 169

hereby or the solvency of Borrower or any person or persons liable for the payment of the indebtedness secured hereby, and Borrower does hereby irrevocably consent to such appointment, waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Lender, but nothing herein is to be construed to deprive Lender of any other right, remedy or privilege Lender may now have under the law to have a receiver appointed, provided, however, that, the appointment of such receiver, trustee or other appointee by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of Lender to receive payment of the Rents and Profits pursuant to other terms and provisions hereof.  Any such receiver shall have all of the usual powers and duties of receivers in similar cases, including, without limitation, the full power to hold, develop, rent, lease, manage, maintain, operate and otherwise use or permit the use of the Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances as more fully set forth in Section 3.3 below.  Such receivership shall, at the option of Lender, continue until full payment of all of the indebtedness secured hereby or until title to the Property shall have passed by foreclosure sale under this Security Instrument or deed in lieu of foreclosure.

(e)      Judicial Foreclosure.  Immediately commence an action to foreclose this Security Instrument or to specifically enforce its provisions or any of the indebtedness secured hereby pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Lender.

(1)      In the event foreclosure proceedings are filed by Lender, all expenses incident to such proceeding, including, but not limited to, attorneys' fees and costs, shall be paid by Borrower and secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  The secured indebtedness and all other obligations secured by this Security Instrument, including, without limitation, interest at the Default Interest Rate (as defined in the Note), any prepayment charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law), attorneys' fees and any other amounts due and unpaid to Lender under the Loan Documents, may be bid by Lender in the event of a foreclosure sale hereunder.  In the event of a judicial sale pursuant to a foreclosure decree, it is understood and agreed that Lender or its assigns may become the purchaser of the Property or any part thereof.

(2)      Lender may, by following the procedures and if permitted by applicable law, foreclose on only a portion of the Property and, in such event, said foreclosure shall not affect the lien of this Security Instrument on the remaining portion of the Property foreclosed.

(f)      Foreclosure by Power of Sale.  Immediately commence an action to foreclose this Security Instrument by power of sale as set forth below to the fullest extent permitted by law.

(1)      In the event of any inconsistencies between the terms and conditions of this subsection 3.1(f) of this Security Instrument and any other terms of this

16101593.7

Security Instrument, the terms and conditions of this subsection 3.1(f) shall control and be binding.

(2)     Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall notify Trustee and shall deposit with Trustee this Security Instrument and, if necessary, the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.  Upon receipt of such notice from Lender, Trustee shall cause to be recorded, published and/or delivered to Borrower such notice of default and notice of sale as then required by law.  Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after giving of such notice of default and after notice of sale as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items as Lender shall determine, and in such order as Lender may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale.  Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof.  Any person, including, without limitation, Borrower or Lender, but excepting Trustee, may purchase at such sale and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers.

(3)     Lender may, in its sole discretion, designate the order in which the Property shall be offered for sale or sold through a single sale or through two or more successive sales, or in any other manner Lender deems to be in its best interest.  If Lender elects more than one sale or other disposition of the Property, Lender may at its option cause the same to be conducted simultaneously or successively, on the same day or at such different days or times and in such order as Lender may deem to be in its best interests, and no such sale shall terminate or otherwise affect the lien of this Security Instrument on any part of the Property not then sold until all indebtedness secured hereby has been fully paid.  If Lender elects to dispose of the Property through more than one sale, Borrower shall pay the costs and expenses of each such sale of its interest in the Property and of any proceedings where the same may be made.  Trustee may postpone the sale of all or any part of the Property by public announcement at such time and place of sale, or in any manner permitted by law from time to time, and without further notice make such sale at the time fixed by the last postponement; or Trustee may, in its discretion, give a new notice of sale.  Lender may rescind or cancel any such notice of default at any time before Trustee's sale by executing a notice of rescission or cancellation and recording the same.  The recordation of such notice shall constitute a cancellation of any prior declaration of default and demand for sale and of any acceleration of maturity of indebtedness affected by any prior declaration or notice of default.  The exercise by Lender of the right of rescission or cancellation shall not constitute a waiver of any default then existing or subsequently occurring, or impair the right of Lender to execute other declarations of default and demand for sale, or notices of default and of election to cause the Property to be sold, nor otherwise affect the Note or this Security Instrument, or any of the rights, obligations or remedies of Lender or Trustee hereunder.

(4)     In the event of a sale of the Property, or any part thereof, pursuant to this subsection 3.1(f) and the execution of a deed therefor, the recital therein of default, and of giving notice of default and of the elapse of the required time (if any) between the recording and the notice, and of the giving of notice of sale, and of a demand by Lender, or its successors or

assigns, that such sale should be made, shall be conclusive proof of such default, recording, election, elapse of time, and giving of such notice, and that the sale was regularly and validly made on due and proper demand by Lender, its successors or assigns.  Any such deed or deeds with such recitals therein shall be effective and conclusive against Borrower, its successors and assigns, and all other persons.  The receipt for the purchase money recited or contained in any deed executed to the purchaser as aforesaid shall be sufficient discharge to such purchaser from all obligations to see to the proper application of the purchase money.

(g)     Other.  Exercise any other right or remedy available hereunder, under any of the other Loan Documents or at law or in equity.

3.2     Application of Proceeds.  To the fullest extent permitted by law, the proceeds of any sale under this Security Instrument shall be applied to the extent funds are so available to the following items in such order as Lender in Lender's discretion may determine:

(a)     To payment of the costs, expenses and fees of taking possession of the Property, and of holding, operating, maintaining, using, leasing, repairing, improving, marketing and selling the same and of otherwise enforcing Lender's right and remedies hereunder and under the other Loan Documents, including, but not limited to, receivers' fees, court costs, attorneys', accountants', appraisers', managers' and other professional fees, title charges and transfer taxes.

(b)     To payment of all sums expended by Lender under the terms of any of the Loan Documents and not yet repaid, together with interest on such sums at the Default Interest Rate.

(c)     To payment of the secured indebtedness and all other obligations secured by this Security Instrument, including, without limitation, interest at the Default Interest Rate and, to the extent permitted by applicable law, any Make Whole Payment and Exit Fee, charge or premium required to be paid under the Note in order to prepay principal, in any order that Lender chooses in Lender's sole discretion.

The remainder, if any, of such funds shall be disbursed to Borrower or to the person or persons legally entitled thereto.

3.3     Right and Authority of Receiver or Lender in the Event of Default; Power of Attorney.  Upon the occurrence and ruing the continuance of an Event of Default hereunder and entry upon the Property pursuant to Section 3.1(b) hereof or appointment of a receiver pursuant to Section 3.1(d) hereof, and under such terms and conditions as may be prudent and reasonable under the circumstances in Lender's or the receiver's sole discretion, all at Borrower's expense, Lender or said receiver, or such other persons or entities as they shall hire, direct or engage, as the case may be, may do or permit one or more of the following, successively or concurrently: (a) enter upon and take possession and control of any and all of the Property; (b) take and maintain possession of all documents, books, records, papers and accounts relating to the Property; (c) exclude Borrower and Borrower's agents, servants and employees wholly from the Property; (d) manage and operate the Property; (e) preserve and maintain the Property; (f) make repairs and alterations to the Property; (g) complete any construction or repair of the

Improvements, with such changes, additions or modifications of the plans and specifications or intended disposition and use of the Improvements as Lender may in Lender's sole discretion deem appropriate or desirable to place the Property in such condition as will, in Lender's sole discretion, make the Property or any part thereof readily marketable or rentable; (h) conduct a marketing or leasing program with respect to the Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Property under such terms and conditions as Lender may in Lender's sole discretion deem appropriate or desirable; (i) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as Lender may in Lender's sole discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (j) execute and deliver, in the name of Lender as attorney-in-fact and agent of Borrower or in Borrower's own name, such documents and instruments as are necessary or appropriate to consummate authorized transactions; (k) enter into such leases, whether of real or personal property, or tenancy agreements, under such terms and conditions as Lender may in Lender's sole discretion deem appropriate or desirable; (l) collect and receive the Rents and Profits from the Property; (m) eject Tenants or repossess personal property, as provided by law, for breaches of the conditions of their Leases; (n) sue for unpaid Rents and Profits, payments, income or proceeds in the name of Borrower or Lender; (o) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (p) compromise or give acquittance for Rents and Profits, payments, income or proceeds that may become due; (q) delegate or assign any and all rights and powers given to Lender by this Security Instrument; and (r) do any acts which Lender in Lender's sole discretion deems appropriate or desirable to protect the security hereof and use such measures, legal or equitable, as Lender may in Lender's sole discretion deem appropriate or desirable to implement and effectuate the provisions of this Security Instrument.   This Security Instrument shall constitute a direction to and full authority to any Tenant, or other third party who has heretofore dealt or contracted or may hereafter deal or contract with Borrower or Lender, at the request of Lender, to pay all amounts owing under any Lease, contract or other agreement to Lender without proof of the Event of Default relied upon.   Any such Tenant or third party is hereby irrevocably authorized to rely upon and comply with (and shall be fully protected by Borrower in so doing) any request, notice or demand by Lender for the payment to Lender of any Rents and Profits or other sums which may be or thereafter become due under its Lease, contract or other agreement, or for the performance of any undertakings under any such Lease, contract, concession, license or other agreement, and shall have no right or duty to inquire whether any Event of Default under this Security Instrument or under any of the other Loan Documents has actually occurred or is then existing.   Borrower hereby constitutes and appoints Lender, and Lender's assignees, successors, transferees and nominees, as Borrower's true and lawful attorney-in-fact and agent, with full power of substitution in the Property, in Borrower's name, place and stead, to do or permit any one or more of the foregoing described rights, remedies, powers and authorities, successively or concurrently, and said power of attorney shall be deemed a power coupled with an interest and irrevocable so long as any indebtedness secured hereby is outstanding.   Any money advanced by Lender in connection with any action taken under this Section 3.3, together with interest thereon at the Default Interest Rate from the date of making such advancement by Lender until actually paid by Borrower, shall be a demand obligation owing by Borrower to Lender and shall be secured by this Security Instrument and by every other instrument securing the secured indebtedness.

16101593.7

3.4     Occupancy After Foreclosure.  In the event there is a foreclosure sale hereunder and at the time of such sale, Borrower or Borrower's representatives, successors or assigns, or any other persons claiming any interest in the Property by, through or under Borrower (except Tenants of space in the Improvements subject to Leases entered into prior to the Effective Date), are occupying or using the Property, or any part thereof, then, to the extent not prohibited by applicable law, each and all shall, at the option of Lender or the purchaser at such sale, as the case may be, immediately become the Tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or Tenant, at a reasonable rental per day based upon the value of the Property occupied or used, such rental to be due daily to the purchaser.  Further, to the extent permitted by applicable law, in the event the Tenant fails to surrender possession of the Property upon the termination of such tenancy, the purchaser shall be entitled to institute and maintain an action for unlawful detainer of the Property in the appropriate court of the county in which the Land is located.

3.5     Notice to Account Debtors.  Lender may, at any time during an Event of Default notify the account debtors and obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness to Borrower which are included as part of the Property to pay Lender directly.  Borrower shall at any time or from time to time upon the request of Lender provide to Lender a current list of all such account debtors and obligors and their addresses.

3.6     Cumulative Remedies.  All remedies contained in this Security Instrument are cumulative and Lender shall also have all other remedies provided at law and in equity or in any other Loan Documents.  Such remedies may be pursued separately, successively or concurrently at the sole subjective direction of Lender and may be exercised in any order and as often as occasion therefor shall arise.  No act of Lender shall be construed as an election to proceed under any particular provisions of this Security Instrument to the exclusion of any other provision of this Security Instrument or as an election of remedies to the exclusion of any other remedy which may then or thereafter be available to Lender.  No delay or failure by Lender to exercise any right or remedy under this Security Instrument shall be construed to be a waiver of that right or remedy or of any Event of Default hereunder.  Lender may exercise any one or more of Lender's rights and remedies at Lender's option without regard to the adequacy of Lender's security.

3.7     Payment of Expenses.  Borrower shall pay on demand all of Lender's expenses incurred in any efforts to enforce any terms of this Security Instrument, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, legal fees (including but not limited to appellate fees and fees for all paralegals, legal consultants and other paraprofessionals) and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred by Lender until actually paid by Borrower at the Default Interest Rate, and the same shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

## ARTICLE 4
## MISCELLANEOUS TERMS AND CONDITIONS

4.1     Time of Essence.  Time is of the essence with respect to all provisions of this Security Instrument and all other Loan Documents.

16101593.7

4.2     Release of Security Instrument.  If all of the secured indebtedness shall be paid, then and in that event only, all rights under this Security Instrument shall terminate except for those provisions hereof which by their terms survive, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Lender in due form at Borrower's cost.  No release of this Security Instrument or the lien hereof shall be valid unless executed by Lender.

4.3     Certain Rights of Lender.  Without affecting Borrower's liability for the payment of any of the indebtedness secured hereby, Lender may from time to time and without notice to Borrower: (a) release any person liable for the payment of the indebtedness secured hereby; (b) extend or modify the terms of payment of the indebtedness secured hereby; (c) accept additional real or personal property of any kind as security or alter, substitute or release any property securing the indebtedness secured hereby; (d) recover any part of the Property; (e) consent in writing to the making of any subdivision map or plat thereof; (f) join in granting any easement therein; or (g) join in any extension agreement of the Security Instrument or any agreement subordinating the lien hereof.

4.4     Waiver of Certain Defenses.  No action for the enforcement of the lien hereof or of any provision hereof shall be subject to any defense which would not be good and available to the party interposing the same in an action at law upon the Note or any of the other Loan Documents.

4.5     Successors and Assigns.  The terms, provisions, indemnities, covenants and conditions hereof shall be binding upon Borrower and the successors and assigns of Borrower, including all successors in interest of Borrower in and to all or any part of the Property, and shall inure to the benefit of Lender, and Lender's directors, officers, shareholders, employees and agents and their respective successors and assigns and shall constitute covenants running with the land (without implying Lender's consent to any transfer of the Property or any interest in Borrower or the Property in violation of this Security Instrument).  All references in this Security Instrument to Borrower or Lender shall be deemed to include all such parties' successors and assigns, and the term "Lender" as used herein shall also mean and refer to any lawful holder or owner, including pledgees and participants, of any of the indebtedness secured hereby.  If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower.

4.6     Severability.  A determination that any provision of this Security Instrument is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Security Instrument to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

4.7     Gender.  Within this Security Instrument, words of any gender shall be held and construed to include any other gender, and words in the singular shall be held and construed to include the plural, and vice versa, unless the context otherwise requires.

4.8     Waiver: Discontinuance of Proceedings.  Lender may waive any single Event of Default by Borrower hereunder without waiving any other prior or subsequent Event of Default.

