1  Marsha A. Houston (SBN 129956)
Christopher O. Rivas (SBN 238765)
2  REED SMITH LLP
355 South Grand Avenue, Suite 2900
3  Los Angeles, CA  90071-1514
Telephone:    213.457.8000
4  Facsimile:    213.457.8080

5  Attorneys for Plaintiff
U.S. Real Estate Credit Holdings III-A, LP

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        LOS ANGELES DIVISION

11

12  In re                          Case Nos.    2:21-bk-11188-BB

13  GLENROY COACHELLA, LLC,        Chapter 11

14          Debtor.                **DECLARATION EDWIN LESLIE IN
                                   SUPPORT OF MOTION FOR THE
15                                 APPOINTMENT OF A CHAPTER 11
                                   TRUSTEE**
16

17

18                                   Date:   March 10, 2021
                                     Time:   10:00 a.m.
19                                   Place:  Courtroom 1539
                                             255 E. Temple Street
20                                           Los Angeles, CA  90012

21                                   Honorable Sheri Bluebond

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 1 -
DECLARATION OF EDWIN LESLIE

I, Edwin Leslie, declare:

1.    I am the receiver of certain real property located at the southeast corner of Avenue 48 and Van Buren Street, in Coachella, California (the "Property"), and was appointed as receiver by the Superior Court of California, County of Riverside.  I am over the age of 18, and I make this declaration based on my personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently thereto.

2.    The Property is owned by Debtor Glenroy Coachella, LLC ("Debtor"); and Force Rubin, LLC; Force Rubin 2, LLC, and Coachella Resort, LLC (together with the Debtor, the "Borrowers"), as tenants-in-common.

3.    Throughout the course of the state court litigation, Debtor's principals, Stuart Rubin ("Rubin") and Elliot Lander ("Lander"), have, without basis, asserted that I had and have an improper bias towards Plaintiff and a prejudice against Debtor and its principals, despite the fact they both stipulated to my appointment.

4.    Defendants have taken an adversarial approach to nearly everything that I have done.  For example, instead of cooperating with my discovery efforts, Rubin and Lander unsuccessfully sought to quash the subpoenas that were issued by me to gather information about the receivership estate in furtherance of my specific right to do so under the Order appointing me.

5.    Rubin and Lander repeatedly refused to participate in any meaningful dialogue with me regarding progress on the Debtor's attempts to refinance the Project, and in at least one instance stated that my discussions with a prospective take-out lender were improper.

6.    When I called an all hands telephone conference to discuss the status of the case, Rubin and Lander and their counsel refused to participate.

7.    Rubin and Lander failed and refused to cooperate with me regarding the preparation of tax returns for the Debtor.  On a number of occasions, I contacted Debtor to request information related to tax filings, including information on the engagement of a CPA or tax preparer, the location of source documents and copies of any prior tax returns.  Rubin ignored every request for information.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

8.      Without consultation with me or my knowledge, Rubin, acting on behalf of the Debtor, entered into an agreement with the City of Coachella relating to payment of lost revenues and taxes to ensure the project development agreement remained in place.  The development agreement was required for Rubin to maintain his marijuana dispensary license, and it appears that much of Rubin's efforts have been diverted from the construction project to this dispensary "side project".  Debtor repeated its actions by entering into a second agreement.  Attached as **Exhibits A, B and C**, are true and correct copies of the development agreement, memorandum of understanding, and amendment to memorandum of understanding reflecting Rubin's agreement with the city.

9.      Glenroy Coachella holds title to a 2019 Bentley financed by Porsche LSG.  The vehicle is in the possession of Rubin.   At least one lawsuit was filed to enforce the financing agreement.  The lender offered to dismiss the suit if the vehicle were returned.  Rubin purportedly cured the initial default, only to default again.  Rubin has ignored my demands to turn over the vehicle to me or return it to the finance company.

10.      While I have not been provided with full access to the Debtor's books and records, based on a preliminary review of the **limited information that has actually been provided by Rubin**, which documentation was reviewed by a forensic accountant engaged by the receiver, I have seen indicia that there have been significant distributions of funds from the Debtor prior to my appointment that may constitute avoidable transfers, including distributions that appear to have funded the construction of the non-borrower Lighthouse Dispensary.  Based upon this review, and tax returns provided by the borrower for prior years, I have determined that the Debtor may have "invested" approximately $1.8 million into the Lighthouse Dispensary.   I have also determined that the Debtor transferred in excess of  $1.0 Million from Mello-Roos financing that was not, based on the records that have been made available to me, used for the construction of the project on the Property.

11.      Debtor entered into a parking lot use agreement with the adjoining business owner, the Lighthouse Dispensary (a deal that benefitted Rubin and Lander), pursuant to which Debtor leased the lot to the marijuana dispensary.  But Debtor never collected any rent under that agreement and then took the side of the dispensary when I fenced off the parking lot after the natural

1  termination of the use agreement and the refusal of the Dispensary to pay rent that I demanded.  I

2  gave the Dispensary extensive notice of my intent to terminate the use agreement if an agreement

3  could not be reached.   The Dispensary ignored my notice until I began taking steps to terminate

4  their use.

5

6        I declare under penalty of perjury under the laws of the State of California that the foregoing

7  is true and correct.

8            Executed at Los Angeles, California on February 17, 2021.

9

10        *Edwin Leslie*
    _____
11        Edwin Leslie

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# Exhibit A

RECORDING REQUESTED BY AND         FOR RECORDER'S USE ONLY
WHEN RECORDED MAIL TO:
City of Coachella
1515 6th Street
Coachella CA 92236
Attn: City Clerk

Record for the Benefit of
the City of Coachella
Pursuant to Government Code Section 6103

_____

(Space Above This Line Reserved for Recorder's Use Only)


# GLENROY RESORT DEVELOPMENT AGREEMENT

# ORDINANCE NO. <u>1110</u>


## BY AND BETWEEN

## THE CITY OF COACHELLA

## AND

## GLENROY COACHELLA, LLC

**ORDINANCE NO. <u>1110</u>**

# GLENROY RESORT DEVELOPMENT AGREEMENT

THIS DEVELOPMENT AGREEMENT ("<u>Development Agreement</u>" or "<u>Agreement</u>") is made and entered into as of <u>February 15</u>, 2018 ("<u>Agreement Date</u>") by and between the CITY OF COACHELLA, a municipal corporation organized and existing under the laws of the State of California ("<u>City</u>"), and GLENROY COACHELLA, LLC, a California limited liability company ("<u>Developer</u>").  City and Developer are referred to individually as "<u>Party</u>," and collectively as the "<u>Parties</u>."

## RECITALS

This Agreement is entered upon the basis of the following facts, understandings and intentions of City and Developer.

A.       The lack of certainty in the approval of development projects can result in a waste of resources, escalate the cost of housing and other development, and discourage investment in and commitment to comprehensive planning that would make maximum efficient utilization of resources at the least economic cost to the public.

B.       In order to strengthen the public planning process, encourage private participation in comprehensive planning and reduce the economic costs and risk of development, the Legislature of the State of California enacted Section 65864 *et seq.* of the Government Code (the "<u>Development Agreement Legislation</u>"), which authorizes City and a developer having a legal or equitable interest in real property to enter into a binding development agreement, establishing certain development rights in the property.

C.       Pursuant to Government Code Section 65865, City has adopted rules and regulations establishing procedures and requirements for consideration of development agreements, which procedures and requirements are contained in City Municipal Code Chapter 17.100 (the "<u>City Development Agreement Regulations</u>").  This Development Agreement has been processed in accordance with the City Development Agreement Regulations.

D.       Developer has a legal interest in certain real property consisting of approximately 33.71 acres located at southeast corner of Avenue 48 and Van Buren Street, as more particularly described in <u>Exhibit A</u> attached hereto, and as depicted in <u>Exhibit B</u> attached hereto (the "<u>Property</u>").

E.       Developer intends to develop the Property as a hotel and retail project (defined more fully in Article 2 below as the "<u>Project</u>").

F.       The complexity, magnitude and long-range nature of the Project would be difficult for Developer to undertake if City had not determined, through this Development Agreement, to inject a sufficient degree of certainty in the land use regulatory process to justify the substantial financial investment associated with development of the Project.  As a result of the execution of this Development Agreement, both Parties can be assured that the Project can proceed without disruption caused by a change in City planning and development policies and

1

**ORDINANCE NO. <u>1110</u>**

requirements, which assurance will thereby reduce the actual or perceived risk of planning, financing and proceeding with construction of the Project.

G.      City is desirous of advancing the socioeconomic interests of City and its residents by promoting the productive use of property and encouraging quality development and economic growth, thereby enhancing employment opportunities for residents and expanding City's property tax base.  City is also desirous of gaining the public benefits associated with the Project, which are in addition to those dedications, conditions and exactions required by laws or regulations and as set forth in this Development Agreement, and which advance the planning objectives of, and provide benefits to, City.

H.      City has determined that by entering into this Development Agreement:  (1) City will ensure the productive use of property and foster orderly growth and quality development in City; (2) development will proceed in accordance with the goals and policies set forth in the City of Coachella General Plan (the "<u>General Plan</u>") and will implement City's stated General Plan policies; (3) City will receive substantially increased property tax and other tax revenues; and (4) City will benefit from increased employment opportunities for residents of City created by the Project.

I.      Developer has applied for, and City has granted, the Project Approvals (as defined in Section 1.4) in order to protect the interests of its citizens in the quality of their community and environment.  As part of the Project Approvals, City has undertaken, pursuant to the California Environmental Quality Act (Public Resources Code Section 21000 *et seq*., hereinafter "<u>CEQA</u>"), the required analysis of the environmental effects that would be caused by the Project and has determined those feasible mitigation measures which will eliminate, or reduce to an acceptable level, the adverse environmental impacts of the Project.  The environmental effects of the proposed development of the Property were originally analyzed by the Mitigated Negative Declaration (as defined in Section 1.4.1) approved by City on May 5, 2010 and October 11, 2017, in connection with the Project.  City has also adopted a mitigation monitoring and reporting program (the "<u>MMRP</u>") to ensure that those mitigation measures incorporated as part of, or imposed on, the Project are enforced and completed.  Those mitigation measures for which Developer is responsible are incorporated into, and required by, the Project Approvals.

J.      In addition to the Project Approvals, the Project may require various additional land use and construction approvals, termed Subsequent Approvals (as defined in Section 1.4.7), in connection with development of the Project.

K.      City has given the required notice of its intention to adopt this Development Agreement and has conducted public hearings thereon pursuant to Government Code Section 65867.  As required by Government Code Section 65867.5, City has found that the provisions of this Development Agreement and its purposes are consistent with the goals, policies, standards and land use designations specified in City's General Plan.

L.      On September 20, 2017, the City of Coachella Planning Commission ("<u>Planning Commission</u>"), the initial hearing body for purposes of development agreement review, recommended approval of this Development Agreement pursuant to Resolution No. <u>PC2017-07</u>.

**ORDINANCE NO. 1110**

On October 11, 2017, the City of Coachella City Council ("City Council") adopted its Ordinance No. 1110 approving this Development Agreement and authorizing its execution.

M.     For the reasons recited herein, City and Developer have determined that the Project is a development for which this Development Agreement is appropriate. This Development Agreement will eliminate uncertainty regarding Project Approvals (including the Subsequent Approvals), thereby encouraging planning for, investment in and commitment to use and development of the Property. Continued use and development of the Property will in turn provide substantial housing, employment, and property and sales tax benefits as well as other public benefits to City, and contribute to the provision of needed infrastructure for area growth, thereby achieving the goals and purposes for which the Development Agreement Legislation was enacted.

N.     The City has added Municipal Code Section 4.49 (Hotel Operations Incentive Program) to create an incentive program for the operation and maintenance of quality and first class hotel facilities which enhance the tourist and travel experience for visitors to the City of Coachella and this Project is eligible to apply for this incentive through the process set forth in the Municipal Code.

O.     The terms and conditions of this Development Agreement have undergone extensive review by City staff, its Planning Commission and its City Council at publicly noticed meetings and have been found to be fair, just and reasonable and in conformance with the City General Plan, the Development Agreement Legislation, and the City Development Agreement Regulations and, further, the City Council finds that the economic interests of City's residents and the public health, safety and welfare will be best served by entering into this Development Agreement.

P.     The City allows commercial cannabis activity, such as cultivation, manufacturing, testing, and distribution, in specific zones, but none of these uses are currently permitted at the Property. The City is assessing the possibility of allowing retail cannabis businesses in certain areas of the City, including the Property. Currently, retail cannabis businesses" or "retailers" are not permitted anywhere in the City.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, City and Developer agree as follows:

ARTICLE 1.
GENERAL PROVISIONS

1.1.    Parties.

1.1.1.    City. City is a California municipal corporation, with offices located at 1515 Sixth Street, Coachella CA 92236. "City," as used in this Development Agreement, shall include City and any assignee of or successor to its rights, powers and responsibilities.

3

**ORDINANCE NO. 1110**

1.1.2. <u>Developer</u>.  Developer shall refer initially to Glenroy Coachella, LLC, a Delaware limited liability company.  "Developer," as used in this Development Agreement, shall also include any permitted assignee or successor-in-interest as herein provided.

1.2.    <u>Property Subject to this Development Agreement</u>.

1.2.1.  <u>Property</u>.  All of the Property, as described in <u>Exhibit A</u> and shown in <u>Exhibit B</u>, shall be subject to this Development Agreement.

1.3.    <u>Term</u>.

1.3.1.  <u>Effective Date</u>.  This Development Agreement shall become effective upon the effectiveness of the ordinance approving this Agreement (the "<u>Effective Date</u>").

1.3.2.  <u>Term of the Agreement</u>.  The term of this Development Agreement shall commence upon the Effective Date and shall continue in full force and effect for a period of twenty years (the "<u>Initial Period</u>"), unless extended or earlier terminated as provided in this Agreement (including, without limitation, pursuant to Section 10.2).

1.4.    <u>Project Approvals</u>.  Developer has applied for and obtained various environmental and land use approvals and entitlements related to the development of the Project, as follows: The Project is a mixed-use development consisting of 130 single story resort bungalows with a total of 624 rooms, as well as an 8,050 square foot conference center (Building A), 2,000 square foot maintenance building (Building E), 12,000 square foot office, gym and food service building with an indoor entertainment area (Building F); a four story, 130 room hotel (Building H); a 3,600 square foot restaurant (Building G); a 3,120 square foot "retail cannabis business" or "retailer" as may be defined under the Coachella Municipal Code in the event such use is permitted under the Coachella Municipal Code (Building B); a 2,500 square foot general store (Building C), and a 2,500 square foot coffee shop with drive-through access (Building D).  The Project will be built in phases, with a portion of the resort bungalows being the first phase of construction.  The phasing of the development, including 76 resort bungalows and commercial development in Phase 1 and the hotel development and balance of the resort bungalows in Phase 2.

