Daniel J. Weintraub – Bar #132111
James R. Selth – Bar #123420
Crystle J. Lindsey – Bar #281944
**WEINTRAUB & SELTH, APC**
11766 Wilshire Boulevard, Suite 1170
Los Angeles, CA 90025
Telephone: (310) 207-1494
Facsimile: (310) 442-0660
Email: dan@wsrlaw.net

[Proposed] General Bankruptcy Counsel to
Chapter 11 Debtor, GLENROY COACHELLA, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GLENROY COACHELLA, LLC<br><br>　　　　Debtor. | Case No. 2:21-bk-11188-BB<br><br>Chapter 11<br><br>**OPPOSITION OF DEBTOR TO MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**<br><br>**[Declarations and Evidentiary Objections filed concurrently herewith]**<br><br>Date:  March 10, 2021<br>Time:  10:00 a.m.<br>Courtroom: 1539<br><br>*(All Appearances by ZoomGov)* |

Glenroy Coachella, LLC, the Chapter 11 debtor (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case"), hereby opposes the *Motion for the Appointment of a Chapter 11 Trustee* (the "Motion", Dkt. No. 16), filed by U.S. Real Estate Credit Holdings III-A, LP c/o Calmwater Capital ("Calmwater").

//

# I.

# **PRELIMINARY STATEMENT**

The Motion should clearly be denied on the basis that Calmwater has failed to provide any admissible evidence that there is sufficient cause to appoint a Chapter 11 trustee, or that the appointment of a trustee would be in the best interests of creditors. Instead, Calmwater relies on massive amounts of hearsay, unsupported allegations, *ad hominem* attacks against Stuart Rubin and his son and repeated and often irrelevant references to a dispensary owned and operated by a non-debtor to try to convince the Court that removal of the Debtor's current management and placement of a Chapter 11 trustee to administer the assets is the best interest of the estate. As set forth below and in the Declarations of Stuart Rubin, Joseph Rubin, Steve Bram, Laurence Berman, Renzo Renzi, Ian Waddell and Dana Barbera filed concurrently herewith, Calmwater's allegations of prepetition misconduct are incorrect and without merit.

The Debtor in fact has a plan to reorganize this estate and pay creditors in full. The Debtor is completing negotiations for a debtor-in-possession ("DIP") loan, which will pay all mechanics lines senior to Calmwater and complete construction of the Project. The Debtor intends to do so under the direction of an experienced Chief Restructuring Officer ("CRO") with experience in property development and the Debtor's Motion to Appoint CRO will be filed prior to the hearing on this Motion. The Debtor will also hire a construction management firm with impeccable credentials to complete the Project.

The Debtor will soon be able present evidence to establish that the completed Project will have a value sufficient to allow a refinancing or sale of the Project, which pays all creditors in full. LW Hospitality Advisors, one of the premier hotel valuation firms in the country, has been engaged to provide a current appraisal of the Project "as is", completed and stabilized. The appraisal report is expected to be completed on or before March 17, 2021.

Finally, if the Court believes that any allegations supporting the appointment of a trustee have not been refuted by this Opposition, the Debtor requests a continuance of the hearing on the Motion to conduct discovery regarding such allegations.

//

## II.

## BACKGROUND FACTS

The Debtor was formed as a Delaware limited liability company in 2007. The Debtor's primary asset is its multiple parcels of property (approximately 33.71 acres) and luxury hotel development located in Coachella, California (the "Property"). The Debtor entered into a Development Agreement with the City of Coachella to develop the Property into a Hotel Indigo, a luxury, full-service, casita-style resort and hotel (the "Project"). The Project would be the City of Coachella's first ever hotel and is expected to spur jobs, development and growth to the area.

The Debtor's largest liability is owed to secured creditor Calmwater, which claims it is owed $30,092,096.90, which sum is disputed by the Debtor. In addition, the Debtor has creditors, including contractors and material suppliers for the Project, who have claims in an estimated amount of $5,000,000, many of whom hold mechanics' or materialmen's liens senior to Calmwater in priority, which Calmwater may dispute. The Debtor has reviewed the mechanics liens and applicable law and believes the properly perfected mechanics lien claims (totaling approximately $2.5 million) are senior to the deed of trust of Calmwater. Historically, the Debtor has funded its business operations and development of the Project through commercial financing, private investments, and loans and contributions from its insiders and affiliates.

