Daniel J. Weintraub – Bar #132111
James R. Selth – Bar #123420
Crystle J. Lindsey – Bar #281944
**WEINTRAUB & SELTH, APC**
11766 Wilshire Boulevard, Suite 1170
Los Angeles, CA 90025
Telephone: (310) 207-1494
Facsimile: (310) 442-0660
Email: dan@wsrlaw.net

[Proposed] General Bankruptcy Counsel to
Chapter 11 Debtor and Debtor in Possession,
GLENROY COACHELLA, LLC

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GLENROY COACHELLA, LLC<br><br>Debtor and Debtor in Possession. | Case No. 2:21-bk-11188-BB<br><br>Chapter 11<br><br>**DECLARATION OF STUART RUBIN IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION FOR THE APPOINTMENT OF CHAPTER 11 TRUSTEE**<br><br>Date: March 10, 2021<br>Time: 10:00 a.m.<br>Courtroom: 1539<br><br>*(Telephonic Appearances Only)* |

-1-

4369.02    DECLARATION OF STUART RUBIN

# DECLARATION OF STUART RUBIN

I, Stuart Rubin, declare:

1. I have personal knowledge of the facts set forth herein and, if called upon, could and would competently testify thereto under oath.

2. I make this declaration in support of the Opposition of Glenroy Coachella, LLC, the Chapter 11 debtor and debtor in possession (the "Debtor" or "Glenroy Coachella"), to the *Motion for the Appointment of a Chapter 11 Trustee* (the "Motion") filed by secured lender, U.S. Real Estate Credit Holdings III-A, LP, aka Calmwater ("Calmwater").

3. I am the majority interest owner of Glenroy Coachella Holdings, LLC, the sole Member and Manager of Glenroy Coachella, LLC, the debtor in the above captioned case.

4. Pursuant to the terms of the Restated Operating Agreement of the Debtor, Michelle A. Dreyer serves as an Independent Manager of the Debtor.

5. I have approximately 36 years of broad-based real estate investment experience and have been involved in over 100 transactions involving approximately $1 billion of real estate.

6. I have overseen the development of over 16 ground up development projects, none of which are hotels. A representative list of the real estate projects I have developed is as follows:

   a. Residential development in Santa Clarita - 12 homes (2 stories) constructed in 1991-1992, approximately 3500-4200 Square feet; each with swimming pools;

   b. Constructed a 14-unit apartment building in Chatsworth in1993;

   c. 700 car parking structure, 15,000 square feet retail, and 20,000 square feet of tech office space at 8th and Francisco in downtown Los Angeles;

   d. 300 car parking structure and a CVS drugstore at 8th and Grand in downtown Los Angeles;

   e. Shopping center of 20,000 square feet at La Cienega and 3rd Street in Los Angeles;

   f. Mann movie theatre, fast food retail and a 400-car subterranean parking structure in Culver City;

   g. Krikorian movie theatre of 1400 seats in San Bernardino;

   h. 30,000 square foot grocery store, including adjacent retail and two sit-down restaurants: iHop and Red Robin in Cincinnati, Ohio;

  i. 60,000 square foot Kohls ground up development and renovated a 300,000 mall with new tenants to include: 60,000 square foot Hobby lobby and TJ Maxx in Bend, Oregon;

  j. 100,000 square feet of retail ground up in Walpole, Massachusetts including an LA Fitness, Lane Bryant, Olympia Sports, Party City and 5 retail pads: Texas Roadhouse, Panda Express, Massage Envy, Five Guys Burgers and Panera Bread;

  k. Redeveloped a shopping center on La Cienega Boulevard to include the following new tenants since acquisition: McDonalds, El Pollo Loco, Dollar Tree, O'Reilly Auto Parts;

  l. 65,000 square foot LA Fitness, CVS drugstore, Kaiser hospital, Ross Dress for Less, Smart N Final grocery in Los Angeles and recently added new 61,000 square foot Target;

  m. Three pad restaurants in Orlando Florida and ground-up development of a 20-acre Wally Park parking facility at the Orlando airport;

  n. At Milwaukee airport developed a 20-acre site to a Wally Park facility;

  o. Developed and repositioned three office buildings to an off-site parking facility at O'Hare airport in Chicago; and

  p. Renovated an 850-car parking structure at 7th and Olive, includes retail on the ground floor for national tenants: Shake Shack and other fast food eateries.

