The Law Offices of Damian D. Capozzola
Damian D. Capozzola (SBN 186412)
Timothy R. Laquer (SBN 306917)
633 W. Fifth Street, 26th Floor
Los Angeles, California 90071
Phone: (213) 533-4112
Facsimile: (213) 223-2014
ddc@ddclaw.com
trl@ddclaw.com

Attorneys for Gary Stiffelman

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| In re: Glenroy Coachella, LLC<br><br>　　　　Debtor, | Case No.: 2:21-bk-11188-BB<br>Chapter: 11<br><br>Hon. Sheri Bluebond<br><br>**DECLARATION OF GARY STIFFELMAN IN SUPPORT OF JOINDER OF GARY STIFFELMAN TO U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP'S MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE AND MOTION TO EXCUSE STATE COURT RECEIVER, EDWIN LESLIE, FROM TURNOVER OF ASSETS UNDER 11 U.S.C. § 543**<br><br>Date: March 10, 2021<br>Time: 10:00 a.m.<br>Place: Courtroom 1539<br>　　　　255 E. Temple Street<br>　　　　Los Angeles, CA 90012 |

## DECLARATION OF GARY STIFFELMAN

I, Gary Stiffelman, declare:

1.      I am over the age of eighteen, and I make this declaration based upon my personal knowledge of the matters set forth in this declaration and, if called to testify, I could and would testify competently thereto.

2.      I am providing this supplemental Declaration in support of my Joinders to U.S. Real Estate Credit Holdings III-A, LP's ("USRECH" or "Movant") Motion for the Appointment of a Chapter 11 Trustee and Motion to Excuse State Court Receiver, Edwin Leslie, From Turnover of Assets Under 11 U.S.C. § 543 (the "Motions") and in response to allegations and exhibits by Stuart Rubin ("S. Rubin") and Joseph Rubin ("J. Rubin") in their declarations in opposition to the Motions.

3.      As an investor with an approximate one-third ownership interest in the hotel development project related to the real property located at the southeast corner of Avenue 48 and Van Buren Street in Coachella, California (the "Project"), I believe that the appointment of a Trustee is in the best interests of Glenroy Coachella, LLC ("Glenroy"), the Project, and all parties and creditors.

4.      Contrary to S. Rubin's contentions, I have invested far more than $2,000,000 in the Project.  In addition to my direct contributions, I personally guaranteed loans from East West Bank and Bank Hapoalim for $3,000,000 and $2,000,000, and I entered into a loan from City National Bank for $1,750,000, in furtherance of the Project.  S. Rubin was principally responsible for negotiating the East West Bank and Bank Hapoalim loans, and he received the funds from these entities.  While I negotiated the City National Bank loan, a significant portion of those loan's proceeds were also directed by S. Rubin.  I believe that S. Rubin subsequently claimed these sums as being sole contributions from him personally, whether direct or through entities controlled by him, such as ASR Development Company, Inc. ("ASR").  S. Rubin has failed and refused to provide an accounting to me concerning the intake of these loan proceeds or the expenditures for these loan proceeds.  I believe that

a review of the books and records within the possession, custody, or control of S. Rubin would reveal and demonstrate that the source of a significant amount of funds, if not nearly all the funds, claimed by S. Rubin as being funded by him or by ASR were instead from other sources, such as the loans which I personally guaranteed.

5.    S. Rubin's improper claims of personal contributions for these joint loans is evidenced by his own statements in his Declaration and Exhibits. This is most clearly demonstrable from the East West Bank loan for $3,000,000. In S. Rubin's Exhibit 2, S. Rubin claims a "personal" contribution of $2,750,000.00 from East West Bank on February 1, 2018. *See* Decl. of S. Rubin, Ex. 2, Dkt. # 79, p. 12 of 417. In the same exhibit, S. Rubin provides records concerning a loan advance request which lists the same date (February 1, 2018) and the same amount ($2,750,000), with the credit to "1604 Sunset Plaza LLC", account number 8003072405. *See* Decl. of S. Rubin, Ex. 2, Dkt. # 79, p. 225 of 417. The Loan / Note Number is listed as 23160476. *See* Decl. of S. Rubin, Ex. 2, Dkt. # 79, p. 225 of 417. This is the same Loan on which I was a guarantor, along with Elliot Lander ("Lander"), and East West Bank informed me that an advance on this loan on that same date (February 1, 2018) for that same amount ($2,750,000) was deposited into that same account (1604 Sunset Plaza LLC). Attached hereto as Exhibit "1" is a true and correct copy of email correspondence with Larry Wong at East West Bank concerning this loan's advancements. Next, these records confirm a wire transfer with this same entity (1604 Sunset Plaza LLC, account ending 2405) as originator and the beneficiary as Glenroy for the same amount ($2,750,000) on the same date (February 1, 2018). *See* Decl. of S. Rubin, Ex. 2, Dkt. # 79, p. 224 of 417.

6.    Accordingly, from this $3,000,000 loan, S. Rubin advanced the sum of $2,750,000 on February 1, 2018 into an account for 1604 Sunset Plaza LLC and then subsequently transferred that to an account for Glenroy – and S. Rubin is now claiming that this entire sum of $2,750,000 was his personal contribution despite it being a joint contribution and joint liability. Attached hereto as Exhibit

"2" is a true and correct copy of email correspondence from Larry Wong at East West Bank to S. Rubin, Lander, and me concerning this loan and its default, with an attachment of a letter dated November 1, 2019 identifying "Loan No.: xxxx0476." This example of this loan from East West Bank is emblematic of S. Rubin's taking "personal" credit of funds for which he is not the actual source: this was joint responsibility by three guarantors, yet S. Rubin claims full personal credit.

7.    S. Rubin's statements in his declaration pertaining to me, specifically, are incorrect and misleading for multiple reasons. S. Rubin's purported offer to "buy" me out of the Project in January 2019 did not include any payment by S. Rubin for my significant investment. S. Rubin's reference to his correspondence confirms the same as S. Rubin made no monetary offer; rather, S. Rubin's proposal was that I walk away from the Project, which would have enabled S. Rubin to usurp my interest and to again claim credit for another individual or entity's contributions, as he has done with various other sources of funding. In January 2019, S. Rubin had also expressed concerns to me about his own financial circumstances and S. Rubin himself did not offer to purchase my interest but claimed "I will help find someone." *See* Decl. of S. Rubin, Ex. 4, Dkt. #80, p. 3 of 133.

8.    To the extent that I expressed apprehension, it was as a direct result of S. Rubin's failure and refusal to provide me with timely, consistent, and sufficient information concerning the status of the Project and the financial information relevant to the Project. During the pendency of the Project, I asked S. Rubin for information, books, and records concerning the Project, but S. Rubin failed or refused to provide those records. This failure and refusal became more pronounced after issues arose concerning the completion of the Project. S. Rubin refused to provide an accounting, and continues to refuse to provide such an accounting.

9.    At the time of the pendency of the Project, I was unaware of the nature and extent of the dire financial situation of the Project caused by S. Rubin's malfeasance and mismanagement. This was directly caused by S. Rubin's failure and refusal to provide information and records to me. I did not

know that S. Rubin had failed and refused to pay significant costs for the Project.  I did not know that he had taken money from Mello-Roos and elsewhere, money which was supposed to be used for the Project but which was not.  S. Rubin never provided to me any reconciliation before or after he took money from Mello-Roos, and S. Rubin never advised me that he would be seeking reimbursements for funds purported advanced.  I did not know that S. Rubin had been claiming credit for funds and financing from other sources beyond his own personal funds and contribution.  While S. Rubin's Declaration contains a note by Lander claiming that Lander provided contributions on S. Rubin's behalf totaling "approximately" $895,000 and that that sum should be credited toward S. Rubin's capital account rather than Lander's account, neither S. Rubin nor Lander informed me of this fact contemporaneously.  *See* Decl. of S. Rubin, Ex. 3, Dkt. # 79, p. 415 of 417.

10.    I did not know that S. Rubin had entered into multiple leases for automobiles through Glenroy (a lease of a Land Rover Range Rover and a lease of a Bentley Bentayga).  I did not know that the budget created and proposed by S. Rubin was dramatically underestimated and that there would be insufficient funds to finish the Project, because S. Rubin again deliberately excluded me from such correspondence and considerations.

11.    Most critically, I did not know that S. Rubin would default on multiple loans on which both he and I were guarantors.  S. Rubin materially misled me concerning his own purported financial wealth, and based upon that misleading and our then close personal friendship, S. Rubin induced me to enter into personal guarantees on these loans which S. Rubin subsequently defaulted on.  Furthermore, S. Rubin did not inform me that these loans were not being paid, even after there were defaults on these loans.  S. Rubin concealed these defaults, and further concealed the basis for the defaults including his own failure to pay taxes and adhere to other obligations.  S. Rubin sought an extension on at least one such loan from East West Bank without informing me, and then I subsequently received a

default notice in November 2019 as a result of S. Rubin's failure to make payments to the bank.  *See* Ex. 2.

12.     By the time of my September 6, 2019 correspondence with a prospective lender referenced by S. Rubin's declaration, I still did not have knowledge about the extent of S. Rubin's wrongdoing because S. Rubin failed and refused to allow me to inspect books and records, or to provide an accounting.  Since I had invested a significant amount of money in the Project and had personally guaranteed multiple loans as a result of S. Rubin's inducement, I attempted to paint a more positive picture for the potential lender.  A lack of allegations of wrongdoing by S. Rubin – the man who was and remained in control of the project – was thus a natural result of these efforts to remedy the underwater Project: alleging malfeasance by S. Rubin would have guaranteed that the potential lender would not engage further or provide any financing.

13.     S. Rubin has been attempting to secure financing from EFO Financial Group, LLC ("EFO") and its principal Renzo Renzi ("Renzi") for more than a year, since approximately September 2019.  However, S. Rubin and EFO have been unable to consummate that financing.  On information and belief, S. Rubin has been unable to find any other potential source of funding for the Project, and S. Rubin has presented no alternative sources of funding.  Despite my significant interest and ownership in the Project, S. Rubin refused to include me in correspondence or negotiations with EFO and Renzi on this purported financing efforts, and I have not seen a current term sheet for EFO's purported financing.  S. Rubin and Lander additionally excluded me in meetings with EFO and Renzi, and I am informed that both S. Rubin and Lander met with EFO and Renzi in Florida without inviting me.  I received a copy of EFO's purported commitment letter last dated December 7, 2019 in the context of this bankruptcy proceeding and in the context of other litigation concerning Glenroy.  I find it odd that this is the most recent material in Renzi's Declaration, dating to December 7, 2019, and that Glenroy, S. Rubin, and Renzi have not provided any more recent evidence concerning their purported

ability to reorganize Glenroy.  Furthermore, S. Rubin's claim concerning an anonymous third party

with a purported investment that would be in excess of $10 million is unsupported by any evidence,

and instead is consistent with S. Rubin's failure and refusal to provide records and information,

deliberately choosing to shroud Glenroy and the Project in mystery and to conceal relevant information

from investors and creditors.  S. Rubin's refusal to disclose this information in the context of this

bankruptcy proceeding is highly unusual yet unfortunately commonplace for S. Rubin's pattern and

practice.

14.    S. Rubin failed and refused to inform me that he was apparently taking

"reimbursements" for funds allegedly advanced by him for the Project.  What is furthermore

concerning is the fact that S. Rubin admits construction on the Project stopped in January 2019, yet S.

Rubin still received "reimbursements" in 2019 for the purported sum of $170,606.21.

15.    Notably, S. Rubin does not deny that he is personally in default on numerous other

obligations and loans.  S. Rubin claims to have significant equity in his own residence in Beverly Hills

and in a multi-million-dollar Santa Barbara vacation home.  However, based upon publicly available

information from ongoing litigation against S. Rubin and public listing information for these

properties, S. Rubin has multiple mortgages on these properties and those mortgages exceed the gross

value of the properties.  Specifically, S. Rubin's residence in Beverly Hills is presently listed with a

sales price of $17.8 million and S. Rubin's vacation home in Santa Barbara is seeking approximately

$24 million; both of these properties have been on and off the market multiple times over the past few

years, including with lower prices.  Additionally, S. Rubin placed his residence in Beverly Hills for

auction on a "no reserve" basis, which purportedly resulted in a high bid of $13 million, but S. Rubin

was prevented from closing as a direct result of his obligations to various lenders, whom he had not

pre-cleared, and as a result of S. Rubin's violation of an injunction sought and secured by USRECH

precluding him from selling this residence.  Even if S. Rubin had been able to sell the residence at $13

million, the entirety of those proceeds would have been consumed by the mortgages on the property, and there would be zero equity for S. Rubin.  Between these two properties, the sum price requested is thus approximately $41.8 million – but S. Rubin has multiple mortgages on these properties in the amounts of $20 million, $6.5 million, $5.5 million, and $5 million for a total of $37 million.  Accordingly, even if these properties sold for the full asking price (which is unlikely given the recent auction which only resulted in an offer of approximately 73% of the asking price on the Beverly Hills property), S. Rubin's total equity is only approximately $4.8 million, not the $11 million in equity claimed in S. Rubin's Declaration.  *See* Decl. of S. Rubin, ¶ 69.

16.    Furthermore, S. Rubin does not and cannot deny that he is an individual defendant in a multitude of other litigation, related and unrelated to the Project.  I am the plaintiff in my individual capacity, in my capacity as Trustee of The Stiffelman Family Trust, and derivatively on behalf of Glenroy Coachella Holdings, LLC for one such action against S. Rubin and J. Rubin.  Attached hereto as Exhibit "3" is a true and correct copy of the operative First Amended Complaint for this action, which has since moved to arbitration.

17.    J. Rubin's statements in his declaration pertaining to The Coachella Lighthouse, LLC ("Lighthouse") and his statements concerning me are incorrect and misleading for multiple reasons as well.

18.    The Stiffelman Family Trust is the minority interest holder of the Lighthouse, while the Licht 2018 Irrevocable Trust is the majority interest holder of the Lighthouse.  J. Rubin is the Trustee of the Licht 2018 Irrevocable Trust and is the Managing Member of the Lighthouse.

