David R. Welch (SBN 251693)
Aluyah I. Imoisili (SBN 245572)
**D | R WELCH ATTORNEYS AT LAW**
500 South Grand Avenue, 18th Floor
Los Angeles, California 90071
Phone: (213) 596-9008
Fax:    (213) 536-4589
Email: litigation@drwelchlaw.com

*Attorneys for Plaintiff Quonset Partners LLC*

## UNITED STATES BANKRUPTCY COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## (LOS ANGELES DIVISION)

| | |
|---|---|
| In re: GLENROY COACHELLA, LLC, | **Case No.: 2:21-BK-11188-BB** |
| Debtor, | **Chapter 7** |
| QUONSET PARTNERS LLC, a California limited liability company, | **Adv. No.:** |
| Plaintiff, | ***VERIFIED* COMPLAINT FOR:** |
| v. | 1) **QUIET TITLE TO REAL PROPERTY;** |
| GLENROY COACHELLA, LLC, a Delaware limited liability company; CITY OF COACHELLA, a municipal corporation; RICHARD A. MARSHACK, in his capacity as Chapter 7 Trustee of the bankruptcy estate of Glenroy Coachella, LLC; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO; and DOES 1 through 10, inclusive, | 2) **RESULTING TRUST;** <br> 3) **DECLARATORY RELIEF; AND** <br> 4) **VIOLATION OF 42 U.S.C. § 1942** |
| Defendants. | |

Plaintiff Quonset Partners LLC ("Quonset") hereby complains and alleges as follows.

## JURISDICTION AND VENUE

1.    This adversary proceeding arises under the Bankruptcy Code and arises in and relates to the above-captioned Chapter 7 bankruptcy case of debtor Glenroy Coachella, LLC ("Glenroy" or "Debtor") in the United States Bankruptcy Court for the Central District, Case No. 2:21-bk-11188-BB, before the Honorable Sheri Bluebond. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and (e).

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The resolution of the claims at issue will have an effect on the value of Glenroy's estate and distribution to its creditors.

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a).

4.    This Court has jurisdiction over them pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 2614 because the matter arises under federal law, specifically, 42 U.S.C. 1983.

5.    Quonset has standing to bring this action pursuant to California Code of Civil Procedure 526a because this is an action to obtain a judgment, and preventing any illegal waste of, or injury to, the property of the City of Coachella (the "City").  Additionally, Quonset, as a member of the tax-paying public, has a substantial interest in the outcome of this controversy.

## NATURE OF THE ACTION

6.    This adversary proceeding seeks to protect and enforce a validly created and existing public easement—which the City has failed and refused to file and record—on Glenroy's real estate that is now part of the present bankruptcy estate.

7.    Glenroy expressly granted the City the subject public easement on Glenroy's land because it used public funds from the City, under California's "Mello-Roos Community Facilities Act of 1982" (the "Mello-Roos Act"), to improve the real property.

8.    The stated purpose of the Mello-Roos Act is to provide an alternate method for local governments to finance capital facilities and services.  Essentially, the Mello-Roos Act authorizes a local government agency to create special geographic districts wherein the local government can levy a special tax on residents specifically to fund the purchase, construction, expansion, or

**VERIFIED COMPLAINT**

1  rehabilitation of public facilities such as parks, schools, libraries, or any other buildings. (*See* Cal.
2  Gov. Code § 53313.5.)

3       9.     Here, the Mello-Roos Act monies in question were raised by the City through the
4  creation of a Community Facilities District No. 2018-1 ("CFD"). Through the CFD, the City issued
5  bonds. Those bonds are to be paid through the implementation and collection of a Mello-Roos Act
6  tax (the "Special Tax") imposed upon the public.

7       10.     Quonset owns the land near Glenroy's property, which Quonset leases (through a
8  sublease with Quonset's original tenant) to The Lighthouse Coachella, LLC ("Lighthouse"), a
9  California state-licensed commercial cannabis retailer. Quonset, Lighthouse, as well as other local
10  businesses and residents, have been paying this Special Tax.

11       11.     Over the past several years, the City has collected thousands of dollars in Special
12  Tax from Quonset and its neighbors and the public. In addition, over the past few years, Quonset
13  and its tenants have paid thousands in sales and use taxes, business license taxes, income taxes, and
14  other remittances to the City.

15       12.     Quonset and the general public are the express and intended beneficiaries of this
16  validly created, existing yet un-recorded easement for use of the property.

17       13.     This easement is now at severe risk of extinguishment or termination if Glenroy's
18  Chapter 7 Trustee, Richard A. Marshack, conducts a sale of the property. Such a sale is to provide
19  free and clear title to any potential buyer, which may not include the subject easement.

20       14.     The City and the Chapter 7 Trustee have failed to file and record this easement as
21  well as enforce this easement against encroachment, all to the detriment of Quonset and the general
22  public.

23       15.     Accordingly, Quonset brings this adversary proceeding to quiet title, obtain a
24  declaration that the City is entitled to a public easement on the property, secure an injunction
25  preventing Glenroy's Chapter 7 Trustee from scheduling a sale of the real property until the City's
26  public easement is recorded, secure a declaration that any sale of the Glenroy real property is subject
27  to the City's public easement, and recover an award of compensatory, other damages, and attorneys'
28

VERIFIED COMPLAINT

fees allowable by law the City has caused by failing to record the public easement that Quonset and other residents have funded in violation of their substantive and procedural due process rights.

## PARTIES

16.    Plaintiff Quonset is a limited liability company organized under the laws of California, and authorized to do business and doing business in the Community Facilities District No. 2018-1 of the City of Coachella, California.

17.    Defendant Glenroy is a limited liability company organized under the laws of Delaware authorized to do business and doing business in California.

18.    Defendant City is a municipal corporation and a political subdivision of the State of California.

19.    Defendant Mr. Marshack is an individual, acting in his capacity as the Chapter 7 Trustee of the bankruptcy estate of Glenroy.

20.    Quonset does not know the true names of "All Persons Unknown, Claiming Any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property Described in the Complaint Adverse to Plaintiff's Title, or Any Cloud on Plaintiff's Title Thereto" and DOES 1 through 10, inclusive, and therefore sues them by those fictitious names.

21.    Each of the DOE defendants claims, or may claim, some interest in the real property described in this Complaint.  The names, capacities, and relationships of DOES 1 through 10 will be added by amendment to this Complaint when they are known.

22.    At all times mentioned in this Complaint, Defendants were the agents and employees of their co-Defendants, and in doing the things alleged in this Complaint were acting within the course and scope of that agency and employment.

## GENERAL ALLEGATIONS

**A.    Glenroy and the City Create a Pubic Easement But Fail to Record It.**

23.    In August 2018, the City entered into an Acquisition Agreement (the "Agreement") with Glenroy to improve its real property under California's Mello-Roos Act.  Attached hereto as Exhibit  A is a true and correct copy of the Agreement.

24.     Under the Agreement, the City formed The City of Coachella Community Facilities District No. 2018-1 (Glenroy) (the "Glenroy CFD").

25.     Pursuant to the Agreement, and under the Mello-Roos Act, in exchange for the public's money being used to improve the land owned by Glenroy, for the express benefit of the public, which includes Quonset, Glenroy expressly granted the City a public easement to a parking lot at 84150 Avenue 48, Coachella, California 92201 (Accessor's Parcel Numbers 603-220-063 and 603-220-069)—the premises adjoining the real property where Glenroy was to develop a luxury hotel.

26.     Despite the easement being created, the City never recorded it, as it had and still has a duty to do.

27.     In the interim, Quonset and the public paid significant sums in Special Tax that funded infrastructure improvements that benefited Glenroy's hotel project.

**B.     Glenroy's Falls Into Receivership, and the Receiver Blocks Use of Public Easement.**

28.     However, in 2019, Glenroy fell into financial turmoil and became engaged in a dispute with its construction lenders.  Ultimately, Glenroy lost control of its hotel project to Edwin W. Leslie (the "Receiver"), appointed by the Honorable Randall Stamen (in the Superior Court of Riverside County, Case No.: RIC1905743) in a separate action against its lenders.

29.     In April 2020, the Receiver ordered a fence to be built around the parking lot, thereby blocking the agreed-to, valid, and presently existing (yet unrecorded) public easement, and sought a separate $20,000 a month fee from Quonset to use the parking lot.

30.     On or around April 14, 2020, the Receiver hired American Fence Company, Inc. to fence off the parking lot that had been operated and maintained by the City.

31.     On April 15, 2020, Quonset advised the Receiver that the fence would trespass on land it had a private agreement to traverse and would also prevent the public from obtaining access to the parking lot per the City's easement.

32.     The Receiver refused to allow the public access to the parking lot unless Quonset agreed to pay an additional $20,000 a month under a private agreement, separate and apart from amounts Quonset and its sub-tenant had already paid in Special Tax and other City taxes.

**VERIFIED COMPLAINT**

33.    On or about April 16, 2020, Quonset alerted the City to the Receiver's plans to erect a fence around the parking lot with the intention of preventing the public from accessing it in violation of the Agreement and the City's public easement.

34.    Although the City staff acknowledged there were issues with the Receiver's proposed fence, the City did nothing to enforce its rights to the public easement, including to record its public easement in Glenroy's property records.

35.    Quonset has made repeated demands on the City to act to no avail.  The City has failed and/or refused to record or enforce the public's reciprocal access easement on the parking lot.

36.    In the meantime, in February 2021, Glenroy filed for bankruptcy protection before this Court.  The Court appointed Mr. Marshack as Trustee.

37.    Now, Mr. Marshack intends to conduct a bankruptcy sale of the subject real property "free and clear" of all interests on September 30, 2021.

38.    If that sale occurs without the City's public easement being properly reflected in the property records, the public easement may be extinguished.

39.    The unfortunate, inequitable consequence of this will be that Quonset, like other local residents and business owners, and the general public—all of whom directly or indirectly financed the infrastructure under the Mello-Roos Act and through other sales, use, and business license taxes—will lose all rights, ownership, and claims to this public easement upon which they have detrimentally relied and continue to rely.

## CLAIMS FOR RELIEF

### COUNT I FOR QUIET TITLE TO REAL PROPERTY

### (By Plaintiff Against All Defendants)

40.    Quonset incorporates by reference herein each of the preceding allegations.

41.    The two parcels of real property at issue in this case, with respect to rightful owner and ownership, are identified as follows:  The first parcel, where Quonset is located, is identified as Accessors Parcel Number 603-220-063 (the "063 Property").  The second parcel, where the parking lot is located, is identified as Accessors Parcel Number 603-220-069 (the "069 Property").

42.    The person claiming an interest in each of the 063 Property and 069 Property is Quonset for itself and on behalf of the public.

43.    By virtue of the City failing to record its expressly granted public easement, a cloud of title now exists on each of the properties concerning the use of the parking lot.

44.    This dispute over title is ripe and the parties require declaratory relief.

45.    Therefore, Quonset hereby seeks an order quieting title to the parking lot and declaring that the City has a public easement on the parking lot belonging to Glenroy, guaranteeing the public access to the parking lot.

## COUNT II FOR RESULTING TRUST

### (By Plaintiff Against All Defendants)

46.    Quonset incorporates by reference herein each of the preceding allegations.

47.    When the transfer of property is made to one person and the purchase price is paid or for another, Courts can impose, as requested here, a resulting trust in favor of the paying person, here Quonset.

48.    Mello-Roos Act monies are raised by the City by issuing bonds.  Those bonds are paid off by the City implementing and collecting upon a Special Tax imposed upon the public in the City.

49.    Quonset, a local state-licensed commercial cannabis retail operator, as well as other local businesses and residents, have been paying this Special Tax, for years.

50.    Over the past several years, the City has in fact collected tens of thousands of dollars in Special Taxes from Quonset, its subtenant, and its neighbors and the public.

51.    By virtue of paying these Special Taxes which pay off the public bonds, Quonset and the public have "paid for," and continue to pay for, the public easement and their individual right to so access the subject parking lot.

52.    Further, the parties' intentions were always to allow Quonset and other members of the public to have access to, and use, the parking lot located on Glenroy's property and for the City to record a public easement for the benefit of the public.

53.     Despite demand, the City and other Defendants fail to record the public easement to use the Parking Lot located at 069.

54.     A resulting trust is should therefore be placed on the subject parking lot for the benefit of Quonset and the general public.

### COUNT III FOR DECLARATORY RELIEF

### (By Plaintiff Against All Defendants)

55.     Quonset incorporates by reference herein each of the preceding allegations.

56.     There is a continuing, ripe and justiciable controversy concerning whether and in what form the City has a public easement on the parking lot owned by Glenroy, notwithstanding the fact that the easement has not been filed and recorded by the City.

57.     Quonset herein claims that they have rightful use of the parking lot, notwithstanding the easement's lack of recordation, by virtue of the City's public easement.

### COUNT IV FOR VIOLATION OF 42 U.S.C. § 1983

### (RIGHT TO PROCEDURAL DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND CALIFORNIA CONSTITUTION)

### (By Plaintiff Against the City)

58.     Quonset hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

59.     Mello-Roos Act monies were used by Glenroy to improve certain of their real property including the parking lot.

60.     In exchange, pursuant to the Agreement, Glenroy granted the City a public easement on Glenroy's property for the subject parking lot.

61.     That easement, validly existing, was never recorded by the City despite repeated demand.

62.     The public easement benefits, and is expressly designed and written to so benefit, the Quonset and the general public

63.     The City fails and refuses to file and record the public easement which it has a duty to do under the Agreement.

**VERIFIED COMPLAINT**

64.    The City has no, and has offered no, lawful and/or legitimate reason or justification for their lack of filing and recording the public easement.

65.    The public easement remains unrecorded as of the date of this Complaint

66.    Quonset, under both the California and U.S. Constitutions, has procedural due process rights which the City has violated by not filing and recording the public easement.

67.    As a result, by their actions, the Defendants have deprived Quonset of its rights, privileges, and/or immunities secured by both the California and U.S. Constitutions.

**COUNT V FOR VIOLATION 42 U.S.C. § 1983**

**(RIGHT TO SUBSTANTIVE DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND THE CALIFORNIA CONSTITUTION)**

**(By Plaintiff Against the City)**

68.    Quonset hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

69.    Mello-Roos Act monies were used by Glenroy to improve certain of their real property including the parking lot.

70.    In exchange, pursuant to the Agreement, Glenroy granted the City a public easement on Glenroy's property for the subject parking lot.

71.    Mello-Roos monies are monies raised by City by issuing bonds.  Those bonds are paid off by a City, including defendant City, implementing and collecting upon a Mello-Roos tax imposed upon the public in that City.

72.    Quonset, its subtenants, as well as other local businesses and residents, have been paying this Special Tax for years.

73.    Quonset and the general public thus have ownership rights to, and in, the public easement.  They have each "paid" valid consideration for the public easement.

74.    The public easement benefits, and is expressly designed and written to so benefit, the Quonset and the general public

**VERIFIED COMPLAINT**

75.     The City fails and refuses to file and record the public easement which it has a duty to do under the Agreement.

76.     The City has no, and has offered no, lawful and/or legitimate reason or justification for their lack of filing and recording the public easement.

77.     The public easement remains unrecorded as of the date of this Complaint.

78.     Because the public easement remains unfiled and unrecorded, Quonset and the general public, who have each been paying monies for the public easement in the form of Special Taxes, are owed, and own right to and interest in, the public easement.

79.     Quonset, under both the California and U.S. Constitutions, has substantive due process rights which the City has violated by not filing and recording the public easement.

80.     As a result, by their actions, the Defendants have deprived Quonset of its rights, privileges, and/or immunities secured by both the California and U.S. Constitutions.

## **PRAYER FOR RELIEF**

WHEREFORE, Quonset demands judgment be entered against Defendants, and DOES 1 through 10, and each of them as follows:

1.  for the imposition of a resulting trust over the Parking Lot located at 069 in the favor of the public;

2.  for declaratory relief to confirm the City of Coachella's easement for public access to the Parking Lot located at 069, irrespective of the current form of title;

3.  for equitable relief in the form of deed reformation to confirm and record on public title the easement for Public access to the Parking Lot located at 069;

4.  for a declaratory judgment declaring that the City's failure to record and defend the public easement is unconstitutional and violation of Quonset's and the public's substantive and procedural due process rights;

5.  for a temporary restraining order, and a preliminary and permanent injunction preventing Glenroy's Chapter 7 Trustee from conducting any sale of the Property until the City's public easement is recorded;

**VERIFIED COMPLAINT**

6.  for an order that any buyer of the Property under a sale by Gelnroy;s Chapter 7 Trustee takes the Property subject to the City's public easement;

7.  for a judgment for general damages in an amount to be determined by proof at trial;

8.  for a judgment for interest thereon at the legal rate;

9.  for an award of attorneys' fees and costs as allowed by law; and

10. for such other and further relief as the Court deems just and proper.

Dated: September 29, 2021                    **D | R WELCH ATTORNEYS AT LAW**


By:  _/s/ Aluyah I. Imoisili_____
Aluyah I. Imoisili

*Attorneys for Plaintiff Quonset Partners LLC*

**VERIFIED COMPLAINT**

# EXHIBIT A

**ACQUISITION AGREEMENT**

**among**

**CITY OF COACHELLA**

**and**

**CITY OF COACHELLA**
**COMMUNITY FACILITIES DISTRICT NO. 2018-1 (GLENROY),**

**and**

**GLENROY COACHELLA, LLC**

# TABLE OF CONTENTS

ARTICLE I.    DEFINITIONS ................................................................................1

  Section 1.01   Definitions ................................................................................1

ARTICLE II.    RECITALS ................................................................................5

  Section 2.01   The CFD ................................................................................5
  Section 2.02   The Development ................................................................5
  Section 2.03   The Facilities ................................................................................5
  Section 2.04   The Financing ................................................................................5
  Section 2.05   The Bonds ................................................................................5
  Section 2.06   No Advantage to City Construction ..............................................5
  Section 2.07   Agreements ................................................................................5

ARTICLE III.    FUNDING ................................................................................6

  Section 3.01   District Proceedings ................................................................6
  Section 3.02   Bond Proceeds ................................................................................6
  Section 3.03   No "Pay Go" Taxes Following the Issuance of Bonds ......................7
  Section 3.04   Prepayments ................................................................................7
  Section 3.05   Limitation ................................................................................7

ARTICLE IV.    CONSTRUCTION OF CITY FACILITIES ....................................7

  Section 4.01   Plans ................................................................................7
  Section 4.02   Construction ................................................................................8
  Section 4.03   Independent Contractor ................................................................8
  Section 4.04   Performance and Payment Bonds ..................................................8
  Section 4.05   Contracts and Change Orders ......................................................9
  Section 4.06   Time for Completion ................................................................9
  Section 5.01   Inspection ................................................................................9
  Section 5.02   Acquisition of City Facilities ......................................................10
  Section 5.03   Payment Requests ................................................................10
  Section 5.04   Processing Payment Requests ....................................................10
  Section 5.05   Payment ................................................................................11
  Section 5.06   Restrictions on Payments ..........................................................11
  Section 5.07   Allocation of Costs ................................................................13
  Section 5.08   Expectations of the Parties ........................................................13
  Section 5.09   Defective or Nonconforming Work ..............................................13
  Section 5.10   Modification of Discrete Components ..........................................14

ARTICLE VI.    OWNERSHIP AND TRANSFER OF CITY FACILITIES ..............14

  Section 6.01   Facilities to be Owned by the City - Conveyance of Land and Easements to
                 City ................................................................................14
  Section 6.02   Facilities to be Owned by the City - Title Evidence ......................14
  Section 6.03   Facilities Constructed on Private Lands ......................................14
  Section 6.04   Facilities Constructed on City Land ............................................15
  Section 6.05   Maintenance and Warranties ......................................................15

i

ARTICLE VII.  PAYMENT OF CITY FEES ...............................................................15

Section 7.01  Request for Payment of City Fees ...................................................15
Section 7.02  Payment of City Fees in Advance of Availability of Funding Sources.............16
Section 7.03  Return of Deposits .........................................................................16
Section 7.04  Deposits Allocated First..................................................................16
Section 7.05  Application of Deposits ..................................................................16
Section 7.06  Expectations.................................................................................17
Section 7.07  Return of Funds Following DIF Fee Credits .......................................17

ARTICLE VIII. INSURANCE.....................................................................................17

Section 8.01  Insurance Requirements...................................................................17
Section 8.02  Standards Applicable .....................................................................18

ARTICLE IX.   INDEMNIFICATION.........................................................................19

Section 9.01  Indemnification and Hold Harmless .................................................19
Section 9.02  Disclosure of Special Tax ...............................................................19

ARTICLE X.    EVENT OF DEFAULT; TERMINATION ............................................20

Section 10.01 Event of Default............................................................................20
Section 10.02 Owner Termination .......................................................................20

ARTICLE XI.   CSD FACILITIES ..............................................................................21

Section 11.01 CSD Acquisition Facilities and CSD Construction Facilities ..................21
Section 11.02 CSD Fees ....................................................................................21

ARTICLE XII.  MISCELLANEOUS ...........................................................................22

Section 12.01 Limited Liability of City.................................................................22
Section 12.02 Audit .........................................................................................22
Section 12.03 Attorney's Fees ...........................................................................22
Section 12.04 Notices.......................................................................................22
Section 12.05 Severability .................................................................................23
Section 12.06 Successors and Assigns .................................................................23
Section 12.07 Other Agreements.........................................................................23
Section 12.08 Waiver........................................................................................23
Section 12.09 Merger........................................................................................23
Section 12.10 Binding on CFD............................................................................23
Section 12.11 Amendment..................................................................................24
Section 12.12 Counterparts.................................................................................24
Section 12.13 Governing Law .............................................................................24

EXHIBIT A    DESCRIPTION OF ELIGIBLE PUBLIC FACILITIES AND DISCRETE
             COMPONENTS
EXHIBIT B    DESCRIPTION OF PROPERTY
EXHIBIT C    FORM OF PAYMENT REQUEST

ii

# ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT (the "Acquisition Agreement"), dated as of May 1, 2018 is by and among the CITY OF COACHELLA, a municipal corporation and a political subdivision of the State of California (the "City"), COMMUNITY FACILITIES DISTRICT NO. 2018-1 OF THE CITY OF COACHELLA (GLENROY) (the "CFD"), and GLENROY COACHELLA, LLC (the "Owner").