16101593.7

Lender may remedy any Event of Default by Borrower hereunder without waiving the Event of Default remedied.   Neither the failure by Lender to exercise, nor the delay by Lender in exercising, any right, power or remedy upon any Event of Default by Borrower hereunder shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right, power or remedy at a later date.   No single or partial exercise by Lender of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.   No modification or waiver of any provision hereof nor consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given.   No notice to nor demand on Borrower in any case shall of itself entitle Borrower to any other or further notice or demand in similar or other circumstances. Acceptance by Lender of any payment in an amount less than the amount then due on any of the secured indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder.   In case Lender shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under the other Loan Documents and shall thereafter elect to discontinue or abandon the same for any reason, Lender shall have the unqualified right to do so and, in such an event, Borrower and Lender shall be restored to their former positions with respect to the indebtedness secured hereby, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the same had never been invoked.

4.9    Section Headings.    The headings of the articles, sections, subsections and paragraphs of this Security Instrument are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect any of the terms hereof.   This Security Instrument shall not be construed more strictly against one party than against the other merely by virtue of the fact that this Security Instrument may have been physically prepared by one of the parties, or such party's counsel, it being agreed that all parties and their respective counsel have mutually participated in the negotiation and preparation of this Security Instrument.

4.10    Counting of Days.   The term "days" when used herein shall mean calendar days. If any time period ends on a Saturday, Sunday or holiday officially recognized by the state within which the Land is located, the period shall be deemed to end on the next succeeding business day.   The term "business day" when used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in Los Angeles, California are authorized by law to be closed.

4.11    Relationship of the Parties.   The relationship between Borrower and Lender is that of a borrower and a lender only and none of those parties is, nor shall it hold itself out to be, the agent, employee, joint venturer or partner of the other party.

4.12    Application of the Proceeds of the Note.   To the extent that proceeds of the Note are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Lender at Borrower's request and Lender shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

16101593.7

4.13     Unsecured Portion of Indebtedness.   If any part of the secured indebtedness cannot be lawfully secured by this Security Instrument or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is unsecured by this Security Instrument.

4.14     Cross Default.   An Event of Default hereunder shall be an Event of Default under each of the other Loan Documents.

4.15     Interest After Sale.   In the event the Property or any part thereof shall be sold upon foreclosure as provided hereunder, to the extent permitted by law, the sum for which the same shall have been sold shall, for purposes of redemption (pursuant to the laws of the state in which the Property is located), bear interest at the Default Interest Rate.

4.16     Inconsistency with Other Loan Documents.   In the event of any inconsistency between the provisions hereof and the provisions in any of the other Loan Documents, it is intended that the provisions selected by Lender in its sole subjective discretion shall be controlling.

4.17     Construction of this Document.   This document may be construed as a mortgage, security deed, deed of trust, chattel mortgage, conveyance, assignment, security agreement, pledge, financing statement, hypothecation or contract, or any one or more of the foregoing, in order to fully effectuate the liens and security interests created hereby and the purposes and agreements herein set forth.

4.18     No Merger.   It is the desire and intention of the parties hereto that this Security Instrument and the lien hereof do not merge in fee simple title to the Property.   It is hereby understood and agreed that should Lender acquire any additional or other interests in or to the Property or the ownership thereof, then, unless a contrary intent is manifested by Lender as evidenced by an appropriate document duly recorded, this Security Instrument and the lien hereof shall not merge in such other or additional interests in or to the Property, toward the end that this Security Instrument may be foreclosed as if owned by a stranger to said other or additional interests.

4.19     Rights With Respect to Junior Encumbrances.   Any person or entity purporting to have or to take a junior mortgage or other lien upon the Property or any interest therein shall be subject to the rights of Lender to amend, modify, increase, vary, alter or supplement this Security Instrument, the Note or any of the other Loan Documents and to extend the maturity date of the indebtedness secured hereby and to increase the amount of the indebtedness secured hereby and to waive or forebear the exercise of any of Lender's rights and remedies hereunder or under any of the other Loan Documents and to release any collateral or security for the indebtedness secured hereby, in each and every case without obtaining the consent of the holder of such junior lien and without the lien or security interest of this Security Instrument losing its priority over the rights of any such junior lien.   Nothing contained in this Section 4.19 shall be deemed to imply Lender's consent to any further encumbering of the Property in violation of this Security Instrument.

Exhibit Page 177

4.20    Lender May File Proofs of Claim.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower or the principals or sole member of Borrower, or any of their respective creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire secured indebtedness at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

4.21    After-Acquired Property.  All property acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further mortgage, deed of trust, conveyance or assignment become subject to the lien and security interest created by this Security Instrument.  Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further mortgages, deeds of trust, security agreements, financing statements, assignments and assurances, as Lender shall require for accomplishing the purposes of this Security Instrument.

4.22    No Representation.  By accepting delivery of any item required to be observed, performed or fulfilled or to be given to Lender pursuant to the Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance of delivery thereof shall not be or constitute any warranty, consent or affirmation with respect thereto by Lender.

4.23    Counterparts.  This Security Instrument may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Security Instrument may be detached from any counterpart of this Security Instrument without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Security Instrument identical in form hereto but having attached to it one or more additional signature pages.

4.24    [Intentionally omitted.]

4.25    Recording and Filing.  Borrower shall cause the Loan Documents and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and re-filed in such manner and in such places as Lender shall reasonably request, and shall pay on demand all such recording, filing, re-recording and re-filing taxes, fees and other charges. Borrower shall reimburse Lender, or Lender's servicing agent, for the costs incurred in obtaining a tax service company to verify the status of payment of taxes and assessments on the Property.

4.26    Entire Agreement and Modification.  This Security Instrument and the other Loan Documents contain the entire agreements between the parties relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained

16101593.7                                                                Exhibit Page 178

herein or therein are terminated. This Security Instrument and the other Loan Documents may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted. Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.

4.27   Maximum Interest. The provisions of this Security Instrument and of all agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of the Note or otherwise, shall the amount paid, or agreed to be paid ("Interest"), to Lender for the use, forbearance or retention of the money loaned under the Note exceed the maximum amount permissible under applicable law. If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under the Note in the inverse order of its maturity (whether or not then due) or at the option of Lender be paid over to Borrower, and not to the payment of Interest. All Interest (including any amounts or payments deemed to be Interest) paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full period until payment in full of the principal balance of the Note so that the Interest thereon for such full period shall not exceed the maximum amount permitted by applicable law. Borrower agrees to an effective rate of interest that is the rate stated in the Note plus any additional rate of interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Borrower, or any benefit received or to be received by Lender, in connection with the Note. This Section 4.27 shall control all agreements between Borrower and Lender.

4.28   Further Stipulations. The additional covenants, agreements and provisions set forth in the exhibits attached hereto and made a part hereof, if any, shall be a part of this Security Instrument and shall, in the event of any conflict between such further stipulations and any of the other provisions of this Security Instrument, be deemed to control.

4.29   Dissemination of Information. If Lender determines at any time to sell, transfer or assign the Note, this Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or to grant participations therein (the "Participations") or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, and/or their respective successors in such Participations and/or Securities (collectively, the "Investor") and/or any Rating Agency rating such Securities, each prospective Investor and each of the foregoing's respective counsel, all documents and information that Lender now has or may hereafter acquire relating to the indebtedness secured hereby and to Borrower, any guarantor, any indemnitor and

the Property, which shall have been furnished by Borrower, any guarantor, and/or any indemnitor, as Lender determines necessary or desirable. Without limiting the foregoing, Borrower acknowledges and agrees that any such transfer, assignment, grant or issuance may be completed at any time without any consent from Borrower.

4.30    Fixture Filing. This Security Instrument shall be effective from the date of its recording as a financing statement filed as a fixture filing with respect to all goods constituting part of the Property which are, or are to become, fixtures for purposes of Chapter 9 of the Uniform Commercial Code of the state where the fixtures are located. Information concerning the security interests herein granted may be obtained at the addresses stated in the introductory paragraph of this Security Instrument. Borrower, for Borrower and Borrower's successors, hereby agrees to warrant and forever defend, all and singular, title to the Property unto Lender, and Lender's successors or substitutes in this trust, forever, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof, subject, however, to the Permitted Exceptions.

4.31    Administrative Fees.    Lender shall have the right to charge reasonable administrative fees during the term of the loan evidence by the Note and secured hereby as Lender may determine, in Lender's sole reasonable discretion, in connection with Lender's evaluation, preparation and processing of any servicing, administrative or other requests made by Borrower, including without limitation:  processing payments; processing insurance and UCC continuation documentation; processing escrow draws and disbursement requests; review of Leases, Tenant subordination, non-disturbance and attornment agreements and tenant estoppels, requests for transfers or assignments, requests for partial releases and requests for review of new easements). Lender shall also be entitled to reimbursement for professional fees Lender incurs for such administration, including without limitation, those of architects, engineers, consultants and attorneys (whether (a) employed by Lender or (b) engaged by Lender as independent contractors).

4.32    Waiver of Right of Offset. No portion of the indebtedness secured hereby shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender.

**ARTICLE 5**
**DEED OF TRUST PROVISIONS**

5.1    Concerning the Trustee. Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction. Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender. Lender may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation,

refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender. The procedure provided for in this Section for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

5.2    Trustee's Fees. Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

5.3    Certain Rights. With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the other Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (iii) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise reasonable or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for actual expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

5.4    Retention of Money. All moneys received by Trustee shall, until used or applied as herein provided be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required  by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

5.5    Perfection of Appointment. Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties,

then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

5.6     Succession Instruments.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

## ARTICLE 6
## SPECIAL CALIFORNIA STATE PROVISIONS

6.1     Conflicts.  In the event of any inconsistencies between the terms and conditions of Articles 1 through 5, inclusive, of this Deed of Trust and Article 6, the terms and conditions this Article 6 shall control and be binding.

6.2     Foreclosure Against Property.  Section 2.1(e) of this Deed of Trust is hereby deleted in its entirety and the following substituted therefor:

(e)     Foreclosure.

(i)     Lender may foreclose this Deed of Trust, insofar as it encumbers the Property, either by judicial action or through Trustee, in whole or in part.  Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall notify Trustee and shall deposit with Trustee this Deed of Trust and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(ii)     Upon receipt of such notice from Lender, Trustee shall cause to be recorded, published and delivered to Borrower such Notice of Default and Election to Sell as is then required by law and by this Deed of Trust.  Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such Notice of Default and after Notice of Sale having been given as required by law, sell the Property or portion thereof at the time and place of sale fixed by it in said Notice of Sale, either as a whole, or in separate lots or parcels or items as Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of Sale.  Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof.  Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers. Borrower hereby constitutes and appoints Trustee as its attorney-in-fact with full power and authority to execute, deliver, file, record or process on

behalf of Borrower any and all instruments or documents or to take any other action on behalf of Borrower reasonably required to accomplish the vesting of the Property or portion thereof, or any part thereof, in the purchaser or purchasers at any sale conducted hereunder.

(iii)     All fees, costs and expenses of any kind incurred by Lender in connection with foreclosure of this Deed of Trust, including, without limitation, the costs of any appraisals of the Property obtained by Lender, the cost of any title reports or abstracts, all costs of any receivership for the Property or any portion thereof advanced by Lender, and all attorneys' and consultants' fees and expenses incurred by Lender, shall constitute a part of the obligations secured hereby and may be included as part of the amount owing from Borrower to Lender at any foreclosure sale.

(iv)     The proceeds of any sale under this Section shall be applied first to the fees and expenses of the Trustee or other officer conducting the sale, and then to the reduction or discharge of the obligations secured hereby in such order and manner as Lender may elect in its sole discretion; any surplus remaining shall be paid over to Borrower or to such other person or persons as may be lawfully entitled to such surplus.

(v)     Subject to California Civil Code § 2924g, Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may in its discretion, give a new notice of sale.

(vi)     A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein; and subsequent sales may be made hereunder until all obligations secured hereby have been satisfied, or the entire Property sold, without defect or irregularity.

(vii)     Nothing contained herein dealing with foreclosure procedures or specifying particular actions to be taken by Lender shall be deemed to contradict or add to the requirements and procedures now or hereafter specified by California law, and any such inconsistency shall be resolved in favor of California law applicable at the time of foreclosure.

**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGE(S)]**

**IN WITNESS WHEREOF**, Borrower has executed this Security Instrument as of the day and year first above written.

"BORROWER"

**GLENROY COACHELLA, LLC**,
a Delaware limited liability company

By: GLENROY COACHELLA HOLDINGS, LLC,
a Delaware limited liability company
Its: Sole Member

By: _____
A. Stuart Rubin, Manager

**FORCE RUBIN, LLC**,
a Delaware limited liability company

By: _____

Name:  Robert Minsky

Title:   Manager


**FORCE RUBIN 2, LLC**,
a Delaware limited liability company

By: _____

Name:  Robert Minsky

Title:   Manager

**COACHELLA RESORT, LLC**,
a California limited liability company

By:

_____
Elliot Barton Lander, M.D., Trustee of The
Elliot Lander Separate Property Trust dated
December 2, 2009, Its Member

Deed of Trust, Security Agreement and Financing Statement
Glenroy Coachella, California

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

State of California        }
}
County of _LOS ANGELES_     }

On _APRIL 24, 2018_ , 2018 before me, _SARAH STERN_ ,
   Date                                 Here Insert Name and Title of the Officer

a Notary Public, personally appeared, A. Stuart Rubin, Manager of Glenroy Coachella Holdings, LLC, as Sole Member of Glenroy Coachella, LLC, who proved to me the basis of satisfactory evidence to be the person (s) whose name (s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her their authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person (s), or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Sarah Stern_
                        Signature of Notary

SARAH STERN
Notary Public – California
Los Angeles County
Commission # 2218654
My Comm. Expires Nov 13, 2021

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

State of California          }

County of __Los Angeles__    }

On __April 18th__ , 2018 before me, __Evelyn Flores__ ,
       Date                                 Here Insert Name and Title of the Officer

a Notary Public, personally appeared, Robert Minsky, as Manager of Force Rubin, LLC, who proved to me the basis of satisfactory evidence to be the person (s) whose name (s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her their authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person (s), or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                         Signature of Notary

**EVELYN FLORES**
COMM. # 2160316
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES AUG. 17, 2020

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

State of California                               }
                                                  }
County of _Los Angeles_                           }

On _April 18th_ , 2018 before me, _Evelyn Flores_ ,
        Date                              Here Insert Name and Title of the Officer

a Notary Public, personally appeared, Robert Minsky, as Manager of Force Rubin 2, LLC, who proved to me the basis of satisfactory evidence to be the person (s) whose name (s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her their authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person (s), or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    Signature of Notary

EVELYN FLORES
COMM. # 2160316
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES AUG. 17, 2020

Deed of Trust, Security Agreement and Financing Statement
Glenroy Coachella, California

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

State of California                     }

County of _Riverside_____ }

On _April 24_____, 2018 before me, _Lisa Simmons_____,
         Date                                   Here Insert Name and Title of the Officer

a Notary Public, personally appeared, Elliot Barton Lander, M.D., Trustee of The Elliot Lander Separate Property Trust, dated December 2, 2009, as Member of Coachella Resort, LLC, who proved to me the basis of satisfactory evidence to be the person (s) whose name (s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her their authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person (s), or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Lisa Simmons_____
                                     Signature of Notary



LISA SIMMONS
Commission # 2082083
Notary Public - California
Riverside County
My Comm. Expires Oct 2, 2018

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

Parcels 1, 2, 4, 5 and 6 of Parcel Map No. 37310, in the City of Coachella, County of Riverside, State of California, according to map on file in Book 243, Pages 82 through 84 of Parcel Maps, Records of Riverside County, California.