For purposes of this Development Agreement, the term "<u>Project Approvals</u>" shall mean all of the approvals, plans and agreements described in this Section 1.4.

1.4.1.  <u>Mitigated Negative Declaration.</u>  The Mitigated Negative Declaration was that approved with findings by the City Council on May 5, 2010 for the "Rancho Las Flores Master Plan" project, inclusive of the new Mitigated Negative Declaration that was approved for the "Glenroy Resort Project" on October 11, 2017 (the "<u>MND</u>")

1.4.2.  <u>Tentative Tract Map</u>.  On July 26, 2017, following Planning Commission review and recommendation, and after a duly noticed public hearing, the City Council approved Tentative Tract Map No. 37310.

4

**ORDINANCE NO. 1110**

   1.4.3. <u>Development Agreement</u>.  On October 11, 2017, following Planning Commission review and recommendation, and after a duly noticed public hearing, the City Council, by Ordinance No. <u>1110</u>, approved this Development Agreement and authorized its execution.  This Development Agreement also authorizes exceptions to the City's Outdoor Advertising Structure regulations and the City's Noise regulations under City Municipal Code Section 5.48.010 and  7.040.040 as set forth and depicted more fully in the Project Approvals.

   1.4.4.  <u>Architectural Review</u>.  On June 7, 2017, the City Planning Commission approved Architectural Review No. 17-07.

   1.4.5.  <u>Conditional Use Permit</u>.  This Agreement allows for the subsequent approvals by the Coachella Planning Commission of a Conditional Use Permit to allow the drive-through coffee shop and on-sale and off-sale alcoholic beverages for the hotel, nightclub, cocktail lounges and general store, respectively, as well as extended hours of sale.

   1.4.6.  <u>Exemption from Public Services CFD</u>.  Since the Glenroy Resort Project entails non-residential development exclusively, it is hereby acknowledged that the project is exempt from the Public Services Community Facilities District (CFD 2005-01).

   1.4.7.  <u>Subsequent Approvals</u>.  In order to develop the Project as contemplated in this Development Agreement, the Project may require land use approvals, architectural review for Buildings G and H, entitlements, development permits, and use and/or construction approvals other than those listed in Sections 1.4.1 through 1.4.6, above, which may include, without limitation: variance to allow for the Project to exceed three story height limit, noise regulations to allow for music until 4 am,  access easements, electronic billboard, electronic message board, special event permits, including extended hours during festival weekends, "retail cannabis business" or "retailer" as may be defined under the Coachella Municipal Code in the event such use is permitted under the Coachella Municipal Code, development plans, subdivision approvals, street abandonments, design review approvals, demolition permits, improvement agreements, infrastructure agreements, grading permits, building permits, right-of-way permits, lot line adjustments, site plans, certificates of occupancy, parcel maps, lot splits, landscaping plans, master sign programs, transportation demand management programs, encroachment permits, and amendments thereto and to the Project Approvals (collectively, "<u>Subsequent Approvals</u>").  At such time as any Subsequent Approval applicable to the Property is approved by the City, then such Subsequent Approval shall become subject to all the terms and conditions of this Development Agreement applicable to Project Approvals and shall be treated as a "Project Approval" under this Development Agreement.  The Project includes as a Subsequent Approval the vacation of the frontage road adjacent to the Property; the Parties acknowledge and agree that while the vacation hearing is anticipated to occur well in advance of the issuance of building permits for the Project, the resolution of vacation shall include a condition that the vacation shall not become effective until the issuance of building permits for the Project.

**ORDINANCE NO. 1110**

ARTICLE 2.

DEVELOPMENT OF THE PROPERTY

2.1.    <u>Project Development</u>.  Developer shall have a vested right to develop the Project on the Property, in accordance with the Vested Elements (defined in Section 2.2).

2.2.    <u>Vested Elements</u>.  The permitted uses of the Property, the maximum density and/or number of hotel rooms or suites, the intensity of use, the maximum height and size of the proposed buildings, provisions for reservation or dedication of land for public purposes, the conditions, terms, restrictions, and requirements for subsequent discretionary actions, the provisions for public improvements and financing of public improvements, and the other terms and conditions of development applicable to the Property are as set forth in:

a.    The General Plan of City on the Agreement Date, including the General Plan Amendments ("<u>Applicable General Plan</u>");

b.    The Zoning Ordinance of City on the Agreement Date ("<u>Applicable Zoning Ordinance</u>");

c.    Other rules, regulations, ordinances and policies of City applicable to development of the Property on the Agreement Date (collectively, together with the Applicable General Plan and the Applicable Zoning Ordinance, the "<u>Applicable Rules</u>"); and

d.    The Project Approvals, as they may be reasonably amended from time to time upon an amendment in accordance with Section 5.4.2 of this Agreement, are hereby vested in Developer, subject to, and as provided in, the provisions of this Development Agreement (the "<u>Vested Elements</u>").  City hereby agrees to be bound with respect to the Vested Elements, subject to Developer's compliance with the terms and conditions of this Development Agreement.  The intent of this Section 2.2 is to cause all development rights which may be required to develop the Project in accordance with the Project Approvals to be deemed to be "vested rights" as that term is defined under California law applicable to the development of land or property and the right of a public entity to regulate or control such development of land or property.

2.3.    <u>Development Construction Completion</u>.

2.3.1.    <u>Timing of Development; *Pardee* Finding</u>.    Because the California Supreme Court held in *Pardee Construction Co. v. City of Camarillo*, 37 Cal.3d 465 (1984), that the failure of the parties therein to provide for the timing of development resulted in a later-adopted initiative restricting the timing of development to prevail over the parties' agreement, it is the Parties' intent to cure that deficiency by acknowledging and providing that, subject to any infrastructure phasing requirements that may be required by the Project Approvals, Developer shall have the right (without obligation) to develop the Property in such order and at such rate and at such times as Developer deems appropriate within the exercise of its reasonable subjective business judgment.

**ORDINANCE NO. <u>1110</u>**

2.3.2. <u>Moratorium</u>. No City-imposed moratorium or other limitation (whether relating to the rate, timing or sequencing of the development or construction of all or any part of the Property, whether imposed by ordinance, initiative, resolution, policy, order or otherwise, and whether enacted by the City Council, an agency of City, the electorate, or otherwise) affecting parcel or subdivision maps (whether tentative, vesting tentative or final), building permits, occupancy certificates or other entitlements, issued or granted within City, or portions of City, shall apply to the Property to the extent such moratorium or other limitation is in conflict with this Agreement; provided, however, the provisions of this Section shall not affect City's compliance with moratoria or other limitations mandated by other governmental agencies or court-imposed moratoria or other limitations.

2.3.3. <u>No Other Requirements</u>. Nothing in this Development Agreement is intended to create any affirmative development obligations to develop the Project at all or in any particular order or manner, or liability in Developer under this Development Agreement if the development fails to occur.

2.4. <u>Effect of Project Approvals and Applicable Rules; Future Rules</u>.

2.4.1. <u>Governing Rules</u>. Except as otherwise explicitly provided in this Development Agreement, development of the Property shall be subject solely to (a) the Project Approvals, and (b) the Applicable Rules.

2.4.2. <u>Changes in Applicable Rules; Future Rules</u>.

a. To the extent any changes in the Applicable Rules, or any provisions of future General Plans, Specific Plans, Zoning Ordinances or other rules, regulations, ordinances or policies (whether adopted by means of ordinance, initiative, referenda, resolution, policy, order, moratorium, or other means, adopted by the City Council, Planning Commission, or any other board, commission, agency, committee, or department of City, or any officer or employee thereof, or by the electorate) of City (collectively, "<u>Future Rules</u>") are not in conflict with the Vested Elements, such Future Rules shall be applicable to the Project.

b. Prior to the Effective Date, the Parties shall have prepared two (2) sets of the Project Approvals and Applicable Rules, one (1) set for City and one (1) set for Developer. If it becomes necessary in the future to refer to any of the Project Approvals or Applicable Rules, the contents of these sets are presumed for all purposes of this Development Agreement, absent clear clerical error or similar mistake, to constitute the Project Approvals and Applicable Rules.

2.4.3. <u>Changes in State or Federal Laws</u>. In accordance with California Government Code Section 65869.5, in the event that state or federal laws or regulations enacted after the Effective Date ("<u>State or Federal Law</u>") prevent or preclude compliance with one or more provisions of this Agreement, the Parties shall meet in good faith to determine the feasibility of any modification or suspension of this Agreement that may be necessary to comply with such State or Federal Law and to determine the effect such modification or suspension would have on the purposes and intent of this Agreement and the Vested Elements. City shall provide written notice to Developer of any proposed or enacted State or Federal Law that could affect this Agreement within five (5) business days of the City learning of such proposed or

7

**ORDINANCE NO. <u>1110</u>**

enacted State or Federal Law.  Following the meeting between the Parties, the provisions of this Development Agreement may, to the extent feasible, and upon mutual agreement of the Parties, be modified or suspended, but only to the minimum extent necessary to comply with such State or Federal Law.  In such an event, this Development Agreement together with any required modifications shall continue in full force and effect.  In the event that the State or Federal Law operates to frustrate irremediably and materially the vesting of development rights to the Project as set forth in this Agreement, Developer may terminate this Agreement.  In addition, Developer shall have the right to challenge (by any method, including litigation) the State or Federal Law preventing compliance with, or performance of, the terms of this Development Agreement and, in the event that such challenge is successful, this Development Agreement shall remain unmodified and in full force and effect, unless the Parties mutually agree otherwise, except that if the Term of this Development Agreement would otherwise terminate during the period of any such challenge and Developer has not commenced with the development of the Project in accordance with this Development Agreement as a result of such challenge, the Term shall be extended for the period of any such challenge.

2.4.4.   <u>Conflicts</u>.  In the event of an irreconcilable conflict between the provisions of the Project Approvals (on the one hand) and the Applicable Rules (on the other hand), the provisions of the Project Approvals shall apply.  In the event of a conflict between the Project Approvals (on the one hand) and this Development Agreement, in particular, (on the other hand), the provisions of Project Approvals shall control, unless expressly modified by this Development Agreement.

2.5.   <u>Processing Subsequent Approvals</u>.

2.5.1.   <u>Processing of Subsequent Approvals</u>.  City will act reasonably to accept, make completeness determinations, and process, promptly and diligently, to completion all applications for Subsequent Approvals for the Project, in accordance with the terms of this Development Agreement, including, but not limited to, the following:

a.   the processing of applications for and issuance of all discretionary approvals requiring the exercise of judgment and deliberation by City, including without limitation, the Subsequent Approvals;

b.   the holding of any required public hearings;

c.   the processing of applications for and issuing of all ministerial approvals requiring the determination of conformance with the Applicable Rules, including, without limitation, site plans, development plans, land use plans, grading plans, improvement plans, building plans and specifications, and ministerial issuance of one or more final maps, zoning clearances, demolition permits, grading permits, improvement permits, wall permits, building permits, lot line adjustments, encroachment permits, temporary use permits, sign permits, certificates of use and occupancy and approvals and entitlements and related matters as may be necessary for the completion of the development of the Property ("<u>Ministerial Approvals</u>").

8

**ORDINANCE NO. <u>1110</u>**

To the extent that additional information is required from Developer to process an application for a Subsequent Approval, City shall notify Developer in writing of all such additional materials within ten (10) day of Developer's initial submission, and City shall process to completion all such applications with reasonable diligence. In the event that Developer submits multiple applications for Subsequent Approvals concurrently, the City shall consider all such requests concurrently unless otherwise requested by Developer.

2.5.2   <u>State License Approvals.</u>  City will act reasonably, promptly, diligently and cooperatively with regard to all State licensure requests. Within fifteen days of receipt of any request for authorization, statement of compliance, or other similar request pursuant to State laws including but not limited to Business & Professions Code section 26055, the City shall provide the authorization, statement of compliance, or response to a similar request from state licensing authorities.

2.6.    <u>Development Fees, Exactions; and Conditions.</u>

2.6.1.   <u>General</u>. All fees, exactions, dedications, reservations or other impositions to which the Project would be subject, but for this Development Agreement, are referred to in this Development Agreement either as "Processing Fees," (as defined in Section 2.6.2) or "Impact Fees" (as defined in Section 2.6.3).

2.6.2.   <u>Processing Fees</u>. "<u>Processing Fees</u>" mean fees charged on a citywide basis to cover the cost of City review of applications for any permit or other review by City departments. Applications for Subsequent Approvals for the Project shall be charged Processing Fees to allow City to recover its actual and reasonable costs of processing Developer's Subsequent Approvals with respect to the Project.

2.6.3.   <u>Impact Fees</u>.   "<u>Impact Fees</u>" means monetary fees, exactions or impositions, other than taxes or assessments, whether established for or imposed upon the Project individually or as part of a class of projects, that are imposed by City on the Project in connection with any Project Approval for the Project for any purpose, including, without limitation, defraying all or a portion of the cost of public services and/or facilities construction, improvement, operation and maintenance attributable to the burden created by the Project. Any fee, exaction or imposition imposed on the Project which is not a Processing Fee is an Impact Fee. No Impact Fees shall be applicable to the Project except as provided in this Development Agreement. City understands that long-term assurances by City concerning Impact Fees were a material consideration for Developer agreeing to develop the Project, to pay the Impact Fees set forth in <u>Exhibit C</u> of this Development Agreement and to provide the public benefits associated with the Project.

b.    For a period of twenty (20) years from the Effective Date (the "<u>Fee Limitation Period</u>"), only the specific Impact Fees listed in <u>Exhibit C</u> shall apply to the Project, except as otherwise explicitly permitted by this Section 2.6.3(a).   Any Impact Fees levied against or applied to the Project must be consistent with the provisions of applicable California law, including the provisions of Government Code Section 66000 *et seq.* ("<u>AB 1600</u>"). Developer retains all rights set forth in California Government Code Section 66020. Nothing in

9

**ORDINANCE NO. <u>1110</u>**

this Development Agreement shall diminish or eliminate any of Developer's rights set forth in such section.

    2.6.4.  <u>Conditions of Subsequent Approvals</u>.

      a.   In connection with any Subsequent Approvals, City shall have the right to impose reasonable conditions including, without limitation, normal and customary dedications for rights of way or easements for public access, utilities, water, sewers, and drainage necessary for the Project; provided, however, such conditions and dedications shall not be inconsistent with the Applicable Rules or Project Approvals, nor inconsistent with the development of the Project as contemplated by this Agreement. Developer may protest any conditions, dedications or fees while continuing to develop the Property.

      b.   No conditions imposed on Subsequent Approvals shall require dedications or reservations for, or construction or funding of, public infrastructure or public improvements beyond those already included in the MMRP. In addition, any and all conditions imposed on Subsequent Approvals for the Project must comply with Sections 2.6.2 and 2.6.3 herein.