The Debtor's need for bankruptcy relief was triggered by the actions of Calmwater, which among other things, ceased funding the Debtor's loan for the Project, commenced foreclosure proceedings against the Debtor by recording a Notice of Default on the Property in September 2019 and initiated state court litigation against the Debtor. In November 2019, Calmwater caused the appointment of a receiver, Edwin Leslie (the "Receiver"), for the Property, which led to a suspension of all work on the Project. Calmwater scheduled a foreclosure sale of the Property to take place on February 16, 2021. As a result, the Debtor sought relief under Chapter 11 of the Bankruptcy Code to prevent the foreclosure of the Property, which would have eliminated any chance of recovery for creditors holding claims of millions of dollars, and to reorganize its debts.

Through this Bankruptcy Case, the Debtor intends to complete negotiations for post-petition financing, which will result in the payment of all perfected mechanics' liens whose liens are senior

in priority to Calmwater and resumption and completion of the construction of the Project, including payment of all ongoing project costs such as permit fees, real estate taxes and insurance. The Debtor is in the process of having the Project appraised on a completed basis and it is believed that completed Project will allow for the Debtor to refinance or sell the Project and pay all creditors in full.

### III.

### THE LEGAL STANDARD FOR APPOINTMENT OF A TRUSTEE

Section 1104(a) of the bankruptcy code provides:

(a)    At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The appointment of a trustee under Chapter 11 is an extraordinary remedy. In re Bayou Group, LLC, 564 F.3d 541, 546 (2nd Cir.2009); In re Lopez-Munoz, 553 B.R. 179, 189–91 (1st Cir. BAP 2016), aff'd sub nom. 866 F.3d 487 (1st Cir. 2017). "It is settled that appointment of a trustee should be the exception, rather than the rule." In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3rd Cir. 1989). "The presumption in chapter 11 cases is that "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." In re V. Savino Oil & Heating Co., 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989). See

also In re G-I Holdings, Inc., 385 F.3d 313, 316 (3rd Cir. 2004), noting that "there is a strong presumption against appointing a trustee."

This extreme relief may not be granted unless the party moving for the appointment of a trustee proves its case under by clear and convincing evidence. See In re Sharon Steel Corp., *supra*, 871 F.2d at 1226; In re G-I Holdings, Inc., *supra*, 385 F.3d at 319; and In re Marvel Entertainment Group, 140 F.3d 463, 471 (3rd Cir. 1998).

> "The appointment of a trustee pursuant to Section 1104(a)(1) is an extraordinary remedy, and there is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee. The parties moving for the appointment of a trustee have the burden of proof, which they must meet by clear and convincing evidence."

In re Cajun Electric Power Cooperative, 69 F.3d 746, 749 (5th Cir. 1995)

Although prepetition conduct can be considered in the analysis under Section 1104(a), the true focus is on the actions taken by the debtor or the management of the debtor postpetition. See In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) which held that "on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct." See also In re Eagle Creek Subdivision, LLC, 2009 Bankr. LEXIS 632, at *7 (Bankr. E.D.N.C. Mar. 9, 2009), citing 7 *Collier on Bankruptcy* ¶ 1104.02[3][b][ii] (15th ed. Rev. 2007): "Generally, the court must narrow its focus to the actions of current management when investigating cause for appointment of a trustee."

Isolated instances of prepetition mismanagement, or even of fraud, dishonesty or other misconduct by the debtor are not sufficient to support a finding of cause under § 1104(a)(1). See Gomez v. U.S. Trustee, 2010 U.S. Dist. LEXIS 14403 (W.D. Va. Feb. 18, 2010). See In re Sletteland, *supra*, 260 B.R. at 672 which, citing 7 *Collier on Bankruptcy* ¶ 1104.02[3][c][i] (15th ed.), held that "[s]ome degree of mismanagement exists in virtually every insolvency case . . . mere mismanagement does not, by itself constitute cause. The philosophy of chapter 11 is to give the debtor a 'second chance' at business success."