7. I was the president of RP Realty Partners, which is a real estate investment company, until March of 2020. I was responsible for setting the strategic direction of the company and was involved in all major acquisition, financing, repositioning, asset management and disposition decisions. RP Realty Partners is an investor in "mid-market properties" of $10-$100 million. During the time I was involved with the company, I was involved in over 100 real estate projects in which RP Realty Partners was a purchaser, seller, lessor or lessee, or was financing and refinancing these projects. For over eight years, I was involved in the purchase and operation of the Vagabond hotel chain of 55 hotels which had its own management and central reservation system.

8. ASR Development Company, Inc. ("ASR"), is a California corporation through which I do the majority of our real estate development projects. I am the sole owner of ASR and the custodian of the books and records of ASR. The books and records are maintained in the ordinary course of business of ASR and entries to the books and records are made by a person with knowledge or from information transmitted by a person with knowledge of such entries.

9. I was the original organizer and one of the founders of The Private Bank of California, which was a publicly traded lending institution. I served on the senior loan committee of The Private Bank of California for seven years and held several other positions until its sale in 2013.

10. I received a Bachelor of Science degree in Business Administration from the University of Southern California.

## Background with the Project

11. I have been actively involved with the property located at the southeast corner of Avenue 48 and Van Buren Street, Coachella, California (the "**Property**") since approximately 2008. Since that time, I have been personally involved in all of the milestone events related to the acquisition of the Property, including its rezoning from residential to General Commercial, the approval of the Development Agreement with Gary Stiffelman ("**Stiffelman**") for the Property, the decisions to enter into the material agreements related to construction of a hotel and other improvements on the Property (the "**Project**") and other material agreements related to the Property and Project.

12. In 2008, the Property was acquired for approximately $23,000,000. I was an investor of the participating group for the equity used by the borrower to purchase the Property, and a member of the limited liability company that originally acquired the Property. The original borrower defaulted, and the investors abandoned the Project and bank debt, and I was asked to step in and cure the debt and pay off the note. When that entity could not successfully develop the site, I took steps to find other investors and, together with these new investors, repaid the entity that lent the funds to acquire the Property.

13. Since 2008, I have been actively involved in trying to develop the Property. From 2008 to 2014, the economic climate in the Inland Empire and the Property's zoning meant that developing the Property did not make sense.

14. As these conditions changed in 2014, Mr. Stiffelman and I began planning for use of the site as a hotel. Planning and development of the site took place from 2014 to 2016. In May of 2017, the site grading permit was issued and site work on the Property began in the fourth quarter

1  of 2017.

2      15.    Many of the construction permits for the Project were pulled in late 2017 and early 2018. Thereafter, construction began.

3      16.    Prior to Calmwater making its loan in late April 2018, the Project was funded almost entirely by contributions and loans from me and ASR ($12,872,043.75) and equity contributed by Mr. Stiffelman (approximately $2,000,000) and Dr. Lander ($2,725,000 acquired through 1031 tax exchange). Attached hereto as **Exhibit 1** and is incorporated herein by reference is a chart showing the contributions made by each of the partners of the Debtor.

4      17.    Mr. Stiffelman's statements in his declaration that I have not contributed any "personal" funds to the Project are false. Since 2010, I have, directly or through ASR, my private development company, contributed approximately $16,416,592.11 to the Project and in order to keep the Project moving, when it had no cash, I often contributed excess equity. I have been reimbursed a total of $3,544,548.36 of excess equity, yielding my net equity contribution to the Debtor in the amount of $12,872,043.75. The amount of my actual obligation to contribute capital to the Debtor is approximately $8,000,000. The "personal funds" contributed by me were used to acquire and develop the Project, including to pay for costs related to changes in the Project's scope. Attached hereto as **Exhibit 2** and is incorporated herein by reference are detailed spreadsheets I have caused to be prepared which show, year by year and transaction by transaction, the contributions I have made to the Project since 2010 and the reimbursements I have received. Attached hereto as **Exhibit 3** and incorporated by reference are a series wires, cancelled checks and bank statements to support each entry on **Exhibit 2**. They show that I contributed approximately $16,416,592.11 to the Project and was reimbursed a total of approximately $3,544,548.36, for a net equity contribution of $12,872,043.75, which is approximately $4,800,000 more than I was obligated to contribute.