19.    I believe that J. Rubin's claim that Lighthouse "never received any funds from the Debtor" (Decl. of J. Rubin, 2:19) is false and misleading, and my understanding is that the construction and initial sources of funding for Lighthouse were directly or indirectly the same sources of funding for Glenroy and the Project.  This was a direct result of overlapping ownership interests between

Glenroy and Lighthouse: the same principal individuals – S. Rubin, me, and subsequently Lander – were involved in both Glenroy and Lighthouse, either through direct individual ownership interests or through interests held by trusts established by us.

20.    Furthermore, the existence of the two entities, Glenroy and Lighthouse, were intertwined and connected as Lighthouse's permit from the City of Coachella was directly contingent upon Glenroy and the Project.  As a result of this connectivity and overlapping interests among principals, there was a consensus among the principals that this was all "our money", and funds initially intended to be used for Glenroy and the Project were used to construct Lighthouse and facilitate the cannabis dispensary's initial operations.  J. Rubin's claim that Lighthouse was paid for by ASR, by J. Rubin, and by other members of the Rubin family is false or misleading.  Just as S. Rubin diverted funds from other sources into entities or accounts controlled solely by him and claimed credit for those for Glenroy, I believe that S. Rubin and J. Rubin engaged in this same pattern and practice for Lighthouse, such that if payments for construction of Lighthouse were "paid for" by ASR, the actual source of those funds were external and were not actually S. Rubin or J. Rubin.

21.    Additionally, J. Rubin's claim that "No money from the Calmwater Loan was used to build the Coachella Lighthouse building or used to pay any expenses of Coachella Lighthouse" (Decl. of J. Rubin, 2:13-14) is misleading as Glenroy and the Project had other sources of funds which could have been, and which I believe were, diverted and commingled with Lighthouse in order to build and fund Lighthouse's initial operations.  These other sources include my direct contributions and the East West Bank loan discussed in detail herein, for which the amount of $2,750,000 was received on February 1, 2018, prior to Lighthouse's opening in April 2018 and prior to the Calmwater loan.

22.    S. Rubin and J. Rubin similarly failed and refused to provide access to Lighthouse's books and records, in the same way that they have failed and refused to provide access to Glenroy's books and records, and I have only received incomplete, partial books and records for Lighthouse as a

result of ongoing litigation.  Nevertheless, I believe that Lighthouse was constructed and initiated with funds initially provided to Glenroy for the Project.  One of the main reasons for this belief is that The Stiffelman Family Trust was not requested to contribute capital specifically to and for Lighthouse prior to its construction; I understood this to be the case because the capital had already been contributed by the same principals and was thus available to enable Lighthouse to become operational and self-sustaining.

23.    J. Rubin's Declaration has taken my email correspondence in December 2017 out of context, as that email was sent at the behest of J. Rubin himself.  Furthermore, in December 2017, the Project was continuing in its construction and had not yet become suspended as a result of S. Rubin and J. Rubin's malfeasance and mismanagement.  It is illustrative that J. Rubin has to go back to December 2017 to find a single example of correspondence praising his efforts.  Subsequent communications are starkly contrasted to this single example as I posed multiple questions and concerns to S. Rubin and J. Rubin which were disregarded or unanswered.  Attached hereto as Exhibit "4" are true and correct copies of correspondence between me and J. Rubin from April, May, and December 2019.  In these emails, I specifically asked J. Rubin for financial records, to which I was entitled, yet J. Rubin would ignore my requests or provide evasive responses, and refuse to provide the financial records.  These three emails are examples of the pattern and practice by J. Rubin in refusing to provide the books and records for Lighthouse, and there are many other such correspondence by me which went ignored or which resulted in evasive responses by J. Rubin.

24.    While Glenroy and Lighthouse are formally separate legal entities, there is an indisputable connection between the two entities, and there has been and continues to be a commingling of funds as a result of S. Rubin and J. Rubin's actions.  Lighthouse's own financial records unequivocally confirm the same: according to Lighthouse's Balance Sheet as of December 31, 2020, Lighthouse is owed $420,736.73 from Glenroy.  Attached hereto as Exhibit "5" is a true and

correct redacted copy of this Balance Sheet which was produced by Lighthouse's accountant pursuant

to a subpoena in connection with an ongoing arbitration.  I do not know the entirety of the basis for this

debt, but S. Rubin informed me after the fact that individuals owed money by Glenroy, such as

construction workers or vendors, would go to Lighthouse and receive payment in cash by Lighthouse.

Whether this is true, or was simply S. Rubin fabricating purported payments in order for him to keep

these funds for himself, is unknown to me as a result of S. Rubin and J. Rubin's failure and refusal to

provide access to books and records.  Money has thus flowed in both directions – from Glenroy to

Lighthouse to facilitate Lighthouse's construction and as a result of the overlapping ownership

structures, and from Lighthouse to Glenroy with substantial amounts still due and owing by Glenroy to

Lighthouse.

25.    Yet a further reason why a Trustee is necessary and appropriate, and why S. Rubin

should not be in control of Glenroy, is S. Rubin's deliberate concealment of books and records and

refusals to be transparent with his actions and relevant information to necessary parties.  Both S. Rubin

and J. Rubin have flouted California law and disregarded the provisions of applicable operating

agreements for the respective entities prior to and during litigation and arbitration.  In particular, the

litigation in which I am a plaintiff and S. Rubin and J. Rubin are defendants has been ongoing since

October 2019.  *See* Ex. 3.  This matter is now proceeding in arbitration, and counsel on my behalf

propounded Requests for Production of Documents to S. Rubin and J. Rubin in November 2020.

However, the *only* materials that either S. Rubin or J. Rubin have produced pursuant to those requests

are the same materials included in S. Rubin's Exhibits in opposition to the Motions and a very select

few email correspondence – and those were only produced on March 5, 2021.  Such materials were

due in December 2020, yet S. Rubin and J. Rubin refused to timely produce materials, and no

extension of time was granted for such excessively delayed production.  S. Rubin and J. Rubin

produced limited documents pursuant to an initial disclosure requirement – but that production did not contain any of the financial materials attached to S. Rubin's Declaration as Exhibit 2.

26.     On information and belief, Glenroy has not filed Federal or State tax returns for taxable years 2018 or 2019.  In S. Rubin and J. Rubin's initial document production in the ongoing arbitration, S. Rubin and J. Rubin produced tax returns for Glenroy Coachella Holdings, LLC (which owns 100% of Glenroy) only through taxable year 2017.  However, no returns for 2018 or 2019 were produced.  S. Rubin and J. Rubin have a pattern and practice of delaying or refusing to pay professional service providers, such as accountants and attorneys, and I am informed that S. Rubin and J. Rubin refused to pay Glenroy's accountants for amounts past due.  Glenroy's own filings in this case confirm the same, as Glenroy lists Neil Rosenfield at Baker Tilly as a creditor in the amount of $20,000.00 with the basis of the claim as "Accounting fees."  *See* Dkt. # 58, Part 3.32, p. 32 of 51.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on March 8, 2021.


_____

Gary Stiffelman

Exhibit "1"

**From:** Larry Wong <Larry.Wong@eastwestbank.com>
**Date:** October 15, 2019 at 4:43:03 PM PDT
**To:** Gary Stiffelman <gary.stiffelman@gmail.com>
**Cc:** Flora Ling <Flora.ling@eastwestbank.com>
**Subject: RE: Joint Credit Line Extension**


Gary,

In response to your question about the loan disbursements or advances, I have attached a copy of the loan history since the loan origination.  The advances are summarized as below:

| Advance Date | Deposit Account # | Name of Account | Amount |
|---|---|---|---|
| 7/25/2019 | 8003072405 | 1604 Sunset Plaza LLC | $5,000.00 |
| 7/24/2019 | 8003072405 | 1604 Sunset Plaza LLC | $22,000.00 |
| 7/17/2018 | 8003072405 | 1604 Sunset Plaza LLC | $19,000.00 |
| 6/1/2018 | 8003072405 | 1604 Sunset Plaza LLC | $35,000.00 |
| 3/7/2018 | 8003072405 | 1604 Sunset Plaza LLC | $28,000.00 |
| 2/23/2018 | 8003072405 | 1604 Sunset Plaza LLC | $110,000.00 |
| 2/1/2018 | 8003072405 | 1604 Sunset Plaza LLC | $2,750,000.00 |
| 2/1/2018 | | Closing Costs | $30,850.00 |

Also, for your reference, I have attached the Disbursement Request and Authorization, indicating that Stuart is the authorized person that can authorize advances for this loan.

Should you have any question, please let me know.

Thanks,
Larry

---

**From:** Gary Stiffelman [mailto:gary.stiffelman@gmail.com]
**Sent:** Monday, October 14, 2019 3:35 PM
**To:** Flora Ling <Flora.Ling@eastwestbank.com>

**Cc:** Larry Wong <Larry.Wong@eastwestbank.com>; Richard Pachulski <rpachulski@pszjlaw.com>
**Subject:** Re: Joint Credit Line Extension

What's the update on this please?

Sent from my iPhone


> On Oct 8, 2019, at 2:43 PM, Flora Ling <Flora.ling@eastwestbank.com> wrote:
>
> Hi Gary,
>
> Hope this email finds you well.
>
> Please see responses in red below.
>
> Flora
>
> ---
>
> **From:** gary stiffelman <gary.stiffelman@gmail.com>
> **Sent:** Tuesday, October 8, 2019 2:39 PM
> **To:** Larry Wong <Larry.Wong@eastwestbank.com>
> **Cc:** Flora Ling <Flora.Ling@eastwestbank.com>
> **Subject:** Re: Joint Credit Line Extension
>
> A few questions first:
>
> 1. I'd like to know how this line was disbursed initially. Where did the money go, in detail? We will send you a loan history later today.
>
> 2. What's the extension being discussed? Stuart requests an one year loan extension with 10% paydown by 12/1/19. However, we need to gather updated information and subject to loan committee for approval.
>
> 3. I assume Stuart is providing the same information. Yes from all three individuals.
>
>
>> On Oct 8, 2019, at 12:25 PM, Larry Wong
>> <Larry.Wong@eastwestbank.com> wrote:
>>
>> **\*EXTERNAL TO GT\***

Dear Gary,

Per instructions from Stuart, I'm sending you this email directly to request your 2017 and 2018 tax returns with K-1s for our further evaluation on your loan extension request.  Please provide at your quickest convenience and let me know with any question.

Thanks,

<image001.png>

Larry Wong
FVP-Re at onsh p Manager
Comm Rea  Est Bank-SoCA
Ma n:   626.768.6726
Fax:    626.817.8898
Ce  :    626.394.5863
Larry.Wong@eastwestbank.com

East West Bank
135 N. Los Rob es Ave., 6th F .
Pasadena, CA 91101

PLEASE READ: The  nformat on conta ned  n th s e ma   s conf dent a  and  ntended for the named rec p ent(s) on y. If you are not an  ntended rec p ent of th s e ma   you must not copy, d str bute or take any further act on  n re  ance upon  t and you shou d de ete  t and not fy the sender  mmed ate y. E ma   s not a secure method of commun cat on. East West Bank cannot accept respons b  ty for the accuracy or comp eteness of th s message or any attachment(s). Th s e ma   s  ntended for  nformat on purposes on y and  s not a so c tat on or offer to buy or se  secur t es or re ated f nanc a  nstruments.

PLEASE READ: The  nformat on conta ned  n th s e ma   s conf dent a  and  ntended for the named rec p ent(s) on y. If you are not an  ntended rec p ent of th s e ma   you must not copy, d str bute or take any further act on  n re  ance upon  t and you shou d de ete  t and not fy the sender  mmed ate y. E ma   s not a secure method of commun cat on. East West Bank cannot accept respons b  ty for the accuracy or comp eteness of th s message or any attachment(s). Th s e ma   s  ntended for  nformat on purposes on y and  s not a so c tat on or offer to buy or se  secur t es or re ated f nanc a  nstruments.

PLEASE READ  The information contained in this e-mail is confidential and intended for the named recipient(s) only   f you are not an intended recipient of this e-mail you must not copy  distribute or take any further action in reliance upon it and you should delete it and notify the sender immediately  E-mail is not a secure method of communication  East West Bank cannot accept responsibility for the accuracy or completeness of this message or any attachment(s)  This e-mail is intended for information purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments

# Exhibit "2"

**From:** Larry Wong <Larry.Wong@eastwestbank.com>
**Date:** November 5, 2019 at 12:16:24 PM PST
**To:** Stuart Rubin <srubin@rprp.com>, Gary Stiffelman <gary.stiffelman@gmail.com>, Elliot Lander <elliot@cellsurgicalnetwork.com>
**Cc:** Flora Ling <Flora.ling@eastwestbank.com>
**Subject: Default Letter / Joint Line of Credit**

Dear Stuart, Gary and Elliot,

I hope you are well.  This is to inform you that we have not received all the information needed for us to further evaluate your loan extension request on your joint credit facility.  In addition, the credit facility has recently matured on October 26th, 2019.  As a result, we have sent the attached letter to your attention and are demanding the full repayment by November 18th, 2019.  Please refer to the attached letter for details.

Should you have any question, please do not hesitate to contact me.

Regards,
Larry Wong
First Vice President
(626)768-6726

PLEASE READ  The information contained in this e-mail is confidential and intended for the named recipient(s) only   f you are not an intended recipient of this e-mail you must not copy  distribute or take any further action in reliance upon it and you should delete it and notify the sender immediately  E-mail is not a secure method of communication  East West Bank cannot accept responsibility for the accuracy or completeness of this message or any attachment(s)  This e-mail is intended for information purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments

# EAST WEST BANK

November 1, 2019


**Regular U.S. Mail**
**and Certified Mail #7018 1830 0000 8034 1510**
Abraham Stuart Rubin
1801 S. La Cienega Blvd., Suite 301
Los Angeles, CA 90035

**Regular U.S. Mail**
**and Certified Mail #7018 1830 0000 8034 1527**
Gary Stiffelman
383 S. Beverly Glen Blvd.
Los Angeles, CA 90024

**Regular U.S. Mail**
**and Certified Mail #7016 0750 0000 5014 5841**
Elliot Lander
71635 Jaguar Way
Palm Desert, CA 92260

RE:    Line of Credit for $3,000,000
      Loan No.:  xxxx0476

Dear Borrowers:

In connection with the above referenced loan, per the terms of the Business Loan Agreement dated January 26, 2018, the granting, renewing or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion.  Therefore, we wish to inform you that this loan has become all due and payable in full as of October 26, 2019 ("Maturity Date").