## ARTICLE I.
## DEFINITIONS

**Section 1.01    Definitions**. The following terms shall have the meanings ascribed to them in this Section 1.01 for purposes of this Acquisition Agreement.

"Acceptable Title" means title to land or interest therein, in form acceptable to the Director, free and clear of all liens, taxes, assessments, leases, easements and encumbrances, whether or not recorded, but subject to any exceptions determined by the Director as not interfering with the actual or intended use of the land or interest therein.  Notwithstanding the foregoing, an irrevocable offer of dedication may constitute land with an "Acceptable Title" if: (i) such offer is necessary to satisfy a condition to a tentative or final parcel map, (ii) such offer is in a form acceptable to the Director, (iii) the Director has no reason to believe that such offer of dedication will not be accepted by the applicable public agency, and (iv) the Owner commits in writing not to allow any liens to be imposed on such property prior to its acceptance.  Notwithstanding the foregoing, if the land is within the boundaries of any existing community facilities district (including the CFD), an assessment district, or other financing district, then the lien of the special taxes or assessments shall be a permitted exception to title so long as the land, while owned by the City or other public agency, is exempt from the special tax or assessments to be levied by the community facilities district, assessment district, or other financing district.

"Acceptance Date" means the date the City Council (or other public entity which is to own a Facility) takes final action to accept dedication of or transfer of title to a Facility.

"Acquisition Agreement" means this Acquisition Agreement, together with any Supplement hereto.

"Act" means the Mello-Roos Community Facilities Act of 1982, Section 53311 et seq. of the California Government Code, as amended.

"Actual Cost" means the substantiated cost of a Facility or a Discrete Component, which costs may include all hard and soft costs associated with the Facility or a Discrete Component, including, but not limited to: (i) the costs for the design, engineering, and construction (including grading) of such Facility or Discrete Component, (ii) the costs incurred by the Owner in preparing the Plans for such Facility or Discrete Component and the related costs of environmental evaluations of the Facility or Discrete Component, (iii) the fees paid to governmental agencies for, and all other costs incurred in connection with obtaining permits, licenses or other governmental approvals for such Facility or Discrete Component, (iv) professional costs incurred by the Owner or the City associated with such Facility or Discrete Component, such as engineering, legal, accounting, inspection, construction staking, materials testing and similar professional services; and (v) costs

directly related to the construction and/or acquisition of a Facility or Discrete Component, such as costs of payment, performance and/or maintenance bonds, and insurance costs (including costs of any title insurance required hereunder).

"Affiliate" means any entity with respect to which fifty percent (50%) or more of the ownership or voting power is held individually or collectively by the Owner and any other entity owned, controlled or under common ownership or control by or with, as applicable, the Owner, and includes all general partners of any entity which is a partnership. Control shall mean ownership of fifty percent (50%) or more of the voting power of or ownership interest in the respective entity. A title or escrow company that is an affiliate of the Owner shall not be considered an Affiliate for purposes of this Acquisition Agreement.

"Authorized Fees" means, collectively, the City Fees and the CSD Fees.

"Bonds" means the bonds to be issued by the City for the CFD, in one or more series, secured by the levy of special taxes of the CFD.

"Business Day" means a day other than a Saturday, Sunday or a day that Coachella City Hall is not open for business and serving the public.

"CFD" means the Community Facilities District No. 2018-1 of the City of Coachella (Glenroy), created by the City under the Act.

"City" means the City of Coachella, a municipal corporation and a political subdivision of the State.

"City Facilities" means the streets, storm drainage, parking, water facilities, parks, trails and landscaping improvements to be owned, operated or maintained by the City; and City Fees as set forth in Exhibit "A."

"City Facilities Account" means the subaccount of the Improvement Fund by that name from which the City Facilities may be funded.

"City Fees" means the City-imposed development impact fees described in Exhibit "A" attached hereto.

"Completed Facility" or "Completed Facilities" means a facility or facilities completed by the Owner prior to the formation of the District as identified on Exhibit A hereto.

"County" means the County of Riverside, California.

"Development Agreement" means the Glenroy Resort Development Agreement by and between the City and the Owner, approved by the City pursuant to Ordinance No. 1110.

"Director" means the City Manager of the City or his or her written designee acting as such under this Acquisition Agreement.

"Disbursement Request Form" means the request form attached to the CSD JCFA as Exhibit C (for CSD Fees) or Exhibit C-1 (for CSD Acquisition Facilities and CSD Construction

Facilities), which shall be used to requisition Funding Sources to pay for CSD Facilities and CSD Fees.

"Discrete Component" means a functional segment or component of a Facility that the Director has agreed can be separately identified, inspected and completed consistent with the provisions of Section 53313.51 of the Act, and be the subject of a Payment Request hereunder. The Discrete Components are shown on Exhibit A hereto with each lettered description of work constituting a Discrete Component of the corresponding Facility.

"CSD" means the Coachella Sanitary District.

"CSD Acquisition Facilities" means the sewer facilities described in Exhibit "A" which are constructed by Owner and acquired by CSD.

"CSD Construction Facilities" means the sewer and water facilities described in Exhibit "A" which are constructed by CSD.

"CSD Facilities" means (i) CSD Acquisition Facilities, (ii) CSD Construction Facilities and (iii) CSD Fees.

"CSD Fees" means sewer connection fees, annexation fees, sewer treatment capacity charges, sewer surcharge fees, and all components thereof imposed by CSD with respect to development of the property within the CFD.

"CSD JCFA" means the Joint Community Facilities Agreement entered into by and among City, CSD and Owner, dated as of May 1, 2018, as it may be amended.

"Event of Default" is defined in Section 10.01 herein.

"Facility" or "Facilities" means the public facility or facilities described in Exhibit "A" hereto which are eligible to be financed by the CFD consisting of City Facilities and CSD Facilities. The descriptions of the Facilities in Exhibit "A" are preliminary in some cases. The final Plans may show substitutes or modifications approved by the applicable public agency to the proposed Facilities in order to accomplish the work or serve the new development within the CFD.

"Fiscal Agent" means the agent named to such position as fiscal agent or trustee under the Fiscal Agent Agreement, or any successor thereto acting as fiscal agent under the Fiscal Agent Agreement.

"Fiscal Agent Agreement" means the fiscal agent agreement, indenture of trust or other agreement providing for, among other matters, the issuance of the Bonds and the establishment of the Improvement Fund, as it may be amended or supplemented from time to time.

"Funding Sources" shall mean, collectively, the proceeds of Bonds, any special taxes collected to directly finance Facilities (as set forth in but subject to the limitations of Section 3.04) and prepayments of special taxes applied to the costs of Facilities (as set forth in Section 3.05), as further described in Section 3 herein.

3

"Goals and Policies" means the Land Secured Financing Policy of the City of Coachella, dated February 14, 2018. The Goals and Policies dated February 14, 2018 shall be applicable to the CFD (as it currently exists or as it may be modified in the future).

"Improvement Fund" means the Improvement Fund, and the following two subaccounts thereof: City Facilities Account; and the Other Facilities Account.

"Other Facilities Account" means the subaccount of the Improvement Fund by that name from which the CSD Facilities may be funded.

"Owner" means Glenroy Coachella, LLC, a Delaware limited liability company, and its successors and assigns to the extent permitted under Section 12.06 hereof.

"Payment Request" means a document, substantially in the form of Exhibit "C" hereto, to be used by the Owner in requesting payment of a Purchase Price or funding with respect to one or more City Facilities or Discrete Components thereof or any City Fees.

"Plans" means the plans, specifications, schedules and related construction contracts for the Facilities and/or any Discrete Components thereof approved pursuant to the applicable standards of the City or other entity that will own or operate the Facilities when completed and acquired.

"Principal Payment Date" shall mean, with respect to Bonds issued, the semi-annual payment date in which principal or sinking fund payments on such Bonds are, in any year, payable. For example, if the principal amount of Bonds are payable on September 1, the Principal Payment Date shall be September 1, regardless of whether principal payments are actually due in any particular year.

"Purchase Price" means the amount paid by the City for a Facility and/or any Discrete Components thereof determined in accordance with Article V hereof, being an amount equal to the Actual Cost of such Facility or Discrete Component, but subject to any limitations and reductions provided for in Article V.

"Rate and Method" means the rate and method of apportionment of the special tax for the CFD.

"Substantially Complete(d)" with respect to a Facility or Discrete Component means that such Facility or Discrete Component is substantially complete in accordance with its Plans and is available for use by the public for its intended purpose, notwithstanding any final "punch list" items still required to be completed, unless such items are required for the safe operation of such Facility or Discrete Component, and shall be based upon approval of the City inspector, which shall not be unreasonably withheld.

"Supplement" means a written document amending, supplementing or otherwise modifying this Acquisition Agreement and any exhibit hereto, or the list of Facilities to be financed by the Funding Sources.

4

## ARTICLE II.
## RECITALS

**Section 2.01   The CFD**.  The City Council of the City is the legislative body of the CFD established under the Act for the financing of, among other things, the acquisition, construction and installation of public facilities identified in the proceedings to form the CFD, which include the Facilities listed in Exhibit "A" hereto.

**Section 2.02   The Development**.  The real property in the CFD is described in Exhibit "B" hereto (the "Property").  The Owner proposes to develop the Property as a commercial development containing resort villas housing approximately 400 rooms, a multi-story hotel (consisting of 130 rooms, convention space, pools and other amenities), retail facilities and other uses (the "Development").

**Section 2.03   The Facilities**.  The Owner will benefit from a coordinated plan of design, engineering and construction of the Facilities and the development of the land.   The Owner acknowledges that the inclusion of Facilities in Exhibit "A" hereto in no way, in itself, obligates the City to issue any Bonds to acquire the Facilities from the Owner or implies that the City has in any way engaged the Owner to construct the Facilities.   The City and CFD acknowledge that the inclusion of Facilities in Exhibit "A" hereto in no way, in itself, obligates the Owner to construct any such Facilities under the terms of this Acquisition Agreement.

**Section 2.04   The Financing**.  The Owner and the City wish to finance the acquisition of the Facilities and the payment therefor by entering into this Acquisition Agreement for the acquisition of the Facilities and payment for Discrete Components thereof (as it may be amended and supplemented) from the Funding Sources.

**Section 2.05   The Bonds**.  The CFD will be proceeding with the authorization and issuance of the Bonds under the Act and the Fiscal Agent Agreement, the proceeds of which Bonds shall be used, in part, to finance the acquisition of all or a portion of the Facilities.  The execution by the City and the CFD of this Acquisition Agreement in no way obligates the City or the CFD to issue any Bonds, or to acquire any Facilities with proceeds of any Bonds issued, except the Facilities listed in Exhibit "A" hereto which are to be acquired subject to the terms and conditions set forth in this Acquisition Agreement.

**Section 2.06   No Advantage to City Construction**.  The City, by its approval of this Acquisition Agreement, has determined that it will obtain no advantage from undertaking the construction by the City directly of the City Facilities, and, except for those facilities identified in Exhibit A as Completed Facilities, that the provisions of this Acquisition Agreement require that the Facilities to be constructed by the Owner and acquired with the proceeds of the Bonds be constructed as if they had been constructed under the direction and supervision of the applicable Public Agency, as set forth in Section 4.02 below.  Notwithstanding anything in this Acquisition Agreement to the contrary, upon the mutual agreement of the City and the Owner and upon an Event of Default, the City and the Owner may allocate a portion of the Funding Sources to the construction of City Facilities that are constructed by the City.

**Section 2.07   Agreements**. In consideration of the mutual promises and covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which are hereby

acknowledged, the City and the Owner agree that the foregoing recitals, as applicable to each, are true and correct and further make the agreements set forth herein.

## ARTICLE III.
## FUNDING

**Section 3.01   District Proceedings**.  The CFD shall conduct all necessary proceedings under the Act for the issuance, sale and delivery of the Bonds; provided, however, that nothing herein shall be construed as requiring the CFD to issue the Bonds or any series thereof.  The Owner and the City staff shall meet regarding the amount, timing and other material aspects of each series of the Bonds, but the legal proceedings and the series, principal amounts, rates, terms and conditions and timing of the sale of the Bonds shall be consistent with this Acquisition Agreement and in all respects subject to the approval of the City Council as legislative body of the CFD.

**Section 3.02   Bond Proceeds**.   The proceeds of the Bonds shall be deposited, held, invested, reinvested and disbursed as provided in the Fiscal Agent Agreement and this Acquisition Agreement.  A portion of the proceeds of the Bonds will be set aside under the Fiscal Agent Agreement in the Improvement Fund and upon the direction of the Owner used to finance City Facilities and CSD Facilities.  Moneys in the Improvement Fund shall be withdrawn therefrom in accordance with the provisions of the Fiscal Agent Agreement and the applicable provisions hereof for payment of all or a portion of the costs of construction and/or acquisition of the Facilities (including payment of the Purchase Price of Discrete Components thereof), and payment or reimbursement of City Fees and CSD Fees all as herein provided or as provided in the CSD JCFA; provided, however, that City Fees shall be financed only if the City shall certify in connection with such financing of City Fees that it reasonably expects to spend Bond proceeds attributable to the financing of such City Fees on public capital improvements within three years from the date of issuance of the Bonds.

Unless otherwise requested in writing by the Owner prior to issuance of each series of Bonds, earnings on amounts in a subaccount of the Improvement Fund shall be retained in the respective subaccount of the Improvement Fund until all Facilities have been financed, as evidenced by a certificate provided by the Owner, or Owner provides a certificate to the CFD indicating that the funds on deposit in the Improvement Fund are sufficient to finance the remaining Facilities for which the Owner expects to submit a payment request.  Earnings on amounts in the reserve fund(s) for the Bonds in excess of the applicable reserve requirement shall be deposited in the fund established by the Fiscal Agent Agreement for payment of debt service on the Bonds.

The City agrees to include capitalized interest for eighteen (18) months in each series of Bonds, unless the Owner requests capitalized interest for a shorter period prior to issuance of each series of Bonds.

The Owner agrees that the City alone shall direct the investment of the funds on deposit in the funds and accounts established by or pursuant to the Fiscal Agent Agreement, including the Improvement Fund, and that the Owner has no right whatsoever to direct investments under the Fiscal Agent Agreement.

Neither the City nor the CFD shall have any responsibility whatsoever to the Owner with respect to any investment of funds made by the Fiscal Agent under the Fiscal Agent Agreement, including any loss of all or a portion of the principal invested or any penalty for liquidation of an

investment. Any such loss may diminish the amounts available in the Improvement Fund to pay the Purchase Price of Facilities and Discrete Components hereunder. The Owner further acknowledges that the obligation of any owner of real property in the CFD, including the Owner to the extent it owns any real property in the CFD, to pay special taxes levied in the CFD is not in any way dependent on: (i) the availability of amounts in the Improvement Fund to pay for all or any portion of the Facilities or Discrete Components thereof, or (ii) the alleged or actual misconduct of the City or CFD in the performance of its obligations under this Acquisition Agreement, the Fiscal Agent Agreement, any Owner agreement or amendment thereto or any other agreement to which the Owner and the CFD and/or the City are signatories.

Section 3.03   No "Pay Go" Taxes Following the Issuance of Bonds.   Following the issuance of Bonds, the CFD shall not levy taxes directly to pay for the costs of acquiring Facilities. Prior to the issuance of any Bonds the CFD shall levy special taxes on all parcels of Developed Property (as defined in the Rate and Method) at the assigned special tax rates and use such funds to pay for the costs of administering the CFD and for the costs of acquiring Facilities.

Section 3.04   Prepayments.   To the extent authorized under the Rate and Method, any prepayments of special tax obligations that the Rate and Method requires to be used to pay for Facilities, whether before or after the issuance of the Bonds, shall be placed in a special fund to be held by the City (the "Prepayment Fund"). Moneys in the Prepayment Fund shall be a source for the payment of the costs of the acquisition of the Facilities and the Discrete Components thereof and the payment of Authorized Fees and shall be applied in the same manner as the proceeds of Bonds. Notwithstanding anything in this Section 3.05 to the contrary, the Owner and the City agree that if only one series of Bonds is issued, then the City shall no longer collect any Future Facilities Costs (as defined in the Rate and Method) in connection with a prepayment of Special Taxes after such Bonds are issued.

Section 3.05   Limitation.   The City shall not be obligated to pay the Purchase Price of the Facilities or any Discrete Components thereof or the Authorized Fees except from amounts on deposit in the Prepayment Fund, and the Improvement Fund in any combination. The City makes no warranty, express or implied, that amounts on deposit in the Prepayment Fund, and the Improvement Fund will be sufficient for payment of the Purchase Price of the Facilities or any Discrete Components thereof or the Authorized Fees. The Owner acknowledges that any lack of availability of amounts in the Prepayment Fund, and the Improvement Fund to pay the Purchase Price of Facilities or any Discrete Components thereof and the Authorized Fees shall in no way diminish any obligation of the Owner with respect to the construction of or contributions for public facilities or the payment of fees required by the conditions of approval for the project.

## ARTICLE IV.
## CONSTRUCTION OF CITY FACILITIES

Section 4.01   Plans.   To the extent that it has not already done so, the Owner shall cause Plans to be prepared for the City Facilities to be constructed by Owner and funded with the Funding Sources. Upon completion of the Plans for each City Facility to the satisfaction of the City in accordance with applicable ordinances and regulations of the City, the City shall immediately notify Owner that the Plans are completed and acceptable to the City. Copies of all Plans shall be provided by the Owner to the Director upon request therefor, and, in any event, as-built drawings and a written assignment of the Plans for any City Facility shall be provided to the City prior to its acceptance of the City Facility.

**Section 4.02   Construction**.  Subject to all of the provisions of this Agreement, the City agrees to acquire from the Owner those Facilities listed in Exhibit A which are constructed by the Owner and tendered for acquisition in accordance with the provisions of this Agreement.  The Owner agrees that any Facility being constructed by, or under the direction of, the Owner and to be acquired by the City after the formation of the CFD shall be constructed in substantial compliance with the approved Plans and in compliance with the requirements of Government Code Section 53313.5, which requires those improvements to be constructed as if such improvements had been constructed under the direction and supervision, or under the authority, of the City.  The Owner shall require its contractor or contractors to pay the prevailing rate of per diem wages for work of a similar character in the locality of the CFD and not less than the general prevailing rate of per diem wages for holiday and overtime work, as provided in Section 1771 *et seq.* of the California Labor Code, to all workers employed by each such contractor in the construction of the Facilities.  As to each Facility, the Owner shall obtain from its contractor or contractors and furnish to the City payroll records for a minimum of one payroll period as to all such workers employed by the contractor or contractors demonstrating compliance with the requirements of Section 1771 et seq.  of the California Labor Code.  In addition to any other warranty or indemnification set forth in this Agreement, the Owner specifically warrants that it and its contractors, subcontractors, successor and assigns shall comply with the provisions of California Labor Code Section 1771 *et seq.*  or any similar applicable state or federal laws relating to payment of the prevailing wage as set forth above.  The Owner shall indemnify, defend and hold harmless the City and the CFD in any action brought by any person, entity or state or federal governmental agency for any failure to pay the prevailing wage or to comply with the applicable law governing payment of the prevailing wage.