ILLEGIBLE NOTARY SEAL DECLARATION (GOVERNMENT CODE 27361.7)

I certify under penalty of perjury that the notary seal on this document to which this statement is attached reads as follows:

Name of Notary: Sarah Stern

Date Commission Expires: November 13, 2021

Principal Office (County): Los Angeles

Notary Commission Number: 2218654

Manufacturer Identification Number: NNA1

Place of Execution of this Declaration:  Riverside County

Date: April 20, 2018

Stewart Title of California, Inc.

_____

Kazmer Bernath, Commercial Title Officer

ILLEGIBLE NOTARY SEAL DECLARATION (GOVERNMENT CODE 27361.7)

I certify under penalty of perjury that the notary seal on this document to which this statement is attached reads as follows:

Name of Notary: Lisa Simmons

Date Commission Expires: 10-2-18

Principal Office (County): Riverside

Notary Commission Number: 2082083

Manufacturer Identification Number: NNA1

Place of Execution of this Declaration:  Riverside County

Date: April 26, 2018

Stewart Title of California, Inc.

_____

Kazmer Bernath, Commercial Title Officer

ILLEGIBLE NOTARY SEAL DECLARATION (GOVERNMENT CODE 27361.7)

I certify under penalty of perjury that the notary seal on this document to which this statement is attached reads as follows:

Name of Notary: Evelyn Flores

Date Commission Expires: 8-17-20

Principal Office (County): Los Angeles

Notary Commission Number: 2160316

Manufacturer Identification Number: MGC1

Place of Execution of this Declaration:  Riverside County

Date: April 26, 2018

Stewart Title of California, Inc.

_____
Kazmer Bernath, Commercial Title Officer

# Exhibit D

# EXHIBIT C

## Approved Budget

| | Budget | Paid to-date | Remaining Budget pre-close | Draw #1 | Remaining Budget post-close |
|---|---|---|---|---|---|
| **Hard Costs** | | | | | |
| Casita Construction and FF&E | $16,462,916 | $2,049,155 | $14,413,761 | $5,162,381 | $9,251,380 |
| Quonset Hut Construction | $4,172,104 | $1,515,846 | $2,656,258 | $0 | $2,656,258 |
| Infrastructure & Site Work | $6,869,000 | $2,976,482 | $3,892,518 | $2,574,794 | $1,317,724 |
| Building A - Conference Center | $1,054,100 | $0 | $1,054,100 | $0 | $1,054,100 |
| Kitchen Equipment | $175,000 | $0 | $175,000 | $0 | $175,000 |
| Hard Cost Contingency | $1,500,000 | $0 | $1,500,000 | $0 | $1,500,000 |
| DWC 5% Mark Up | $500,000 | $0 | $500,000 | $0 | $500,000 |
| **Total Hard Costs** | $30,733,120 | $6,541,483 | $24,191,637 | $7,737,175 | $16,454,462 |
| | | | | | |
| **Soft Costs** | | | | | |
| Architecture, Legal, Engineering, and Permits | $2,696,807 | $2,313,835 | $382,972 | $0 | $382,972 |
| Hotel Flag, F&B Consulting, Licenses | $200,000 | $82,500 | $117,500 | $0 | $117,500 |
| Legal & AccountingFees | $40,000 | $0 | $40,000 | $0 | $40,000 |
| Fund Control & Loan Servicing Fees | $113,843 | $0 | $113,843 | $13,842.94 | $100,000 |
| Property Taxes & Insurance | $130,000 | $0 | $130,000 | $0 | $130,000 |
| Operating Supplies & Pre-opening Expenses | $1,500,000 | $0 | $1,500,000 | $0 | $1,500,000 |
| **Total Soft Costs** | $4,680,650 | $2,396,335 | $2,284,315 | $13,843 | $2,270,472 |
| | | | | | |
| **Financing Fees & Costs** | | | | | |
| Calmwater Origination Fee | $366,000 | $0 | $366,000 | $366,000 | $0 |
| PACE Project Development Expenses | $36,400 | $0 | $36,400 | $36,400 | $0 |
| PACE Finance and Closing Expenses | $141,000 | $0 | $141,000 | $141,000 | $0 |
| PACE Capitalized Interest | $332,913 | $0 | $332,913 | $332,913 | $0 |
| PACE Development Fee | $176,250 | $0 | $176,250 | $176,250 | $0 |
| PACE Program Administration Fee | $227,852 | $0 | $227,852 | $227,852 | $0 |
| GSP Investment Banking Fees | $483,863 | $0 | $483,863 | $483,863 | $0 |
| Other Closing Costs | $499,620 | $0 | $499,620 | $499,620 | $0 |
| Calmwater Interest Holdback | $1,800,000 | $0 | $1,800,000 | $0 | $1,800,000 |
| **Total Financing Fees & Costs** | $4,063,898 | $0 | $4,063,898 | $2,263,898 | $1,800,000 |
| | | | | | |
| **Total Costs** | $39,477,668 | $8,937,818 | $30,539,849 | $10,014,915 | $20,524,934 |
| Bank Hapoalim Payoff | | | $4,000,000 | $4,000,000 | $0 |
| **Total Uses** | | | $34,539,849 | $14,014,915 | $20,524,934 |

C-1

# Exhibit E

# Construction Budget

## Glenroy Coachella Hotel & Resort

| BUDGET LINE ITEM | PROJECT BUDGET REVISED | DRAW REQUESTS TOTAL | UNFUNDED BALANCE |
|---|---|---|---|
| **HARD COSTS** | | | |
| Doug Wall Contracting - Casitas/Quonsets/Site Work | $ 27,596,376.16 | $ 14,102,889.85 | 13,493,486.31 |
| Jacobsson Engineering - Infrascructure & Site Work | $ 7,322,000.00 | $ 6,781,750.08 | 40,249.92 |
| Star Development - Interior Fixture Installation | $ 2,570,563.87 | $ 1,444,463.13 | 1,126,100.74 |
| Owner Contracts - Various | $ 7,954,255.69 | $ 5,874,149.00 | 2,080,106.69 |
| Building A - Conference Center | $ 2,050,000.00 | $ - | 2,050,000.00 |
| Kitchen Equipment | $ 800,000.00 | $ - | 800,000.00 |
| Hard Cost Contingency | $ 1,500,000.00 | 34,506.58 | 1,465,493.42 |
| Land | $ 19,000,000.00 | $ 19,000,000.00 | - |
| Insert as Needed | $ - | $ - | - |
| **TOTAL HARD COSTS INCLUDING RETAINAGE** | **$ 68,793,195.72** | **$ 47,237,758.64** | **$ 21,055,437.08** |
| **SOFT COSTS** | | | |
| Architecture, Legal, Engineering, and Permits | $ 6,333,807.00 | $ 5,854,684.92 | 479,122.08 |
| Hotel Flag, F&B Consulting & Licenses | $ 200,000.00 | $ 82,500.00 | 117,500.00 |
| Legal & Accounting Fees | $ 40,000.00 | $ - | 40,000.00 |
| Fund Control & Loan Servicing Fees | $ 113,843.00 | 21,578.33 | 92,264.67 |
| Property Taxes & Insurance | $ 130,000.00 | $ - | 130,000.00 |
| Operating Supplies & Pre-opening Expenses | $ 3,400,000.00 | $ - | 3,400,000.00 |
| Insert as Needed | $ - | $ - | - |
| **TOTAL SOFT COSTS INCLUDING RETAINAGE** | **$ 10,217,650.00** | **$ 5,958,763.25** | **4,258,886.75** |
| **PROJECT TOTAL INCLUDING RETAINAGE** | **$ 79,010,845.72** | **$ 53,196,521.89** | **$ 25,314,323.83** |
| **RETAINAGE** | | | |
| Less: Retainage Held from This Draw | $ - | $ - | - |
| Add: Retainage Paid for Previous Draw | $ - | $ - | - |
| **TOTAL RETAINAGE** | **$ -** | **$ -** | **$ -** |
| **GRAND TOTAL LESS RETAINAGE** | **$ 79,010,845.72** | **$ 53,196,521.89** | **$ 25,314,323.83** |

| Uses | | Sources | |
|---|---|---|---|
| Remaining Project Costs | $ 25,314,323.83 | IHG Key Money | $ 2,350,000.00 |
| Calmwater Payoff | $ 16,532,460.63 | PACE | $ 1,573,000.00 |
| | | New Debt Source | $ 36,000,000.00 |
| Total | $ 41,846,784.46 | Total | $ 39,923,000.00 |

# Exhibit F

**Brownstein Hyatt
Farber Schreck**

Ana L. Tenzer
Attorney at Law
303.223.1156 tel
303.223.0956 fax
altenzer@bhfs.com

May 7, 2019

*VIA OVERNIGHT DELIVERY AND EMAIL*

**Glenroy Coachella, LLC**          A. Stuart Rubin
**Force Rubin, LLC**                1801 S. La Cienega Blvd., Suite 301
**Force Rubin 2, LLC**              Los Angeles, CA 90035
**Coachella Resort, LLC**           Email:  srubin@rprp.com
1801 S. La Cienega Blvd, Suite 301
Los Angeles, CA 90035
Attention:  A. Stuart Rubin
Email:  srubin@rprp.com


Gary Stiffelman                     Elliot Lander
383 South Beverly Glen Blvd.        72780 Country Club Drive, St. 301
Los Angeles, CA 90024              Rancho Mirage, CA  92270
Email:  stiffelmang@gtlaw.com       Email:  elliot@cellsurgicalnetwork.com

**RE:**   Mortgage Loan in the amount of up to $24,400,000.00 (the "***Loan***") made by **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP** (together with its successors and/or assigns "***Lender***"), to Glenroy Coachella, LLC, Force Rubin, LLC, Force Rubin 2, LLC and Coachella Resort, LLC, as evidenced by the following documents, each dated as of April 26, 2018, as amended from time to time: that certain Loan Agreement among Borrower and Lender (the "***Loan Agreement***"); that certain Promissory Note executed and delivered by Borrower to Lender in the original principal amount of up to $24,400,000.00 (the "***Note***"); that certain Indemnity and Guaranty Agreement executed and delivered by A. Stuart Rubin, Gary Stiffelman and Elliot Lander (each an individual and collectively "***Guarantor***"), jointly and severally (the "***Carveout Guaranty***"); that certain Completion Guaranty Agreement executed and delivered by Guarantor (the "***Completion Guaranty***"), and that certain Comfort Letter among Lender, Glenroy Coachella, LLC on behalf of Borrower, and the hotel franchisor, the International Hotel Group pursuant to that certain Hotel Indigo New Development License Agreement (the "***Hotel License Agreement***") governing the construction of the hotel as an Indigo Hotel (the "***Hotel Brand***").  The Improvements to be constructed at the Property consist of approximately one prefabricated casita and fifty newly built casitas containing no less than 250 guest rooms, currently under construction and such other amenities (the "***Improvements***") on the Property located at the Southeast Corner of Ave 48 and Van Buren Street, in Coachella, California (the "***Property***").  Terms not defined herein shall have the meaning given the term in the Loan Agreement.

To Whom it May Concern:

410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
main  303.223.1100

Brownstein Hyatt Farber Schreck, LLP

Exhibit Page 200

Glenroy Coachella LLC
A. Stuart Rubin
Gary Stiffleman
Elliott Lander
May 7, 2019
Page 2

We thank you for sharing with us your recent efforts to refinance the Loan with SilverPeak Argentic pursuant to the non-binding term sheet dated January 17, 2019, as well as your assessment of the immediate financial sources and uses needed to complete construction of the Improvements on the Property. To that end, we need to understand your short term and longer term plans to infuse sufficient capital to the Borrower in order to fund Completion of the Improvements pursuant to the Loan Documents. The project has critical needs in order to keep the project on track for Completion pursuant to the Construction Documents, including, as reflected in the most recent Construction Budget received by Lender on April 18, 2019, the need to fund approximately $25,000,000 of additional sources to Complete construction pursuant to the Loan Documents and the Construction Documents. As you know, Section 9.13 of the Loan Agreement requires Borrower and Guarantors to deposit deficiency amounts with Lender, as needed, to keep the Loan "In-Balance". The Loan proceeds remaining unfunded as of the date hereof are $4,487,811.30, which based on the approximate $25,000,0000 in estimated costs to Complete, renders the existing deficiency at approximately $19,252,951.98. We cannot make additional advances of proceeds under the Loan until we understand how Borrower and Guarantors plan to fund such deficiency, bring the Loan In-Balance, Complete the Improvements and maintain the Indigo Brand.

Notice is hereby given to you that pursuant to the Loan Documents, the deficiency is due to be deposited by Borrower pursuant to Section 9.13 of the Loan Agreement in an amount, calculated by Lender based on the information you have provided, is approximately $21,771,438.65 (inclusive of $2,518,486.67 calculated by Lender and required to be deposited in the Interest Reserve as a result of the Interest Reserve Deficiency). Deposit of the deficiency is due from Borrower within five (5) Business Days after the date of this letter pursuant to the Loan Agreement.

Furthermore (i) Borrower and Guarantors are currently in default under the Loan Agreement and the Carveout Guaranty, respectively, as a result of Borrower's misapplication and misappropriation of the bond proceeds of the Mello Roos financing which were not applied, as required under the Loan Agreement, to repay the Loan, and (ii) Borrower is in default under the Note due to its failure to make the May 1, 2019 debt service payment (and the Interest Reserve has insufficient funds to pay the same). All events of default by Borrower and/or Guarantors give rise to Lender's legal rights and remedies under the Loan Documents.