    2.7.  <u>Public Services</u>. City hereby acknowledges that it will have, and shall reserve, sufficient capacity in its infrastructure and services, including, without limitation, traffic circulation, storm drainage, and flood control, as and when necessary to serve the Project as it is developed. To the extent that City renders such services or provides such utilities, City hereby agrees that it will serve the Project and that there shall be no restriction on hookups or service for the Project except for reasons beyond City's control.

    2.8.  <u>Taxes and Assessments</u>.

    2.8.1.  <u>Assessment Districts or Other Funding Mechanisms</u>. City is unaware of any pending efforts to initiate, or consider applications for new or increased assessments covering the Property, or any portion thereof, except for the creation of a community facilities district on the Property being handled by separate process. City understands that long-term assurances by City concerning fees, taxes and assessments were a material consideration for Developer agreeing to process the siting of the Project in its present location and to pay long-term fees, taxes and assessments described in this Agreement. City shall retain the ability to initiate or process applications for the formation of new assessment districts covering all or any portion of the Property. Subject to the provisions of Section 2.6 above, City may impose new taxes and assessments, other than Impact Fees, on the Property in accordance with the then-applicable laws, but only if such taxes or assessments are adopted by or after City-wide voter or City-wide landowner approval of such taxes or assessments and are equally imposed on other land and projects of the same category within the jurisdiction of City, and, as to assessments, only if the impact thereof does not fall disproportionately on the Property vis-à-vis the other land and projects within City's jurisdiction or the portion of City's jurisdiction subject to the assessment. Nothing herein shall be construed so as to limit Developer from exercising whatever rights it may otherwise have in connection with protesting or otherwise objecting to the imposition of taxes or assessments on the Property. In the event as assessment district is lawfully formed to provide funding for services, improvements, maintenance or facilities which

**ORDINANCE NO. 1110**

are substantially the same as those services, improvements, maintenance or facilities being funded by the fees or assessments to be paid by Developer under the Project Approvals or this Agreement, such fees or assessments to be paid by Developer shall be subject to reduction/credit in an amount equal to Developer's new or increased assessment under the assessment district. Alternatively, the new assessment district shall reduce/credit Developer's new assessment in an amount equal to such fees or assessments to be paid by Developer under the Project Approvals or this Agreement.

2.9.    Life of Project Approvals and Subdivision Maps.

2.9.1.    Life of Subdivision Maps.    The terms of any tentative subdivision or parcel map for the Property, any amendment or reconfiguration thereto, or any subsequent tentative map, shall be automatically extended such that such tentative maps remain in effect for a period of time coterminous with the term of this Development Agreement.

2.9.2.    Life of Other Project Approvals.    The term of all other Project Approvals shall be automatically extended such that these Project Approvals remain in effect for a period of time at least as long as the term of this Development Agreement.

2.9.3.    Termination of Agreement.    In the event that this Agreement is terminated prior to the expiration of the Term of the Agreement, the term of any subdivision or parcel map or any other Project Approval and the vesting period for any final subdivision map approved as a Project Approval shall be the term otherwise applicable to the approval, which shall commence to run on the date that the Project Approval was granted or as otherwise provided by applicable law.

2.10.    Further CEQA Environmental Review.    The MND, which has been approved by City as being in compliance with CEQA, addresses the potential environmental impacts of the entire Project as it is described in the Project Approvals.    Nothing in this Development Agreement shall be construed to require CEQA review of Ministerial Approvals.    It is agreed that, in acting on any discretionary Subsequent Approvals for the Project, City will rely on the MND and the mitigations imposed pursuant thereto to satisfy the requirements of CEQA to the fullest extent permissible by CEQA and City will not require a new initial study, negative declaration or environmental impact report unless required by CEQA.

2.11.    Design/Development Standards.    The Project consists of a hotel, resort and retail development as set forth in the Project Approvals.    The Project's height, parking requirements, and set back requirements shall be as Project Approvals for the Project.

2.12.    Developer's Right to Rebuild.    Developer may renovate or rebuild the Project within the Term of this Agreement should it become necessary due to natural disaster, changes in seismic requirements, destruction by fire or other casualty or should the buildings located within the Project become functionally outdated, within Developer's sole discretion, due to changes in technology.    Any such renovation or rebuilding shall be subject to the Vested Elements, shall comply with the Project Approvals, the Building Regulations existing at the time of such rebuilding or reconstruction, and the requirements of CEQA.    Notwithstanding the foregoing, City acknowledges that, due to market conditions at the time of such rebuilding or

11

**ORDINANCE NO. 1110**

reconstruction, Developer may, in its sole discretion, seek to modify the density or ratio of hotel rooms or suites, as necessary to meet then current market conditions, which such modification the City acknowledges would be consistent with the Project Approvals so long as such modification does not result in an overall net increase in the building square footage or the combined total number of hotel rooms or suites. In no case, however, shall Developer be required to modify the density or ratio of hotel rooms or suites.

2.13. <u>Written Verification of Sufficient Water Supply</u>. Any and all tentative subdivision maps approved for the Project shall comply with Government Code Section 66473.7, if, and to the extent, required by Government Code Section 65867.5(c).

ARTICLE 3.
ADDITIONAL RIGHTS AND OBLIGATIONS OF THE PARTIES; ALLOCATIONS OF
RIGHTS AND OBLIGATIONS OF THE PARTIES

3.1. <u>Public Infrastructure</u>. In conjunction with construction of the Project, Developer shall construct the following public improvements:

a) Off-site improvements along Van Buren Street including removal of overhead power lines, roadway widening, curb, gutter, sidewalk, street lights, utility infrastructure, and landscaping.

b) Off-site improvements along Avenue 48 including roadway widening, curb, gutter, sidewalk, street lights, utility infrastructure, and landscaping.

c) Improvements to the Rancho Las Flores Park Retention Basin which will be re-engineered in order to create a secondary access from the project site onto Mitchell Drive (over an easement to be granted by City).

d) On-site improvements for public utilities including water, sewer, and dry utilities.

e) Retrofitting of existing Rancho Las Flores Park perimeter fence along common property boundary on south side of project site in order to create a privacy wall up to 9 feet in height.

The above improvements shall be conveyed to City in accordance with the terms of this Article 3 (the "<u>Public Infrastructure</u>"). Upon the completion of the Project improvements by Developer, City shall cause the following "City Improvements" to be completed: based on the approved Phasing Plan for the project, pursuant to Architectural Review No. 17-07. City shall not be required to complete this work until the Project improvements are complete and in operation. It is further recognized that the above improvements may be satisfied by future improvement agreements with the City, and/or through a City capital improvement project.

3.1.1. <u>Acceptance; Maintenance</u>. Upon completion of any and all Public Infrastructure to be completed by Developer, Developer shall offer for dedication to City from time to time as such Public Infrastructure is completed, and City shall, acting reasonably, promptly accept from Developer the completed Public Infrastructure (and release to Developer

12

**ORDINANCE NO. 1110**

any bonds or other security posted in connection with performance thereof in accordance with the terms of such bonds), and thereafter City shall maintain the Public Infrastructure. Developer may offer dedication of Public Infrastructure in phases and the City shall not unreasonably refuse to accept such phased dedications or unreasonably refuse phased releases of bonds or other security so long as all other conditions for acceptance have been satisfied.

3.2.    Public Improvements.    City shall use its best efforts to work with Developer to ensure that all Public Infrastructure in connection with the Project is (i) designed and constructed in accordance with all applicable City standards, (ii) reviewed and accepted by City in the most expeditious fashion possible, and (iii) maintained by City after acceptance, including, without limitation, maintenance of the public parks. Developer (or its affiliates or contractor(s)) shall be responsible for obtaining all permits and approvals necessary for development of the public infrastructure.

3.3    Prevailing Wage.    Developer has been alerted to the requirements of California Labor Code Sections 1720 et seq. and 1770 et seq. (the "Prevailing Wage Laws"), which require the payment of prevailing wage rates and the performance of other requirements on certain "public works" and "maintenance" projects. If the work to be performed under this Agreement by Developer is being performed as part of an applicable "public works" or "maintenance" project, as defined by the Prevailing Wage Laws, Developer agrees to fully comply with such Prevailing Wage Laws. Developer shall defend, indemnify and hold the City, its officials, officers, employees and agents free and harmless from any claims, liabilities, costs, penalties or interest arising out of any failure or alleged failure to comply with the Prevailing Wage Laws. It shall be mandatory upon the Developer and its contractors to comply with all California Labor Code provisions, which include but are not limited to prevailing wages (Labor Code Sections 1771, 1774 and 1775), employment of apprentices (Labor Code Section 1777.5), certified payroll records (Labor Code Section 1776), hours of labor (Labor Code Sections 1813 and 1815), public works contractor registration (Labor Code Sections 1725.5 and 1771.1) and debarment of contractors and subcontractors (Labor Code Sections 1777.1). It shall be the sole responsibility of Developer to determine whether to comply with Prevailing Wage Laws for any or all work required by this Agreement. As a material part of this Agreement, Developer agrees to assume all risk of liability arising from any decision not to comply with Prevailing Wage Laws for work required by this Agreement.

3.4    Economic Development Requirements of Project.

3.4.1    The Developer of the Project shall provide free use of meeting space for public entities and not-for-profit Coachella based charities and community organizations, subject to availability and not to interfere with conflicting reservations.

3.4.2    The Developer shall provide the City with use of a six-room suite for economic development purposes, subject to availability and not to interfere with conflicting reservations.

13

**ORDINANCE NO. 1110**

       3.4.3   The Developer shall support a Workforce Training Program between the hotel developments in the Project, the College of the Desert Hospitality Management Program, and the Coachella Valley High School Hospitality Academy.

ARTICLE 4.
ANNUAL REVIEW

    4.1.   <u>Annual Review</u>.  The annual review required by California Government Code Section 65865.1 and Section 25.37.070 of the City Municipal Code shall be conducted for the purposes and in the manner stated in those laws as further provided herein.  As part of that review, City and Developer shall have a reasonable opportunity to assert action(s) that either Party reasonably believes have not been undertaken in accordance with this Development Agreement, to explain the basis for such assertion, and to receive from the other Party a justification for the other Party's position with respect to such action(s), and to take such actions as permitted by law.  The procedure set forth in this Article shall be used by Developer and City in complying with the annual review requirement.

    4.2.   <u>Commencement of Process</u>.  The Director of City's Department of Community Development/Planning (the "<u>Planning Director</u>") shall commence the annual review process by notifying Developer in writing at least forty-five (45) days prior to the anniversary of the Effective Date each year that the annual review process shall commence as specified in Section 4.1.  Failure of Planning Director to send such notification shall be deemed to extend the time period in which annual review is required until at least forty-five (45) days after such notice is provided.  City's failure to perform an annual review pursuant to the terms of this Article 4 shall not constitute or be asserted as a default by Developer.

    4.3.   <u>Developer Compliance Letter</u>.  Not more than thirty (30) days after receipt of the Planning Director's notice pursuant to Section 4.2, Developer shall submit a letter to the Planning Director demonstrating Developer's good faith compliance with the material terms and conditions of this Development Agreement and shall include in the letter a statement that the letter is being submitted to City pursuant to the requirements of Government Code Section 65865.1.

    4.4.   <u>Planning Director Review</u>.  Within thirty (30) days after the receipt of Developer's letter, the Planning Director shall review Developer's submission and reasonably determine whether Developer has, for the year under review, demonstrated good faith compliance with the material terms and conditions of this Development Agreement.

    4.5.   <u>Planning Director Compliance Finding</u>.  If the Planning Director finds that Developer has so complied, the Planning Director shall schedule the annual review for the next available meeting of the Planning Commission and shall prepare a staff report to the Planning Commission, which shall include, in addition to Developer's letter, (i) a demonstration of City's good faith compliance with the material terms and conditions of this Development Agreement; and (ii) the Planning Director's recommendation that the Planning Commission find Developer to be in good faith compliance with the material terms and conditions of this Development Agreement.

14

**ORDINANCE NO. <u>1110</u>**

     4.6.   <u>Planning Director Noncompliance Finding</u>.  If the Planning Director (or the Planning Commission, on review of the Planning Director's recommendation pursuant to Section 4.5) reasonably finds and determines that there is substantial evidence that Developer has not complied in good faith with the material terms and conditions of this Development Agreement and that Developer is in material breach of this Development Agreement for the year under review, the Planning Director shall issue and deliver to Developer a written "<u>Notice of Alleged Default</u>" specifying in detail the nature of the failures in performance that the Planning Director (or Planning Commission) reasonably claim constitutes material noncompliance, all facts demonstrating substantial evidence of material noncompliance, and the manner in which such noncompliance may be satisfactorily cured in accordance with the Development Agreement.  In the event that the material noncompliance, if proven to be true, would qualify an Event of Default pursuant to Article 6 herein, the Parties shall be entitled to their respective rights and obligations under both Articles 4 and 6 herein, except that the particular entity allegedly in default shall be accorded only one of the 60-day cure periods referred to in Sections 4.7 and 6.1 herein.

     4.7.   <u>Cure Period</u>.  If the Planning Director or Planning Commission reasonably finds that Developer is not in compliance, the Planning Director shall grant a reasonable period of time for Developer to cure the alleged noncompliance.  The Planning Director shall grant a cure period of at least thirty (30) days and shall extend the thirty (30) day period if Developer is proceeding in good faith to cure the noncompliance and additional time is reasonably needed.  At the conclusion of the cure period, the Planning Director shall either (i) find that Developer is in compliance and refer the matter to the Planning Commission as specified in Section 4.5; or (ii) find that Developer is not in compliance and refer the matter to the Planning Commission as specified in Section 4.8.

     4.8.   <u>Referral of Noncompliance to Planning Commission</u>.  The Planning Director shall refer the alleged default to the Planning Commission if Developer fails to cure the alleged noncompliance to the Planning Director's reasonable satisfaction during the prescribed cure period and any extensions thereto.  In addition, the Planning Director shall refer the alleged noncompliance to the Planning Commission if Developer requests a hearing before the Planning Commission to review the Planning Director's determination of non-compliance.  The Planning Director shall prepare a staff report to the Planning Commission which shall include, in addition to Developer's letter, if any, (i) demonstration of City's good faith compliance with the terms and conditions of this Development Agreement; (ii) the Notice of Alleged Default; and (iii) a description of any cure undertaken by Developer during the cure period.