Absent strong evidence of postpetition mismanagement or misconduct, the courts are disinclined to appoint a trustee because "[s]peculation that a debtor may do something in the future

does not overcome the strong presumption that the debtor should be permitted to remain in possession in a chapter 11 case or justify the additional costs of a trustee." In re Sletteland, *supra*, 260 B.R. at 671–72. The Fourth Circuit cogently addressed this issue in Committee of Dalkon Shield Claimants v. A.H. Robins Co. Inc., 828 F.2d 239, 242 (4th Cir. 1987) in affirming the denial of a motion to appoint a trustee, where, unlike this case, it was supported by a creditors committee:

> "[The Committee] asserts that Robins' lack of candor and preferential treatment of certain pre-petition creditors were dishonest and otherwise constituted cause. Like the district court, we recognize that Robins' conduct was improper and warranted a civil contempt sanction. But a policy of flexibility pervades the bankruptcy code with the ultimate aim of protecting creditors. A determination of cause, therefore, is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding. "[T]he concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide range of conduct.... Implicit in a finding of incompetence, dishonesty, etc., for purposes of section 1104(a)(1), is whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee." [citation omitted]  Obviously, to require the appointment of a trustee, regardless of the consequences, in the event of an act of dishonesty by the debtor, however slight or immaterial, could frustrate the purpose of the Bankruptcy Act. Section 1104(a)(1), therefore, must be construed, if possible, to make it harmonious with the Act in its entirety. Such a construction requires that the courts be given discretionary authority to determine whether conduct rises to the level of "cause."

See also In re Crescent Beach Inn, 22 B.R. 155, 159 (Bankr. D. Me. 1982), holding that the debtor's mismanagement, which was due to its lack of sophistication, did not constitute gross mismanagement required under § 1104(a)(1), particularly in the absence of any signs of postpetition mismanagement.

Mere allegations, which are contested, that a debtor or its management have engaged in fraud, dishonesty, or other similar conduct, are not sufficient to warrant appointment of a trustee. See In re Concord Coal Corp.,11 B.R. 552, 553 (Bankr. S.D.W.Va. 1981), holding that appointment of a trustee is not warranted where "fraud and dishonesty have been alleged but not proven."  The Motion is devoid of any such proof, and the Debtor has attached Declarations and evidence refuting

the allegations.

## IV.

## **MOVANT'S ALLEGATIONS ARE DEMONSTRABLY UNTRUE**

Calmwater alleges in its Motion the following five "clear acts" by the Debtor that it argues require the appointment of a trustee, as follows:

- The Debtor fraudulently induced Lender to make the loan on the construction project on the Project by providing the Lender with a false budget that was grossly understated by approximately $20 million;

- The Debtor's own investors, including Gary Stiffelman, have alleged that Stuart Rubin has defrauded them into loaning millions of dollars into the Project under false pretenses;

- Stuart Rubin hired his 23-year old son, Joseph Rubin, as construction manager, although Joseph was incapable of managing a Project of this size, and Stuart Rubin diverted well over $1 million of the Debtor's cash to an adjacent cannabis dispensary that was owned, in part, by Joseph.

- Stuart Rubin apparently diverted millions of dollars in funds from Mello-Roos financing to unknown parties, and although he caused more than $8.8 million in mechanics liens to be recorded against the Project, he leased a Bentley under the Debtor's name and with the Debtor's funds to further his own luxurious lifestyle;

- To further enrich his children, Stuart Rubin directly tied the success of the cannabis dispensary to the completion of the Project through a development agreement the Debtor previously reached with the City of Coachella, and an independent fiduciary is fundamentally necessary to disentangle the dealings of the Debtor from this dispensary.

Calmwater makes additional false or irrelevant allegations in its Motion that:

- The Debtor refused to cooperate with the Receiver and did not provide documents to the Receiver;

- The Debtor has no means of completing the Project;

- The Debtor's Motion for a protective advance loan was denied by the Superior Court on the merits;
- Stuart Rubin did not put any personal money into the Project and misrepresented that he had done so, and has diverted assets from the Project for his personal use;
- Stuart Rubin personally negotiated with suppliers to keep the lender from learning about outstanding unpaid invoices from subcontractors and suppliers;
- The Debtor mismanaged the project with budgeting deficiencies, cost issues and unrealistic start dates;
- Mello-Roos and PACE funds have been diverted from the Project;
- Joseph Rubin took an unproductive tourism trip to Korea paid by the Debtor;
- Stuart Rubin has no construction experience;
- The Debtor engaged in misconduct in the Superior Court litigation, including refusing to cooperate in discovery.