    18.    I have also executed personal guarantees in favor of the Calmwater loan and DWC.

    19.    I have spent thousands of hours on this Project. I have never received a developer's fee or other remuneration.

**Stiffelman Allegations**

20. Mr. Stiffelman's attacks on me in his Declaration are completely untrue and without any evidence. Despite the claim in the Motion that "the Debtor's own investors" have alleged fraud and misconduct by me, Mr. Stiffelman is in fact the only investor to make such claims.

21. Mr. Stiffelman is a sophisticated attorney with forty years of experience and was a former shareholder at Ziffren Brittenham LLP, specializing in complex entertainment and other transactions for over 20 years and also at Greenberg Traurig LLP. He was actively involved in the Project since he first became an investor and was well aware of everything that took place. He is hardly the "passive investor that his Declaration suggests. In fact, Mr. Stiffelman begged to remain in the Project even when I offered to buy him out, as late as January 2019.

22. On January 19, 2017, Mr. Stiffelman asked me: *"Do we have a sense of what the partners may have to come up with financially? This makes me apprehensive."* I responded: *"Gary- This is a process to build something. I don't know yet. It makes me nervous that you are apprehensive. It is difficult to inform you along the way as there are bumps and starts. Do you want out?" I will help find someone if you do. I do not know the value at the moment, as the value is in the entitlements and what is going to be built. Please let me know."* Mr. Stiffelman insisted that he wanted to be part of the Project, and stated as follows: *"I don't want out at all. I want to stay in. I trust you as my brother. Please forgive my apprehensions. I don't have your resources. I don't have millions more to put into this if that's what it may take. I appreciate that this will unfold over the coming weeks and months and there is no way to know with certainty today. I need to be more patient. I'll stop asking and wait for the answers to reveal themselves. I know I can always find an exit if it becomes necessary."* True and correct copies of these January 19, 2017 e-mail are attached hereto as **Exhibit 4** and incorporated herein by reference.

23. As recently as January 4, 2019, even after Calmwater stopped funding the Project, and after Mr. Stiffelman's investment was approximately $2,000,000, he affirmed his interest in continuing to be a partner in the Project and rejected my offer to buy out his interest, stating as follows: *"I want to [be] a good partner. You're my best friend. I don't want you to buy me out. I just want to help find a solution, knowing that I don't have anything close to your resources. I love you,*

*Stuart, and I ache to think I've upset you."* A true and correct copy of this January 4, 2019 e-mail is attached hereto as **Exhibit 5** and incorporated herein.

24. Mr. Stiffelman's claim that the Project was over budget and could not pay its debts because I took money from it are also belied by his e-mails from the time in question. In a September 6, 2019 e-mail and five-page attachment, Mr. Stiffelman explained to a potential lender that the cost overruns and delay affecting the Project were attributable to the fact that "the project has grown substantially, principally because the developers decided to build something quite unprecedented." Mr. Stiffelman provided a detailed summary of the "material changes and improvements" to the Project that resulted in the cost overruns and delays. Conspicuously absent from this letter was any mention of any wrongdoing by me. A true and correct copy of this September 6, 2019 e-mail and attachment is attached hereto as **Exhibit 6** and incorporated herein.

25. The truth of the matter is Mr. Stiffelman's law career cratered and he ran out of the needed capital for our Project. A true and correct copy of his of July 9, 2019 stating that he had kept material things from me, that he's "pretty much broke" and that his "law firm income fell off the edge of the earth" and that he has "no secondary income source" is attached hereto as **Exhibit 7** and incorporated herein.

**The Project**

26. The Project is a 35-acre luxury resort, including 250 rooms contained with 51 casita style accommodations (which are describe more fully below), a 30,000-person outdoor events theater and a 10,000 square foot pool. The 51 casitas on the Property are luxury bungalows which are configured in two, four and six room configurations that are one-story and separated 15-25 feet from one another. The casitas at the Property may have two separate hotel rooms, other casitas may have four rooms and others may have six rooms.