Therefore, it is necessary for you to remit the total amount due to pay off your loan on or before **November 18, 2019**.  For your reference, the amount due to date (November 1, 2019) is as follows:

| | | |
|---|---|---|
| Principal | $ | 2,999,850.00 |
| Accrued Interest from 8/26/19 to 11/1/19 | $ | 23,832.14 |
| Late Fees | $ | 11,989.71 |
| NSF Fee | $ | 20.00 |
| **TOTOAL AMOUNT DUE \*** | $ | **3,035,691.85** |

**\*ONLY THE TOTAL AMOUNT DUE WILL BE ACCEPTED.  PLEASE CALL ON THE DAY OF PAYOFF TO RECEIVE AN UPDATED PAYOFF QUOTE.**

    Plus: Daily Interest at $645.80 per diem after 11/1/2019.

Stuart Rubin
Gary Stiffelman
Elliot Lander
November 1, 2019
Page 2

Failure to pay the loan in full by **November 18, 2019** can result in the bank taking whatever steps necessary to protect its interests, including but not limited to proceeding with foreclosure activity against your loan without further demand.  Should you have any questions regarding the payoff amount, please contact me at (626) 768-6726.

Sincerely,

Larry Wong
First Vice President

Exhibit "3"

Electronically FILED by Superior Court of California, County of Los Angeles on 01/31/2020 04:43 PM Sherri R. Carter, Executive Officer/Clerk of Court, by B. McClendon,Deputy Clerk

1  CHRISTOPHER FROST (SBN 200336)
   cfrost@eisnerlaw.com
2  KATHERINE R. PIERUCCI (SBN 301051)
   kpierucci@eisnerlaw.com
3  EISNER, LLP
   9601 Wilshire Blvd., 7th Floor
4  Beverly Hills, California 90210
   Telephone:  (310) 855-3200
5  Facsimile:  (310) 855-3201

6  Attorneys for Plaintiff Gary Stiffelman

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                COUNTY OF LOS ANGELES, WEST DISTRICT

10

11  GARY STIFFELMAN, in his individual            Case No. 19SMCV01908
    capacity, and in his capacity as trustee of the
12  STIFFELMAN TRUST and derivatively on          *Assigned for all purposes to:*
    behalf of GLENROY COACHELLA              *Hon. Elaine W. Mandel, Dept. P*
13  HOLDINGS, LLC, a Delaware limited liability
    company,
14
                   Plaintiff,                    **FIRST AMENDED COMPLAINT**
15
          vs.
16
    STUART RUBIN, in his individual capacity and
17  in his capacity as trustee of the STUART &
    ANNETTE RUBIN FAMILY TRUST; JOSEPH
18  RUBIN, an individual; GLENROY                 Action Filed:   October 29, 2019
    COACHELLA HOLDINGS, LLC, a Delaware          Trial Date:     none set
19  limited liability company; and DOES 1-20
    inclusive,
20
                   Defendants.                   <u>DEMAND FOR TRIAL BY JURY</u>
21

22

23

24

25

26

27

28

EISNER, LLP    750833.3
                        FIRST AMENDED COMPLAINT

Plaintiff GARY STIFFELMAN ("Plaintiff" or "Stiffelman"), in his individual capacity, and in his capacity as trustee of the STIFFELMAN TRUST and derivatively on behalf of GLENROY COACHELLA HOLDINGS, LLC ("Glenroy Coachella Holdings"), for his complaint against Defendants STUART RUBIN ("Rubin"), in his individual capacity and in his capacity as trustee of the STUART & ANNETTE RUBIN FAMILY TRUST (the "Rubin Family Trust"), JOSEPH RUBIN ("Joseph"), GLENROY COACHELLA HOLDINGS, and DOES 1 through 20, inclusive (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.    "There is no vice that doth cover a man with shame as to be found false and perfidious." Frances Bacon. Gary Stiffelman was forced to file this lawsuit after his business partner and longtime friend (or so Stiffelman thought) Stuart Rubin engineered a massive fraud of over $50 million in connection with a hotel development in Coachella Valley, California (the "Project"). Relying on the ruse of personal friendship and touting his own purported financial wealth, Rubin induced Stiffelman to invest his time, money, reputation, and personal guarantees in the development of a hotel that Rubin and his son Joseph subsequently sabotaged by their incompetence and fraud.

2.    Stiffelman has now learned that Rubin's opulent lifestyle was a fraud built on amassing massive amounts of debt and not paying obligations. For instance, Rubin leased a Bentley Bentayga and financed an extravagant six-figure wedding for his daughter, all while refusing to pay millions of dollars owed to accountants, lawyers, construction professionals, and virtually every other vendor servicing the Project.

3.    Rubin misrepresented and mismanaged the Project from the outset, telling Stiffelman, among other lies, that the Project would require only $25 million to complete, and thereby fraudulently induced Stiffelman to invest over $4 million in a Project destined to fail with Rubin at the helm. Rubin drove the Project further into the ground by fraudulently misappropriating millions of dollars committed for the Project to support his own lavish lifestyle. To make matters worse, Rubin hired his son, Joseph Rubin, fresh out of college, to "oversee" construction of the multi-million dollar Project. With no professional or construction experience

EISNER, LLP

750833.3

2

FIRST AMENDED COMPLAINT

1 on his resume, Joseph was the perfect conspirator for Rubin's fraud.  Joseph provided virtually no

2 oversight to the multi-million dollar Project, causing the Project to fall behind schedule and over

3 budget, and effectively shielded Rubin's fraud from all interested parties.

4    4.    And even when it became abundantly clear that, due to the fraud and negligence of

5 Rubin and Joseph, there were insufficient funds to complete the Project or repay existing debt,

6 Rubin perpetuated the fraud by concealing the Project's financial turmoil and inducing Stiffelman

7 to take out personal loans and guaranty other debts to fund the Project.  The proceeds of these

8 loans evaporated as quickly as those that came before them due to Rubin's misappropriation and

9 negligent expenditure of Project funds.

10    5.    As of the date of this filing in January 2020, notwithstanding that approximately

11 $50 million has been raised for the Project, the Project sits in disrepair, out of money, and *still* $25

12 million away from completion.  The only explanation for the Project's current status lies in the

13 fraud, incompetence, and misappropriation of Project funds by Rubin and Joseph.

14    6.    Due to the fraud perpetrated by Rubin and Joseph, the Project has stalled and

15 Stiffelman is threatened with the loss of his equity position, personal liability on guarantees, and

16 damages of over $50 million—all while Rubin makes excuse after excuse, refuses repeated

17 requests for books and records for the Project, and now threatens to file and hide behind a personal

18 bankruptcy.  This lawsuit seeks to hold Rubin and Joseph Rubin liable for their intentional and

19 fraudulent wrongdoing and the resultant harm to Stiffelman, the Stiffelman Trust, and Glenroy

20 Coachella Holdings.

21    **THE PARTIES**

22    7.    Plaintiff Gary Stiffelman is, and at all relevant times mentioned herein was, an

23 individual residing in the State of California, County of Los Angeles.

24    8.    The Stiffelman Trust is, and at all relevant times mentioned herein was, located at

25 1840 Century Park East, Suite 1900, Los Angeles, CA 90067.

26    9.    Glenroy Coachella Holdings is, and at all relevant times mentioned herein was, a

27 Delaware limited liability company with its principal place of business at Rubin's office in Los

28 Angeles, California.

EISNER, LLP    750833.3    3

10.    Defendant Stuart Rubin is, and at all relevant times mentioned herein was, an individual residing in the State of California, County of Los Angeles.

11.    Defendant Joseph Rubin is, and at all relevant times mentioned herein was, an individual residing in the State of California, County of Los Angeles.

12.    The Rubin Family Trust is, and at all relevant times mentioned herein was, located at Rubin's office at 1801 South La Cienega Boulevard, Suite 301, Los Angeles, CA 90035.

13.    Plaintiff is informed and believes, and on that basis alleges, that Defendants DOES 1 through 20, inclusive, are individually and/or jointly liable to Plaintiff for the conduct alleged herein.  The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 20, inclusive, are unknown to Plaintiff at this time.  Accordingly, Plaintiff sues Defendants DOES 1 through 20, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities once ascertained.

14.    Plaintiff is informed and believes, and on that basis alleges, that, at all relevant times mentioned herein, Defendants, and each of them, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all acting within the course and scope of the agency of and/or employment by the others, each and all acting in concert one with the other and all together.

15.    Plaintiff is informed and believes, and on that basis alleges, that at all relevant times mentioned herein, Defendants, and each of them, were, and are, the agents, servants, alter egos and/or employees of each of the other Defendants, and all the things alleged to have been done by Defendants were done in the capacity of and as agent, servant, alter ego and/or employee of and for the other Defendants, with their knowledge, approval, and ratification.

## **JURISDICTION AND VENUE**

16.    Jurisdiction is proper in the Superior Court of the State of California for the County of Los Angeles pursuant to California Code of Civil Procedure Section 410.10.

17.    Venue is proper in Los Angeles County, California pursuant to California Code of Civil Procedure Section 392, *et seq.* because Defendants reside and conduct business in Los

Angeles County and the damage to Plaintiff occurred in Los Angeles County.  Venue is proper in

Los Angeles County because Plaintiff resides and conducts business in Los Angeles County, and a

majority of events constituting the basis for this lawsuit and the underlying obligations forming the

basis of this lawsuit occurred in the County of Los Angeles.

### GENERAL ALLEGATIONS

18.    Defendants' actions are especially sinister, given the fact that Stiffelman and Rubin

were longtime and close friends.  The Rubin and Stiffelman families first met over twenty-five

years ago when they were neighbors on Arden Drive in Beverly Hills, California.  They even spent

holidays together and took family vacations together.

19.    Over the years, the Rubins became increasingly ostentatious.  Rubin bragged about

his copious wealth, exotic cars, and vast wine collection.  Though the families remained close

friends, the Stiffelmans found it increasingly difficult to relate to the Rubins' grandiose lifestyle.

20.    In or around 2005, Rubin encouraged Stiffelman to invest approximately $100,000

in property located at the southeast corner of Avenue 48 and Van Buren Street, in Coachella,

California (the "Property").  The intended use for the Property went through several incarnations

before it was finally decided that the Property would be used for a hotel development called

"Glenroy" (sometimes referenced herein as the "Project") that would serve, among others, guests

attending the annual Coachella Valley Music and Arts Festival, and host its own concerts and

events on the premises for guests.  Stiffelman ultimately decided that he could afford the risk given

the relatively small size of the investment (as represented by Rubin).

21.    Initially, Stiffelman was one of approximately eleven investors, including Rubin, in

the Property.  Over time, all but two of the investors were bought out, and together Stiffelman and

Rubin owned the Property in its entirety.  A 4.5% share was later sold to another of Rubin's other

longtime friends, Elliot Lander ("Lander") for approximately $3.5 million plus an additional $1

million of capital calls.

22.    In or around 2017, Rubin and Stiffelman set up Glenroy Coachella, LLC ("Glenroy

Coachella") with its principal place of business in Los Angeles, California, pursuant to a Limited

Liability Company Agreement dated August 8, 2007.  Initially, Rubin and Stiffelman were the sole

members of Glenroy Coachella.    Pursuant to the Amended and Restated Limited Liability
Company Agreement, as amended, dated August 28, 2018 (the "Glenroy Coachella Operating
Agreement"), Glenroy Coachella Holdings is now the sole equity member of Glenroy Coachella
and an individual named Michelle A. Dreyer is listed as the Independent Manager.

23.    Glenroy Coachella Holdings is governed by the Second Amended and Restated
Limited Liability Company Operating Agreement, dated March 31, 2017, as amended (the
"Glenroy Coachella Holdings Operating Agreement"), and its members are the Rubin Family Trust
and the Stiffelman Trust.  Stiffelman is a trustee of the Stiffelman Trust.  Rubin is a trustee of the
Rubin Family Trust.  Rubin is named the Manager of Glenroy Coachella Holdings.  The Glenroy
Coachella Holdings Operating Agreement required Rubin, as Manager, to "discharge his duties
and responsibilities under th[e Glenroy Coachella Holdings Operating Agreement] in a manner
consistent with the Manager's fiduciary duties of care and loyalty to the LLC."  And Rubin was
required to "perform his duties as the Manager in good faith, in a manner [he] reasonably
believe[d] to be in the best interest of the LLC and its Members and with such care as an ordinarily
prudent Person  in a like position would use under similar circumstances."

24.    Stiffelman never anticipated investing substantial money in the Project, and was
always explicit with Rubin about his intentions in this regard.  At a lunch at the Four Seasons in
Beverly Hills, Rubin induced Stiffelman to remain in the Project by promising that Stiffelman's
financial investment would be limited to a maximum of $500,000 and that Rubin would shield
Stiffelman from any financial exposure and liability in connection with the Project.  Stiffelman's
involvement, according to Rubin, was "purely strategic."  Rubin explained that Stiffelman had
personal connections that would benefit the development and marketing of Glenroy.  Rubin further
assured Stiffelman that Rubin had plenty of money to fund the development of Glenroy on his
own.  Given Rubin's repeated assertions and displays of massive personal wealth, Stiffelman
believed Rubin's averments that he would fund development of Glenroy and limit Stiffelman's
liability to $500,000.  Relying on Rubin's representations, Stiffelman decided to keep his interest
in the Property, rather than pursue a buyout.

25.    But over the years, Rubin induced Stiffelman to contribute massive amounts of personal capital to the Project by conveniently "forgetting" his agreed limitation on Stiffelman's financial investment. On several occasions, Rubin claimed that Stiffelman had to reimburse Rubin in proportion to their two-thirds to one-third equity interests for contributions Rubin had recently made to the Project. But this was a lie. Rubin's "contributions" were largely loan proceeds belonging to the Project, rather than Rubin's own money. On information and belief, Rubin knowingly misrepresented this fact to Stiffelman to induce Stiffelman to put more money into the Project. By 2017, before construction had even broken ground on Glenroy, Rubin had already induced Stiffelman to invest over $860,000 in Glenroy.

26.    Moreover, Stiffelman suspects that Rubin took unmerited and undisclosed disbursements from Glenroy Coachella totaling in the millions of dollars.