This Acquisition Agreement is for the acquisition by the City of the City Facilities to be constructed by Owner and funded with the Funding Sources and payment for City Facilities and Discrete Components and CSD Facilities (in accordance with the CSD JCFA) thereof from such Funding Sources and is not intended to be a public works contract.  Except for the Completed Facilities, the City and the Owner agree that the Owner shall award all contracts for the construction of the City Facilities to be constructed by Owner, acquired by the City and funded with the Funding Sources and the Discrete Components thereof and that this Acquisition Agreement is necessary to assure the timely and satisfactory completion of such City Facilities.  Notwithstanding the foregoing, the Owner shall award all contracts for construction of the City Facilities (other than Completed Facilities) to be acquired by City with the Funding Sources by means of a bid process whereby at least three independent bids are obtained, and the contract is awarded to the lowest responsible bidder.  The Director shall be entitled to discuss the bidding process with the Owner at any time and from time to time, and to require reasonable changes thereto for future contracts if, in the judgment of the Director, said process is not resulting in competitive bids for the City Facilities.  Notwithstanding the foregoing, Owner may proceed with fewer than three bids if the City reasonably determines that three bids were not reasonably available at the time of the bid.

**Section 4.03   Independent Contractor**.   In performing its obligations under this Acquisition Agreement, the Owner is an independent contractor and not the agent or employee of the City or the CFD.  Neither the City nor the CFD shall be responsible for making any payments to any contractor, subcontractor, agent, consultant, employee or supplier of the Owner.

**Section 4.04   Performance and Payment Bonds**.  The Owner agrees to comply with all applicable performance and payment bonding requirements of the City (and other applicable public entities and/or public utilities) and the California Public Contracts Code with respect to the

8

construction of the City Facilities to be constructed by Owner, acquired by City and funded with the Funding Sources.

**Section 4.05  Contracts and Change Orders**.  The Owner shall be responsible for entering into all contracts and any supplemental agreements (commonly referred to as "change orders") required for the construction of the City Facilities to be constructed by Owner, acquired by City and funded with the Funding Sources, and all such contracts and supplemental agreements shall be submitted to the Director.  Except for Completed Facilities, prior approval of supplemental agreements by the Director shall only be required for such change orders which in any way materially alter the quality or character of the subject City Facilities, or which involve an amount equal to the greater of ten percent (10%) of the amount of the bid for the Discrete Component involved or $50,000 for supplemental agreements entered into subsequent to the date of this Acquisition Agreement.  The City expects that such contracts and supplemental agreements needing prior approval by the Director will be approved or denied (any such denial to be in writing, stating the reasons for denial and the actions, if any that can be taken to obtain later approval) within fifteen (15) Business Days of receipt by the Director thereof.

**Section 4.06  Time for Completion**.  The Owner agrees that this Acquisition Agreement is for the benefit of the City and the Owner and, therefore, the Owner represents that it expects that the City Facilities to be constructed by Owner, acquired by City and funded with proceeds of a series of Bonds will be completed and the payment request for such City Facilities submitted within thirty-six (36) calendar months from the date of the closing of such series of Bonds.  Any failure to complete such City Facilities within said time period shall not, however, in itself, constitute a breach by the Owner of the terms of this Acquisition Agreement.

The Owner agrees to use its good faith efforts to complete all City Facilities to be constructed by Owner, acquired by City and funded with proceeds of a series of Bonds within thirty-six (36) calendar months from the date of closing of such series of Bonds.

### ARTICLE V.
### ACQUISITION AND PAYMENT

**Section 5.01  Inspection**.  The City's inspector shall conduct its inspection within fifteen (15) Business Days following notice from the Owner to the City that the construction of each City Facility or Discrete Component thereof to be acquired with the Funding Sources is complete.  Upon the City inspector's determination that construction of the City Facility or Discrete Component thereof has been completed in accordance with the Plans, the City shall immediately notify Owner in writing that the construction of such City Facility or Discrete Component thereof has been satisfactorily completed.  No payment hereunder shall be made by the City to the Owner for a City Facility or Discrete Component thereof until the City Facility or Discrete Component thereof has been inspected and found to be completed in accordance with the approved Plans by the City or other applicable public entity or utility.  The City shall make or cause to be made periodic site inspections of the City Facilities to be constructed by Owner and acquired by City with the Funding Sources; provided that in no event shall the City incur any liability for any delay in the inspection of any City Facilities or Discrete Components.  For City Facilities to be constructed by Owner, acquired by other public entities or utilities and funded with proceeds of the Bonds, the Owner shall be responsible for obtaining such inspections and providing written evidence thereof to the CFD.  The reasonable costs incurred by the City in inspecting and approving the City Facilities to be constructed by Owner, acquired by City and funded with the Funding Sources and all related permit and other similar fees of

the City applicable to construction of such City Facilities shall be paid by Owner or, at the election of the City, from the Funding Sources.

**Section 5.02    Acquisition of City Facilities**.  Upon completion of a City Facility to be constructed by Owner, and funded with the Funding Sources, Owner hereby agrees to sell the City Facility to the City (or other applicable public agency that will own such City Facility), and the City hereby agrees to use the Funding Sources to pay the Purchase Prices thereof to the Owner, subject to the terms and conditions hereof.  The City shall not be obligated to purchase any City Facility until the City Facility is completed and the Acceptance Date for such City Facility has occurred; provided that the City has agreed hereunder to make payments to the Owner for Discrete Components of City Facilities.  The Owner acknowledges that the Discrete Components have been identified for payment purposes only, and that the City (or other applicable public agency that will own a City Facility) shall not accept a City Facility of which a Discrete Component is a part until the entire City Facility has been completed.  The City acknowledges that the Discrete Components do not have to be accepted by the City (or other applicable public agency that will own a City Facility) as a condition precedent to the payment of the Purchase Price therefor, but the City shall not be obligated to make such payment until the Discrete Component has been Substantially Completed.  In any event, the City shall not be obligated to pay the Purchase Price for any City Facility or Discrete Component except from the Funding Sources.

**Section 5.03    Payment Requests**.  In order to receive the Purchase Price for a City Facility or Discrete Component thereof, inspection thereof under Section 5.01 shall have been made and the Owner shall deliver to the Director:  (i) a Payment Request in the form of Exhibit "C" hereto for such City Facility or Discrete Component thereof, together with all supporting documentation evidencing the Actual Costs of the City Facility or Discrete Component thereof; (ii) if payment is requested for a completed City Facility, (a) if the property on which the City Facility is located is not owned by the City at the time of the request, a copy of the recorded documents conveying to the City Acceptable Title to the real property on, in or over which such City Facility is located, as described in Section 6.01 hereof, (b) a copy of the recorded notice of completion of such City Facility (if applicable), (c) to the extent paid for with the proceeds of the Bonds, an assignment to the CFD of any reimbursements that may be payable with respect to the City Facility, such as public or private utility reimbursements, and (d) an assignment of the warranties and guaranties for such City Facility, as described in Section 6.05 hereof, in a form acceptable to the City; and (iii) if reimbursement is requested for City Fees advanced by a third party builder, proof acceptable to the City of the assignment of such reimbursement to the Owner.

**Section 5.04    Processing Payment Requests**.    Upon receipt of a Payment Request (including all accompanying supporting documentation evidencing the Actual Costs), the Director shall conduct a review in order to confirm that such request is complete, that such City Facility or Discrete Component thereof and identified therein was constructed in accordance with the Plans therefor, and to verify and approve the Actual Cost of such Discrete Component or City Facility specified in such Payment Request.  The Director shall also conduct such review as is required in his discretion to confirm the matters certified in the Payment Request.  The Owner agrees to cooperate with the Director in conducting each such review and to provide the Director with such additional information and documentation as is reasonably necessary for the Director to conclude each such review.  For any City Facilities to be acquired by a utility, the Owner shall provide evidence acceptable to the Director that such City Facilities are acceptable to such utility.  Within fifteen (15) Business Days of receipt of any Payment Request, the Director shall review the request for completeness and notify the Owner whether such Payment Request is complete, and, if not, what

10

additional documentation must be provided.  If such Payment Request is complete, the Director shall provide a written approval or denial (specifying the reason for any denial) of the request within 30 calendar days of its submittal.  If a Payment Request seeking reimbursement for more than one City Facility or Discrete Component is denied, the Director shall state whether the Payment Request is nevertheless approved and complete for any one or more City Facilities or Discrete Components and any such City Facilities or Discrete Components shall be processed for payment under Section 5.05 notwithstanding such partial denial.

Section 5.05   Payment.  Upon approval of the Payment Request by the Director, the Director shall sign the Payment Request and forward the same to the City finance department of the City.  Upon receipt of the reviewed and fully signed Payment Request, the City finance department shall, within fifteen (15) Business Days of receipt of the approved Payment Request, cause the same to be paid by the Fiscal Agent under the applicable provisions of the Fiscal Agent Agreement, to the extent of the Funding Sources.  Any approved Payment Request not paid due to an insufficiency of Funding Sources, shall be paid promptly following the deposit of additional Funding Sources.

The Purchase Price paid hereunder for any City Facility or Discrete Component (in any number of installments as Funding Sources become available) shall constitute payment in full for such City Facility or Discrete Component, including, without limitation, payment for all labor, materials, equipment, tools and services used or incorporated in the work, supervision, administration, overhead, expenses and any and all other things required, furnished or incurred for completion of such City Facility or Discrete Component, as specified in the Plans.

Section 5.06   Restrictions on Payments.  Notwithstanding any other provisions of this Acquisition Agreement, the following restrictions shall apply to any payments made to the Owner under Sections 5.02 and 5.05 hereof:

A.     Amounts of Payments.   Subject to the following paragraphs of this Section 5.06, payments for each Discrete Component or City Facility will be made only in the amount of the Purchase Price for the respective Discrete Component or City Facility.  Nothing herein shall require the City in any event (i) to pay more than the Actual Cost of a City Facility or Discrete Component or (ii) to make any payment beyond the Funding Sources (at the time of initial payment or later upon subsequent deposits to the Improvement Fund).  The parties hereto acknowledge and agree that all payments to the Owner for the Purchase Prices of City Facilities or Discrete Components are intended to be reimbursements to the Owner for monies already expended or for immediate payment by the Owner (or directly by the City) to third parties in respect of such City Facilities and/or Discrete Components.

B.     Joint or Third Party Payments.  The City may make any payment jointly to the Owner and any mortgagee or trust deed beneficiary, contractor or supplier of materials, as their interests may appear, or solely to any such third party, if the Owner so requests the same in writing or as the City otherwise determines such joint or third party payment is necessary to obtain lien releases.

C.     Withholding Payments.  The City shall be entitled, but shall not be required, to withhold any payment hereunder for a Discrete Component or a Facility if the Owner or any Affiliate is delinquent in the payment of ad valorem real property taxes, special assessments or taxes, or special taxes levied in the CFD.  In the event of any such delinquency, the City shall only make payments under this Section 5.06, should any be made at the City's sole discretion, directly to contractors or other third parties employed in connection with the construction of the City Facilities

11

or to any assignee of the Owner's interests in this Acquisition Agreement (and not to the Owner or any Affiliate), until such time as the Owner provides the Director with evidence that all such delinquent taxes and assessments have been paid.

The City shall be entitled to withhold any payment hereunder for a City Facility or Discrete Component thereof that is the subject of a Payment Request until it is satisfied that any and all claims for labor and materials have been paid by the Owner for the City Facility or Discrete Component thereof that is the subject of a Payment Request, or conditional lien releases have been provided by the Owner for such City Facility or Discrete Component thereof, or until all certificates required by Section 5.03 have been obtained. The City, in its discretion, may waive this limitation upon the provision by the Owner of sureties, undertakings, securities and/or bonds of the Owner or appropriate contractors or subcontractors and deemed satisfactory by the Director to assure payment of such claims.

The City shall be entitled to withhold payment for any City Facility (or the final Discrete Component of any such City Facility) hereunder to be constructed by Owner, acquired by City and reimbursed with the Funding Sources until: (i) the Director determines that the City Facility is ready for its intended use, (ii) the Acceptance Date for the City Facility has occurred and the requirements of Section 6.01, if applicable to such City Facility, have been satisfied, and (iii) a Notice of Completion executed by the Owner, in a form acceptable to the Director, has been recorded for the City Facility and general lien releases conditioned solely upon payment from the Funding Sources to be used to acquire such City Facility (or final Discrete Component) have been submitted to the Director for the City Facility. The City hereby agrees that the Owner shall have the right to post or cause the appropriate contractor or subcontractor to post a bond with the City to indemnify it for any losses sustained by the City because of any liens that may exist at the time of acceptance of such a City Facility, so long as such bond is drawn on an obligor and is otherwise in a form acceptable to the Director. If the Director determines that a City Facility is not ready for intended use under (i) above, the Director shall so notify the Owner as soon as reasonably practicable in writing specifying the reason(s) therefor.

Nothing in this Acquisition Agreement shall be deemed to prohibit the Owner from contesting in good faith the validity or amount of any mechanics or materialman lien nor limit the remedies available to the Owner with respect thereto so long as such delay in performance shall not subject the City Facilities or any Discrete Component thereof to foreclosure, forfeiture or sale. In the event that any such lien is contested, the Owner shall only be required to post or cause the delivery of a bond in an amount equal to the amount in dispute with respect to any such contested lien, so long as such bond is drawn on an obligor and is otherwise in a form acceptable to the Director.

D.    Retention. The City may withhold in the Improvement Fund an amount equal to ten percent (10%) of the Purchase Price of each City Facility or Discrete Component to be paid hereunder. Any such retention will be released to the Owner upon final completion and acceptance of the related City Facility and the expiration of a maintenance period consistent with applicable City policy thereafter (a one year maintenance period for any landscaping, and upon receipt of a faithful performance bond acceptable to the Director to remain in effect for one year as to other City Facilities).

Notwithstanding the foregoing, the Owner shall be entitled to payment of any such retention upon the completion and acceptance of a Facility or Discrete Component, if a maintenance or warranty bond is posted in lieu thereof in accordance with Section 6.05 hereof. Payment of any

retention shall also be contingent upon the availability of monies in the Improvement Fund therefore. No retention shall apply if the Owner proves to the Director's satisfaction that the Owner's contracts for the City Facilities (or Discrete Components) provide for the same retention as herein provided, so that the Purchase Price paid for the City Facility or Discrete Component is at all times net of the required retention.

   E. <u>Frequency</u>.  Unless otherwise agreed to by the Director, no more than one Payment Request shall be submitted by the Owner in any calendar month, but the Payment Request may include more than one Facility or Discrete Component or Authorized Fee.

  **Section 5.07 Allocation of Costs.**  If Owner incurs costs that (1) apply to more than one Facility or Discrete Component (e.g., soft costs) or (2) apply to both Facilities or Discrete Components and improvements other than the Facilities or Discrete Components (e.g., grading), Owner shall allocate, or cause the contractor to reasonably allocate, such costs between the Facilities or Discrete Components (in the case of clause (1)) or between the Facilities or Discrete Components and the improvements other than the Facilities or Discrete Components (in the case of clause (2)) (the "Owner Allocation").  The City shall notify Owner of its good-faith reasonable disapproval of any Owner Allocation within fifteen (15) Business Days of submittal of the payment request.  If the City has disapproved the Owner Allocation, then the City and Owner shall promptly allocate such costs, on a reasonable basis, between the Facilities or Discrete Components (in the case of clause (1)) or between the Facilities or Discrete Components and the improvements other than the Facilities or Discrete Components (in the case of clause (2)) (the "Agreed-Upon Allocation").  Based on the Owner Allocation or the Agreed-Upon Allocation, if applicable, the City shall include the costs allocated to a specific Facility or Discrete Component as part of the Actual Costs of such Facility or Discrete Component when such Facility or Discrete Component is subject to a payment request.

  **Section 5.08 Expectations of the Parties.**  The City understands and agrees that (i) the Owner will be constructing City Facilities (and Discrete Components) prior to the availability of the Funding Sources that will be used to pay for such City Facilities (and Discrete Components), (ii) the City may be inspecting such City Facilities (or Discrete Components) and processing and completing Payment Requests for the payment on such City Facilities (or Discrete Components) with knowledge that there may be insufficient Funding Sources available at such time, (iii) the City Facilities (or Discrete Components) may be conveyed to and accepted by the City when there are insufficient Funding Sources to pay the Purchase Prices of such City Facilities (or Discrete Components), and (iv) in any such case, the payment of any approved Payment Requests for the Purchase Prices of such City Facilities (or Discrete Components) will be deferred until there are sufficient Funding Sources available to pay the Purchase Prices of such City Facilities (or Discrete Components), at which time the City will make such payments in accordance with this Acquisition Agreement.  At all times, the Owner will be constructing such City Facilities (or Discrete Components) with the expectation that the Purchase Prices for such City Facilities (or Discrete Components) will be paid from the Funding Sources.  The conveyance of City Facilities (or Discrete Components) to the City prior to receipt of the Purchase Prices for such City Facilities (or Discrete Components) shall not be construed as a dedication or gift, or a waiver of the payment of the Purchase Prices, or any part thereof, for such City Facilities (or Discrete Components).  The Owner acknowledges that the Funding Sources may not be sufficient to reimburse the Owner for all of its costs incurred to complete or pay for the Facilities.

  **Section 5.09 Defective or Nonconforming Work**.  If any of the work done or materials furnished for a City Facility or Discrete Component are found by the Director to be defective or not

13

in accordance with the applicable Plans:  (i) and such finding is made prior to payment for the Purchase Price of such City Facility or Discrete Component hereunder, the City may withhold payment therefor until such defect or nonconformance is corrected to the satisfaction of the Director, or (ii) and such finding is made after payment of the Purchase Price of such City Facility or Discrete Component, the City and the Owner shall act in accordance with the City's standard specification for public works construction.

Section 5.10  **Modification of Discrete Components**.  Upon written request of the Owner, the Director shall consider modification of the description of any Facility or Discrete Component or the addition or substitution of Facilities and Discrete Components.  Any such modification shall be subject to the written approval of the Director, which will not be unreasonably delayed.

## ARTICLE VI.
## OWNERSHIP AND TRANSFER OF CITY FACILITIES

Section 6.01  **Facilities to be Owned by the City - Conveyance of Land and Easements to City**.  Owner shall provide Acceptable Title to all property on, in or over which each City Facility to be constructed by Owner, acquired by the City and funded out of the Funding Sources will be located, which Acceptable Title shall be deeded over to the City by way of grant deed, quitclaim, or dedication of such property, or easement thereon, if such conveyance of interest is approved by the City as being a sufficient interest therein to permit the City to properly own, operate and maintain such City Facility located therein, thereon or thereover, and to permit the Owner to perform its obligations as set forth in this Acquisition Agreement.  Completion of the transfer of title to land shall be accomplished prior to the payment of the Purchase Price for a City Facility and shall be evidenced by recordation of the acceptance thereof by the City Council or the designee thereof.

Section 6.02  **Facilities to be Owned by the City - Title Evidence**.  The Owner shall furnish to the City a preliminary title report for land with respect to City Facilities to be constructed by Owner, acquired by the City and funded out of the Funding Sources and not previously dedicated or otherwise conveyed to the City, for review and approval at least fifteen (15) Business Days prior to the transfer of Acceptable Title to such City Facility to the City.  The City shall approve the preliminary title report unless it reveals a matter which, in the reasonable judgment of the City, could materially affect the City's use and enjoyment of any part of the property or easement covered by the preliminary title report.  In the event the City does not approve the preliminary title report, the City shall not be obligated to accept title to such City Facility or pay the Purchase Price for such City Facility (or the last Discrete Component thereof) until the Owner has cured such objections to title to the satisfaction of the City.  As a further precondition to the payment of the Purchase Price for a City Facility, the Owner shall provide a policy of title insurance on such land, in an amount determined by the Director, which is equal to or, with the consent of the Owner, greater than the Purchase Price for a City Facility and in the form normally required by the City in connection with the dedication of land for subdivision improvements.

Section 6.03  **Facilities Constructed on Private Lands**.  If any City Facilities to be constructed by Owner, acquired by the City and funded out of the Funding Sources are located on privately-owned land, the owner thereof shall retain title to the land and the completed City Facilities until acquisition of the City Facilities under Article V hereof.  Pending the completion of such transfer, the Owner shall not be entitled to receive any payment for any such City Facility or the last Discrete Component thereof.  The Owner shall, however, be entitled to receive payment for Discrete Components of City Facilities (other than the last Discrete Component) upon making an irrevocable

14

offer of dedication of such land, or appropriate interest therein, in form and substance acceptable to the Director.  Notwithstanding the foregoing, before payment for any Discrete Component of such a City Facility, the Owner shall convey or cause to be conveyed Acceptable Title thereto in the manner described in Sections 6.01 and 6.02 hereof.  If the land is within the boundaries of any existing community facilities district (including the CFD), an assessment district, or other financing district, then the lien of the special taxes or assessments shall be a permitted exception to title so long as the land, while owned by the City or other public agency, is exempt from the special tax or assessments to be levied by the community facilities district, assessment district, or other financing district.