We expect that the immediate needs of the Property to be addressed by a potential infusion of equity to Borrower, from sources outside the Loan. We need to receive from you a proposed plan concretely setting forth the steps by which Borrower and Guarantors plan to remedy the matters set forth above by Friday May 10, 2019.

Please note that the Loan Documents prohibit (i) Borrower's incurring any additional indebtedness secured or encumbering the Property, including, a Clean Fund Loan, and (ii) the termination of the License Agreement, without Lender's consent, which as of the date hereof, Lender is not providing.

Please note that other Defaults and/or Events of Default under the Loan Documents may exist, and the foregoing described Defaults and/or Events of Default is not meant to be exhaustive, and does not constitute waiver of any other Default or Event of Default which may have occurred and be continuing under the Loan Documents and not mentioned above.

19183654.2

Glenroy Coachella LLC
A. Stuart Rubin
Gary Stiffleman
Elliott Lander
May 7, 2019
Page 3

Interest at the Default Rate shall accrue on the unpaid principal amount of the Note in accordance with the terms of the Loan Documents.  Interest shall continue to accrue at the Default Rate until such time that no Events of Default under the Loan Documents then exist.

Pursuant to the Loan Documents, Borrower is responsible for paying all expenses, charges, costs and fees (including attorneys' fees and expenses) of Lender in connection with the enforcement of the Loan and Loan Documents.

This notice is also being provided to Guarantors to notify Guarantors of the matters set forth herein.  Lender's transmission of this notice to Guarantors shall not obligate Lender to provide any future notices to Guarantor.  In addition, we advise Guarantors that various obligations under the Loan Agreement with which Borrower has failed to comply may be Guaranteed Obligations of Guarantors under the Carveout Guaranty and/or the Completion Guaranty which may result in the personal liability of Guarantors.

Neither this notice nor any statement by or on behalf of Lender as to the amount due and owing under any of the Loan Documents: (i) shall constitute a waiver of any rights of Lender to collect any additional amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, including, without limitation, prepayment fees, default interest or late charges, or otherwise at law or in equity; or (ii) shall constitute an offer to settle or waive any rights of Lender under any of the Loan Documents.  Lender's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction, and is not and shall not be deemed to be binding upon Lender.  Lender may accept any such payment or check without prejudice to its rights to receive the balance of Secured Obligations and/or any other amounts due under the Loan Documents.

Nothing contained herein, including, but not limited to: (i) this notice; (ii) any delay or failure by Lender to exercise at this time (or any time hereafter) any of its rights and remedies under the Loan Documents or applicable law with respect to any Default or Event of Default that may have occurred or may occur under the Loan Documents; or (iii) any discussions, actions, negotiations, correspondence or documentation drafted or entered into by Lender occurring prior to, on, or after the date hereof, including, but not limited to acceptance of any partial payment or monthly debt service payment, shall (a) constitute a waiver of, or acquiescence in, any Default or Event of Default, now or hereafter existing under the Loan Documents or any related document, (b) constitute a modification or amendment of any of the terms of any of the Loan Documents, (c) constitute an election of remedies regarding any other Default or Event of Default, (d) constitute a waiver of or an agreement to forbear from exercising, any rights and remedies Lender may have under the Loan Documents, or (e) impair any power, right or privilege granted to Lender under the Loan Documents or under applicable law, in equity or otherwise.  Lender hereby expressly reserves all of its rights, powers and remedies of Lender under the Loan Documents, at law and in equity or otherwise with respect to the Loan, including, without limitation, its right to recover any and all fees, expenses and costs incurred in the collection of the amounts due under the terms of the Loan Documents.

19183654.2

Glenroy Coachella LLC
A. Stuart Rubin
Gary Stiffleman
Elliott Lander
May 7, 2019
Page 4

     Lender is willing to actively discuss any proposal and plans you may have get the project back on track, and in compliance with the Loan Documents. Please contact the Lender directly, or the undersigned at 303-223-1156 to discuss the matters herein.

Very truly yours,

Ana L. Tenzer

cc:    ***Via Overnight Delivery to all***:

    Jeffer Mangels Butler & Mitchell LLP
    1900 Avenue of the Stars
    Los Angeles, CA 90067
    Attention:  David A. Sudeck, Esq.
    Email:  dsudeck@jmbm.com

    Brian M. Lewis
    Attorney at Law
    44-700 Village Court, Suite 100
    Palm Desert, CA 92260
    Telephone:  (760) 568-9200
    Email: brian.lewis@lawlewis.com

    Michael Tuchin, Esq.
    Klee, Tuchin, Bogdanoff & Stern LLP
    1999 Avenue of the Stars
    Thirty-Ninth Floor
    Los Angeles, CA 90067-6049
    Telephone: (310) 407-4000
    E-Mail: mtuchin@ktbslaw.com

19183654.2

# Exhibit G

**Brownstein Hyatt
Farber Schreck**

Ana L. Tenzer
Attorney at Law
303.223.1156 tel
303.223.0956 fax
altenzer@bhfs.com

May 28, 2019

*VIA OVERNIGHT DELIVERY AND EMAIL*

Glenroy Coachella, LLC
Force Rubin, LLC
Force Rubin 2, LLC
Coachella Resort, LLC
1801 S. La Cienega Blvd, Suite 301
Los Angeles, CA 90035
Attention:  A. Stuart Rubin
Email:  srubin@rprp.com

A. Stuart Rubin
1801 S. La Cienega Blvd., Suite 301
Los Angeles, CA 90035
Email:  srubin@rprp.com

Gary Stiffelman
383 South Beverly Glen Blvd.
Los Angeles, CA 90024
Email:  stiffelmang@gtlaw.com

Elliot Lander
72780 Country Club Drive, St. 301
Rancho Mirage, CA  92270
Email:  elliot@cellsurgicalnetwork.com

**RE:**  Mortgage Loan in the amount of up to $24,400,000.00 (the "*Loan*") made by **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP** (together with its successors and/or assigns "*Lender*"), to Glenroy Coachella, LLC, Force Rubin, LLC, Force Rubin 2, LLC and Coachella Resort, LLC, as evidenced by the following documents, each dated as of April 26, 2018, as amended from time to time: that certain Loan Agreement among Borrower and Lender (the "*Loan Agreement*"); that certain Promissory Note executed and delivered by Borrower to Lender in the original principal amount of up to $24,400,000.00 (the "*Note*"); that certain Indemnity and Guaranty Agreement executed and delivered by A. Stuart Rubin, Gary Stiffelman and Elliot Lander (each an individual and collectively "*Guarantor*"), jointly and severally (the "*Carveout Guaranty*"); that certain Completion Guaranty Agreement executed and delivered by Guarantor (the "*Completion Guaranty*"), and that certain Comfort Letter among Lender, Glenroy Coachella, LLC on behalf of Borrower, and the hotel franchisor, the International Hotel Group pursuant to that certain Hotel Indigo New Development License Agreement (the "*Hotel License Agreement*") governing the construction of the hotel as an Indigo Hotel (the "*Hotel Brand*").  The Improvements to be constructed at the Property consist of approximately one prefabricated casita and fifty newly built casitas containing no less than 250 guest rooms, currently under construction and such other amenities (the "*Improvements*") on the Property located at the Southeast Corner of Ave 48 and Van Buren Street, in Coachella, California (the "*Property*").  Terms not defined herein shall have the meaning given the term in the Loan Agreement.

To Whom it May Concern:

410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
main  303.223.1100

Glenroy Coachella LLC
A. Stuart Rubin
Gary Stiffleman
Elliott Lander
May 28, 2019
Page 2

On behalf of Lender, notice is hereby given to you that a default exists under the Loan due to the failure to deposit additional funds in the Tax and Insurance Reserve as required by Section 2.4(a) of the Loan Agreement so that Lender's servicer for the Loan, Trimont Real Estate Advisors ("Servicer") is able to pay in full the second installment of 2018 property taxes currently due on the Property, which was delinquent as of April 10, 2019. On May 2, 2019, Servicer sent a written request to Borrower for an additional $61,246.05 to be deposited into the Tax and Insurance Reserve so that Servicer could make the full installment payment. No such additional funds have been provided to date. If an additional $61,246.05 in funds is not promptly remitted to Servicer, a tax default will exist on the Property after June 1, 2019.

Please note that other Defaults and/or Events of Default under the Loan Documents may exist, and the foregoing described Defaults and/or Events of Default is not meant to be exhaustive, and does not constitute waiver of any other Default or Event of Default which may have occurred and be continuing under the Loan Documents and not mentioned above.

Interest at the Default Rate shall accrue on the unpaid principal amount of the Note in accordance with the terms of the Loan Documents. Interest shall continue to accrue at the Default Rate until such time that no Events of Default under the Loan Documents then exist.

Pursuant to the Loan Documents, Borrower is responsible for paying all expenses, charges, costs and fees (including attorneys' fees and expenses) of Lender in connection with the enforcement of the Loan and Loan Documents.

This notice is also being provided to Guarantors to notify Guarantors of the matters set forth herein. Lender's transmission of this notice to Guarantors shall not obligate Lender to provide any future notices to Guarantor. In addition, we advise Guarantors that various obligations under the Loan Agreement with which Borrower has failed to comply may be Guaranteed Obligations of Guarantors under the Carveout Guaranty and/or the Completion Guaranty which may result in the personal liability of Guarantors.

Neither this notice nor any statement by or on behalf of Lender as to the amount due and owing under any of the Loan Documents: (i) shall constitute a waiver of any rights of Lender to collect any additional amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, including, without limitation, prepayment fees, default interest or late charges, or otherwise at law or in equity; or (ii) shall constitute an offer to settle or waive any rights of Lender under any of the Loan Documents. Lender's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction, and is not and shall not be deemed to be binding upon Lender. Lender may accept any such payment or check without prejudice to its rights to receive the balance of Secured Obligations and/or any other amounts due under the Loan Documents.

Nothing contained herein, including, but not limited to: (i) this notice; (ii) any delay or failure by Lender to exercise at this time (or any time hereafter) any of its rights and remedies under the Loan Documents or applicable law with respect to any Default or Event of Default that may have occurred or may occur under the Loan Documents; or (iii) any discussions, actions, negotiations, correspondence or documentation drafted or entered into by Lender occurring prior to, on, or after the date hereof, including,

Glenroy Coachella LLC
A. Stuart Rubin
Gary Stiffleman
Elliott Lander
May 28, 2019
Page 3

but not limited to acceptance of any partial payment or monthly debt service payment, shall (a) constitute a waiver of, or acquiescence in, any Default or Event of Default, now or hereafter existing under the Loan Documents or any related document, (b) constitute a modification or amendment of any of the terms of any of the Loan Documents, (c) constitute an election of remedies regarding any other Default or Event of Default, (d) constitute a waiver of or an agreement to forbear from exercising, any rights and remedies Lender may have under the Loan Documents, or (e) impair any power, right or privilege granted to Lender under the Loan Documents or under applicable law, in equity or otherwise.  Lender hereby expressly reserves all of its rights, powers and remedies of Lender under the Loan Documents, at law and in equity or otherwise with respect to the Loan, including, without limitation, its right to recover any and all fees, expenses and costs incurred in the collection of the amounts due under the terms of the Loan Documents.

Lender is willing to actively discuss any proposal and plans you may have get the project back on track, and in compliance with the Loan Documents. Please contact the Lender directly, or the undersigned at 303-223-1156 to discuss the matters herein.

Very truly yours,

Ana L. Tenzer

cc:     *Via Overnight Delivery to all*:

        Jeffer Mangels Butler & Mitchell LLP
        1900 Avenue of the Stars
        Los Angeles, CA 90067
        Attention:  David A. Sudeck, Esq.
        Email:  dsudeck@jmbm.com

        Brian M. Lewis
        Attorney at Law
        44-700 Village Court, Suite 100
        Palm Desert, CA 92260
        Telephone:  (760) 568-9200
        Email: brian.lewis@lawlewis.com

        Michael Tuchin, Esq.
        Klee, Tuchin, Bogdanoff & Stern LLP
        1999 Avenue of the Stars
        Thirty-Ninth Floor
        Los Angeles, CA 90067-6049
        Telephone: (310) 407-4000
        E-Mail: mtuchin@ktbslaw.com

19291536.3

# Exhibit H

## INDEMNITY AND GUARANTY AGREEMENT
### (Glenroy Coachella, California)

**THIS INDEMNITY AND GUARANTY AGREEMENT** (this "<u>Agreement</u>"), made as of  April 26, 2018 by **GARY STIFFELMAN, ELLIOT LANDER** and **A. STUART RUBIN** (each shall individually, be an "<u>Indemnitor</u>" and collectively, jointly and severally, "<u>Indemnitor</u>"), in favor of **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership ("<u>Lender</u>"), whose address is c/o Calmwater Capital, 11755 Wilshire Blvd., Suite 1425, Los Angeles, California 90025.

### W I T N E S S E T H :

WHEREAS, Lender has extended to **GLENROY COACHELLA, LLC**, a Delaware limited liability company, **FORCE RUBIN, LLC**, a Delaware limited liability company, **FORCE RUBIN 2, LLC**, a Delaware limited liability company, and **COACHELLA RESORT, LLC**, a California limited liability company (collectively, jointly and severally the "<u>Borrower</u>") a loan in the principal amount of up to ($24,400,000.00) (the "<u>Loan</u>") pursuant to that certain Loan Agreement (the "<u>Loan Agreement</u>") between Borrower and Lender, dated as the date hereof; and

WHEREAS, the Loan is evidenced by a Promissory Note dated of even date herewith (the "<u>Note</u>"), executed by Borrower and payable to the order of Lender in the stated principal amount of up to Twenty-Four Million Four Hundred Thousand and No/100 Dollars ($24,400,000.00) and is secured by a Deed of Trust, Security Agreement and Financing Statement dated of even date herewith (the "<u>Security Instrument</u>"), from Borrower, as trustor, for the benefit of Lender, as beneficiary, encumbering that certain real property situated in Coachella, California, as is more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference, together with the buildings, structures and other improvements now or hereafter located thereon (said real property, buildings, structures and other improvements being hereinafter collectively referred to as the "<u>Property</u>") and by other documents and instruments (the Loan Agreement, the Note, the Security Instrument, and such other documents and instruments, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "<u>Loan Documents</u>"); and

WHEREAS, as a condition to making the Loan to Borrower, Lender has required that Indemnitor indemnify Lender from and against and guarantee payment to Lender of the items described herein; and

WHEREAS, the extension of the Loan to Borrower is of substantial benefit to Indemnitor and, therefore, Indemnitor desires to indemnify Lender from and against and guarantee payment to Lender of the items described herein;

NOW, THEREFORE, to induce Lender to extend the Loan to Borrower and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Indemnitor hereby covenants and agrees for the benefit of Lender, as follows:

16102900.9

(a)    <u>Indemnity and Guaranty</u>.  Indemnitor hereby assumes liability for, hereby guarantees payment to Lender of, hereby agrees to pay, protect, defend and save Lender harmless from and against, and hereby indemnifies Lender from and against any and all liabilities, obligations, losses, damages, costs and expenses (including, without limitation, attorneys' fees (which attorneys' fees shall include but not be limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals)), causes of action, suits, claims, demands and judgments of any nature or description whatsoever (collectively, "<u>Costs</u>") which may at any time be imposed upon, incurred by or awarded against Lender as a result of any of the Guaranteed Obligations of Borrower (hereinafter defined).   As used herein, the term "<u>Guaranteed Obligations of Borrower</u>" shall mean all obligations and liabilities of Borrower arising under the Loan Documents, including without limitation the full and prompt payment when due, whether at the Maturity Date, by acceleration or otherwise, of, and the performance and observance of, the Loan and all other advances, debts, indemnities, liabilities, obligations, covenants and duties owing by Borrower to Lender (of every type and description, present or future, whether or not evidenced by any note, guaranty or other instrument) arising under the Loan Agreement or the other Loan Documents, together with all costs and expenses, including reasonable fees and out of pocket expenses of attorneys (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and expert witnesses, incurred by Lender in enforcing its rights under this Agreement.