     4.9.   <u>Delivery of Documents</u>.  At least five (5) days prior to any City hearing regarding Developer's compliance with this Development Agreement, City shall deliver to Developer all staff reports and all other relevant documents pertaining to the hearing.

     4.10.  <u>Planning Commission Compliance Finding</u>.  If the Planning Commission, following a noticed public hearing pursuant to Section 4.5 or 4.8, determines that Developer is in compliance with the material terms and conditions of this Development Agreement, and that determination is not appealed to the City Council, the annual review shall be deemed concluded.

**ORDINANCE NO. <u>1110</u>**

City shall, at Developer's request, issue and have recorded a Certificate of Compliance indicating Developer's compliance with the terms of this Development Agreement.

4.11.  <u>Planning Commission Noncompliance Finding; Referral to City Council</u>.  If the Planning Commission, at a properly noticed public hearing pursuant to Section 4.5 or 4.8, reasonably finds and determines, on the basis of substantial evidence, that Developer has not complied in good faith with the material terms or conditions of this Development Agreement and that Developer is in material breach of this Development Agreement, Developer shall have a reasonable time determined by the Planning Commission to meet the reasonable terms of compliance approved by the Planning Commission, which time shall be not less than fifteen (15) days.  If Developer does not complete the terms of compliance within the time specified, the Planning Commission shall forward its recommendations to the City Council and the City Council shall hold a public hearing regarding termination or modification of this Development Agreement.  Notification of intention to modify or terminate this Development Agreement shall be delivered to Developer by certified mail containing: (i) the time and place of the City Council hearing; (ii) a statement as to whether City proposes to terminate or modify this Development Agreement and the terms of any proposed modification; and (iii) any other information reasonably necessary to inform Developer of the nature of the proceedings.  At the time of the hearing, Developer shall be given an opportunity to be heard.  The City Council may impose conditions to the action it takes as necessary to protect the interests of City; provided that any modification or termination of this Development Agreement pursuant to this provision shall bear a reasonable nexus to, and be proportional in severity to the magnitude of, the alleged breach, and in no event shall termination be permitted except in accordance with Article 6 herein.

4.12.  <u>Relationship to Default Provisions</u>.  The above procedures shall supplement and shall not replace that provision of Section 6.4 of this Development Agreement whereby either City or Developer may, at any time, assert matters which either Party believes have not been undertaken in accordance with this Development Agreement by delivering a written Notice of Alleged Default and following the procedures set forth in said Section 6.4.

ARTICLE 5.<br>AMENDMENTS

5.1.  <u>Amendments to Development Agreement Legislation</u>.  This Development Agreement has been entered into in reliance upon the provisions of the Development Agreement Legislation as those provisions existed at the Agreement Date.  No amendment or addition to those provisions or any other federal or state law and regulation that would materially adversely affect the interpretation or enforceability of this Development Agreement or would prevent or preclude compliance with one or more provisions of this Development Agreement shall be applicable to this Development Agreement unless such amendment or addition is specifically required by the change in law, or is mandated by a court of competent jurisdiction.  In the event of the application of such a change in law, the Parties shall meet in good faith to reasonably determine the feasibility of any modification or suspension that may be necessary to comply with such new law or regulation and to determine the effect such modification or suspension would have on the purposes and intent of this Development Agreement and the Vested Elements.

16

**ORDINANCE NO. 1110**

Following the meeting between the Parties, the provisions of this Development Agreement may, to the extent feasible, and upon mutual agreement of the Parties, be modified or suspended but only to the minimum extent necessary to comply with such new law or regulation. If such amendment or change is permissive (as opposed to mandatory), this Development Agreement shall not be affected by same unless the Parties mutually agree in writing to amend this Development Agreement to permit such applicability. Developer and/or City shall have the right to challenge any new law or regulation preventing compliance with the terms of this Agreement, and in the event such challenge is successful, this Agreement shall remain unmodified and in full force and effect. The Term of this Agreement may be extended for the duration of the period during which such new law or regulation precludes compliance with the provisions of this Agreement.

5.2.    Amendments to or Cancellation of Development Agreement. This Development Agreement may be amended from time to time or canceled in whole or in part by mutual consent of both Parties in writing in accordance with the provisions of the Development Agreement Legislation and the City Development Agreement Regulations. Review and approval of an amendment to this Development Agreement shall be strictly limited to consideration of only those provisions to be added or modified. No amendment, modification, waiver or change to this Development Agreement or any provision hereof shall be effective for any purpose unless specifically set forth in a writing that expressly refers to this Development Agreement and signed by the duly authorized representatives of both Parties. All amendments to this Development Agreement shall automatically become part of the Project Approvals.

5.3.    Amendments to Project Approvals. Notwithstanding any other provision of this Development Agreement, Developer may seek and City may review and grant amendments or modifications to the Project Approvals (including the Subsequent Approvals) subject to the following (except that the procedures for amendment of this Development Agreement are set forth in Section 5.2 herein).

5.3.1.    Amendments to Project Approvals. Project Approvals (except for this Development Agreement the amendment process for which is set forth in Section 5.2) may be amended or modified from time to time, but only with the written consent of both Developer and the City (in their respective sole discretion) and in accordance with Section 2.4. All amendments to the Project Approvals shall automatically become part of the Project Approvals. The permitted uses of the Property, the maximum density, the intensity of use, the maximum height and size of the proposed buildings, provisions for reservation or dedication of land for public purposes, the conditions, terms, restrictions and requirements for subsequent discretionary actions, the provisions for public improvements and financing of public improvements, and the other terms and conditions of development as set forth in all such amendments shall be automatically vested pursuant to this Development Agreement, without requiring an amendment to this Development Agreement. Amendments to the Project Approvals shall be governed by the Project Approvals and the Applicable Rules, subject to Section 2.4.

17

**ORDINANCE NO. 1110**

## ARTICLE 6.
### DEFAULT, REMEDIES AND TERMINATION

6.1.    <u>Events of Default</u>.  Subject to any extensions of time by mutual consent of the Parties in writing, and subject to the provisions of Section 10.2 hereof regarding permitted delays and a Mortgagee's right to cure pursuant to Section 9.3 hereof, any failure by either Party to perform any material term or provision of this Development Agreement (not including any failure by Developer to perform any term or provision of any other Project Approvals) shall constitute an "<u>Event of Default</u>," (i) if such defaulting Party does not cure such failure within thirty (30) days (such thirty (30) day period is not in addition to any cure period under Section 4.7, if Section 4.7 is applicable) following written notice of default from the other Party, where such failure is of a nature that can be cured within such thirty (30) day period, or (ii) if such failure is not of a nature which can be cured within such thirty (30) day period, the defaulting Party does not within such thirty (30) day period commence substantial efforts to cure such failure, or thereafter does not within a reasonable time prosecute to completion with diligence and continuity the curing of such failure.  Any notice of default given hereunder shall specify in detail the nature of the failures in performance that the noticing Party claims constitutes the Event of Default, all facts constituting substantial evidence of such failure, and the manner in which such failure may be satisfactorily cured in accordance with the terms and conditions of this Development Agreement.  During the time periods herein specified for cure of a failure of performance, the Party charged therewith shall not be considered to be in default for purposes of (a) termination of this Development Agreement, (b) institution of legal proceedings with respect thereto, or (c) issuance of any approval with respect to the Project.  The waiver by either Party of any default under this Development Agreement shall not operate as a waiver of any subsequent breach of the same or any other provision of this Development Agreement.

6.2.    <u>Meet and Confer</u>.  During the time periods specified in Section 6.1 for cure of a failure of performance, the Parties shall meet and confer in a reasonably timely and responsive manner, to attempt to resolve any matters prior to litigation or other action being taken, including without limitation any action in law or equity; provided, however, nothing herein shall be construed to extend the time period for this meet and confer obligation beyond the 30-day cure period referred to in Section 6.1 (even if the 30-day cure period itself is extended pursuant to Section 6.1(ii)) unless the Parties agree otherwise in writing.

6.3.    <u>Remedies and Termination</u>.  If, after notice and expiration of the cure periods and procedures set forth in Sections 6.1 and 6.2, the alleged Event of Default is not cured, the non-defaulting Party, at its option, may institute legal or judicial reference proceedings pursuant to Section 6.4 or 6.6 of this Development Agreement and/or terminate this Development Agreement pursuant to Section 6.7 herein.  In the event that this Development Agreement is terminated pursuant to Section 6.7 herein and litigation or judicial reference is instituted that results in a final decision that such termination was improper, then this Development Agreement shall immediately be reinstated as though it had never been terminated.

**ORDINANCE NO. 1110**

    6.4.   Legal Action by Parties.

        6.4.1.  Remedies.  Either Party may, in addition to any other rights or remedies, institute legal action to cure, correct or remedy any default, enforce any covenant or agreement herein, enjoin any threatened or attempted violation thereof, enforce by specific performance the obligations and rights of the Parties hereto or to obtain any remedies consistent with the purpose of this Development Agreement.  All remedies shall be cumulative and not exclusive of one another, and the exercise of any one or more of these remedies shall not constitute a waiver or election with respect to any other available remedy.  Without limiting the foregoing, Developer reserves the right to challenge in court any Future Rules that would conflict with the Vested Elements or the Subsequent Approvals for the Project or reduce the development rights provided by the Project Approvals.

        6.4.2.  No Damages.  In no event shall either Party, or its boards, commissions, officers, agents or employees, be liable in damages for any default under this Development Agreement, it being expressly understood and agreed that the sole legal remedy available to either Party for a breach or violation of this Development Agreement by the other Party shall be an action in mandamus, specific performance or other injunctive or declaratory relief to enforce the provisions of this Development Agreement by the other Party, or to terminate this Development Agreement.  This limitation on damages shall not preclude actions by a Party to enforce payments of monies or the performance of obligations requiring an obligation of money from the other Party under the terms of this Development Agreement including, but not limited to obligations to pay attorneys' fees and obligations to advance monies or reimburse monies.  In connection with the foregoing provisions, each Party acknowledges, warrants and represents that it has been fully informed with respect to, and represented by counsel of such Party's choice in connection with, the rights and remedies of such Party hereunder and the waivers herein contained, and after such advice and consultation has presently and actually intended, with full knowledge of such Party's rights and remedies otherwise available at law or in equity, to waive and relinquish such rights and remedies to the extent specified herein, and to rely to the extent herein specified solely on the remedies provided for herein with respect to any breach of this Development Agreement by the other Party.

    6.5.   Effects of Litigation.  In the event that litigation is timely instituted, and a final judgment is obtained, which invalidates in its entirety this Development Agreement, then Developer shall have no obligations whatsoever under this Development Agreement.  In the event that any payment(s) have been made by or on behalf of Developer to City pursuant to the obligations contained in Section 2.6, City shall give to Developer a refund of the monies remaining in any segregated City account into which such payment(s) were deposited, if any, along with interest which has accrued, if any.  To the extent the payment(s) made by or on behalf of Developer were not deposited, or no longer are, in the segregated City account, City shall give Developer a credit for the amount of said payment(s) as determined pursuant to this Section 6.5, along with interest, if any, that has accrued, which credit may be applied by Developer to any costs or fees imposed by City on Developer in connection with construction or development within or outside the Property.  Developer shall be entitled to use all or any portion of the credit at its own discretion until such time as the credit has been depleted.  Any credits due to

**ORDINANCE NO. <u>1110</u>**

Developer pursuant to this Section 6.5 may, at Developer's own discretion, be transferred by Developer to a third party for application by said third party to any costs or fees imposed by City on the third party in connection with construction or the development of property within City, whether or not related to the Project. In the event that Developer has already developed or is developing a portion of the Project at the time of any invalidation of the Development Agreement, then any such refund or credit shall be limited to the amount paid by Developer that exceeds, on a pro rata basis, the proportion and uses of the Property retained by Developer to the entire Property. This Section 6.5 shall survive the termination or expiration of this Development Agreement.

6.6. <u>Judicial Reference</u>. Pursuant to Code of Civil Procedure Section 638, et seq., all legal actions shall be heard by a referee who shall be a retired judge from either the Riverside County Superior Court, the California Court of Appeal, the United States District Court or the United States Court of Appeals, provided that the selected referee shall have experience in resolving land use and real property disputes. Developer and City shall agree upon a single referee who shall then try all issues, whether of fact or law, and report a finding and judgment thereon and issue all legal and equitable relief appropriate under the circumstances of the controversy before such referee. If Developer and City are unable to agree on a referee within ten (10) days of a written request to do so by either Party hereto, either Party may seek to have one appointed pursuant to Code of Civil Procedure Section 640. The cost of such proceeding shall initially be borne equally by the Parties. Any referee selected pursuant to this Section 6.6 shall be considered a temporary judge appointed pursuant to Article 6, Section 21 of the California Constitution. Notwithstanding the provisions of this Section 6.6, either Party shall be entitled to seek declaratory and injunctive relief in any court of competent jurisdiction to enforce the terms of this Agreement, or to enjoin the other Party from an asserted breach thereof, pending the selection of a referee as provided in this Section 6.6, on a showing that the moving party would otherwise suffer irreparable harm. Upon the mutual agreement by both Parties, any legal action shall be submitted to non-binding arbitration in accordance with rules to be mutually agreed upon by the Parties.

6.7. <u>Termination</u>.

6.7.1. <u>Expiration of Term</u>. Except as otherwise provided in this Development Agreement, this Development Agreement shall be deemed terminated and of no further effect upon the expiration of the Term of this Development Agreement as set forth in Section 1.3.

6.7.2. <u>Survival of Obligations</u>. Upon the termination or expiration of this Development Agreement as provided herein, neither Party shall have any further right or obligation with respect to the Property under this Development Agreement except with respect to any obligation that is specifically set forth as surviving the termination or expiration of this Development Agreement. The termination or expiration of this Development Agreement shall not affect the validity of the Project Approvals (other than this Development Agreement) for the Project.

6.7.3. <u>Termination by City</u>. Notwithstanding any other provision of this Development Agreement, City shall not have the right to terminate this Development Agreement

**ORDINANCE NO. 1110**

with respect to all or any portion of the Property before the expiration of its Term unless City complies with all termination procedures set forth in the Development Agreement Legislation and there is an Event of Default by Developer and such Event of Default is not cured pursuant to Article 4 herein or this Article 6 and Developer has first been afforded an opportunity to be heard regarding the alleged default before the City Council and this Development Agreement is terminated only with respect to that portion of the Property to which the default applies. Compliance with the procedures set forth in Sections 6.1 through 6.3 and 6.7.3 shall be deemed full compliance with the requirements of the California Claims Act (Government Code Sections 900 *et seq.*) including, but not limited to, the notice of an event of default hereunder constituting full compliance with the requirements of Government Code Section 910.