However, when these allegations are explored in detail, they all fail, or in many cases are irrelevant to the issue at hand.

A.    Calmwater Was Not "Duped" By A False Budget Provided By Debtor

It is clear that Calmwater knew at the time its loan was funded that the budget would not be sufficient to complete the Project, as evidenced by the Declarations of Steven Bram ("Bram Dec.") and Stuart Rubin ("S. Rubin Dec.") and exhibits thereto.

Mr. Bram of George Street Partners, Inc. introduced Calmwater to the Debtor and was involved with Calmwater from inception of the discussions among the parties through closing of the loan. Mr. Bram coordinated and provided to Calmwater all due diligence materials requested by Calmwater and worked closely with Calmwater's internal underwriters, Tristine Lim and Heull Kim. This due diligence included the April 18, 2018 construction budget ("Budget") identified in the Declaration of Simond Lavian ("Lavian Dec.") and attached thereto as Exhibit D.

As set forth in the Bram Dec., Mr. Bram attended meetings with Calmwater and had numerous phone calls and email exchanges and had many discussions with Mssrs. Lim and Kim concerning the Project and the Budget. Mr. Lim told Mr. Bram that he had analyzed the Debtor's

construction budgets and was concerned that Debtor would not have sufficient funds to complete the project. Calmwater representatives told Mr. Bram that because Debtor's principals had provided personal guarantees, Calmwater would fund the loan.

E-mail correspondence from Tristine Lim and Heull Kim attached to the S. Rubin Dec, as **Exhibits 9, 10** and **12**, make clear that Calmwater knew the initial Budget was not complete and that discussions regarding revisions to the Budget continued after the loan funded. Attached as **Exhibit 13** to the S. Rubin Dec. is the "Pre-Construction Project Report" dated March 13, 2018, prepared for Calmwater by Marx|Okubo Associates, Inc., and addressed to Tristine Lim, Calmwater's underwriter ("Marx|Okubo Report"). The Marx|Okubo Report was prepared prior to the Calmwater loan closing and was provided to Mr. Bram, although Stuart Rubin did not see it until after the bankruptcy case was filed.

Pages 21 and 22 of the Marx|Okubo Report contain the Marx|Okubo "Construction Budget Analysis and include two pages of qualifications regarding and criticisms of the Budget and states in several places that the expert believes the construction plans to be not complete or inconsistent and the construction budget to be "insufficient" for the proposed construction, that the "costs would be higher" and that their "review suggests that the costs could exceed the budget price".

Given Mr. Lim's comments to Mr. Bram and the Marx|Okubo Report, it is obvious that Calmwater knew at the time of making the loan that the Budget was insufficient for the Project and yet it elected to proceed because it knew it had deep-pocketed guarantors. It is disingenuous for Calmwater to now assert that it was surprised by the errors and omissions in the Budget. Moreover, since Calmwater was apprised that there were problems with the Budget and acknowledged them in e-mails to the Debtor, it is hard to understand how it can now claim it was defrauded.

B. The Allegations of Disgruntled Investor Stiffelman Are Easily Disproven

The Declaration of Gary Stiffelman ("Stiffelman Dec.") is replete with outrageous allegations but entirely lacking in supporting documents or evidence. Despite the claim in the Motion that "the Debtor's own investors" have alleged fraud and misconduct by Stuart Rubin, Mr. Stiffelman is in fact the only investor to make such claims, and the claims are simply incorrect.

//

1  First, Mr. Stiffelman is a sophisticated attorney with forty years of experience and was a

2  former shareholder at Greenberg Traurig LLP.  Notwithstanding his legal training and lengthy

3  experience, he has submitted a Declaration filled with hearsay statements ("I have learned") and

4  utterly lacking in foundation.  As such, his Declaration should be completely disregarded.

5  Mr. Stiffelman was actively involved in the Project until his falling out with Stuart Rubin,

6  and was hardly the passive investor his Declaration suggests.  He begged to remain in the Project

7  even when Stuart Rubin offered to buy him out, as late as January 2019.  See S. Rubin Dec. and

8  **Exhibits 4, 5** and **6** thereto.

9  More importantly, his primary allegations that Stuart Rubin was not putting his own money

10  into the Project and was misappropriating Project funds are completely false.  As set forth in the S.