27. In 2018, Glenroy Coachella LLC (the "**Hotel**") entered into a license agreement with Holiday Hospitality Franchising, LLC to allow the Hotel to be operated and branded as a Hotel Indigo® property. Holiday Hospitality Group is part of InterContinental Hotels Group ("**IHG**"). It took over four (4) months to negotiate this license agreement with IHG, which took place after we

spent months identifying which hotel licensing group would best serve the Project. Having IHG act as the franchisor for the Hotel on the Project is a valuable asset as IHG is a valuable brand, because consumers' purchasing decisions for hotels are influenced by the reputation such brands represent and the positive message the IHG brand communicates about the Hotel and its reputation and services. There is another tangible benefit to have IHG brand the Hotel. The marketplace for hotels in this area is crowded and the IHG brand for the Hotel allows it to distinguish itself from its competitors and make the Hotel stand out. IHG also has one of the largest customer loyalty memberships and its own reservation systems, both of which add value to the Hotel and the Project.

28. In my conversations with IHG, IHG has notified me and the Debtor that it will renew the franchise agreement and waive the franchise fee. Attached hereto as **Exhibit 8** is an email dated January 4, 2021 related to the Debtor's reapplication for the renewed franchise.

29. As part of the Project, Glenroy entered into a Development Agreement with the City of Coachella ("**Coachella**") permitting the Project to proceed. The Development Agreement is a valuable asset. Not only does it allow the Project to proceed, as part of the Development Agreement, Glenroy received a Transient Occupancy Tax ("**TOT**") abatement of $25 million for a twenty (20) year period, plus other favorable entitlements.

30. The City of Coachella provided the Debtor with valuable entitlements. I have been in regular contact with the City and based upon recent discussions with the City believe the Development Agreement can be renewed and these entitlements can be saved and reactivated provided the Debtor cures any defaults and re-mobilizes construction on the site.

31. Calmwater seeks to make a major issue out of the Memorandum of Understanding (and Amended Memorandum of Understanding) entered into last year between the City of Coachella, the Debtor and Coachella Lighthouse, which merely provided for payment of expected transient occupancy tax ("TOT") revenues which had not yet commenced from the Project due to the delays in construction. The Debtor and Coachella Lighthouse cooperated with the City to keep the Development Agreement alive and accomplish the City's stated "strong desire to see the Glenroy Resort completed and open to the public as soon as possible, and to begin receiving transient occupancy tax ("TOT") revenue, and further, in the spirit of cooperation and the aim of continuing a

mutually beneficial partnership among the Parties." See Exhibit B to Declaration of Edwin Leslie ("Leslie Dec."). Under this Memorandum of Understanding, Coachella Lighthouse has been making these TOT payments. Thus, rather than "enriching" my children, the actual effect of the Memorandum of Understanding was to take profits from Coachella Lighthouse which would otherwise have been distributed to the owners (including my children) and pay them to the City as TOT payments. It was the Debtor which benefitted by these payments, not Coachella Lighthouse.

### Status of Construction on the Project

32. The last advance made by Calmwater for the Project took place in December of 2018. Construction on the Project stopped in January of 2019. Even with all of these changes in scope, phase one of the Project, which is approximately 150 rooms, is approximately 60-65% complete, with framing and shells for the majority of the commercial buildings and casitas complete, and the initial groundwork on the pool complex complete.

33. Although 60-65% of the overall construction in phase one has been completed, the hotel is close to opening. To explain why this is true, it is important to understand the nature of the hotel that was designed and built at the Property. Most hotels are vertical buildings, which means that the entire building must be completed before the hotel can open. The hotel at the Property is a horizontal development of 51 casitas, which means that the hotel can be opened in stages as groups of the casitas are developed. An individual hotel room in these casitas is also referred to as a key.

34. Out of the initial 250 hotel rooms in these casitas, 150 are very close to being finished, and 70 of the 250 hotel rooms are 85-90% complete. Another 80 rooms are 70% complete and will be done in 90 days. Since the hotel can be opened in stages because of its horizontal design, when the first 150 rooms in these casitas are ready, the hotel can start generating revenue. The remaining 100 rooms are framed and have roofs on them and will be finished within nine months after construction begins again.

35. Additionally, I completely deny the allegations on the Lavian Dec. that I maintained a dual set of books to mislead Calmwater and that I diverted construction assets to the Coachella Lighthouse property.