27.    To make matters worse, Rubin put his son, Joseph Rubin, fresh out of college with no professional or business experience, in charge of construction oversight for the Project. Joseph had no experience with construction management prior to his work on Glenroy. On information and belief, Rubin affirmatively chose not to engage professional management so he could fraudulently conceal material information from Stiffelman and other interested parties. As to be expected, Joseph provided little to no useful construction oversight or other value to the Project, but nonetheless took a salary from the Project funds and used Project funds for various lavish vacations he misrepresented as "business trips."

28.    Rubin repeatedly assured Stiffelman that the Project would cost no more than $25 million and would be complete in advance of the Coachella Valley Music and Arts Festival in April 2018 ("Coachella 2018"). Stiffelman expressed to Rubin his concerns that this aggressive deadline was unrealistic, would drive up costs, and would make it difficult to engage a hotel operations system—a crucial partnership given Rubin had no experience opening and operating a hotel. Rubin told Stiffelman that he had the Project under control and did not need or want Stiffelman's input.

29.    After Rubin rejected Stiffelman's concerns, Stiffelman had no choice but to leverage his connections to help the Project as best he could. Stiffelman connected Rubin with

Blau and Associates, a hospitality food and beverage expert.  Rubin hired Blau and Associates to design menus and concepts and to arrange to rent temporary kitchens in trailers because the permanent food and beverage service could not be completed by April 2018.  The temporary trailers would be an added expense owing directly to the April 2018 deadline, but Rubin swore the expense would be worth the revenue generated at Coachella 2018.  Because there was no time to engage a hotel operations system before the April 2018 deadline, Stiffelman also introduced Rubin to Creative Playground, a marketing and public relations company that developed an expensive marketing concept around the name "Glenroy."  Moreover, at Rubin's insistence, Stiffelman also sourced furniture through a personal relationship, after Rubin's efforts, using his daughter as a resource, failed to find a source capable of delivering appropriate furniture in time for a reasonable price to meet Rubin's delusional opening date.  As a result, furniture to fill 250 bedrooms and 50 great rooms was delivered before April 2018.

30.    Construction broke ground on Glenroy in or around January 2017, giving Rubin and his incompetent construction supervisor, Joseph, less than two years to complete the Project.  The ineptitude of Rubin and Joseph came to light almost immediately.  For example, Stiffelman learned that the initial plan to use pre-fabricated casitas meant that the rooms would be too small to accommodate more than one bed.  When Stiffelman raised this concern to Rubin, Rubin once again lashed out and told Stiffelman to mind his own business—ironic given Stiffelman's substantial investment to date.  Weeks later, in a rare expression of humility, Rubin realized the error of his ways and agreed to switch from pre-fabricated to "stick-built" casitas, which would allow for larger hotel rooms.  Rubin said he agreed to the change because it would have no effect on the budget or the timeline.

31.    Months passed and, despite expenditure of the entire budget, Rubin and Joseph were not even close to completing the Project by Coachella 2018.  The failure to meet the April 2018 completion deadline meant Glenroy was unable to capitalize on Coachella 2018, an event projected to generate a year's worth of revenue for Glenroy.  Similarly, Glenroy was scheduled to host an event for TRESemmé, a brand of hair care products, in 2018, that was projected to generate $700,000, but was not open in time.

32.     Moreover, the additional costs incurred to meet Rubin's aggressive timeline resulted in enormous waste.  The food and beverage services provided by Blau and Associates went unused.  The Project funds paid to Creative Playground for the "Glenroy" concept also went to waste.  When it became clear that the hotel would not be ready for Coachella 2018 and Rubin was in over his head, Rubin agreed to bring in a hotel operations system, IHG, which rebranded the hotel as "Indigo," leaving no use for Creative Playground's "Glenroy" concept which was already paid for by Project funds.  The furniture Rubin ordered on an expedited basis for the April 2018 opening now languishes in a warehouse losing value with every minute Glenroy remains unfinished.  And, as with much of Rubin's undertakings, the furniture bill remains significantly unpaid and subject to accrual of interest.

33.     Having blown through the initial $25 million budget, Rubin fabricated a new $25 million budget and set out to raise more money.  In January 2018, Rubin caused Glenroy Coachella to obtain a loan from PACE Equity for $7,050,000.  Rubin insisted that Stiffelman and Lander take out loans in their names to fund the Project and induced them to do so by promising that he would be responsible for repayment.  On January 28, 2018, Rubin, Stiffelman, and Lander obtained a loan from East West Bank in the amount of $3 million scheduled to mature on October 26, 2019 (the "East West Loan").  And, on April 16, 2018, Rubin, Stiffelman, and Lander assumed a $2 million loan from Bank Hapoalim, B.M. ("Bank Hapoalim"), scheduled to mature on April 16, 2020.  Rubin refused numerous requests from Stiffelman to account for the proceeds of these loans.  On information and belief, Rubin has misappropriated these loan proceeds for expenditures unrelated to the Project.  In particular, Stiffelman later learned that Rubin misappropriated proceeds from the East West Loan in connection with a property that has nothing to do with the Project.

34.     On April 26, 2018, Glenroy Coachella and three other entities affiliated with Rubin obtained a secured loan from U.S. Real Estate Credit Holdings III-A, L.P. for $24,400,000 (the "Calmwater Loan").  The Calmwater Loan was secured by a first priority lien in the Property.  At the urging of Rubin, Stiffelman personally guaranteed the Calmwater Loan pursuant to the Completion Guaranty Agreement and the Indemnity and Guaranty Agreement, each dated April

26, 2018.   To induce Stiffelman to sign the guaranty, Rubin told Stiffelman that the Calmwater Loan would be used to pay off the loans from East West Bank and Bank Hapoalim in full. Stiffelman subsequently learned that Rubin's representation was wholly false: the Calmwater Loan was a construction loan and, therefore, as a practical matter, could not be used to repay the other lenders.

35.    In addition to the Calmwater Loan, Glenroy Coachella obtained approximately $6 million in Mello Roos financing, which the Calmwater Loan required to be available to repay the Calmwater Loan as needed.   Stiffelman never saw the Mello Roos proceeds and Rubin has refused to account for them.   Unsurprisingly, Stiffelman later learned that Rubin misappropriated the Mello Roos funds in material breach of the Calmwater Loan.

36.    Despite the roughly $35 million raised from lenders, Rubin again told Stiffelman that he had contributed capital to the Project and that Stiffelman must make a proportionate contribution.   In reliance on Rubin's representations, Stiffelman contributed $479,300 in 2018 and another $1,066,150.83 in 2019.

37.    Even after these contributions, Rubin demanded more money from Stiffelman so that Glenroy Coachella could pay for EB-5 financing.   Rubin urged Stiffelman to take out a personal loan of $1,750,000, even if it meant borrowing against Stiffelman's retirement savings. To induce Stiffelman to take out the loan, Rubin promised to guaranty Stiffelman's debt.   In reliance on Rubin's representations, Stiffelman obtained a personal loan from City National Bank (the "CNB Loan") and invested $1,750,000 in loan proceeds in the Project.   As promised, Rubin executed a letter from City National Bank, guarantying that certain real estate sale and refinance proceeds would be used to repay the CNB Loan.

38.    Stiffelman subsequently learned that Rubin's guaranty of the CNB Loan was effectively worthless.   First, the said refinancing is far from certain and, as of the date of this filing, remains unconsummated.   Second, even if Rubin does obtain the refinancing, there is virtually no chance Rubin will receive a distribution from the said real estate sale and refinance proceeds sufficient to repay the CNB Loan.   Third, even if the refinancing and sale proceeds were sufficient to repay Stiffelman's debt, Rubin has committed those proceeds to guaranty other debts, so they

1    would not be available to repay the CNB Loan.  Rubin's guaranty, like all of his other frauds, is as

2    good as a lead balloon.  Rubin admitted as much when Stiffelman expressed doubts about the

3    numerous debts Rubin had induced Stiffelman to incur.  Rubin "consoled" Stiffelman by offering

4    him $1 million to help pay back the CNB Loan.  Stiffelman immediately reminded Rubin that

5    Rubin had executed a guaranty for the entire amount of the CNB Loan—$1,750,000—not just $1

6    million.  Rubin flatly ignored Stiffelman's concerns.  Stiffelman continues to pay substantial

7    interest on the CNB Loan every month.

8        39.    Worse yet, Rubin sabotaged the sole purpose for the CNB Loan—to obtain EB-5

9    financing, which was virtually impossible after Rubin forced the Calmwater Loan into default.

10   Rubin has refused to account for substantial portions of the CNB Loan proceeds.

11       40.    At this point Stiffelman's contributions to the Project surpassed $4 million.

12   Stiffelman repeatedly asked Rubin for accounting and financial records so he could determine

13   where his money, and the loan proceeds, were going.  Rubin refused each request.

14       41.    Once again, the Project went way over Rubin's second $25 million budget.  By

15   May 2019, the Project was nearly $25 million over budget thanks, in part, to its incompetent

16   construction manager, Joseph Rubin, the fraudulent budget constructed by Rubin, and the apparent

17   use of Project funds to support Rubin's lifestyle rather than the Project itself.  Having blown

18   through the budget and loan proceeds, Rubin and his son have forced the Project into a state of

19   disrepair, with no money left to complete the Project or make timely payments to lenders.  Indeed,

20   Rubin failed to pay the debt service payment due under the Calmwater Loan on May 1, 2019—an

21   express event of default under the Calmwater Loan.

22       42.    In utter denial of the mess he created, Rubin continued to pursue the EB-5 financing

23   program and had a Private Placement Memorandum (the "PPM") prepared in July 2019 for this

24   purpose.  True to Rubin's dishonest nature, the PPM concealed the financial and physical disrepair

25   of the Project.  Of course, Rubin's lies were for naught as the EB-5 funding never came to pass.

26       43.    As Aesop is famed for writing, "a false tale often betrays itself."  On September 9,

27   2019, Stiffelman received a Notice of Default on the Calmwater Loan, which exposed Rubin's

28   massive fraud.  The Notice of Default enumerated eleven events of default, principally the failure

1    to pay the debt service payment due on and after May 1, 2019, together with all subsequent

2    payments; together with late charges due.  Moreover, the Notice of Default alleged that Borrower

3    "misappropriated bond proceeds of the Mello Roos financing (or failed to explain how such funds

4    were applied to the Project)."    The Notice of Default provided that the amount due was

5    $20,922,900.18 as of September 4, 2019, subject to increase until the account is made current.

6    Due to Rubin's fraud, Stiffelman, as a guarantor on the Calmwater Loan faces potential liability

7    for the entirety of the outstanding balance.

8        44.    And of course, once someone lies enough times, sustaining the lies requires more

9    lies.  Notwithstanding the enormous debts coming due and the Calmwater Notice of Default,

10   Rubin could not, would not, and still has not, acknowledged the truth.  Rather, he continues to

11   perpetuate his fraud and harm to Stiffelman by creating false stories, concealing material

12   information from Stiffelman, and refusing to comply with basic requests for information.  For

13   instance, on October 7, 2019, Stiffelman learned that Rubin received a forbearance offer on the

14   Calmwater Loan and intentionally hid it from Stiffelman for *over two months*.  To date, Rubin has

15   not consummated a forbearance agreement, leaving Stiffelman potentially liable on his personal

16   guaranty of the Calmwater Loan.  Notably, Calmwater's forbearance offer explicitly states that

17   Rubin put his "son in charge of the project and he screwed it up."  The offer further states that the

18   Project "is in terrible condition" because Rubin left "open elevator shafts and wood sitting in 110

19   degree heat."  The offer estimates that, as of July 24, 2019, another $24 million was required to

20   complete Glenroy.  Moreover, Rubin has blocked Stiffelman's efforts to obtain information about

21   the Project's checking account from Preferred Bank.

22       45.    In another covert action, Rubin sent his children, Joseph and Lauren Rubin, on

23   secret meetings with potential investors about Glenroy, despite their inexperience in raising money

24   and without any consultation with or permission from Stiffelman.  On information and belief, the

25   market for investment in Glenroy Coachella has been materially harmed by the interference of

26   Rubin's unqualified children.  Rubin, Joseph, and Lauren have all refused Stiffelman's numerous

27   requests for further information about these covert meetings.

28

46.    As a result of the fraud perpetrated by Rubin and his son Joseph, Stiffelman is threatened with the loss of his equity position (for which he paid over $4 million) as well as potential liability on the Calmwater guaranty and other guarantees totaling over $25 million, and $1,750,000 in primary obligations to CNB.

47.    Rubin has also harmed Stiffelman by taking fraudulent disbursements from Glenroy Coachella and depriving Stiffelman of profits from Glenroy, totaling many more millions of dollars.  Meanwhile, Rubin has threatened to file and hide behind a personal bankruptcy, rather than make any attempt to salvage Glenroy or Stiffelman's investment therein.

48.    This litigation followed.

## **FIRST CAUSE OF ACTION**

### **(Fraud in the Inducement and Concealment)**

**(Stiffelman, individually and as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Joseph Rubin, and DOES 1-20)**

49.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 48, inclusive, as though set forth in full.

50.    Rubin knowingly misrepresented to Stiffelman that:

a.    Stiffelman's liability in the Project would be limited to $500,000;

b.    The initial construction budget for the Project was only $25 million;

c.    The Project would be completed by April 2018;

d.    The second construction budget for the Project was only $25 million;

e.    Rubin invested personal capital in the Project necessitating Stiffelman's contributions of over $4 million; and

f.    Rubin had the requisite knowledge, experience, and qualifications regarding hotel development.

51.    Moreover, Rubin fraudulently concealed the following from Stiffelman:

a.    That Rubin took millions of dollars from the Project or from funds intended for the Project;

b.    Rubin's self-dealing in the Project funds;

1       c.      Rubin's expenditure of Project funds for uses other than the Project, including

2  to support his opulent lifestyle and in connection with a property that is entirely unrelated to the

3  Project;

4       d.      Events of default on the Calmwater Loan and other loans in connection with

5  the Project;

6       e.      Rubin's failure to keep the Project on schedule;

7       f.      Rubin's failure to perform his obligations under the Glenroy Coachella

8  Holdings Operating Agreement;

9       g.      A potential opportunity to enter into a forbearance agreement in connection

10  with the Calmwater Loan, despite knowledge that Stiffelman is a guarantor on the Calmwater Loan;

11  and

12      h.      Books and records related to the Project.