Section 6.04   **Facilities Constructed on City Land**.  If the City Facilities to be constructed by Owner, acquired by the City and funded out of the Funding Sources are on land owned by the City, the City hereby grants to the Owner a license to enter upon such land for purposes related to the construction (and maintenance pending acquisition) of the City Facilities.   The provisions for inspection and acceptance of such City Facilities otherwise provided herein shall apply.

Section 6.05   **Maintenance and Warranties**.  The Owner shall maintain each Discrete Component of a City Facility to be constructed by Owner, acquired by the City and funded out of proceeds of the Funding Sources in good and safe condition until the Acceptance Date of the City Facility of which such Discrete Component is a part.  Prior to the Acceptance Date, the Owner shall be responsible for performing any required maintenance on any such completed Discrete Component or City Facility.  On or before the Acceptance Date of a City Facility to be constructed by Owner, acquired by City and funded with the Funding Sources, the Owner shall assign to the City all of the Owner's rights in any warranties, guarantees, maintenance obligations or other evidence of contingent obligations of third persons with respect to such City Facility.  After the Acceptance Date, and subject to the City's rules and regulations in effect at the time of this Acquisition Agreement, the acquiring public agency shall be solely responsible for maintenance of the City Facility.   With respect to each City Facility constructed by Owner, acquired by City and funded with the Funding Sources, the Owner shall warrant each such City Facility to be free from construction defects (and shall correct or cause to be corrected any such defects) for a period of one year from the Acceptance Date thereof, and shall provide a maintenance bond reasonably acceptable in form and substance to the Director for such period and such purpose to insure that such defects, which appear within said period will be repaired, replaced, or corrected by the Owner, at its own cost and expense, to the satisfaction of the Director.  The Owner shall continue to repair, replace or correct any such defects within thirty (30) calendar days after written notice thereof by the City to the Owner, and shall complete such repairs, replacement or correction as soon as practicable.  Any warranties, guarantees or other evidences of contingent obligations of third persons with respect to the City Facilities to be constructed by Owner, acquired by City and funded with the Funding Sources shall be delivered to the Director as part of the transfer of title.  For purposes of this Acquisition Agreement, following conveyance of a City Facility to the City, the terms "maintain" and "maintenance" mean the repair, replacement, or correction of any defects in the City Facility, and shall not mean the day-to-day upkeep or correction of normal wear and tear of the City Facility (such as watering or weeding for landscape improvements, painting, graffiti removal, etc.).

## ARTICLE VII.
## PAYMENT OF CITY FEES

Section 7.01   **Request for Payment of City Fees**.  The Owner may request payment of City Fees from the Funding Sources by executing and submitting to the CFD a payment request.

15

Upon receipt of such payment request, the CFD shall pay, or cause to be paid, to the City the City Fees requested in such payment request, subject to the following conditions:

   A. The City Fees shall be payable only to the extent of available Funding Sources and only if and to the extent there are no additional eligible City Facilities, CSD Facilities or CSD Fees to be paid or acquired, as applicable; and provided further that City Fees shall be financed only if the City shall certify in connection with such financing of City Fees that it reasonably expects to spend Bond proceeds attributable to the financing of such City Fees on public capital improvements within three years from the date of issuance of the Bonds. Notwithstanding the foregoing, the Owner understands that the City Fees are an obligation of the Owner or its assignees for the public impacts created by the Owner's or its assignees development of the real property within the CFD. Whether or not funds become available from the Funding Sources to pay City Fees, the owner of the property at the time such City Fees are due is obligated to pay the City Fees.

   B. The City Fees shall be payable only to the extent that the City has not provided Development Impact Fee credits for such City Fees pursuant to the Development Agreement. For example, if the City Fee is $3,000 per unit, and the Owner constructs facilities equivalent to $2,000 per unit and the City provides a credit of $2,000 against the City Fee, then only $1,000 per unit may be financed by the Funding Sources.

  **Section 7.02    Payment of City Fees in Advance of Availability of Funding Sources.** The Owner may be required pursuant to the conditions of development or the fee ordinance to pay the City Fees prior to the availability of the Funding Sources to pay such City Fees. In the event such City Fees are paid prior to the availability of the Funding Sources, the amounts paid to the City shall be deemed to be deposits (each a "Deposit") that are subject to refund by the City to Owner (and the Owner only, regardless of the entity that paid the Deposits). The City shall place each Deposit in a capital facilities account(s).

  **Section 7.03    Return of Deposits.** If the Owner has made any Deposits to the City, then following deposit of Funding Sources with the City for the corresponding City Fees, the City shall return to the Owner (and the Owner only, regardless of the entity that paid the Deposit), from the capital account in which the Deposits were deposited the Deposits not previously returned, without interest or other earnings thereon. The City shall be so obligated to return such Deposits only to the extent that an equivalent amount of the Deposits to be returned is deposited with the City from the Funding Sources. The Deposits may be returned from time to time as additional Funding Sources become available.

  **Section 7.04    Deposits Allocated First.** Funding Sources used to pay City Fees shall be allocated first for return of all Deposits prior to being allocated to the payment of City Fees not previously deposited by the Owner. For example, if the Owner has paid $10,000 in Deposits, and Funding Sources become available in the amount of $15,000, the City shall apply the first $10,000 of the Funding Sources to the payment of the City Fees that were paid by the Deposits (and, thereafter, return the Deposits to the Owner) and use the remaining $5,000 of the Funding Sources to the payment of City Fees identified in the payment requisition.

  **Section 7.05    Application of Deposits.** Any Deposits that have not been returned to the Owner at the time it is determined that there will be no further Funding Sources available (now or in the future) shall be retained by the City and may be used for the purposes for which the City Fee was

required, and the unrefunded Deposits shall constitute full and final payment for such City Fees, without any increase of any kind.

Section 7.06    **Expectations.**    The Owner may pay City Fees (as Deposits) prior to the availability of Funding Sources to pay such City Fees.  Any City Fees paid (as Deposits) by the Owner shall be made with the understanding that such Deposits will be returned from the Funding Sources if, and when, such Funding Sources become available.  The payment of Deposits prior to the availability of the Funding Sources shall not be construed as a dedication or gift of the City Fees, or a waiver of the return of the Deposits, it being the intention that the City Fees be paid by the Funding Sources to the extent of the Funding Sources.

Section 7.07    **Return of Funds Following DIF Fee Credits.**    If the City provides fee credits against a Development Impact Fee as the result of the Owner constructing Facilities, any deposits made by the Owner or any other party to secure the payment of the subject Development Impact Fee shall be returned in accordance with the City's procedures for returning deposits following a DIF Fee credit.  To the extent that there remains any deposit of the Development Impact Fees that are otherwise City Fees for which credit was not provided, such amounts shall be considered Deposits within the meaning set forth in Section 7.02 and shall be returned to the Owner upon the funding of such differential from Funding Sources, as set forth in this Article VII.  Nothing in this Article VII shall adversely affect the financing of Facilities for which a DIF credit is provided.  For example, if the City Fee is $3,000 per unit, and the Owner constructs Facilities equivalent to $2,000 per unit and the City provides a credit of $2,000 against the City Fee, both the $1,000 remaining portion of the City Fee as well as the costs of the Facilities from which the credit was derived may be financed by the Funding Sources under this Agreement.  The $2,000 portion of the City Fee shall not be financed by the Funding Sources and any deposits returned pursuant to the City's policies as a result of the DIF Fee credit shall not be considered a Deposit within the meaning of Section 7.02.

## ARTICLE VIII.
### INSURANCE

Section 8.01    **Insurance Requirements**.    The Owner shall, at all times prior to the final Acceptance Date of all City Facilities to be constructed by Owner, acquired by City and funded out of the Funding Sources, maintain and deliver to the City evidence of and keep in full force and effect, or cause the general contractor for such City Facilities to maintain and deliver to the City evidence of and keep in full force and effect, not less than the following coverage and limits of insurance, which shall be maintained with insurers and under forms of policies satisfactory to the Director: (i) Workers, Compensation and Employer's Liability - Workers' Compensation coverage as required by law; Employer's Liability - limits of at least $100,000.00 per occurrence; (ii) Comprehensive General Liability - Combined Single Limit - $1,000,000.00; and (iii) Automobile Liability - Combined Single Limit - $1,000,000.00.  The automobile and general comprehensive liability policies shall be accompanied by an umbrella policy with a combined limit of $5,000,000.00.  All of the Owner's insurance policies shall contain an endorsement providing that written notice shall be given to the City at least 30 calendar days prior to termination, cancellation, or reduction of coverage in the policy.

The Bodily Injury and Property Damage Liability policies shall contain the following:

A.    An endorsement extending coverage to the City and its agents as an insured, in the same manner as the named insured as respects liabilities arising out of the performance of any work related to the City Facilities to be constructed by Owner, acquired by City and funded out of the Funding Sources.  Such insurance shall be primary insurance as respects the interest of the City, and any other insurance maintained by the City shall be excess and not contributing insurance with the insurance required hereunder.

B.    Severability of Interest clause.

C.    Provision or endorsement stating that such insurance, subject to all of its other terms and conditions, applies to the liability assumed by the Owner under this Acquisition Agreement.

Before awarding a contract for the construction of the City Facilities to be acquired with the Funding Sources, the Owner shall deliver to the Director certificates of insurance and endorsements as to such insurance, in a form acceptable to the City and the City Attorney, and Owner shall upon each renewal of such insurance policy provide the City with new certificates of insurance with respect thereto.

The Owner shall require and verify the same insurance on the part of its contractors and subcontractors.

The foregoing requirements as to the types, limits and City approval of insurance coverage to be maintained by the Owner are not intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by the Owner under this Acquisition Agreement.

Any policy or policies of insurance that the Owner or its contractors or subcontractors elect to carry as insurance (i) against loss or damage to their construction equipment and tools or other personal property used in fulfillment of this Acquisition Agreement or a contract related to the City Facilities to be constructed by Owner and funded out of the Funding Sources shall include a provision waiving the insurer's right of subrogation against the City, and (ii) in fulfillment of this Acquisition Agreement involving a dual obligee bond may contain a clause to the effect that: "provided that Principal and Surety shall not be liable to the Obligees or any of them unless the Obligees or any of them have performed the obligations to the Principal in accordance with the terms of said contract; and provided, further, that Principal and Surety shall not be liable to all Obligees in the aggregate in excess of the penal sum above stated."

**Section 8.02  Standards Applicable**.  The Owner may effect such coverage under blanket insurance policies, provided, however, that (i) such policies are written on a per occurrence basis, (ii) such policies comply in all other respects with the provisions of Section 8.01, and (iii) the protection afforded the City under any such policy shall be no less than that which would be available under a separate policy relating only to this Acquisition Agreement.  All policies of insurance shall be with companies licensed or approved by the State of California Insurance Commissioner and rated (i) A12 or better with respect to primary levels of coverage, and (ii) B+12 or better with respect to excess levels of coverage, in the most recent edition of Best's Insurance Guide and shall be issued and delivered in accordance with State law and regulations.

18

## ARTICLE IX.
## INDEMNIFICATION

**Section 9.01    Indemnification and Hold Harmless.**    The Owner hereby assumes the defense of, and indemnifies and saves harmless the City, the CFD and each of their respective officers, directors, employees and agents, from and against all actions, damages, claims, losses or expenses of every type and description to which they may be subjected or put, by reason of, or resulting from the design, engineering and construction of any of the City Facilities, or arising out of a failure of the Owner to provide notice of the special tax to be levied by the CFD pursuant to Section 53341.5 of the Act (but only if the Owner is required to provide such notice), or arising out of any alleged misstatements of fact or alleged omission of a material fact made by the Owner, its officers, directors, employees or agents to the City, the CFD, the CFD's underwriter and its counsel, appraiser, special tax consultant, market absorption consultant or bond counsel regarding the Owner, its proposed developments, its property ownership, and any contractual arrangement it may enter into in a disclosure document describing the CFD and the risks relating to the Bonds; provided that the actions, damages, claims, losses and expenses covered by this Section 9.01 which relate to the City Facilities being acquired shall be those arising out of the personal injury or property damage which occurred during the period up to the acceptance of the City Facilities by the City, whether or not an action or claim is filed by the date of acceptance of the City Facilities; and provided, further, that nothing in this Section 9.01 shall limit in any manner the indemnified party's rights against any of the Owner's architects, engineers, contractors or other consultants.    The Owner shall furnish to the CFD a certificate or certificates of insurance substantiating that it has obtained for the entire period of the construction of the City Facilities a policy of comprehensive general liability insurance with coverage broad enough to include the Owner's contractual obligations under this section and having a combined single limit of liability meeting the requirements set forth in Article VIII.    Said certificate of insurance shall include an endorsement naming the parties entitled to indemnity under this Section 9.01 as additional named insureds.

Except as set forth in this Section 9.01, no provision of this Agreement shall in any way limit the extent of the responsibility of the Owner for payment of damages resulting from the operations of the Owner, its agents, employees or contractors.    Nothing in this Section 9.01 shall be understood or construed to mean that the Owner agrees to indemnify the City or the CFD, or any of their respective officers, directors, employees or agents, for any negligent or wrongful acts or omissions to act of the City or the CFD, or any of their respective officers, directors, employees or agents.

**Section 9.02    Disclosure of Special Tax.**    Provided the Owner is selling property within the CFD or is leasing the property within the CFD for a term exceeding five years, the Owner covenants and agrees that it will provide all forms of disclosure of the special tax to be levied by the CFD as required by existing law and by any future laws.    In particular, provided the Owner is selling property within the CFD or is leasing the property within the CFD for a term exceeding five years, the Owner covenants and agrees from and after the date hereof to provide the special tax disclosure notice required by Section 53341.5 of the Act and to retain in its files copies of all notices signed by purchasers in accordance with Section 53341.5.    The City shall have the right to inspect and obtain copies of all of the Owner's records regarding special tax disclosure.    The Owner represents that it has included in its contracts with purchasers of land within the CFD, and further agrees to include in its contracts with purchasers of land within the CFD entered into from and after the date hereof, a requirement that such purchasers (i) provide to the City all forms of disclosure of the special tax required by law, including the Section 53341.5 notice, (ii) retain signed copies of the Section 53341.5 notice following the sale of any parcel of land within the CFD to another, and (iii) provide the City

19

on request an opportunity to review and obtain copies of all records relating to disclosure of the special tax.  Such contractual provision shall further provide that the City and the CFD are third party beneficiaries of such disclosure requirements and that the purchaser of land will indemnify the City, the CFD and their respective officers and employees for any failure of such purchaser to disclose the special tax as required by law.

## ARTICLE X.
## EVENT OF DEFAULT; TERMINATION

**Section 10.01  Event of Default**.  If the City has provided the Owner with written notice that the work to construct the City Facilities is not being timely performed in a satisfactory manner (and providing a description of the defect or failure to timely perform) and the Owner has not commenced actions to cure any such defects identified in such notice within 60 calendar days after the giving of such notice and does not diligently pursue to completion the cure of any such defects as determined by the Director, the City may declare that an "Event of Default" has occurred.  The Event of Default may be cured by the Owner by commencing within the 60 calendar day period following receipt of notice of default and diligently pursuing to completion the cure of such defect identified in the notice.

During the occurrence and continuation of an Event of Default, the City shall have the right but not the obligation to require the Owner to make an irrevocable offer of dedication to the City of the land owned by the Owner for the City Facility identified in the notice and to assume responsibility for the work to be performed thereunder.  In the event the City elects to assume the responsibility for any work on a previously awarded contract as described in the preceding sentence, the following will occur:

      A.     the Owner will make an irrevocable offer of dedication to the City of the land owned by the Owner for such City Facility identified in the notice;

      B.     to the extent permitted by law and the applicable contract, the Owner will assign all of the contracts for the work performed to date on the City Facility identified in the notice to the City, if requested to do so by the Director;

      C.     the City will use its best efforts to complete the City Facility within a reasonable time frame; and

      D.     upon completion of the City Facility, to the extent there are Funding Sources available following payment to the City for the costs of completing such City Facility, the Owner will be reimbursed for the lesser of the cost or value of the previously unreimbursed satisfactory work performed or paid for by the Owner.  The cost of such work will be determined by taking the unreimbursed amounts expended by the Owner under the contract(s) taken over by the City and deducting any incremental cost incurred by the City to complete the work under the contracts in question.  Incremental cost shall be costs in excess of the sum of the original contract cost plus change orders approved by the City.

**Section 10.02  Owner Termination**.  This Acquisition Agreement shall terminate and be of no further force as of May 1, 2028, unless extended by agreement of all the parties.  If the Acquisition Agreement is terminated as provided herein, neither City nor Owner shall have any further responsibility or liability pursuant to this Acquisition Agreement, except for Owner's responsibility and liability as set forth in Article IX, which shall continue upon termination of this

Acquisition Agreement. Upon the termination of this Agreement, the City shall direct the use of any remaining Bond or Special Tax proceeds to complete any remaining authorized facilities, redeem Bonds or use in any way permitted by the Act.

## ARTICLE XI.
## CSD FACILITIES

**Section 11.01  CSD Acquisition Facilities and CSD Construction Facilities**.

A.      CSD Acquisition Facilities and CSD Construction Facilities shall be acquired from the Funding Sources, and such CSD Acquisition Facilities and CSD Construction Facilities shall be bid and constructed in accordance with the CSD JCFA. CSD Acquisition Facilities and CSD Construction Facilities shall be funded from the Funding Sources, to the extent available, pursuant to the Disbursement Request Form set forth as Exhibit C-1 in the CSD JCFA. Upon receipt of a fully-executed Disbursement Request Form, the City shall pay the amount so requested from the available Funding Sources. With respect to any CSD Acquisition Facility and CSD Construction Facility constructed by Owner, acquired by CSD and funded out of the Funding Sources, the Owner shall comply with CSD's rules and regulations regarding title and conveyance of the subject CSD Acquisition Facility and CSD Construction Facility. The provision of a signed Disbursement Request Form from CSD shall be evidence of such compliance.

B.      CSD Acquisition Facilities and CSD Construction Facilities may be financed by the Funding Sources, including Bonds, pursuant to the JCFA. There is no requirement that the City Facilities or City Fees be paid first before financing CSD Acquisition Facilities and CSD Construction Facilities. The amount and timing of the financing of the CSD Acquisition Facilities and CSD Construction Facilities shall be in the discretion of the Owner.

C.      The City understands and agrees that (i) the Owner will be constructing CSD Facilities prior to the availability of the Funding Sources that will be used to pay for such CSD Facilities, (ii) CSD will be inspecting such CSD Facilities and processing and completing Disbursement Request Forms for the payment on such CSD Facilities with knowledge that there may be insufficient Funding Sources available at such time, (iii) the CSD Facilities may be conveyed to and accepted by CSD when there are insufficient Funding Sources to pay the Purchase Prices of such CSD Facilities, and (iv) in any such case, the payment of any approved Disbursement Request Forms for the Purchase Prices of such CSD Facilities will be deferred until there are sufficient Funding Sources available to pay the Purchase Prices of such CSD Facilities, at which time the City will make such payments in accordance with this Acquisition Agreement. At all times, the Owner will be constructing such CSD Facilities with the expectation that the Purchase Prices for such CSD Facilities will be paid from the Funding Sources. The conveyance of CSD Facilities to CSD prior to receipt of the Purchase Prices for such CSD Facilities shall not be construed as a dedication or gift, or a waiver of the payment of the Purchase Prices, or any part thereof, for such CSD Facilities.

**Section 11.02  CSD Fees**.

A.      CSD Fees shall be paid from the Funding Sources. CSD Fees paid in advance of the availability of Funding Sources shall be deemed deposits and shall be reimbursed to the Owner in accordance with the CSD JCFA following the funding of such CSD Fees from the Funding Sources. CSD Fees shall be funded from the Funding Sources, to the extent available, pursuant to the Disbursement Request Form set forth as Exhibit C in the CSD JCFA. Upon receipt of a fully-

executed Disbursement Request Form, the City shall pay the amount so requested from the available Funding Sources. With respect to any CSD Fees funded out of the Funding Sources, the Owner shall comply with the provisions of the CSD JCFA. The provision of a signed Disbursement Request Form from CSD shall be evidence of such compliance.

B.    CSD Fees may be financed by the Funding Sources, including Bonds, pursuant to the JCFA. There is no requirement that the City Facilities or City Fees be paid first before financing CSD Fees. The amount and timing of the financing of the CSD Fees shall be in the discretion of the Owner.