(b)    This is a guaranty of payment and performance and not of collection.  The liability of Indemnitor under this Agreement shall be direct and immediate and not conditional or contingent upon the genuineness, validity or enforceability of the Note, the Security Instrument, or any other Loan Document, or the pursuit of any remedies against Borrower or any other person (including, without limitation, other guarantors, if any), nor against the collateral for the Loan.  Indemnitor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any collateral for the Loan or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person.  In the event, on account of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, Borrower shall be relieved of or fail to incur any debt, obligation or liability as provided in the Loan Documents, Indemnitor shall nevertheless be fully liable therefor.  In the event of a default under the Loan Documents which is not cured within any applicable grace or cure period, Lender shall have the right to enforce its rights, powers and remedies (including, without limitation, foreclosure of all or any portion of the collateral for the Loan) thereunder or hereunder, in any order, and all rights, powers and remedies available to Lender in such event shall be non-exclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity.  If the indebtedness and obligations guaranteed hereby are partially paid or discharged by reason of the exercise of any of the remedies available to Lender, this Agreement shall nevertheless remain in full force and effect, and Indemnitor shall remain liable for all remaining indebtedness and obligations guaranteed hereby, even though any rights which Indemnitor may have against Borrower may be destroyed or diminished by the exercise of any such remedy.

2

1.    <u>Indemnification Procedures</u>.

(a)    If any action shall be brought against Lender based upon any of the matters for which Lender is indemnified hereunder, Lender shall notify Indemnitor in writing thereof and Indemnitor shall promptly assume the defense thereof, including, without limitation, the employment of counsel selected by Indemnitor and reasonably acceptable to Lender and the negotiation of any settlement; provided, however, that any failure of Lender to notify Indemnitor of such matter shall not impair or reduce the obligations of Indemnitor hereunder.  Lender shall have the right, at the expense of Indemnitor (which expense shall be included in Costs), to employ separate counsel in any such action and to participate in the defense thereof.  In the event Indemnitor shall fail to discharge or undertake to defend Lender against any claim, loss or liability for which Lender is indemnified hereunder, Lender may, at its sole option and election, defend or settle such claim, loss or liability.  The liability of Indemnitor to Lender hereunder shall be conclusively established by such settlement, provided such settlement is made in good faith, the amount of such liability to include both the settlement consideration and the costs and expenses, including, without limitation, reasonable attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements, incurred by Lender in effecting such settlement.  In such event, such settlement consideration, costs and expenses shall be included in Costs and Indemnitor shall pay the same as hereinafter provided.  Lender's good faith in any such settlement shall be conclusively established if the settlement is made on the advice of outside independent legal counsel for Lender.

(b)    No Indemnitor shall, without the prior written consent of Lender: (i) settle or compromise any action, suit, proceeding or claim relating to an indemnified obligation or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to Lender of a full and complete written release of Lender (in form, scope and substance satisfactory to Lender in its sole discretion) from all liability in respect of such action, suit, proceeding or claim and a dismissal with prejudice of such action, suit, proceeding or claim; or (ii) settle or compromise any action, suit, proceeding or claim relating to an indemnified obligation in any manner that may adversely affect Lender or obligate Lender to pay any sum or perform any obligation as determined by Lender in its sole discretion.

(c)    All Costs shall be immediately reimbursable to Lender when and as incurred and, in the event of any litigation, claim or other proceeding, without any requirement of waiting for the ultimate outcome of such litigation, claim or other proceeding, and Indemnitor shall pay to Lender any and all Costs within ten (10) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice.  In addition to any other remedy available for the failure of Indemnitor to periodically pay such Costs, such Costs, if not paid within said ten (10) day period, shall bear interest at the Default Interest Rate (as defined in the Note).

(d)    <u>Reinstatement of Obligations</u>.  If at any time all or any part of any payment made by Indemnitor or received by Lender from Indemnitor under or with respect to this Agreement is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Indemnitor or Borrower), then the obligations of Indemnitor hereunder shall, to the extent of the payment rescinded or returned, be

3

deemed to have continued in existence, notwithstanding such previous payment made by Indemnitor, or receipt of payment by Lender, and the obligations of Indemnitor hereunder shall continue to be effective or <u>be reinstated, as the case ma</u>y be, as to such payment, all as though such previous payment by Indemnitor had never been made.

2.    <u>Waivers by Indemnitor</u>.  To the extent permitted by law, each Indemnitor hereby waives and agrees not to assert or take advantage of:

(a)    Any right to require Lender to proceed against any other person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power or under any other agreement before proceeding against Indemnitor hereunder;

(b)    The defense of the statute of limitations in any action hereunder;

(c)    Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons;

(d)    Demand, presentment for payment, notice of nonpayment, intent to accelerate, acceleration, protest, notice of protest and all other notices of any kind, or the lack of any thereof, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of Indemnitor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender;

(e)    (i) any defense based upon an election of remedies by Lender, even though such election (*e.g.*, nonjudicial foreclosure with respect to any collateral held by Lender to secure repayment of the indebtedness evidenced by the Note) destroys or otherwise impairs the subrogation rights of Indemnitor or the right of Indemnitor (after payment of the obligations guaranteed by Indemnitor under this Agreement) to proceed against Borrower for reimbursement, or both, and (ii) any and all rights or defenses Indemnitor may have by reason of protection afforded to Borrower with respect to any of the obligations of Indemnitor under this Agreement pursuant to the antideficiency or other laws of the State of California limiting or discharging Borrower's indebtedness; evidenced by the Note and secured, in part, by the Security Instrument;

(f)    Any right or claim of right to cause a marshaling of the assets of Indemnitor;

(g)    Any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Agreement;

(h)    Any duty on the part of Lender to disclose to Indemnitor any facts Lender may now or hereafter know about Borrower or the Property, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Indemnitor

4

intends to assume or has reason to believe that such facts are unknown to Indemnitor or has a reasonable opportunity to communicate such facts to Indemnitor, it being understood and agreed that Indemnitor is fully responsible for being and keeping informed of the financial condition of Borrower, of the condition of the Property and of any and all circumstances bearing on the risk that liability may be incurred by Indemnitor hereunder;

(i)       Any lack of notice of disposition or of manner of disposition of any collateral for the Loan;

(j)       Any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents;

(k)       Any deficiencies in the collateral for the Loan or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed;

(l)       Any assertion or claim that the automatic stay provided by 11 U.S.C. §362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter required, which Lender may have against Indemnitor or the collateral for the Loan;

(m)       Any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise;

(n)       Any action, occurrence, event or matter consented to by Indemnitor under Section 5(h) hereof, under any other provision hereof, or otherwise;

(o)       Any and all benefits and defenses under any applicable law which would limit Indemnitor's liability if Borrower had no liability at the time of execution of the Note, the Security Instrument or any other Loan Document, or thereafter ceases to be liable;

(p)       Any and all benefits and defenses under any applicable law which, if Indemnitors had not given this waiver would otherwise prohibit Indemnitor's liability from being larger in amount and more burdensome than that of Borrower;

(q)       Principles or provisions of law, statutory or otherwise, which might otherwise constitute a legal or equitable discharge of a surety or a guarantor; and

(r)       Any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors thereunder.

5

Indemnitor understands that the exercise by Lender of certain rights and remedies contained in the Security Instrument (such as a nonjudicial foreclosure sale) may affect or eliminate Indemnitor's right of subrogation against Borrower and that Indemnitor may therefore incur a partially or totally nonreimbursable liability under this Agreement. Nevertheless, Indemnitor hereby authorizes and empowers Lender to exercise, in its sole and absolute discretion, any right or remedy, or any combination thereof, which may then be available, since it is the intent and purpose of Indemnitor that the obligations under this Agreement shall be absolute, independent and unconditional under any and all circumstances. Indemnitor expressly waives, to the maximum extent permitted by law, any defense (which defense, if Indemnitor had not given this waiver, Indemnitor might otherwise have) to a judgment against Indemnitor by reason of a non-judicial foreclosure. Without limiting the generality of the foregoing, Indemnitor hereby expressly waives any and all benefits under (i) any applicable law which would otherwise limit Indemnitor's liability after a non-judicial foreclosure sale to the difference between the obligations of Indemnitor under this Agreement and the fair market value of the property or interests sold at such non-judicial foreclosure sale, (ii) any applicable law which, if Indemnitor had not given this waiver, would otherwise limit Lender's right to recover a deficiency judgment with respect to purchase money obligations and after a non-judicial foreclosure sale, respectively, and (iii) any applicable law which, if Indemnitor had not given this waiver, among other things, would otherwise require Lender to exhaust all of its security before a personal judgment could be obtained for a deficiency. Notwithstanding any foreclosure of the lien of the Security Instrument, whether by the exercise of the power of sale contained in the Security Instrument, by an action for judicial foreclosure or by Lender's acceptance of a deed in lieu of foreclosure, Indemnitor shall remain bound under this Agreement. Indemnitor waives all rights and defenses that Indemnitor may have because Borrower's obligations are secured by real property. This means, among other things:

(s)    Lender may collect from Indemnitor without first foreclosing on any real or personal property collateral pledged by Borrower or others; and

(t)    If Lender forecloses on any real property collateral pledged by Borrower or others: (a) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (b) Lender may collect from Indemnitor even if Lender, by foreclosing on the real property collateral, has destroyed any right Indemnitor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses that Indemnitor may have because Borrower's obligations are secured by real property.

3.    General Provisions.

(a)    Fully Recourse.  All of the terms and provisions of this Agreement are recourse obligations of Indemnitor and not restricted by any limitation on personal liability, if any, set forth in any Loan Document.

(b)    Unsecured Obligations.  Indemnitor hereby acknowledges that Lender's appraisal of the Property is such that Lender is not willing to accept the consequences of the inclusion of Indemnitor's indemnity set forth herein among the obligations secured by the

6

Security Instrument and the other Loan Documents and that Lender would not make the Loan but for the unsecured personal liability undertaken by Indemnitor herein.

(c)     Survival.  This Agreement shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the exercise of any remedy by Lender under the Security Instrument or any of the other Loan Documents, including, without limitation, any foreclosure or deed in lieu thereof, even if, as a part of such remedy, the Loan is paid or satisfied in full.

(d)     No Subrogation; No Recourse Against Lender.  Notwithstanding the satisfaction by Indemnitor of any liability hereunder, until such time as the Loan has been fully and indefeasibly repaid, all obligations owed to Lender under the Loan Documents have been fully performed, and Lender has released, transferred or disposed of all of Lender's right, title and interest in all collateral or security for the Loan, and there has expired the maximum possible period thereafter during which any payment made by Borrower or others to Lender with respect to the indebtedness evidenced by the Note could be deemed a preference under the United States Bankruptcy Code, Indemnitor shall not have any right of subrogation, contribution, reimbursement or indemnity whatsoever or any right of recourse to or with respect to the assets or property of Borrower or to any collateral for the Loan.  In connection with the foregoing, Indemnitor expressly waives, until such time as the Loan has been fully and indefeasibly repaid, all obligations owed to Lender under the Loan Documents have been fully performed, and Lender has released, transferred or disposed of all of Lender's right, title and interest in such collateral or security, and there has expired the maximum possible period thereafter during which any payment made by Borrower or others to Lender with respect to the indebtedness evidenced by the Note could be deemed a preference under the United States Bankruptcy Code, any and all rights of subrogation to Lender against Borrower, and Indemnitor hereby waives any rights to enforce any remedy which Lender may have against Borrower, and any right to participate in any collateral for the Loan.  In addition to and without in any way limiting the foregoing, Indemnitor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Indemnitor to all indebtedness of Borrower to Lender, and agree with Lender that Indemnitor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Indemnitor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the collateral from the Loan; provided, however, that so long as there does not exist a default or Event of Default, or condition of event which, with the passage of time or giving of notice, or both, would constitute a default or Event of Default, a distribution of profits on a return of capital made by Borrower which may ultimately be received by Indemnitor shall not be deemed to be indebtedness of, or payment of principal and interest from, Borrower.  Further, Indemnitor shall not have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Agreement or under the provisions of any of the Loan Documents.