ARTICLE 7.
COOPERATION AND IMPLEMENTATION

7.1.    <u>Further Actions and Instruments</u>.   Each Party to this Development Agreement shall reasonably cooperate with and provide reasonable assistance to the other Party and take all actions necessary to ensure that the Parties receive the benefits of this Development Agreement, subject to satisfaction of the conditions of this Development Agreement.   Upon the request of any Party, the other Party shall promptly execute, with acknowledgment or affidavit if reasonably required, and file or record such required instruments and writings and take any actions as may be reasonably necessary under the terms of this Development Agreement to carry out the intent and to fulfill the provisions of this Development Agreement or to evidence or consummate the transactions contemplated by this Development Agreement.

7.2.    <u>Regulation by Other Public Agencies</u>.    Other public agencies not within the control of City may possess authority to regulate aspects of the development of the Property separately from or jointly with City, and this Development Agreement does not limit the authority of such other public agencies.   Nevertheless, City shall be bound by, and shall abide by, its covenants and obligations under this Development Agreement in all respects when dealing with any such agency regarding the Property.   To the extent that City, the City Council, the Planning Commission or any other board, agency, committee, department or commission of City constitutes and sits as any other board, agency, commission, committee, or department, it shall not take any action that conflicts with City's obligations under this Agreement.

7.3.    <u>Other Governmental Permits and Approvals; Grants</u>.   Developer shall apply in a timely manner in accordance with Developer's construction schedule for the permits and approvals from other governmental or quasi-governmental agencies having jurisdiction over the Project as may be required for the development of, or provision of services to, the Project. Developer shall comply with all such permits, requirements and approvals.   City shall reasonably cooperate with Developer in its endeavors to obtain (a) such permits and approvals and shall, from time to time, at the request of Developer, attempt with due diligence and in good faith to enter into binding agreements with any such entity to ensure the availability of such permits and approvals, or services, at each stage of the development of the Project; and (b) any grants for the Project for which Developer applies.

21

**ORDINANCE NO. 1110**

7.4.    Cooperation in the Event of Legal Challenge.

7.4.1.    The filing of any third party lawsuit(s) against City or Developer relating to this Agreement, the Project Approvals or other development issues affecting the Property shall not delay or stop the development, processing or construction of the Project or approval of any Subsequent Approvals, unless the third party obtains a court order preventing the activity. City shall not stipulate to or cooperate in the issuance of any such order.

7.4.2.    In the event of any administrative, legal or equitable action instituted by a third party challenging the validity of any provision of this Development Agreement, the procedures leading to its adoption, or the Project Approvals for the Project, Developer and City each shall have the right, in its sole discretion, to elect whether or not to defend such action. Developer shall defend, indemnify, and hold harmless the City (including its agents, officers and employees) from any such action, claim, or proceeding with counsel chosen by the City, subject to Developer's approval of counsel, which shall not be unreasonably denied, and at Developer's sole expense. If the City is aware of such an action or proceeding, it shall promptly notify Developer and cooperate in the defense. Developer upon such notification shall deposit with City sufficient funds in the judgment of City Finance Director to cover the expense of defending such action without any offset or claim against said deposit to assure that the City expends no City funds. If both Parties elect to defend, the Parties hereby agree to affirmatively cooperate in defending said action and to execute a joint defense and confidentiality agreement in order to share and protect information, under the joint defense privilege recognized under applicable law. As part of the cooperation in defending an action, City and Developer shall coordinate their defense in order to make the most efficient use of legal counsel and to share and protect information. Developer and City shall each have sole discretion to terminate its defense at any time. The City shall not settle any third party litigation of Project Approvals without Developer's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

7.5.    Revision to Project. In the event of a court order issued as a result of a successful legal challenge, City shall, to the extent permitted by law or court order, in good faith seek to comply with the court order in such a manner as will maintain the integrity of the Project Approvals and avoid or minimize to the greatest extent possible (i) any impact to the development of the Project as provided for in, and contemplated by, the Vested Elements, or (ii) any conflict with the Vested Elements or frustration of the intent or purpose of the Vested Elements.

7.6.    State, Federal or Case Law. Where any state, federal or case law allows City to exercise any discretion or take any act with respect to that law, City shall, in an expeditious and timely manner, and to extent consistent with law, (a) exercise its discretion in such a way as to be consistent with, and carry out the terms of, this Agreement and (b) take such other reasonable actions as may be necessary to carry out in good faith the terms of this Agreement.

7.7.    Defense of Agreement. City shall take all actions that are necessary or advisable to uphold the validity and enforceability of this Agreement but shall not be required to spend City resources in complying with this requirement. If this Agreement is adjudicated or determined to be invalid or unenforceable, City agrees, subject to all legal requirements, to

**ORDINANCE NO. <u>1110</u>**

consider modifications to this Agreement to render it valid and enforceable to the extent permitted by applicable law.

ARTICLE 8.
TRANSFERS AND ASSIGNMENTS

8.1.    <u>Right to Assign</u>.   Developer shall have the right to sell, assign or transfer ("<u>Transfer</u>") in whole or in part its rights, duties and obligations under this Development Agreement, to any person or entity at any time during the Term of this Development Agreement; provided, however, in no event shall the rights, duties and obligations conferred upon Developer pursuant to this Development Agreement be at any time so Transferred except through a transfer of the Property.  In the event of a transfer of a portion of the Property, Developer shall have the right to Transfer its rights, duties and obligations under this Development Agreement that are applicable to the transferred portion, and to retain all rights, duties and obligations applicable to the retained portions of the Property.  Upon Developer's request, City shall reasonably cooperate with Developer and any proposed transferee to allocate rights, duties and obligations under this Development Agreement and the Project Approvals among the transferred Property and the retained Property.

8.1.1.   <u>Transfers to Third Parties</u>.   Developer shall provide notice to the City in accordance with this Section 8.1.1.  Developer shall notify City of Developer entering into an agreement with a third party to market the Property for sale within fifteen (15) days of the effective date of such agreement, and no later than five (5) days prior to their publication, Developer shall provide the City Manager with draft marketing materials to afford the City an opportunity to comment on such materials, which such comments may be incorporated by Developer in Developer's reasonable discretion.  Developer shall provide updates at least as frequently as every forty-five (45) days, in writing, to the City Manager during any period in which Developer is actively engaged in any such marketing efforts.  In the event that Developer enters into a written agreement for any sale of the Property to a third party, then at least sixty (60) days prior to close of any such transfer, Developer shall provide the City Manager, for his review and comment, the identity of the proposed transferee, a summary of the proposed transferee's developer and financial qualifications, and a copy of the proposed assignment and assumption agreement between Developer and the proposed transferee, subject to a reasonable confidentiality agreement, if necessary.  Within thirty (30) days of receipt of such notice, the City Manager may provide to Developer written comments or seek reasonable additional information regarding such proposed transferee.  Notwithstanding the foregoing, a foreclosing Mortgagee (defined below) shall provide notice to City upon acquiring title to the Property.

8.2.    <u>Release upon Transfer</u>.   Upon the Transfer of Developer's rights and interests under this Development Agreement pursuant to Sections 8.1 and 8.1.1, Developer shall automatically be released from its obligations and liabilities under this Development Agreement with respect to that portion of the Property transferred, and any subsequent default or breach with respect to the Transferred rights and/or obligations shall not constitute a default or breach with respect to the retained rights and/or obligations under this Development Agreement, provided that (i) Developer has provided to City written notice of such Transfer, and (ii) the transferee

23

**ORDINANCE NO. 1110**

executes and delivers to City a written agreement in which (a) the name and address of the transferee is set forth and (b) the transferee expressly and unconditionally assumes all of the obligations of Developer under this Development Agreement with respect to that portion of the Property transferred.  Upon any transfer of any portion of the Property and the express assumption of Developer's obligations under this Agreement by such transferee, City agrees to look solely to the transferee for compliance by such transferee with the provisions of this Agreement as such provisions relate to the portion of the Property acquired by such transferee. A default by any transferee shall only affect that portion of the Property owned by such transferee and shall not cancel or diminish in any way Developer's rights hereunder with respect to any portion of the Property not owned by such transferee.  The transferor and the transferee shall each be solely responsible for the reporting and annual review requirements relating to the portion of the Property owned by such transferor/transferee, and any amendment to this Agreement between City and a transferor or a transferee shall only affect the portion of the Property owned by such transferor or transferee.  Failure to deliver a written assumption agreement hereunder shall not affect the running of any covenants herein with the land, as provided in Section 8.3 below, nor shall such failure negate, modify or otherwise affect the liability of any transferee pursuant to the provisions of this Development Agreement. .

8.3.   Covenants Run with the Land.  All of the provisions, agreements, rights, powers, standards, terms, covenants and obligations contained in this Development Agreement shall be binding upon the Parties and their respective successors (by merger, reorganization, consolidation, or otherwise) and assigns, devisees, administrators, representatives, lessees, and all of the persons or entities acquiring the Property or any portion thereof, or any interest therein, whether by operation of law or in any manner whatsoever, and shall inure to the benefit of the Parties and their respective successors (by merger, consolidation or otherwise) and assigns.  All of the provisions of this Development Agreement shall be enforceable as equitable servitudes and constitute covenants running with the land pursuant to applicable law, including but not limited to, Section 1468 of the Civil Code of the State of California.  Each covenant to do, or refrain from doing, some act on the Property hereunder (i) is for the benefit of such Property and is a burden upon such Property, (ii) runs with such Property, (iii) is binding upon each Party and each successive owner during its ownership of such Property or any portion thereof, and (iv) each person or entity having any interest therein derived in any manner through any owner of such Property, or any portion thereof, and shall benefit the Property hereunder, and each other person or entity succeeding to an interest in such Property.

ARTICLE 9.
MORTGAGEE PROTECTION; CERTAIN RIGHTS OF CURE

9.1.   Mortgagee Protection.  This Agreement shall not prevent or limit Developer in any manner, at Developer's sole discretion, from encumbering the Property or any portion thereof or any improvement thereon by any mortgage, deed of trust or other security device securing financing with respect to the Property ("Mortgage").  This Development Agreement shall be superior and senior to any lien placed upon the Property or any portion thereof after the date of recording this Development Agreement, including the lien of any Mortgage. Notwithstanding the foregoing, no breach hereof shall defeat, render invalid, diminish or impair

24

**ORDINANCE NO. 1110**

the lien of any Mortgage made in good faith and for value, but all of the terms and conditions contained in this Development Agreement shall be binding upon and effective against and inure to the benefit of any person or entity, including any deed of trust beneficiary or mortgagee ("Mortgagee") who acquires title to the Property, or any portion thereof, by foreclosure, trustee's sale, deed in lieu of foreclosure, or otherwise.

9.2.    Mortgagee Not Obligated.  Notwithstanding the provisions of Section 9.1 above, no Mortgagee shall have any obligation or duty under this Development Agreement to perform Developer's obligations or other affirmative covenants of Developer hereunder; provided, however, that if a Mortgagee elects not to assume the obligations under this Development Agreement, then the Mortgagee shall have no right to receive the benefits of this Development Agreement.

9.3.    Notice of Default to Mortgagee; Right of Mortgagee to Cure.  If City receives a notice from a Mortgagee requesting a copy of any Notice of Default given to Developer hereunder and specifying the address for service thereof, then City shall deliver to such Mortgagee, concurrently with service thereon to Developer, any notice given to Developer with respect to any claim by City that Developer has committed a default, and if City makes a determination of noncompliance hereunder, City shall likewise serve notice of such noncompliance on such Mortgagee concurrently with service thereof on Developer.  Each Mortgagee shall have the right (but not the obligation) during the same period available to Developer to cure or remedy, or to commence to cure or remedy, the Event of Default claimed or the areas of noncompliance set forth in City's notice.

9.4.    No Supersedure.  Nothing in this Article 9 shall be deemed to supersede or release a Mortgagee or modify a Mortgagee's obligations under any subdivision improvement agreement or other obligation incurred with respect to the Project outside this Development Agreement, nor shall any provision of this Article 9 constitute an obligation of City to such Mortgagee, except as to the notice requirements of Section 9.3.

9.5.    Technical Amendments to this Article 9.  City agrees to reasonably consider and approve interpretations and/or technical amendments to the provisions of this Agreement that are required by lenders for the acquisition and construction of the improvements on the Property or any refinancing thereof and to otherwise cooperate in good faith to facilitate Developer's negotiations with lenders.

ARTICLE 10.
MISCELLANEOUS PROVISIONS

10.1.    Limitation on Liability.  Notwithstanding anything to the contrary contained in this Development Agreement, in no event shall:  (a) any partner, officer, director, member, shareholder, employee, affiliate, manager, representative, or agent of Developer or any general partner of Developer or its general partners be personally liable for any breach of this Development Agreement by Developer, or for any amount which may become due to City under the terms of this Development Agreement; or (b) any member, officer, agent or employee of City

25

**ORDINANCE NO. <u>1110</u>**

be personally liable for any breach of this Development Agreement by City or for any amount which may become due to Developer under the terms of this Development Agreement.

10.2.  <u>Force Majeure</u>.  The Term of this Development Agreement and the Project Approvals and the time within which Developer shall be required to perform any act under this Development Agreement shall be extended by a period of time equal to the number of days during which performance of such act is delayed unavoidably and beyond the reasonable control of the Party seeking the delay by , Acts of God, inclement weather, , any development moratorium or any action of other public agencies that regulate land use, enemy action, civil disturbances, wars, terrorist acts, fire, unavoidable casualties, litigation involving this Agreement or the Project Approvals,   Such extension(s) of time shall not constitute an Event of Default and shall occur at the request of any Party.  In addition, the Term of this Development Agreement and any subdivision map or any of the other Project Approvals shall not include any period of time during which (i) a development moratorium is in effect; (ii) there is any mediation, arbitration; litigation or other administrative or judicial proceeding pending involving the Vested Elements, or Project Approvals.  The Term of the Project Approvals shall therefore be extended by the length of any development moratorium or similar action; the amount of time any actions of public agencies prevent, prohibit or delay the construction, funding or development of the Project or prevents, prohibits or delays the construction, funding or development of the Project; or the amount of time to finally resolve any mediation, arbitration, litigation or other administrative or judicial proceeding involving the Vested Elements, or Project Approvals. Furthermore, in the event the issuance of a building permit for any part of the Project is delayed as a result of Developer's inability to obtain any other required permit or approval, then the Term of this Development Agreement shall be extended by the period of any such delay.