11  Rubin Dec. and **Exhibit 2** thereto, Stuart Rubin and his private development company ASR

12  Development Company, Inc. ("ASR") advanced $16,416,592.11 in equity contributions to the

13  Project and was reimbursed a total of $3,544,548.36, for a net equity contribution of

14  $12,872,043.75.

15  Mr. Stiffelman's claim that Stuart Rubin used his son Joseph Rubin as a construction

16  manager and gave him control over design questions is also incorrect.  Although Joseph Rubin has

17  spent a great amount of time helping his father with the Project, he was never a construction

18  manager and never held himself out as such.  At all times, even before Calmwater's loan closed, Ian

19  Waddell served as the owner's representative and on-site Project construction manager.  Joseph

20  Rubin was never an employee of the Debtor and never received compensation from the Debtor,

21  only occasional reimbursements for out of pocket expenses.  Also, tile and toilet options for the

22  hotel were all provided by the Debtor's design and architecture firm, Carrier Johnson, which made

23  all final selections down to shape and color, focusing on price and budget.  See Declarations of

24  Joseph Rubin ("J. Rubin Dec.") and Ian Waddell ("Waddell Dec.").  Mr. Stiffelman's critique of

25  Joseph's involvement in the project is also belied by the very complimentary e-mail he sent Joseph

26  on December 12, 2017 attached to the J. Rubin Dec. as **Exhibit 8**.

27  Likewise, Mr. Stiffelman's claim that Debtor funds were squandered on a "paid trip to the

28  South Korea Winter Olympics" by Joseph Rubin with no benefit to the Debtor is false.  As set forth

in the J. Rubin Dec., Joseph Rubin paid for the trip to Korea himself and the Debtor did not pay for any part of the trip. **Exhibit 9** to the J. Rubin Dec. shows that his airfare was purchased with his own personal American Express miles. While Mr. Rubin did not secure an agreement with Samsung from that trip, he procured at no cost a set of top-quality appliances for the hotel that are displayed in the model room as well as a set of phones, tablets and devices all provided as a result of his involvement and dealings with Samsung, with a value of approximately $20,000.00.

C.    No Funds Were Diverted to The Dispensary for Construction or Operations

Calmwater alleges, without any documentary evidence, that Debtor funds were used for the construction and/or operations of Coachella Lighthouse, LLC, an entity of which Joseph Rubin is the Manager, and which under its Operating Agreement is owned by the Rubin Children (67%) and the Stiffelman Children (33%). As set forth in the J. Rubin Dec., construction on the Coachella Lighthouse began on or about December of 2017, with planning and design commencing in the summer of 2017. The costs to build the foundation and shell for building were paid for by ASR and Coachella Lighthouse. See **Exhibit 1** to the J. Rubin Dec. ASR is owned 100% by Stuart Rubin. The interior buildout and tenant improvements were paid for by ASR, Stuart Rubin and his children. See **Exhibit 2** to the J. Rubin Dec.

Construction of the Coachella Lighthouse was completed, and the Coachella Lighthouse received its temporary Certificate of Occupancy form the City of Coachella in April of 2018, which is attached to the J. Rubin Dec. as **Exhibit 3**. The Coachella Lighthouse was opened and operating as of April 13, 2018, <u>before</u> the April 26, 2018 closing date of the Calmwater loan as set forth in the Lavian Dec, and the Coachella Lighthouse never received any project or other funds from the Debtor.

In fact, Coachella Lighthouse and Joseph Rubin lent money <u>to</u> the Debtor. As set forth in the J. Rubin Dec. and **Exhibits 4-6** thereto, in December 2018 Coachella Lighthouse made a loan to SGE Realty, LLC, an entity owned by Stuart Rubin, Elliot Lander and Gary Stiffelman, totaling $1.4 million, with net proceeds of $1,268,785.52, which were used to advance the Project.

In addition to the loan from Coachella Lighthouse, Joseph Rubin personally loaned $125,000 to the Debtor as evidenced by **Exhibit 7** to the J. Rubin Dec. and along with Coachella

Lighthouse, funded additional expenses of the project in 2019 in excess of $350,000. Clearly, contrary to the claims of Calmwater, the flow of funds was from the Coachella Lighthouse and Joseph Rubin to the Debtor and not the other way around.