### The Change in the Project Budgets

36. Calmwater has asserted that Dr. Lander and I along with our capital finance advisor, Steve Bram of George Smith Partners ("GSM"), defrauded Calmwater by providing a deliberately understated budget for the Project in order to "lure" Calmwater into making this loan. This is not true and as the Court will see there is ample evidence that Calmwater knew and acknowledged that the budget for the Project was incomplete and would need to be finalized before it entered into the loan on April 26, 2018. Calmwater hired a construction consultant Marx/Okubo Associates, Inc., to review the budgets and construction documents submitted to Calmwater and advise it on these issues. According to the Marx/Okubo report that was submitted to Calmwater before it made the loan to the Debtor, Calmwater knew the budget was incomplete and understated. Although this report was *never* disclosed to the borrower, Calmwater's procurement and receipt of the Okubo report prior to funding means that Calmwater hurried to close the loan without addressing missing items, discrepancies in contract scope and amounts and other development issues of which it was aware. Calmwater never alerted the borrower to the deficiencies or budget shortcoming issues in the Obuko Report and went into this loan with eyes wide open.

37. I know that Calmwater knew from the very beginning, including at the time it made the loan and shortly after closing the loan, that the Project's budget was insufficient for the Project and that Project's costs were evolving and increasing from the star, because I received e-mails from Calmwater acknowledging that this was true and Calmwater was in possession of a report from its own construction consultant, as set forth below.

38. The Calmwater Loan closed on April 26, 2018. One day later, on April 27, 2018, Tristine Lim, a vice president with Calmwater, sent me the following e-mail*: "Stuart, I spoke with Annie, and what Annie has requested is a copy of 4 cancelled checks that Doug Wall wrote to the subcontractors for the first draw. He's saying he paid those invoices and would like to get reimbursed, so we need back-up showing that these have been paid. Also, Doug Wall's first draw has gone from $5,162,380.69 to approx. $4.4M because of shortfall in certain line items. We'll figure out the budget after we fund the first draw."* A true and correct copy of Tristine Lim's April 27, 2018 e-mail is attached hereto as **Exhibit 9** and incorporated herein by reference.

39. On May 21, 2018, Heull Kim, the Debtor's assigned Asset Manager and main contact at Calmwater, sent me the following e-mail, *"I believe the budget provided to us has insufficient information for us to be able to accurately provide the requested information regarding project costs to date and balances to finish. To help with this process, I've outlined a checklist of items that'll need to be provided or clarified, so that we're able to provide you with an accurate draw schedule for immediate future draw requests while also potentially minimizing the time spent on future back and forth needed to rebalance the budget later down the construction timeline."* A true and correct copy of Huell Kim's May 21, 2018 e-mail is attached hereto as **Exhibit 10** and incorporated herein by reference.

40. On June 11, 2018, a meeting took place where the Debtor's representatives presented a revised budget for the Project to Calmwater's representatives. David Pascale and Steve Bram (the Debtor's commercial real estate brokers with George Smith Partners) attended on behalf of the Debtor, and Tristine Lim and Larry Grantham (founder and Managing Principal of Calmwater) attended on behalf of Calmwater. I attended by telephone, as did Annmarie Lemento, President of Integrity Joint Control, the fund controller for Calmwater. A true and correct copy of Steve Bram's June 10, 2018 e-mail to Tristin Lim confirming the meeting is attached hereto as **Exhibit 11** and incorporated herein by reference.

41. After the meeting, on June 13, 2018, Tristine Lim of Calmwater expressed concerns about the revised budget and requested a call with Steve Bram to discuss. A true and correct copy of Tristine Lim's June 13, 2018 e-mail and Steve Bram's June 14, 2018 e-mail to me is attached hereto as **Exhibit 12** and incorporated herein by reference.

42. Attached hereto Attached hereto as **Exhibit 13** and incorporated herein by this reference is the "Pre-Construction Project Report" ("Obuko Report"), dated March 13, 2018, prepared for Calmwater by Marx|Okubo Associates, Inc., and addressed to Tristine Lim, Calmwater's underwriter. The Report was prepared prior to the Calmwater loan closing. It was provided to Steve Bram of GSM by Calmwater on or about March 23, 2018 who provided it to me on February 20, 2021. I had never seen the Obuko Report before. The Obuko Report was sent to

me for the first time, not by Calmwater, but by Steve Bram on February 2021, well after the litigation with Calmwater had begun.