13      52.    Joseph Rubin knowingly misrepresented to Stiffelman that:

14      a.      Joseph Rubin was providing adequate oversight to the construction of the

15  Project;

16      b.      Joseph Rubin was qualified to oversee construction of the Project;

17      c.      The initial construction budget for the Project was only $25 million;

18      d.      The Project would be completed by April 2018;

19      e.      The second construction budget from the Project was only $25 million; and

20      f.      The Project was on schedule and within the budget.

21      53.    Moreover, Joseph Rubin fraudulently concealed from Stiffelman that:

22      a.      Rubin was self-dealing in the Project funds; and

23      b.      The Project was over budget and behind schedule.

24      54.    At the time Defendants made the foregoing misrepresentations, Defendants knew

25  that these representations were false.

26      55.    Defendants intended that Stiffelman rely on the foregoing misrepresentations.

27      56.    Stiffelman reasonably relied on the foregoing misrepresentations when he invested

28  a significant amount of money in the Project and personally guaranteed the Calmwater Loan

1    pursuant to the Completion Guaranty Agreement and the Indemnity and Guaranty Agreement

2    April 26, 2018 (the "Guarantees").

3        57.    Stiffelman's reliance on Defendants' misrepresentations and Defendants' fraudulent

4    concealments were a substantial factor in causing harm to Stiffelman and the Stiffelman Trust.

5        58.    As a result of the wrongful and fraudulent conduct perpetrated by Rubin and Joseph

6    Rubin as alleged herein, Stiffelman lost significant amounts of his investment in the Project and

7    risks liability to third parties in connection with the Project and the Guarantees.  Indeed, Stiffelman

8    has already been sued personally in connection with the Guarantees as a direct result of the

9    Rubins' fraud.  Moreover, the Stiffelman Trust has been deprived of distributions to which it is

10    entitled under the Glenroy Coachella Holdings Operating Agreement, and the value of its interest

11    in Glenroy Coachella Holdings has been destroyed as a direct and proximate result of the Rubins'

12    fraud.

13        59.    As a result of the wrongful and fraudulent conduct perpetrated by Rubin and Joseph

14    Rubin as alleged herein, Stiffelman and the Stiffelman Trust have been damaged in an amount to

15    be determined according to proof at trial, but no less than $50 million.

16        60.    The wrongful acts of Defendants alleged herein were willful and intentional.

17    Defendants acted with conscious disregard of the rights of Stiffelman and the Stiffelman Trust, for

18    the purpose of oppressing, defrauding, and injuring Stiffelman and the Stiffelman Trust, and as a

19    result of such willful, intentional, oppressive, and fraudulent conduct, punitive damages should be

20    imposed against Rubin and Joseph Rubin in order to dissuade such outrageous conduct, in an

21    amount according to proof at the time of trial.

<div align="center">

**SECOND CAUSE OF ACTION**

**(Fraud in the Inducement and Concealment - Derivative)**

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella**

**Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust,**

**Glenroy Coachella Holdings, and DOES 1-20)**

</div>

27        61.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs

28    1 through 60, inclusive, as though set forth in full.

1    62.    Rubin knowingly misrepresented to Stiffelman that:

2        a.    Stiffelman's liability in the Project would be limited to $500,000;

3        b.    The initial construction budget for the Project was only $25 million;

4        c.    The Project would be completed by April 2018;

5        d.    The second construction budget for the Project was only $25 million;

6        e.    Rubin invested personal capital in the Project necessitating Stiffelman's

7    contributions of over $4 million; and

8        f.    Rubin had the requisite knowledge, experience, and qualifications regarding

9    hotel development.

10    63.    Moreover, Rubin fraudulently concealed the following from Stiffelman:

11        a.    That Rubin took millions of dollars from the Project or from funds intended

12    for the Project;

13        b.    Rubin's self-dealing in the Project funds;

14        c.    Rubin's expenditure of Project funds for uses other than the Project, including

15    to support his opulent lifestyle and in connection with a property that is entirely unrelated to the

16    Project;

17        d.    Events of default on the Calmwater Loan and other loans in connection with

18    the Project;

19        e.    Rubin's failure to keep the Project on schedule;

20        f.    Rubin's failure to perform his obligations under the Glenroy Coachella

21    Holdings Operating Agreement;

22        g.    A potential opportunity to enter into a forbearance agreement in connection

23    with the Calmwater Loan, despite knowledge that Stiffelman is a guarantor on the Calmwater Loan;

24    and

25        h.    Books and records related to the Project.

26    64.    Joseph Rubin knowingly misrepresented to Stiffelman that:

27        a.    Joseph Rubin was providing adequate oversight to the construction of the

28    Project;

1   b. Joseph Rubin was qualified to oversee construction of the Project;

2   c. The initial construction budget for the Project was only $25 million;

3   d. The Project would be completed by April 2018;

4   e. The second construction budget from the Project was only $25 million; and

5   f. The Project was on schedule and within the budget.

6 65. Moreover, Joseph Rubin fraudulently concealed from Stiffelman that:

7   a. Rubin was self-dealing in the Project funds; and

8   b. The Project was over budget and behind schedule.

9 66. At the time Defendants made the foregoing misrepresentations, Defendants knew

10 that these representations were false.

11 67. Defendants intended that Stiffelman rely on the foregoing misrepresentations.

12 68. Stiffelman reasonably relied on the foregoing misrepresentations when he invested

13 a significant amount of money in the Project and personally guaranteed the Calmwater Loan

14 pursuant to the Guarantees.

15 69. Stiffelman's reliance on Defendants' misrepresentations and Defendants' fraudulent

16 concealments were a substantial factor in causing harm to the Stiffelman Family Trust and Glenroy

17 Coachella Holdings.

18 70. As a result of the wrongful and fraudulent conduct perpetrated by Rubin and Joseph

19 Rubin as alleged herein, the Stiffelman Trust has been deprived of distributions to which it is

20 entitled under the Glenroy Coachella Holdings Operating Agreement and Glenroy Coachella

21 Holdings has lost significant value.

22 71. As a result of the wrongful and fraudulent conduct perpetrated by Rubin and Joseph

23 Rubin as alleged herein, the Stiffelman Trust and Glenroy Coachella Holdings have been damaged

24 in an amount to be determined according to proof at trial, but no less than $50 million.

25 72. The wrongful acts of Defendants alleged herein were willful and intentional.

26 Defendants acted with conscious disregard of the rights of Stiffelman and the Stiffelman Trust, for

27 the purpose of oppressing, defrauding, and injuring Stiffelman and the Stiffelman Trust, and as a

28 result of such willful, intentional, oppressive, and fraudulent conduct, punitive damages should be

1  imposed against Rubin and Joseph Rubin in order to dissuade such outrageous conduct, in an

2  amount according to proof at the time of trial.

3       73.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and

4  that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust,

5  and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be

6  futile.  Rubin would act to block and deny any such demand.

7  <center>**THIRD CAUSE OF ACTION**</center>

8  <center>**(Conversion)**</center>

9  <center>**(Stiffelman, as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as**</center>

10  <center>**Trustee of the Rubin Family Trust, Joseph Rubin, and DOES 1-20)**</center>

11       74.    Plaintiff incorporates herein by reference the allegations contained in Paragraphs 1

12  through 73, inclusive, as though set forth in full.

13       75.    Rubin and Joseph Rubin misappropriated Glenroy Coachella Holdings funds for

14  uses unrelated to the Project, including to pay for their lavish lifestyles and exotic vacations, and

15  caused Glenroy Coachella Holdings to make undisclosed and undeserved distributions to Rubin or

16  the Rubin Family Trust without making pro rata distributions to the Stiffelman Trust.

17       76.    As a member of Glenroy Coachella Holdings and pursuant to the Glenroy

18  Coachella Holdings Operating Agreement, the Stiffelman Trust has a right to immediate

19  possession of and/or an ownership interest in at least a pro rata share of Glenroy Coachella

20  Holdings' funds misappropriated by Rubin and Joseph Rubin.

21       77.    Rubin and Joseph Rubin have intentionally and substantially interfered with the

22  rights of the Stiffelman Trust to distributions from Glenroy Coachella Holdings by

23  misappropriating Glenroy Coachella Holdings funds for uses unrelated to the Project, including to

24  pay for their lavish lifestyles and exotic, and by causing Glenroy Coachella Holdings to make

25  undisclosed and undeserved distributions to Rubin or the Rubin Family Trust without making pro

26  rata distributions to the Stiffelman Trust, and thereby destroying the value of the Stiffelman Trust's

27  interest in Glenroy Coachella Holdings.

28

EISNER, LLP    750833.3

<center>18</center>
<center>FIRST AMENDED COMPLAINT</center>

78.    The Stiffelman Trust has suffered monetary damages as a proximate result of Rubin and Joseph Rubin's misconduct in an amount according to proof at trial, but no less than $50 million.

79.    The nature of Defendants' conversion of Glenroy Coachella Holdings funds constitutes oppressive, fraudulent, and malicious conduct evidencing Defendants' willful and reckless indifference to the rights of the Stiffelman Trust and the Company.    Such conduct warrants the award of punitive or exemplary damages against Rubin.

## FOURTH CAUSE OF ACTION

### (Conversion - Derivative)

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Joseph Rubin, Glenroy Coachella Holdings, and DOES 1-20)**

80.    Plaintiff incorporates herein by reference the allegations contained in Paragraphs 1 through 79, inclusive, as though set forth in full.

81.    Rubin and Joseph Rubin misappropriated Glenroy Coachella Holdings funds for uses unrelated to the Project, including to pay for their lavish lifestyles and exotic vacations, and caused Glenroy Coachella Holdings to make undisclosed and undeserved distributions to Rubin or the Rubin Family Trust without making pro rata distributions to the Stiffelman Trust.

82.    Glenroy Coachella Holdings has a right to the immediate possession of and/or an ownership interest in the Project funds misappropriated by Rubin and Joseph Rubin as alleged herein.

83.    Rubin and Joseph Rubin have intentionally and substantially interfered with the rights of Glenroy Coachella Holdings by misappropriating Glenroy Coachella Holdings funds for uses unrelated to the Project, including to pay for their lavish lifestyles and exotic vacations, and causing Glenroy Coachella Holdings to make undisclosed and underserved distributions to Rubin or the Rubin Family Trust.

84.    Glenroy Coachella Holdings and the Stiffelman Trust have suffered monetary damages as a proximate result of Rubin's and Joseph Rubin's misconduct in an amount according to proof at trial.

85.    The nature of Rubin's and Joseph Rubin's conversion of Glenroy Coachella Holdings funds constitutes oppressive, fraudulent, and malicious conduct evidencing Rubin's and Joseph Rubin's willful and reckless indifference to the rights of the Stiffelman Trust and Glenroy Coachella Holdings.  Such conduct warrants the award of punitive or exemplary damages against Rubin and Joseph Rubin.

86.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be futile.  Rubin would act to block and deny any such demand.

## FIFTH CAUSE OF ACTION

### (Negligence)

**(Stiffelman, individually and as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Joseph Rubin, and DOES 1-20)**

87.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 86, inclusive, as though set forth in full.

88.    Rubin and Joseph Rubin owe duties of care to Stiffelman and the Stiffelman Trust to conduct themselves as a reasonable person, acting under similar circumstances, would conduct himself.

89.    Rubin breached his duty of care to Stiffelman and the Stiffelman Trust by:

a.    Spending Project funds, including the Mello Roos funds, for uses other than the Project, including to support his opulent lifestyle and to invest in property entirely unrelated to the Project;

b.    Hiring Joseph Rubin who, fresh out of college with no professional or construction experience, was terribly incompetent and unqualified to oversee the Project;

c.    Refusing to employ professionals to oversee and manage the Project;

EISNER, LLP

750833.3

20

FIRST AMENDED COMPLAINT

        d.      Committing events of defaults on the Calmwater Loan and other loans in

connection with the Project;

        e.      Failing to keep the Project on schedule;

        f.      Failing to perform his obligations under the Operating Agreement;

        g.      Failing to pursue forbearance of the Calmwater Loan, despite knowledge that

Stiffelman is a guarantor on the Calmwater Loan; and

        h.      Failing to disclose the books and records related to the Project despite

repeated demands by Stiffelman.

   90.   Joseph Rubin breached his duty of care to Stiffelman by:

        a.      Providing inadequate oversight to the construction of the Project;

        b.      Concealing that the Project was over budget and behind schedule; and

        c.      Concealing that Rubin was self-dealing in Project funds.

   91.   As a direct and proximate result of the wrongful and fraudulent conduct perpetrated

by Rubin and Joseph Rubin as alleged herein, Stiffelman lost significant amounts of his investment

in the Project and risks liability to third parties in connection with the Project and the Guarantees.

Indeed, Stiffelman has already been sued personally in connection with the Guarantees as a direct

result of the Rubins' fraud.  Moreover, the Stiffelman Trust has been deprived of distributions to

which it is entitled under the Glenroy Coachella Holdings Operating Agreement and the value of

its interest in Glenroy Coachella Holdings has been destroyed as a direct and proximate result of

the Rubins' fraud.

   92.   As a direct and proximate result of the wrongful and fraudulent conduct perpetrated

by Rubin and Joseph Rubin as alleged herein, Stiffelman and the Stiffelman Trust have been

damaged in an amount to be determined according to proof at trial, but no less than $50 million.

## SIXTH CAUSE OF ACTION

### (Negligence - Derivative)

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Glenroy Coachella Holdings, and DOES 1-20)**

93.     Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 92, inclusive, as though set forth in full.

94.     Rubin and Joseph Rubin owe duties of care to Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings to conduct themselves as a reasonable person, acting under similar circumstances, would conduct himself.

95.     Rubin breached his duty of care to Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings by:

    a.     Spending Project funds, including the Mello Roos funds, for uses other than the Project, including to support his opulent lifestyle and to invest in property entirely unrelated to the Project;

    b.     Hiring Joseph Rubin who, fresh out of college with no professional or construction experience, was terribly incompetent and unqualified to oversee the Project;

    c.     Refusing to employ professionals to oversee and manage the Project;

    d.     Committing events of defaults on the Calmwater Loan and other loans in connection with the Project;

    e.     Failing to keep the Project on schedule;

    f.     Failing to perform his obligations under the Operating Agreement;

    g.     Failing to pursue forbearance of the Calmwater Loan, despite knowledge that Stiffelman is a guarantor on the Calmwater Loan; and

    h.     Failing to disclose the books and records related to the Project despite repeated demands by Stiffelman.