C.    The Owner may pay CSD Fees (as deposits) prior to the availability of Funding Sources to pay such CSD Fees. Any CSD Fees paid (as deposits) by the Owner shall be made with the understanding that such deposits will be returned from the Funding Sources if, and when, such Funding Sources become available. The payment of deposits prior to the availability of the Funding Sources shall not be construed as a dedication or gift of the CSD Fees, or a waiver of the return of the deposits, it being the intention that the CSD Fees be paid by the Funding Sources to the extent of the Funding Sources.

### ARTICLE XII.
### MISCELLANEOUS

**Section 12.01 Limited Liability of City**. The Owner agrees that any and all obligations of the City arising out of or related to this Acquisition Agreement are special and limited obligations of the City and the City's obligations to make any payments hereunder are restricted entirely to the moneys, if any, from the Funding Sources. No member of the City Council, or City staff member, employee or agent shall incur any liability hereunder to the Owner or any other party in their individual capacities by reason of their actions hereunder or execution hereof.

**Section 12.02 Audit**. The Director and/or the Finance Director or other finance officer of the City shall have the right, during normal business hours and upon the giving of two (2) Business Days prior written notice to the Owner, to review all books and records of the Owner pertaining to costs and expenses incurred by the Owner in the construction of the City Facilities to be funded with the Funding Sources, and any bids taken or received for the construction thereof or materials therefor.

**Section 12.03 Attorney's Fees**. In the event that any action or suit is instituted by either party against the other arising out of this Acquisition Agreement, the party in whose favor final judgment shall be entered shall be entitled to recover from the other party all costs and expenses of suit, including reasonable attorneys' fees.

**Section 12.04 Notices**. Any notice, payment or instrument required or permitted by this Acquisition Agreement to be given or delivered to any party hereto shall be deemed to have been received when personally delivered, or transmitted by telecopy or facsimile transmission (with telecopy or facsimile confirmation obtained), or seventy-two hours following deposit of the same in any United States Post Office, registered or certified mail, postage prepaid, addressed as follows:

22

City:                          City of Coachella
1515 Sixth Street
Coachella, CA 92236
Attention:  City Manager

Owner:                     Glenroy Coachella, LLC
1801 South La Cienega Boulevard
Los Angeles, California 90035
Attention:  Stuart Rubin

Each party may change its address or addresses for delivery of notice by delivering written notice of such change of address to the other party.

**Section 12.05 Severability**.  If any part of this Acquisition Agreement is held to be illegal or unenforceable by a court of competent jurisdiction, the remainder of this Acquisition Agreement shall be given effect to the fullest extent possible.

**Section 12.06 Successors and Assigns**.  This Acquisition Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.  The Owner may not assign its rights or obligations hereunder except with the prior written approval of the City Manager, or his designee, which approval shall not be unreasonably withheld, provided such assignment is in whole.  Notwithstanding the preceding sentence, the Owner may assign its rights and obligations hereunder as security to lenders for the purpose of obtaining loans to finance development within the CFD, but no such assignment shall release the Owner from its obligations hereunder to the City and the CFD, which the Owner shall remain obligated to perform itself.  The Owner shall provide written notice to the City of any assignment of this Agreement as security for lenders.

**Section 12.07 Other Agreements**.  The obligations of the Owner hereunder shall be those of a party hereto and not as an owner of property in the CFD.  Nothing herein shall be construed as affecting the City's or the Owner's rights, or duties to perform their respective obligations, under other agreements, use regulations or subdivision requirements relating to the development of the lands in the CFD.  This Acquisition Agreement shall not confer any additional rights, or waive any rights given, by either party hereto under any development or other agreement to which they are a party.

**Section 12.08 Waiver**.  Failure by a party to insist upon the strict performance of any of the provisions of this Acquisition Agreement by the other party, or the failure by a party to exercise its rights upon the default of the other party, shall not constitute a waiver of such party's right to insist and demand strict compliance by the other party with the terms of this Acquisition Agreement thereafter.

**Section 12.09 Merger**.  No other agreement, statement or promise made by any party or any employee, officer or agent of any party with respect to any matters covered hereby that is not in writing and signed by all the parties to this Acquisition Agreement shall be binding.

**Section 12.10 Binding on CFD**.  The City Council of the City, acting as the legislative body of the CFD, shall perform all parts of this Acquisition Agreement which require performance on the part of the CFD.

23

**Section 12.11 Amendment**.   This Acquisition Agreement may be amended, from time to time, by written Supplement hereto and executed by both the City and the Owner.

**Section 12.12 Counterparts**.    This Acquisition Agreement may be executed in counterparts, each of which shall be deemed an original.

**Section 12.13 Governing Law**.   This Acquisition Agreement and any dispute arising hereunder shall be governed by and interpreted in accordance with the laws of the State.

**IN WITNESS WHEREOF,** the parties have executed this Acquisition Agreement as of the day and year first-above written.

CITY:

CITY OF COACHELLA
For the Community Facilities District No. 2018-1 of the City of Coachella (Glenroy)

By: _____
      City Manager

25

**OWNER:**                                    **GLENROY COACHELLA, LLC**, a Delaware limited
liability company

By: _____
Name: Stuart Rubin
Title:   Manager

**Exhibit "A"**

**PUBLIC FACILITIES AND DISCRETE COMPONENTS ELIGIBLE TO BE FINANCED
BY CITY OF COACHELLA COMMUNITY FACILITIES DISTRICT 2018-1[1]**

| Facility | Discrete Component |
|---|---|
| **CITY FACILITIES** | |
| Van Buren Street Improvements | N/A |
| Phase 2 storm drain system installed under City of Coachella Permit No. 2018-32. | N/A |
| Phase 2 domestic water system installed under City of Coachella Permit Nos. 2018-53 and 2018-60. | N/A |
| Landscaping Improvements | |
| **CSD FACILITIES** | |
| Phase 2 sanitary sewer system installed under City of Coachella Permit No. 2018-53. | N/A |

The description of the Facilities and Discrete Components set forth in this Exhibit "A" are preliminary in some cases. The final plans and specifications may show substitutes or modifications to the proposed Facilities and Discrete Components approved by the applicable public agency. In no event shall any Facility or Discrete Component thereof be eligible for acquisition and/or reimbursement to the extent that such Facility or Discrete Component thereof was previously reimbursed to the Owner out of Funding Sources. Unless agreed to otherwise by the Owner and the City, dry utility cost reimbursements shall not exceed 5% of the proceeds of any series of Bonds.

**COMPLETED FACILITIES**

| Facility | Discrete Component | Estimated Purchase Price |
|---|---|---|
| **CITY FACILITIES** | | |
| Phase 1 storm drain system installed under City of Coachella Permit No. 2018-32. | N/A | $1,276,460.64 |
| Phase 1 domestic water system installed under City of Coachella Permit Nos. 2018-53 and 2018-60. | N/A | $1,575,233.90 |
| Underground retention system installed under City of Coachella Permit No. 2018-32 | N/A | $504,867.07 |
| Parking Lot Lighting (Bases, Poles, Fixtures and Install) | N/A | $165,484.80 |
| Landscaping for limited retail frontage and parking | N/A | $66,591.72 |
| **CSD FACILITIES** | | |
| Phase 1 sanitary sewer system installed under City of Coachella Permit No. 2018-53. | N/A | $763,371.84 |

A-1

**Exhibit "B"**

**DESCRIPTION OF PROPERTY**

Real property in the City of Coachella, County of Riverside, State of California, described as follows:

Lot numbers 1, 2, 3, 4 and 6 of Parcel Map No. 37310 recorded November 9, 2017 as instrument number 2017-0472863.

Exhibit "C"

## FORM OF PAYMENT REQUEST

**City of Coachella**
**Community Facilities District No. 2018-1 (Glenroy)**

The City of Coachella (the "City") and Glenroy Coachella, LLC ("Owner") are parties to the Acquisition Agreement, dated as of May 1, 2018 (the "Acquisition Agreement"). Capitalized undefined terms use herein shall have the meanings ascribed thereto in the Acquisition Agreement. Pursuant to the Acquisition Agreement, Owner hereby requests confirmation that the City Facilities (or Discrete Components) described in Attachment A attached hereto (the "City Facilities or Discrete Components") is [Complete] [Substantially Complete] and hereby further requests approval of the Purchase Price of the City Facilities or Discrete Components. In connection with this Payment Request, Owner hereby represents and warrants to the City as follows:

(a)     The person executing this Payment Request on behalf of Owner is qualified to execute this Payment Request on behalf of Owner and knowledgeable as to the matters set forth herein.

(b)     Owner has submitted or submits herewith to the Director as-built drawings or similar plans and specifications for the City Facilities or Discrete Components for which payment is requested, and such drawings or plans and specifications, as applicable, are true, correct and complete; provided, however, that if certification is being requested that such City Facilities or Discrete Components is Substantially Complete, such drawings or plans and specifications need not be submitted to the Director until certification is being requested that such City Facilities or Discrete Components is complete.

(c)     Each of the City Facilities or Discrete Components described in Attachment A has been constructed in accordance with the Plans therefor, and in accordance with all applicable City standards and the requirements of the Acquisition Agreement, and the as-built drawings or similar Plans and specifications referenced in paragraph (b) above.

(d)     The true and correct Actual Cost of each City Facilities or Discrete Components is set forth in Attachment A.

(e)     Owner has submitted or submits herewith to the City Engineer invoices, receipts, worksheets and other evidence of costs which are in sufficient detail to allow the City Engineer to verify the Actual Cost of each City Facility or Discrete Component for which payment is requested.

Owner hereby declares that the above representations and warranties are true and correct.

C-1

Owner hereby requests that the Purchase Price be paid to the Person or Persons, in the amounts, set forth in Attachment B hereto.

Date:                           **GLENROY COACHELLA, LLC,**
                                a Delaware limited liability company

                                By: _____

                                Name: _____

                                Title: _____

APPROVED FOR PAYMENT


Date:                           **CITY OF COACHELLA**


                                By: _____

                                Name: _____

                                Title:  City Manager

C-2

**ATTACHMENT A**

| City Facilities or Discrete Components | Actual Cost | Purchase Price |
| --- | --- | --- |

Total Purchase Price to be Paid:

**ATTACHMENT B**

**PURCHASE PRICE PAYMENT INSTRUCTIONS**

JOINT COMMUNITY FACILITIES AGREEMENT

by and among

CITY OF COACHELLA,

COACHELLA SANITARY DISTRICT,

and

GLENROY COACHELLA, LLC

relating to

COMMUNITY FACILITIES DISTRICT NO. 2018-1
OF THE CITY OF COACHELLA (GLENROY)

## JOINT COMMUNITY FACILITIES AGREEMENT

THIS JOINT COMMUNITY FACILITIES AGREEMENT (the "**Agreement**") is dated as of May 1, 2018, by and among CITY OF COACHELLA, a municipal corporation and a political subdivision of the State of California ("**City**"), COACHELLA SANITARY DISTRICT, a public agency organized and existing pursuant to the Sanitary District Act of 1923 ("**CSD**"), GLENROY COACHELLA, LLC, a Delaware limited liability company (the "**Property Owner**"), and relates to the formation by the City of a community facilities district known as "Community Facilities District No. 2018-1 of the City of Coachella (Glenroy)" (the "**CFD**"), which is being formed for the purpose of financing certain facilities to be owned, operated or maintained by the City or CSD from proceeds of bonds issued by the CFD in one or more series, or special taxes levied thereby.  The City, CSD and the Property Owner are each a "**Party**" hereto, and, collectively, the "**Parties**."

R E C I T A L S:

A.      The property described in Exhibit "A" hereto (the "**Property**"), which is located in the City of Coachella, County of Riverside, State of California, is proposed to constitute the land within the boundaries of the CFD.

B.      Property Owner owns a portion of the Property to be included in the proposed CFD. Property Owner intends to develop the Property for commercial and retail purposes and have obtained or intends to obtain the necessary development approvals to construct resort villas housing approximately 400 rooms, a multi-story hotel (consisting of 130 rooms, convention space, pools and other amenities), retail facilities and other uses, as such development may be modified from time to time (the "**Project**").

C.      The Property Owner petitioned the City to form the CFD for the purpose of financing, among other things, the acquisition and/or construction of various public facilities to be owned and operated by CSD as described in Exhibit "B" hereto, which facilities will benefit the Project in whole or in part, including (i) certain public facilities constructed or to be constructed by or on behalf of Property Owner and ultimately owned and operated by CSD (the "**Acquisition Facilities**") and (ii) certain public facilities to be constructed and owned and operated by CSD (the "**CSD Fee Facilities**") in lieu of the payment of CSD Fees (defined herein).  Upon the construction of the Acquisition Facilities by or on behalf of Property Owner and the inspection and acceptance thereof by CSD as described herein, the Acquisition Facilities shall become part of the CSD system. The Acquisition Facilities and CSD Fee Facilities are collectively referred to herein as the "**CSD Facilities**."

D.      Property Owner has yet to determine whether they will finance all of the CSD Facilities with Bond Proceeds (defined below) available for such purpose.  The Parties hereto acknowledge that the purpose of this Agreement is to satisfy the requirements of the Act.

E.      CSD and Property Owner agree that any Acquisition Facilities constructed or to be constructed by Property Owner shall be eligible for acquisition by CSD and the costs thereof shall be eligible for reimbursement from Bond Proceeds pursuant to this Agreement.

F.      In conjunction with the issuance of building permits for the construction of the Project on the Property, the Property Owner, or its successors or assigns, may elect to advance CSD Fee Facilities costs in lieu of payment of CSD Fees (the "**Advances**") before Bond Proceeds (defined

1

herein) are available in sufficient amounts to pay for CSD Fee Facilities. In such case, the Property Owner shall be entitled to (i) reimbursement of such Advances limited to Bond Proceeds available to CSD, if any, and (ii) credit against CSD Fees which would otherwise be due to CSD equal to the amount of Bond Proceeds disbursed to CSD or at the direction of CSD for CSD Facilities, all as further described herein.

G.    The City will have sole discretion and responsibility for the formation and administration of the CFD.

H.    The City is authorized by Section 53313.5 of the Act to assist in the financing of the acquisition and/or construction of the CSD Facilities. This Agreement constitutes a joint community facilities agreement, within the meaning of Section 53316.2 of the Act, by and among CSD, the Property Owner and the City, pursuant to which the CFD will be authorized to finance the acquisition and/or construction of all or a portion of the CSD Facilities. As authorized by Section 53316.6 of the Act, responsibility for acquiring, constructing, providing for and operating the CSD Facilities is delegated to CSD.

I.    The Parties hereto find and determine that the residents residing within the boundaries of CSD, the City and the CFD will be benefited by the construction and/or acquisition of the CSD Facilities and that this Agreement is beneficial to the interests of such residents.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

1.    Recitals. Each of the above recitals is incorporated herein and is true and correct.

2.    Definitions. Unless the context clearly otherwise requires, the terms defined in this Section shall, for all purposes of this Agreement, have the meanings herein specified.

(a)    "Act" means the Mello-Roos Community Facilities Act of 1982, Chapter 2.5 (commencing with Section 53311) of Part 1 of Division 2 of Title 5 of the California Government Code.

(b)    "Acquisition Facility or Facilities" means those sewer facilities listed on Exhibit "B" hereto, which are eligible to be constructed by or on behalf of the Property Owner, acquired by CSD and paid for with Bond Proceeds.

(c)    "Acquisition Price" means the amount to be paid out of Bond Proceeds for an Acquisition Facility.

(d)    "Actual Costs" with respect to an Acquisition Facility includes: (i) the actual hard construction costs including labor, materials and equipment costs; (ii) the costs incurred in design, engineering and preparation of plans and specifications; (iii) the fees paid to consultants and government agencies in connection with and for obtaining permits, licenses or other required governmental approvals; (iv) construction management fee of 5% of the costs described in clause (i) above; (v) professional costs such as engineering, legal, accounting, inspection, construction staking, materials testing and similar professional services; (vi) costs of payment, performance of maintenance bonds, and insurance costs (including the costs of any title insurance); and (vii) the

value of any real property or interests therein that (1) are required for the construction of the Acquisition Facility such as temporary construction easements, haul roads, etc., and (2) are required to be conveyed with such Acquisition Facility in an amount equal to the fair market value of such real property or interests therein.

(e)    "Advances" means an amount paid by a Property Owner for CSD Fee Facilities in lieu of payment of CSD Fees prior to the availability of sufficient Bond Proceeds.

(f)    "Bond Proceeds" or "Proceeds of the Bonds" shall mean those net funds generated by the sale of the Bonds and investment earnings thereon. Bond Proceeds shall also include any Special Taxes collected by the CFD prior to the issuance of the Bonds to pay directly for the acquisition of facilities as authorized by the Rate and Method.

(g)    "Bond Resolution" means that Resolution, Resolution Supplement, Fiscal Agent Agreement, Indenture of Trust or other equivalent document(s) providing for the issuance of the Bonds.

(h)    "Bonds" shall mean those bonds, or other securities, issued by, or on behalf of the CFD, in one or more series, as authorized by the qualified electors within the CFD.

(i)    "Completed Facility" or "Completed Facilities" means a facility or facilities completed by the Property Owner prior to the formation of the District as identified on Exhibit "B" hereto.

(j)    "Disbursement Request" means a request for payment relating to CSD Facilities substantially in the form attached hereto as Exhibit "C-1" for CSD Fee Facilities and Exhibit "C-2" for Acquisition Facilities

(k)    "CSD Engineer" means the engineering firm or in-house personnel used by CSD to determine the value of an Acquisition Facility to be acquired with Bond Proceeds.

(l)    "CSD Facilities" means the Acquisition Facilities and CSD Fee Facilities.

(m)    "CSD Facilities Account" means the fund, account or subaccount of the CFD (regardless of its designation within the Bond Resolution) into which a portion of the Bond Proceeds may be deposited in accordance with the Bond Resolution to finance CSD Facilities.

(n)    "CSD Fees" means sewer connection fees, sewer treatment capacity charges and all components thereof imposed by CSD upon the Property to finance CSD Fee Facilities.

(o)    "CSD Fee Facilities" means those sewer facilities listed on Exhibit "B" hereto, which are necessary for the provision of sewer services to the Property and paid for with Bond Proceeds in lieu of the payment of CSD Fees.

(p)    "CSD Representative" means the CSD Engineer or his designee.

(q)    "Field Engineer" shall have the meaning ascribed to the term in Section 7(a)(i) of this Agreement.

(r)    "Party" or "Parties" shall mean anyone or all of the parties to this Agreement.

(s)    "Plans and Specifications" shall mean the plans and specifications for the design and construction of an Acquisition Facility as approved by CSD, which approval shall not be unreasonably withheld.

(t)    "Rate and Method" means the Rate and Method of Apportionment of the Special Tax authorizing the levy and collection of special taxes within the CFD pursuant to proceedings undertaken for the formation of the CFD pursuant to the Act.

(u)    "Special Taxes" means the special taxes authorized to be levied and collected within the CFD pursuant to the Rate and Method.

(v)    "State" means the State of California.

(w)    "Substantially Complete" or "Substantial Completion" with respect to an Acquisition Facility means that such Acquisition Facility is substantially complete in accordance with its Plans and Specifications and is available for use by the public for its intended purpose, notwithstanding any final "punch list" items still required to be completed, unless such items are required for the safe operation of such Acquisition Facility, and shall be based upon approval of CSD's inspectors, which shall not be unreasonably withheld.

3.    <u>Formation of the CFD</u>.  The City has undertaken the analysis of the appropriateness of forming the CFD therein to finance the CSD Facilities and other facilities.  The City has retained, at the expense of the Property Owner, the necessary consultants to analyze the proposed formation of the CFD.

4.    <u>Sale of Bonds and Use of Proceeds</u>.  In the event that the CFD issues Bonds, the City and the Property Owner shall determine the amount of Bond Proceeds to be deposited in the CSD Facilities Account.  Nothing herein shall supersede the obligation of an owner of the Property to make an Advance or pay CSD Fees to CSD when due.  The purpose of this Agreement is to provide a mechanism by which the CFD may issue the Bonds to provide a source of funds to finance CSD Fee Facilities in lieu of the payment of CSD Fees and fund the Acquisition Price of Acquisition Facilities. In the event that Bond Proceeds, including investment earnings thereon, are not available or sufficient to satisfy the obligation, then the Property Owner shall remain obligated to make an Advance for which it will receive no reimbursement (except to the extent Bond Proceeds later become available to CSD), or pay CSD Fees to CSD as a condition of receiving sewer service to the Property.

5.    <u>Disbursements</u>.

(a)    Upon the funding of the CSD Facilities Account, the Property Owner shall notify CSD of the amount of Bond Proceeds to be reserved to fund CSD Facilities and CSD may execute and submit a Disbursement Request for payment to the City requesting disbursement of an amount equal to all or a portion of Advances from the CSD Facilities Account to the extent that Bond Proceeds are available in the CSD Facilities Account for such purpose.  Upon CSD's receipt of funds pursuant to such Disbursement Request, the Property Owner shall receive reimbursement of the Advances from CSD.