(e)     Reservation of Rights.  Nothing contained in this Agreement shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Indemnitor or any other party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified at Title 42 U.S.C. §9601 et seq.), as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

7

16102900.9

(f)    <u>Financial Statements; Net Worth</u>.  Indemnitor hereby agrees, as a material inducement to Lender to make the Loan to Borrower, to furnish, from time to time to Lender promptly upon demand by Lender current and dated financial statements detailing the assets and liabilities of Indemnitor certified by Indemnitor, in substantially the same form as such statements provided to Lender prior to the closing of the Loan, and as more particularly set forth in the Loan Agreement. Indemnitor hereby warrants and represents unto Lender that any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Lender with respect to Indemnitor did or will at the time of such delivery fairly and accurately present the financial condition of Indemnitor.  Indemnitor hereby agrees, for the benefit of Lender:  (i) no Indemnitor shall enter into, effect or permit by operation of law or otherwise, any merger, reorganization, consolidation, dissolution or liquidation affecting Indemnitor, or any change in ownership of Indemnitor, or any sale of any assets of Indemnitor (a "<u>Transfer Event</u>"), which would result in Indemnitor failing to have, immediately after the effective date of such Transfer Event, a minimum net worth, in the aggregate, of at least Thirty Million and No/100 Dollars ($30,000,000.00), excluding any direct or indirect interest in the Property (the "<u>Minimum Net Worth</u>"), with not less than Three Million and No/100 Dollars ($3,000,000.00) of such Minimum Net Worth consisting of cash and cash equivalents ("<u>Minimum Liquidity</u>"), provided that for so long as the Reserves are maintained with Lender pursuant to the terms of the Loan Agreement, Five Hundred Thousand and No/100 Dollars ($500,000.00) shall be credited to such Minimum Liquidity requirement; (ii)  Indemnitor shall maintain, from and after the date of execution of this Agreement and thereafter throughout the term of the Loan, a net worth equal to the Minimum Net Worth and the Minimum Liquidity in the amounts, as in clause (i) immediately above, as evidenced by financial statements certified by Indemnitor in the form required under the terms of the Loan Agreement;  Indemnitor agrees that such financial statements shall be prepared for Indemnitor for each calendar year commencing with the calendar year 2018 and delivered to Lender within one hundred twenty (120) days following the end of each such calendar year, together with a certificate from Indemnitor that no material adverse change in the financial statements and Net Worth of Indemnitor has occurred since the date of such statement; and (iii) Indemnitor shall notify Lender within ten (10) days after Indemnitor becomes aware that Indemnitor has failed to maintain the Minimum Net Worth and/or Minimum Liquidity required as set forth above.  For the purposes hereof, "<u>Net Worth</u>" shall be determined based upon the (1) fair market value of all of the assets of Indemnitor (excluding intangible assets (determined in conformity with generally accepted accounting principles as of the date of the applicable financial report ("<u>GAAP</u>")) and excluded intangible assets shall include goodwill, intellectual property, licenses, organizational costs, deferred amounts, covenants not to compete, unearned income, restricted funds, investments in subsidiaries or other Affiliates (as defined in the Loan Agreement), intercompany receivables and accumulated depreciation, <u>less</u> (2) all liabilities of Indemnitor (as determined in accordance with GAAP). Any breach of this <u>Section 5(f)</u> shall be deemed an Event of Default under the Loan Documents.

(g)    <u>Rights Cumulative; Payments</u>.  Lender's rights under this Agreement shall be in addition to all rights of Lender under the Note, the Security Instrument and the other Loan Documents.  Further, payments made by Indemnitor under this Agreement shall not reduce in any respect Borrower's obligations and liabilities under the Note, the Security Instrument and the other Loan Documents.

16102900.9

(h)    <u>No Limitation on Liability</u>.  Indemnitor hereby consents and agrees that the liability of Indemnitor under this Agreement shall be unconditional and absolute and shall in no way be impaired or limited by any of the following events, whether occurring with or without notice to Indemnitor or with or without consideration: (i) any extensions of time for performance required by any of the Loan Documents or extension or renewal of the Note; (ii) any sale, assignment or foreclosure of the Note, the Security Instrument or any of the other Loan Documents or any sale or transfer of the Property; (iii) any change in the composition of Borrower, including, without limitation, the withdrawal or removal of Indemnitor from any current or future position of ownership, management or control of Borrower; (iv) the accuracy or inaccuracy of the representations and warranties made by Indemnitor herein or by Borrower in any of the Loan Documents; (v) the release of Borrower or of any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise; (vi) the release or substitution in whole or in part of any security for the Loan; (vii) Lender's failure to record the Security Instrument or to file any financing statement (or Lender's improper recording or filing thereof) or to otherwise perfect, protect, secure or insure any lien or security interest given as security for the Loan; (viii) the modification of the terms of any one or more of the Loan Documents; or (ix) the taking or failure to take any action of any type whatsoever.  No such action which Lender shall take or fail to take in connection with the Loan Documents or any collateral for the Loan, nor any course of dealing with Borrower or any other person, shall limit, impair or release Indemnitor's obligations hereunder, affect this Agreement in any way or afford Indemnitor any recourse against Lender.  Nothing contained in this Section shall be construed to require Lender to take or refrain from taking any action referred to herein.

(i)    <u>Entire Agreement; Amendment; Severability</u>.  This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements, whether written or oral, between the parties respecting such matters.  Any amendments or modifications hereto, in order to be effective, shall be in writing and executed by the parties hereto.  A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Agreement to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

(j)    <u>Binding Effect; Waiver of Acceptance</u>.  This Agreement shall bind Indemnitor and the heirs, personal representatives, successors and assigns of Indemnitor and shall inure to the benefit of Lender and the officers, directors, shareholders, agents and employees of Lender and their respective heirs, successors and assigns.  Notwithstanding the foregoing, Indemnitor shall not assign any of their rights or obligations under this Agreement without the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion.  Indemnitor hereby waives any acceptance of this Agreement by Lender, and this Agreement shall immediately be binding upon Indemnitor.

(k)    <u>Notices</u>.  All notices or other communications required or permitted to be given pursuant to the provisions of this Agreement shall be in writing and shall be considered as properly given if delivered to the appropriate party at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement).  Except when

9

16102900.9

otherwise required by law, any notice which a party is required or may desire to give the other shall be in writing and may be sent by e-mail (provided that a copy is simultaneously sent by one of the other permitted means of giving notice hereinafter set forth), by personal delivery or by mail (either (i) by United States registered or certified mail, return receipt requested, postage prepaid, or (ii) by Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery). Any notice so given by e-mail shall be deemed to have been given as of the date on which the sender of such communication shall confirm receipt thereof by the appropriate parties. Any notice so given by mail shall be deemed to have been given as of the date of delivery established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be. Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the notice is to be given; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication. For purposes of notice, the addresses of the parties shall be:

Indemnitor:                     A. Stuart Rubin
                                1801 S. La Cienega Blvd., Suite 301
                                Los Angeles, CA 90035
                                Email:  srubin@rprp.com

         With a copy to:        Jeffer Mangels Butler & Mitchell LLP
                                1900 Avenue of the Stars
                                Los Angeles, CA 90067
                                Attention:  David A. Sudeck, Esq.
                                Email:  dsudeck@jmbm.com

                                Gary Stiffelman
                                383 South Beverly Glen Blvd.
                                Los Angeles, CA 90024
                                Email:  stiffelmang@gtlaw.com

                                Elliot Lander
                                72780 Country Club Drive, St. 301
                                Rancho Mirage, CA  92270
                                Email:  elliot@cellsurgicalnetwork.com

         With a copy to:        Brian M. Lewis
                                Attorney at Law
                                44-700 Village Court, Suite 100
                                Palm Desert, CA 92260
                                Telephone:  (760) 568-9200
                                Email: brian.lewis@lawlewis.com

Lender:                         U.S. Real Estate Credit Holdings III-A, LP
                                c/o Calmwater Capital
                                11755 Wilshire Blvd., Suite 1425
                                Los Angeles, California 90025

16102900.9

Attention:  Larry Grantham
Email:  larry@calmwatercapital.com

With a copy to:            Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202
Attention:  Ana L. Tenzer, Esq.
Email:  altenzer@bhfs.com

Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of fifteen (15) days' notice to the other party in the manner set forth hereinabove.

(l)      No Waiver; Time of Essence; Business Day.  The failure of any party hereto to enforce any right or remedy hereunder, or to promptly enforce any such right or remedy, shall not constitute a waiver thereof nor give rise to any estoppel against such party nor excuse any of the parties hereto from their respective obligations hereunder.  Any waiver of such right or remedy must be in writing and signed by the party to be bound.  This Agreement is subject to enforcement at law or in equity, including actions for damages or specific performance.  Time is of the essence hereof.  The term "business day" as used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in Los Angeles, California are authorized by law to be closed.

(m)      Captions for Convenience.  The captions and headings of the sections and paragraphs of this Agreement are for convenience of reference only and shall not be construed in interpreting the provisions hereof.

(n)      Attorneys' Fees.  If any dispute (whether or not any action or proceeding for any relief against the other is brought) arises between the parties relating to this Agreement, the losing party shall pay to the prevailing party a reasonable sum for attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and costs incurred in bringing or defending such action or proceeding and appealing and enforcing any judgment granted therein, all of which shall be deemed to have accrued upon the commencement of such action or proceeding and shall be paid whether or not such action or proceeding is prosecuted to final judgment and, to the extent the Lender is the prevailing party, such costs, fees and expenses shall be included in Costs.

(o)      Successive Actions.  A separate right of action hereunder shall arise each time Lender acquires knowledge of any matter indemnified or guaranteed by Indemnitor under this Agreement.  Separate and successive actions may be brought hereunder to enforce any of the provisions hereof at any time and from time to time.  No action hereunder shall preclude any subsequent action, and Indemnitor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

(p)      Reliance.  Lender would not make the Loan to Borrower without this Agreement.  Accordingly, Indemnitor intentionally and unconditionally enters into the covenants and agreements as set forth above and understand that, in reliance upon and in consideration of

11

such covenants and agreements, the Loan shall be made and, as part and parcel thereof, specific monetary and other obligations have been, are being and shall be entered into which would not be made or entered into but for such reliance.

(q)    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(i)    INDEMNITOR, TO THE FULL EXTENT PERMITTED BY LAW, EACH HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE PROPERTY IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii)  HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA EXCEPT AS SPECIFICALLY SET FORTH HEREIN, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) AGREES THAT INDEMNITOR WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS AGREEMENT (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). INDEMNITOR FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE AUTHORIZED AGENT FOR INDEMNITOR AT THE ADDRESS FOR NOTICES DESCRIBED ABOVE, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE UPON INDEMNITOR (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(ii)    INDEMNITOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT  OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.  NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL

PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE.  PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE.  IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN.  THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.  ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

(r)    Waiver by Indemnitor.  Indemnitor covenants and agrees that, upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, Indemnitor shall not seek or cause Borrower or any other person or entity to seek a supplemental stay or other relief, whether injunctive or otherwise, pursuant to 11 U.S.C. § 105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law, (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against Indemnitor or the collateral for the Loan by virtue of this Agreement or otherwise.

(s)    No Petition.  Indemnitor hereby covenants and agrees that they will not at any time institute against Borrower, or join in any institution against Borrower of, any bankruptcy proceedings under any United States Federal or state bankruptcy or similar law.

(t)    Secondary Market.  Lender may sell, transfer and deliver the Loan Documents to one or more investors in the secondary market.  In connection with such sale, Lender may retain or assign responsibility for servicing the Loan or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the investors.  All references to Lender herein shall refer to and include, without limitation, any such servicer, to the extent applicable.

13

(u)     <u>Construction</u>.  This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that this Agreement may have been physically prepared by one of the parties, or such party's counsel, it being agreed that all parties and their respective counsel have mutually participated in the negotiation and preparation of this Agreement.

(v)     <u>Marital Status of Guarantor</u>.  Each Indemnitor represents and warrants that Indemnitor which is not an entity is married and resides in the State of California.

(w)     <u>Joint and Several Liability</u>.   The liability of all persons and entities obligated in any manner under this Agreement shall be joint and several.

**[END OF TEXT; SIGNATURE FOLLOWS ON NEXT PAGE]**

14

16102900.9

**IN WITNESS WHEREOF**, Indemnitor has executed this Indemnity and Guaranty Agreement as of the day and year first above written.

"INDEMNITOR"

_____
A. Stuart Rubin, an individual


_____
Gary Stiffelman, an individual


_____
Elliot Lander, an individual

Indemnity and Guaranty Agreement
Glenroy Coachella, California

**IN WITNESS WHEREOF**, Indemnitor has executed this Indemnity and Guaranty Agreement as of the day and year first above written.

"**INDEMNITOR**"

_____
A. Stuart Rubin, an individual

_____
Gary Stiffelman, an individual

_____
Elliot Lander, an individual

Indemnity and Guaranty Agreement
Glenroy Coachella, California

IN WITNESS WHEREOF, Indemnitor has executed this Indemnity and Guaranty Agreement as of the day and year first above written.

"INDEMNITOR"

_____

A. Stuart Rubin, an individual


_____

Gary Stiffelman, an individual


_____

Elliot Lander, an individual

Indemnity and Guaranty Agreement
Glenroy Coachella, California

**EXHIBIT A**

**LEGAL DESCRIPTION OF LAND**

Parcels 1, 2, 4, 5 and 6 of Parcel Map No. 37310, in the City of Coachella, County of Riverside, State of California, according to map on file in Book 243, Pages 82 through 84 of Parcel Maps, Records of Riverside County, California.

EXHIBIT A

16102900.9

## CONSENT BY SPOUSE

With respect to the liability of A. Stuart Rubin, an individual ("Indemnitor") under the INDEMNITY AND GUARANTY AGREEMENT to which this Consent by Spouse is attached and of which it is made a part (the "Guaranty"), the undersigned spouse signs this Consent by Spouse for the purpose of binding such person's marital community and community assets and not such person's sole and separate property, it being understood that Lender's recourse under the Guaranty with respect to Indemnitor shall be limited to the community assets of Indemnitor and the undersigned spouse and the sole and separate property of Indemnitor.

_____,
a natural person

Print Name: Annette Rubin

Indemnity and Guaranty Agreement
Glenroy Coachella, California

## CONSENT BY SPOUSE

With respect to the liability of Gary Stiffelman, an individual ("Indemnitor") under the INDEMNITY AND GUARANTY AGREEMENT to which this Consent by Spouse is attached and of which it is made a part (the "Guaranty"), the undersigned spouse signs this Consent by Spouse for the purpose of binding such person's marital community and community assets and not such person's sole and separate property, it being understood that Lender's recourse under the Guaranty with respect to Indemnitor shall be limited to the community assets of Indemnitor and the undersigned spouse and the sole and separate property of Indemnitor.

_____,
a natural person

Print Name: Cammn L Stiffelman

Indemnity and Guaranty Agreement
Glenroy Coachella, California

## CONSENT BY SPOUSE

With respect to the liability of Elliot Lander, an individual ("Indemnitor") under the INDEMNITY AND GUARANTY AGREEMENT to which this Consent by Spouse is attached and of which it is made a part (the "Guaranty"), the undersigned spouse signs this Consent by Spouse for the purpose of binding such person's marital community and community assets and not such person's sole and separate property, it being understood that Lender's recourse under the Guaranty with respect to Indemnitor shall be limited to the community assets of Indemnitor and the undersigned spouse and the sole and separate property of Indemnitor.