10.3.  <u>Notices, Demands and Communications Between the Parties</u>.  Formal written notices, demands, correspondence and communications between City and Developer shall be sufficiently given if delivered personally (including delivery by private courier), dispatched by certified mail, postage prepaid and return receipt requested, or delivered by nationally recognized overnight courier service, or by electronic facsimile transmission followed by delivery of a "hard" copy to the offices of City and Developer indicated below.  Such written notices, demands, correspondence and communications may be sent in the same manner to such persons and addresses as either Party may from time-to-time designate in writing at least fifteen (15) days prior to the name and/or address change and as provided in this Section 10.3.

|  |  |
|---|---|
| City: | City of Coachella |
| | 1515 Sixth Street |
| | Coachella CA 92236 |
| | Attn:  City Manager |
| | |
| with copies to: | City of Coachella |
| | 1515 Sixth Street |
| | Coachella CA 92236 |
| | Attn:  City Attorney |

**ORDINANCE NO. 1110**

<table>
<tr><td></td><td>City of Coachella<br>1515 Sixth Street<br>Coachella CA 92236<br>Attn: Planning Director</td></tr>
<tr><td>Developer:</td><td>Glenroy Coachella, LLC<br>c/o RP Realty Partners, LLC<br>990 W. 8th St., Suite 600<br>Los Angeles, CA 90017<br>Attn: Stuart Rubin</td></tr>
</table>

Notices personally delivered shall be deemed to have been received upon delivery. Notices delivered by certified mail, as provided above, shall be deemed to have been given and received on the first to occur of (i) actual receipt by any of the addresses designated above as the Party to whom notices are to be sent, or (ii) within five (5) days after a certified letter containing such notice, properly addressed, with postage prepaid, is deposited in the United States mail. Notices delivered by overnight courier service as provided above shall be deemed to have been received twenty-four (24) hours after the date of deposit. Notices delivered by electronic facsimile transmission shall be deemed received upon receipt of sender of electronic confirmation of delivery, provided that a "hard" copy is delivered as provided above.

10.4.   <u>Project as a Private Undertaking; No Joint Venture or Partnership</u>. The Project constitutes private development, neither City nor Developer is acting as the agent of the other in any respect hereunder, and City and Developer are independent entities with respect to the terms and conditions of this Agreement. Nothing contained in this Development Agreement or in any document executed in connection with this Development Agreement shall be construed as making City and Developer joint venturers or partners.

10.5.   <u>Severability</u>. If any terms or provision(s) of this Development Agreement or the application of any term(s)or provision(s) of this Development Agreement to a particular situation, is (are) held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of this Development Agreement or the application of this Development Agreement to other situations, shall remain in full force and effect unless amended or modified by mutual consent of the Parties; provided that, if the invalidation, voiding or enforceability would deprive either City or Developer of material benefits derived from this Development Agreement, or make performance under this Development Agreement unreasonably difficult, then City and Developer shall meet and confer and shall make good faith efforts to amend or modify this Development Agreement in a manner that is mutually acceptable to City and Developer. Notwithstanding the foregoing, if any material provision of this Development Agreement, or the application of such provision to a particular situation, is held to be invalid, void or unenforceable, Developer (in its sole and absolute discretion) may terminate this Development Agreement by providing written notice of such termination to City.

**ORDINANCE NO. 1110**

10.6.    Section Headings.  Article and Section headings in this Development Agreement are for convenience only and are not intended to be used in interpreting or construing the terms, covenants or conditions of this Development Agreement.

10.7.    Construction of Agreement.  This Development Agreement has been reviewed and revised by legal counsel for both Developer and City, and no presumption or rule that ambiguities shall be construed against the drafting Party shall apply to the interpretation or enforcement of this Development Agreement.

10.8.    Entire Agreement.  This Development Agreement is executed in two (2) duplicate originals, each of which is deemed to be an original.  This Development Agreement consists of thirty two (32) pages including the Recitals, and three (3) exhibits, attached hereto and incorporated by reference herein, which, together with the Project Approvals, constitute the entire understanding and agreement of the Parties and supersedes all negotiations or previous agreements between the Parties with respect to all or any part of the subject matter hereof.  The exhibits and appendices are as follows:

> Exhibit A    Legal Description of the Property
>
> Exhibit B    Map of the Property
>
> Exhibit C    Impact Fees

10.9.    Estoppel Certificates.  Either Party may, at any time during the Term of this Development Agreement, and from time to time, deliver written notice to the other Party requesting such Party to certify in writing that, to the knowledge of the certifying Party, (i) this Development Agreement is in full force and effect and a binding obligation of the Parties, (ii) this Development Agreement has not been amended or modified either orally or in writing, or if amended; identifying the amendments, (iii) the requesting Party is not in default in the performance of its obligations under this Development Agreement, or if in default, to describe therein the nature and amount of any such defaults, and (iv) any other information reasonably requested.  The Party receiving a request hereunder shall execute and return such certificate or give a written, detailed response explaining why it will not do so within five (5) business days following the receipt thereof.  The failure of either Party to provide the requested certificate within such five (5) business day period shall constitute a confirmation that this Agreement is in full force and effect and no modification or default exists.  Either the City Manager or the Planning Director shall have the right to execute any certificate requested by Developer hereunder.  City acknowledges that a certificate hereunder may be relied upon by transferees and Mortgagees.

10.10.    Recordation.  Pursuant to California Government Code Section 65868.5, within ten (10) days after the later of execution of the Parties of this Development Agreement or the Effective Date, the City Clerk shall record this Development Agreement with the Riverside County Recorder.  Thereafter, if this Development Agreement is terminated, modified or amended, the City Clerk shall record notice of such action with the Riverside County Recorder.

**ORDINANCE NO. 1110**

10.11. <u>No Waiver</u>.  No delay or omission by either Party in exercising any right or power accruing upon noncompliance or failure to perform by the other Party under any of the provisions of this Development Agreement shall impair any such right or power or be construed to be a waiver thereof.  A waiver by either Party of any of the covenants or conditions to be performed by the other Party shall be in writing and signed by a duly authorized representative of the Party against whom enforcement of a waiver is sought, and any such waiver shall not be construed as a waiver of any succeeding breach or non-performance of the same or other covenants and conditions hereof.

10.12. <u>Time Is of the Essence</u>.  Time is of the essence for each provision of this Development Agreement for which time is an element.

10.13. <u>Applicable Law</u>.  This Development Agreement shall be construed and enforced in accordance with the laws of the State of California.

10.14. <u>Attorneys' Fees</u>.  Should any legal action be brought by either Party because of a breach of this Development Agreement or to enforce any provision of this Development Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and such other costs as may be found by the referee.  Attorneys' fees under this Section shall include attorneys' fees on any appeal and, in addition, a Party entitled to attorneys' fees shall be entitled to all other reasonable costs and expenses, including without limitation, expert witness fees, incurred in connection with such action.  In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit shall be entitled to its attorneys' fees incurred in any post-judgment proceedings to collect or enforce the judgment.  This provision is separate and several and shall survive the merger of this Agreement into any judgment on this Agreement.

10.15. <u>Third Party Beneficiaries</u>.  Except as otherwise provided herein, City and Developer hereby renounce the existence of any third party beneficiary to this Development Agreement and agree that nothing contained herein shall be construed as giving any other person or entity third party beneficiary status.

10.16. <u>Constructive Notice and Acceptance</u>.  Every person who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every provision contained herein, whether or not any reference to this Development Agreement is contained in the instrument by which such person acquired an interest in the Property.

10.17. <u>Counterparts</u>.  This Development Agreement may be executed by each Party on a separate signature page, and when the executed signature pages are combined, shall constitute one single instrument.

10.18. <u>Authority</u>.  Each party to this Agreement represents and warrants that the person or persons executing this Agreement on such party's behalf has the authority to bind his or her respective Party and that all necessary board of directors', shareholders', partners', city councils', redevelopment agencies' or other approvals have been obtained.

29

**ORDINANCE NO. <u>1110</u>**

[SIGNATURES ON NEXT PAGE]

30

**ORDINANCE NO. 1110**

IN WITNESS WHEREOF, City and Developer have executed this Development Agreement as of the date first set forth above.

**DEVELOPER:**

**GLENROY COACHELLA, LLC**,
a Delaware limited liability company

By:_____

Name: Stuart Rubin

Title:  Manager

**CITY:**

**CITY OF COACHELLA**,
a California municipal corporation

By:_____

Name: William B. Pattison, Jr.

Title: City Manager

ATTESTATION:

By:_____, City Clerk
Andrea J. Carranza, Deputy City Clerk

APPROVED AS TO FORM:

By:_____, City Attorney
Carlos Campos

31

## ORDINANCE NO. <u>1110</u>

STATE OF CALIFORNIA            )
                                    )   ss:

COUNTY OF RIVERSIDE          )

On_____, 2017 before me,_____(here insert  name of the officer), Notary Public, personally appeared_____, who proved to me  on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

[Seal]

STATE OF CALIFORNIA            )
                                      )   ss:

COUNTY OF <u>*LOS ANGELES*</u>        )

On *MARCH 2nd*, 2018 before me, *SARAH STERN*_____(here insert  name of the officer), Notary Public, personally appeared___*A. STUART RUBIN*_____, who proved to me  on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

SARAH STERN
Notary Public – California
Los Angeles County
Commission # 2218654
My Comm. Expires Nov 13, 2021

[Seal]

32

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ Riverside _____ )

On ___ March 6, 2018 ___ before me, ___ Andrea J. Carranza, Notary Public ___

(insert name and title of the officer)

personally appeared ___ William B. Pattison, Jr. ___,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

ANDREA J. CARRANZA
Notary Public - California
Riverside County
Commission # 2156111
My Comm. Expires Jul 6, 2020

Signature _Andrea J Carranza_    (Seal)

**ORDINANCE NO. <u>1110</u>**

## EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

**The land referred to herein is situated in the State of California, County of Riverside and described as follows:**

Parcel 1 of Parcel Map No. 17167, as shown by map on file in <u>book 87 page(s) 56,</u> of Parcel Maps, Records of Riverside County, California;

Excepting therefrom those portions conveyed to the City of Coachella by deeds recorded June 10, 2003 as Instrument No. <u>03-422633</u> and October 18, 2006 as Instrument No. <u>06-766527,</u> both of Official Records;

Also Excepting therefrom that portion conveyed to the City of Coachella by Grant Deed recorded August 11, 1969 as Instrument No. <u>81918</u> and re-recorded January 8, 1970 as Instrument No. <u>1828</u> both of Official Records of Riverside County, California;

Also Excepting therefrom Lots A through G of Parcel Map 17167, as shown by map on file in <u>book 87 page(p) 56</u> of Parcel Maps, Records of Riverside County, California;

Also Excepting therefrom that portion as conveyed to the City of Coachella by deed recorded February 8, 2008 as Instrument No. <u>08-66101</u> of Official Records.

Also excepting therefrom that portion as conveyed to the Desert Horizons Properties, LLC, a California limited liability company, by Grant Deed, recorded November 19, 2014 as Instrument No. <u>14-442823</u> of Official Records of Riverside County, California.

(End of Legal Description)

APN: <u>603-220-050</u>

33

**ORDINANCE NO. <u>1110</u>**

## <u>EXHIBIT B</u>

## <u>MAP OF PROPERTY</u>



34

## EXHIBIT C

## IMPACT FEES

All terms not defined herein shall have the meaning ascribed to them in the Development Agreement to which this Exhibit C is attached to and a part thereof.

1.    Facilitate Developer use of fee credits from January 31, 2008 Agreement as follows:

a. $569,411 Quimby Act fee credits, not to be used for any other purpose.

b. $2,183,821 in "Retail Credit" to be used only "toward the payment of building permit and other fees", including City development impact fees, subject to a security interest to ensure Developer complies and completes certain conditions as outlined below. As such, to the extent Developer has not complied with these next conditions, then the City has a security interest in the Retail Credit in the amount of $1,190,293. The conditions are as follows:

(i) Developer to provide $500,000 worth of improvement to the Rancho Las Flores Park if this condition is not complied with, then the City will not release $500,000 of the Retail Credit (Sec. 9.03)

(ii) Developer to pay for half of the construction of new street adjacent to/east of the park (on Frederick), south to Mitchell and East to Grapefruit as well as half of the street light at Grapefruit and Mitchel, if this work is not completed then the City will not release $425,000 of the Retail Credit (Sec. 9.05)

(iii) As collateral for the Frederick Street Improvements, $265,293 of the Retail Credit would not be released until the Frederick Street Improvements are completed (Sec. 9.06), if required by City General Plan.

2.    The following Impact Fees shall apply to the Project as provided in Section 2.6.3 of this Development Agreement and shall be based on January 1, 2015 effective rates:

A. General government facilities fees
B. Library facilities fees
C. Park and recreation facility fees
D. Street facilities fees
E.  Fire facility fees
F.  Police facility fees

i

# Exhibit B

<u>**MEMORANDUM OF UNDERSTANDING**</u>
**between**
**THE CITY OF COACHELLA**
**and**
**GLENROY COACHELLA, LLC AND THE COACHELLA LIGHTHOUSE, LLC**

    **THIS MEMORANDUM OF UNDERSTANDING** (this "Memorandum") is made and entered into effective as of the 13th day of May, 2020 ("Effective Date") by and among (i) the City of Coachella, a municipal corporation organized and existing under the laws of the State of California ("City") (ii) Glenroy Coachella, LLC, a California limited liability company ("Glenroy Coachella"), and (iii) The Coachella Lighthouse, a California limited liability company ("Coachella Lighthouse"), each a "Party" and collectively the "Parties."