### D. No Funds Were Diverted From the Project to Stuart Rubin, and the Debtor Did Not Pay for the Bentley

Without any evidence to support its claims, Calmwater's most alarming allegation is that Stuart Rubin "diverted millions of dollars in funds" from the Project to "further his own luxurious lifestyle", including that he "leased a Bentley under the Debtor's name and with the Debtor's funds." As set forth in detail in the S. Rubin Dec. and exhibits thereto, in fact the opposite is true. As set forth in the S. Rubin Dec. and **Exhibit 2** thereto, Stuart Rubin and his private development company ASR advanced over $16.2 million in equity contributions between 2010-2019, and was reimbursed only $3,544,548. Since the report of the "forensic accountant engaged by the receiver" referenced in the Declaration of Edwin Leslie was not attached, one must assume that it came to the same result.

First, although one would not know it from reading the Motion, as required by the Loan Agreement (Exhibit A to Lavian Dec.), all Calmwater loan proceeds were disbursed only through Integrity Joint Control, a licensed joint control agent specializing in the disbursement of funds from construction loans. See S. Rubin Dec.. As such, it was not possible for any of Calmwater's loan proceeds to have been diverted by Stuart Rubin or anyone else.

Calmwater alleges that millions of dollars were diverted from Mello-Roos financing to "unknown parties", but does not state how or when this was alleged to have occurred. As set forth in the S. Rubin Dec. and attached exhibits, Stuart Rubin and ASR advanced over $8 million to the Project in 2018, $2.8 million of which should have been covered by Mello Roos funds. As a result, when the Mello Russ funds were received, the Debtor reimbursed ASR $2.8 million on October 1, 2018 for a small portion of the funds it had advanced.

Likewise, the Motion claims, again without evidence, that PACE funds were misappropriated to "invest in the cannabis dispensary and to fund the Debtor's lifestyle." This is of course, impossible, as all PACE funds were sent to Integrity Joint Control, from where they were disbursed

WEINTRAUB & SELTH, APC
11766 WILSHIRE BLVD., SUITE 1170
LOS ANGELES, CA 90025

to contractors and suppliers.  See S. Rubin Dec.

The Bentley automobile mentioned in the Stiffelman Dec. (and throughout the Motion) was paid for entirely by Stuart Rubin.  The down payment for the vehicle lease consisted of a trade-in of a vehicle owned by Stuart Rubin and all monthly payments were made by Stuart Rubin or one of his entities.  See S. Rubin Dec. and **Exhibit 14** thereto.

    E.    <u>The Memorandum of Understanding With The City Does Not "Entangle" the Debtor With The Dispensary or Enrich Stuart Rubin's Children</u>

The Motion seeks to make a major issue out of the Memorandum of Understanding (and Amended Memorandum of Understanding) entered into last year between the City of Coachella, the Debtor and Coachella Lighthouse, which merely provided for payment of expected transient occupancy tax ("<u>TOT</u>") revenues which had not yet commenced from the Project due to the delays in construction.  The Debtor and Coachella Lighthouse cooperated with the City to keep the Development Agreement alive and accomplish the City's stated "strong desire to see the Glenroy Resort completed and open to the public as soon as possible, and to begin receiving transient occupancy tax ("TOT") revenue, and further, in the spirit of cooperation and the aim of continuing a mutually beneficial partnership among the Parties."  See Exhibit B to the Declaration of Edwin Leslie ("<u>Leslie Dec.</u>").  Under this Memorandum of Understanding, Coachella Lighthouse has been making these TOT payments.

As noted in the S. Rubin Dec., rather than "enriching" Stuart Rubin's children, the actual effect of the Memorandum of Understanding was to take profits from Coachella Lighthouse which would otherwise have been distributed to the owners (including the Rubin Children) and pay them to the City as TOT payments.  It was the Debtor which benefitted by these payments, <u>not</u> Coachella Lighthouse.

    F.    <u>Stuart Rubin and the Debtor Did Cooperate With The Receiver and Provided Over 6700 Pages of Documents</u>

The Motion claims that Stuart Rubin has not cooperated with the Receiver and the Leslie Dec. references in bold print, the "**limited information that has been provided by Rubin.**"  This is simply false, as well as being wholly irrelevant to the appointment of a trustee under Section

1104. As set forth in detail in the Declaration of Laurence Berman ("<u>Berman Dec.</u>") and exhibits thereto, within weeks of the appointment of the Receiver in 2019, Stuart Rubin, through his counsel, provided the Receiver with over 6,700 pages of documents, in addition to 294 square feet of oversize blueprints, at a total copy cost of $2,451.60.