43. Pages 21 and 22 of the Report contains the Marx|Okubo "Construction Budget Analysis and includes two pages of qualifications regarding and criticisms of the budget and states in several places that the expert believes the construction plans to be not complete or inconsistent and the construction budget to be "insufficient" for the proposed construction, that the "costs would be higher" and that their "review suggests that the costs could exceed the budget price". To my knowledge, the Obuko Report was not provided to or discussed with the Debtor's general contractor or any other Project professionals. However, it is clear from the Obuko Report that during the inspections and diligence collection process performed by Rich Milstead, the inspector from Marx|Okubo, that he was very unhappy with the budget and quality of the information he reviewed.

44. In preparing its construction budgets, the Debtor relied upon its general contractors, Doug Wall Construction ("DWC"), Jacobson Engineering and STAR DEVELOPMENT, and its owners' representative, Ian Waddell, P.E., TRC Parkitects. Though I have been involved and supervised a number of ground-up real estate development projects, I had never developed a hotel before and therefore relied heavily on our contractor and tradespeople.

45. Based on feedback and demands from the City, developers, hotel operator and Mr. Stiffelman, and the desire to create a world-class development, improvements and changes in scope to the Project were made. The Project's budget increases were due to (1) construction cost increases caused by the move from prefabricated casita units to ground-up casitas, (2) omissions in the plan by our contractor, (3) increase in size of the convention center, and (4) added scope required by the County and the City.

46. The changes in the Project's scope were described on September 6, 2019 by my partner in the Project, Gary Stiffelman, in an email a copy of which is attached hereto as **Exhibit 6** and is incorporated herein by reference, and included the following changes to the Project: doubling the size of the conference center, enlarging the pool; adding city-mandated poolside structures to accommodate additional bathrooms, changing rooms and showers and additional piping so that the

water pressure to the site was adequate; and adding a new poolside restaurant and building to house pool equipment.

47. Most importantly, the rooms and villas were reinvented at Mr. Stiffelman's behest, with construction being shifted from pre-manufactured structures to ground-up buildings, and the guest rooms being enlarged by over 30%, including enlarging the common area rooms and ceiling heights, adding a powder room to the six-bedroom units and purchasing expensive custom furniture for the rooms. Multiple linen closets for housekeeping were also added. Other buildings were also expanded: the quick service market was increased from 2,600 square feet to 3,250 square feet, the back of house service building was increased from 5,000 square feet to 8,000 square feet and a two-story gym with a juice and coffee bar totaling 7,000 square feet were added. A new convention center building was redesigned and changed by Mr. Stiffelman in conjunction with the hotel company.

48. We believed that these changes collectively would create a world-class luxury hotel in Coachella and make the Project much more attractive and improve and expand the Project's revenue opportunities.

49. Prior to agreeing to change the Project from prefabricated casitas to ground up, we had several meetings and calls with the principal managers of the Project of DWC, our general contractor to be advised as to whether there would be any increased costs or delays. On October 1, 2017, I attended a meeting at Ian Waddel's country club, Mesa Verde in Costa Mesa called by Mr. Butler of DWC. The purpose of the meeting was to present to Ownership the differences in the costs and timeframes, if any, associated with the move from prefabricated casita units to ground-up casitas. The meeting was attended by Mr. Butler, Andrew Fluken of DWC, Ian Waddell our owner's representative, Joseph Rubin and myself. At this meeting Mr. Butler presented a rough budget and represented that ground up construction would not cause any significant increase in costs or time delays and he indicated formal plans needed to be completed in order to present a budget and timeline.

50. The October 1, 2017 meeting was followed by a meeting at the end of October, 2017 at the Property at which Mr. Butler presented a detailed budget which showed that the ground up

project could be constructed at the same approximate cost as the prefabricated units and that the contractor believed a ground up construction Project could be completed with all of the new specifications more quickly than the prefabricated units could be finished. The meeting was attended by Mr. Butler, Andrew Fluken, Ian Waddell, Joseph Rubin, Gary Stiffelman and myself. Unfortunately, as we would come to learn, this was not the case as many elements were not included in the new plan and other material changes to cost were not accounted for. As an example, the units were larger in square footage and the planned HVAC and electrical systems were no longer adequate, the structure of the roof had to change and because the foot print of the units grew, the property had to be re-new graded which entailed additional civil engineering work, and architectural layouts. DWC had not previously built a hotel and I believe these issues were caused by the contractor's lack of experience in the hospitality space.