96.     Joseph Rubin breached his duty of care to Stiffelman by:

    a.     Providing inadequate oversight to the construction of the Project;

   b.  Concealing that the Project was over budget and behind schedule; and

   c.  Concealing that Rubin was self-dealing in Project funds.

97. As a direct and proximate result of the negligent acts perpetrated by Rubin and Joseph Rubin as alleged herein, the Stiffelman Trust has been deprived of distributions to which it is entitled under the Glenroy Coachella Holdings Operating Agreement and Glenroy Coachella Holdings has lost significant value.

98. As a direct and proximate result of the negligent acts perpetrated by Rubin and Joseph Rubin as alleged herein, the Stiffelman Trust and Glenroy Coachella Holdings have been damaged in an amount to be determined according to proof at trial, but no less than $50 million.

99. Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and that Rubin has engaged in conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be futile.  Rubin would act to block and deny any such demand.

### SEVENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

**(Stiffelman, individually and as Trustee of the Stiffelman Trust, against Stuart Rubin,**

**individually and as Trustee of the Rubin Family Trust, Joseph Rubin, and DOES 1-20)**

100. Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 99, inclusive, as though set forth in full.

101. Rubin and Joseph Rubin owe a duty of care to Stiffelman and the Stiffelman Trust to conduct themselves as a reasonable person, acting under similar circumstances, would conduct himself.

102. For the purpose of inducing Stiffelman to invest (and remain invested) in the Project, Rubin breached his duty of care to Stiffelman by negligently misrepresenting to Stiffelman that:

   a.  Stiffelman's liability in the Project would be limited to $500,000;

   b.  The initial construction budget for the Project was only $25 million;

   c.  The Project would be completed by April 2018;

1          d.      The second construction budget for the Project was only $25 million;

2          e.      Rubin invested personal capital in the Project necessitating Stiffelman's

3    contributions of over $4 million; and

4          f.      Rubin had the requisite knowledge, experience, and qualifications regarding

5    hotel development.

6    103.    For the purpose of inducing Stiffelman to invest (and remain invested) in the

7    Project, Joseph Rubin breach his duty of care to Stiffelman by negligently misrepresenting to

8    Stiffelman that:

9          a.      He was qualified to oversee construction of the Project;

10          b.      The initial construction budget was $25 million;

11          c.      The Project would be completed by April 2018;

12          d.      The second construction budget was $25 million;

13          e.      The Project was on schedule and within the budget; and

14          f.      That Joseph Rubin was providing adequate oversight to construction of the

15    Project.

16    104.    Defendants had no reasonable grounds for believing these representations were true

17    when made.

18    105.    Defendants intended Stiffelman to rely on said representations.

19    106.    Stiffelman, in fact, reasonably relied on Defendants' representations and was

20    harmed thereby.  Stiffelman not only invested a significant amount of money in the Project, but he

21    also personally guaranteed the Calmwater Loan pursuant to the Guarantees.

22    107.    As a direct and proximate result of the wrongful and fraudulent conduct perpetrated

23    by Rubin and Joseph Rubin as alleged herein, Stiffelman lost significant amounts of his investment

24    in Glenroy and risks liability to third parties in connection with Glenroy and the Guarantees.

25    Indeed, Stiffelman has already been sued personally in connection with the Guarantees as a direct

26    result of the Rubins' negligence.   Moreover, and the Stiffelman Trust has been deprived of

27    distributions to which it is entitled under the Glenroy Coachella Holdings Operating Agreement,

28

1   and the value of its interest in Glenroy Coachella Holdings has been destroyed as a direct and

2   proximate result of the Rubins' misconduct.

3       108.    As a direct and proximate result of the wrongful and fraudulent conduct perpetrated

4   by Rubin and Joseph Rubin as alleged herein, Stiffelman and the Stiffelman Trust have been

5   damaged in an amount to be determined according to proof at trial, but no less than $50 million.

6                           **EIGHTH CAUSE OF ACTION**

7                       **(Negligent Misrepresentation - Derivative)**

8   **(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella**

9       **Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust,**

10                      **Glenroy Coachella Holdings, and DOES 1-20)**

11      109.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs

12  1 through 108, inclusive, as though set forth in full.

13      110.    Rubin and Joseph Rubin owe a duty of care to Stiffelman, the Stiffelman Trust, and

14  Glenroy Coachella Holdings to conduct themselves as a reasonable person, acting under similar

15  circumstances, would conduct himself.

16      111.    For the purpose of inducing Stiffelman to invest (and remain invested) in the

17  Project, Rubin breached his duty of care to Stiffelman, the Stiffelman Trust, and Glenroy

18  Coachella Holdings by negligently misrepresenting to Stiffelman that:

19          a.      Stiffelman's liability in the Project would be limited to $500,000;

20          b.      The initial construction budget for the Project was only $25 million;

21          c.      The Project would be completed by April 2018;

22          d.      The second construction budget for the Project was only $25 million;

23          e.      Rubin invested personal capital in the Project necessitating Stiffelman's

24  contributions of over $4 million; and

25          f.      Rubin had the requisite knowledge, experience, and qualifications regarding

26  hotel development.

27

28

1    112.    For the purpose of inducing Stiffelman to invest (and remain invested) in the

2  Project, Joseph Rubin breach his duty of care to Stiffelman, the Stiffelman Trust, and Glenroy

3  Coachella Holdings by negligently misrepresenting to Stiffelman that:

4              a.     He was qualified to oversee construction of the Project;

5              b.     The initial construction budget was $25 million;

6              c.     The Project would be completed by April 2018;

7              d.     The second construction budget was $25 million;

8              e.     The Project was on schedule and within the budget; and

9              f.     That Joseph Rubin was providing adequate oversight to construction of the

10  Project.

11    113.    Defendants had no reasonable grounds for believing these representations were true

12  when made.

13    114.    Defendants intended Stiffelman to rely on said representations.

14    115.    Stiffelman, in fact, reasonably relied on Defendants' representations, resulting in

15  harm to the Stiffelman Trust and Glenroy Coachella Holdings.

16    116.    As a direct and proximate result of the negligent acts perpetrated by Rubin and

17  Joseph Rubin as alleged herein, the Stiffelman Trust has been deprived of distributions to which it

18  is entitled under the Glenroy Coachella Holdings Operating Agreement and Glenroy Coachella

19  Holdings has lost significant value.

20    117.    As a direct and proximate result of the negligent acts perpetrated by Rubin and

21  Joseph Rubin as alleged herein, the Stiffelman Trust and Glenroy Coachella Holdings have been

22  damaged in an amount to be determined according to proof at trial, but no less than $50 million.

23    118.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and

24  that Rubin has engaged in conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy

25  Coachella Holdings, any demand made to Glenroy Coachella Holdings would be futile.  Rubin

26  would act to block and deny any such demand.

27

28

## <u>NINTH CAUSE OF ACTION</u>

### <u>(Breach of Written Contract)</u>

**(Stiffelman, as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as**

**Trustee of the Rubin Family Trust)**

119.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 118, inclusive, as though set forth in full.

120.    The Glenroy Coachella Holdings Operating Agreement is a valid and existing contract among Rubin, the Rubin Family Trust, and the Stiffelman Trust.

121.    Stiffelman is the trustee of the Stiffelman Trust.

122.    Rubin is the trustee of the Rubin Family Trust and Manager of Glenroy Coachella Holdings.

123.    Stiffelman, in his capacity as trustee of the Stiffelman Trust, and the Stiffelman Family Trust, have at all times performed, or were otherwise excused from performing, all duties and obligations required of them under the Glenroy Coachella Holdings Operating Agreement.

124.    The Glenroy Coachella Holdings Operating Agreement requires Rubin, among other things, as Manager, to "discharge his duties and responsibilities under th[e Glenroy Coachella Holdings Operating Agreement] in a manner consistent with the Manager's fiduciary duties of care and loyalty to the LLC." It further requires Rubin to "perform his duties as the Manager in good faith, in a manner [he] reasonably believes to be in the best interest of the LLC and its Members and with such care as an ordinarily prudent Person in a like position would use under similar circumstances."

125.    Rubin, in his individual capacity and in his capacity as trustee of the Rubin Family Trust, breached the Glenroy Coachella Holdings Operating Agreement by, among other things, self-dealing; taking undisclosed and improper disbursements; spending Project funds for uses other than the Project, including to support his opulent lifestyle and invest in property unrelated to the Project; and fraudulently concealing material information from other members of Glenroy Coachella Holdings, including the Stiffelman Trust. Moreover, by this same conduct, as trustee of

1  the Rubin Family Trust, Rubin caused the Rubin Family Trust to breach the Glenroy Coachella

2  Holdings Operating Agreement.

3      126.   As a result of Rubin's conduct as alleged herein, the Stiffelman Trust has been

4  deprived of distributions to which it is entitled under the Glenroy Coachella Holdings Operating

5  Agreement, the value of its interest in Glenroy Coachella Holdings has been destroyed, and it has

6  been damaged in an amount to be determined according to proof at trial, but no less than $50

7  million.

8  <div align="center">**TENTH CAUSE OF ACTION**</div>

9  <div align="center">**(Breach of Written Contract - Derivative)**</div>

10 <div align="center">**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella**</div>

11 <div align="center">**Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust,**</div>

12 <div align="center">**Glenroy Coachella Holdings, and DOES 1-20)**</div>

13     127.   Stiffelman incorporates herein by reference the allegations contained in Paragraphs

14 1 through 126, inclusive, as though set forth in full.

15     128.   The Glenroy Coachella Holdings Operating Agreement is a valid and existing

16 contract among Rubin, the Rubin Family Trust, and the Stiffelman Trust.

17     129.   Stiffelman is the trustee of the Stiffelman Trust.

18     130.   Rubin is the trustee of the Rubin Family Trust and Manager of Glenroy Coachella

19 Holdings.

20     131.   Stiffelman, in his capacity as trustee of the Stiffelman Trust, and the Stiffelman

21 Family Trust, have at all times performed, or were otherwise excused from performing, all duties

22 and obligations required of them under the Glenroy Coachella Holdings Operating Agreement.

23     132.   The Glenroy Coachella Holdings Operating Agreement requires Rubin, among

24 other things, as Manager, to "discharge his duties and responsibilities under th[e Glenroy

25 Coachella Holdings Operating Agreement] in a manner consistent with the Manager's fiduciary

26 duties of care and loyalty to the LLC."  It further requires Rubin to "perform his duties as the

27 Manager in good faith, in a manner [he] reasonably believes to be in the best interest of the LLC

28

1  and its Members and with such care as an ordinarily prudent Person in a like position would use

2  under similar circumstances."

3      133.    Rubin, in his individual capacity and in his capacity as trustee of the Rubin Family

4  Trust, breached the Glenroy Coachella Holdings Operating Agreement by, among other things,

5  self-dealing; taking undisclosed and improper disbursements; spending Project funds for uses other

6  than the Project, including to support his opulent lifestyle and invest in property unrelated to the

7  Project; and fraudulently concealing material information from other members of Glenroy

8  Coachella Holdings, including the Stiffelman Trust.  Moreover, by this same conduct, as trustee of

9  the Rubin Family Trust, Rubin caused the Rubin Family Trust to breach the Glenroy Coachella

10  Holdings Operating Agreement.

11      134.    As a result of Rubin's conduct, Glenroy Coachella Holdings has lost significant

12  value and has suffered monetary damages in an amount to be proven at trial, but no less than $50

13  million.

14      135.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and

15  that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust,

16  and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be

17  futile.  Rubin would act to block and deny any such demand.

18              **ELEVENTH CAUSE OF ACTION**

19          **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

20  **(Stiffelman, as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as**

21                  **Trustee of the Rubin Family Trust)**

22      136.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs

23  1 through 135, inclusive, as though set forth in full.

24      137.    The Glenroy Coachella Holdings Operating Agreement contains an implied

25  covenant of good faith and fair dealing that the parties would not do anything to deprive one

26  another of the benefits of the Glenroy Coachella Holdings Operating Agreement.  This implied

27  covenant imposes on Rubin, in his individual capacity and in his capacity as trustee of the Rubin

28  Family Trust, the duty to do everything the Glenroy Coachella Holdings Operating Agreement

1    presupposes that Rubin should do to accomplish the purposes of the Glenroy Coachella Holdings

2    Operating Agreement.

3        138.    Rubin, in his individual capacity and in his capacity as the trustee of the Rubin

4    Family Trust, materially breached the implied covenant of good faith and fair dealing by, among

5    other things, self-dealing; spending Project funds for personal use, including to support his opulent

6    lifestyle and invest in property entirely unrelated to the Project; and fraudulently concealing

7    material information from other members of Glenroy Coachella Holdings, including the Stiffelman

8    Trust.  Moreover, by this same conduct, as trustee of the Rubin Family Trust, Rubin caused the

9    Rubin Family Trust to breach the implied covenant of good faith and fair dealing contained in the

10    Glenroy Coachella Holdings Operating Agreement.

11        139.    At the time Rubin and the Rubin Family Trust committed said material breaches of

12    the implied covenant of good faith and fair dealing, Stiffelman, in his capacity as trustee of the

13    Stiffelman Trust, and the Stiffelman Trust had performed all material conditions, covenants,

14    obligations, and promises required on their part to be performed in accordance with the terms and

15    conditions of the Glenroy Coachella Holdings Operating Agreement, except those conditions,

16    covenants, obligations and promises that were waived, excused, or prevented by Rubin and the

17    Rubin Family Trust.

18        140.    As a result of Rubin's conduct as alleged herein, the Stiffelman Trust has been

19    deprived of distributions to which it is entitled under the Glenroy Coachella Holdings Operating

20    Agreement, the value of its interest in Glenroy Coachella Holdings has been destroyed, and it has

21    been damaged in an amount to be determined according to proof at trial, but no less than $50

22    million.

23

24

25

26

27

28

## TWELFTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing - Derivative)

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella**

**Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust,**

**Glenroy Coachella Holdings, and DOES 1-20)**

141.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 140, inclusive, as though set forth in full.