To the extent that CSD expends all or a portion of an Advance pending the deposit of Bond Proceeds in the CSD Facilities Account, for purposes of Treasury Regulations regarding

4

investment and expenditure of Bond Proceeds, the Advance shall be a considered an interest free loan by the Property Owner, which the City agrees to repay to the extent of the deposit, if any, of Bond Proceeds in the CSD Facilities Account and CSD's written direction as described below to pay all or a portion of such deposit to the Property Owner as repayment of an Advance.

(b)      From time to time following the funding of one or more CSD Facilities Accounts, the Property Owner may notify CSD in writing and request a disbursement from the CSD Facilities Account to fund CSD Fee Facilities by executing and submitting a Disbursement Request. Upon receipt of such Disbursement Request completed in accordance with the terms of this Agreement, the CFD shall wire transfer or otherwise pay to CSD (or upon CSD's written direction pay to the Property Owner or a CSD contractor) such requested funds to the extent that Bond Proceeds are available in the CSD Facilities Account for such purpose. Upon such notice and CSD's receipt of such disbursement (or upon payment to the Property Owner or a CSD contractor in accordance with directions from CSD relating to CSD Facilities), the Property Owner shall be deemed to have satisfied the applicable CSD Fees with respect to the number of connections for which the CSD Fees would otherwise have been required in an amount equal to such disbursement.

(c)      CSD agrees that prior to submitting a Disbursement Request requesting payment from the CFD it shall review and approve all costs included in its request and will have already paid or incurred such costs of CSD Facilities from its own funds (which may include Advances from a Property Owner) subsequent to the date of this Agreement, or will disburse such amounts to pay the costs of CSD Facilities following receipt of funds from the CFD. In the event that CSD does not disburse any Bond Proceeds (or equivalent amount of Advances repaid pursuant to the second to the last sentence of the first paragraph of Section 5(a) above) received by it to third parties within five banking days of receipt, it will trace and report to the CFD all earnings, if any, earned by CSD, from the date of receipt of such Bond Proceeds by CSD (or the date of disbursement pursuant to the second to the last sentence of the first paragraph of Section 5(a) above) to the date of expenditure by CSD for capital costs of the CSD Facilities. Such report shall be delivered at least semiannually until all Bond Proceeds are expended by CSD. CSD agrees that in processing the above disbursements it will comply with all legal requirements for the expenditure of Bond Proceeds under the Internal Revenue Code of 1986 and any amendments thereto.

(d)      CSD agrees to maintain adequate internal controls over its payment function and to maintain accounting records in accordance with generally accepted accounting procedures. CSD will, upon request, provide the City and/or the Property Owner with access to CSD's records related to the CSD Facilities and expenditure of Advances and will provide to the City its annual financial report certified by an independent certified public accountant for purposes of assisting the City in calculating the arbitrage rebate obligation of the CFD, if any.

(e)      The City or the CFD agrees to maintain full and accurate records of all amounts, and investment earnings, if any, expended from the CSD Facilities Accounts and expenditure of Advances. The City or the CFD will, upon request, provide CSD and/or Property Owner with access to the City's or the CFD's records related to the CSD Facilities Accounts.

(f)      The City and CSD acknowledge that the City has the ultimate responsibility for issuance of the Bonds, the administration of the CFD, and the tax-exempt status of any Bonds issued by the CFD. Accordingly, the City Council shall have ultimate responsibility for making all decisions with respect to the issuance of any Bonds and the levy of Special Taxes.

6.     Ownership of CSD Facilities.  The CSD Facilities shall be and remain the property of CSD.

7.     Acquisition Facilities.  The Parties acknowledge that CSD may require the Property Owner, pursuant to the CSD Rules and Regulations, to design, construct and dedicate to CSD Acquisition Facilities as a condition to providing sewer service to the Property.  The following provisions of this Section 7 shall apply solely with respect to those Acquisition Facilities to be constructed by the Property Owner and acquired by CSD with Bond Proceeds:

(a)     Construction and Acquisition of Acquisition Facilities.  This Section 7(a) shall not apply to any Completed Facilities.

(i)     The Property Owner will complete the Plans and Specifications for such Acquisition Facilities.  The Plans and Specifications shall include CSD's standard specifications and shall be subject to CSD approval, which shall not be unreasonably withheld.  CSD agrees to process any Plans and Specifications for approval with reasonable diligence and in a timely manner.  A Property Owner may proceed with the construction of any such Acquisition Facilities in accordance with the provisions of Section 7(b) hereof.  A qualified engineering firm ("**Field Engineer**") shall be employed by the Property Owner to provide all field engineering surveys determined to be necessary by the CSD inspection personnel. Field Engineer shall promptly furnish to CSD a complete set of grade sheets listing all locations, offsets, etc., in accordance with good engineering practices, and attendant data and reports resulting from the Field Engineer's engineering surveys and/or proposed facility design changes.  CSD shall have the right, but not the obligation, to review, evaluate and analyze whether such results comply with applicable specifications.

(ii)     A full-time soils testing firm, approved by CSD, shall be employed by the Property Owner to conduct soil compaction testing and certification.  The Property Owner shall promptly furnish results of all such compaction testing to CSD for its review, evaluation and decision as to compliance with applicable specifications.  In the event the compaction is not in accordance or compliance with applicable specifications, the Property Owner shall be fully liable and responsible therefore.  A final report shall be required fully certifying trench compaction efforts prior to acceptance of each of the Acquisition Facilities.

(iii)     The cost of all surveying, compaction testing and report costs associated with such Acquisition Facilities furnished and constructed by any contractors or sub-contractors (collectively, "**Contractors**") shall be included among the costs which are eligible to be paid from the CSD Facilities Account.

(iv)     CSD shall not be responsible for conducting any environmental, archaeological, biological, or cultural studies or any mitigation requirements related to the Acquisition Facilities to be constructed by a Property Owner that may be requested by appropriate Federal, State, and/or local agencies.  Any such work shall be paid for and such work shall be conducted by, or on behalf of a Property Owner and the costs of such work shall be eligible to be paid from the CSD Facilities Account of the Improvement Fund.

(b)     Public Works Requirements.  This Section 7(b) shall not apply to any Completed Facilities.  In order to insure that the Acquisition Facilities to be constructed by the Property Owner and acquired with Bond Proceeds will be constructed as if they had been constructed under the direction and supervision, or under the authority, of CSD, so that they may be acquired by

6

the CSD pursuant to Government Code Section 53313.5, the Property Owner shall comply with all of the following requirements:

(i)    The Property Owner shall obtain a minimum of three (3) bids from firms reasonably determined to be qualified to construct the Acquisition Facilities in conformance with the Plans and Specifications.

(ii)    The Property Owner shall make arrangements with CSD to schedule the bid opening, which is to be held at CSD headquarters, conducted by the Property Owner and witnessed by CSD staff.

(iii)    The contract or contracts for the construction of such Acquisition Facilities shall be awarded to the responsible bidder(s) submitting the lowest responsive bid(s) for the construction of such Acquisition Facilities.

(iv)    The Property Owner shall require, and the specifications and bid and contract documents shall require all such Contractors to pay prevailing wages and to otherwise comply with applicable provisions of the State Labor Code, Government Code and Public Contract Code relating to public works projects to the extent expressly applicable to a non-governmental entity constructing infrastructure to be acquired by a public entity.

(v)    Said Contractors shall be required to furnish labor and material payment bonds and contract performance bonds in an amount equal to 100 percent of the contract price naming the Property Owner and the CSD as obligees and issued by insurance or surety companies approved by the CSD.  All such bonds shall be in a form approved by the CSD Representative.  Rather than requiring its Contractors to provide such bonds, the Property Owner may elect to provide the same for the benefit of its Contractors.

(vi)    All such Contractors shall be required to provide proof of insurance coverage throughout the term of the construction of such Acquisition Facilities which they will construct in conformance with the approved Plans and Specifications.

(vii)    The Property Owner and all such Contractors shall comply with such other requirements relating to the construction of such Acquisition Facilities which the CSD may impose by written notification delivered to the Property Owner and each such Contractor at any time either prior to the receipt of bids by the Property Owner for the construction of such Acquisition Facilities or, to the extent required as a result of changes in applicable laws, during the progress of construction thereof.  In accordance with this Section 7(b), the Property Owner shall be deemed the awarding body and shall be solely responsible for compliance and enforcement of the provisions of the State Labor Code, Government Code, and Public Contract Code to the extent expressly applicable to a nongovernmental entity constructing infrastructure to be acquired by a public entity.

(viii)    The Property Owner shall provide proof to the CSD, at such intervals and in such form as the CSD Representative may require that the foregoing requirements have been satisfied as to all of the Acquisition Facilities constructed by the Property Owner, acquired by CSD and paid for with Bond Proceeds.

(c)    Inspection; Completion of Construction.

(i)    CSD shall have primary responsibility for providing inspection of the construction of the Acquisition Facilities constructed by a Property Owner to insure that the construction is accomplished in accordance with the Plans and Specifications.  CSD's personnel shall have access to the site of the work at all reasonable times for the purpose of accomplishing such inspection.  Upon Substantial Completion of the construction of such Acquisition Facilities by Property Owner, the Property Owner shall notify the CSD in writing that the construction of such Acquisition Facilities has been Substantially Completed.

(ii)    Upon receiving such written notification from the Property Owner, and upon receipt of written notification from its inspectors that construction of any of the Acquisition Facilities by Property Owner has been Substantially Completed, the CSD shall within 15 days notify the Property Owner in writing that the construction of such Acquisition Facilities has been satisfactorily completed.  Upon receiving such notification, the Property Owner shall forthwith file with the County Recorder of the County of Riverside a Notice of Completion pursuant to the provisions of Section 3093 of the Civil Code.  The Property Owner shall furnish to the CSD a duplicate copy of each such Notice of Completion showing thereon the date of filing with the County Recorder.  Any actual costs reasonably incurred by the CSD in inspecting and approving the construction of any Acquisition Facilities by the Property Owner not previously paid by the Property Owner shall be eligible to be reimbursed from the CSD Facilities Account of the Improvement Fund or paid directly by Property Owner.

(d)    Liens.  Upon the expiration of the time for the recording of claim of liens as prescribed by Sections 3115 and 3116 of the Civil Code, the Property Owner shall provide to the CSD such evidence or proof as the CSD shall require that all persons, firms and corporations supplying work, labor, materials, supplies and equipment on behalf of the Property Owner for the construction of any Acquisition Facilities have been paid, and that no claims of liens have been recorded by or on behalf of any such person, firm or corporation.  Rather than await the expiration of the said time for the recording of claims of liens, the Property Owner may elect to provide to the CSD a title insurance policy or other security acceptable to the CSD guaranteeing that no such claims of liens will be recorded or become a lien upon the Property with priority over the lien of the special taxes to be levied thereon in the proceedings for the formation of the CFD.

(e)    Acquisition, Acquisition Price; Source of Funds.

(i)    Provided the Property Owner has complied with the requirements of this Agreement, CSD agrees to acquire the Acquisition Facilities from the Property Owner. Notwithstanding the above, nothing herein shall be construed as requiring the Property Owner to construct and deliver any Acquisition Facility.  The price to be paid by the CFD for the acquisition of such Acquisition Facilities by CSD ("**Acquisition Price**") shall be the lesser of (i) the value of the Acquisition Facilities or (ii) the total of the Actual Costs of the Acquisition Facilities.  The Property Owner shall transfer ownership of the Acquisition Facilities to the CSD by grant deed, bill of sale or such other documentation as the CSD may require.  Upon the transfer of ownership of the Acquisition Facilities or any portion thereof from the Property Owner to CSD, CSD shall be responsible for the maintenance of the Acquisition Facilities or the portion transferred.

(ii)    For purposes of determining the Acquisition Price to be paid by the CFD for the acquisition of the Acquisition Facilities by CSD, the value of such improvements shall

8

be the amount determined by the CSD Engineer to be the value of the Acquisition Facilities based on the Actual Costs submitted by the Property Owner, as hereinbefore specified; provided, however, that if the CSD Engineer determines that such Actual Costs, or any of them, are excessive and that the value of the Acquisition Facilities is less than the total amount of such Actual Costs, the Acquisition Price to be paid by the CFD for the acquisition of the Acquisition Facilities shall be the value thereof as determined by the CSD Engineer.

(iii)    Upon completion of the construction of any Acquisition Facilities by the Property Owner, the Property Owner shall deliver to CSD copies of the contract(s) with the Contractor(s) who have constructed the Acquisition Facilities or other relevant documentation with regard to the payments made to such Contractor(s) and each of them for the construction of such Acquisition Facilities, and shall also provide to CSD copies of all invoices and purchase orders with respect to all supplies and materials purchased for the construction of such Acquisition Facilities. CSD shall require the CSD Engineer to complete its determination of the value of the Acquisition Facilities as promptly as is reasonably possible.

(iv)    To the extent funds are available therein, the Acquisition Price of any Acquisition Facilities may be determined and paid out of the CSD Facilities Account of the Improvement Fund upon a determination of Substantial Completion of such Acquisition Facility. The Property Owner shall submit a payment request form to the City or the CFD in substantially the form attached hereto as Exhibit "C-2" which must also contain therewith approval of CSD, which approval shall not be unreasonably withheld.

(v)    Notwithstanding the preceding provisions of this section, the sole source of funds for the acquisition by CSD of the Acquisition Facilities or any portion thereof shall be the Bond Proceeds made available by the CFD pursuant to Section 4 above.  If for any reason beyond CSD's control, the Bonds are not sold, CSD shall not be required to acquire any Acquisition Facilities from the Property Owner.  In such event, the Property Owner shall complete the design and construction and offer to the CSD ownership of such portions of Acquisition Facilities as are required to be constructed by the Property Owner as a condition to recordation of subdivision maps for the Property or any other agreement between the Property Owner and CSD, but need not construct any portion of the Acquisition Facilities which it is not so required to construct.

(vi)    Any CSD monetary reimbursements for construction of Acquisition Facilities funded by the CFD will be paid to the CFD to pay down CFD bond debt.  All other reimbursements due the Property Owner for the construction of facilities other than those financed by the CFD shall be addressed in a separate agreement between the Property Owner and CSD.

(f)    Easements.  The Property Owner shall, at the time CSD acquires the Acquisition Facilities as provided in Section 7(e) hereof, grant to CSD, by appropriate instruments prescribed by CSD, all easements on private property which may be reasonably necessary for the proper operation and maintenance of such Acquisition Facilities, or any part thereof.

(g)    Maintenance.  Prior to the transfer of ownership of an Acquisition Facility by the Property Owner to CSD, as provided in Section 7(e) hereof, the Property Owner shall be responsible for the maintenance thereof and shall maintain and transfer such Acquisition Facility to CSD in as good condition as the Acquisition Facility was in at the time the Property Owner notified the CSD that construction of same had been completed in accordance with the Plans and Specifications.

9

(h)    Responsibility for Acquisition Facilities.  The Parties acknowledge and agree that all responsibility and obligation for the design, construction and dedication of such Acquisition Facilities to CSD, in accordance with all applicable statutes and the CSD Rules and Regulations, shall be and remain the responsibility of the Property Owner.  The Parties also acknowledge and agree that the construction and acquisition of the Acquisition Facilities to be constructed by the Property Owner is a matter between Property Owner and CSD only, and that the City and the CFD shall have no responsibility or liability for on-site inspection or monitoring or for certifying that the provisions of this Section 7 be satisfied.

8.    Indemnification.

(a)    Indemnification by City.  City shall assume the defense of, indemnify and save harmless, CSD and Property Owner, their respective officers, employees and agents, and each and every one of them, from and against all actions, damages, claims, losses or expenses of every type and description to which they may be subjected or put, by reason of, or resulting from, any act or omission of the City with respect to this Agreement and the issuance of the Bonds; provided, however, that the City shall not be required to indemnify any person or entity as to damages resulting from negligence or willful misconduct of such person or entity or their officers, agents or employees.

(b)    Indemnification by Property Owner.  The Property Owner shall assume the defense of, indemnify and save harmless, the City, the CFD and CSD, their respective officers, employees and agents, and each and every one of them, from and against all actions, damages, claims, losses or expenses of every type and description to which they may be subjected or put, by reason of, or resulting from, any act or omission of Property Owner with respect to this Agreement, and the design, engineering and construction of the Acquisition Facilities constructed by Property Owner; provided, however, that Property Owner shall not be required to indemnify any person or entity as to damages resulting from negligence or willful misconduct of such person or entity or their officers, agents or employees.

(c)    Indemnification by CSD.  CSD shall assume the defense of, indemnify and save harmless, the City, the CFD and Property Owner, their respective officers, employees and agents, and each and every one of them, from and against all actions, damages, claims, losses or expenses of every type and description to which they may be subjected or put, by reason of, or resulting from, any act or omission of CSD with respect to this Agreement, and the design, engineering and construction of the CSD Facilities constructed by CSD; provided, however, that CSD shall not be required to indemnify any person or entity as to damages resulting from negligence or willful misconduct of such person or entity or their officers, agents or employees.

9.    Amendment and Assignment.  This Agreement may be amended at any time but only in writing signed by each Party hereto.  This Agreement may be assigned, in whole or in part, by the Property Owner to the purchaser of any parcel of land within the Property, provided, however, such assignment shall not be effective unless and until CSD and the City have been notified, in writing, of such assignment.

10.    Entire Agreement.  This Agreement contains the entire agreement between the Parties with respect to the matters provided for herein and supersedes all prior agreements and negotiations between the Parties with respect to the subject matter of this Agreement.

10

11.    <u>Notices</u>.  Any notice, payment or instrument required or permitted by this Agreement to be given or delivered to either Party shall be deemed to have been received when personally delivered or seventy-two hours following deposit of the same in any United States Post Office in California, registered or certified, postage prepaid, addressed as follows:

City:                        City of Coachella
                             1515 Sixth Street
                             Coachella, California  92236
                             Attention:  City Manager

CSD:                         Coachella Sanitary District
                             1515 Sixth Street
                             Coachella, California  92236
                             Attention:  District Manager

Property Owner:              Glenroy Coachella, LLC
                             1801 South La Cienega Boulevard
                             Los Angeles, California 90035
                             Attention:  Stuart Rubin

Each Party may change its address for delivery of notice by delivering written notice of such change of address to the other Party hereto.

12.    <u>Exhibits</u>.   All exhibits attached hereto are incorporated into this Agreement by reference.

13.    <u>Attorney's Fees</u>.   In the event of the bringing of any action or suit by any Party against any other Party arising out of this Agreement, the Party in whose favor final judgment shall be entered shall be entitled to recover from the losing Party all costs and expenses of suit, including reasonable attorneys' fees.

14.    <u>Severability</u>.  If any part of this Agreement is held to be illegal or unenforceable by court of competent jurisdiction, the remainder of this Agreement shall be given effect to the fullest extent reasonably possible.

15.    <u>Governing Law</u>.   This Agreement and any dispute arising hereunder shall be governed by interpreted in accordance with the laws of the State of California.

16.    <u>Waiver</u>.   Failure by a Party to insist upon the strict performance of any of the provisions of this Agreement by the other Party hereto, or the failure by a Party to exercise its rights upon the default of another Party, shall not constitute a waiver of such Party's right to insist and demand strict compliance by such other Party with the terms of this Agreement thereafter.

17.    <u>No Third Party Beneficiaries</u>.  No person or entity other than the CFD, when and if formed, shall be deemed to be a third party beneficiary hereof, and nothing in this Agreement (either express or implied) is intended to confer upon any person or entity, other than CSD, the City, the CFD and Property Owner (and their respective successors and assigns, exclusive of individual homebuyers), any rights, remedies, obligations or liabilities under or by reason of this Agreement.

18.    <u>Singular and Plural; Gender</u>.  As used herein, the singular of any word includes the plural, and terms in the masculine gender shall include the feminine.

19.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute but one instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**CITY OF COACHELLA**

_____
City Manager

**COACHELLA SANITARY DISTRICT**

_____
District Manager

**GLENROY COACHELLA, LLC, a
Delaware limited liability company**

By: _____
Name: Stuart Rubin
Title:   Manager

S-1

# EXHIBIT A

## DEPICTION OF PROPERTY

Real property in the City of Coachella, County of Riverside, State of California, described as follows:

Lot numbers 1, 2, 3, 4 and 6 of Parcel Map No. 37310 recorded November 9, 2017 as instrument number 2017-0472863.