_____,
a natural person

Print Name:  Krista Lander

Indemnity and Guaranty Agreement
Glenroy Coachella, California

Exhibit Page 229

# Exhibit I

Recording Requested By

and When Recorded Mail to:

DOC # 2019-0350304
09/09/2019 02:09 PM Fees: $108.00
Page 1 of 4
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: ALYCIA #778

FIDELITY NATIONAL TITLE COMPANY
1101 Investment Blvd., Suite 170
El Dorado Hills, CA  95762

---

Trustee Sale No: 19-00233-2
Loan No:  Coachella

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $20,922,900.18 as of September 4, 2019, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to

stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:
U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership
c/o Calmwater Capital
11755 Wilshire Blvd., Suite 1425
Los Angeles, CA 90025
Phone: (310) 806-9762

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That default has been declared by U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership, the current beneficiary under that certain Deed of Trust, Security Agreement, Financing Statement and Fixture Filing dated as of April 26, 2018, executed by Glenroy Coachella, LLC, a Delaware limited liability company, Force Rubin, LLC, a Delaware limited liability company, Force Rubin 2, LLC, a Delaware limited liability company, and Coachella Resort, LLC, a California limited liability company, as trustor (the "original trustor"), to secure obligations in favor of U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership, as beneficiary (the "original beneficiary"), recorded on April 26, 2018, as Instrument No. 2018-0162476 of official records in the office of the Recorder of Riverside County, California (the "Original Deed of Trust"), and that

The Original Deed of Trust and any modifications thereto are collectively referred to herein from time to time as the "Deed of Trust", and that

The Deed of Trust encumbers certain property more particularly described therein (the "trust property"), and that

The Deed of Trust secures the payment of and the performance of certain obligations, including but not limited to, the obligations set forth in (1) that certain Promissory Note dated as of April 26, 2018 with a face amount of $24,400,000.00 (the "Original Note") and (2) that certain Loan Agreement dated as of April 26, 2018 (the "Original Loan Agreement"), and that

The Original Note, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the Original Note are collectively referred to herein from time to time as the "Note", and that

The Original Loan Agreement, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the Original Loan Agreement are collectively referred to herein from time to time as the "Loan Agreement", and that

The Note, Loan Agreement, and any other documents evidencing the obligations secured by the Deed of Trust, together with any modifications thereto, are collectively referred to herein from time to time as the "Loan Documents", and that

The term "trustor" as used herein shall mean either the original trustor under the Deed of Trust or, if applicable, its successors in interest, and that

The term "trustee" as used herein shall mean the original trustee under the Deed of Trust or, if applicable, its successors in interest, and that

The term "beneficiary" as used herein shall mean the original beneficiary under the Deed of Trust or, if applicable, its successors in interest, and that

Capitalized terms not defined herein shall have the same meaning as those in the Loan Documents, the Deed of Trust and/or any other loan documents, and that

A breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the trustor has failed to perform obligations pursuant to or under the Loan Documents and/or the Deed of Trust, specifically:

1. failed to pay the debt service payment due on and after May 1, 2019, together with all subsequent payments; together with late charges due;

2. failed to pay default rate interest;

3. failed to pay sums advanced by the beneficiary to protect the security; together with other fees and expenses incurred by the beneficiary;

4. failed to pay attorneys' fees and expenses;

5. together with Guarantor, failed to post the deficiency previously calculated to be approximately $19,252,951.98 to place the Loan "In-Balance" in accordance with the Loan Agreement;

6. misappropriated bond proceeds of the Mello Roos financing (or failed to explain how such funds were applied to the Project);

7. failed to deposit approximately $2,518,486.67 in the Interest Reserve to cure the Interest Reserve Deficiency;

8. breached the terms of the Hotel License Agreement;

9. wasted construction materials and finishes located at the site as construction has ceased;

10. failed to deliver recent financial statements in accordance with the Loan Agreement;

11. failed to construct the project pursuant to the construction schedule and the construction documents in accordance with the Loan Agreement; and that

The trustor has failed, or shall hereafter fail, to pay all other and subsequent interest and/or principal together with late charges and/or default interest and/or any and all other obligations and indebtedness as may become due under the terms of or under the Loan Documents and/or Deed of Trust and not performed and/or paid including, without limitation, reimbursement to the beneficiary and/or the trustee of any of the following fees, costs and expenses heretofore or hereafter incurred, suffered or paid by the beneficiary and/or the trustee in connection with the Loan Documents and/or Deed of Trust, the trustor or the trust property:

1. attorneys' fees and costs including, without limitation, those incurred in connection with foreclosure of the Deed of Trust, appointment of a receiver with respect to the trust property, litigation over the amount, validity, enforcement or

priority of the Loan Documents and/or Deed of Trust, or commencement of an action or proceeding for relief from any bankruptcy court or other judicial or administrative stay, order or injunction, and all other such matters;

2.  real and/or personal property taxes, or payments under or with respect to prior or junior liens or encumbrances, insurance premiums and all other such matters;

3.  protection, preservation, repairs, restoration or completion of the trust property, and all other such matters;

4.  compliance with any applicable laws, regulations or orders, and all other such matters;

5.  trustee's fees, trustee's sale guarantee premiums, and other foreclosure costs, and all other such matters; and that

It is the intention of the beneficiary to include herein all delinquent sums or obligations now or hereafter secured by and under the Deed of Trust, whether presently known or unknown, and whether or not specifically set forth herein, and that

Beneficiary hereby elects to conduct a unified foreclosure sale pursuant to the provisions of California Commercial Code Section 9604(a)(1)(B) and to include in the nonjudicial foreclosure of the estate described in this Notice of Default and Election to Sell Under Deed of Trust all of the personal property and fixtures described in the Deed of Trust and in any other instruments in favor of beneficiary. Beneficiary reserves the right to revoke its election as to some or all of said personal property and/or fixtures, or to add additional personal property and/or fixtures to the election herein expressed, at beneficiary's sole election, from time to time and at any time until the consummation of the trustee's sale to be conducted pursuant to the Deed of Trust and this Notice of Default and Election to Sell Under Deed of Trust, and that

By reason thereof, the beneficiary has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Date: September 9, 2019                                    TS #:19-00233-2

FIDELITY NATIONAL TITLE COMPANY, Trustee

_____

Jenny Taylor, Authorized Signor

# Exhibit J

DOC #/2021-0025741
1/14/2021 08:00 AM Fees: $264.00
Page 1 of 6
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

Recording Requested by
**Synrgo fka SPL**

and When Recorded Mail to:

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: NORMA #248

FIDELITY NATIONAL TITLE COMPANY
1101 Investment Blvd., Suite 170
El Dorado Hills, CA 95762

---

**Trustee Sale No. 19-00233-2    Loan No: Coachella
APN 603-220-061, -062, -064, -065 and -066 (Old) 603-220-061, -065, -067, -068 and -069 (New)**

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING DATED APRIL 26, 2018. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On February 9, 2021, at 09:00 AM, in front of the Corona Civic Center, 849 W. Sixth Street, Corona, CA 92882, FIDELITY NATIONAL TITLE COMPANY, as the duly appointed Trustee (the "Trustee"), under and pursuant to the power of sale contained in that certain Deed of Trust, Security Agreement, Financing Statement and Fixture Filing recorded on April 26, 2018, as Instrument No. 2018-0162476 of official records in the office of the Recorder of Riverside County, CA, executed by: Glenroy Coachella, LLC, a Delaware limited liability company, Force Rubin, LLC, a Delaware limited liability company, Force Rubin 2, LLC, a Delaware limited liability company, Coachella Resort, LLC, a California limited liability company, as Trustor (the "Trustor"), in favor of U.S. Real Estate Credit Holdings III-A, LP, an Irish limited partnership, as Beneficiary (the "Beneficiary"), and any modifications thereto are collectively referred to herein from time to time as the "Deed of Trust", WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER, in lawful money of the United States, all payable at the time of sale, that certain property situated in said County, California describing the land therein as: PARCELS 1, 2, 4, 5 AND 6 OF PARCEL MAP NO. 37310, IN THE CITY OF COACHELLA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, ACCORDING TO MAP ON FILE IN BOOK 243, PAGES 82 THROUGH 84 OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA (THE "LAND").

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the Property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the Property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the Property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this Property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the Property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this Property,

you may call **714.730.2727** or visit this Internet Website **www.servicelinkasap.com**, using the file number assigned to this case **19-00233-2**. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Website. The best way to verify postponement information is to attend the scheduled sale.

Beneficiary has elected and hereby elects to conduct a unified foreclosure sale pursuant to the provisions of California Commercial Code Section 9604(a)(1)(B) and to include in the nonjudicial foreclosure of the estate described in this Notice of Trustee's Sale all of the personal property and fixtures described in the Deed of Trust and in any other instruments in favor of Beneficiary, which property is more particularly described in Exhibit "A" hereto. Beneficiary reserves the right to revoke its election as to some or all of said personal property and/or fixtures, or to add additional personal property and/or fixtures to the election herein expressed, at Beneficiary's sole election, from time to time and at any time until the consummation of the trustee's sale to be conducted pursuant to the Deed of Trust and this Notice of Trustee's Sale.

No warranty is made that any or all of the personal property still exists or is available for the successful bidder and no warranty is made as to the condition of any of the personal property, which shall be sold "as is", "where is".

The real Property heretofore described is being sold "as is".  The street address and other common designation, if any, of the real Property described above is purported to be: No common designation- Directions may be obtained pursuant to a written request submitted to U.S. Real Estate Credit Holdings III-A, LP c/o Fidelity National Title Company, 1101 Investment Blvd., Suite 170, El Dorado Hills, CA 95762 within 10 days from the first publication of this notice

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be made without covenant or warranty, express or implied, regarding title, possession, or encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale contained in that certain Deed of Trust (together with any modifications thereto).

The total amount of the unpaid balance of the obligations secured by the Property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $30,092,096.90 (Estimated), provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale.  Beneficiary's bid at said sale may include all or part of said amount.  In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee.  In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right.  The Property offered for sale excludes all funds held on account by the Property receiver, if applicable.

DATE: January 6, 2021

FIDELITY NATIONAL TITLE COMPANY, TRUSTEE
19-00233-2
1101 Investment Blvd., Suite 170
El Dorado Hills, CA 95762
916-636-0114

Jenny Taylor, Authorized Signor

**SALE INFORMATION CAN BE OBTAINED ON LINE AT www.servicelinkasap.com
AUTOMATED SALES INFORMATION PLEASE CALL 714.730.2727**

19-00233-2

## EXHIBIT "A"

ALL OF THE TRUSTOR'S RIGHT, TITLE AND INTEREST NOW OWNED OR HEREAFTER ACQUIRED IN AND TO THE FOLLOWING PROPERTY, ALL OF WHICH IS HEREINAFTER COLLECTIVELY DEFINED AS THE "PROPERTY":

A.  ALL THAT CERTAIN LAND SITUATED AT THE SOUTHEAST CORNER OF AVE 48 AND VAN BUREN STREET, COACHELLA, CALIFORNIA, MORE PARTICULARLY DESCRIBED IN THE ATTACHED NOTICE OF TRUSTEE'S SALE (THE "LAND"), TOGETHER WITH ALL OF THE EASEMENTS, RIGHTS, PRIVILEGES, FRANCHISES, TENEMENTS, HEREDITAMENTS AND APPURTENANCES NOW OR HEREAFTER THEREUNTO BELONGING OR IN ANY WAY APPERTAINING AND ALL OF THE ESTATE, RIGHT, TITLE, INTEREST, CLAIM AND DEMAND WHATSOEVER OF TRUSTOR THEREIN OR THERETO, EITHER AT LAW OR IN EQUITY, IN POSSESSION OR IN EXPECTANCY, NOW OR HEREAFTER ACQUIRED;

B.  ALL STRUCTURES, BUILDINGS AND IMPROVEMENTS OF EVERY KIND AND DESCRIPTION NOW OR AT ANY TIME HEREAFTER LOCATED OR PLACED ON THE LAND (THE "IMPROVEMENTS");

C.  ALL FURNITURE, FURNISHINGS, FIXTURES, GOODS, EQUIPMENT, INVENTORY OR PERSONAL PROPERTY OWNED BY TRUSTOR AND NOW OR HEREAFTER LOCATED ON, ATTACHED TO OR USED IN AND ABOUT THE IMPROVEMENTS, INCLUDING, BUT NOT LIMITED TO, INVENTORY AND ARTICLES OF PERSONAL PROPERTY AND ACCESSIONS THEREOF AND RENEWALS AND REPLACEMENTS THEREOF AND SUBSTITUTIONS THEREFOR, IF ANY (INCLUDING, BUT NOT LIMITED TO BEDS, BUREAUS, CHIFFONIERS, CHESTS, CHAIRS, DESKS, LAMPS, MIRRORS, BOOKCASES, TABLES, RUGS, CARPETING, DRAPES, DRAPERIES, CURTAINS, SHADES, VENETIAN BLINDS, SCREENS, PAINTINGS, HANGINGS, PICTURES, DIVANS, COUCHES, LUGGAGE CARTS, LUGGAGE RACKS, STOOLS, SOFAS, CHINAWARE, LINENS, PILLOWS, BLANKETS, GLASSWARE, FOODCARTS, COOKWARE, DRY CLEANING FACILITIES, DINING ROOM WAGONS, KEYS OR OTHER ENTRY SYSTEMS, BARS, BAR FIXTURES, LIQUOR AND OTHER DRINK DISPENSERS, ICEMAKERS, RADIOS, TELEVISION SETS, INTERCOM AND PAGING EQUIPMENT, ELECTRIC AND ELECTRONIC EQUIPMENT, DICTATING EQUIPMENT, PRIVATE TELEPHONE SYSTEMS, MEDICAL EQUIPMENT, POTTED PLANTS, HEATING, LIGHTING AND PLUMBING FIXTURES, FIRE PREVENTION AND EXTINGUISHING APPARATUS, COOLING AND AIR-CONDITIONING SYSTEMS, ELEVATORS, ESCALATORS, FITTINGS, PLANTS, APPARATUS, STOVES, RANGES, REFRIGERATORS, LAUNDRY MACHINES, TOOLS, MACHINERY, ENGINES, DYNAMOS, MOTORS, BOILERS, INCINERATORS, SWITCHBOARDS, CONDUITS, COMPRESSORS, VACUUM CLEANING SYSTEMS, FLOOR CLEANING, WAXING AND POLISHING EQUIPMENT, CALL SYSTEMS, BRACKETS, ELECTRICAL SIGNS, BULBS, BELLS, ASH AND FUEL, CONVEYORS, CABINETS, LOCKERS, SHELVING, SPOTLIGHTING EQUIPMENT, DISHWASHERS, GARBAGE DISPOSALS, WASHERS AND DRYERS), OTHER CUSTOMARY HOTEL EQUIPMENT, ALL MACHINES, ENGINES, BOILERS, DYNAMOS, ELEVATORS, STOKERS, TANKS, CABINETS, AWNINGS, SCREENS, SHADES, BLINDS, CARPETS, DRAPERIES, LAWN MOWERS, AND ALL APPLIANCES, PLUMBING, HEATING, AIR CONDITIONING, LIGHTING, VENTILATING, REFRIGERATING, DISPOSAL AND INCINERATING EQUIPMENT, AND ALL FIXTURES AND APPURTENANCES THERETO, AND SUCH OTHER GOODS AND CHATTELS AND PERSONAL PROPERTY OWNED BY TRUSTOR AS ARE NOW OR HEREAFTER USED OR FURNISHED IN OPERATING THE IMPROVEMENTS, OR THE ACTIVITIES CONDUCTED THEREIN, AND ALL BUILDING MATERIALS AND EQUIPMENT HEREAFTER SITUATED ON OR ABOUT THE LAND OR THE IMPROVEMENTS, AND ALL WARRANTIES AND GUARANTIES RELATING THERETO, AND ALL ADDITIONS THERETO AND SUBSTITUTIONS AND REPLACEMENTS