    WHEREAS, on October 11, 2017, the City entered into a Development Agreement (the "Development Agreement") with Glenroy Coachella for the development and construction of the Glenroy Resort ("Glenroy Resort," as more particularly set forth in the Development Agreement);

    WHEREAS, Section 1.4 of the Development Agreement contemplated the construction of a "retail cannabis business" in the event such use is permitted under the Coachella Municipal Code; and

    WHEREAS, the City of Coachella permitted retail cannabis businesses pursuant to Ordinance No. 1114, adopted on February 14, 2018; and

    WHEREAS, the Coachella Lighthouse obtained Conditional Use Permit No. 312 (the "CUP") to operate a retail cannabis dispensary on February 27, 2019; and

    WHEREAS, CUP Condition of Approval No. 2(a) and No. 16 required the completion of the first phase of the Glenroy Resort, to include 76 resort bungalows and commercial development, as more particularly set forth in Section 1.4 of the Development Agreement; and

    WHEREAS, as of the date hereof, the first phase of the Glenroy Resort has not yet been completed due to various reasons, and therefore, the Coachella Lighthouse is in violation of the CUP; and

    WHEREAS, on April 15, 2020, the Coachella Planning Commission voted unanimously to revoke the CUP; and

    WHEREAS, on April 22, 2020, the Coachella Lighthouse filed an appeal of the Planning Commission's revocation, which stays the effectiveness of said revocation until that appeal is heard by the City Council of the City of Coachella (the "City Council"); and

49023413-v3

WHEREAS, as a result of the COVID-19 pandemic, the Parties are currently subject to, among other things, a stay at home order by Executive Order N-33-20 from the California Governor dated March 19, 2020 and related executive orders from the President of the United States, including Executive Order 13910 dated March 23, 2020. As a result of these and other governmental responsive actions, construction activity in many parts of the State, not including the City, has been completely halted temporarily to prevent the spread of COVID-19 and to generally protect the public health and safety, which stoppages may effect this Memorandum should stay at home orders or construction stoppages be in place in the City during the Term of this Memorandum; and

WHEREAS, the Parties mutually desire to keep the Coachella Lighthouse open and operating, including, without limitation, during the COVID-19 crisis, provided, that, measurable progress is consistently achieved towards the completion of the first phase of the Glenroy Resort; and

WHEREAS, the Parties recognize and affirm that this Memorandum aims to resolve these issues without recourse to revocation of the CUP or adverse action under the Development Agreement, and that Glenroy Coachella and the Coachella Lighthouse waive any and all claims against the City relating to this Memorandum and any actions taken hereunder, as further set forth herein; and

WHEREAS, the Parties recognize and affirm that this Memorandum does not serve to amend the CUP nor the Development Agreement except as otherwise expressly set forth herein, and that the City reserves all rights and recourses under those prior approvals should this Memorandum be violated.

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be bound legally and beneficially, hereby covenant and agree as follows:

1.    General. The foregoing recitals are true and correct and are hereby incorporated into and made a part of this Memorandum.

2.    Payment of In-Lieu Transient Occupancy Taxes.

(a)    In recognition of the City's strong desire to see the Glenroy Resort completed and open to the public as soon as possible, and to begin receiving transient occupancy tax ("TOT") revenue, and further, in the spirit of cooperation and the aim of continuing a mutually beneficial partnership among the Parties, Glenroy Coachella and the Coachella Lighthouse hereby voluntarily agree to make an annual payment to the City in the amount of Three Hundred Thousand Dollars and 00/100 ($300,000.00) until issuance of a final Certificate of Occupancy for Phase 1 the Glenroy Resort, in lieu of the TOT revenue the City believes it would have received were the Glenroy Resort open and

operational pursuant to the original terms of the Development Agreement ("TOT Payment"). The City agrees to accept the TOT Payment on the following schedule:

> (i)     Upon execution of this Memorandum, a TOT Payment in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00);
>
> (ii)    On or before June 30, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54);
>
> (iii)   On or Before August 31, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54);
>
> (iv)    On or before October 31, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54);
>
> (v)     On or before December 31, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54)
>
> (vi)    On or before February 29, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54); and
>
> (vii)   On or before April 30, 2021, a TOT Payment in the amount of Twenty-Two Thousand Seven Hundred and Twenty Seven and 30/100 Dollars ($22,727.30)

(b)     To the extent the Phase 1 of the Glenroy Resort (as defined in the Development Agreement) is open and operational prior to April 30, 2021, Glenroy Coachella will subsequently remit TOT Payments as required pursuant to the Coachella Municipal Code. In the event such Phase 1 is not open and operating before April 30, 2021, Glenroy Coachella and the Coachella Lighthouse shall continue to make bimonthly TOT Payments in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54) until such time as such Phase 1 is open and operational.

(c)     Should any TOT Payment required pursuant to this Section 2 fail to be paid by the deadlines laid out herein above, the City shall immediately hold the appeal hearing for revocation of the CUP before the City Council without further noticing required.

3.    Payment of Permitting and Legal Fees.

(a)    Glenroy Coachella and the Coachella Lighthouse recognize there are certain outstanding fees for prior permitting and legal work on behalf of the City of Coachella related to the Glenroy Resort project in the amount of Three Hundred and Fifty-Seven Thousand Three Hundred and Eighty-Six and 66/100 Dollars ($357,386.66) require payment, and that permit reactivation fees in the amount of Three Thousand Four Hundred and Forty and 00/100 Dollars ($3,440.00) will be required to be paid to allow work to recommence on the Glenroy Resort. The City agrees to accept payment for these amounts on the following schedule:

(i)    On or before August 31, 2020, a payment in the amount of Three Thousand Four Hundred and Forty and 00/100 Dollars ($3,440.00) for City permit reactivation and One Hundred Seventy-Eight Thousand Six Hundred and Ninety-Three and 33/100 Dollars ($178,693.33) for prior permitting and legal work; and

(ii)    On or before October 31, 2020, a payment in the amount of One Hundred Seventy-Eight Thousand Six Hundred and Ninety-Three and 33/100 Dollars ($178,693.33) for prior City permitting and legal work.

(b)    Should any payment required pursuant to this Section 3 fail to be paid by the deadlines laid out herein, the City shall immediately hold the appeal hearing for revocation of the CUP before the City Council.

4.    Progress Benchmarks.

(a)    Glenroy Coachella and the Coachella Lighthouse recognize that the Glenroy Resort is not presently open and operating and that regular progress on the construction and operation of the Glenroy Resort is a material element of this Memorandum. Glenroy Coachella and the Coachella Lighthouse agree to the following deadlines ("Benchmarks") with respect to progress on the Glenroy Resort:

(i)    On or before June 30, 2020, permanent financing for construction of the Glenroy Resort has been recorded and in effect, and the project has been taken out of receivership, provided that a one-time extension of 30 days is permissible upon showing by Glenroy Coachella or the Coachella Lighthouse, and with the written consent of the City Manager (not to be unreasonably withheld) in the event the delay is due to delay of a necessary government or banking approval as a result of the above-referenced stay-at-home orders due to the COVID-19 pandemic or their replacements that remain in place at that time; and

49023413-v3

(ii)     On or before August 31, 2020, the Glenroy Resort has recommenced construction as an "Active Worksite" (taken here to mean construction crews are mobilized on site and weekly construction progress is being made) with demonstrable progress being made towards the completion of Phase 1 of the Glenroy Resort, provided that an extension shall be provided in the event any delay is due to a delay of a necessary government approval including, without limitation, any failure to lift any applicable shelter-at-home orders related to the COVID-19 pandemic, only if Glenroy Coachella has timely submitted all required documentation to obtain said approvals; and

(iii)    On or before April 30, 2021, the City has issued the final Certificate of Occupancy for Phase 1 of the Glenroy Resort.

(b)     Should any Benchmark required pursuant to Section 4(a)(i) or Section 4(a)(ii) fail to be achieved by the deadline laid out therein, the City shall immediately hold the appeal hearing for revocation of the CUP before the City Council. Should any Benchmark required pursuant to Section 4(a)(iii) fail to be achieved by the deadline laid out therein, further TOT payments as laid out in Section 2(b) shall be deemed compliant with the Benchmark laid out in Section 4(a)(iii).

5.     Term. This Memorandum shall be effective as of the Effective Date and shall continue in effect until April 30, 2021, unless extended or earlier terminated as provided herein. This Memorandum shall be automatically renewed from year to year until such point as the City has issued the final Certificate of Occupancy for Phase 1 of the Glenroy Resort, or until such point as the preconditions to termination laid out in Section 6(b) have been achieved.

6.     Termination.

(a)     The City may, by forty-eight (48) hours' prior written notice to Glenroy Coachella and the Coachella Lighthouse, terminate this Memorandum at any time for failure to receive payment under Sections 2 and 3 or Glenroy Coachella's failure to timely meet a Benchmark under Section 4. Termination of this Memorandum shall result in the City immediately holding the appeal hearing for revocation of the CUP before the City Council.

(b)     Prior to termination of this Memorandum, provided all payments under Sections 2 and 3 and all Benchmarks under Section 4 are timely achieved, the City Council shall immediately hold the appeal hearing for revocation of the CUP before the City Council.

7.     <u>Waiver of Claims</u>.  Notwithstanding anything in this Memorandum to the contrary, Glenroy Coachella and the Coachella Lighthouse hereby waive and release the City of, and from, any and all right of recovery, monetary or civil claim or remedy, action or cause of action against the City, its agents, officers, and employees, for any claims related to this Memorandum including, but not limited to, claims that any amount paid hereunder is paid as a penalty, a prepayment of future TOT which will be owed, or a forfeiture of any rights.

8.     <u>Disclosure Requirements</u>.  In the event that disclosure of the terms and provisions of this Memorandum is required by law, regulation, or order of a court with competent jurisdiction, including, but not limited to, the California Public Records Act (California Government Code Section 6250 *et seq.*), written notice of disclosure must be given to each other Party to this Memorandum at least fifteen (15) days prior to disclosure, or at the earliest possible opportunity, whichever is less.

9.     <u>Indemnification</u>.  Glenroy Coachella and Coachella Lighthouse shall defend (with legal counsel reasonably acceptable to the City), indemnify, and hold harmless the City and its agents, officers, and employees against and from any and all liabilities, demands, claims, actions or proceedings and costs and expenses incidental thereto (including costs of defense, settlement and reasonable attorneys' fees), which any or all of them may suffer, incur, be responsible for or pay out as a result of or in connection with any challenge to the legality, validity, or adequacy of this Memorandum. In the event of any legal or equitable action or other proceeding instituted by any third party (including a governmental entity or official) challenging the validity of any provision of this Memorandum or any portion thereof as set forth herein, the parties shall mutually cooperate with each other in defense of said action or proceeding. Notwithstanding the foregoing, the City, at its sole option, may tender the complete defense to Glenroy Coachella and Coachella Lighthouse of any third-party challenge as described herein. In the event the City elects to contract with special counsel to provide for such a defense, the City shall consult with Glenroy Coachella and Coachella Lighthouse regarding the selection of counsel, and Glenroy Coachella and Coachella Lighthouse shall pay all costs and legal fees related to retention of such counsel.

10.     <u>Enforceability</u>.  Each party hereto represents that this Memorandum constitutes a legal, valid and binding obligation of such party enforceable against such party in accordance with its terms.

11.     <u>Notices</u>.  Notices under this Memorandum shall be given in writing, by personal delivery, or first-class mail, shall be assumed delivered upon mailing, and addressed to:

If to City:                    City of Coachella
                               1515 Sixth Street
                               Coachella, CA 92236
                               Attn: City Manager
                               Email: bpattison@coachella.org

and                                Carlos Campos , Esq.
                                   Best Best & Krieger
                                   74-760 Highway 111
                                   Suite 200
                                   Indian Wells, CA 92210
                                   Email: carlos.campos@bbklaw.com

If to Glenroy Coachella:           Quonset Partners, LLC
                                   c/o Joseph Rubin
                                   1801 South La Cienega Blvd.
                                   Suite 302
                                   Los Angeles, CA 90035
                                   Email: jrubin@rubincapitalgroup.com

If to Coachella Lighthouse:        Coachella Lighthouse, LLC
                                   84-160 Avenue 48
                                   Coachella, California 92236
                                   Email: jrubin@rubincapitalgroup.com

With a copy to:                    Jordan Ferguson, Esq.
                                   Venable LLP
                                   2049 Century Park E.
                                   Suite 2300
                                   Los Angeles, CA 90067
                                   Email: jferguson@venable.com

12.    Amendments. This Memorandum may be amended only by the written mutual consent of the Parties to this Memorandum or their successors in interest. Any change to the Term not contemplated pursuant to Section 5 herein may be authorized by the City Manager and the City Attorney, without need for approval by the City Council.

13.    Severability. If any part of this Memorandum is found to conflict with applicable state laws or regulations, such part shall be inoperative, null, and void insofar as it conflicts with said laws or regulations, or modified or suspended as may be necessary to comply with such state laws or regulations,  but the remainder of this Memorandum shall continue to be in full force and effect.

14.    Counterparts. This Memorandum may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. The execution of this Memorandum may be by actual, facsimile, or electronic signature.

15.    Governing Law.    The law governing this Memorandum shall be that of the State of California. Any suit brought by any Party against any other Party arising

49023413-v3

out of the performance of this Memorandum shall be filed and maintained in the County of Riverside Superior Court.

16.    Independent Representation. All Parties have reviewed this Memorandum in full, consulted with their own counsel with respect to this Memorandum, its requirements, and its legal effect, and have not relied on the representations or advice of another Party or its counsel in connection with this Memorandum. All Parties have knowingly and voluntarily entered into this Memorandum after comprehensive negotiations.

49023413-v3

IN WITNESS WHEREOF, the parties hereto have entered into this Memorandum as of the date first set forth above.

**CITY OF COACHELLA:**

By: _____
Name: _____
Title: _____

**GLENROY COACHELLA, LLC:**

By: _____
Name: _____
Title: _____

**THE COACHELLA LIGHTHOUSE, LLC:**

By: _____
Name: _____
Title: _____

**APPROVED AS TO FORM:**

By: _____
Name: _____
Title: _____

49023413-v3

# Exhibit C

# FIRST AMENDMENT TO THE
## MEMORANDUM OF UNDERSTANDING
### between
## THE CITY OF COACHELLA
### and
## GLENROY COACHELLA, LLC and the COACHELLA LIGHTHOUSE, LLC

**THIS FIRST AMENDMENT TO THE MEMORANDUM OF UNDERSTANDING** (this "Memorandum") is made and entered into effective as of the __8th day of October, 2020 ("Effective Date") by and among (i) the City of Coachella, a municipal corporation organized and existing under the laws of the State of California ("City") (ii) Glenroy Coachella, LLC, a California limited liability company ("Glenroy Coachella"), and (iii) The Coachella Lighthouse, a California limited liability company ("Coachella Lighthouse"), each a "Party" and collectively the "Parties."