G. <u>The Debtor's Motion For a Protective Advance Loan Was Not Denied By the Superior Court on the Merits</u>

Yet another misleading (and irrelevant) argument made by Calmwater is that the Superior Court denied Debtor's motion in that case to prime Calmwater's lien and install Colliers International as Project Manager without a hearing. However, as set forth in the Berman Dec. and **Exhibit 7** thereto, the motion was denied solely on the ground that there no basis for ex parte relief. The Motion was <u>not</u> denied on the merits.

H. <u>The Debtor Did Not Maintain "Dual Books" and Stuart Rubin Did Not Direct Construction Assets to the Lighthouse</u>

Among the numerous false allegations which are completely without support are those contained in the astounding Paragraph 21 of the Lavian Dec., as follows:

> Lender **has been advised** by its control fund that Debtors maintained dual sets of books in order to provide a misleading set to the Lender. Meanwhile, unbeknownst to Lender at the time, Lender has **since been informed** that Rubin personally negotiated directly with suppliers to keep Lender from learning about outstanding and unpaid invoices from subcontractors and suppliers and misdirected construction assets to the neighboring dispensary property owned, in part, by Rubin and not part of Lender's collateral. [emphasis added]

There are many expressions which could be used to describe such unfounded allegations based entirely on hearsay from unknown individuals and without the slightest evidentiary support. "Throw everything against the wall and see what sticks" comes to mind. In any event, Mr. Rubin cannot prove a negative, that he did not maintain dual books and did not direct construction assets to Coachella Lighthouse.

The disputed allegations in the final five paragraphs of the Lavian Dec. are replete with such unsupported and second-hand assertions, to wit: "Lender believes…" (Paragraph 20); "Lender has been advised that…" (Paragraph 21); "Lender has since been informed that…" (Paragraph 21);

"Lender understands that…" (Paragraph 22); "Lender saw that…" (Paragraph 23); "Lender has been informed…" (Paragraph 24). Does Calmwater believe that a Court would appoint a Trustee on such flimsy claims?

### I. Stuart Rubin Has Significant Development Experience

Calmwater attempts to belittle Stuart Rubin's long history as a successful developer by arguing that he has no "construction experience". As set forth in detail the S. Rubin Dec., Stuart Rubin has significant experience developing multiple commercial properties in Southern California and throughout the country. Of course he employs construction managers, as he has for the Project. See the Waddell Dec. Recognizing that greater expertise is needed to complete the Project, the Debtor has retained the well-respected firm of Colliers International. See the Declaration of Dana Barbera. See the Declaration of Dana Barbera ("Barbera Dec.")

### J. The Alleged "Discovery Abuses" in the Calmwater Litigation Are Completely Irrelevant

The Motion states that the Debtor and its principals refused to cooperate in discovery in the Superior Court litigation between Calmwater and the Debtor and actually sought to quash subpoenas! If prepetition litigation tactics are now grounds for the appointment of a trustee under Section 1104, the requirement of "cause" will truly have been put out to pasture. Such allegations do not warrant a response.

### K. The Debtor Does Have a Plan to Complete the Project

Finally, the Debtor does have a plan to complete the Project and pay its creditors, none of which can happen if a trustee is appointed and the property either sold "as is" or if Calmwater is allowed to foreclose.

The Debtor is completing negotiations for a debtor-in-possession ("DIP") loan, which will pay all mechanics lines senior to Calmwater and complete construction of the Project. See Declaration of Renzo Renzi. The Debtor intends to do so under the direction of an experienced Chief Restructuring Officer ("CRO") with experience in property development and the Debtor's Motion to Appoint CRO will be filed prior to the hearing on this Motion. The Debtor will also hire

1   a construction management firm with impeccable credentials to complete the Project.  See the

2   Barbera Dec and the detailed completion Project Budget attached thereto as **Exhibit 6**.

## V.

## **CONCLUSION**

Calmwater has failed to meet its substantial burden to support the extreme remedy of appointing a Chapter 11 trustee by clear and convincing evidence, especially at the very beginning of this Bankruptcy Case before the Debtor has even had the opportunity to recover possession of its Property and attempt to reorganize.