### No Diversion of Project or Loan Funds

51. Calmwater asserts that millions of dollars were diverted to build the Coachella Lighthouse. This is false. As is explained in detail in the *Declaration of Joseph Rubin*, no funds went from the Project to the Coachella Lighthouse. To the contrary, Coachella Lighthouse secured and provided a loan of $1,268,785.52 to SGE Realty, LLC ("SGE"), a California limited liability company owned by Mr. Stiffelman, Dr. Lander and me. These monies were used to fund the Project. My son Joseph Rubin, along with Coachella Lighthouse, funded additional expenses for the Project in 2019 in excess of $350,000. Joseph also personally loaned the Project $125,000 to fund Project costs. Finally, the Coachella Lighthouse was fully built out, opened and operating on April 13, 2018, two weeks before Calmwater closed its loan.

52. Calmwater never states that any of its loan funds were diverted but infers same and would obviously like the Court to believe that. Calmwater does not tell the Court that at all times that the Calmwater loan was in place and funding draws, all advances were made by Calmwater's funds control manager, Integrity Joint Control, Inc. ("Integrity"), who issued all payments on the Project and also conducted all field inspections on behalf of Calmwater before funding. In addition

to the Calmwater loan funds, all PACE Equity funds went to Integrity. No Calmwater loan proceeds were or could have been diverted.

53. In 2018, ASR and I advanced over $8 million to the Project, of which $2.8 million was used to fund expenses which should have been covered by Mello Roos funds. As a result, when the Mello Roos funds were received, I reimbursed ASR $2.8 million for the funds it had advanced.

54. The claim that I diverted any funds from this Project is absurd on its face which is why I believe Calmwater did not attach the report of the "forensic accountant engaged by the receiver" (*Declaration of Edwin Leslie, page 3, line 16*). As the Court can see from **Exhibit 2,** I funded and was reimbursed by the Project for expenses I paid the following sums:

| Year | Total ASR | Various Contributions | Total Glenroy to ASR Reimbursed | Total Capital Additions | Equity Balance |
|---|---|---|---|---|---|
| 2010 | $570,900.00 | $0.00 | $0.00 | $570,900.00 | $570,900.00 |
| 2011 | $193,100.00 | $0.00 | $0.00 | $193,100.00 | $764,000.00 |
| 2012 | $228,850.00 | $0.00 | $0.00 | $228,850.00 | $992,850.00 |
| 2014 | $350,472.07 | $0.00 | $179,000.00 | $171,472.07 | $1,164,322.00 |
| 2016 | $127,100.00 | $0.00 | $0.00 | $127,100.00 | $1,291,422.00 |
| 2017 | $4,409,889.59 | $0.00 | $370,000.00 | $4,039,889.59 | $5,331,311.59 |
| 2018 | $7,874,855.07 | $193,309.91 | $2,824,942.15 | $5,243,222.83 | $10,574,534.43 |
| 2019 | $2,468,115.47 | $0.00 | $170,606.21 | $2,297,509.26 | $12,872,043.68 |

This is clearly not the picture of someone intent on committing fraud by diverting funds from a project. I am a principal who has strongly backed this Project.

### Bentley Payments

55. Like so many of the other allegations made against me in the Calmwater Motion and declarations, the claim that I have caused a diversion of Project funds by having the Debtor pay for a luxury car has no factual support and is in fact false.

56. It is correct that I leased a car under Glenroy Coachella, LLC. Attached hereto as

**Exhibit 14** and incorporated herein by this reference is a copy of the California Motor Vehicle Lease Agreement. This fact without any context or explanation looks damming, and I believe Calmwater deliberately presented it that way. But it is grossly misleading because Calmwater chose to not inform the Court that I made the $35,000 down payment on this car lease by trading in a car that I owned and I made all payments on the Glenroy car lease directly or through entities I own. Attached hereto as Exhibit 15 and incorporated herein by this reference are copies of lease payments that I made to Bentley. I understand why Calmwater withheld these facts from the Court as it would not serve Calmwater's hypothetical story to say: "Mr. Rubin leased a car in the name of the Debtor, but he made all of the payments."

## Debtor in Possession Financing and Equity Investor

57. The Debtor has received a commitment from EFO Financial Group, LLC, a Florida limited liability company ("EFO") to provide the Debtor with financing in the amount of $38.25 million ("DIP Loan") to help fund the completion of the Project and pay the allowed claims of all perfected lienholders senior to Calmwater. EFO's financing commitment is based on its conclusion that the Project, when fully complete and operating, will be worth substantially more than all of the secured debt on the Project.