142.    The Glenroy Coachella Holdings Operating Agreement contains an implied covenant of good faith and fair dealing that the parties would not do anything to deprive one another of the benefits of the Glenroy Coachella Holdings Operating Agreement.  This implied covenant imposes on Rubin, in his individual capacity and in his capacity as trustee of the Rubin Family Trust, the duty to do everything the Glenroy Coachella Holdings Operating Agreement presupposes that Rubin should do to accomplish the purposes of the Glenroy Coachella Holdings Operating Agreement.

143.    Rubin, in his individual capacity and in his capacity as the trustee of the Rubin Family Trust, materially breached the implied covenant of good faith and fair dealing by, among other things, self-dealing; spending Project funds for personal use, including to support his opulent lifestyle and invest in property entirely unrelated to the Project; and fraudulently concealing material information from other members of Glenroy Coachella Holdings, including the Stiffelman Trust.  Moreover, by this same conduct, as trustee of the Rubin Family Trust, Rubin caused the Rubin Family Trust to breach the implied covenant of good faith and fair dealing contained in the Glenroy Coachella Holdings Operating Agreement.

144.    At the time Rubin and the Rubin Family Trust committed said material breaches of the implied covenant of good faith and fair dealing, Stiffelman, in his capacity as trustee of the Stiffelman Trust, and the Stiffelman Trust had performed all material conditions, covenants, obligations, and promises required on their part to be performed in accordance with the terms and conditions of the Glenroy Coachella Holdings Operating Agreement, except those conditions,

1    covenants, obligations and promises that were waived, excused, or prevented by Rubin and the

2    Rubin Family Trust.

3        145.    As a result of Rubin's conduct, Glenroy Coachella Holdings has lost significant

4    value and has suffered monetary damages in an amount to be proven at trial, but no less than $50

5    million.

6        146.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and

7    that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust,

8    and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be

9    futile.  Rubin would act to block and deny any such demand.

10                            **THIRTEENTH CAUSE OF ACTION**

11                                  **(Unjust Enrichment)**

12    **(Stiffelman, as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as**

13                **Trustee of the Rubin Family Trust, Joseph Rubin, and DOES 1-20)**

14        147.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs

15    1 through 146, inclusive, as though set forth in full.

16        148.    Stiffelman is informed and believes and on that basis alleges that Rubin and Joseph

17    Rubin have been unjustly enriched as a result of their fraudulent conduct, including but not limited

18    to:

19            a.      Rubin spending Project funds on uses other than the Project, including to

20    support his lavish lifestyle and invest in other property having nothing to do with the Project;

21            b.      Joseph Rubin taking a salary from funds raised for the Project;

22            c.      Rubin taking unmerited distributions from Glenroy Coachella Holdings; and

23            d.      Rubin misappropriating the Mello Roos financing that was expressly

24    earmarked for the Project.

25        149.    Defendants are aware that they have received such benefits.

26        150.    It would be unjust to allow Defendants to retain the monetary benefits they have

27    realized through their unlawful and fraudulent conduct, as outlined above.

28

EISNER, LLP        750833.3                    32

                                FIRST AMENDED COMPLAINT

151.    As a result of the foregoing wrongful and fraudulent actions, the Stiffelman Trust has been harmed, deprived of distributions to which it is entitled under the Glenroy Coachella Holdings Operating Agreement, and the value of its interest in Glenroy Coachella Holdings has been destroyed.  The Stiffelman Trust has been damaged in an amount to be determined according to proof at trial, but no less than $50 million.

## FOURTEENTH CAUSE OF ACTION

### (Unjust Enrichment - Derivative)

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Joseph Rubin, Glenroy Coachella Holdings, and DOES 1-20)**

152.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 152, inclusive, as though set forth in full.

153.    Stiffelman is informed and believes and on that basis alleges that Rubin and Joseph Rubin have been unjustly enriched as a result of their fraudulent conduct, including but not limited to:

a.    Rubin spending Project funds on uses other than the Project, including to support his lavish lifestyle and invest in other property having nothing to do with the Project;

b.    Joseph Rubin taking a salary from funds raised for the Project;

c.    Rubin taking unmerited distributions from Glenroy Coachella Holdings; and

d.    Rubin misappropriating the Mello Roos financing that was expressly earmarked for the Project.

154.    Defendants are aware that they have received such benefits.

155.    It would be unjust to allow Defendants to retain the monetary benefits they have realized through their unlawful and fraudulent conduct, as outlined above.

156.    As a result of the foregoing wrongful and fraudulent actions, Glenroy Coachella Holdings has been harmed and is entitled to an award of damages in an amount by which Rubin and Joseph Rubin have been enriched, which will be shown according to proof at trial, but no less than $50 million.

157.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be futile.  Rubin would act to block and deny any such demand.

### FIFTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

**(Stiffelman, as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, and DOES 1-20)**

158.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 157, inclusive, as though set forth in full.

159.    By reason of the Glenroy Coachella Holdings Operating Agreement, Rubin, in his individual capacity and as trustee of the Rubin Family Trust, owed the Stiffelman Trust the fiduciary obligations of trust, loyalty, good faith, due care, and was required to use his utmost ability to control and manage the Project in a fair, just, honest, and equitable manner.  Rubin was required to act in furtherance of the best interests of Glenroy Coachella Holdings and the Stiffelman Trust.

160.    As described above, Rubin failed to act in the best interest of Glenroy Coachella Holdings and the Stiffelman Trust by engaging in fraudulent misrepresentations, fraudulent concealment, and breaching the Operating Agreement.

161.    Moreover, because Glenroy Coachella Holdings is the sole member of Glenroy Coachella, Glenroy Coachella Holdings owed the aforementioned fiduciary duties to Glenroy Coachella pursuant to the Glenroy Coachella Operating Agreement.  Rubin caused Glenroy Coachella Holdings to breach its fiduciary duties as the sole member of Glenroy Coachella.

162.    In engaging in the above-described conduct, Rubin disregarded sound business practices and knowingly, intentionally, recklessly, or negligently breached his fiduciary and other duties owed to the Stiffelman Trust, and as a result, Stiffelman and the Stiffelman Trust have been substantially damaged in an amount to be determined according to proof at trial, but no less than $50 million.

163.   The foregoing conduct of Rubin was intended by Rubin to cause injury to Glenroy Coachella Holdings, Glenroy Coachella, and the Stiffelman Trust or was despicable conduct carried on by Rubin with a willful and conscious disregard of the rights of the Stiffelman Trust or subjected the Stiffelman Trust to cruel and unjust hardship in conscious disregard of the rights of the Stiffelman Trust such as to constitute malice, oppression, or fraud under California and Delaware law, thereby entitling the Stiffelman and the Stiffelman Trust to punitive damages in an amount appropriate to punish or make an example of Rubin.

164.   As a result of Rubin's conduct as alleged herein, the Stiffelman Trust has been deprived of distributions to which it is entitled under the Glenroy Coachella Holdings Operating Agreement, the value of its interest in Glenroy Coachella Holdings has been destroyed, and the Stiffelman Trust has been damaged in an amount to be determined according to proof at trial, but no less than $50 million.

## SIXTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty - Derivative)

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Glenroy Coachella Holdings, and DOES 1-20)**

165.   Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 164, inclusive, as though set forth in full.

166.   By reason of the Glenroy Coachella Holdings Operating Agreement, Rubin, in his individual capacity and as trustee of the Rubin Family Trust, owed Glenroy Coachella Holdings the fiduciary obligations of trust, loyalty, good faith, due care, and was required to use his utmost ability to control and manage the Project in a fair, just, honest, and equitable manner.  Rubin was required to act in furtherance of the best interests of Glenroy Coachella Holdings and the Stiffelman Trust.

167.   As described above, Rubin failed to act in the best interest of Glenroy Coachella Holdings and the Stiffelman Trust by engaging in fraudulent misrepresentations, fraudulent concealment, and breaching the Operating Agreement.

168.    Moreover, because Glenroy Coachella Holdings is the sole member of Glenroy Coachella, Glenroy Coachella Holdings owed the aforementioned fiduciary duties to Glenroy Coachella pursuant to the Glenroy Coachella Operating Agreement.    Rubin caused Glenroy Coachella Holdings to breach its fiduciary duties as the sole member of Glenroy Coachella.

169.    In engaging in the above-described conduct, Rubin disregarded sound business practices and knowingly, intentionally, recklessly, or negligently breached his fiduciary and other duties owed to Glenroy Coachella Holdings, and as a result, Glenroy Coachella Holdings has been substantially damaged in an amount to be determined according to proof at trial, but no less than $50 million.

170.    The foregoing conduct of Rubin was intended by Rubin to cause injury to Glenroy Coachella Holdings, Glenroy Coachella, and the Stiffelman Trust or was despicable conduct carried on by Rubin with a willful and conscious disregard of the rights of the Stiffelman Trust or subjected the Stiffelman Trust and Glenroy Coachella Holdings to cruel and unjust hardship in conscious disregard of the rights of the Stiffelman Trust and Glenroy Coachella Holdings such as to constitute malice, oppression, or fraud under California and Delaware law, thereby entitling Glenroy Coachella Holdings to punitive damages in an amount appropriate to punish or make an example of Rubin.

171.    As a result of Rubin's conduct, Glenroy Coachella Holdings has lost significant value and has suffered monetary damages in an amount to be proven at trial, but no less than $50 million.

172.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings would be futile.  Rubin would act to block and deny any such demand.

## SEVENTEENTH CAUSE OF ACTION

### (Involuntary Dissociation of Member - Derivative)

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Glenroy Coachella Holdings, and DOES 1-20)**

173.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 172, inclusive, as though set forth in full.

174.    Pursuant to the Glenroy Coachella Holdings Operating Agreement, the Rubin Family Trust and the Stiffelman Trust are members of Glenroy Coachella Holdings.

175.    Rubin is the trustee of the Rubin Family Trust and manager of Glenroy Coachella Holdings.

176.    Stiffelman is the trustee of the Stiffelman Trust.

177.    As set forth above, Rubin has engaged in fraudulent conduct in breach of both the Glenroy Coachella Holdings Operating Agreement and Rubin's fiduciary duties, and has caused the Rubin Family Trust to do the same, thereby causing harm to Glenroy Coachella Holdings, Stiffelman, and the Stiffelman Trust.

178.    Notwithstanding the foregoing conduct, the Rubin Family Trust remains a member of Glenroy Coachella Holdings and Rubin remains the Manager of Glenroy Coachella Holdings.

179.    Accordingly, Rubin should be judicially expelled as manager of Glenroy Coachella Holdings and the Rubin Family Trust should be judicially expelled as a member of Glenroy Coachella Holdings by way of involuntary dissociation.

180.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings, any demand made to Glenroy Coachella Holdings to expel Rubin and the Rubin Family Trust as members of Glenroy Coachella Holdings would be futile. Rubin would act to block and deny any such demand.

## **EIGHTEENTH CAUSE OF ACTION**

### **(Declaratory Relief for Indemnity and Contribution)**

**(Stiffelman against Stuart Rubin, individually and as Trustee of the Rubin Family Trust,**

**Joseph Rubin, and DOES 1-20)**

181.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 180, inclusive, as though set forth in full.

182.    Stiffelman maintains indemnity and contribution rights pursuant to, among other things, California law.

183.    As a result of the wrongful and fraudulent conduct perpetrated by Rubin and Joseph Rubin as alleged herein, Stiffelman risks liability to third parties in connection with Glenroy and the Guarantees, which Rubin fraudulently induced Stiffelman to execute.

184.    Stiffelman therefore seeks a declaration that Rubin, individually and as trustee of the Rubin Family Trust, and Joseph Rubin are required to fully indemnify Stiffelman for any losses caused by the aforementioned wrongful and fraudulent conduct in connection with Glenroy.

## **NINETEENTH CAUSE OF ACTION**

### **(Accounting)**

**(Stiffelman, as Trustee of the Stiffelman Trust, against Stuart Rubin, individually and as**

**Trustee of the Rubin Family Trust, and DOES 1-20)**

185.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 184, inclusive, as though set forth in full.

186.    The Stiffelman Trust maintains audit rights pursuant to, among other provisions and laws, the Glenroy Coachella Holdings Operating Agreement.

187.    The extent of the amount of money due and owing from Defendants to Stiffelman as a result of Defendants' wrongful and fraudulent conduct is unknown to Stiffelman and cannot be ascertained without an accounting of the money Defendants disbursed and received in connection with Glenroy.

188.    Rubin has access to such information, but Rubin has refused to provide Stiffelman with the same despite Stiffelman's repeated requests.

189.    As a result of Rubin's failure to provide an accounting, an order from the Court requiring Rubin to provide a full accounting of Glenroy Coachella Holdings' books and records, and money that Defendants disbursed and received in connection with Glenroy is necessary.

## **TWENTIETH CAUSE OF ACTION**

### **(Accounting - Derivative)**

**(Stiffelman, as Trustee of the Stiffelman Trust, derivatively on behalf of Glenroy Coachella Holdings, against Stuart Rubin, individually and as Trustee of the Rubin Family Trust, Glenroy Coachella Holdings, and DOES 1-20)**

190.    Stiffelman incorporates herein by reference the allegations contained in Paragraphs 1 through 189, inclusive, as though set forth in full.

191.    The Stiffelman Trust maintains audit rights pursuant to, among other provisions and laws, the Glenroy Coachella Holdings Operating Agreement.

192.    The extent of the amount of money due and owing from Defendants to Stiffelman as a result of Defendants' wrongful and fraudulent conduct is unknown to Stiffelman and cannot be ascertained without an accounting of the money Defendants disbursed and received in connection with Glenroy.

193.    Rubin has access to such information, but Rubin has refused to provide Stiffelman with the same despite Stiffelman's repeated requests.  As manager of Glenroy Coachella Holdings, Rubin has caused Glenroy Coachella Holdings to violate the audit rights of the Stiffelman Trust.

194.    As a result of Rubin's failure to provide an accounting, an order from the Court requiring Rubin to provide a full accounting of Glenroy Coachella Holdings' books and records, and money that Defendants disbursed and received in connection with Glenroy is necessary.

195.    Furthermore, given that Rubin is the Manager of Glenroy Coachella Holdings and that Rubin has engaged in fraudulent conduct designed to harm Stiffelman, the Stiffelman Trust, and Glenroy Coachella Holdings, any further demand for books and records to Glenroy Coachella Holdings would be futile.  Rubin would act to block and deny any such demand.