(Assessor Parcel Numbers: 603-220-061, 603-220-062, 603-220-063, 603-220-064, and 603-220-066)

**EXHIBIT B**

**CSD FACILITIES DESCRIPTION**

<u>CSD Fee Facilities</u>.  The type of CSD Fee Facilities eligible to be financed by the CFD under the Act are as follows:

"CSD Fee Facilities" means sewer facilities and other public facilities of Coachella Sanitary District, including the foregoing public facilities included in the Coachella Sanitary District capacity and connection fee programs.

<u>Acquisition Facilities</u>.  The type of Acquisition Facilities eligible to be financed by the CFD under the Act are as follows:

**CSD ACQUISITION FACILITIES**

| Facility |
|---|
| Phase 2 sanitary sewer system installed under City of Coachella Permit No. 2018-53. |

**COMPLETED FACILITIES**

| Facility | Estimated Purchase Price |
|---|---|
| Phase 1 sanitary sewer system installed under City of Coachella Permit No. 2018-53. | $763,371.84 |

B-1

## EXHIBIT C-1

### DISBURSEMENT REQUEST FORM (FEES)

1.      Community Facilities District No. 2018-1 of the City of Coachella (Glenroy) ("**CFD**") is hereby requested to pay from the CFD bond proceeds to Coachella Sanitary District ("**CSD**"), as Payee, or to CSD's designee, the sum set forth in 3 below.

2.      The undersigned certifies that the amount requested for CSD Fees is due and payable, has not formed the basis of prior request or payment, and is being made with respect to the connection of the property described below to the CSD system.

3.      Amount requested:      $_____

        For Tract:              _____

By requisitioning Bond proceeds as described herein, CSD is not passing upon, determining or assuming the tax-exempt status of the Bonds for federal or California state income tax purposes.

4.      The amount set forth in 3 above is authorized and payable pursuant to the terms of the Joint Community Facilities Agreement, by and among the City of Coachella, CSD and Glenroy Coachella, LLC, dated May __, 2018 (the "**Agreement**").  Capitalized terms not defined herein shall have the meaning set forth in the Agreement.

**GLENROY COACHELLA, LLC, a Delaware limited liability company**

By:      _____
Name:    _____
Title:   _____
Date:    _____

**COACHELLA SANITARY DISTRICT**

By:      _____
Name:    _____
Title:   _____
Date:    _____

C-1

## EXHIBIT C-2

### DISBURSEMENT REQUEST FORM (ACQUISITION FACILITIES)

1.    Community Facilities District No. 2018-1 of the City of Coachella (Glenroy) ("**CFD**") is hereby requested to pay from the CSD Facilities Account of the Improvement Fund established by the CFD in connection with its special tax bonds (the "**Bonds**") to Coachella Sanitary District ("**CSD**"), as Payee, the sum set forth in 3 below.

2.    The undersigned certifies that the amount requested hereunder has been expended or encumbered for costs related to the construction and completion of the CSD Acquisition Facilities. The amount requested is due and payable and has not formed the basis of prior request or payment. In the event that CSD does not disburse any Bond Proceeds received for disbursement to third parties within five banking days of receipt, CSD agrees to trace and report to the CFD all earnings, if any, accruing from the investment of such Bond Proceeds, from the date of receipt by CSD of such amounts to the date of expenditure of such amounts for costs of the CSD Acquisition Facilities.

3.    Amount Requested    $_____
      Attach supporting documentation.

By requisitioning Bond proceeds as described herein, CSD is not passing upon, determining or assuming the tax-exempt status of the Bonds for federal or California state income tax purposes.

4.    The amount set forth in 3 above is authorized and payable pursuant to the terms of the Joint Community Facilities Agreement, by and among the City of Coachella, CSD and Glenroy Coachella, LLC, dated May __, 2018 (the "**Agreement**").  Capitalized terms not defined herein shall have the meaning set forth in the Agreement.

**GLENROY COACHELLA, LLC, a Delaware limited liability company**

By:    _____
Name:  _____
Title: _____
Date:  _____

**COACHELLA SANITARY DISTRICT**

By:    _____
Name:  _____
Title: _____
Date:  _____



**AMENDED PROPOSED BOUNDARY MAP**

SHEET 1 OF 1 SHEET

**COMMUNITY FACILITIES DISTRICT NO. 2018-1
(GLENROY)
CITY OF COACHELLA,
COUNTY OF RIVERSIDE, STATE OF CALIFORNIA**

THIS AMENDED BOUNDARY MAP AMENDS THE BOUNDARY MAP FOR COMMUNITY FACILITIES DISTRICT NO. 2018-1 OF THE CITY OF COACHELLA (GLENROY), CITY OF COACHELLA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, PRIOR RECORDED AT BOOK NO. 82 OF MAPS OF ASSESSMENT AND COMMUNITY FACILITIES DISTRICT AT PAGE 7, IN THE OFFICE OF THE COUNTY RECORDER, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA.

FILED IN THE OFFICE OF THE CITY CLERK, CITY OF COACHELLA, THIS 11th DAY OF APRIL, 20 18 .

_____
CITY CLERK, CITY OF COACHELLA

I HEREBY CERTIFY THAT THE WITHIN MAP SHOWING PROPOSED BOUNDARIES OF COMMUNITY FACILITIES DISTRICT NO. 2018-1 (GLENROY), CITY OF COACHELLA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, WAS APPROVED BY THE CITY COUNCIL OF THE CITY OF COACHELLA AT A REGULAR SCHEDULED MEETING THEREOF, HELD ON 11TH DAY OF APRIL, 20 18 .

BY RESOLUTION NO. 2018-25

_____
CITY CLERK, CITY OF COACHELLA

FILED THIS 25th DAY OF April , 20 18 AT THE HOUR OF 10:53 O'CLOCK A M IN BOOK 82 OF MAPS OF ASSESSMENT AND COMMUNITY FACILITIES DISTRICTS PAGE 38 AS INSTRUMENT NO. 2018-0158456 IN THE OFFICE OF THE COUNTY RECORDER, IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA.    FEE: 89.00

BY: _____
PETER ALDANA, ASSESSOR, COUNTY CLERK, RECORDER

THIS BOUNDARY MAP CORRECTLY SHOWS THE BOUNDARIES OF THE COMMUNITY FACILITIES DISTRICT. FOR DETAILS CONCERNING THE LINES AND DIMENSIONS OF LOTS OR PARCEL REFER TO THE COUNTY ASSESSOR'S MAPS FOR FISCAL YEAR 2017-18.

SPICER CONSULTING GROUP

**LEGEND**

CFD BOUNDARY

ZONE BOUNDARY

PARCEL LINE

XXX-XXX-XXX    ASSESSOR PARCEL NUMBER

①    ZONE

Recording Requested By and
When Recorded Mail To:

Stradling, Yocca, Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, California 92660
Attn: Brian P. Forbath, Esq.



**2018-0225621**
06/04/2018 01:04 PM Fee: $ 69.00
Page 1 of 16
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

675

This document is exempt from the
payment of a recording fee pursuant to
Government Code Section 6103.

NOTICE OF SPECIAL TAX LIEN
FOR COMMUNITY FACILITIES DISTRICT NO. 2018-1
OF THE CITY OF COACHELLA (GLENROY)

    Pursuant to the requirements of Section 3114.5 of the Streets and Highways Code and Section 53328.3 of the Government Code, the undersigned City Clerk of the City of Coachella (the "City"), acting on behalf of Community Facilities District No. 2018-1 of the City of Coachella (Glenroy) (the "District"), State of California, hereby gives notice that a lien to secure payment of special taxes is hereby imposed by the City Council of the City of Coachella, Riverside County, State of California, sitting as the legislative body of the District (the "City Council"). The Special Tax for Facilities (as defined in Appendix A hereto) secured by this lien is authorized to be levied for the purpose of: (a) paying for the cost of the construction, purchase, modification, expansion, rehabilitation and/or improvement of (1) storm drainage, sewer facilities, roadway, landscaping and other public facilities of the City, including the foregoing public facilities which are included in the City's fee programs with respect to such facilities and authorized to be financed under the Mello-Roos Community Facilities Act of 1982, as amended (the "City Facilities"); (2) sewer facilities and other public facilities of Coachella Sanitary District, including the foregoing public facilities included in the Coachella Sanitary District capacity and connection fee programs (the "Sanitary District Facilities"); and (3) water facilities, including the acquisition of capacity in the water system of the Imperial Irrigation District which are included in Imperial Irrigation District's water capacity and connection fee programs, and electric transmission and distribution facilities of the Imperial Irrigation District (the "Irrigation District Facilities" and together, with the City Facilities and the Sanitary District Facilities, the "Facilities"), and to finance the incidental expenses (the "Incidental Expenses") to be incurred, including: (b) (1) the cost of engineering, planning and designing the Facilities; (2) all costs, including costs of the property owner petitioning to form the District, associated with the creation of the District, the issuance of the bonds, the determination of the amount of special taxes to be levied and costs otherwise incurred in order to carry out the authorized purposes of the District; and (3) any other expenses incidental to the construction, acquisition, modification, rehabilitation, completion and inspection of the Facilities; and (c) paying for the principal and interest and other periodic costs on the bonds to be issued to finance the Facilities and Incidental Expenses.

    The Special Tax for Services (as defined in Appendix A hereto) secured by this lien is authorized to be levied for the purpose of paying for costs attributable to (i) maintenance and lighting of parks, parkways, streets, roads and open space, (ii) maintenance and operation of water quality

1

improvements, (iii) public street sweeping, (iv) fund an operating reserve for the costs of such services, and (v) Administrative Expenses (as defined in Appendix A hereto).

The special taxes described herein are authorized to be levied within the District, which has now been officially formed and the lien is a continuing lien which shall secure each annual levy of such special taxes and which shall continue in force and effect until the special tax obligations are prepaid, permanently satisfied, and canceled in accordance with law or until the special taxes cease to be levied and a notice of cessation of special tax is recorded in accordance with Section 53330.5 of the Government Code.

The rate, method of apportionment and manner of collection of the authorized special taxes is as set forth in Appendix A attached hereto and incorporated herein by this reference.  The Special Tax for Services may not be prepaid in whole or in part.  Conditions under which the obligation to pay the Special Tax for Facilities may be prepaid and permanently satisfied and the lien of the Special Tax for Facilities cancelled are as follows:

Parcels within the District may prepay the obligation with respect to the Special Tax for Facilities in whole or in part as set forth in Section E and Section F of Appendix A attached hereto.

Notice is further given that upon the recording of this notice in the office of the County Recorder, the obligation to pay the levy of the special taxes described herein shall become a lien upon all nonexempt real property within the District in accordance with Section 3115.5 of the Streets and Highway Code.

The names of the owners and the assessor's tax parcel numbers of the real property included within the District and not exempt from the special taxes are as set forth in Appendix B attached hereto and incorporated herein by this reference.

Reference is made to the boundary map of the District recorded at Book No. 82 of Maps of Assessment and Community Facilities Districts at Page No. 38, in the office of the County Recorder for the County of Riverside, State of California, which map is now the final boundary map of the District.

For further information concerning the current and estimated future tax liability of owners or purchasers of real property subject to this special tax lien, interested persons should contact the City Manager, City of Coachella, 1515 Sixth Street, Coachella, California 92236, (760) 398-3502.

Andrea J. Carranza, Deputy City Clerk of the City of Coachella, acting on behalf of Community Facilities District No. 2018-1 of the City of Coachella (Glenroy)

APPENDIX A

## RATE AND METHOD OF APPORTIONMENT OF SPECIAL TAX FOR COMMUNITY FACILITIES DISTRICT NO. 2018-1 (GLENROY) OF THE CITY OF COACHELLA

The following sets forth the Rate and Method of Apportionment for the levy and collection of Special Tax of the City of Coachella Community Facilities District No. 2018-1 (Glenroy) ("CFD No. 2018-1"). The Special Tax shall be levied on and collected each Fiscal Year, in an amount determined through the application of the Rate and Method of Apportionment described below. All of the real property within CFD No. 2018-1 unless exempted by law or by the provisions hereof, shall be taxed for the purposes, to the extent, and in the manner herein provided.

## A. DEFINITIONS

**"Acre or Acreage"** means the land area of an Assessor's Parcel as shown on an Assessor's Parcel Map, or if the land area is not shown on an Assessor's Parcel Map, the land area shown on the applicable Final Map, parcel map, condominium plan, or other recorded County parcel map or similar instrument. The square footage of an Assessor's Parcel is equal to the Acreage multiplied by 43,560.

**"Act"** means the Mello-Roos Community Facilities Act of 1982, being Chapter 2.5, Part 1, Division 2 of Title 5 of the California Government Code.

**"Administrative Expenses"** means the actual or reasonably estimated costs directly related to the administration of CFD No. 2018-1 including, but not limited to: the costs of computing the Special Tax and preparing the annual Special Tax collection schedules (whether by the City or designee thereof or both); the costs to the City, CFD No. 2018-1, or any designee thereof associated with fulfilling the CFD No. 2018-1 disclosure requirements; the costs associated with responding to public inquiries regarding the Special Tax; the costs of the City, CFD No. 2018-1 or any designee thereof related to an appeal of the Special Tax; and the City's annual administration fees including payment of a proportional share of salaries and benefits of any City employees and City overhead whose duties are related to the administration and third party expenses. Administrative Expenses shall also include amounts estimated or advanced by the City or CFD No. 2018-1 for any other administrative purposes of CFD No. 2018-1, including attorney's fees and other costs related to commencing and pursuing to completion any foreclosure of delinquent Special Tax.

**"Assessor's Parcel"** means a lot or parcel shown on an Assessor's Parcel Map with an assigned Assessor's Parcel Number valid at the time the Special Tax for Facilities is enrolled for the Fiscal Year for which the Special Tax is being levied.

**"Assessor's Parcel Map"** means an official map of the Assessor of the County designating parcels by Assessor's Parcel Number.

**"Assessor's Parcel Number"** means that number assigned to an Assessor's Parcel by the County for purposes of identification.

**"Bonds"** means any obligation to repay a sum of money, including obligations in the form of bonds, notes, certificates of participation, long-term leases, loans from government agencies, or loans from banks, other financial institutions, private businesses, or individuals, or long-term contracts, or any refunding thereof, to which Special Tax for Facilities within CFD No. 2018-1 have been pledged.

**"Calendar Year"** means the period commencing January 1 of any year and ending the following December 31.

**"CFD" or "CFD No. 2018-1"** means Community Facilities District No. 2018-1 (Glenroy) established by the City under the Act.

**"CFD Administrator"** means an official of the City, or designee thereof, responsible for (i) determining the Special Tax for Facilities Requirement, (ii) determining the Special Tax for Services Requirement, and (iii) providing for the levy and collection of the Special Taxes.

**"City"** means the City of Coachella.

**"City Council"** means the City Council of the City of Coachella, acting as the Legislative Body of CFD No. 2018-1, or its designee.

**"County"** means the County of Riverside.

**"Developed Property"** means Assessor's Parcels for which a final certificate of occupancy has been issued for any building on that Assessor's Parcels by the City.

**"Exempt Property"** means all Assessor's Parcels designated as being exempt from Special Tax for Facilities and/or Special Tax for Services pursuant to Section H, below.

**"Fiscal Year"** means the period commencing on July 1 of any year and ending the following June 30.

**"Indenture"** means the indenture, fiscal agent agreement, resolution or other instrument pursuant to which Bonds are issued, as modified, amended and/or supplemented from time to time, and any instrument replacing or supplementing the same.

**"Maximum Special Tax for Facilities"** means for each Assessor's Parcel, the Maximum Special Tax for Facilities, determined in accordance with Section C, that can be levied by CFD No. 2018-1 in any Fiscal Year on such Assessor's Parcel.

**"Maximum Special Tax for Services"** means for each Assessor's Parcel, the Maximum Special Tax for Services, as determined in accordance with Section K below that can be levied in any Fiscal Year on such Assessor's Parcel.

**"Operating Fund"** means a fund that shall be maintained for any Fiscal Year to pay for the actual costs of maintenance related to the Services, and the applicable Administrative Expenses.

**"Operating Fund Balance"** means the amount of funds in the Operating Fund at the end of the preceding Fiscal Year.

**"Outstanding Bonds"** means all Bonds which are then outstanding under the Indenture.

**"Proportionately"** means (i) with respect to the levy of the Special Tax for Facilities, that the ratio of the actual Special Tax for Facilities levy to the applicable Maximum Special Tax for Facilities is equal for all applicable Assessor's Parcels and (ii) with respect to the levy of the Special Tax for Services, that the ratio of the actual Special Tax for Services levy to the applicable Maximum Special Tax for Services is equal for all applicable Assessor's Parcels.

A-2

**"Services"** means services permitted under the Mello-Roos Community Facilities Act of 1982 including, without limitation, those services authorized to be funded by CFD No. 2018-1 as set forth in Appendix A and the documents adopted by the City Council at the time the CFD was formed.

**"Special Tax(es)"** means the Special Tax for Facilities and/or the Special Tax for Services.

**"Special Tax for Facilities"** means the Special Tax for Facilities to be levied in each Fiscal Year on each Assessor's Parcel of Taxable Property to fund the Special Tax for Facilities Requirement.

**"Special Tax for Facilities Requirement"** means that amount required in any Fiscal Year for CFD No. 2018-1 to: (i) pay debt service on all Outstanding Bonds due in the calendar year commencing in such Fiscal Year; (ii) pay periodic costs on the CFD No. 2018-1 Bonds, including but not limited to, credit enhancement and rebate payments on the CFD No. 2018-1 Bonds due in the calendar year commencing in such Fiscal Year; (iii) pay a proportionate share of Administrative Expenses; (iv) pay any amounts required to establish or replenish any reserve funds for all Outstanding Bonds; (v) pay for reasonably anticipated Special Tax for Facilities delinquencies to the extent not already included in a prior year's levy; (vi) pay directly for acquisition or construction of CFD Public Facilities to the extent that the inclusion of such amount does not increase the Special Tax for Facilities levy on Undeveloped Property; less (vii) a credit for funds available to reduce the annual Special Tax for Facilities levy, as determined by the CFD Administrator pursuant to the Indenture.

**"Special Tax for Services"** means any of the Special Tax for Services authorized to be levied within CFD No. 2018-1 pursuant to the Act to fund the Special Tax for Services Requirement.

**"Special Tax for Services Requirement"** means that amount to be collected in any Fiscal Year to pay for the estimated costs of Services as required to meet the needs of CFD No. 2018-1 in the next Fiscal Year. The costs to be covered shall be the direct costs to fund (i) the Services, (ii) fund an operating reserve for the costs of such Services as determined by the CFD Administrator, and (iii) a proportionate share of Administrative Expenses. Under no circumstances shall the Special Tax for Services Requirement include funds for Bonds.

**"Taxable Property"** means all Assessor's Parcels within the boundaries of CFD No. 2018-1, which are not Exempt Property.

**"Trustee"** means the trustee, fiscal agent, or paying agent under the Indenture.

**"Undeveloped Property"** means Assessor's Parcels of Taxable Property not classified as Developed Property.

**"Zone"** means a separate geographic area within Zone 1, Zone 2, or Zone 3 as applicable within CFD No. 2018-1 depicted on the Amended Proposed Boundary Map for CFD No. 2018-1 on Appendix B attached hereto.

**"Zone 1"** means the separate geographic area identified as Zone 1 on Appendix B attached hereto.

**"Zone 2"** means the separate geographic area identified as Zone 2 on Appendix B attached hereto.

**"Zone 3"** means the separate geographic area identified as Zone 3 on Appendix B attached hereto.

**B. IDENTIFYING TAXABLE PROPERTY**

Each Fiscal Year, beginning with Fiscal Year 2018-19, each Assessor's Parcel within CFD No. 2018-1 shall be classified as Taxable Property or Exempt Property. In addition, each Assessor's Parcel of Taxable Property shall be further classified as Developed Property or Undeveloped Property and as being within Zone 1, Zone 2, or Zone 3. If an Assessor's Parcel of Taxable Property is located within more than one Zone, it shall be deemed to be entirely within the Zone in which the largest portion of its Acreage is located. Taxable Property shall be subject to Special Taxes for Facilities in accordance with Section C and D below.

**C. MAXIMUM SPECIAL TAX FOR FACILITIES**

The Maximum Special Tax for Facilities for each Assessor's Parcel of Taxable Property in any Fiscal Year shall be determined pursuant to Table 1 below:

**Table 1**
**Maximum Special Tax for Facilities Rates**
**For Taxable Property**

| Zone | Parcel Map No. - Lot | Rate |
|------|---------------------|------|
| 1 | 37310 – 3, 6 | $18,000 per Acre |
| 2 | 37310 – 1, 2 | $7,650 per Acre |
| 3 | 37310 – 4 | $3,620 per Acre |

**D. METHOD OF APPORTIONMENT OF THE SPECIAL TAX FOR FACILITIES**

Commencing with Fiscal Year 2018-19 and for each following Fiscal Year, the City Council shall determine the Special Tax for Facilities Requirement and shall levy the Special Tax for Facilities in the following priority until the amount of Special Tax for Facilities levied equals the Special Tax Requirement for Facilities.

**First:** The Special Tax for Facilities shall be levied on Proportionately on each Assessor's Parcel within Zone 1 and each Assessor's Parcel of Developed Property within Zone 2 or Zone 3 at up to 100% of the Maximum Special Tax for Facilities;

**Second:** If additional monies are needed to satisfy the Special Tax for Facilities Requirement after the first step has been completed, the Special Tax for Facilities shall be levied Proportionately on each Assessor's Parcel of Undeveloped Property within Zone 2 and Zone 3 at up to 100% of the Maximum Special Tax for Facilities for such Assessor's Parcels;

## E.  PREPAYMENT OF SPECIAL TAX FOR FACILITIES

The following additional definitions apply to this Section E:

**"CFD Public Facilities"** means $7,000,000 expressed in 2018 dollars, which shall increase by the Construction Inflation Index on July 1, 2019, and on each July 1 thereafter, or such lower amount (i) determined by the City Council as sufficient to provide the public facilities under the authorized bonding program, or (ii) determined by the City Council concurrently with a covenant that it will not issue any more Bonds to be supported by Special Tax for Facilities levied under this Rate and Method of Apportionment.

**"Construction Fund"** means an account specifically identified in the Indenture or functionally equivalent to hold funds, which are currently available for expenditure to acquire or construct public facilities eligible under CFD No. 2018-1.

**"Construction Inflation Index"** means the annual percentage change in the Engineering News-Record Building Cost Index for the city of Los Angeles, measured as of the calendar year which ends in the previous Fiscal Year.  In the event this index ceases to be published, the Construction Inflation Index shall be another index as determined by the City that is reasonably comparable to the Engineering News-Record Building Cost Index for the city of Los Angeles.

**"Future Facilities Costs"** means the CFD Public Facilities minus public facility costs available to be funded through existing construction or escrow accounts or funded by the Outstanding Bonds, and minus public facility costs funded by interest earnings on the Construction Fund actually earned prior to the date of prepayment.

**"Outstanding Bonds"** means all previously issued Bonds issued and secured by the levy of Special Tax for Facilities which will remain outstanding after the first interest and/or principal payment date following the current Fiscal Year, excluding Bonds to be redeemed at a later date with the proceeds of prior prepayments of Special Tax for Facilities.

The Special Tax for Facilities applicable to any Assessor's Parcel of Taxable Property may be prepaid.  The Special Tax for Facilities obligation applicable to the Assessor's Parcel in CFD No. 2018-1 may be fully prepaid and the obligation to pay the Special Tax for Facilities for such Assessor's Parcel permanently satisfied as described herein.  An owner of an Assessor's Parcel intending to prepay the Special Tax for Facilities obligation shall provide the CFD Administrator with written notice of intent to prepay.  Within 30 days of receipt of such notice, the CFD Administrator shall notify such owner of the Prepayment Amount of such Assessor's Parcel.  The CFD Administrator may charge a reasonable fee for providing this service.  Prepayment must be made not less than 45 days prior to the next occurring date that notice of redemption of Bonds from the proceeds of such prepayment may be given by the Trustee pursuant to the Indenture.

The Prepayment Amount for each applicable Assessor's Parcel shall be calculated according to the following formula (capitalized terms defined below):

A-5

|         | Bond Redemption Amount      |
|---------|-----------------------------|
| plus    | Redemption Premium          |
| plus    | Future Facilities Amount     |
| plus    | Defeasance Cost             |
| plus    | Administrative Fee          |
| less    | Reserve Fund Credit         |
| <u>less</u> | <u>Capitalized Interest Credit</u> |
| equals  | Prepayment Amount           |

As of the date of prepayment, the Prepayment Amount shall be calculated as follows:

1.   For an Assessor's Parcel of Taxable Property for which the Special Tax for Facilities is intended to be prepaid, compute the Maximum Special Tax for Facilities for that Assessor's Parcel.

2.   Divide the Maximum Special Tax for Facilities computed pursuant to paragraph 1 for such Assessor's Parcel by the sum of the estimated Maximum Special Tax for Facilities applicable to all Assessor's Parcels of Taxable Property in CFD No. 2018-1, excluding any Assessor's Parcels which have prepaid their Special Tax for Facilities in full.

3.   Multiply the quotient computed pursuant to paragraph 2 by the Outstanding Bonds. The product shall be the "Bond Redemption Amount".

4.   Multiply the Bond Redemption Amount by the applicable redemption premium, if any, on the Outstanding Bonds to be redeemed with the proceeds of the Bond Redemption Amount. This product is the "Redemption Premium."

5.   Compute the Future Facilities Cost.

6.   Multiply the quotient computed pursuant to paragraph 2 by the amount determined pursuant to paragraph 5 to determine the Future Facilities Cost to be prepaid (the "Future Facilities Amount").
7.   Compute the amount needed to pay interest on the Bond Redemption Amount to be redeemed with the proceeds of the Prepayment Amount until the earliest redemption date for the Outstanding Bonds.

8.   Determine the actual Special Tax for Facilities levied on the Assessor's Parcel in the current Fiscal Year which has not yet been paid.

9.   Estimate the amount of interest earnings to be derived from the reinvestment of the Bond Redemption Amount plus the Redemption Premium until the earliest redemption date for the Outstanding Bonds.

10. Add the amounts computed pursuant to paragraph 7 and 8 and subtract the amount computed pursuant to paragraph 9. This difference is the "Defeasance Cost."

11. Estimate the administrative fees and expenses associated with the prepayment, including the costs of computation of the Prepayment Amount, the costs of redeeming Bonds, and the costs of recording any notices to evidence the prepayment and the redemption. This amount is the "Administrative Fee."

12. Calculate the "Reserve Fund Credit" as the lesser of: (a) the expected reduction in the applicable reserve requirements, if any, associated with the redemption of Outstanding Bonds as a result of the prepayment, or (b) the amount derived by subtracting the new reserve requirements in effect after the redemption of Outstanding Bonds as a result of the prepayment from the balance in the applicable

reserve funds on the prepayment date. Notwithstanding the foregoing, if the reserve fund requirement is satisfied by a surety bond or other instrument at the time of the prepayment, then no Reserve Fund Credit shall be given. Notwithstanding the foregoing, the Reserve Fund Credit shall in no event be less than 0.

13. If any capitalized interest for the Outstanding Bonds will not have been expended as of the date immediately following the first interest and/or principal payment following the current Fiscal Year, a capitalized interest credit shall be calculated by multiplying the quotient computed pursuant to paragraph 2 by the expected balance in the capitalized interest fund or account under the Indenture after such first interest and/or principal payment. This amount is the "Capitalized Interest Credit."

14. The Prepayment Amount is equal to the sum of the Bond Redemption Amount, the Redemption Premium, the Future Facilities Amount, the Defeasance Cost, and the Administrative Fee, less the Reserve Fund Credit and the Capitalized Interest Credit.

15. From the Prepayment Amount, the amounts computed pursuant to paragraphs 3, 4, 10, 12, and 13 shall be deposited into the appropriate fund as established under the Indenture and used to retire Outstanding Bonds or make debt service payments. The amount computed pursuant to paragraph 6 shall be deposited into the Construction Fund. The amount computed pursuant to paragraph 11 shall be retained by CFD 2018-1.

The Special Tax for Facilities prepayment amount may be insufficient to redeem a full $5,000 increment of Bonds. In such cases, the increment above $5,000 or integral multiple thereof will be retained in the appropriate fund established under the Indenture to be used with the next prepayment of Bonds or to make debt service payments.

With respect to a Special Tax for Facilities obligation that is prepaid pursuant to this Section E, the City Council shall indicate in the records of CFD No. 2018-1 that there has been a prepayment of the Special Tax for Facilities obligation and shall cause a suitable notice to be recorded in compliance with the Act within thirty (30) days of receipt of such prepayment to indicate the prepayment of the Special Tax for Facilities obligation and the release of the Special Tax for Facilities lien on such Assessor's Parcel and the obligation to pay such Special Tax for Facilities of such Assessor's Parcel shall cease.

Notwithstanding the foregoing, no prepayment will be allowed unless the amount of Special Tax for Facilities that may be levied on Taxable Property after such prepayment, net of Administrative Expenses, shall be at least 1.1 times the regularly scheduled annual interest and principal payments on all Outstanding Bonds in each future Fiscal Year.

## F.  PARTIAL PREPAYMENT OF SPECIAL TAX FOR FACILITIES

The Maximum Special Tax for Facilities obligation of an Assessor's Parcel of Taxable Property may be partially prepaid, provided that there are no delinquent Special Tax for Facilities, penalties, or interest charges outstanding with respect to such Assessor's Parcel at the time the Special Tax for Facilities obligation would be prepaid.

The Partial Prepayment Amount shall be calculated according to the following formula:

$$PP = (PG - A) \times F + A$$

The terms above have the following meanings:

A-7

PP =       the Partial Prepayment Amount.
PG =      the Prepayment Amount calculated according to Section E.
F =        the percent by which the owner of the Assessor's Parcel is partially prepaying the Special Tax for Facilities obligation.
A =        the Administration Fee calculated according to Section E.

The owner of any Assessor's Parcel who desires such prepayment shall notify the CFD Administrator of such owner's intent to partially prepay the Special Tax for Facilities and the percentage by which the Special Tax for Facilities shall be prepaid. The CFD Administrator shall provide the owner with a statement of the amount required for the partial prepayment of the Special Tax for Facilities for an Assessor's Parcel within 30 days of the request and may charge a reasonable fee for providing this service. With respect to any Assessor's Parcel that is partially prepaid, the City Council shall (i) distribute the funds remitted to it according to Section E, and (ii) shall indicate in the records of CFD No. 2018-1 that there has been a partial prepayment of the Special Tax for Facilities obligation and shall cause a suitable notice to be recorded in compliance with the Act within thirty (30) days of receipt of such partial prepayment of the Special Tax for Facilities obligation to indicate the partial prepayment of the Special Tax for Facilities obligation and the partial release of the Special Tax for Facilities lien on such Assessor's Parcel, and the obligation of such Assessor's Parcel to pay such prepaid portion of the Special Tax for Facilities shall cease.

Notwithstanding the foregoing, no partial prepayment will be allowed unless the amount of Special Tax for Facilities that may be levied on Taxable Property after such partial prepayment, net of Administrative Expenses, shall be at least 1.1 times the regularly scheduled annual interest and principal payments on all Outstanding Bonds in each future Fiscal Year.

## G. TERMINATION OF SPECIAL TAX FOR FACILITIES

The Special Tax for Facilities shall cease not later than the 2058-2059 Fiscal Year, however, the Special Tax for Facilities will cease to be levied in an earlier Fiscal Year if the CFD Administrator has determined (i) that all required interest and principal payments on Bonds for which the Special Tax for Facilities has been pledged have been paid; (ii) all authorized facilities for CFD No. 2018-1 have been acquired, (iii) no delinquent Special Tax for Facilities remain uncollected and (iv) all other obligations of CFD No. 2018-1 have been satisfied.

## H. EXEMPTIONS

The City shall classify as Exempt Property within the applicable Zone, in order of priority, (i) Assessor's Parcels which are owned by, irrevocably offered for dedication, encumbered by or restricted in use by the State of California, Federal or other local governments, including school districts, (ii) Assessor's Parcels which are used as places of worship and are exempt from *ad valorem* property taxes because they are owned by a religious organization, (iii) Assessor's Parcels which are owned by, irrevocably offered for dedication, encumbered by or restricted in use by a property owners' association, (iv) Assessor's Parcels with public or utility easements making impractical their utilization for other than the purposes set forth in the easement, or (v) Assessor's Parcels restricted to other types of public uses determined by the City Council, provided for purposes of levying the Special Tax for Facilities only that no such classification would reduce the sum of all Taxable Property within the applicable Zone to less than the following Acres described in Table 2:

A-8

**Table 2**
**Minimum Taxable Acres**

| Zone | Acres |
|------|-------|
| 1 | 21.29 |
| 2 | 10.10 |
| 3 | 1.80 |

Notwithstanding the above, the City Council for the purpose of levying the Special Tax for Facilities shall not classify an Assessor's Parcel as Exempt Property if such classification would reduce the sum of all Taxable Property within the applicable Zone to less than the acreage amounts described in Table 2. Assessor's Parcels which cannot be classified as Exempt Property because such classification would reduce the Acreage of all Taxable Property within the applicable Zone to less than the acreage amounts described in Table 2 will be classified as Taxable Property, and will be subject to Special Tax for Facilities pursuant to Section D.

**I.    MANNER OF COLLECTION OF SPECIAL TAX FOR FACILITIES**

The Special Tax for Facilities shall be collected in the same manner and at the same time as ordinary ad valorem property taxes, provided, however, that CFD No. 2018-1 may collect Special Tax for Facilities at a different time or in a different manner if necessary to meet its financial obligations, and may covenant to foreclose and may actually foreclose on delinquent Assessor's Parcels as permitted by the Act.

**J.    APPEALS RELATING TO SPECIAL TAX FOR FACILITIES**

Any property owner claiming that the amount or application of the Special Tax for Facilities is not correct may file a written notice of appeal with the CFD Administrator not later than twelve months after having paid the first installment of the Special Tax for Facilities that is disputed. The CFD Administrator shall promptly review the appeal, and if necessary, meet with the property owner, consider written and oral evidence regarding the amount of the Special Tax for Facilities, and rule on the appeal. If the CFD Administrator's decision requires that the Special Tax for Facilities for an Assessor's Parcel be modified or changed in favor of the property owner, a cash refund shall not be made (except for the last year of levy), but an adjustment shall be made to the Special Tax for Facilities on that Assessor's Parcel in the subsequent Fiscal Year(s).

The City Council may interpret this Rate and Method of Apportionment for purposes of clarifying any ambiguity and make determinations relative to the annual administration and levy of the Special Tax for Facilities and any landowner or resident's appeals. Any decision of the City Council shall be final and binding as to all persons.

**K.    SPECIAL TAX FOR SERVICES**

Commencing with Fiscal Year 2018-19 and for each following Fiscal Year, the City Council shall determine the Special Tax for Services Requirement and shall levy the Special Tax for Services on all Assessor's Parcels of Taxable Property until the aggregate amount of Special Tax for Services equals the Special Tax for Services Requirement. The Special Tax for Services shall be levied Proportionately on all Assessor's Parcels of Taxable Property up to 100% of the applicable Maximum Special Tax for Services to satisfy the Special Tax for Services Requirement;

The Maximum Special Tax for Services for each Assessor's Parcel of Taxable Property for Fiscal Year 2018-19 is $1,300.00 per Acre.

A-9

On each July 1, commencing on July 1, 2019 the Maximum Special Tax for Services for Taxable Property shall increase by i) the percentage increase in the Consumer Price Index (All Items) for Los Angeles - Riverside - Orange County (1982-84 = 100) since the beginning of the preceding Fiscal Year, or ii) by two percent (2.0%), whichever is greater.

### L.  DURATION OF SPECIAL TAX FOR SERVICES

The Special Tax for Services shall be levied in perpetuity to fund the Special Tax for Services Requirement, unless the Services are no longer being funded by CFD No. 2018-1 as determined at the sole discretion of the City Council.

### M.  MANNER OF COLLECTION

The Special Tax for Services shall be collected in the same manner and at the same time as ordinary ad valorem property taxes, provided, however, that CFD No. 2018-1 may collect the Special Tax for Services at a different time or in a different manner if necessary to meet its funding requirements.

### N.  APPEALS RELATING TO SPECIAL TAXES FOR SERVICES

Any property owner claiming that the amount or application of the Special Tax for Services is not correct may file a written notice of appeal with the CFD Administrator not later than twelve months after having paid the first installment of the Special Tax for Services that is disputed.  The CFD Administrator shall promptly review the appeal, and if necessary, meet with the property owner, consider written and oral evidence regarding the amount of the Special Tax, and rule on the appeal.  If the CFD Administrator's decision requires that the Special Tax for Services for an Assessor's Parcel be modified or changed in favor of the property owner, a cash refund shall not be made (except for the last year of levy), but an adjustment shall be made to the Special Tax for Services on that Assessor's Parcel in the subsequent Fiscal Year(s).

The City Council may interpret this A Rate and Method of Apportionment for purposes of clarifying any ambiguity and make determinations relative to the annual administration of the Special Tax for Services and any landowner or residents appeals.  Any decision of the City Council shall be final and binding as to all persons.

A-10

## APPENDIX A

### CITY OF COACHELLA
### COMMUNITY FACILITIES DISTRICT NO. 2018-1 (GLENROY)
### DESCRIPTION OF AUTHORIZED SERVICES

The services which may be funded with proceeds of the Special Tax for Services of CFD No. 2018-1, as provided by Section 53313 of the Act, will include all costs attributable to maintaining, servicing, cleaning, repairing and/or replacing landscaped areas (may include reserves for replacement) in public street right-of-ways, public landscaping, public open spaces and other similar landscaped areas officially dedicated for public use. These services including the following:

(a)    maintenance and lighting of parks, parkways, streets, roads and open space, which maintenance and lighting services may include, without limitation, furnishing of electrical power to street lights; repair and replacement of damaged or inoperative light bulbs, fixtures and standards; maintenance (including irrigation and replacement) of landscaping vegetation situated on or adjacent to parks, parkways, streets, roads and open space; maintenance and repair of irrigation facilities; maintenance of public signage; graffiti removal from and maintenance and repair of public structures situated on parks, parkways, streets, roads and open space; maintenance and repair of playground or recreation program equipment or facilities situated on any park; and

(b)    maintenance and operation of water quality improvements which include storm drainage and flood protection facilities, including, without limitation, drainage inlets, catch basin inserts, infiltration basins, flood control channels, fossil fuel filters, and similar facilities. Maintenance services may include but is not limited to the repair, removal or replacement of all or part of any of the water quality improvements, fossil fuel filters within the public right-of-way including the removal of petroleum hydrocarbons and other pollutants from water runoff, or appurtenant facilities, clearing of inlets and outlets; erosion repairs; and cleanup to improvements, and other items necessary for the maintenance, servicing; or both of the water quality basin improvements within flood control channel improvements; and

(c)    public street sweeping, on the segments of the arterials within the boundaries of CFD No. 2018-1; and any portions adjacent to the properties within CFD No. 2018-1; and

In addition to payment of the cost and expense of the forgoing services, proceeds of the special tax may be expended to pay "Administrative Expenses," as said term is defined in the Rate and Method of Apportionment.

A-11



APPENDIX B

CITY OF COACHELLA
COMMUNITY FACILITIES DISTRICT NO. 2018-1 (GLENROY)
AMENDED PROPOSED BOUNDARY MAP

A-12

## APPENDIX B

### NAME OF OWNERS AND ASSESSOR'S PARCEL NUMBERS

| *Landowner* | *Assessor's Parcel Number* |
|---|---|
| Glenroy Coachella, LLC, a Delaware limited liability company | |
| Force Rubin, LLC, a Delaware limited liability company | |
| Force Rubin 2, LLC, a Delaware limited liability company | |
| Coachella Resort, LLC, a California limited liability company | 603-220-061 |
| | |
| Glenroy Coachella, LLC, a Delaware limited liability company | |
| Force Rubin, LLC, a Delaware limited liability company | |
| Force Rubin 2, LLC, a Delaware limited liability company | |
| Coachella Resort, LLC, a California limited liability company | 603-220-062 |
| | |
| Desert Medical Properties, a California corporation | 603-220-063 |
| | |
| Glenroy Coachella, LLC, a Delaware limited liability company | |
| Force Rubin, LLC, a Delaware limited liability company | |
| Force Rubin 2, LLC, a Delaware limited liability company | |
| Coachella Resort, LLC, a California limited liability company | 603-220-064 |
| | |
| Glenroy Coachella, LLC, a Delaware limited liability company | |
| Force Rubin, LLC, a Delaware limited liability company | |
| Force Rubin 2, LLC, a Delaware limited liability company | |
| Coachella Resort, LLC, a California limited liability company | 603-220-066 |

B-1

## VERIFICATION

### UNITED STATES BANKRUPTCY COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

I, JOSEPH RUBIN, declare as follows.

I am the managing member of **QUONSET PARTNERS LLC**, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

I have read the foregoing **VERIFIED COMPLAINT FOR: (1) QUIET TITLE TO REAL PROPERTY; (2) RESULTING TRUST; (3) DECLARATORY RELIEF; AND 4) VIOLATION OF 42 U.S.C. § 1983** and know its contents. The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on September 29, 2021, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

       _/s/ Joseph Rubin_____

JOSEPH RUBIN