THEREFOR (EXCLUSIVE OF ANY OF THE FOREGOING OWNED OR LEASED BY TENANTS OF SPACE IN THE IMPROVEMENTS);

D.  ALL EASEMENTS, RIGHTS OF WAY, STRIPS AND GORES OF LAND, VAULTS, STREETS, WAYS, ALLEYS, PASSAGES, SEWER RIGHTS, AIR RIGHTS AND OTHER DEVELOPMENT RIGHTS NOW OR HEREAFTER LOCATED ON OR APPURTENANT TO THE LAND AND/OR THE IMPROVEMENTS OR UNDER OR ABOVE THE SAME OR ANY PART OR PARCEL THEREOF, AND ALL ESTATES, RIGHTS, TITLES, INTERESTS, TENEMENTS, HEREDITAMENTS AND APPURTENANCES, REVERSIONS AND REMAINDERS WHATSOEVER, IN ANY WAY BELONGING, RELATING OR APPERTAINING TO THE LAND AND/OR THE IMPROVEMENTS OR ANY PART THEREOF, OR WHICH HEREAFTER SHALL IN ANY WAY BELONG, RELATE OR BE APPURTENANT THERETO, WHETHER NOW OWNED OR HEREAFTER ACQUIRED BY TRUSTOR;

E.  ALL WATER, DITCHES, WELLS, RESERVOIRS AND DRAINS AND ALL WATER, DITCH, WELL, RESERVOIR AND DRAINAGE RIGHTS WHICH ARE APPURTENANT TO, LOCATED ON, UNDER OR ABOVE OR USED IN CONNECTION WITH THE LAND AND/OR THE IMPROVEMENTS, OR ANY PART THEREOF, WHETHER NOW EXISTING OR HEREAFTER CREATED OR ACQUIRED;

F.  ALL MINERALS, CROPS, TIMBER, TREES, SHRUBS, FLOWERS AND LANDSCAPING FEATURES NOW OR HEREAFTER LOCATED ON, UNDER OR ABOVE THE LAND;

G.  ALL CASH FUNDS, DEPOSIT ACCOUNTS, INCLUDING, WITHOUT LIMITATION, ALL REVENUES AND CREDIT CARD RECEIPTS COLLECTED FROM GUEST ROOMS, RESTAURANTS, BARS, MEETING ROOMS, BANQUET ROOMS AND RECREATIONAL FACILITIES, ALL RECEIVABLES, CUSTOMER OBLIGATIONS, INSTALLMENT PAYMENT OBLIGATIONS AND OTHER OBLIGATIONS NOW EXISTING OR HEREAFTER ARISING OR CREATED OUT OF THE SALE, LEASE, SUBLEASE, LICENSE, CONCESSION OR OTHER GRANT OF THE RIGHT OF THE USE AND OCCUPANCY OF PROPERTY OR RENDERING OF SERVICES BY TRUSTOR OR ANY OPERATOR OR MANAGER OF THE HOTEL OR THE COMMERCIAL SPACE LOCATED  IN THE IMPROVEMENTS OR ACQUIRED FROM OTHERS (INCLUDING, WITHOUT LIMITATION, FROM THE RENTAL OF ANY OFFICE SPACE, RETAIL SPACE, GUEST ROOMS OR OTHER SPACE, HALLS, STORES, AND OFFICES, AND DEPOSITS SECURING RESERVATIONS OF SUCH SPACE), LICENSE, LEASE, SUBLEASE AND CONCESSION FEES AND RENTALS, HEALTH CLUB MEMBERSHIP FEES, FOOD AND BEVERAGE WHOLESALE AND RETAIL SALES, SERVICE CHARGES, VENDING MACHINE SALES AND PROCEEDS, IF ANY, FROM BUSINESS INTERRUPTION OR OTHER LOSS OF INCOME INSURANCE AND OTHER RIGHTS AND EVIDENCE OF RIGHTS TO INVESTMENTS OR CASH, NOW OR HEREAFTER CREATED OR HELD BY BENEFICIARY PURSUANT TO THE SECURITY INSTRUMENT OR ANY  OTHER OF THE LOAN DOCUMENTS (AS HEREINAFTER DEFINED), INCLUDING, WITHOUT LIMITATION, ALL FUNDS NOW OR HEREAFTER ON DEPOSIT IN ANY RESERVES OR ACCOUNTS HELD BY OR ON BEHALF OF BENEFICIARY PURSUANT TO THE SECURITY INSTRUMENT OR ANY OTHER OF THE LOAN DOCUMENTS (INCLUDING, WITHOUT LIMITATION, THE RESERVES ESTABLISHED PURSUANT TO ARTICLE I OF THE SECURITY INSTRUMENT) (COLLECTIVELY, THE "RESERVES");

H.  ALL LEASES (INCLUDING, WITHOUT LIMITATION, OIL, GAS AND MINERAL LEASES), LICENSES, RENTAL AGREEMENTS, CONCESSIONS AND OCCUPANCY AGREEMENTS OF ALL OR ANY PART THE LAND AND/OR THE IMPROVEMENTS NOW OR HEREAFTER ENTERED INTO (EACH, A "LEASE" AND COLLECTIVELY, "LEASES"), AND ALL RENTS, ROYALTIES, ISSUES, PROFITS, REVENUE, INCOME AND OTHER BENEFITS (COLLECTIVELY, THE "RENTS AND PROFITS") OF THE LAND AND/OR THE IMPROVEMENTS, NOW OR HEREAFTER ARISING FROM THE USE OR ENJOYMENT OF ALL OR ANY

PORTION THEREOF OR FROM ANY PRESENT OR FUTURE LEASE OR OTHER AGREEMENT PERTAINING THERETO OR ARISING FROM ANY OF THE CONTRACTS (AS HEREINAFTER DEFINED) OR ANY OF THE GENERAL INTANGIBLES (AS HEREINAFTER DEFINED) AND ALL CASH OR SECURITIES DEPOSITED TO SECURE PERFORMANCE BY THE TENANTS, LESSEES, LICENSEES OR OCCUPANTS (EACH, A "TENANT" AND COLLECTIVELY, "TENANTS"), AS APPLICABLE, OF THEIR OBLIGATIONS UNDER ANY SUCH LEASES, WHETHER SAID CASH OR SECURITIES ARE TO BE HELD UNTIL THE EXPIRATION OF THE TERMS OF SAID LEASES OR APPLIED TO ONE OR MORE OF THE INSTALLMENTS OF RENT COMING DUE PRIOR TO THE EXPIRATION OF SAID TERMS, SUBJECT TO, HOWEVER, THE PROVISIONS CONTAINED IN SECTION 1.8 OF THE DEED OF TRUST;

I.   ALL CONTRACTS AND AGREEMENTS, INCLUDING THE HOTEL MANAGEMENT AGREEMENT, NOW OR HEREAFTER ENTERED INTO COVERING ANY PART OF THE LAND AND/OR THE IMPROVEMENTS (EXCEPT LEASES) (COLLECTIVELY, THE "CONTRACTS") AND ALL REVENUE, INCOME AND OTHER BENEFITS THEREOF, INCLUDING, WITHOUT LIMITATION, MANAGEMENT AGREEMENTS, SERVICE CONTRACTS, MAINTENANCE CONTRACTS, EQUIPMENT LEASES, PERSONAL PROPERTY LEASES AND ANY CONTRACTS OR DOCUMENTS RELATING TO CONSTRUCTION ON ANY PART OF THE LAND AND/OR THE IMPROVEMENTS (INCLUDING PLANS, DRAWINGS, SURVEYS, TESTS, REPORTS, BONDS AND GOVERNMENTAL APPROVALS) OR TO THE MANAGEMENT OR OPERATION OF ANY PART OF THE LAND AND/OR THE IMPROVEMENTS;

J.   ALL PRESENT AND FUTURE DEPOSITS GIVEN TO ANY PUBLIC OR PRIVATE UTILITY WITH RESPECT TO UTILITY SERVICES FURNISHED TO ANY PART OF THE LAND AND/OR THE IMPROVEMENTS;

K.   ALL PRESENT AND FUTURE FUNDS, ACCOUNTS, INSTRUMENTS, ACCOUNTS RECEIVABLE, DOCUMENTS, CAUSES OF ACTION, CLAIMS, GENERAL INTANGIBLES (INCLUDING WITHOUT LIMITATION, PATENTS, COPYRIGHTS, TRADEMARKS, TRADE NAMES, SERVICE MARKS AND SYMBOLS NOW OR HEREAFTER USED IN CONNECTION WITH ANY PART OF THE LAND AND/OR THE IMPROVEMENTS, ALL NAMES BY WHICH THE LAND OR THE IMPROVEMENTS MAY BE OPERATED OR KNOWN, ALL RIGHTS TO CARRY ON BUSINESS UNDER SUCH NAMES, AND ALL RIGHTS, INTEREST AND PRIVILEGES WHICH TRUSTOR HAS OR MAY HAVE AS DEVELOPER OR DECLARANT UNDER ANY COVENANTS, RESTRICTIONS OR DECLARATIONS NOW OR HEREAFTER RELATING TO THE LAND AND/OR THE IMPROVEMENTS) AND ALL NOTES OR CHATTEL PAPER NOW OR HEREAFTER ARISING FROM OR BY VIRTURE OF ANY TRANSACTIONS RELATED TO THE LAND AND/OR IMPROVEMENTS (COLLECTIVELY, THE "GENERAL INTANGIBLES");

L.   ALL WATER TAPS, SEWER TAPS, CERTIFICATES OF OCCUPANCY, PERMITS, LICENSES, FRANCHISES, CERTIFICATES, CONSENTS, APPROVALS AND OTHER RIGHTS AND PRIVILEGES NOW OR HEREAFTER OBTAINED IN CONNECTION WITH THE LAND AND/OR THE IMPROVEMENTS AND ALL PRESENT AND FUTURE WARRANTIES AND GUARANTIES RELATING TO THE IMPROVEMENTS OR TO ANY EQUIPMENT, FIXTURES, FURNITURE, FURNISHINGS, PERSONAL PROPERTY OR COMPONENTS OF ANY OF THE FOREGOING NOW OR HEREAFTER LOCATED OR INSTALLED ON THE LAND AND/OR THE IMPROVEMENTS;

M.  ALL BUILDING MATERIALS, SUPPLIES AND EQUIPMENT NOW OR HEREAFTER PLACED ON THE LAND AND/OR IN THE IMPROVEMENTS AND ALL ARCHITECTURAL RENDERINGS, MODELS, DRAWINGS, PLANS, SPECIFICATIONS, STUDIES AND DATA NOW OR HEREAFTER RELATING TO THE LAND AND/OR THE IMPROVEMENTS;

N. ALL RIGHT, TITLE AND INTEREST OF TRUSTOR IN ANY INSURANCE POLICIES OR BINDERS NOW OR HEREAFTER REFERRED TO IN CLAUSES (A)-(M) AND (O)-(Q) INCLUDING ANY UNEARNED PREMIUMS THEREON;

O. ALL PROCEEDS, PRODUCTS, SUBSTITUTIONS AND ACCESSIONS (INCLUDING WITHOUT LIMITATION, CLAIMS AND DEMANDS THEREFOR) OF THE CONVERSION, VOLUNTARY OR INVOLUNTARY, OF ANY OF THE FOREGOING INTO CASH OR LIQUIDATED CLAIMS, INCLUDING, WITHOUT LIMITATION, PROCEEDS OF INSURANCE AND CONDEMNATION AWARDS;

P. ALL PRESENT AND FUTURE TAX REFUNDS RELATING TO THE PROPERTY. THE TERM "TAX" INCLUDES, WITHOUT LIMITATION, ALL REAL ESTATE AND PERSONAL PROPERTY TAXES, ASSESSMENTS AND IMPOSITIONS, WHETHER SPECIAL OR GENERAL, AND ANY SIMILAR GOVERNMENTAL CHARGES OR ASSESSMENTS THAT ARE LEVIED UPON THE PROPERTY; AND

Q. ALL OTHER OR GREATER RIGHTS AND INTERESTS OF EVERY NATURE IN THE LAND AND/OR THE IMPROVEMENTS AND IN THE POSSESSION OR USE THEREOF AND INCOME THEREFROM, WHETHER NOW OWNED OR HEREAFTER ACQUIRED BY TRUSTOR.

AS USED HEREIN, THE TERM "SECURITY INSTRUMENT" SHALL MEAN THAT CERTAIN DEED OF TRUST, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING BETWEEN TRUSTOR AND BENEFICIARY. ANY CAPITALIZED TERMS NOT SPECIFICALLY DEFINED HEREIN SHALL HAVE THE MEANING ASCRIBED THERETO IN THE SECURITY INSTRUMENT.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
355 South Grand Avenue, Suite 2900, Los Angeles, CA  90071

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF SIMOND LAVIAN IN SUPPORT OF MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 17, 2021   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Eryk R Escobar     eryk.r.escobar@usdoj.gov
- Mark S Horoupian     mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
- Michael S Kogan     mkogan@koganlawfirm.com
- Kenneth G Lau     kenneth.g.lau@usdoj.gov
- James R Selth     jim@wsrlaw.net, jselth@yahoo.com; eduardo@wsrlaw.net; gabby@wsrlaw.net; vinnet@ecf.inforuptcy.com
- Alan G Tippie     atippie@sulmeyerlaw.com, atippie@ecf.courtdrive.com; pdillamar@sulmeyerlaw.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Daniel J Weintraub     dan@wsrlaw.net, vinnet@ecf.inforuptcy.com; gabby@wsrlaw.net; eduardo@wsrlaw.net

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) February 17, 2021 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BY PERSONAL DELIVERY:**
**Hon. Sheri Bluebond**
**USBC-Central District of California**
**255 E. Temple Street**
**Suite 1534 / Courtroom 1539**
**Los Angeles, CA 90012**

☒ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 17, 2021 | Gilda S. Anderson | *Gilda S. Anderson* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**