WHEREAS, on October 11, 2017, the City entered into a Development Agreement (the "Development Agreement") with Glenroy Coachella for the development and construction of the Glenroy Resort ("Glenroy Resort," as more particularly set forth in the Development Agreement);

WHEREAS, Section 1.4 of the Development Agreement contemplated the construction of a "retail cannabis business" in the event such use is permitted under the Coachella Municipal Code; and

WHEREAS, the City of Coachella permitted retail cannabis businesses pursuant to Ordinance No. 1114, adopted on February 14, 2018; and

WHEREAS, the Coachella Lighthouse obtained Conditional Use Permit No. 312 (the "CUP") to operate a retail cannabis dispensary on February 27, 2019; and

WHEREAS, CUP Condition of Approval No. 2(a) and No. 16 required the completion of the first phase of the Glenroy Resort, to include 76 resort bungalows and commercial development, as more particularly set forth in Section 1.4 of the Development Agreement; and

WHEREAS, as of the date hereof, the first phase of the Glenroy Resort has not yet been completed due to various reasons, and therefore, the Coachella Lighthouse is in violation of the CUP; and

WHEREAS, on April 15, 2020, the Coachella Planning Commission voted unanimously to revoke the CUP; and

WHEREAS, on April 22, 2020, the Coachella Lighthouse filed an appeal of the Planning Commission's revocation, which stays the effectiveness of said revocation until that appeal is heard by the City Council of the City of Coachella (the "City Council"); and

WHEREAS, as a result of the COVID-19 pandemic, the Parties are currently subject to, among other things, a stay at home order by Executive Order N-33-20 from the California Governor dated March 19, 2020 and related executive orders from the President of the United States, including Executive Order 13910 dated March 23, 2020. As a result of these and other

-1-

governmental responsive actions, construction activity in many parts of the State, not including the City, has been completely halted temporarily to prevent the spread of COVID-19 and to generally protect the public health and safety, which stoppages may effect this Memorandum should stay at home orders or construction stoppages be in place in the City during the Term of this Memorandum; and

WHEREAS, the Parties mutually desire to keep the Coachella Lighthouse open and operating, including, without limitation, during the COVID-19 crisis, provided, that, measurable progress is consistently achieved towards the completion of the first phase of the Glenroy Resort; and

WHEREAS, the Parties recognize and affirm that this Memorandum aims to resolve these issues without recourse to revocation of the CUP or adverse action under the Development Agreement, and that Glenroy Coachella and the Coachella Lighthouse waive any and all claims against the City relating to this Memorandum and any actions taken hereunder, as further set forth herein; and

WHEREAS, on May 13, 2020 the Parties entered into a Memorandum of Understanding which it hereby replaced and superseded by this Memorandum; and

WHEREAS, the Parties recognize and affirm that this Memorandum does not serve to amend the CUP nor the Development Agreement except as otherwise expressly set forth herein, and that the City reserves all rights and recourses under those prior approvals should this Memorandum be violated.

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be bound legally and beneficially, hereby covenant and agree as follows:

1.   General.  The foregoing recitals are true and correct and are hereby incorporated into and made a part of this Memorandum.

2.   Payment of In-Lieu Transient Occupancy Taxes.

(a)   In recognition of the City's strong desire to see the Glenroy Resort completed and open to the public as soon as possible, and to begin receiving transient occupancy tax ("TOT") revenue, and further, in the spirit of cooperation and the aim of continuing a mutually beneficial partnership among the Parties, Glenroy Coachella and the Coachella Lighthouse hereby voluntarily agree to make an annual payment to the City in the amount as outlined below until issuance of a final Certificate of Occupancy for Phase 1 the Glenroy Resort, in lieu of the TOT revenue the City believes it would have received were the Glenroy Resort open and operational pursuant to the original terms of the Development Agreement ("TOT Payment"). The City agrees to accept the TOT Payment on the following schedule:

(i)   On or before October 31, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54);

-2-

(ii)     On or before December 31, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54);

(iii)     On or before February 29, 2020, a TOT Payment in the amount of Forty-Five Thousand Four Hundred and Fifty-Four and 54/100 Dollars ($45,454.54); and

(iv)     On or before April 30, 2021, a TOT Payment in the amount of Twenty-Two Thousand Seven Hundred and Twenty Seven and 30/100 Dollars ($22,727.30).

(b)     To the extent the Phase 1 of the Glenroy Resort (as defined in the Development Agreement) is open and operational prior to April 30, 2021, Glenroy Coachella will subsequently remit TOT Payments as required pursuant to the Coachella Municipal Code. In the event such Phase 1 is not open and operating before April 30, 2021, Glenroy Coachella and the Coachella Lighthouse shall make the following monthly TOT Payments:  First, third, fifth, seventh, ninth and eleventh month in the amount of Forty-Five Thousand Dollars ($45,000) and second, fourth, sixth, eighth, tenth and twelfth  month Fifteen Thousand ($15,000), third month the next month until such time as such Phase 1 is open and operational.

(c)     Should any TOT Payment required pursuant to this <u>Section 2</u> fail to be paid by the deadlines laid out herein above, the City shall immediately hold the appeal hearing for revocation of the CUP before the City Council without further noticing required.

3.     <u>Payment of Permitting and Legal Fees.</u>

(a)     Glenroy Coachella and the Coachella Lighthouse recognize there are certain outstanding fees for prior permitting and legal work on behalf of the City of Coachella related to the Glenroy Resort project in the amount of Three Hundred and Fifty-Seven Thousand Three Hundred and Eighty-Six and 66/100 Dollars ($357,386.66) require payment, and that permit reactivation fees in the amount of Three Thousand Four Hundred and Forty and 00/100 Dollars ($3,440.00) will be required to be paid to allow work to recommence on the Glenroy Resort. The City agrees to accept payment for these amounts on the following schedule:

(i)     On or before January 1, 2021, a payment in the amount of Three Thousand Four Hundred and Forty and 00/100 Dollars ($3,440.00) for City permit reactivation and One Hundred Seventy-Eight Thousand Six Hundred and Ninety-Three and 33/100 Dollars ($178,693.33) for prior permitting and legal work; and

(ii)     On or before January 1, 2021, a payment in the amount of One Hundred Seventy-Eight Thousand Six Hundred and Ninety-Three and 33/100 Dollars ($178,693.33) for prior City permitting and legal work.

80237.00851\33268086.2

(b)      Should any payment required pursuant to this <u>Section 3</u> fail to be paid by the deadlines laid out herein, the City shall immediately hold the appeal hearing for revocation of the CUP before the City Council.

4.      <u>Progress Benchmarks</u>.

(a)      Glenroy Coachella and the Coachella Lighthouse recognize that the Glenroy Resort is not presently open and operating and that regular progress on the construction and operation of the Glenroy Resort is a material element of this Memorandum. Glenroy Coachella and the Coachella Lighthouse agree to the following deadlines ("Benchmarks") with respect to progress on the Glenroy Resort:

(i)      On or before November 30, 2020, permanent financing for construction of the Glenroy Resort has been recorded and in effect, and the project has been taken out of receivership, provided that a one-time extension of 30 days is permissible upon showing by Glenroy Coachella or the Coachella Lighthouse, and with the written consent of the City Manager (not to be unreasonably withheld) in the event the delay is due to delay of a necessary government or banking approval as a result of the above-referenced stay-at-home orders due to the COVID-19 pandemic or their replacements that remain in place at that time; and

(ii)      On or before January 31, 2021, the Glenroy Resort has recommenced construction as an "Active Worksite" (taken here to mean construction crews are mobilized on site and weekly construction progress is being made) with demonstrable progress being made towards the completion of Phase 1 of the Glenroy Resort, provided that an extension shall be provided in the event any delay is due to a delay of a necessary government approval including, without limitation, any failure to lift any applicable shelter-at-home orders related to the COVID-19 pandemic, only if Glenroy Coachella has timely submitted all required documentation to obtain said approvals; and

(iii)      On or before April 30, 2022, the City has issued the final Certificate of Occupancy for Phase 1 of the Glenroy Resort.

(b)      Should any Benchmark required pursuant to <u>Section 4(a)(i)</u> or <u>Section 4(a)(ii)</u> fail to be achieved by the deadline laid out therein, the City shall immediately hold the appeal hearing for revocation of the CUP before the City Council. Should any Benchmark required pursuant to <u>Section 4(a)(iii)</u> fail to be achieved by the deadline laid out therein, further TOT payments as laid out in <u>Section 2(b)</u> shall be deemed compliant with the Benchmark laid out in <u>Section 4(a)(iii)</u>.

5.      <u>Term</u>.  This Memorandum shall be effective as of the Effective Date and shall continue in effect until April 30, 2022, unless extended or earlier terminated as provided herein.

80237.00851\33268086.2

This Memorandum shall be automatically renewed from year to year until such point as the City has issued the final Certificate of Occupancy for Phase 1 of the Glenroy Resort, or until such point as the preconditions to termination laid out in Section 6(b) have been achieved.

6.     Termination.

(a)     The City may, by forty-eight (48) hours' prior written notice to Glenroy Coachella and the Coachella Lighthouse, terminate this Memorandum at any time for failure to receive payment under Sections 2 and 3 or Glenroy Coachella's failure to timely meet a Benchmark under Section 4. Termination of this Memorandum shall result in the City immediately holding the appeal hearing for revocation of the CUP before the City Council.

(b)     Prior to termination of this Memorandum, provided all payments under Sections 2 and 3 and all Benchmarks under Section 4 are timely achieved, the City Council shall immediately hold the appeal hearing for revocation of the CUP before the City Council.

7.     Waiver of Claims.  Notwithstanding anything in this Memorandum to the contrary, Glenroy Coachella and the Coachella Lighthouse hereby waive and release the City of, and from, any and all right of recovery, monetary or civil claim or remedy, action or cause of action against the City, its agents, officers, and employees, for any claims related to this Memorandum including, but not limited to, claims that any amount paid hereunder is paid as a penalty, a prepayment of future TOT which will be owed, or a forfeiture of any rights.

8.     Disclosure Requirements.  In the event that disclosure of the terms and provisions of this Memorandum is required by law, regulation, or order of a court with competent jurisdiction, including, but not limited to, the California Public Records Act (California Government Code Section 6250 *et seq.*), written notice of disclosure must be given to each other Party to this Memorandum at least fifteen (15) days prior to disclosure, or at the earliest possible opportunity, whichever is less.

9.     Indemnification.  Glenroy Coachella and Coachella Lighthouse shall defend (with legal counsel reasonably acceptable to the City), indemnify, and hold harmless the City and its agents, officers, and employees against and from any and all liabilities, demands, claims, actions or proceedings and costs and expenses incidental thereto (including costs of defense, settlement and reasonable attorneys' fees), which any or all of them may suffer, incur, be responsible for or pay out as a result of or in connection with any challenge to the legality, validity, or adequacy of this Memorandum. In the event of any legal or equitable action or other proceeding instituted by any third party (including a governmental entity or official) challenging the validity of any provision of this Memorandum or any portion thereof as set forth herein, the parties shall mutually cooperate with each other in defense of said action or proceeding. Notwithstanding the foregoing, the City, at its sole option, may tender the complete defense to Glenroy Coachella and Coachella Lighthouse of any third-party challenge as described herein. In the event the City elects to contract with special counsel to provide for such a defense, the City shall consult with Glenroy Coachella and Coachella Lighthouse regarding the selection of counsel, and Glenroy Coachella and Coachella Lighthouse shall pay all costs and legal fees related to retention of such counsel.

80237.00851\33268086.2

10. <u>Enforceability</u>.  Each party hereto represents that this Memorandum constitutes a legal, valid and binding obligation of such party enforceable against such party in accordance with its terms.

11. <u>Notices</u>.  Notices under this Memorandum shall be given in writing, by personal delivery, or first-class mail, shall be assumed delivered upon mailing, and addressed to:

| | |
|---|---|
| If to City: | City of Coachella<br>1515 Sixth Street<br>Coachella, CA 92236<br>Attn: City Manager<br>Email: bpattison@coachella.org |
| and | Carlos Campos , Esq.<br>Best Best & Krieger<br>74-760 Highway 111<br>Suite 200<br>Indian Wells, CA 92210<br>Email: carlos.campos@bbklaw.com |
| If to Glenroy Coachella: | Quonset Partners, LLC<br>c/o Joseph Rubin<br>1801 South La Cienega Blvd.<br>Suite 302<br>Los Angeles, CA 90035<br>Email: jrubin@rubincapitalgroup.com |
| If to Coachella Lighthouse: | Coachella Lighthouse, LLC<br>84-160 Avenue 48<br>Coachella, California 92236<br>Email: jrubin@rubincapitalgroup.com |
| With a copy to: | [Who?] |

12. <u>Amendments</u>.  This Memorandum may be amended only by the written mutual consent of the Parties to this Memorandum or their successors in interest. Any change to the Term not contemplated pursuant to <u>Section 5</u> herein may be authorized by the City Manager and the City Attorney, without need for approval by the City Council.

13. <u>Severability</u>.  If any part of this Memorandum is found to conflict with applicable state laws or regulations, such part shall be inoperative, null, and void insofar as it conflicts with said laws or regulations, or modified or suspended as may be necessary to comply with such state laws or regulations, but the remainder of this Memorandum shall continue to be in full force and effect.

14. <u>Counterparts</u>.  This Memorandum may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the

same instrument. The execution of this Memorandum may be by actual, facsimile, or electronic signature.

15.    Governing Law.  The law governing this Memorandum shall be that of the State of California. Any suit brought by any Party against any other Party arising out of the performance of this Memorandum shall be filed and maintained in the County of Riverside Superior Court.

16.    Independent Representation.  All Parties have reviewed this Memorandum in full, consulted with their own counsel with respect to this Memorandum, its requirements, and its legal effect, and have not relied on the representations or advice of another Party or its counsel in connection with this Memorandum. All Parties have knowingly and voluntarily entered into this Memorandum after comprehensive negotiations.

IN WITNESS WHEREOF, the parties hereto have entered into this Memorandum as of the date first set forth above.

**CITY OF COACHELLA:**

By: _____
Name:    William B. Pattison, Jr.
Title:    City Manager


**GLENROY COACHELLA, LLC:**

By: _____
Name: _____
Title: _____


**THE COACHELLA LIGHTHOUSE, LLC:**

By: _____
Name: _____
Title: _____


**APPROVED AS TO FORM:**

By: _____

-7-

Name: _____

Title: _____

80237.00851\33268086.2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
355 South Grand Avenue, Suite 2900, Los Angeles, CA  90071

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF EDWIN LESLIE IN SUPPORT OF MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 17, 2021   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Eryk R Escobar    eryk.r.escobar@usdoj.gov
- Mark S Horoupian    mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
- Michael S Kogan    mkogan@koganlawfirm.com
- Kenneth G Lau    kenneth.g.lau@usdoj.gov
- James R Selth    jim@wsrlaw.net, jselth@yahoo.com; eduardo@wsrlaw.net; gabby@wsrlaw.net; vinnet@ecf.inforuptcy.com
- Alan G Tippie    atippie@sulmeyerlaw.com, atippie@ecf.courtdrive.com; pdillamar@sulmeyerlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Daniel J Weintraub    dan@wsrlaw.net, vinnet@ecf.inforuptcy.com; gabby@wsrlaw.net; eduardo@wsrlaw.net

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) February 17, 2021 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BY PERSONAL DELIVERY:**
**Hon. Sheri Bluebond**
**USBC-Central District of California**
**255 E. Temple Street**
**Suite 1534 / Courtroom 1539**
**Los Angeles, CA 90012**

☒ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 17, 2021 | Gilda S. Anderson | *Gilda S. Anderson* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                     **F 9013-3.1.PROOF.SERVICE**