Calmwater's Motion is not based on any concern for creditors of the estate.  Simply put, Calmwater does not want the Debtor to secure DIP financing and does not want the Project to succeed and the lien claimants paid.  Instead, Calmwater wants to foreclose on the Property or have it sold in its "as is" condition.  While it touts a sale as the right solution, Calmwater knows full well that there is presently insufficient equity in the Property "as is" to pay the Debtor's creditors, and that an "as is" sale of the property by a trustee, or an abandonment of the property, would only benefit Calmwater.  The many dozens of other creditors will only get paid in this Bankruptcy Case through completion of the development.  The Debtor should have an opportunity to present its plan to creditors and to this Court in a commercially reasonable and robust manner.

Finally, to the extent that the court believes that any material allegations made by Calmwater remain unrefuted, the Debtor should also have an opportunity to conduct discovery.  A motion to appoint a Chapter 11 trustee is entirely fact based.  The Debtor disputes Calmwater's numerous hearsay allegations, the factually vacuous declaration of Calmwater's main proponent, the disgruntled investor Gary Stiffelman, and depositions can unearth the truth and establish the emptiness of the false portrayals and inaccuracies before the Court.

//
//
//
//

**WHEREFORE**, the Debtor requests that the Court enter an order denying the Motion to Appoint a Chapter 11 Trustee.

Respectfully submitted,

Dated: March 3, 2021   **WEINTRAUB & SELTH, APC**

By:   */s/Daniel J. Weintraub*
Daniel J. Weintraub
James R. Selth
Crystle J. Lindsey
[Proposed] General Bankruptcy Counsel for Chapter 11 Debtor,
GLENROY COACHELLA, LLC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

11766 Wilshire Blvd., Suite 1170, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled **OPPOSITION OF DEBTOR TO MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On March 3, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **N/A**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 3, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 3, 2021 | Gabby Piceno | /s/ *Gabby Piceno* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                                                    **F 9013-3.1.PROOF.SERVICE**

# Mailing Information for Case 2:21-bk-11188-BB

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Steven M Berman**    sberman@slk-law.com, awit@shumaker.com;bgasaway@shumaker.com
- **Daren Brinkman**    office@brinkmanlaw.com, 7764052420@filings.docketbird.com
- **Caroline Djang**    caroline.djang@bbklaw.com, laurie.verstegen@bbklaw.com;wilma.escalante@bbklaw.com
- **Jenny L Doling**    JD@jdl.law, dolingjr92080@notify.bestcase.com
- **Eryk R Escobar**    eryk.r.escobar@usdoj.gov
- **Douglas Harris**    Douglas.harris@alston.com
- **Mark S Horoupian**    mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com
- **Marsha A Houston**    mhouston@reedsmith.com
- **Michael S Kogan**    mkogan@koganlawfirm.com
- **Timothy R Laquer**    trl@ddclaw.com, trl@ddclaw.com
- **Leib M Lerner**    leib.lerner@alston.com, autodockettest-lax@alston.com
- **Crystle Jane Lindsey**    crystle@wsrlaw.net, crystle@cjllaw.com;gabby@wsrlaw.net;dairi@wsrlaw.net
- **Sean A OKeefe**    sokeefe@okeefelc.com, seanaokeefe@msn.com
- **Matthew D Pham**    mpham@hahnlawyers.com, marias@hahnlawyers.com;mpham@ecf.courtdrive.com
- **Dean G Rallis**    drallis@hahnlawyers.com, marias@hahnlawyers.com;mpham@hahnlawyers.com;drallis@ecf.courtdrive.com;drallis@ecf.inforuptcy.com
- **Debra Riley**    driley@allenmatkins.com
- **Christopher O Rivas**    crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com
- **James R Selth**    jim@wsrlaw.net, jselth@yahoo.com;dairi@wsrlaw.net;gabby@wsrlaw.net;vinnet@ecf.inforuptcy.com
- **Leonard M Shulman**    lshulman@shulmanbastian.com
- **Alan G Tippie**    atippie@sulmeyerlaw.com, atippie@ecf.courtdrive.com;pdillamar@sulmeyerlaw.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Daniel J Weintraub**    dan@wsrlaw.net, vinnet@ecf.inforuptcy.com;gabby@wsrlaw.net;dairi@wsrlaw.net