58. The Project Budget totals approximately $42.4 million, which includes, (a) soft costs of the Project, (B) hard costs for public structures, (C) hard costs to complete 250 key hotel operations in 51 "casitas," (D) hard costs for site development, (E) other costs, FF&E, contingency, etc., and (F) payment of all perfected mechanics liens which are senior in priority to Calmwater, cure payments to amounts owed to critical vendors (subcontractors), loan fees and legal and professional fees.

59. The Project Budget was prepared by Dana Barbera, Senior Director or Project Management for Colliers International, Renzo Renzi, a principal and manager of EFO and myself.

60. The difference between the Project Budget and EFO loan will be paid with long-term municipal debt that the Debtor has in place through Mello Roos and Property Assessed Clean Energy ("PACE") loans.

61. The Debtor has retained LW Hospitality Advisors to re-appraise the Project. I expect to have the updated report on or about March 10, 2021. Give the previous values assigned to the Project, I believe the appraisal report will show that the Project when completed will have a value sufficient to refinance the property and pay all creditors in full.

62. I am also in negotiation with a third party concerning an infusion of equity ("Equity Contribution") into the project in an amount in excess of $10 mil. The terms of our negotiations are currently confidential, but new equity in the Project would allow the Debtor to significantly reduced its DIP Loan from EFO.

63. I wish to propose a plan of reorganization funded either by the DIP Loan or a combination of the DIP Loan and Equity Contribution which provides for the completion of the construction and a sale or refinance and pays creditors in full.

### Retention of Chief Restructuring Officer and Construction Manager

64. Since the filing of this case, I have authorized Daniel Weintraub to seek to engage a Chief Restructuring Officer ("CRO") for the Debtor. Subject to Court approval, I believe the retention of a CRO for the Debtor to, among other things, manage and oversee the Debtor's business operations, completion of the Project and the Chapter 11 process is in the best interests of the estate and its creditors.

65. I have reviewed all Curriculum Vitae and information materials provided by Mr. Weintraub and authorized him to negotiate employment arrangements. The Debtor has narrowed its focus to Conway Mackenzie Management Services, LLC ("CMS"), and Glass Ratner Advisory & Capital Group, LLC, dba B. Riley Advisory Services ("Glass Ratner"), both of whom have construction management, turnaround and bankruptcy expertise to manage the Debtor's affairs in this case and complete this process.

66. The Debtor has negotiated engagement agreements with both CMS with Matthew

-17-

4369.02   DECLARATION OF STUART RUBIN

1. Mason to serve as the Debtor's CRO and Glass Ratner with Daniel Berman to serve as the Debtor's CRO and intends select one of these parties on or before March 5, 2021.

67. The appointment of a CRO, unlike a Chapter 11 Trustee, brings the funds needed to finish the Project and construction expertise. It also eliminates the concerns that Calmwater raises about trusting me, which are misplaced as I have not misappropriated any Project funds, and my ability to complete the Project. The appointment of a Trustee will hurt the creditors who are junior to Calmwater as they will all be wiped out in a foreclosure sale.

68. The Debtor is also prepared to engage Colliers Project Leaders ("CPL"), a division of Colliers International, as the construction manager for the Project. CPL and Dana Barbera, Senior Director, Project Management at CPL, was initially hired by the Debtor as Owner's Representative and Construction Manager in February 2020. Mr. Barbera has evaluated the site conditions, reviewed all existing drawings, permits, inspection reports, contract documents and project correspondence and is extremely familiar with the Project and CPL is prepared to re-engage and mobilize upon Court approval of the DIP Loan. The Project Master Schedule prepared by Mr. Barbera provides for a start date of May 3, 2021 and a completion date of May 3, 2022.

### Calmwater's Collateral and the Injunction

69. Calmwater is well secured. Calmwater had a deed of trust on the Project, the personal guarantees of Dr. Lander, Mr. Stiffelman and myself. Calmwater also obtained an injunction preventing the sale of my home located at 715 N. Alpine Drive, Beverly Hills, CA which has approximately $4,000,000 in equity and a residence my wife and I own located at 4347 Marina Drive, Hope Ranch, CA which has approximately $7,000,000 in equity.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed by me on March 3, 2021, at Beverly Hills, California.

STUART RUBIN