1

**PRAYER**

2    WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as

3  follows:

4    1.    For actual and compensatory damages in an amount to be proven at trial, but no less

5  than $50 million;

6    2.    For exemplary and punitive damages in an amount to be determined at the time of

7  trial;

8    3.    For attorneys' fees and costs as permitted by applicable law;

9    4.    For pre-judgment and post-judgment interest at the maximum legal rate;

10    5.    For an order expelling Rubin and the Rubin Family Trust as members of Glenroy

11  Coachella Holdings;

12    6.    For a constructive trust over, and turnover of, the wrongfully received and retained

13  funds, for the benefit of Plaintiff;

14    7.    For a declaration that Defendants are required to fully indemnify Stiffelman for any

15  losses occasioned by Defendants' wrongful and fraudulent acts in connection with Glenroy;

16    8.    For an immediate accounting; and

17    9.    For such other and further relief as the Court may deem just and proper.

18

19  DATED:  January 31, 2020                    EISNER, LLP

20

21                                    By: _____

22                                    CHRISTOPHER FROST
                                      KATHERINE R. PIERUCCI
23                                    Attorneys for Plaintiff Gary Stiffelman

24

25

26

27

28

1

### **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a trial by jury on all issues and causes of action triable by a jury.

3

4   DATED:  January 31, 2020                  EISNER, LLP

5

6                                 By:

7                                  CHRISTOPHER FROST
                               KATHERINE R. PIERUCCI

8                                Attorneys for Plaintiff Gary Stiffelman

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

### Gary Stiffelman v. Stuart Rubin, et al.
### Case No. 19SMCV01908

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 9601 Wilshire Blvd., 7th Floor, Beverly Hills, California 90210.

On January 31, 2020, I served true copies of the following document(s) described as **FIRST AMENDED COMPLAINT** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to Laurence Berman and David Baake and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Eisner, LLP for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Beverly Hills, California.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address ckoscinski@eisnerlaw.com to Laurence Berman and David Baake.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**BY FEDEX:**  I enclosed said document(s) in an envelope or package provided by FedEx and addressed to Agent for Service of Process for Glenroy Coachella.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 31, 2020, at Beverly Hills, California.

_____
Czarbelle Koscinski

1

**SERVICE LIST**
*Gary Stiffelman v. Stuart Rubin, et al.*
**Case No. 19SMCV01908**

2

3     Laurence M. Berman                              *Attorney for Defendant Stuart Rubin*
       Berman Litigation Group
4      815 Moraga Drive
       Los Angeles, CA 90049
5      Telephone:  (424) 465-9079
       Facsimile:  (310) 454-0868
6      Email:  lberman@bermanlitigationgroup.com

7

       David Baake                                    *Attorney for Defendant Joseph Rubin*
8      Baake Law LLC
       350 El Molino Blvd.,
9      Las Cruces, NM 88005
       Telephone:  (575) 343-2782
10     Email:  david@baakelaw.com

11     Glenroy Coachella Holdings, LLC

       Sapphire McFarland                             *Agent for Service of Process for Glenroy*
12     Tiffiney Lomax                                 *Coachella Holdings, LLC*

13     Tressa White
       7801 Folsom Boulevard, Suite 202
14     Sacramento, CA 95826

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "4"

**Subject:** Re: Distributions Lighthouse

**Date:** Sunday, April 7, 2019 at 12:00:47 PM Pacific Daylight Time

**From:** gary stiffelman <gary.stiffelman@gmail.com>

**To:** Joseph Rubin <jrubin@rubincapitalgroup.com>

Any newer financials?  We very seen nothing since year-end 2018.  I know it's doing very well.  Seems like it's making well over $100k/month even after rent. Any plans to make a profit accounting and distribution beyond $9000?

> On Feb 17, 2019, at 3:09 PM, Joseph Rubin <jrubin@rubincapitalgroup.com> wrote:
>
> This email was sent out on December 1st. It is now February
>
> Joseph Rubin
> Rubin Capital Group, LLC
> 1801 S La Cienega Blvd Suite 301
> Los Angeles, CA 90035
> M: (310) 740-0132
>
>> On Feb 17, 2019, at 2:56 PM, Gary Stiffelman <gary.stiffelman@gmail.com> wrote:
>>
>> What happened to these distributions ?  Feels like we've are close to half a mil of net to date.
>>
>> Sent from my iPhone
>>
>>> On Dec 1, 2018, at 7:42 AM, Joseph Rubin <jrubin@rubincapitalgroup.com> wrote:
>>>
>>> Hi guys,
>>>
>>> Cheers to a very successful month.
>>>
>>> Gross revenues totaled almost 600k.
>>> After cogs (product) and taxes, we generated close to 250k, a little under that. After labor we will have generated roughly 160-170k.
>>>
>>> I will be issuing the first distribution to respective parties shortly.
>>>
>>> Best,
>>>
>>> Joseph Rubin
>>> Rubin Capital Group, LLC
>>> 1801 S La Cienega Blvd Suite 301
>>> Los Angeles, CA 90035
>>> M: (310) 740-0132

**Subject:** Re: Distributions Lighthouse

**Date:** Sunday, May 12, 2019 at 9:37:45 AM Pacific Daylight Time

**From:** Gary Stiffelman <gary.stiffelman@gmail.com>

**To:** Joseph Rubin <jrubin@rubincapitalgroup.com>

It's now May. Can I get financials please?

Sent from my iPhone

> On Feb 17, 2019, at 3:09 PM, Joseph Rubin <jrubin@rubincapitalgroup.com> wrote:
>
> This email was sent out on December 1st. It is now February
>
> Joseph Rubin
> Rubin Capital Group, LLC
> 1801 S La Cienega Blvd Suite 301
> Los Angeles, CA 90035
> M: (310) 740-0132
>
>> On Feb 17, 2019, at 2:56 PM, Gary Stiffelman <gary.stiffelman@gmail.com> wrote:
>>
>> What happened to these distributions ?  Feels like we've are close to half a mil of net to date.
>>
>> Sent from my iPhone
>>
>>> On Dec 1, 2018, at 7:42 AM, Joseph Rubin <jrubin@rubincapitalgroup.com> wrote:
>>>
>>> Hi guys,
>>>
>>> Cheers to a very successful month.
>>>
>>> Gross revenues totaled almost 600k.
>>> After cogs (product) and taxes, we generated close to 250k, a little under that. After labor we will have generated roughly 160-170k.
>>>
>>> I will be issuing the first distribution to respective parties shortly.
>>>
>>> Best,
>>>
>>> Joseph Rubin
>>> Rubin Capital Group, LLC
>>> 1801 S La Cienega Blvd Suite 301
>>> Los Angeles, CA 90035
>>> M: (310) 740-0132

**Subject:** Re: Rent October

**Date:**    Friday, December 6, 2019 at 11:16:04 PM Pacific Standard Time

**From:**    gary stiffelman <gary.stiffelman@gmail.com>

**To:**    Joseph Rubin <jrubin@rubincapitalgroup.com>

**CC:**    zmwerner@gmail.com <zmwerner@gmail.com>, garystiffelman@gmail.com
<garystiffelman@gmail.com>

When do you intend to address the balance of my "commentary" apart from the first payment from Palm Springs?

> On Nov 27, 2019, at 8:39 AM, Joseph Rubin <jrubin@rubincapitalgroup.com> wrote:
>
> Hi Zach and Gary,
>
> Happy thanksgiving.
>
> Chris has been notified that a messenger is picking up the rent today from First Legal.
>
> The rest of your commentary will be addressed later after the holidays.
>
> Stay safe if traveling, the weather is crazy.
>
> Best,
>
> Joseph Rubin
> Rubin Capital Group, LLC
> 1801 S La Cienega Blvd Suite 301
> Los Angeles, CA 90035
> M: (310) 740-0132
>
>> On Nov 27, 2019, at 8:32 AM, stiffelmang@gtlaw.com wrote:
>>
>>
>>>
>>> Can you explain why the Coachella lighthouse business has been so poor that it used to be able to pay rent of $51,000 per month and now you can just pay out $5000 yet there are zero profits?  I'm also aware that you havent been paying Tom Slovak's legal fees. The other litigation expenses are also long behind us.
>>
>>> How is your Palm Springs store faring?  We await that accounting.
>>>
>>> For months, you claimed that the hot weather was cramping sales but summer is long behind us.  We haven't seen a statement for any period since July although you said months ago that August was forthcoming. It's now almost December. I'm also wondering what you have paid yourself in management fees in the past six months if money is so tight.
>>>
>>> Also, in late October you wrote Zack Werner with regard to detailed financials: " Gary requested some documents be compiled Sunday. We spoke yesterday on the phone And these will be gathered for you and him."
>>>
>>> Nothing has been forthcoming.
>>>
>>> I await your reply.  All rights reserved.
>>
>> Sent from my iPhone

>>

>>>> On Nov 26, 2019, at 12:44 PM, Joseph Rubin <jrubin@rubincapitalgroup.com> wrote:

>>>

>>> *EXTERNAL TO GT*

>>>

>>> Hi Zach,

>>>

>>> Happy thanksgiving. Hope all is well on the east coast. We are going to be making a rent payment for the month of October in the total amount of $5,500. Gary's share of 31.84% which equates to $1,751.20 will be available for pickup in Coachella. It is being store in the safe in an envelope. If Gary would like to send a messenger for its retrieval please notify in advance the name of the driver for pickup for security purposes.

>>>

>>> Have a great and happy thanksgiving.

>>>

>>> Thank you

>>>

>>> Joseph Rubin

>>

>> ---------------------------------------------------------------------

>> If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

# Exhibit "5"

# The Lighthouse

Balance Sheet

As of December 31, 2020

| | TOTAL |
|---|---|

**ASSETS**



Due from Glenroy Coachella ............................................ 420,736.73

Preliminary Financial Statements THESE ARE NOT FINAL.

# The Lighthouse

Balance Sheet

As of December 31, 2020



Preliminary Financial Statements THESE ARE NOT FINAL.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

633 W. Fifth Street, 26th Floor, Los Angeles, California 90071

A true and correct copy of the foregoing document entitled: DECLARATION OF GARY STIFFELMAN IN SUPPORT OF JOINDER OF GARY STIFFELMAN TO U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP'S MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE AND MOTION TO EXCUSE STATE COURT RECEIVER, EDWIN LESLIE, FROM TURNOVER OF ASSETS UNDER 11 U.S.C. § 543

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On March 8, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 8, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

BY PERSONAL DELIVERY:
Hon. Sheri Bluebond
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, California 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 8, 2021 | Timothy R. Laquer | /s/ Timothy R. Laquer |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**2:21-bk-11188-BB Notice will be electronically mailed to:**

Steven M Berman on behalf of Interested Party EFO Financial Group LLC
sberman@slk-law.com, awit@shumaker.com;bgasaway@shumaker.com

Daren Brinkman on behalf of Creditor Saxon Engineering Services Inc.
office@brinkmanlaw.com, 7764052420@filings.docketbird.com

Caroline Djang on behalf of Creditor Doug Wall Construction
caroline.djang@bbklaw.com, laurie.verstegen@bbklaw.com;wilma.escalante@bbklaw.com

Caroline Djang on behalf of Interested Party Caroline R. Djang
caroline.djang@bbklaw.com, laurie.verstegen@bbklaw.com;wilma.escalante@bbklaw.com

Jenny L Doling on behalf of Attorney INTERESTED PARTY
JD@jdl.law, dolingjr92080@notify.bestcase.com

Eryk R Escobar on behalf of U.S. Trustee United States Trustee (LA)
eryk.r.escobar@usdoj.gov

Douglas Harris on behalf of Interested Party Courtesy NEF
Douglas.harris@alston.com

Mark S Horoupian on behalf of Interested Party Courtesy NEF
mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com

Marsha A Houston on behalf of Creditor U.S. Real Estate Credit Holdings III-A, LP
mhouston@reedsmith.com

Michael S Kogan on behalf of Interested Party Courtesy NEF
mkogan@koganlawfirm.com

Timothy R Laquer on behalf of Interested Party Courtesy NEF
trl@ddclaw.com, trl@ddclaw.com

Leib M Lerner on behalf of Interested Party Courtesy NEF
leib.lerner@alston.com, autodockettest-lax@alston.com

Crystle Jane Lindsey on behalf of Debtor Glenroy Coachella, LLC
crystle@wsrlaw.net, crystle@cjllaw.com;gabby@wsrlaw.net;dairi@wsrlaw.net

Sean A OKeefe on behalf of Interested Party Stuart Rubin
sokeefe@okeefelc.com, seanaokeefe@msn.com

Matthew D Pham on behalf of Interested Party Courtesy NEF
mpham@hahnlawyers.com, marias@hahnlawyers.com;mpham@ecf.courtdrive.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Dean G Rallis, Jr on behalf of Interested Party Courtesy NEF
drallis@hahnlawyers.com, marias@hahnlawyers.com;mpham@hahnlawyers.com;drallis@ecf.courtdrive.com;d
rallis@ecf.inforuptcy.com

Debra Riley on behalf of Creditor California Statewide Communities Development Authority
driley@allenmatkins.com

Christopher O Rivas on behalf of Creditor U.S. Real Estate Credit Holdings III-A, LP
crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com

James R Selth on behalf of Debtor Glenroy Coachella, LLC
jim@wsrlaw.net, jselth@yahoo.com;dairi@wsrlaw.net;gabby@wsrlaw.net;vinnet@ecf.inforuptcy.com

James R Selth on behalf of Interested Party Courtesy NEF
jim@wsrlaw.net, jselth@yahoo.com;dairi@wsrlaw.net;gabby@wsrlaw.net;vinnet@ecf.inforuptcy.com

Leonard M Shulman on behalf of Interested Party Latham Management & Consulting Services, Inc.
lshulman@shulmanbastian.com

Alan G Tippie on behalf of Interested Party Courtesy NEF
atippie@sulmeyerlaw.com, atippie@ecf.courtdrive.com;pdillamar@sulmeyerlaw.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Daniel J Weintraub on behalf of Debtor Glenroy Coachella, LLC
dan@wsrlaw.net, vinnet@ecf.inforuptcy.com;gabby@wsrlaw.net;dairi@wsrlaw.net

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE